Petition for Injunction Exhibit Index

# EXHIBIT R – Hearing Transcript and Exhibits in Case 18-CA-151245

## Part 1 of 2

| Document Description | Date | Bates Number in PDF |
|---|---|---|
| Transcript, Volume 1 of 3 | December 15, 2015 | P 00193 |
| Transcript, Volume 2 of 3 | December 16, 2015 | P 00438 |
| Transcript, Volume 3 of 3 | December 17, 2015 | P 00640 |
| General Counsel Exhibits, Volume 1 of 4 | December 15-17, 2015 | P 00890 |
| General Counsel Exhibits, Volume 2 of 4 | December 15-17, 2015 | P 01167 |
| General Counsel Exhibits, Volume 3 of 4 | December 15-17, 2015 | P 01321 |
| General Counsel Exhibits, Volume 4 of 4 | December 15-17, 2015 | P 01480 |

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

RICHFIELD HOSPITALITY, INC., AS
MANAGING AGENT FOR KAHLER HOTELS, LLC,

        Respondent,

and                       Case No. 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21,

        Charging Party.


Pages:  1 through 244 (Volume 1 of 3)

Date:  December 15, 2015

Place:  Rochester, Minnesota

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00193

EXHIBIT R(1)

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

**In the Matter of:**

**RICHFIELD HOSPITALITY, INC., AS**
**MANAGING AGENT FOR KAHLER HOTELS, LLC,**

       **Respondent,**

**and**                        **Case No. 18-CA-151245**

**UNITE HERE INTERNATIONAL UNION**
**LOCAL 21,**

       **Charging Party.**


The above entitled matter came on for trial pursuant to notice, before The Honorable Sharon L. Steckler, Administrative Law Judge, in Conference Room 3101A of the Olmstead County Government Center, 151 - 4th Street SE, Rochester, Minnesota, on Tuesday, December 15, 2015, at 9:10 a.m.

```
 1                    A P P E A R A N C E S

 2        On behalf of the NLRB, Counsel for the General Counsel:

 3        TYLER J. WIESE, ESQ.

 4        NICHOLE L. BURGESS, ESQ.

 5        National Labor Relations Board, Region 18

 6        212 3rd Avenue South, Suite 200

 7        Minneapolis, Minnesota  55403

 8        (612)348-1757

 9        tyler.wiese@nlrb.gov

10        nichole.burgess@nlrb.gov

11        On behalf of the Charging Party:

12        MARTIN GOFF, Sr. Vice President

13        Director of Organizing

14        Unite HERE International Union Local 17

15        312 Central Avenue, Suite 444

16        Minneapolis, Minnesota  55414

17        (612)379-4730, Ext 14

18        mgoff@here17.org

19

20

21

22

23   (Appearances continued on page 3.)

24

25
```

1                    **A P P E A R A N C E S** (continued):

2        **On behalf of the Respondent:**

3        KARL M. TERRELL, ESQ.

4        ARCH Y. STOKES, ESQ.

5        Stokes Wagner Hunt Maretz & Terrell

6        One Atlantic Center

7        Suite 2400

8        1201 West Peachtree Street

9        Atlanta, Georgia  30309

10       O  (404)766-0076

11       kterrell@stokeswagner.com

12       astokes@stokeswagner.com

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2   **WITNESSES**          **DIRECT** **CROSS** **REDIRECT** **RECROSS** **VOIR DIRE**

3   Michael Henry            37

4

5   Martin Goff             129    178     230               144

6                                                            153

7                                                            173

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00197

1                          **E X H I B I T S**

2   **OPENING STATEMENT:**                                    **PAGE:**

3   By Mr. Wiese, on behalf of the NLRB,                22

4   Counsel for the General Counsel

5   By Mr. Terrell, on behalf of the Respondent         29

6

7   **EXHIBIT**                    **IDENTIFIED**          **IN EVIDENCE**

8   **General Counsel's**

9    1(a) - (o)                                          8

10   2                                                   51

11   3                                                   65

12   5                                                   70

13   6(a)                                                54

14   6(g)                                                73

15   9                               79                  80

16   10(a) - (l)                                         98

17   11                                                  112

18   12                                                  113

19   13                                                  113

20   14                                                  115

21   18                                                  127

22   19                                                  162

23   20                                                  171

24   21                                                  172

25

1                          E X H I B I T S (continued)

2     **EXHIBIT**                         **IDENTIFIED**            **IN EVIDENCE**

3     **General Counsel's**

4     22                                                            174

5     23(a)                                                         148

6     23(b)                                                         150

7     23(c)                                                         151

8     23(d)                                                         152

9     23(e)                                                         153

10    23(f)                                                         154

11    28                                                            45

12    29 (Offered only - pg 240)

13    30                                                            45

14    37                                                            15

15

16    **Joint**

17     1                                                            16

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00199

1                    P R O C E E D I N G S

2                                        9:10 a.m.

3        JUDGE STECKLER:  We'll be on the record.

4        Good morning.

5        This hearing is in order.  This is formal trial before the

6    National Labor Relations Board in Richfield Hospitality, case

7    18-CA-151245.

8        The Administrative Law Judge presiding is Sharon L.

9    Steckler.  I am assigned to the Washington, D.C. Office of the

10   Division of Judges.  Any communication should be addressed to

11   that office; and any requests for extensions of time should be

12   addressed to Chief Judge Giannasi or Deputy Chief Judge Amchan.

13       Will the counsel and other representatives please state

14   their appearances for the record?

15       For General Counsel, please?

16       MR. WIESE:  Tyler J. Wiese, W-I-E-S-E.

17       MS. BURGESS:  And Nichole L. Burgess, B-U-R-G-E-S-S.

18       JUDGE STECKLER:  For the Charging Party?

19       MR. GOFF:  Martin Goff, M-A-R-T-I-N  G-O-F-F.

20       JUDGE STECKLER:  And for the Respondent.

21       MR. TERRELL: Karl M. Terrell, T-E-R-R-E-L-L.

22       MR. HENRY:  Michael Henry, Kahler Hospitality Group.

23       MR. STOKES:  Arch Stokes, A-R-C-H  S-T-O-K-E-S.

24       JUDGE STECKLER:  If at any time settlement discussions

25   are desired during, before or after trial, I will be glad to

1   grant a reasonable recess for that purpose.  Trial developments

2   can sometimes change attitudes and make settlements possible.

3   Accordingly, I am advising you now before I have heard any

4   testimony that I intend to offer you the opportunity for

5   settlement discussions at two specific stages of the trial:

6   first, at the conclusion of the General Counsel's case; and,

7   second, at the conclusion of the trial.  If, by inadvertence, I

8   overlook the matter, please call it to my attention.

9        I invite you to bear in mind as the trial proceeds, that

10  opportunities for discussion of settlement may occur and are

11  available at any time.

12       Thank you.

13       Mr. Wiese, would you please introduce the formal papers and

14  other pleadings.  I will dispose of any preliminary motions

15  after that.

16       MR. WIESE:  Okay, thank you, Your Honor.

17       So GC Exhibit 1 is the formal papers.  An index and

18  description of those documents has been provided to all parties.

19       So I would offer GC Exhibit 1.

20       MR. TERRELL:  No objection.

21       JUDGE STECKLER:  GC 1 is admitted.

22  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 1(a) through 1(o).)

23       JUDGE STECKLER:  And just for the record, it's through

24  1(o), with "O" being an index and description of the formal

25  documents.

1    Okay, now has everybody filled out the appearance sheet or

2  given the Court Reporter a card?

3    MS. BURGESS:  Yes, Your Honor.

4    JUDGE STECKLER:  Okay, very good.

5    At this time, I'll take preliminary motions, but I

6  understand the next order of business is compliance with

7  subpoenas.

8    MR. WIESE:  Well, Your Honor, I guess at this point, there

9  are -- we did receive documents responsive to most of the

10  requests in my subpoena.  I think we're still waiting on

11  documents responsive to requests 2 through 4 of the subpoena, 10

12  through 12 and 18 through 20, and also request 22.

13    JUDGE STECKLER:  And, Mr. Terrell, do you have those

14  documents?

15    MR. TERRELL:  Yes, we did produce a ton of documents

16  yesterday and we do have additional documents this morning.

17    JUDGE STECKLER:  Okay.

18    And are there any other documents that need to be produced

19  to you?

20    MR. TERRELL:  I do not believe so.

21    JUDGE STECKLER:  Okay, so at this time, how many pages are

22  we talking about in response to the General Counsel's subpoena?

23    MR. TERRELL:  Say again?

24    JUDGE STECKLER:  How many pages are we expecting for the

25  rest of the response to the subpoena?

1    MR. TERRELL:  Roughly, a third of the stack here.

2    JUDGE STECKLER:  And were you able to respond also to the

3  new subpoena that was issued on Friday?

4    MR. TERRELL:  We have stipulated -- that subpoena related

5  only to individuals proposed or --

6    JUDGE STECKLER:  Supervisory status.

7    MR. TERRELL:  -- managers or agents, and we have stipulated

8  to all of those.

9    JUDGE STECKLER:  Okay.

10    If you'll be so kind to produce it to the General Counsel

11  and we'll take about a half an hour to review.

12    And we'll go off the record.

13  (Off the record.)

14    JUDGE STECKLER:  We'll be back on the record.

15    During this time, Respondent produced documents to General

16  Counsel.

17    Any further comments about the subpoena issues?

18    MR. WIESE:  Yes, Your Honor, there's still -- and actually

19  before I do that, I think for completeness of the record, I'd

20  like to offer the subpoena that we're talking about as General

21  Counsel Exhibit 37.

22    MR. TERRELL:  Do we have a copy of GC 1 for our table.

23    MR. WIESE:  General Counsel Exhibit 1?

24    MR. TERRELL:  Yes.  I didn't receive a copy.

25    MR. WIESE:  No, only the index.

1    MS. BURGESS:  I gave you two copies I think of the index

2  and description.

3    MR. TERRELL:  You did?  I think I handed it back to the

4  Court Reporter, because I thought it was the Court Reporter's

5  copy.

6  (Pause.)

7    MR. TERRELL:  If you've got an extra copy of the index, I'd

8  like that.

9    JUDGE STECKLER:  I have an extra copy of the index here.

10    MR. TERRELL:  Okay.  Thank you, Judge.

11    JUDGE STECKLER:  Okay, Mr. Wiese.

12    MR. WIESE:  Out of the requests that I mentioned earlier,

13  requests 3, 4, 10, 20 and 22 remain unsatisfied.

14    MR. TERRELL:  Allow me to comment on that.

15    JUDGE STECKLER:  Please.

16    MR. TERRELL:  Subpoena item number 3, which is documents

17  which refer in any way to union representative access, I've

18  represented to Mr. Wiese that we have searched for e-mails.  We

19  believe that there is one e-mail.  We have simply not been able

20  to locate at this point, but we're continuing to look.

21    Item 4, documents referring in any way to decisions to

22  cease granting wage increases after the expiration of the prior

23  collective bargaining agreement, basically the same response.

24  We believe that there was one e-mail exchange between Mr. Henry

25  and someone with the union.  We have looked for that e-mail, and

P 00204

1    we've been unsuccessful in locating it.  Mr. Wiese represented

2    that he is aware of the -- or he believes he has an e-mail that

3    fits that category in his possession, so we'd like to look at

4    it.  That may be the e-mail that we have in mind, and, if so,

5    then that would take care of that item.

6        Go ahead.

7        MR. WIESE:  Your Honor, I think we're going to be

8    introducing that e-mail early in the hearing.

9        MR. TERRELL:  Okay, number 10:  "Copies of all disciplines

10   and terminations issued to employees due to attendance issues."

11   We have given General Counsel a pretty hefty stack -- we have

12   tasked folks at the hotel to continue looking.  There may be

13   others.

14       Number 20 -- is that the next one?

15       MR. WIESE:   I believe so.

16       MR. TERRELL:  "Pie charts" -- we have -- during the course

17   of the bargaining, numerous individual -- by individual

18   employees, pie charts were produced across the table as part of

19   the employer's proposal.  Those pie charts were received by the

20   union and taken by the union on the day of bargaining.  Those

21   documents had been produced in response to our subpoena to us by

22   the Union.  General Counsel has seen those documents.  We have

23   the pie charts in the courtroom.

24       In addition, there was an additional group of the

25   individual pie charts pertaining to the Marriott Hotel and those

1   were also delivered to the union during the course of

2   bargaining; however, when the union departed from the bargaining

3   room, they left those behind.  We have held those in our

4   possession and we have brought them today and we've provided

5   them to General Counsel.

6      In addition to those individual pie charts, several of the

7   proposals that were given to the union during the course of

8   bargaining contained attached by position pie charts; and those

9   have also been produced attached to the proposals that we have

10   produced to the General Counsel yesterday.

11      Twenty-two:  "The seniority lists" -- the seniority lists

12   are maintained by departments in the four hotels.  We have

13   gathered all of those seniority departmental lists.  We're

14   waiting for one more:  the kitchen department at the Kahler

15   Grand, and we have tasked someone to provide that to us so we'll

16   have that probably later today.

17      JUDGE STECKLER:  How much later today?

18      MR. TERRELL:  We'll have somebody bring it to us to by

19   lunch.

20      JUDGE STECKLER:  Mr. Wiese, do you need those -- that

21   document for your case in chief this morning?

22      MR. WIESE:  No, I do not, Your Honor.

23      JUDGE STECKLER:  Okay.

24      MR. WIESE:  And the only item I would like to respond to is

25   item 20, the pie charts.  In our view, I guess it's still an

1  open item.  I mean, these pie charts were in Respondent's

2  possession.  We have no information about when they were

3  discarded -- destroyed, so, in our view, that subpoena request

4  is still open.

5      MR. TERRELL:  Well, we've represented to Mr. Wiese that the

6  pie charts were of course created electronically based on a

7  template by position.  The individual who created those pie

8  charts did not save the individual pie charts as they were being

9  created electronically.

10     JUDGE STECKLER:  Will that individual be testifying in this

11 hearing?

12     MR. TERRELL:  We're not planning to, but she is available

13 and she could testify to that.

14     MR. WIESE:  I may subpoena her.

15     JUDGE STECKLER:  It would be helpful for her to testify, so

16 to that effect, if you're planning on relying -- it sounds like

17 both sides want to rely on the pie charts.

18     MR. TERRELL:  Yes, the pie charts, as they were created in

19 hard copy form and then they were delivered to the union in the

20 bargaining room.

21     MR. WIESE:  Mr. Terrell, who is that individual?

22     MR. TERRELL:  Leslie Hohmann.

23     MR. WIESE:  Okay.

24     COURT REPORTER:  Leslie --

25     MR. TERRELL:  Hohmann, H-O-H-M-A-N-N.

1      MR. WIESE:  Did I offer General Counsel Exhibit 37?

2      JUDGE STECKLER:  No.

3      MR. WIESE:  I'll offer that at this time.

4      MR. TERRELL:  No objection.

5      JUDGE STECKLER:  All right, GC 37 is admitted.

6  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 37.)

7      JUDGE STECKLER:  Okay, regarding item 3, there might be one

8  e-mail, you said, Mr. Terrell, and you're continuing to look.

9  At what point do we know whether you have that e-mail?

10      MR. TERRELL:  I think by tomorrow.  If we have it, if we

11  can locate it, we'll provide it by tomorrow.

12      JUDGE STECKLER:  Okay, and if there are no others relevant

13  to item 10, we'll move along, regarding the pie charts, we're

14  going to get some testimony on that hopefully and the seniority

15  department.

16      Anything else, Mr. Wiese?

17      MR. WIESE:  I believe the only other thing is request 10

18  for the attendance records, which I think we covered --

19      JUDGE STECKLER:  Okay.

20      MR. WIESE:  -- and should be here by noon if I heard right.

21      JUDGE STECKLER:  I think noon was the seniority list.

22      MR. WIESE:  Oh, excuse me.

23      JUDGE STECKLER:  But item 10, there may be others -- still

24  looking --

25      MR. TERRELL:  We'll do our best to see if we have

1    additional ones by tomorrow.

2        JUDGE STECKLER:  Okay, and, if necessary, General Counsel

3    will have the opportunity to examine on those as well.

4        MR. WIESE:  Okay.

5        JUDGE STECKLER:  Okay.

6        Any other preliminary matters?

7        MR. WIESE:  Yes, Your Honor, just a handful.

8        The first is I have copies of Joint Exhibit 1.  This is a

9    stipulation that was agreed to by the parties this morning.  It

10   includes bargaining dates, bargaining locations, supervisors and

11   agents for Respondent and also bargaining participants -- and

12   the parties have had a chance to review and sign it.

13       COURT REPORTER:  Can we go off the record?

14       JUDGE STECKLER:  Off the record.

15   (Off the record.)

16       JUDGE STECKLER:  We'll be back on the record.  Thank you.

17       MR. WIESE:  So I'll offer Joint Exhibit 1.

18       JUDGE STECKLER:  Any objections?

19       MR. TERRELL:  No objections.

20       JUDGE STECKLER:  Mr. Goff?

21       MR. GOFF:  No objections.

22       JUDGE STECKLER:  Thank you.

23       Joint Exhibit 1 is admitted.

24   (EXHIBIT RECEIVED:  JOINT 1.)

25       JUDGE STECKLER:  Thank you for stipulating to some facts

P 00209

1    that will help the trial move along a little quicker.

2        Any other preliminary matters?

3        MR. WIESE:  Yes, Judge.

4        I'm showing the parties what's been marked as General

5    Counsel Exhibit 29.  These are electronic copies of the several

6    thousand pages of pie charts.

7        And the parties have not had a chance to review these

8    documents, and I understand that, and I'm not offering it at

9    this time.  I wanted it to be on the record as --

10       JUDGE STECKLER:  Thanks.

11       So this is the jump drive or thumb drive with the documents

12   on there.  And on Friday, I understand that on Friday you

13   presented them by e-mail.

14       MR. WIESE:  Yes, Your Honor.

15       JUDGE STECKLER:  Okay.  So at the appropriate time, you'll

16   offer it.

17       MR. WIESE:  Yes.

18       JUDGE STECKLER:  Okay.

19       MR. TERRELL:  Let me just note for the record that what is

20   on the jump drive, as I understand the representation, is the

21   complete set of the pie charts that the Union pulled together

22   and in response to Respondent's subpoena, but provided first to

23   General Counsel.  And then General Counsel provided them to us.

24   And we were not present during the delivery from the Union to

25   the General Counsel.  General Counsel then e-mailed us what he

1   represents is also contained on this jump drive, and we have not

2   had a chance to go through the thousands of pages to confirm

3   accuracy against the hard copies of the pie charts that we

4   received.  And, in addition, this jump drive would not contain

5   the additional individual pie charts for the Marriott Hotel

6   which I referred to a few moments ago.

7        Were we on the record at that point?

8        JUDGE STECKLER:  Yes.

9        MR. TERRELL:  Okay, that I referred to that were given to

10  the Union during the course of bargaining.  But at the end of

11  the day, when the Union departed from the bargaining room, they

12  left those Marriott individual pie charts behind.  We retained

13  possession of them, and we have produced that subset to General

14  Counsel today.

15       JUDGE STECKLER:  Okay.

16       So at the appropriate time, we can discuss whether these

17  are the correct copies or not.

18       MR. TERRELL:  Yes, I think so.

19       JUDGE STECKLER:  Okay.

20       MR. WIESE:  And, Your Honor, I don't know if I'll be able

21  to supplement those while we're here, but I can either enter the

22  paper copies while we're on the record or I can supplement the

23  jump drives at a later date.

24       JUDGE STECKLER:  Okay, we can see as the trial progresses

25  what we'll have to do with those documents.

1        Any other preliminary matters, Mr. Wiese?

2        MR. WIESE:  Yes, Judge.

3        We -- the General Counsel would like to request

4    sequestration of witnesses.

5        MR. TERRELL:  And we agree.

6        JUDGE STECKLER:  Okay, I agree too.

7        A sequestration order is being issued in this proceeding.

8    This means that all persons who are expected to be called as

9    witnesses in this proceeding, other than a person designated as

10   essential to the presentation of the party's case will be

11   required to remain outside the courtroom whenever testimony or

12   other proceedings are taking place.

13       A limited exception applies to witnesses who are alleged

14   discriminatees in this matter.  They may be present in the

15   courtroom at all times other than when witnesses for the General

16   Counsel or the Charging Party are giving testimony regarding the

17   same events that the alleged discriminatees are expected to

18   testify about.

19       The sequestration order also prohibits all witnesses from

20   discussing any other witness or any possible witness -- the

21   testimony he or she has already given or will be expected to

22   give.  Likewise, counsel for a party may not disclose to any

23   witness the testimony of any other witnesses.  Counsel may,

24   however, may inform his or her witness of the content of

25   testimony given by any opposing party's witness to prepare to

 1  rebut that witness testimony.

 2      It is the responsibility of counsel to see that they and

 3  their witnesses comply with this sequestration rule.  The Judge

 4  may also ask if here if that any person essential to the

 5  presentation of any party's cause to be designated to remain in

 6  the courtroom. Do we have any essential parties to remain in the

 7  courtroom?

 8      MR. WIESE:  Yes, Judge.  I mean, we have Mr. Goff on behalf

 9  of the Charging Party.

10      JUDGE STECKLER:  And he made an entry of counsel.

11      So are there any discriminatees who are staying?

12      MR. WIESE:  No.

13      JUDGE STECKLER:  Anybody for the Respondent?

14      MR. TERRELL:  No essential witnesses.  Mr. Stokes, who is

15  co-counsel here, may testify at some point related to the

16  collective bargaining that he participated in.

17      JUDGE STECKLER:  Okay, but they have made entries of

18  appearance as well.

19      MR. TERRELL:  Right.

20      JUDGE STECKLER:  Okay.

21      In that case, are we ready to move to opening statements?

22  Any preliminary witnesses for -- any preliminaries for you, Mr.

23  Terrell?

24      MR. TERRELL:  Forgive me?

25      JUDGE STECKLER:  Any preliminary motions from you, Mr.

1    Terrell?

2        MR. TERRELL:  No, Your Honor.

3        MR. WIESE:  Judge, I guess I'm a little confused about

4    what's going on over here, since is Mr. Henry and Mr. Stokes

5    allowed at their table?

6        MR. TERRELL:  Mr. Henry is the Respondent's representative,

7    corporate representative.  Mr. Stokes is counsel.

8        MS. BURGESS:  But to the extent that Mr. Stokes is going to

9    be testifying as a witness about the bargaining, it seems that

10   he should not be allowed to stay under the sequestration order.

11   If he's not going to testify, that's fine obviously.

12       MR. TERRELL:  No, he's counsel, and he will also -- he may

13   testify as to collective bargaining because he was a participant

14   in collective bargaining.  This is common standard practice

15   under Board practice.

16       JUDGE STECKLER:  He's in-house counsel, correct?

17       MR. TERRELL:  Yes.

18       JUDGE STECKLER:  Then he gets to stay.  Even though he may

19   be a witness, he is still counsel.

20       MR. TERRELL:  Correct.

21       JUDGE STECKLER:  And then Mr. Stokes is their

22   representative at the table, if I understand --

23       MR. TERRELL:  Mr. Henry.

24       JUDGE STECKLER:  Mr. Henry, I'm sorry.

25   (Pause.)

1    MR. WIESE:  Judge, just one more thing before we give

2  opening statements or before I give my opening statement.

3    I'm serving a subpoena on Respondent regarding Leslie

4  Hohmann, the creator of the pie charts.

5    JUDGE STECKLER:  Okay, and Mr. Terrell has that in his

6  possession.

7    Any other preliminary matters before we proceed?

8    MR. WIESE:  Not from the General Counsel, Your Honor.

9    JUDGE STECKLER:  Mr. Wiese, you may proceed with your

10  opening statement, please.

11                    OPENING STATEMENT

12    MR. WIESE:  Your Honor, this is a case about a successor

13  employer who wants what it wants, and who plans to get what it

14  wants by whatever means necessary.  This employer entered

15  bargaining with predetermined goals, goals it was determined to

16  achieve without regard to the Union that has represented

17  employees for decades, and the obligations required of it under

18  the National Labor Relations Act.

19    The bargaining even in this case consists in four hotels:

20  The Kahler Grand Hotel, the Marriott Hotel, the Kahler Inn and

21  Suites and the Residence Inn.  Employees at these properties

22  have been represented by Unite HERE or its predecessors since at

23  least the 1960s.

24    The Respondent in this case, Richfield Hospitality, is a

25  hotel management company.  The evidence will show that

1    Respondent assumed management of the four hotels at issue in

2    this case sometime in 2013, which the Union and the predecessor

3    employer were operating under an existing collective bargaining

4    agreement.  Respondent assumed this existing agreement; and,

5    although not flawless, the parties operated in relative harmony

6    for a period of time.  This harmony, however, began to erode at

7    the beginning of 2015, when the time came to negotiate a new

8    collective bargaining agreement.

9         The evidence will demonstrate that Respondent, during the

10   course of this bargaining, has undermined and denigrated the

11   Union through certain proposals, and has essentially sought to

12   mold itself as a non-union employer.  The evidence will show

13   that Respondent has made several specific attacks on the

14   bargaining rights of the Union members and the ability of

15   employees to be represented effectively by the Union.  This

16   includes:

17        First, a wage proposal that consists of literally thousands

18   of pages of individual pie charts.  The evidence will show that

19   these pie charts are internally flawed, do not accurately

20   represent even the current wages of employees; and, in fact,

21   show differing wage rates, different wage increases, and, in

22   some cases, even wage decreases for employees in the same

23   classification in the same year.  The evidence will also show

24   that these pie charts are, in fact contradicted by the written

25   terms of the employer's last, best and final contract offer of

1  March 24, 2015.  The evidence will further show that the Union

2  pointed out these flaws on numerous occasions at the bargaining

3  table, while simultaneously making the legitimate argument that

4  a several thousand page wage offer simply cannot be policed from

5  a practical perspective.  In response to these arguments, the

6  evidence will show that Respondent doubled-down by, among other

7  things, sending notices to employees saying that they should go

8  the Union to ask for their pie charts to see the Respondent's

9  reasonable offer.  Finally, the evidence will demonstrate that

10 as of the date of this hearing, Respondent no longer even

11 possesses the pie charts that encompass its wage offer.

12     Second, the evidence will demonstrate that the Respondent

13 made an unexplained proposal to cause employees who took leave

14 for union events longer than 3 days to risk losing their

15 seniority.  Now this is distinct from every other leave proposal

16 in the employer's offers.  This proposal primarily affects

17 employees who wish to participate in union conventions, which,

18 while only 3 days in length, are always in locations that

19 required additional travel days.  As a result, under this

20 proposal, any employ who wished to participate in the Union's

21 convention would risk losing their seniority.  The evidence will

22 further demonstrate that when the Union questioned the employer

23 about this proposal at the bargaining table, the Respondent

24 simply responded that this is what it wanted.

25     Third, on top of these proposals, the evidence will

1    demonstrate the extreme discourtesy shown by the Respondent

2    toward the Union representatives.  This discourtesy was

3    manifested by the Respondent's abject disrespect for the time of

4    the Union representatives and employee committee members present

5    at bargaining.  The evidence will show that Respondent was late

6    to at least eight of the 11 formal bargaining sessions listed on

7    the stipulation; and that on several of these occasions, it was

8    more than an hour late.  The evidence will also demonstrate that

9    on at least three occasions, Respondent left the table to on

10   caucus, but, in fact, never returned.

11        Exacerbating all this conduct has been the Respondent's

12   recent posture in negotiations.  After the unfair labor

13   practices were filed this spring, the evidence will show that

14   the parties took a hiatus in bargaining of these hotels.  This

15   fall, after a contract was reached in a related bargaining nit

16   between the parties, the Union and Respondent met again and had

17   some success at the bargaining table.  This success, the

18   evidence will show, was short lived.  The parties next

19   bargaining session schedule for October 20, 2015, was cancelled

20   by the respondent late in the afternoon of October 19th.  After

21   several attempts to press Respondent for bargaining dates, the

22   Respondent, through HR representative, Michael Henry, told the

23   Union that the Respondent was not going to meet again until the

24   Union proposed a better offer.  Now keep in mind, this is all

25   occurring while Respondent's last, best and final offer of March

1  24th, with the pie charts that we've already talked about was

2  still on the table and after Complaint issued in this case.

3      Beyond the allegations related to bargaining, the evidence

4  will demonstrate the Respondent's simultaneous efforts away from

5  the table to undermine the Union.  Most notably, after the

6  expiration of the parties' predecessor collective bargaining

7  agreement in February 2015, the Respondent ceased paying time of

8  service, or what I'll call "step increases" to employees.  These

9  increases were based on time served; so, for example, after an

10  employee had worked a year, they were supposed to receive a wage

11  increase and has been receiving those wage increases under the

12  prior contract on top of the increases that came into effect on

13  the anniversary date of the contract.  Now this was a calculated

14  attempt by Respondent to undermine the Union.

15      The evidence will demonstrate that Respondent opened pre-

16  negotiation discussions in 2014, by presenting the Union with a

17  wish list of regressive proposals.  Most notably, one of these

18  proposals called for the elimination of these very same step

19  increases.  When the Union did not agree to eliminating the step

20  increases at the table, Respondent simply implemented them.  And

21  exacerbating this conduct, the evidence will show that in

22  numerous conversations with employees, Respondent's

23  representatives have placed the blame for the elimination of the

24  step increases squarely on the Union, saying that it's the

25  Union's fault that employees aren't receiving the step increases

1  because they aren't accepting Respondent's March 24th offer.

2       Roughly contemporaneous with the elimination of these step

3  increases, Respondent dramatically limited the Union's ability

4  to communicate with employees.  Several witnesses will testify

5  that managers told them they could no longer post union flyers

6  in locations where union flyers had been posted for years at

7  several of the hotel properties.  In addition, Union

8  representative, Linda Henry, will testify to numerous other

9  occasions where she was told both with management and in the

10 presence of other employees that she could no longer access

11 break rooms and areas of the hotels that she had also been

12 visiting for years.

13      Coupled with this conduct directed at the Union, Respondent

14 also targeted also targeted several prominent union supporters

15 during these --

16      JUDGE STECKLER:  Just one moment.

17 (Pause.)

18      JUDGE STECKLER:  Go ahead.

19      MR. WIESE:  Your Honor, coupled with this conduct directed

20 at the Union at the bargaining table and away from the

21 bargaining table, Respondent also targeted several prominent

22 union supporters during these negotiations; namely, the evidence

23 will demonstrate that Respondent inexplicably refused to provide

24 work hours to the employee Union Vice President, Kelli Johnston,

25 the only employee Union Vice President in the entire bargaining

1   unit; and that it also issued a frankly ridiculous discipline to

2   union steward, Graham Brandon.

3        Now the evidence will demonstrate that the allegations that

4   I've spoken of are only the "highlights," if you want to call

5   them that, of Respondent's unlawful course of action, and that

6   there are also numerous independent violations of Section

7   8(a)(1) of the Act.

8        So what we have here is an inexplicable and ungovernable

9   wage offer:

10       A proposal targeting active union employees;

11       Consistent disrespect for the Union and employee's time at

12   the bargaining table;

13       Conditioning further negotiations on the Union presenting a

14   new proposal;

15       Unlawfully eliminating a wage increase for employees and

16   blaming the Union for it;

17       Cutting off long-time access and posting rights for union

18   representatives;

19       Disciplining prominent union employees.

20       Your Honor, these are not the actions of a Respondent who

21   is bargaining in good faith and respecting the rights of

22   employees under the National Labor Relations Act.  They are the

23   actions of a Respondent who has flagrantly disregarded its

24   obligations under Federal Labor Law.  And, at the end of this

25   case, it will be clear that this case involves an employer who

1  wants what it wants and is willing to do whatever it takes to

2  get it.

3      JUDGE STECKLER:  Thank you.

4      Are any of the people in the room witnesses?

5      MR. TERRELL:  Say it again?

6      JUDGE STECKLER:  Are any of the people left in the room

7  still witnesses?

8  (Pause.)

9      JUDGE STECKLER:  I just wanted to make sure.

10     Okay, Mr. Terrell, you may proceed.

11                         OPENING STATEMENT

12     MR. TERRELL:  I'll just respond briefly, Your Honor.

13     There was extensive bargaining of this contract.  We

14 stipulated to eight or 10 dates.  We will put into evidence the

15 bargaining notes.  The bargaining notes show extensive, careful,

16 detailed bargaining.  Every single provision in the proposals

17 were discussed at the table.  This is classic good-faith

18 bargaining.

19     Mr. Wiese uses the phrase, "the employer wants what it

20 wants."  Well, both parties negotiate from their respective

21 economic positions.  Was there hard bargaining?  Yes, there was

22 hard bargaining.  Were there economic necessities that generated

23 the hard bargaining?  Yes, there were, and Your Honor will hear

24 testimony on that particular issue.

25     Then Mr. Wiese referred to the wage proposal as consisting

1  of a thousand or thousands of pie charts; but the wage proposal
2  itself was very simple and very straightforward.  They were
3  annual increases, a schedule of those increases showing the
4  dollar amounts by position, by hotel is attached to the
5  proposals that the employer put on the bargaining table.  It's
6  very straightforward.  It did not include what Mr. Wiese refers
7  to as the "step increases."  The employer's proposal -- its
8  proposal was to eliminate the anniversary date increases, and
9  they were not step increases, they were anniversary date
10  increases over a 4-year period in the previous contract.  The
11  employer's wage proposal was simplified.  It was a schedule of
12  annual increases.  The pie charts were provided in an effort to
13  communicate fully how the employer's proposal would work.  The
14  individual pie charts were also provided to that same effect,
15  and the committee members in the bargaining room were given an
16  opportunity to look at their own pie charts' errors and some of
17  the pie charts were identified and they were corrected.  It was
18  all part of an exchange.  It was the employer's intent and
19  purpose in providing these pie charts to effectively communicate
20  so that everyone would understand exactly how their individual
21  real wage pie charge would play out over the 5 years of the
22  proposed term that the employer proposed in bargaining.
23       There is an allegation relating to -- we're having
24  difficulty understanding it, but it relates to leave for union
25  conventions.  There was a proposal by the employer to limit the

P 00223

1  number of days.  We respectfully submit when Your Honor looks at

2  the previous contract and looks at the proposal, the proposal

3  cannot be read the way the General Counsel is reading it as to

4  indicate a threat of loss of seniority.

5      And it should also be noted that while every other leave

6  that employees are potentially entitled to under the old

7  collective bargaining and under the proposals as made, those

8  leaves are discretionary with the employer.

9      When the Union requests employees to take leave for a union

10  convention, the old contract made that mandatory, it wasn't a

11  matter of employer discretion.  The employer did not change that

12  aspect of the union convention leave proposal.  So the union

13  leave proposal does stand in distinction to every other type of

14  leave in that it's a leave that can be taken without the

15  employer's discretion, and that did not change with the

16  employer's proposals.

17      Mr. Wiese has referred to tardy -- or the Respondent's

18  negotiators showing up late or leaving early.  We reject that

19  allegation and we're confident that the testimony will establish

20  that.  Now did the parties on both sides engage in caucuses?  Of

21  course.  That's the way collective bargaining works.  Do

22  caucuses sometimes take longer than maybe expected?  That

23  happens all the time.  There were a lot of documents, as we have

24  already learned, that were produced at the table that were

25  sometimes brief delays in order to get documents together.  At

P 00224

1  the end of the day, there will be no evidence of extreme

2  discourtesy or discourtesy at all.  And the parties -- the

3  Respondents were not late and did not leave early.

4      There was a hiatus in bargaining from April through the

5  summer; and then the parties at the Respondent's request met

6  again in September.  During that hiatus, the Respondent

7  successfully negotiated a collective bargaining agreement with

8  Textile Care Services.  The Respondent filed a unit

9  clarification petition in March of 2015.  The previous contract

10  included the four hotels plus a separate laundry facility.  The

11  Respondent filed a UC Petition to separate the Textile care

12  service, as a separate bargaining unit with separate bargaining;

13  that during the initial stages of bargaining at issue in this

14  case, proposals were made for the hotels and for Textile Care

15  Services.  The decision I believe came down in April or May to

16  separate the Textile Care Services unit.  The decision I

17  believe came down in April or May to separate the Textile Care

18  Services unit.  The bargaining with Textile Care Services

19  continued over the summer with the same union, of course, and

20  there was an agreement that was successfully reached.  This is

21  not an employer that goes into bargain9ing as Mr. Wiese has

22  suggested lacking the intent to reach agreement.  We reached

23  agreement at Textile Care Services because the parties were able

24  to agree on the positions that Respondent took.  There are

25  unique issues, however, relating to the hotel and that's what

1   has prevented an agreement up to this point -- economic reality,

2   not a lack of intent to reach agreement.  Respondent has always

3   had the intent to reach agreement and has bargained accordingly.

4       When the parties return in September, once again at the

5   Respondent's request, there was -- Mr. Weise referred to some

6   success at the table.  The proposals and the testimony and the

7   bargaining notes will reflect clearly that the Union did not

8   make any new moves, did not make any material changes to its

9   previous position, and that has remained the case.  The Union is

10  stuck on its position, has been stuck on its position, has not

11  made moves that have been responsive to the Respondent's

12  positions at the table.  The Respondent had moves early on, but

13  has been very clear in communicating in a very careful and

14  thorough way what its position is on several key items; and the

15  parties, although no impasse or implementation has occurred, the

16  Respondent has placed its last, best and final offer on the

17  table, and the Union has not made any moves since then.

18      Mr. Wiese alleged that it is not the Union's fault-- or

19  that the employer somehow communicated that it was the Union's

20  fault that the employees were not receiving their step

21  increases.  First of all, these are not step increases, these

22  are anniversary date increases.  And when Your Honor looks at

23  the expired CBA, Your Honor will see a Schedule A, which

24  contains dollar amounts for both annual increases and dollar

25  amounts for anniversary date increases.   It is clear from the

1  face of that collective bargaining agreement that that schedule

2  was only in effect during the time of the period of the former -

3  - during the term of the former collective bargaining agreement,

4  which originally expired in August.  There was a mutual

5  extension to February 28, 2015.  Both parties mutually extended

6  the contract, there was a quid pro quo in that extension.  The

7  Union continued to abide by the "no strike" clause, and the

8  Respondent, employer, continued to apply the anniversary date

9  increases that are contained in the term of that agreement.  But

10  the face of the document of the former CBA could not be clearer

11  that those increases are only in effect during the term of that

12  agreement, and we've articulated this in our third affirmative

13  defense.

14       Mr. Wiese made reference to union flyers or posters.  The

15  Union has designated union bulletin boards in the appropriate

16  locations in all four hotels.  The only -- and over the many

17  years of the working relationship, at least during the period of

18  time that Richfield has been managing this property, there was

19  never a problem.  Posters and notices were always placed at the

20  appropriate location.  There were a few incidents where they

21  were placed in inappropriate locations.  They were placed on

22  bulletin boards that are the employer's bulletin board for

23  purposes of providing schedule and other work-related

24  information when -- that was an inappropriate bulletin board.

25  There was a union bulletin board where the Union could

1    communicate.  They should not be interfering with the employer's

2    communication board.  There was also an incident at the

3    Starbuck's.  There's a Starbuck's off the main lobby of the

4    Kahler Grand Hotel, which has a public community bulletin board.

5    This is -- the Starbuck's is an employer operated franchise

6    business within the hotel, and it was inappropriate to put union

7    materials there.

8        We will have witnesses who will testify to the issues

9    involving the employee by the name of Kelli Johnston, and the

10   employee by the name of Graham Brandon.  Mr. Brandon -- his

11   personnel file will come into evidence and it will show that Mr.

12   Brandon has a long history of attendance problems.  He was given

13   yet another discipline.  There was a grievance and there was

14   some adjustment made.  This is the way grievances work in union

15   work places, nothing unusual at all.  And we will have testimony

16   concerning Ms. Johnston's brief interest in working at a

17   different bar and Your Honor will conclude that there was no

18   targeting, no discrimination.

19       That's all we have.

20       Thank you.

21       JUDGE STECKLER:  Mr. Goff, do you have any opening?

22       MR. GOFF:  I do not.

23       JUDGE STECKLER:  Okay, thank you.

24       Are we ready for our first witness?

25       MR. WIESE:  Yes, Your Honor.

 1      JUDGE STECKLER:  Mr. Wiese, who would you like to call?

 2      MR. WIESE:  At this time, General Counsel calls Michael

 3  Henry to the stand.

 4  (WITNESS SWORN:  M8ICHAEL HENRY)

 5      JUDGE STECKLER:  Please take a seat and state your name for

 6  the record.

 7      THE WITNESS:  Michael Henry, Managing Director for Human

 8  Resources for the Kahler Hospitality Group.

 9      MR. TERRELL:  Before we go forward, can we just confirm

10  that we don't have any witnesses in the room who are going to

11  testify.

12      JUDGE STECKLER:  Yes, I think we did that before.  Let's

13  check again.

14      MR. TERRELL:  The same is true.

15      Can I get an identification of who is in the room?

16  (Discussion with unidentified parties observing in the hearing

17  room.)

18      MR. TERRELL:  Who are you with, Mr. Hill?

19      UNIDENTIFIED SPEAKER:  What?

20      MR. TERRELL:  Who are you with?

21      UNIDENTIFIED SPEAKER:  Who am I with?  I'm with Marriott

22  Hotel.  I work --

23      MR. TERRELL:  You're not going to testify?

24  (No response.)

25      JUDGE STECKLER:  Let's just -- instead of asking whether --

1  (Simultaneous conversation with unidentified speakers.)

2      JUDGE STECKLER:  Okay, let me just ask, is anybody here

3  planning to testify?

4      UNIDENTIFIED SPEAKERS:  No.

5      JUDGE STECKLER:  Okay, in that case, we don't need to have

6  any other further identification, but keep in mind if your

7  observer, you please do not discuss what you've heard in this

8  room with anybody else as well.

9      Is that sufficient, Mr. Terrell?

10     MR. TERRELL:  Yes, Your Honor.

11     JUDGE STECKLER:  Thank you.

12     I think Mr. Wiese, we're ready for your direct.

13     MR. WIESE:  Okay, thank you, Your Honor.

14                     DIRECT EXAMINATION

15  Q   BY MR. WIESE:  Good morning, Mr. Henry.

16     My name is Tyler Wiese.  I'm Counsel for the General

17  Counsel in this case.

18     So, Mr. Henry, could you tell me what your current

19  occupation is?

20  A   I am the Managing Director of Human Resources.

21  Q   And what do you do in this position?

22  A   I'm responsible for the daily operation of four hotels,

23  overseeing the employee relations, responsible for providing

24  consistency and just making sure the policies and procedures are

25  followed through effectively and consistent.

1   Q    And I believe you said you were the Managing Director.  Who

2   are you the Managing Director for?

3   A    I work through the employer for Richfield Hospitality for

4   the Kahler Hospitality Group, I'm sorry.

5   Q    Okay, no problem.

6        MR. WIESE:  Your Honor, I request to question this witness

7   under 611(c) of the Federal Rules of Evidence.

8        JUDGE STECKLER:  You may proceed.

9   Q    BY MR. WIESE:  Mr. Henry, how long have you worked in HR

10  for?

11  A    I would say in the Human Resources capacity in hospitality,

12  I would say probably about 11 or 12 years.

13  Q    And during that time, where have you worked?

14  A    I have worked in New York City, I've worked in Washington,

15  D.C., I've worked in Houston, Texas.

16  Q    And which employers have you worked for during this time?

17  A    I worked for Marriott International, I've worked for Noble

18  House Hospitality, I had a brief stint with Interstate, worked

19  with the Hilton Corporation as well.

20  Q    And in all of these capacities as Human Resources person?

21  A    Not at all capacities.  At the Hilton Corporation, I was

22  not in Human Resources.  With Marriott, I worked in Human

23  Resources.  As -- associated with the Maplewood Park Place,

24  which is a Senior Living Facility, which I did some work there

25  as the Chief of Security and the HR Manager for a short period,

1    and then I began at the Noble House Hospital LaTorretta Lake

2    Resorts as the Director of Human Resources there.

3    Q    Mr. Henry, have you dealt with unions in any of these

4    positions?

5    A    Yes, I have.

6    Q    Which ones?

7    A    The Hilton New York.

8    Q    Any others?

9    A    That's -- and currently.

10   Q    Right, yes, besides the current -- what did you do at the

11   Hilton New York?

12   A    The Hilton New York, I was the Director of Guest Services.

13   Q    And what were you interactions with the union in that

14   position?

15   A    I had responsibility for probably about 65 unit employees,

16   worked directly with guest services.  I have had interaction

17   with the shop stewards, working with business agents, working

18   through different aspects of understanding the collective

19   bargaining agreement.

20   Q    Okay.  Were you involved in any negotiations in that

21   position?

22   A    No.

23   Q    So these negotiations are the first collective bargaining

24   negotiations that you've been a part of?

25   A    Yes.

1    Q    So, Mr. Henry, I'd like to ask you about a couple of Human

2    Resources terms that I've seen during my investigation that I'm

3    not totally familiar with.

4        So could you explain to me how a wage survey works?

5    A    A wage survey is done annually by industry from our

6    industry perspective.  We typically will call around to

7    different properties and just verify with them exactly each --

8    we have a list, so we go by criteria.  For example, stewarding,

9    housekeeping, housemen, front office manager, front desk

10   manager, front desk associate and ask their respective Human

11   Resource counterpart as to exactly what they are paying in that

12   regard.  So we go through each property within our reach and

13   within our marketplace to verify exactly what they are paying,

14   to make sure that we are competitive.

15   Q    And so the market for Rochester, would you be talking to

16   the other Rochester hotels?

17   A    That is correct.

18   Q    Okay.

19       Now another term that I've seen is "benchmarking."  Could

20   you tell me what that means?

21   A    Benchmarking is similar  When you look at the -- you want

22   to make sure you're at that particular standard within the

23   business, and, as a result, you operate according to that.  For,

24   example, our benchmark for hospitality or for industry

25   standards, for example, for the front office would be what you

1  pay the work force, where are you within the percentile and to

2  make sure that you're managing according to that, to make sure

3  you're within the top 75 percent or 25 percent.

4  Q    Okay.  And so that applies to pay and other terms and

5  conditions of employment?

6  A    We try to make sure it does, yes.

7  Q    Okay, all right.

8       Now another term that I've seen is "red-circling."  And

9  that term, as I understand it, is used for employees who are

10  paid over scale, is that right?

11      That is correct.

12  Q    And employees who are red-circled, typically at least,

13  don't get wage increases until the scale catches up with them,

14  is that correct?

15  A    That is also correct.

16  Q    Okay, all right.

17      So, Mr. Henry, I'd like to talk about the hotels that are

18  in this bargaining unit.  What hotels are in the bargaining unit

19  in this case?

20  A    Within our bargaining unit, you have the Kahler Grand

21  Hotel, the Marriott, Kahler Inn and Suites and the Residence

22  Inn.

23  Q    Generally, could you describe each of the hotels, maybe

24  highlighting the differences between the four properties?

25  A    How would you say, the Residence Inn is the smaller of our

1    hotels, which has limited services available to it.  There's no

2    food and beverage in terms of restaurants available.  There is a

3    breakfast provided at that property.  It's the smallest of our

4    hotels, which is 89 rooms.

5        We have the Kahler Inn and Suites, which is primarily a

6    suite product that also has some food and beverage offering, but

7    has some limited service associated with it:  minimal banquet

8    space, doesn't provide room service and other amenities

9    associated with full service hotels.

10       Then you have the full service Marriott, which is operated

11   through Marriott standard, which is I would say a full service

12   property, which provides a wide array of services for all of our

13   guests.  And the Kahler Grand, which is the biggest of the

14   hotels, which also has the same or similar services provided

15   through that property.

16   Q    How many employees in total are in the bargaining unit?

17   A    Oh, I don't have a number right off-hand.  I would say

18   probably about close to 300, if I'm not mistaken.

19   Q    And that's across the four hotels?

20   A    Across the four properties, yes.

21   Q    All right.  Do you know roughly how many employees are at

22   each property?

23   A    Pretty much, yah, probably about 24 -- 25 at the Residence

24   Inn; about 60 or 65 at the Kahler Inn and Suites; would say the

25   Marriott, probably about 90; and then the rest primarily the

1    Kahler Grand.

2    Q    And which classifications are covered by the bargain9ing

3    unit?  Is it all the employees who work at these properties or

4    are there employees who are excluded?

5    A    Not all of the employees working at the hotels are covered

6    under the CBA.  Typically, you have the Banquet Department,

7    which consists of the banquet servers, the housemen, the bar

8    attendants.  You have the culinary staff, the food and beverage

9    staff, that's covered primarily by the unit, which includes the

10   cooks or culinary team, the front of the house staff members,

11   which are servers, bussers, the bartenders.  We have the PBX

12   operators at the Kahler Grand that's covered from the front

13   office; the bell staff from the Marriott and the Kahler Grand

14   Hotel are covered on the CBA; and, of course, the housekeeping

15   team and the engineering team.

16   Q    Okay.

17        COURT REPORTER:  Did you say PBX?

18        THE WITNESS:  I'm sorry.

19        COURT REPORTER:  What is that acronym you said?

20        THE WITNESS:  Oh, PBX, I'm sorry.

21        COURT REPORTER:  Okay.

22   Q    BY MR. WIESE:  What does that mean? PBX?

23   A    Oh, my goodness, it's the telephone operators.

24        MR. WIESE:  Your Honor, permission to approach?

25        JUDGE STECKLER:  Please.

1      MR. WIESE:  I'm showing the witness what's previously been

2   marked as General Counsel 28 and 30.

3   (Witness proffered documents.)

4   Q    BY MR. WIESE:  Let's start with General Counsel Exhibit 28.

5   Do you recognize this document?

6   A    Yes.

7   Q    And what is it?

8   A    It's an org. chart for the hotels.

9   Q    Okay.  And do you know about when this org. chart is from?

10  Do you recognize when you would have seen it before?

11  A    I've seen it before, I just don't remember when it was

12  produced.

13  Q    And do you know about when this org. chart is from?  Do you

14  recognize when you would have seen it before?

15  A    I've seen it before, I just don't remember when it was

16  produced.

17  Q    Okay.

18     MR. WIESE:  Your Honor, I'll offer that this was -- and Mr.

19  Terrell can respond if he likes.  This is the organizational

20  chart that was produced pursuant to the -- or as an exhibit in

21  the unit clarification hearing that occurred this spring?

22     MR. TERRELL:  I recall introducing an org. chart in that

23  hearing.  I can't verify as I sit here that this is the actual

24  one, but I'll take Mr. Wiese's representation that that's

25  accurate, and if we need to confirm it, we will.

1        JUDGE STECKLER:  Okay.

2        MR. WIESE:  So I'll offer General Counsel Exhibit 28.

3        JUDGE STECKLER:  General Counsel's 28 is admitted.

4  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 28.)

5  Q    BY MR. WIESE:  And set that aside, Mr. Henry.

6        So I'd like to take a look now at General Counsel Exhibit

7  30.

8        Do you recognize this document?

9  A    Yes.

10 Q    And what is it?

11 A    It's an organizational chart as well.

12 Q    And do you know when this organizational chart was created?

13 A    That was -- this was an updated one provided I think this

14 week or, yes, this week.

15 Q    So it would have been current as of this week?

16 A    That is correct.

17 Q    Okay.

18       MR. WIESE:  Offer General Counsel Exhibit 30 into evidence.

19       MR. TERRELL:  No objection.

20       JUDGE STECKLER:  GC 30 is admitted.

21 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 30.)

22 Q    BY MR. WIESE:  So I just want to take a look at General

23 Counsel Exhibit 30 here, and see if we can get some explanation

24 about it.

25       So the lines going up, say from -- well, let's look at the

1    HR Department on the right-hand side of that document.  It looks

2    like Chad Decker and Mary Kay Costello have lines going up to

3    you, is that right?

4    A    That is correct, yes.

5    Q    Okay.  And does that mean that they report to you?

6    A    Yes.

7    Q    Okay, all right.  And then you have lines going up to

8    Richfield Hospitality, is that right?

9    A    That is correct.

10   Q    Okay.  And who do you report to at Richfield Hospitality?

11   A    Currently, there's an interim person in that role.  Her

12   name is Camille Garner.

13   Q    And what is --

14   A    She's the VP of Human Resources for Richfield Hospitality

15   or acting -- the director of -- Vice President of Human

16   Resources.

17   Q    What role does Richfield play - Richfield Hospitality play

18   in running the hotels?

19   A    They are the management company responsible for overseeing

20   the successful operation of the hotels.

21   Q    And are you employed directly by Richfield Hospitality?

22   A    Yes.

23   Q    Okay.

24        What about Mr. Decker and Ms. Costello?  Are they employed

25   by Richfield?

P 00239

1   Q    Okay.

2        All right, in your role as the -- was it Director of HR?

3   Is that right?

4   A    Yes.

5   Q    Okay.  In your role as the Director of HR, do you report to

6   Javon Bea?

7   A    No, I report to Camille Garner, right now.

8   Q    Do you speak with Mr. Bea?

9   A    Occasionally.

10  Q    How often?

11  A    I don't know, just occasionally.

12  Q    Okay.  Weekly?

13       MR. TERRELL:  Objection:  asked and answered.

14       THE WITNESS:  I can't say weekly.

15       JUDGE STECKLER:  I'll allow it.

16       Go ahead.

17  Q    BY MR. WIESE:  Would you like me to repeat the question?

18  A    You can.  You're saying "weekly."

19  Q    Yes.

20  A    And I'm saying to you that I can't say weekly because I

21  don't speak to him weekly, so --

22  Q    What about once a month?

23  A    That's a guesstimate -- probably.

24  Q    Okay, all right.

25       And who is Mr. Bea?

1  A    Mr. Bea is the representing Chair of the ownership group

2  for the hotels.

3  Q    What role, if any, do you currently play in the operations

4  of Textile Care Services, the laundry service?

5  A    None.

6  Q    None at all?

7  A    None.

8  Q    Could you describe who owns each of the hotels?

9  A    Who owns?

10 Q    Yes, who owns the hotels?

11 A    The -- my understanding is the hotels are owned by a

12 corporation from the -- that's chaired by Javon Bea.

13 Q    And do you know the individual ownership of each of the

14 hotels?

15 A    I don't understand the question.  I'm sorry.

16 Q    Do you know who owns the Kahler Grand Hotel?

17 A    It's part of -- I don't know the legal name that's

18 associated with it, but I do know who is associated with the

19 ownership, yes.

20 Q    And who is that?

21 A    That is Javon Bea, as well as the Bea family and whomever

22 else are investors.

23 Q    Okay, and is that the same for all the hotels?

24 A    I would imagine so, yes.

25 (Witness proffered document.)

1  Q     Showing you what's been marked as General Counsel Exhibit

2  2, Mr. Henry, do you recognize this document?

3  A     This looks like a copy of the old CBA.

4  Q     And who is Sunstone Hotel Properties?

5  A     To my knowledge, Sunstone Hotel Properties was the previous

6  ownership of the hotels.

7  Q     And this Collective Bargaining Agreement covers all the

8  hotels that we've been talking about, the four hotels, is that

9  right?

10  A     That is correct, yes, from what I can see so far, yes.

11  Q     So when did Richfield Hospitality come into the picture

12  with this bargaining unit?

13  A     Richfield Hospitality came on board in October of 2013.

14  Q     And when Richfield Hospitality came on board, it

15  voluntarily assumed this Collective Bargaining Agreement.  Is

16  that right?

17  A     That's my understanding.  It was in existence, so we --

18  yah.

19  Q     You didn't engage in negotiations with the Union?

20  A     No, not at that time, correct.

21  Q     All right.  And during negotiations, the current

22  negotiations we're talking about, the parties extended this

23  Collective Bargaining Agreement for 6 months, is that right?

24  A     There was an extension of the contract from the anticipated

25  expiration date of August 31, 2014 through February of 2015, on

1  the 28th.

2  Q    Okay.  Now looking at this Collective Bargaining Agreement,

3  it covers Textile Care Services as well the hotel properties, is

4  that right?

5  A    Let me make sure.  Yes, I can see the amendment in there,

6  yes.

7  Q    And at the outset of these current negotiations in 2015,

8  the bargaining unit still included Textile Care Services, is

9  that right?

10  A    At the onset, yes.

11  Q    Okay.  And at the outset of these negotiations, Richfield

12  wanted the laundry facility to be part of a separate bargaining

13  unit, isn't that right?

14  A    I think as we came on board, if I can answer in this

15  matter:  Coming on board, I think one of the things that was

16  quite evident when you get a chance to understand the dynamics

17  of the properties, you realize they are separate entities, they

18  are separate units.  And, as a result, we wanted to manage the

19  properties accordingly.

20  Q    So it was something that you wanted, right?

21  A    Well, it's something that we were suggesting would be the

22  appropriate thing to do in order of how the business model

23  presents itself.

24      MR. WIESE:  Okay, before I go on, I'll offer General

25  Counsel Exhibit 2 into evidence.

1       MR. TERRELL:  No objection.

2       JUDGE STECKLER:  General Counsel Exhibit 2 is admitted.

3   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 2.)

4   (Witness proffered the document.)

5   Q    BY MR. WEISE:  Showing you what's been marked as General

6   Counsel Exhibit 6(a), Mr. Henry, do you recognize this document?

7   A    Yes.

8   Q    What is it?

9   A    It is a side-by-side comparison proposal that was part of

10  our bargaining sessions earlier on.

11  Q    Do you recall which bargaining session this proposal would

12  have been made at?

13  A    Well, you have a date on here that says "1/20, so I would

14  imagine that based on that date then, that's when this was

15  presented, because I know one we presented the first one at that

16  time, yes.

17  Q    And at that time, you were presenting a separate proposed

18  contract for Textile Care Services, is that right?

19  A    That is correct.

20      MR. WIESE:  I'll offer General Counsel Exhibit 6(a).

21      MR. TERRELL:  We would like the opportunity to verify the

22  accuracy of this document.  As the witness indicated, there was

23  a side-by-side proposal that looked like this that was proposed

24  and delivered across the table on January 20, but we still have

25  a question as to whether this is an accurate copy.

P 00244

1    JUDGE STECKLER:  How much time do you need to review?

2    MR. TERRELL:  Ten minutes.

3    JUDGE STECKLER:  Okay, we'll take a break for 10 minutes.

4  That clock is not accurate.

5    MS. BURGESS:  Your Honor, I did change it.

6    JUDGE STECKLER:  Oh, you changed it.

7    MS. BURGESS:  I just changed it, so it should be correct.

8    JUDGE STECKLER:  It's now accurate, okay.

9    It is 10 till 11.  We will break until 11 for Mr. Terrell

10  to have an opportunity to review the document.

11    MR. TERRELL:  And I may need to consult with Mr. Henry

12  related to that -- just that narrow question.  I won't speak

13  with him about his other testimony though.

14    MR. WIESE:  Well, I mean, I would just like a reminder then

15  to the witness and --

16    JUDGE STECKLER:  Yes.

17    MR. WIESE:  -- to counsel that the sequestration order is

18  still in effect.

19    MR. TERRELL:  We understand the rule, Your Honor.

20    I just want to consult with Mr. Henry for purposes for

21  verifying whether this exhibit is the accurate exhibit.  I'll

22  need his assistance in order to do that.

23    MR. WIESE:  Your Honor, I mean --

24    JUDGE STECKLER:  Well, let me ask -- I'm sorry, let me ask

25  one question.  Do you have your own copy?

1       MR. TERRELL:  We have a copy, yes.

2       JUDGE STECKLER:  Can you compare the copy without talking

3   to Mr. Henry?

4       MR. TERRELL:  I can do that, but I may need to consult with

5   Mr. Henry just to verify.

6       JUDGE STECKLER:  Well, let's do that first, and then if you

7   need to speak with Mr. Henry, we'll go back on the record.

8       MR. TERRELL:  Okay.

9       MR. WIESE:  Your Honor, before we go off the record, I

10  would also like to point out that Mr. Stokes was at the

11  bargaining table as well as --

12      JUDGE STECKLER:  Yes, but I --

13      MR. TERRELL:  Well, he actually wasn't at the January 20

14  session.

15      JUDGE STECKLER:  Okay.

16      So we'll take a 10-minute break and come back at 1 minute

17  after 11.

18  (Off the record.)

19      JUDGE STECKLER:  Back on the record.

20      There were off-the-record discussions regarding how to

21  handle GC Exhibit 6(a).

22      Did the parties reach some type of accommodation?

23      MR. WIESE:  Yes, Your Honor, I believe that we did.

24      But before I talk about GC Exhibit 6(a), I'd just like to

25  clarify that I miss-spoke after we went on break.  I represented

1    that Mr. Stokes was at bargaining on January 20th.  As indicated

2    by the stipulation, he was not, in fact, at those negotiations.

3         But with regard to 6(a), so I believe we reached an

4    accommodation whereby the General Counsel Exhibit 6(a) is being

5    offered for the purpose of showing that when bargaining opened

6    on January 20th, there were separate contract -- there was a

7    separate contract offer on the table for Textile Care Services

8    while that was still part of the bargaining unit with the

9    hotels.

10        MR. TERRELL:  And could you identify for the witness what

11   document you placed in front of him?

12        MR. WIESE:  This is -- I believe this is that contract

13   offer from January 20th.

14        MR. TERRELL:  For which entity?

15        MR. WIESE:  For Textile Care Services.

16   Q    BY MR. WIESE:  Is that accurate?

17   A    That is accurate.  That's what I have here.

18   Q    Okay.

19        MR. WIESE:  So I'll offer it for that purpose.

20        JUDGE STECKLER:  Any objection to the --

21        MR. TERRELL:  No objection.  No objection.

22        JUDGE STECKLER:  Thank you.

23        Six (a) is admitted.

24   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 6(a).)

25   Q    BY MR. WIESE:  So, Mr. Henry, at negotiations on January

1  20th, Mr. Stokes wasn't present, was he?

2  A    No, he was not.

3  Q    Okay.

4       And you had Paul Jewison at those negotiations, is that

5  right?

6  A    That is correct.

7  Q    Okay, and Mr. Jewison is or was the President of Textile

8  Care Services, is that right?

9  A    That is correct.

10 Q    Okay.  And at negotiations on January 20th, the vast

11 majority of discussion that day was focused on separating --

12 explaining to the Union why the laundry business should be

13 separate from the hotel business.   Is that right?

14 A    Not in those terms.  What was -- we started the meeting --

15 we had made prior to our meeting on the 20th -- had several

16 discussions regarding potential and the differences between the

17 businesses.  We talked significantly about that as we led up to

18 that time period, which led us to the proposed contract in

19 discussing, "Well, these are our thoughts, this is what we see

20 moving forward.  Could you take a look at it and see what your

21 thoughts are too, as well, to support us."

22 Q    Mmm-hmm, so this contract offer was just your thoughts

23 about moving forward?

24 A    Yah, because we had discussed it briefly, so we wanted to

25 see what we would be able to do with it.

P 00248

1   Q    Okay.  And, in fact, you told the Union during negotiations

2   on January 20th, that you are moving forward with two contracts,

3   isn't that right?

4   A    That we would like to move forward two contracts, yes.

5   Q    And, in fact, you said you are moving forward with two

6   contracts, is that correct?  Do you remember saying that?

7   A    I don't remember saying that.

8        COURT REPORTER:  You say you "don't" remember?

9        THE WITNESS:  I don't remember saying that we are moving

10  forward, but I know that we said that we would like very much to

11  be able to move forward with separate contracts.

12  (Witness proffered the document.)

13       MR. WIESE:  Your Honor, I'm showing the witness what's been

14  marked as -- well, actually it  hasn't been marked -- it's the

15  Respondent's bargaining notes from the January 20, 2015 session,

16  and I only have one copy, because I received it pursuant to the

17  subpoena last night.  But I'd like to show it to the witness and

18  see if it refreshes his recollection as to what occurred at

19  bargaining that day?

20       MR. TERRELL:  Give me a minute to get my copy in front of

21  me.

22       JUDGE STECKLER:  Okay.

23  (Pause.)

24       MR. TERRELL:  Okay.

25       What number did you give this?

1      MR. WIESE:  It's not been marked yet.

2  Q   BY MR. WIESE:  So if you look at page 7 of these notes, I

3  believe you said you don't remember making the statement that

4  "We are moving forward with two contracts."

5      MR. TERRELL:  Objection:  asked and answered twice

6      JUDGE STECKLER:  I'm going to allow it.

7      Go ahead.

8      THE WITNESS:  I don't remember what my exact statements

9  were, but --

10 Q   BY MR. WIESE:  I'm showing you a copy of what's been marked

11 -- well, of the bargaining notes from January 20th.

12     MR. TERRELL:  I'm sorry, what number did you give that?

13     MR. WIESE:  It has not been marked.  It's just been

14 identified.

15     JUDGE STECKLER:  It's just for recollection and refresh.

16 He may not enter it at all.

17     MR. TERRELL:  Okay.

18     MR. STOKES:  I thought he said GC 5.

19     JUDGE STECKLER:  No, he didn't.

20 Q   BY MR. WIESE:  Are you --

21     MR. WIESE:  And I apologize for standing so close to your

22 witness but --

23 Q   BY MR. WIESE:  Are you the "MH" identified in that

24 document, is that right?

25 A   Yes, uh-huh.

1  Q    Okay.  Take a minute to look at -- look at the bottom --

2  A    Okay.

3  Q    -- quarter of that page and let me know when you're done.

4  (Pause.)

5  A    I'm done.

6  Q    Do you now recall making the statement, "We are moving

7  forward with two contracts"?

8  A    Similar to that, yes.

9  Q    Okay.  And do you recall making the statement, "You have

10  the document in front of you that we are moving forward with."

11  A    As it relates to the notes, yes.

12  Q    Okay.  And the document that you're talking about is this

13  separate contract offer for Textile Care Services, isn't that

14  right?

15  A    That would be I --

16      JUDGE STECKLER:  Is that, for the record --

17      MR. WIESE:  General Counsel Exhibit 6(a).

18      JUDGE STECKLER:  Okay, just want to make sure it's on the

19  record.

20  Q    BY MR. WIESE:  So after the parties met on January 20th,

21  they met again on January 29th, isn't that right?

22  A    That is correct.

23  Q    Okay, and at those negotiations on January 29th, the

24  parties continue to discuss separating out Textile Care Services

25  from the hotel units.  Do you recall that?

P 00251

59

1  A    I think we did, yes.

2  Q    Are you sure or do you just --

3  A    I think we did, yah.

4  Q    Okay, all right.

5      And do you recall the Union walking out from negotiations

6  that day?

7  A    That they left, yes.

8  Q    And they kept insisting at negotiations that day that

9  separating out the laundry facility from the hotel units was a

10 permissive subject of bargaining.  Do you remember that coming

11 up?

12 A    I do.

13 Q    All right.  And then after negotiations on January 29th,

14 there was an unfair labor practice charge filed.  Do you recall

15 that?

16 A    Yes, I do.

17 Q    Okay, and it was after the negotiations on January 29th

18 that Mr. Arch Stokes came in to the bargaining table, is that

19 correct?

20 A    I think so, yes.

21 Q    Okay.  All right, and it was after Mr. Stokes came in to

22 the table that the employer filed a "UC" Petition with the Board

23 to determine whether Textile Care Services should be part of the

24 unit, is that right?

25 A    Yes, we were  hoping that before we filed a "UC" Petition,

P 00252

1    that we would have an amicable agreement before such time.

2    Q    And you did that by telling the Union that you're moving

3    forward with two separate contracts?

4    A    No, we did that by having conversations about having two

5    separate contracts prior to the bargaining session starting.

6        MR. WIESE:  All right, Your Honor, the following line of

7    questions is in support of Complaint allegations 6(c) and -- or

8    excuse me, yes, 6(c) and 12(l) of the General Counsel's

9    Complaint.

10   Q    BY MR. WIESE:  So, Mr. Henry, while the parties were

11   bargaining in 2015, the prior collective bargaining agreement

12   that we were talking about is General Counsel Exhibit 2,

13   expired, is that right?

14   A    When we started the negotiation, it was extended through

15   February of 2015, yes.

16   Q    Right, and the parties continued to negotiate after

17   February 2015?

18   A    Yes.

19   Q    Okay.  And the agreement then expired after February 28,

20   2015?

21   A    Yes.

22   Q    So I'd like to take a look at Appendix A of this agreement.

23       JUDGE STECKLER:  GC Exhibit 2.

24       MR. WIESE:  Yes, thank you.

25       MR. TERRELL:  Excuse me, Tyler.

61

1       What Complaint allegation are you referring to?

2       MR. WIESE:  I believe it's 6(c) and 12(l),

3   Q    BY MR. WIESE:  So if you turn to -- it looks like it's page

4   29 of 52 of the exhibit or (a)(2) -- or actually, let's go to

5   (a)(3), page 30 of 52.

6       So looking at this document, let's take the second cook at

7   the top for the Kahler Hotel.  So there are wage rates for 2011,

8   2012 and 2013.  So if a second cook got hired in 2011, they

9   would have been hired at 15.03, according to this, is that

10  right?

11  A    That is correct.

12  Q    And then the same rate in 2012 and 2013 it looks like for

13  the hire rate, is that right?

14  A    If they hired, yes, on the property, it will be the same

15  rate, yes.

16  Q    Okay.  And then after working for a year, let's say they

17  had worked -- their anniversary date came up in 2011, they would

18  be making 16.26, is that right?

19  A    Well, their anniversary date, as it states here, after 12

20  months, yes, they would have gotten an increase after 12 months

21  to 16.26.  And then based on what the contract states here, that

22  if they were hired either within that 12-month period of time up

23  to September 1st, they would have gotten another increase, yes.

24  Q    Okay.  And so when I'm talking about step increases here,

25  the increases that I am talking about are the increases from the

P 00254

1  hire to 12 months and then 12 months to 24 months, 24 months, 42

2  months and 42 months to 60 months.  Do you understand what I'm

3  talking about?

4      MR. TERRELL:  Respondent -- first, Respondent wants to make

5  a continuing objection to the term "step increases."  We do not

6  believe and contend as a legal matter that these are not step

7  increases.

8      JUDGE STECKLER:  So noted.

9      Please proceed, Mr. Wiese.

10 Q    BY MR. WIESE:  So when I'm talking about step increases,

11 those are the increases that I'm talking about.

12     Do you understand?

13 A    I understand what's on here, yes.

14 Q    Okay, all right.

15     And then the annual increases, when I use that term, I'm

16 talking about the shift from the 2011 columns to the 2012

17 columns and the increases that occur on the anniversary date of

18 the contract.  Is that clear?

19 A    That is clear.

20 Q    Okay, all right.

21     So when you assumed this Collective Bargaining Agreement in

22 2013, you continued to pay the step increases outlined in this

23 contract, is that right?

24 A    Yah, we continued to pay the increase as indicated in the

25 contract, yes.

1   Q   When you started bargaining with the Union, in fact before

2   you began formal bargaining sessions, you told the Union that

3   you wanted to eliminate these step increases, didn't you?

4   A   I said we would like to change how the increases are done,

5   yes.

6   Q   And part of those changes included eliminating these step

7   increases, isn't that right?

8   A   Part of those changes means changing what they have

9   established here currently in the contract.

10   Q   But I'm asking about the specific change that we're talking

11   about as it relates to step increases.  Was one of the proposals

12   that the employer made prior to formal negotiations -- did that

13   include eliminating step increases?

14   A   To -- as you acknowledge it, I guess so, yes.

15   Q   Showing the witness what has been marked as General Counsel

16   Exhibit 3.

17   (Witness proffered the document.)

18   Q   Mr. Henry, do you recognize this document?

19   A   Just give me a minute here, sir.

20   Q   Yes.

21   (Pause.)

22   A   This looks like some prior notes in preparation for

23   bargaining.

24   A   Mmm-hmm.  And, in fact, this is what the employer gave to

25   the Union, isn't that right?  This is something that the

1  employer gave to the Union?

2  A    I don't recall to be honest.

3  Q    But you do recognize what this document is?

4  A    Yes, I do recognize the verbiage, yes.

5  Q    And where it says, "proposed language," that's what the

6  employer wanted to have included in the upcoming contract, is

7  that right?

8  A    That's look like it, yes.

9  Q    Okay, all right.  And if you look at the second box on the

10 first page, it says -- it talks about eliminating rate increases

11 at various service points, isn't that right?

12 A    It says here "Retain the annual increases, however,

13 eliminate rate increases at various service points."  It does

14 say that --

15 Q    And the service points that we're talking about are the

16 step increases, isn't that right?

17 A    I can't testify to that.  I'm not sure.  I guess that's

18 what they represent here, but I don't know.

19 Q    All right.  And the reason you wanted to eliminate those

20 step increases because it would be consistent with standard

21 practice across various organizations, is that right?

22 A    That's what it states here.

23 Q    That's what it states.

24 A    Yes.

25 Q    And when you're talking about various organizations, you're

65

1  talking about other hotel properties, is that right?

2  A    I would imagine so, yes.

3  Q    Okay.  Including non-union hotel properties?

4  A    I would imagine so.

5  MR. WIESE:  I'll offer General Counsel Exhibit 3 into

6  evidence.

7  MR. TERRELL:  The only objection we have is these

8  handwritten stars on the first page.  There's been no testimony

9  as to where those stars came from or who put those there, what

10 significance they have.  So I'll not object to the document, but

11 would request that the stars be ignored for purposes of

12 accepting this document into evidence.

13 MR. WIESE:  And, Your Honor, we're fine with that.

14 JUDGE STECKLER:  Subject to Mr. Terrell's limitation, GC 3

15 I admitted.

16 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 3.)

17 Q    BY MR. WIESE:  Now, Mr. Henry, the Union didn't agree to --

18 didn't reach any agreement with you to eliminate the step

19 increases, did they?

20 A    I don't think there was a tentative agreement on anything

21 as relates to wages at all or pay rates.

22 Q    Including the step increases?

23 A    As I said, there's been no agreement on anything related to

24 rates or wages.

25 Q    And so once the predecessor Collective Bargaining

1  Agreement, the one in General Counsel Exhibit 2, expired in

2  February, you stopped paying the step increases, isn't that

3  right?

4  A    We didn't have a contract to pay anything on, so I didn't

5  pay anything.

6  Q    But I'd like you to answer my question "yes" or "no," did

7  you stop paying those step increases when the contract expired?

8  A    Well, when the contract expired, we stopped providing

9  increases associated with the contract that is no longer in use.

10  Q    I'll ask the question one more time.

11      MR. TERRELL:  Objection:  asked and answered.  He's got his

12  answer.

13      JUDGE STECKLER:  I think I understand the answer.

14      MR. WIESE:  Okay.

15      JUDGE STECKLER:  So we'll move on.

16      MR. WIESE:  We'll move on, Your Honor.

17  Q    BY MR. WIESE:  And you did this, you stopped paying the

18  increases in the contract without the agreement of the Union, is

19  that right?

20  A    Well, in bargaining session, I'm quite sure that the notes

21  will reflect that we also shared with the Union during the

22  bargaining session that the contract had expired after the 28th,

23  and as a result we have no contract moving forward, which

24  reflects the pay increases will stop and then other issue --

25  items there were discussed during negotiations.

1  Q    So you were using the elimination of the step increases as

2  leverage against the Union at the bargaining table, is that

3  right?

4  A    No, that's incorrect.

5  Q    Oh, it's not?  But you kept bringing it up to the Union,

6  right?

7  A    No.

8  Q    As you just said, the bargaining notes reflect that.

9        MR. TERRELL:  Objection.  Let the witness answer.

10       The witness was cut off, Your Honor.

11       JUDGE STECKLER:  He said "no."  I think the explanation --

12       MR. TERRELL:  He was -- there was a comma and there was

13  more discussion and then he was cut off.

14       JUDGE STECKLER:  Both -- since this is a 611(c), he is

15  entitled to just get a "no" and move ahead.

16       Proceed, Mr. Wiese.

17  Q    BY MR. WIESE:  So your testimony is now that the

18  elimination of the step increases did not come up at the

19  bargaining table?

20  A    I'm sorry, could you repeat that, please?

21  Q    Yes.

22       So your testimony now is that the elimination of the step

23  increases did not come up at the bargaining table?

24  A    Okay, can you explain what you mean by "the elimination of

25  the step increases did not come up during bargaining."  I'm

P 00260

1    trying to understand what you're saying.

2    Q    I'm asking whether at the bargaining table the parties

3    discussed -- you know what I'm talking about with the step

4    increases, is that right?

5    A    No, I understand what you're referring to, yes.

6    Q    Okay.  So I'm asking whether the elimination of those step

7    increases -- whether that came up at the bargaining table.

8    A    What came up at the bargaining table is our discussion with

9    what we would like to see of what we have proposed in our

10   contract.  That's what we discussed at the bargaining table.

11   Q    Okay.  So you did discuss it at the bargaining table?

12   A    We discussed our proposal, yes.

13   Q    And you also discussed the fact that you had stopped paying

14   these step increases after the contract in General Counsel

15   Exhibit 2 expired, is that right?

16   A    Could you repeat that, please.

17   Q    Mmm-hmm.

18       So you also discussed the fact that you or Richfield had

19   stopped paying these step increases after the expiration of the

20   contract, the prior Collective Bargaining Agreement.  Did that

21   come up at the bargaining table?

22   A    It did not come up at the bargaining table.

23   Q    All right.

24       And so the Union never agreed to eliminate those step

25   increases after the expiration of this Collective Bargaining

P 00261

69

1   Agreement, did they?

2   A    The Union did not make any arguments to continue with the

3   step increases either.

4   Q    That's not the question that I asked, Mr. Henry.

5   A    But that's the response.

6   Q    No, but I'm asking whether there was an agreement between

7   the parties to eliminate the step increases after the expiration

8   of the contract the prior Collective Bargaining Agreement, "yes"

9   or "no"?

10  A    There was no agreement to either extend or any arguments to

11  extend the step increases.

12       MR. WIESE:  Your Honor, I would ask that the witness be

13  directed to answer my question.

14       JUDGE STECKLER:  I think I understand the answer.

15       Let's just move along.

16  Q    BY MR. WIESE:  And, in fact, the Union filed at least one

17  grievance over the elimination of these step increases, didn't

18  they?

19  A    There was an e-mail that I either received from either

20  Brian or Nancy associated with an associate who came to them

21  with regard to their increase, to my recollection.

22  Q    Showing you what's been marked as General Counsel Exhibit

23  5.

24  (Witness proffered the document.)

25  Q    So, Mr. Henry, do you recognize this document?

P 00262

1  A    Yes, I do.

2  Q    And is this the e-mail that you were referring to --

3  A    Yes.

4  Q    -- a second ago about the elimination of the step

5  increases?

6  A    This is the e-mail I was referring to when you asked me the

7  question regarding an associate who was impacted by not getting

8  an increase, yes.

9      MR. WIESE:  I will offer General Counsel Exhibit 5 -- the

10  top exchange, I -- we can exclude it if you'd like.

11      MR. TERRELL:  I have no objection to the e-mail from

12  Michael Henry and the ones that preceded it.

13      What's this at the top?  It's an e-mail from Martin to

14  Tyler.  The top e-mail from Goff to Wiese has no relevance to

15  the case.

16      JUDGE STECKLER:  I don't think we would consider it as part

17  of the case.

18      GC 5 is admitted.

19  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 5.)

20  Q    BY MR. WIESE:  So, Mr. Henry, you've had employees speak to

21  you about the elimination of their step increases, haven't you?

22  A    I have had employees speak to me about the fact that they

23  have not gotten an increase, yes.

24  Q    Right.  And how many employees?

25  A    I don't have a good number in my head right now; roughly, I

```
 1  don't know, quite a few.

 2  Q    So did you say "quite a few"?

 3  A    Quite a few, yes.

 4  Q    More or less than 10?

 5  A    Oh, I would say probably more than 10.

 6  Q    More or less than 20?

 7  A    Kind of put myself in a box if I said that, I don't know,

 8  I'm not sure.

 9  Q    But certainly more than 10?

10  A    Yes.

11  Q    All right.

12       Do you remember the names of any employees who have talked

13  to you about this?

14  A    Ashley, who is referenced in here.  Who else?  A few other

15  associates who are no longer with us at the property.

16  Q    Do you remember when you spoke with Ashley?

17  A    I remember having a conversation with her, yes.

18  Q    And where did that conversation take place?

19  A    She was in my office.

20  Q    And she came up to you asking you about why she wasn't

21  getting her step increase?

22  A    No, she came to me and said that Brian told me -- told her

23  to come to me to talk to me about the increase, getting her an

24  increase.

25  Q    And you told her that she wasn't going to be getting an
```

1   increase?  Did you?

2   A    What I shared with her was that we have left an offer on

3   the table with an increase associated with it, and once the

4   Union signs it, the increase will be in effect.

5   Q    And is this essentially the same thing that you told to the

6   other more than 10 employees that you talked to?

7   A    Yes.

8   Q    Okay.  All right.

9        So now, Mr. Henry, I'd like to talk to you a little bit

10  about contract negotiations.  You served as the employer's lead

11  negotiator at several sessions, is that right?

12  A    That is correct, yes.

13  Q    Okay.  And those were the sessions that Mr. Stokes wasn't

14  at, is that correct?

15  A    That is correct.

16  Q    Okay.

17       MR. WIESE:  Your Honor, I'm showing the witness what's

18  previously been marked as General Counsel Exhibit 6(g).

19  (Witness proffered the document.)

20  Q    BY MR. WIESE:  Do you recognize this document?

21  A    It looks very familiar.

22  Q    And what do you recognize it as?

23  A    The changes on here represents I guess a proposal that we

24  put on the table for -- during our bargaining session.

25  Q    And do you recall when this specific proposal would have

1  been made?

2  A    This would probably be somewhere in about March.

3  Q    If you have chance to look at this -- I would actually

4  direct your attention to page 50 of 150, this offer.

5  A    You said 5-0?

6  Q    Yes, yup, 5-0?

7  A    Okay.

8  Q    There's a signature page back there, is that right?

9  A    Yes, that's right.

10  Q    And does this help you identify when this contract offer

11  was made?

12  A    This will be a signature page, because we probably -- this

13  was our last and final offer that we put on the table I would

14  imagine.

15  Q    Okay.  So this is the last, best and final contract offer

16  of March 24th, is that right?

17  A    It looks like it.

18      MR. WIESE:  I'll offer General Counsel Exhibit 24 -- or,

19  excuse me, 6(g).

20      MR. TERRELL:  No objection.  We just reserve the right to

21  review it more closely, to insure that it's an accurate copy,

22  but no objection.

23      JUDGE STECKLER:  Okay, 6(g) is admitted.

24  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 6(g).)

25  Q    BY MR. WIESE:  Mr. Henry, you gave this to the Union

P 00266

1    representatives who were present that day at negotiations on

2    March 24th, is that right?

3    A    Yes.

4    Q    And you hand-delivered it to them?

5    A    I think this was hand-delivered, yes.

6    Q    And, in fact, you gave it to them as they were getting on

7    the elevator to leave negotiations that day.  Do you recall

8    that?

9    A    I recall that, yes, that we gave it to them when they were

10   on their way out, yes.

11   Q    While they were in the elevator, correct?

12   A    No, they were in the hallway.

13   Q    Okay, on their way to the elevator?

14   A    Yes.

15   Q    So the Union -- you called this the employer's last, best

16   and final offer, and that's what this is, is that right?

17   A    Yes.

18   Q    And the Union has made contract offers since March 24th,

19   isn't that right?

20   A    They have not made contract offers, their proposed

21   amendment to the contract, but not contract offers, no.

22   Q    Okay.  And when you say contract offer, you are talking

23   about a full, comprehensive contract.

24   A    That's what I thought you were referring to.

25   Q    Oh, yah, and then it's my apologies.

1    A    Okay.

2    Q    But the Union has made proposals since March 24th, is that

3    right?

4    A    Yes.

5    Q    And in these proposals, the -- well, you've rejected these

6    proposals in total, haven't you?

7    A    Yes.

8    Q    Since March 24th, you haven't declared impasse, have you?

9    A    No, but Brian has.

10    Q    Okay.

11         Well, Mr. Henry, I'd like to take a look at this March 24th

12    contract offer a little more closely.

13         MR. WIESE:  And, Your Honor, this line of questions is

14    going to be in support of Complaint allegations 12(b) through

15    (d).

16         MR. TERRELL:  Twelve --

17         MR. WIESE:  "B" as in "bear" through "D" as in "dog."

18         MR. TERRELL:  Okay.

19    Q    BY MR. WIESE:  So I'd like to take a look at Appendix A of

20    this proposal, which I believe starts on page 52 of the

21    document.

22         MR. TERRELL:  And, Tyler, when you say page 52, you are

23    referring to page 52 of 150?

24         MR. WIESE:  Right, yes.

25         MR. TERRELL:  So it's not the original document number, but

1    the Bates stamp number you've added.

2        MR. WIESE:  That's correct.

3        MR. TERRELL:  Okay.

4        MR. WIESE:  And, actually, if you flip over, it looks like

5    Appendix A starts on page 51 of the document.

6        MR. TERRELL:  Right.

7        Are we on the record?

8        COURT REPORTER:  Yes.

9        MR. TERRELL:  Thank you.

10   Q    BY MR. WIESE:  So this is the employer's most recent offer

11   on wages, is that right?

12   A    That is correct.

13   Q    And in Appendix A, all of the employees it looks like are

14   scheduled to receive wage increases across the term of the

15   contract, is that right?

16   A    I'm sorry, could you repeat that, please?

17   Q    Employees are scheduled to receive -- based on Appendix A,

18   employees are scheduled to receive wage increases during the 5-

19   year term of the contract?

20   A    Yes.

21   Q    And you could take a minute to look at this if you need to,

22   but none of the employees or the classifications listed in

23   Appendix A -- none of those employees are scheduled to get wage

24   decreases during the contract, are they?

25   A    No one is scheduled to get a wage decrease, no.

1  Q    And, in fact, you represented to the Union at the

2  negotiating table that with the exception of the banquet

3  servers, that no employees were scheduled to receive decreases

4  during the term of the employer's proposed contract.  Do you

5  recall saying that?

6  A    Yes.

7  Q    Okay, and this is, in fact, reflected in Appendix A?

8  A    Correct.

9  Q    Now in order to demonstrate the economics of the employer's

10  wage proposals, the employer presented pie charts for each

11  individual employee in the bargaining unit.

12  A    Correct.

13  Q    And these pie charts showed how the employer's wages and

14  benefits in its proposal would apply to each employee in the

15  bargaining unit, is that correct?

16  A    That is correct.

17  Q    And, in fact, you stand by the accuracy of these pie

18  charts, don't you?

19  A    As best as we possibly can, yes.

20  Q    And you would say that these pie charts accurately display

21  how the employer's offer affects each employee in the bargaining

22  unit, is that correct?

23  A    Primarily, yes.

24  Q    Yes or no?

25       JUDGE STECKLER:  Wait a minute.

P 00270

1      I was going to ask what does "primarily" mean?

2      THE WITNESS:  Because I -- with regards to -- I know that

3   there were some changes within the meeting when we had

4   negotiations with regards to those folks who would receive

5   uniforms, those folk who were not part of the uniform aspect of

6   it.  So there were a small percentage associated, like 20 cents

7   that goes towards uniform allowances that some of the Union

8   members don't get uniforms.  So they were saying that that

9   should not be reflected in their total remuneration  So that's

10  what I --

11     JUDGE STECKLER:  Thank you.

12     Mr. Wiese, you may continue.

13  Q   BY MR. WIESE:  Besides uniforms, would you stand by their

14  accuracy?

15  A   Yah, I would say that, yes.

16  Q   Okay.  And you've, in fact, told the Union on multiple

17  occasions that they need to show these pie charts to the

18  individual employees, so that employees can see how this March

19  24th contract offer would apply to them.  Is that right?

20  A   We encourage that, yes.

21  Q   And, in fact, you have given individual notices to each

22  employee in the bargaining unit telling them that they should go

23  to the Union and ask for their pie chart.  Is that right?

24  A   What is correct is that since we started -- I just said

25  we've had over 10 folks that have stopped by the office asking

1   about increases.  And one of the things that we have done is in

2   order for us to -- for them to fully understand what their total

3   compensation package is, that it was associated with the pie

4   charts to go to speak with the Union to get that information, so

5   they can reflect what their wage increase would be as they move

6   forward.

7   Q    And --

8        MR. WIESE:  Would you mark it.

9        COURT REPORTER:  GC --

10       MR. WIESE:  GC 9.

11   (EXHIBIT MARKED:  GENERAL COUNSEL'S 9.)

12   (Witness proffered the document.)

13   Q    BY MR. WIESE:  Showing the witness what's previously been

14   marked as General Counsel Exhibit 9, do you recognize this

15   document?

16   A    Yes.

17   Q    And this is the notice that you gave to employees about the

18   individual pie charts.  Is that correct?

19   A    That is correct.

20   Q    And what you told employees was that the pie charts

21   reflected exactly what management's last, best and final

22   proposal is for each member of the bargaining unit, is that

23   correct?

24       MR. TERRELL:  Objection:  misstating the document, I

25   believe.  No, I'll withdraw the objection.

1          JUDGE STECKLER:  Okay, go ahead, Mr. Wiese.

2          MR. WIESE:  Okay.

3    Q    BY MR. WIESE:  And what you were telling employees is that

4    their pie charts reflect exactly what management's last, best

5    and final proposal is for each member of the bargaining unit, is

6    that right?

7    A    Yes.

8    Q    Okay.

9          MR. WIESE:  I'll offer General Counsel Exhibit 9.

10         MR. TERRELL:  No objection.

11         JUDGE STECKLER:  GC 9 is admitted.

12   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 9.)

13   Q    BY MR. WIESE:  So, Mr. Henry, there's a separate pie chart

14   for each employee for each year of the employer's March 24th

15   proposal.  Is that right?

16   A    Yah, I think we created one, yes.

17   Q    All right.

18         And you mentioned earlier there were maybe a little under

19   300 employees in the bargaining unit?

20   A    Somewhere there, yes.

21   Q    And you were -- the March 24th proposal is a 5-year

22   contract, is that right?

23   A    Yes.

24   Q    So I think we would be talking about --

25   A    Fifteen hundred.

1   Q    -- 1,500, maybe a little --

2   A    Somewhere around there.

3   Q    Yes.  And, in fact, for some of those employees, there is

4   more than one pie chart for each year, is that right?

5   A    For some employees, yes.

6   Q    Okay.  And you -- in fact, you presented these individual

7   pie charts to the Union at the negotiating table, is that right?

8   A    Yes, we did.

9   Q    Okay, all right.  And you did this in paper form?

10  A    Yes.

11  Q    In approximately two bankers boxes?

12  A    I can't remember how many, but, yes, we did --

13  Q    All right, but several boxes, is that right?

14  A    Yes.

15  Q    Okay, all right.  And these pie charts were only provided

16  in paper form, is that right?

17  A    That's what we -- yes.

18  Q    And only one copy was provided to the Union?

19  A    We went through -- if I'm not mistaken, yah.

20  Q    And so it's this proposal, these individual pie charts,

21  that you expect the Union to agree to as part of your last, best

22  and final offer?

23  A    Well, not what we expect the -- what we presented to the

24  Union is a representation of what each bargaining group would be

25  paid as new hires as they move forward, yes.

1    Q    Now, Mr. Henry, you were responsible for producing the

2    documents responsive to a subpoena that I issued to you, is that

3    correct?

4    A    Yes.

5    Q    And one of the documents that I requested was true and

6    accurate copies of the pie charts that were provided to the

7    Union.  Is that right?

8    A    If memory -- I don't have the document in front of me, but

9    I think so, yes.

10    Q    In fact, it should be up there.  I can provide it to you if

11    you'd like.

12        MS. BURGESS:  The subpoena.

13        MR. WIESE:  Yes, General Counsel Exhibit 37.

14        JUDGE STECKLER:  I have a copy here.  I'm handing it to Mr.

15    Henry now.

16    (Witness proffered the document.)

17    Q    BY MR. WIESE:  And if you look at the second page, request

18    20 -- it's actually on the 4th page.  That request is for the

19    pie charts that were provided by the employer to the Union.  Is

20    that right?

21    A    Yes.

22    Q    And you did not, in fact, produce these pie charts to me,

23    did you?

24    A    No, we did not.

25    Q    And that's because you didn't have any copies of the pie

83

1  charts, is that right?

2  A    Correct.

3  Q    Despite the fact they are a part of our March 24th offer to

4  the Union, is that right?

5  A    Well, the pie charts are associated with every single

6  employee that is currently employed under the bargaining unit as

7  a reflection of what we discussed in the bargaining unit and was

8  supposed to be distributed to all of those bargaining members at

9  the time.

10 Q    So it's part -- it reflects what employees are going to be

11 paid under your last, best and final offer, is that right, the

12 pie charts?

13 A    Yes, they do.

14 Q    And so you don't have these pie charts, despite the fact

15 that they reflect what employees are going to be paid under your

16 last, best and final offer?

17 A    No, we don't.

18 Q    And you're aware that there was an unfair labor practice

19 filed over this bargaining in May, aren't you?

20 A    An unfair labor practice filed in --

21 Q    In May of this year -- are you aware that there was an

22 unfair labor practice charge filed by the Union related to what

23 was going on at the bargaining table?

24 A    I'm aware of all the charges, yes.

25 Q    Okay, all right.  And that these were subject to a

 1  Complaint that issued in September of this year.  Are you aware

 2  of that fact?

 3  A    I don't understand, I'm sorry.  Subject to a --

 4  Q    Okay.  Well, anyways, that these pie charts are part of the

 5  litigation and the reason that we're here today?

 6  A    Yes.

 7  Q    And yet you destroyed these pie charts, isn't that right?

 8       MR. TERRELL:  Objection.

 9       THE WITNESS:  Excuse me?

10       MR. TERRELL:  Miss-states his previous testimony about the

11  pie charts.

12       MR. WIESE:  I didn't refer to any previous --

13       JUDGE STECKLER:  Could you rephrase, Mr. Wiese?

14  Q    BY MR. WIESE:  You got rid of these pie charts, didn't you?

15  A    No, I did not.

16       MR. TERRELL:  Objection.

17       I'll withdraw it.  He answered.

18       THE WITNESS:  No, I did not.

19       JUDGE STECKLER:  He said he didn't.  That's the answer.

20  Q    BY MR. WIESE:  Then where are they?

21  A    You have them or the Union has them.

22  Q    The only copy?

23  A    Right, so they were not destroyed.  The Union has them.

24  Q    Were they handwritten?

25  A    They were typed.

1  Q    So where is the electronic copy?

2  A    We don't have copies of those.

3  Q    So you got rid of the electronic copy?

4  A    No, we did not.  We provided the material and provided it

5  to the Union at negotiations and they have copies of it.

6  Q    What happened to the file that these were created with?

7  A    I don't know.

8  Q    And so when did you get rid of that file?

9       MR. TERRELL:  Objection to the term "get rid of."

10  Q    BY MR. WIESE:  When did this file cease to exist?

11  A    Again, I go back to my previous statement.  We provided the

12  documentation and gave it to the Union during negotiations for

13  them to distribute it to every single member of their union

14  body, plain and simple.  You have copies of them.

15  Q    The only copies.

16  A    Copies, nonetheless.

17  Q    Showing the witness what has been marked as General Counsel

18  Exhibit 10(a) through (l).

19  (Witness proffered the document.)

20  Q    You can take a minute to look at these, but we'll go

21  through them one by one.

22       So taking a look at -- let me know when you are ready, Mr.

23  Henry.

24  A    Yup, just go ahead.

25  Q    Okay.  So taking a look at General Counsel Exhibit 10(a),

P 00278

1   this is a pie chart for Andrew Vacura, Lead Cook, is that right?

2   A    Yes.

3   Q    And just going through the pie charts, the biggest section

4   of the pie chart on the left-hand side, that's 20.58; that's

5   base pay and overtime, is that right?

6   A    Yes.

7   Q    And if you go through this pie chart, if you go in two

8   pages, page 3, it's the pie chart for 2016, is that right?

9   A    That is correct.

10   Q    And there -- the biggest portion of the pie chart, the

11   20.89 section, is also base pay and OT, is that right?

12   A    That is correct.

13   Q    Ad if you look at the other years in the contract, 2017,

14   2018, 2019 and 2020, that's the same thing.  That section of the

15   pie chart is for base rate and overtime, is that right?

16   A    That's what is reflected, yes.

17   Q    Okay.  So you're projecting, in fact, overtime for

18   employees in 2020 as part of your offer, is that right?

19   A    That is correct.

20   Q    And if you look at the top right, again, we can look at the

21   first page here.   It says "TRW equals $30.10."

22   A    Yes.

23   Q    What is the term "TRW"?

24   A    Total -- it represents total wages and benefits for an

25   associate.

1    Q    Okay.  Do you know what each letter in that mean?

2    A    I have it written down somewhere.

3    Q    Okay, but you're aren't sure today?

4    A    I don't have it with me to speak, it's just what I

5    represented to you just now, total wages and benefits.

6    Q    All right.  So looking at the bottom of this document, so

7    where it says base pay, OT, vacation, holiday, do you see what

8    I'm talking about?

9    A    Yup.

10   Q    Okay.  So one of the things that's included in this pie

11   chart is jury duty, is that right?

12   A    That is correct.

13   Q    Okay.  Now employees don't take jury duty each year, do

14   they?

15   A    Not always.

16   Q    Okay.  And what about -- and then next to that there's

17   bereavement leave, is that right?

18   A    That is correct.

19   Q    Okay, and employees don't necessarily take bereavement

20   leave each year, do they?

21   A    I would hope not, no.

22   Q    And it also includes taxes, if you go over a couple -- a

23   couple lines.

24   A    Yah.

25   Q    And these are the taxes that are paid by the employer,

1    isn't that right?

2    A    That is correct.

3    Q    Okay, and Workers Comp, right next to that, that's also

4    something that's paid by the employer, isn't that right?

5    A    That is correct.

6    Q    Okay, along with uniforms?

7    A    Yes.

8    Q    All right.  And the uniforms are, in fact, tax deductible

9    for the employer, aren't they?

10    A    Could very well be.

11    Q    So you aren't sure of the answer to that?

12    A    No, I'm not sure.

13    Q    Did all of these terms, the employer's taxes, the Workers

14    Comp. -- these are included as part of the employee's wages, is

15    that right?

16    A    Yes, total wages.

17    Q    Right.  But the -- at least the employee's compensation.

18    A    Yes.

19    Q    So if you turn to page 2 of this document, the -- in the

20    table on the left hand side of the page where it says base pay,

21    and then going across underneath "hourly rate," do you see what

22    I'm talking about?

23    A    Yes.

24    Q    It says 18.82, is that right?

25    A    That is correct.

P 00281

1  Q    And that's different than the base pay and overtime figure

2  listed next to it in the pie chart, isn't that right?

3  A    That is correct.

4  Q    And if we flip through this document, you can see that Mr.

5  Vacura is schedule to get wage increases, according to both his

6  base pay and the -- base pay and overtime section of the pie

7  chart, is that right?

8  A    That's correct.

9  Q    Okay, and so from 2015 to 2016, it looks like it's maybe

10  about a 30 cent raise?

11  A    Yah, it's about.

12  Q    Roughly.

13  A    Mmm-hmm.

14  Q    So let's take a look at General Counsel Exhibit 10(b),

15  which should be the next document.

16       Do you have it?

17  A    Ten(b)?

18  Q    Yes, 10(b).  It should be right behind 10(a), in the stack,

19  the next stapled -- stapled set of charts.

20  A    Uh-huh.

21  Q    So this is a pie chart for Felipe Cruz Garcia.  Is that

22  right?

23  A    Yes.

24  Q    And like Mr. Vacura, he is a Lead Cook.  Is that right?

25  A    Yes.

1    Q    And if you take a second to compare the base rates and the

2    base pay and overtime sections of the pie charts, Mr. Garcia is

3    making a different wage rate for each year of the contract that

4    Mr. Vacura, is that correct?

5    A    That is correct.

6    Q    And he is also receiving different wage increases than Mr.

7    Vacura during the course of that contract, is that right?

8    A    That's reflected here, yes.

9    Q    All right.

10    We can go to the next document, GC Exhibit 10(c).  So this

11    is a pie chart for Tum Chan.  He's also a Lead Cook, isn't he,

12    Mr. Henry.

13    A    Yes.

14    Q    And you can compare if you need to, but Mr. Chan is making

15    a different wage rate than both Mr. Vacura and Mr. Garcia, is

16    that right?

17    A    That is also correct.

18    Q    All right.

19    Turning your attention to General Counsel 10(d), this is a

20    pie chart for Bonifica Schnell, is that right?

21    A    That's correct.

22    Q    And she's the Dish Machine Operator, is that right?

23    A    Correct.

24    Q    And if you turn to the page 12 of the contract, it has her

25    hourly rate according to the --

1  MR. TERRELL:  Contract?

2  MR. WIESE:  Or, excuse me, thank you, Mr. Terrell.

3 Q BY MR. WIESE:  This proposal in 2020, her hourly rate is

4 10.65, is that right?

5 A Let me go back to that, hold on.

6  You said in Exhibit 6?  Is that what you're talking about,

7 GC6?

8 Q No, I'm talking about -- I'm still talking about 10(d)

9 A Okay.

10 Q And so looking at page 12 of the pie chart --

11 A Okay.

12 Q -- across from "base pay" underneath "hourly rate," it says

13 that she is scheduled to make 10.65.  Is that right?

14 A All right, you said page 12?

15 Q Yes.

16 A This page 12 right here?

17 Q Yah, the pie chart should say "2020" underneath it?

18 A Yah.

19 Q Okay.

20 A It says 11.49 here.

21 Q Yes, I'm talking about in the table though, the hour --

22 A Okay.

23 Q -- her base hourly rate --

24 A Okay.

25 Q -- says 10.65, is that right?

P 00284

1   A    Yes.

2        MR. TERRELL:  10.65.

3   Q    BY MR. WIESE:  And if you turn to General Counsel Exhibit

4   6(g), the Appendix, Appendix A of that agreement that we talked

5   about earlier.

6        MR. TERRELL:  I'm sorry, we're on 6(g)?

7        MR. WIESE:  Yes.

8        MR. TERRELL:  Page what now?

9        MR. WIESE:  That's the March 24th offer.

10       MR. TERRELL:  Right.

11       MR. WIESE:  Appendix A of that offer.

12       MR. TERRELL:  Page 50 -- 51?

13  Q    BY MR. WIESE:  So if we look at page 52.  And if you go

14  down about halfway down the machine, it says "Dish Machine O-P-

15  E-R and Porter, do you see what I'm talking about?

16  A    I see it, yah.

17  Q    Okay, all right.

18       If you go across to 2020, that wage rate is --

19  A    11.08.

20  Q    -- is 11.08, okay.

21       And it's the same, in fact, for all the Dish Machine and

22  Porters that are listed in the contract, isn't that right?

23  A    That is correct.

24  Q    Okay.

25       All right, now let's take a look at General Counsel Exhibit

93

1  10(e). this is for Michael Lindell, a houseman. Could you

2  point to me, looking at Appendix A of General Counsel Exhibit

3  6(g), the March 24th contract offer that we were looking at,

4  could you show me where a houseman is listed in that Appendix?

5  A    Should be the Houseperson -- Housekeeper.

6  Q    Okay, so it's another term for -- "houseman" is another

7  term for "Housekeeper"?

8  A    Mmm-hmm, that's how have been called, yah.

9  Q    But "houseman" isn't specifically isn't listed in that

10  Appendix, is it?

11  A    No, it's not.

12  Q    All right.

13      So now let's take a look at the next three exhibits, GC

14  10(f), (e) --

15  A    And if I could clarify too as well, it's in the prior

16  contract -- it's not listed in there either.

17  Q    Okay.

18  A    Okay.

19  Q    Looking at General Counsel Exhibits 10(f), (g) and (h) --

20  so these are all three Dish Room employees, isn't that right?

21  A    Yes.

22  Q    And looking through these, all of these employees have

23  different wage rates for each year of the contract, is that

24  right?

25  A    Absolutely.

P 00286

1  Q    And they all have different wage increases, isn't that

2  right?

3  A    Yes.

4  Q    And if we look at page 3 of General Counsel Exhibit 10(g) -

5  - in fact, that employee is receiving a wage decrease from 2016

6  to 2017, isn't he?

7  A    These documents are very different from the ones that we

8  were looking at before that has the -- if I could state that.

9  So I'm not sure exactly where the inaccuracy is coming from,

10 because I'm not able to see the calculations associated with it.

11 So these documents are different from the ones that we were

12 looking at in GC 10(a) and GC 10(h), (j) and (g) that you're

13 referring to, because they don't have the same notation or

14 calculation associated with them.  So I can't refer to them

15 because I don't -- it does state it here, but they are different

16 documents.  They are different from the ones that we have there,

17 so I don't know where the other information is associated with

18 these documents.

19 Q    Well, Mr. Henry, this is the only copy we have, so this is

20 what we're going to have to deal with, so --

21 A    I'm not able to then accurately answer your question

22 without further documents.

23 Q    Well, just looking at the document on its face, if you look

24 at the -- on page 2 of the document, I mean -- I guess I mean

25 the document speaks for itself, but it says on page 2 the TRW is

1   23.57, and then it goes down to 23.58 [sic] on page 3, isn't

2   that right?

3   A    23.38, yah, I see that, yah.

4   Q    Okay, all right.

5       And the base in OT goes down from 14.28 to $14.00.   Isn't

6   that right?

7   A   I see that on there too, but as I mentioned before, there's

8   no way for me to verify or validate those statements when I'm

9   not able to see the calculations on the charts.

10      JUDGE STECKLER:  And just to clarify, because you don't

11   have a copy saved as the employer?

12      THE WITNESS:  We don't have a general copy saved with all

13   these documentations.  These materials were produced for all the

14   folks associated with the bargaining unit.  So once they were

15   all done, we moved on to the next associate, based on their rate

16   of pay.  We typed that information in, got that done, got it

17   printed out and moved on to the next associate, because we were

18   in a time crunch to get everything prepared during the

19   bargaining table -- during the bargaining session.  So we don't

20   have a general revised copy saved somewhere that we can pull for

21   ourselves.

22      JUDGE STECKLER:  Were there underlying documents that the

23   data -- the person who was inputting the data used to generate

24   these documents?

25      THE WITNESS:  Just the person's wages, based on what is in

1    the negotiated contract prior.

2        COURT REPORTER:  Negotiated contract --

3        THE WITNESS:  Prior, the previous contract.

4    Q    BY MR. WIESE:  So you don't know why Mr. Suljevik would be

5    schedule to receive a wage decrease in 2017?

6    A    Yah, I don't know why that came up that way, but no one is

7    supposed to.

8    Q    Okay, all right.

9        So turning your attention to General Counsel Exhibit --

10   actually, let's look at General Counsel Exhibits 10(i) through

11   (l).  And looking at the last page of Mr. Lammer's pie chart,

12   General Counsel Exhibit 10(i), in 2020, Mr. Lammer is scheduled

13   to receive a wage decrease according to this pie chart, is that

14   right?

15   A    That's what's indicated on here.  Again, as I said, I'm not

16   sure why this anomaly exists.

17   Q    All right.  Turning your attention to General Counsel

18   Exhibit 10(j) --

19       THE WITNESS:  Granted, Your Honor, if I may --

20       MR. WIESE:  Your Honor, there isn't a question before the

21   witness.

22       JUDGE STECKLER:  There's no question -- I'm sorry, Mr.

23   Henry, there's no question out for you right now.  There will be

24   plenty of time where Mr. Terrell is going to ask you probably a

25   ton of questions, am I correct, Mr. Terrell?

P 00289

1      MR. TERRELL:  I'm sorry?

2      JUDGE STECKLER:  You're going to ask him a ton of questions

3  probably about this document.

4      MR. TERRELL:  At some point, yes.

5      JUDGE STECKLER:  So Mr. Terrell will take of you later,

6  don't worry.

7      THE WITNESS:  Okay.

8  Q    BY MR. WIESE:  And turning to page 5 of Exhibit 10(j), that

9  employee is schedule to receive a wage decrease in 2019, isn't

10  that right?

11  A    From this information, yes, it seems that way.

12  Q    Turning your attention to General Counsel Exhibit 10(j) or

13  19(k), excuse me, it looks like this one does have the

14  calculations you were talking about.  Are these additional pages

15  the calculations you were talking about?

16  A    Yes.

17  Q    Okay.  If you turn to page 11 of that exhibit, looking in

18  the upper right-hand corner below the "TRW," it says that Mr.

19  Hall is scheduled to receive a 17.95 percent decrease in 2020,

20  is that right?

21  A    That's what it says here.

22  Q    The same year that other employees are receiving increases,

23  isn't that right?

24  A    The same year that other employees seem to be given

25  decreases as well, yes.

1    Q    Right, but several employees are receiving increases that

2    year, isn't that right?

3    A    Yes.

4    Q    Okay.  And turning your attention to General Counsel

5    Exhibit 10(l), looking at page 3 of that document, Mr. Dubois is

6    scheduled to receive a wage decrease that year as well, isn't

7    that right?

8    A    Hold on a second.

9    (Pause.)

10   A    Scheduled to be given an increase?

11   Q    A decrease, on page 3.

12   A    In 2020?

13   (Pause.)

14   A    Yes, that's the case here.

15       MR. WIESE:  Offer General Counsel Exhibits 10(a) through

16   (l).

17       MR. TERRELL:  No objection.

18       JUDGE STECKLER:  GC 10(a) through 10(l) are admitted into

19   the record.

20   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 10(a) through 10(l).)

21   Q    BY MR. WIESE:  Now you represented to the Union during

22   negotiations that with the exception of the banquet servers, no

23   employees would have their wages decreased.  Isn't that right?

24   A    That is correct.

25   Q    And at negotiations on March 16th, and you can look at the

1    stip, if you need to verify this, but that day, several Banquet

2    Servers came to the bargaining table.  Do you recall that?

3    A    I recall that, yes.

4    Q    All right.  And during negotiations that day --

5         MR. TERRELL:  I'm sorry, what day was that?

6         MR. WIESE:  March 16th.

7         MR. TERRELL:  Thank you.

8    Q    BY MR. WIESE:  And the reason that the Banquet Servers came

9    to negotiations that day or your understanding of that reason is

10   because their wages were going to be decreased, is that right?

11   A    I'm not sure why they were there, but that could be very

12   much a part of it, absolutely.

13   Q    During negotiations that day, the topic of service charges

14   came up, didn't it?

15   A    I think so, yes.

16   Q    Now a service charge is something that is charged to

17   banquet customers, is that right?

18   A    Typically, yes.

19   Q    And, historically, what had happened in the past is that a

20   service was going to -- or at least a portion of that service

21   charge when to the Banquet Servers, is that right?

22   A    Yah, the majority of the service charges at the time, yes.

23   Q    And, in fact, the service charge formed a large portion of

24   the Banquet Servers' wages, is that right?

25   A    It's a part of their compensation, yes.

1  Q    Okay.  And what the -- the employer was proposing that it

2  wanted to change what it was going to do with the service

3  charges, is that correct?

4       JUDGE STECKLER:  Just a second, Mr. Wiese.

5       Let me back up to that last question.  You said the

6  question was whether it was a large part of the compensation,

7  and you said it was part of the compensation.

8       Approximately how much of the compensation does it make up?

9       THE WITNESS:  It varies, though, Your Honor, because each

10  function is different.  It depends on how many people are

11  working, that the service charge gets divided among all those

12  people that are working; so, yes, it does present a percentage

13  of their compensation, because they do get an hourly rate as

14  well, in addition to some of the compensation associated with

15  there being -- so there are times that it's half or less of

16  their compensation for that pay.

17       JUDGE STECKLER:  Okay.

18       Mr. Wiese, you may ask your question.  I'm sorry.

19       JUDGE STECKLER:  Are we back on the record?

20       COURT REPORTER:  We are.

21       JUDGE STECKLER:  Okay.

22       MR. WIESE:  And before I go any further, I am going to be

23  asking Mr. Henry about statements that were made by Mr. Stokes

24  at the bargaining table, or may have been made by Mr. Stokes,

25  and I would like to make a request that Mr. Stokes leave the

1    hearing room just during this portion of the testimony, and then

2    be recalled back.

3         MR. TERRELL:  Your Honor, I don't know of any authority for

4    that proposition.  I have been through dozens of Board

5    proceedings where counsel was -- counsel for purposes of the ULP

6    trial and was also a negotiator at the table during bargaining,

7    and I've never -- I don't think there's any authority for what

8    Mr. Wiese is proposing here.

9         JUDGE STECKLER:  I tell you what, let's take a 10-minute

10   break, let me consider it.  And when we come back, I'll give you

11   an answer.

12        So come back at about 12:20.

13   (Off the record.)

14        JUDGE STECKLER:  Thank you, we're back on the record.

15        Before we broke, the question was whether Mr. Stokes can

16   stay in during a discussion of what he did during the -- stated

17   during the negotiations.

18        As I recall, Mr. Wiese, you asked for him to be excluded.

19   Mr. Terrell objected, saying he knows no precedence for this.

20        A person who is essential to a party's presentation has to

21   be shown that he is essential.  He is counsel, we've allowed him

22   to stay in; however, I think the better part of determining

23   credibility at this point would be to exclude him hearing what

24   Mr. Henry is about to testify to.  He will be back in after that

25   time and be able to listen to the rest of the testimony.

1   MR. TERRELL:  Well, Your Honor, we object to your ruling in

2 this regard and ask you to reconsider.  We submit, respectfully,

3 that to have Mr. Stokes sequestered would be a denial of

4 counsel, a denial of due right.  It is also highly unusual.  I

5 don't think there's anything anywhere in the rules or procedure

6 that calls for piecemeal sequestration or periodic

7 sequestration; and Mr. Stokes is here an active participant in

8 this trial.

9   I can speak to my own experience, having gone through

10 numerous Board trials.  It is common practice -- I'm sure there

11 is Board law for the proposition that it is common that the

12 witness sequestration rule does not apply to the unique

13 circumstances of Board law practice where it is very common for

14 counsel who represents an employer at a ULP trial who was -- in

15 a g(5) case who was also -- or a(5) case, who was also the

16 negotiator during the bargaining at issue.  So we take objection

17 and respectfully ask you to reconsider your ruling, because it

18 is a denial of counsel, Your Honor.

19   And I'll note again -- I'll note, in addition, Nicole

20 Burgess is sitting here at the GC table.  Ms. Burgess was the

21 Hearing Officer for the UC Petition that we filed.  There's

22 already been testimony about the UC Petition.  And we did not

23 move to exclude or sequester Ms. Burgess during that

24 questioning.  And we may call her as a witness related to the UC

25 Petition.  So there would be an inconsistency --

1    JUDGE STECKLER:  What's going to be the relevance of the UC

2  Petition at this point?

3    MR. TERRELL:  The UC -- there's already been a lot of

4  testimony relating to that.  It is part of the bargaining that

5  took place during the bargaining of this contract, the first

6  several proposals; in fact, all of the proposals up through the

7  last, best and final by the employer on March 24, included

8  proposals relating to the Unit Clarification Petition that was

9  filed and subsequently ruled on.

10    Mr. Wiese, in his questioning, is obviously seeking some

11  argument to support his theory I think as he put it that "the

12  employer wants what it wants."  And his questioning suggested

13  that that is part of his argument related to the UC -- related

14  to the Respondent's position regarding the clarification and

15  separation of the units.

16    The fact of the matter is, the UC Petition was filed, it

17  was ruled upon by the Regional Director of Region 18, and the

18  Regional Director found merit in the separation and

19  clarification of the two units.  That's an essential fact in

20  this case.  We're going to be putting that into evidence.  And

21  Ms. Burgess was the Hearing Officer in that UC Petition hearing.

22  She made the findings of fact that informed the decision that

23  was made by the Regional Director.

24    JUDGE STECKLER:  I think the process for UC Petitions is

25  that the RD appoints a Hearing Officer.  The Hearing Officer

1    does not draft the decision, someone else in the Region, who is

2    a deep dark secret, drafts the decision, and then the Regional

3    Director says, "yes -- no -- maybe."  And the Regional Director

4    is the ultimate decision maker in those cases.

5        MR. TERRELL:  I understand that, but nonetheless, Ms.

6    Burgess was the Hearing Officer, was intimately involved in the

7    -- closely involved in the UC Petition proceedings.

8        JUDGE STECKLER:  Are you saying that the transcript for the

9    UC proceedings would not be sufficient to support your issues

10   here?

11       MR. TERRELL:  At this point, I don't know.  We haven't

12   seen the entire General Counsel's case at this point.

13       JUDGE STECKLER:  Have you issued a subpoena to Ms. Burgess?

14       MR. TERRELL:  We have not, but we are now.

15       JUDGE STECKLER:  Oh, you are now.

16       And okay --

17       MR. STOKES:  Your Honor, may I be heard just for a second

18   just to supplement something.

19       JUDGE STECKLER:  Certainly, sir.

20       MR. STOKES:  When Counsel for the General Counsel

21   affirmatively stated that I was present at a January meeting

22   when he knew that I was not --

23       JUDGE STECKLER:  Wait a minute, he withdrew that.

24       MR. STOKES:  May I just please finish what I'm saying?

25       When he made that comment, he had not withdrawn that at

1   that time, that is not correct.  In an off-the-record

2   discussion, I commented to him, "Please do not represent to Her

3   Honor that I was present at a meeting when I was not."  He said,

4   "I'm sorry and I will correct it."  He corrected it after I

5   pointed it out to him off the record.  I don't know what he's

6   going to do behind my back.  All I know is that I caught him --

7        JUDGE STECKLER:  We're not here to discuss this.

8        MR. STOKES:  I've caught him once.

9        JUDGE STECKLER:  Sir, we're not here to discuss it.

10       I was going to grant the motion that you stay, and I will

11   let you stay, but please be advised you're on a very short leash

12   on this.

13       We'll proceed.

14       Go ahead, Mr. Wiese.

15       And I don't want to hear any more comments like that.

16       MR. STOKES:  Well, Your Honor --

17       JUDGE STECKLER:  No, sir, you stop right there.

18       MR. STOKES:  I don't want to be said "I'm on a leash."

19       JUDGE STECKLER:  No, sir.  No, sir, you're not on a leash.

20       And you would have had an opportunity to testify contrary

21   to that.  Now the fact that he went and corrected his mistake on

22   the record, it's done, it's finished.

23       Is there anything else you'd like to bring up, Mr. Stokes,

24   before we continue?

25       MR. STOKES:  I am offended by Your Honor's saying that I'm

P 00298

1    like a dog on a leash.

2        JUDGE STECKLER:  No, sir, no, sir, I said, "You're on a

3    short lease," I didn't say "you're like a dog on a leash."

4    Don't misconstrue my -- don't --

5        MR. STOKES:  That's what a "leash" refers to.

6        JUDGE STECKLER:  Sir, this is -- this is --

7        MR. STOKES:  That's what a "leash" refers to and you know

8    it and I know it.  And I'm offended by your using that phrase to

9    me.  I don't mind you telling me to be quiet; I don't mind your

10   overruling me; I don't mind you telling me not to talk; but I'm

11   offended by Your Honor -- you're the Judge here -- saying, "You

12   are on a short leash."  That refers to a dog and you know it and

13   I know it.

14       JUDGE STECKLER:  Sir --

15       MR. STOKES:  It's the way -- look it up in Webster's.

16       JUDGE STECKLER:  Sir, it' an expression in our Lexicon.

17       MR. STOKES:  Look it up in Webster's.

18       MR. STOKES:  It's an expression in our Lexicon in this

19   country.

20       Mr. Terrell, I'm asking you to police your witness.  Is

21   there any further explanation needed?

22       MR. TERRELL:  You ruled, Your Honor.

23       JUDGE STECKLER:  I ruled in your favor.

24       MR. TERRELL:  I understand.

25       JUDGE STECKLER:  And I did not need to hear any further on

P 00299

1  it.

2      Is that clear?

3      MR. STOKES:  Yes, Your Honor, it is.

4      MR. WIESE:  May I proceed?

5      JUDGE STECKLER:  You may proceed.

6  Q   BY MR. WIESE:  Mr. Henry, we were talking about service

7  charges for Banquet Servers.

8      And at negotiations on March 16, if you recall, the

9  employer -- or do you recall whether the employer was looking to

10  change what it wanted to do with service charges?

11  A   I can't remember what our proposals exact were at this

12  point, but I know that there were some changes associated with

13  it, yes.

14  Q   The employees were concerned about the changes being made

15  to the service charges, weren't they?

16  A   Yes.

17  Q   And at negotiations that day, do you recall Mr. Stokes and

18  Mr. Bill Bunce going back and forth between the two of them over

19  the topic of service charges?

20  A   I know that there was some explanation as to exactly

21  service charges, where they are today, where they came about.

22  Mr. Stokes gave some history associated with services charges

23  and how they came about as well.  And then we talked primarily

24  as well regarding our reasoning or rationale behind, you know,

25  looking to change and to be more competitive within the market.

1    Q    To be competitive with non-union hotels, is that right?

2    A    To be competitive within the market.

3    Q    With non-union hotels?

4    A    Well, there --

5         MR. TERRELL:  Objection:  asked and answered.

6         THE WITNESS:  --- there are not only union hotels that are

7    involved in the banquet business here in this market.

8    Q    BY MR. WIESE:  And one of the individuals on your side of

9    the table who responded to Mr. Stokes was Mr. Bill Bunce, is

10   that right?

11   A    Yes.

12   Q    And Bill was the one -- if you recall, he was the one who

13   as talking about whether there would be a service charge for --

14   that the employer would be charging.  Do you recall that?

15   A    Without my notes, I can't remember exactly what transpired,

16   but I know that there was conversations, yes.

17   Q    I guess -- I mean, the notes will speak for themselves.

18        So, Mr. Henry, there are employees who are currently making

19   more than the wage scale in Appendix A of the employer's March

20   24th offer, is that right?

21   A    Yes.

22   Q    And so that would mean they are being paid over that scale,

23   is that right?

24   A    That's correct.

25   Q    All right.

1       If you turn to page 41 of that contract, specifically, I'm

2  looking at Section 111.

3  (Pause.)

4       Do you see it?

5  A    Yah.

6  Q    Okay.  And that section says that "Employees being paid

7  more than the maximum rate for their job classification shall

8  continue to be paid that red-circled rate," is that right?

9  A    That's what it says here, yes.

10  Q    And we went over "red-circle" before.  Do you recall that?

11  A    Except for banquet employees it says here.

12  Q    Yes.

13  A    You left out that part.

14  Q    Right, I did, I did.

15       So, again, and excluding the banquet employees and service

16  charges and whatever was said about those --

17  A    Yes, yes.  If I could clarify too, as well, based on your

18  question that you just asked --

19  Q    Well, I'll finish asking my question.

20  A    Okay.

21  Q    And then your counsel can have you clarify.

22       So what it says is that "Employees being paid more than

23  maximum rate for their job classification shall be continued to

24  be paid that red-circled rate," isn't that right?

25  A    Okay, it says, "Employees being paid more than the maximum

P 00302

1  rate for their job classification shall be continued to be paid

2  that red-circled rate except for banquet employees.  Banquet

3  employees shall be paid the hourly rate set forth on the

4  schedule of wages."

5      To answer your question, banquet employees today are being

6  paid over the red-circled rate.  So they are being paid more

7  than what their rate would be indicated here in the index.  So

8  that is something that is standard.

9      Currently, too, as well, when it comes down on to

10  associates being red-circled, there are currently employees red-

11  circled under the existing contract while the expired contract

12  that are red-circled currently -- many employees that are

13  associated with our bargaining group.  Our proposal indicates

14  that we intend to give them an increase too, as well, because

15  the market has changed that.  So that is something that we have

16  truly acknowledged and we recognize that it is something that

17  needs to happen too, as well, as we move forward.

18  Q    So your testimony is that under the prior contract for

19  employees paid over scale, they were being red-circled?

20  A    Yah, we have a lot of people being red-circled right now.

21  Housekeeping staff have been red-circled; 13.82 has been their

22  top rate.

23  Q    All right.  Well, we know what "red-circled" means.

24  A    Yah.

25  Q    It speaks for itself.

1      So turning your attention to the most recent negotiations

2  this fall --

3      MR. WIESE:  And, Your Honor, this is in support of

4  Complaint allegation 12(m).

5  Q   BY MR. WIESE:  The parties met for negotiations around the

6  end of September of this year.  Do you recall that?

7  A   Yes.

8  Q   And at the end of these negotiations, the parties scheduled

9  another negotiating session for October 20th, is that correct?

10  A   That is correct, yes.

11  Q   And on the afternoon of October 19th, you cancelled those

12  negotiations, didn't you?

13  A   Yes.

14  Q   Showing the witness what has been marked as General Counsel

15  Exhibit 12 --

16      JUDGE STECKLER:  Thank you.

17      MR. WIESE:  Actually, I'm going to take that back.

18      I need 11.

19      MS. BURGESS:  Okay.

20  Q   BY MR. WIESE:  Showing the witness what has been marked as

21  General Counsel Exhibit 11, and again, excluding the top portion

22  of that e-mail chain, do you recognize this document?

23  (Witness proffered the document.)

24  A   Yes.

25  Q   And this is, in fact, the e-mails that you sent to the

1   Union on October 19th, cancelling negotiations on October 20th?

2   A     This is the e-mail that I sent to the Union responding to

3   their proposal and every line item on their proposal; and our

4   rationale of why we should meet or should not meet on the 20th.

5   So the stipulation in this e-mail was that if they have

6   something that we could bring back to the table, to discuss it

7   so we can go forward.

8   Q     So what your e-mail is saying on October 19th is that you

9   aren't going to meet the Union unless they present something new

10   to the table, is that right?

11   A     That's your interpretation, yes.

12   Q     Well, that's what it says.

13   A     Okay.

14         MR. WIESE:  I'll offer General Counsel Exhibit 11 into

15   evidence.

16         MR. TERRELL:  No objection.

17         JUDGE STECKLER:  General Counsel 11 is admitted.

18   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 11.)

19   Q     BY MR. WIESE:  Showing you what's been marked as General

20   Counsel Exhibit 12.

21   (Witness proffered the document.)

22   Q     And, again, excluding the top e-mail, but looking at this

23   e-mail chain, the bottom e-mail appears to be the same one

24   that's in General Counsel Exhibit 11 -- but the top e-mail.  Do

25   you recognize that?

1   A    Yes

2   Q    And that's the Union's request for further negotiating

3   rights, isn't that right?

4   A    That's correct.

5        MR. WIESE:  Offer General Counsel Exhibit 12.

6        MR. TERRELL:  No objection.

7        JUDGE STECKLER:  General Counsel's 12 is admitted.

8   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 12.)

9   Q    Showing you what's been marked as General Counsel Exhibit

10  13.

11  (Witness proffered the document.)

12  Q    And, again, excluding the top e-mail, do you -- and the

13  first e-mail on this from October 19th is in as General Counsel

14  Exhibit 11, and the second e-mail from November 4th is the same

15  as in General Counsel 12.  That e-mail from November 9th -- do

16  you recognize that 3-mail?

17  A    I do.

18  Q    And this is, in fact, another request for bargaining dates

19  from the Union, isn't that right?

20  A    Yes.

21       MR. WIESE:  I'll offer General Counsel Exhibit 13.

22       MR. TERRELL:  No objection.

23       JUDGE STECKLER:  Thirteen is admitted.

24  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 13.)

25  Q    BY MR. WIESE:  Showing you what's been marked as General

1    Counsel Exhibit 14.

2    (Witness proffered the document.)

3    Q    So, again, looking at the e-mail chain, the first e-mail is

4    an e-mail from General Counsel Exhibit 11, from October 19th.

5    But the e-mail above that -- do you recognize that?

6    A    The one on November 11, 2015?

7    Q    Yes.

8    A    Yes.

9    Q    And excluding the top e-mail?

10    A    Mmm-hmm.

11    Q    Okay.  And so this is your response to the Union's request

12    for negotiating dates, is that right?

13    A    That is correct.

14    Q    And attached to this document -- or the e-mail, I believe,

15    references an attachment.

16    A    Yes.

17    Q    And the attachment that is referenced is the document on

18    pages three through 11 of General Counsel Exhibit 14.  Is that

19    right?

20    A    That is correct.

21    Q    And this is your response to the Union's proposal that was

22    made at negotiations on September 24th?

23    A    That is correct.

24        MR. WIESE:  I'll offer General Counsel Exhibit 14 into

25    evidence.

P 00307

1      MR. TERRELL:  No objection.

2      JUDGE STECKLER:  General Counsel 14 is admitted.

3  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 14.)

4  Q    BY MR. WIESE:  In your response on November 11th, you told

5  the Union that you weren't going to meet with them unless they

6  presented a new proposal, isn't that right?

7  A    I said I have attached -- I'll read that for you.  My

8  response was "After very careful review of the Union's counter-

9  proposal presented at the September 24, 2015, there is nothing

10  we have seen or that they have said over the past few months of

11  negotiation that dictates quid pro quo.  We have seen your

12  position to the proposed changes to tighten up the effective

13  operation of the hotels and to make us more competitive in the

14  Rochester market and with the Rochester competition.  As we

15  continue to manage in the competitive Rochester market, we must

16  make changes to impact the fact that we are the only union

17  hotels.

18      We went through each of the line items that our responses

19  are attached -- and our responses are attached.  Based on the

20  status of the negotiations and the fact that you have not given

21  us any significant reason to change our proposal, we do not feel

22  the need for an additional meeting to discuss the same things we

23  have already discussed several times over the last several

24  months.

25      If you bring us something that is significant enough for us

1  to move off of our last, best and final offer, then let us

2  know."

3  Q    So what you were looking for from the Union was a proposal

4  to make the Kahler Hotels more like the non-union hotels.  Is

5  that right?

6  A    No.

7      MR. WIESE:  Did I offer General Counsel Exhibit 14.  I

8  don't believe that I did.  I'll offer it at this time.

9      JUDGE STECKLER:  Do you have any objection, Mr. Terrell?

10     MR. TERRELL:  It's offered -- yah, no objection.

11     JUDGE STECKLER:  Okay.

12     Fourteen is -- I believe was already entered.  Just to be

13  sure.

14     MR. WIESE:  All right.

15  Q    BY MR. WIESE:  Mr. Henry, the parties don't have any

16  further negotiations scheduled, do they?

17  A    Not at this time.

18  Q    And the reason for that is because the Union won't give you

19  a new proposal, is that right?

20  A    No, the reason for that is because we are asking for us to

21  be able to sit and discuss a reasonable proposal that we'll be

22  able to manage our business needs as effectively as we possibly

23  can.

24  Q    So your last proposal was on March 24th?  Is that right?

25  A    Correct.

1    Q    And since then, the Union has presented multiple proposals,

2    is that right?

3    A    No, they have given us additions to what we already have on

4    the table, and they have asked us to make some changes to a few

5    things that are currently in the proposal, but they have not

6    provided with a new proposal, no.

7        MR. WIESE:  All right, well, the documents will speak for

8    themselves.

9    Q    BY MR. WIESE:  So the employer's last, best and final offer

10   from March 24th, encompasses the pie charts that we discussed,

11   right?

12   A    Correct.

13   Q    And it also includes a proposal limiting union leave to

14   employees to only 3 days, isn't that right?

15   A    That's part of the proposal.  And as you mentioned, the pie

16   charts, as we go forward, one thing I'm remiss not to share --

17       MR. WIESE:  Your Honor, I'm going to object.  This is non-

18   responsive.

19       MR. TERRELL:   Your Honor, he -- allow the witness to

20   explain.

21       MR. WIESE:  I'm not talking about pie charts, I'm talking

22   about union leave right now.

23       MR. TERRELL:  He was responding to the previous question

24   that was about union -- about the pie charts, Your Honor.

25       The witness is entitled to explain his answer; and a "yes"

1   or "no" often isn't a complete answer, so he's entitled to

2   explain his answer.

3         JUDGE STECKLER:  Okay, let's go ahead.

4         Mr. Henry, could you please continue your thought on the

5   pie charts, and then let's move on to the union leave issue.

6         THE WITNESS:  Absolutely.

7         With regards to the pie charts, as we've been talking about

8   them, you've gone through the differences that are associated

9   with the pie charts and how it impacts the decrease that you've

10  seen in some of those wages; one of the things that we must -- I

11  must point out to you is the fact that during our negotiations

12  at the bargaining table, the folks who were sitting at that

13  table had a chance to be able to look at every single one of

14  those pie charts as it impacts them personally.  We were able to

15  make significant changes at that time as it reflects the pie

16  charts.  We continued to work through that whole process and

17  manage through that, because that was something that was

18  discussed at the negotiation table, which forced us to be able

19  to go back and forth and get that material brought forward to

20  the table.

21        So some of those changes that you're saying and the

22  anomalies associated with some of those pie charts are items

23  that we can certainly work towards once we have this contract

24  negotiated and finalized so we can manage through those things.

25  So that does not tell you that -- this definitively this is

1  where exactly everything sits, because we have the

2  responsibility of making sure that our associates are taken care

3  of.

4      JUDGE STECKLER:  Let me make sure I'm understanding, Mr.

5  Henry.

6      So you would work -- could you work on the alleged

7  anomalies before the contract was negotiated -- it was

8  completed?

9      THE WITNESS:  Yah, what happened was we went to the

10  bargaining table with information with regards to what we

11  believe our total wages and benefits are for all of the

12  associates.  When we got to the bargaining table, we presented

13  the proposals.  As we went through the pie charts, the question

14  was asked at the bargaining table, how does that impact every

15  single one of my associated currently covered under the CBA,

16  because what we were proposing is the new hires and everything

17  else and the wages as it moved forward.  So when they did that,

18  we went back and we made sure that every single one of these pie

19  charts reflected every single member sitting around the

20  bargaining table, so we made the adjustments.  We went back and

21  brought them in and then the adjustments and changes were made.

22  When it came on to benefits, we talked about the bereavements

23  leaves, the different things that were associated -- the

24  uniforms.  Some folks don't get uniforms, others get uniforms,

25  so we made the adjustments to those and we went through the

1  whole process.

2      JUDGE STECKLER:  After March 24th?

3      THE WITNESS:  Before March 24th, yes.

4      JUDGE STECKLER:  Okay.  So after March 24th, was there any

5  --

6      THE WITNESS:  The documents that we presented -- all the

7  documents that were there -- you've got to remember, Your Honor,

8  it's over 1,500 documents that were presented, because we were

9  trying to cover every single one of those bargaining employees.

10     JUDGE STECKLER:  Okay.

11     THE WITNESS:  So, yes, there were some errors associated

12  with some of those.

13     JUDGE STECKLER:  All right.

14     THE WITNESS:  And we have no problem going back through and

15  making those adjustments if they were brought to our attention.

16  Well, the ones that were brought to our attention, we made

17  changes to.

18     JUDGE STECKLER:  Okay, when did you make those changes?

19     THE WITNESS:  Right then and there when it was brought to

20  our attention.

21     JUDGE STECKLER:  Were you able to do a pie chart on that

22  person at the table?

23     THE WITNESS:  Absolutely.

24     JUDGE STECKLER:  Did you send e-mail of it or print out a

25  copy of it?

1    THE WITNESS:  We got copies of it.  It was on Leslie's

2  computer at the time.   She brought it over for the specific

3  person.  She was able to type the information in, got it on the

4  screen, we were able to look at it.  Those that we were able to

5  -- when she was not in the room, we went over, we gave her the

6  information that we needed to have changed.  She went and typed

7  it up, presented it to us, we came back and we distributed it

8  around the table.

9    JUDGE STECKLER:  And tell me again who "Leslie" is?

10    THE WITNESS:  Leslie Hohmann is our finance person.

11    JUDGE STECKLER:  Okay, okay.

12    And now, Mr. Wiese, your question on the union leave.  Or

13  unless you want to come back on what I just questioned about?

14    MR. WIESE:  No.  We'll get to the Union's response later.

15  Q    BY MR. WIESE:  So in addition to these pie charts and the

16  wage rate -- wage scale in the contract, the March 24th offer

17  also contains a proposal limiting union leave to employees to

18  only 3 days, doesn't it?

19  A    Yes.

20  Q    Just to be clear, you are the one who is demanding a new

21  proposal before the parties sit down at the bargaining table?

22  A    No, we're asking --

23    MR. WIESE:  Your Honor, I'm going to ask that counsel for

24  Respondent not talk to the witness while he's testifying.

25    MR. TERRELL:  I talked to the witness?

1     JUDGE STECKLER:  You might be a little better if you guys

2  pass notes or try to keep it a little quieter.

3     Go ahead, Mr. Wiese.

4     MR. TERRELL:  Your Honor, in asking your question, just

5  clarify what page you're talking about.  I don't think it's

6  clear from your question.

7  Q    BY MR WIESE:  Well, as of today, based off of your e-mails

8  to the Union, in November, you are the one who is demanding that

9  the Union present a new proposal before the parties sit down and

10  bargain again.  Is that right?

11  A    No, that's not right.

12  Q    All right, well, okay.

13     JUDGE STECKLER:  Let me make sure I'm understanding this

14  also.

15     You want the Union to present you with a complete package.

16  Is that what I'm understanding?

17     THE WITNESS:  What we are asking for, Your Honor, is that

18  the -- we have seen several proposals that has come from the

19  Union, and all the proposals, in addition to what we've

20  presented -- nothing has changed over the months that we've

21  negotiated.  So we are saying is we've gone through their

22  suggestions to us.  We have not seen any difference in which --

23  we've gone through all this documentation --

24     JUDGE STECKLER:  Okay.

25     THE WITNESS:  We've keyed several portions of it.  We have

1  not seen anything change in there in terms of making some

2  adjustments.

3       JUDGE STECKLER:  Okay.  And there's -- so you're saying

4  there's nothing left to discuss, is that what I'm understanding?

5       THE WITNESS:  Based on what they presented to us over the

6  last several months, yes, Your Honor.

7       JUDGE STECKLER:  Okay.  I just wanted to clarify that.

8       Okay, Mr. Wiese, could you tell me which page the union

9  leave proposal was on, please?

10      MR. WIESE:  Of the contract?

11      JUDGE STECKLER:  Of the proposed contract in 6(g)?

12      MR. WIESE:  Yes, it's -- using the pagination that I added,

13  it's on page 29 and then goes over to page 30 of 150.

14      JUDGE STECKLER:  Okay.  Okay.

15      Please continue.

16  Q    BY MR. WIESE:  So, Mr. Henry, we might be arguing semantics

17  here.  When you -- for example, looking at what's attached to

18  General Counsel Exhibit 14, pages 3 through 11, it's titled

19  "Unite HERE Local 21 Counter Proposal," is that a proposal?

20  A    That's what they typed it as.  Yes, they are adding things

21  to different sections of what we have already presented.

22  Q    And would you characterize that as just a proposal or not?

23  A    It's suggestions on what they would like to have seen added

24  to our proposal.

25  Q    But, in your view, is that a proposal?

1   A    No, it' not a proposal.

2        MR. TERRELL:  Objection.

3        MR. WIESE:  Okay.

4        MR. TERRELL:  Asked and answered.

5   Q    BY MR. WIESE:  And so --

6        MR. WIESE:  May I proceed, Judge.

7        JUDGE STECKLER:  Please.

8   Q    BY MR. WIESE:  So when I asked you if your meeting was

9   conditional on the Union presenting a proposal, you were talking

10  about something like General Counsel Exhibit 6(g), an entire

11  contract proposal, is that right?

12  A    No, that's not what I'm asking for.  I think, if I may

13  elaborate, yes, you pointed out that this is my first

14  negotiations.  We are fully aware of that.  But I think

15  importantly, more than anything else, is that as we go to the

16  table, one of the things that my responsibility is is to make

17  sure we're managing within this market as effectively as we

18  possibly can be.

19       What we've presented now -- quite a bit of items here that

20  is associated with the current contract that we're very much in

21  agreement with.  All we're saying is that if there's nothing

22  else that is associated with the additions that they have

23  brought to the table, they propose at the table, then we can

24  move on with signing the current contract that we have on the

25  table.  If there is something else that they would like to bring

1    to the table, then, yes, certainly, by all means, bring it to

2    the table so we can discuss it -- that's different from what

3    they presented so far.

4    Q    So because the Union is not presenting what you want to

5    see, you aren't going to be --

6    A    It's not what I want to see, it's what they would like to

7    bring to the table.

8    Q    But that's the reason that you aren't meeting with them,

9    because they aren't presenting something that you would like to

10   see.

11   A    No, because they have not presented anything that will

12   change our positions currently, based on what we've presented.

13   Q    To what you would like your position to be.

14   A    Those are your words, sir.

15   Q    Well, no, I'm asking the question.

16        JUDGE STECKLER:  I think we have covered this sufficiently.

17        Mr. Wiese, please proceed.

18   Q    BY MR. WIESE:  Showing you what has been marked as General

19   Counsel Exhibit 18.

20   Q    Do you recognize this document?

21   A    Give me a minute here, if you don't mind.

22   Q    Mm-hmm.

23   (Pause.)

24   A    Yes.

25   Q    And this document is a position statement provided by Mr.

1  Terrell, is that right?

2  A    Yes.

3  Q    He is your attorney for purposes of responding to the

4  Unfair Labor Practice charges in this case?

5  A    Correct.

6  Q    Did you have a chance to review this document before it was

7  submitted to me?

8  A    Yes.

9      MR. WIESE:  I will offer General Counsel 18.

10     MR. TERRELL:  Objection on relevance.

11     I mean, the position's taken prior to -- and this case is

12 going to be decided on the evidence that comes into the record

13 during this case, not on positions or statements made during the

14 investigation stage.  If he wants to use it to impeach prior

15 testimony, that's one thing, perhaps, but this is not relevant.

16 This is not material or probative.

17     JUDGE STECKLER:  What about all these attachments, Mr.

18 Terrell?

19     MR. TERRELL:  Well, he hasn't asked any questions about

20 these attachments, so they are just pieces of paper right now.

21     JUDGE STECKLER:  Do the documents speak for themselves?

22     MR. TERRELL:  I am sorry?

23     JUDGE STECKLER:  Do the documents speak for themselves?

24     MR. TERRELL:  I have never seen a document talk, Your

25 Honor.  I mean, the --

1        JUDGE STECKLER:  Well, as a manner of speaking.

2        MR. TERRELL:  -- the documents, we don't know anything

3    about these documents.  It is improper to just simply put

4    documents into the record without tying it in some way to an

5    issue that is relevant to the case, and that hasn't been

6    established by the questions that Mr. Wiese just asked this

7    witness.

8        JUDGE STECKLER:  I am going to admit GC 18, and I will take

9    a running objection on that.

10   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 18.)

11       MR. TERRELL:  You did what?

12       JUDGE STECKLER:  I am admitting it, and you can have a

13   running objection on it.

14       MR. TERRELL:  Okay.

15       MR. WIESE:  I don't have anything further at this time,

16   Your Honor.

17       JUDGE STECKLER:  Okay.  We have got about 5 until 1.  Do

18   you want a lunch break?

19       MR. TERRELL:  We want a lunch break.

20       MR. WIESE:  Sure, yes.

21       JUDGE STECKLER:  Okay.

22       How much lunch break would you like?  An hour?

23       MR. TERRELL:  Forty-five minutes, an hour.

24       MR. WIESE:  Yes, 45 minutes would be good.

25       JUDGE STECKLER:  Okay, so we will reconvene at 1:40?

1          MR. WIESE:  Although is there a place to eat around here?

2          MS. BURGESS:  There's that cafeteria all the way downstairs

3     and that would probably be the closest --

4          MR. WIESE:  Oh, okay --

5          JUDGE STECKLER:  Let's go off the record.

6     (Whereupon, at 12:55 p.m., the hearing was recessed for lunch,

7     to reconvene at 1:40 p.m. in the same place.)

8          JUDGE STECKLER:  We're back on the record after lunch

9     period.

10         General Counsel, do we have copies of General Counsel 9?

11         COURT REPORTER:  She just gave me copies.

12         JUDGE STECKLER:  Oh, she did, okay, excellent.  Okay, we're

13    covered on that.

14         Any other housekeeping matters before we proceed?

15         MR. TERRELL:  I think I have one of the documents requested

16    by Mr. Wiese from the subpoena.

17    (Pause.)

18         JUDGE STECKLER:  Okay, Mr. Wiese, in light of receiving

19    that document, do you have any further questions for Mr. Henry?

20         MR. WIESE:  I do not have any further questions for Mr.

21    Henry.

22         JUDGE STECKLER:  Okay.

23         MR. WIESE:  We will call him in our case in chief.

24    (Witness excused from the stand.)

25         JUDGE STECKLER:  Okay, that is fine.

1       In that case, General Counsel, please call your next

2   witness.

3       MR. WIESE:  Your Honor, at this time, the Counsel for the

4   General Counsel calls Martin Goff to the stand.

5       JUDGE STECKLER:  Will you please raise your right hand?

6   (WITNESS SWORN:  MARTIN GOFF)

7       JUDGE STECKLER:  Please have a seat and state your name for

8   the record.

9       THE WITNESS:  Martin Goff, G-O-F-F.

10                      DIRECT EXAMINATION

11  Q    BY MR. WIESE:  Good afternoon, Mr. Goff.

12  A    Good afternoon.

13  Q    What is your current occupation?

14  A    I am the Organizing Director and the Vice President of

15  Local 17 in Minneapolis.

16  Q    How long have you been a Vice President for Local 17?

17  A    Since 1995.

18  Q    Did you work for Local 17 before becoming a vice president?

19  A    Yes, I was a staff organizer.

20  Q    And when did you begin working as a staff organizer?

21  A    Early January 1991.

22  Q    Did you hold any positions before that?

23  A    Not with the Union.

24  Q    Okay, fine.  So what are your job duties in your current

25  position as the Vice President for Local 17?

1    A    I oversee all new organizing.  I assist Nancy Goldman, who

2    is our President, with negotiations.  I have five contracts that

3    I administer.  I am the business agent for five shops.  I help

4    strategize when we have a dispute, and I do the initial work

5    with the NLRB if we have charges to be filed or something like

6    that.

7    Q    How many bargaining units are there in Local 17's

8    jurisdiction?

9    A    Counted them last night -- 53.

10   Q    All right, and what industries are covered?

11   A    Hotels; restaurants; the sporting complexes both in

12   Minneapolis and St. Paul, all three of them -- a fourth very

13   soon with the Vikings stadium -- catering.  We have the

14   concourses at the airport, all the concourses at the airport.

15   We have the in-flight catering -- that's -- they make food that

16   goes overseas or if you are taking long flights.  I think that

17   is about it.

18   Q    All right.

19        And what is the geographic scope of Local 17?

20   A    Minneapolis, St. Paul, and Bloomington and the general

21   area.

22   Q    How many employees are there in this Local?

23   A    Employees or members?

24   Q    Member, thank you.

25   A    Members -- 35, maybe 3,700 full time members; another 2,500

1   or so on-call or part-time members.

2   Q    In your time working with Local 17, how many collective

3   bargaining agreements have you negotiated?

4   A    Hundreds.

5   Q    And how many agreements have you negotiated in the last

6   calendar year?

7   A    In a little more than a year, about 42.

8   Q    So let's talk about the bargaining unit in this case.  Are

9   you familiar with this bargaining unit?

10  A    Somewhat, yes, not as familiar as mine own, but --

11  Q    And so what is your role, as the vice president of Local

12  17, with this bargaining unit?

13  A    Well, Brian Brandt, who is the President of Local 21 here

14  in Rochester, asked Nancy Goldman to be the lead negotiator.

15  And I, generally speaking, assist Nancy on all negotiations.

16  Q    And how long have you provided this support to the

17  bargaining unit here?

18  A    I think this would be the second contract, maybe third.

19  Q    Do you know how long employees have been organized at these

20  hotels?

21  A    I think we have found contracts going back to either '64 or

22  '65 -- 1964, 1965.

23  Q    Since 1964, do you know how many different owners the

24  hotels have had during that time?

25  A    I don't really know how many different owners.

132

1   Q     Okay.

2   A     I know of several, but I --

3   Q     So are these your first negotiations with Richfield

4   Hospitality at this property?

5   A     Yes.

6   Q     And when did these negotiations begin?

7   A     January 20, 2015.

8   Q     Before we go any further, I am going to hand you what has

9   been marked as Joint Exhibit 1.

10  (Witness proffered document.)

11  Q     And I would actually like to have you look at General

12  Counsel Exhibit 3.

13       MR. TERRELL:  Which one is 3?

14       MR. WIESE:  It is the "wish list," is what I call it.

15  Q     BY MR. WIESE:  Mr. Goff, do you recognize this document?

16  A     This document?  I am sorry.

17  Q     Yes, yes.

18  A     Yes, I do.

19  Q     What is it?

20  A     Well, we called it the "wish list."  It was given to us, I

21  think, Javon Bea.

22  Q     And do you know -- recall when you got this document?

23  A     I believe that it was given to Nancy Goldman, myself, and

24  Brian Brandt at a meeting with Javon Bea and Bill Bunce in their

25  office.

1    Q    Okay.

2    A    Or in their outer office.

3    Q    And do you recall when that happened, approximately?

4    A    I believe it was March of '14.

5    Q    Okay.

6    A    I am not positive.

7    Q    All right.  So turning your attention to the beginning of

8    formal negotiations, on January 20, 2015, what topic did the

9    parties discuss at those negotiations?

10    MR. TERRELL:  On just the 20th -- the question is limited

11    to --

12    MR. WIESE:  Right, yes, yes, limited to the 20th.

13    THE WITNESS:  Well, proposals were made, but the topic that

14    was most discussed was the division of the bargaining unit,

15    which was a single bargaining unit, into three parts.  And that

16    would have been two of the hotels; and another two of the

17    hotels, which were full-service hotels; and then TCS, which is

18    an industrial laundry.

19    Q    BY MR. WIESE:  And was this -- was January 20th the only

20    date that this was brought up?

21    A    No, it was brought up on the 29th, as well.  That meeting

22    lasted less than an hour, because I had said to Michael Henry

23    that this was a subject -- permissive subject of bargaining, and

24    that he told us that he wouldn't negotiate any further unless we

25    agreed to breaking up the unit.

P 00326

1      MR. WIESE:  So, Your Honor, the following line of questions

2   relates to Complaint paragraph 12(a).

3   Q    BY MR. WIESE:  Now, Mr. Goff, looking at the stipulation,

4   it appears that the parties met for 11 bargaining sessions.

5   Were there any issues with the employer's negotiators arriving

6   on time for any of these sessions?

7   A    Seven or eight of these, the employer was late.

8   Q    All right, I would like to go through each session, and to

9   the best of your recollection, if you could tell me what time

10   they were scheduled to start and what time the employer's

11   negotiators arrived?  So let's start with January 20th.  Do you

12   recall whether the employer's negotiators were late for that

13   session?

14   A    No, they were on time.

15   Q    And what about the negotiations on January 29th?

16   A    My recollection is that they were on time on that day, as

17   well.

18   Q    And what about on the next session, on February 5th?

19   A    February 5th they were due to come in at 10:00, and they

20   arrived at 10:25 a.m.

21   Q    And what about on February 13th?

22   A    On February 13th, we were due to start at 10, but had

23   gotten an e-mail the night before, asking to delay until 10:30.

24   They came in at 10:30.

25   Q    Was this the only time that you got an e-mail like this?

1    A    Yes, that I know of, yes.

2    Q    Okay.  And turning to the next negotiations on February

3    26th, what time were those negotiations scheduled to begin?

4    A    Those were supposed to start at 10 o'clock.

5    Q    And what time did the employer actually arrive that day?

6    A    Ten fifty-five a.m.

7    Q    And what about the next session, on February 27th?

8    A    We were supposed to start at 11:30 a.m., the employer

9    arrived at 1:20 p.m.

10   Q    And what about the next negotiations on March 16th?

11   A    March 16th we were supposed to start at 9:30 a.m., and the

12   employer came in at 10:10.

13   Q    Okay.  And what about on March 24th?

14   A    The -- we were supposed to start at 9:30.  The employer

15   came in at 10:45.

16       JUDGE STECKLER:  I am sorry, could you repeat that?

17       THE WITNESS:  I am sorry.  The employer -- we had it set

18   for 9:30 in the morning and the employer came in at 10:45 -- I

19   am sorry, 10 in the morning.

20       MR. TERRELL:  I am sorry, now you confused me.

21       THE WITNESS:  Yes, I am sorry.  In -- we started at -- we

22   were supposed to start at 9:30 and they came in at 10:45.  That

23   is what I first stated, I am sorry.

24       MR. TERRELL:  Ten twenty-three?  Are you reading from

25   something?

1    THE WITNESS:  I am just looking at the dates that he gave

2   me on this.

3    MR. TERRELL:  All right, what was it again for March 24th,

4   is that --

5    MR. WIESE:  He is --

6    THE WITNESS:  March 24th, we were supposed to start at

7   9:30; we started at 10:45.

8   Q    BY MR. WIESE:  All right, Mr. Goff, let's turn to the next

9   session on April 16th.  Was the employer late for those

10  negotiations?

11  A    On April 16th, we were supposed to start at 9:30, and the

12  employer came in at 10:33.

13  Q    Okay, all right.  And what about negotiations on April

14  28th?  Do you recall whether the employer was late that day?

15  A    They were.  We were supposed to start at 10 a.m.; the

16  employer came in at 10:20 a.m.

17  Q    And what about the parties' most recent session on

18  September 24, 2015?  Do you recall whether the employer was late

19  that day?

20  A    I don't remember exactly, but I don't believe they were

21  late.  If they were, it wasn't very -- it wasn't very late.

22  Q    So looking at the issue of the employer's tardiness more

23  broadly, did the Union representatives even object to this at

24  the bargaining table?

25  A    Nancy Goldman did, at times.

1   Q    And how often do you remember Ms. Goldman bringing this up

2   at the table?

3   A    A number of times.  She would say things like, you know,

4   "Your time is not more valuable than ours."  Or, "I am going to

5   give you a warning for being late," that type of thing.

6   Q    Okay.

7   A    It was never really responded to.

8   Q    And do you remember anybody from the employer's side of the

9   negotiating table ever providing an answer when Nancy would

10  object to this?

11  A    I don't believe so, no.

12  Q    And was there ever any notice provided by the employer,

13  prior to the negotiating session, that they were going to be

14  late?

15  A    On February 13th, when they e-mailed us the night before.

16  Q    Besides February 13th, was there any notice?

17  A    Not to my recollection, no, I'm sorry.

18  Q    Were there ever any occasions where you remember the

19  employer -- the employer's negotiators -- leaving negotiations

20  without telling the Union that negotiations were done for the

21  day?

22  A    I can think of three, off-hand.

23  Q    When was the first time you remember this happening?

24  A    April 16th, I believe.

25  Q    All right, well, tell me what happened on April 16th?

1    A    Actually, I think it was March 24th.  But April 16th --

2    Q    Is --

3    A    I am sorry?

4    Q    Is there anything I can show that would help you remember

5    which day it was?

6    A    Maybe if I had my notes?

7    Q    Okay.

8    (Pause.)

9         MR. TERRELL:  What are you showing him?

10        MR. WIESE:  I am showing him a copy of his notes.

11        MR. TERRELL:  Okay, well, you need to show me first.

12        MR. WIESE:  Well, I am refreshing his recollection.

13        MR. TERRELL:  Fine, but I need to know what it is you are

14   showing the witness.

15        JUDGE STECKLER:  I think he is entitled to take a quick

16   look.

17        MR. WIESE:  Okay.

18        MR. TERRELL:  So what are you showing him?

19        MR. WIESE:  I am showing him his bargaining notes.

20   (Witness proffered document.)

21   Q    BY MR. WIESE:  Mr. Goff, take a minute to look at this

22   document and tell me when your memory has been refreshed?

23        MR. TERRELL:  And what was the question?

24        MR. WIESE:  I was asking him if reviewing his notes would

25   help to refresh his recollection, and he said it would.

1        THE WITNESS:  Yes.

2    Q    BY MR. WIESE:  Is your memory refreshed?

3    A    I would say somewhat refreshed, yeah.

4        MR. TERRELL:  Can we now take the notes away?

5        JUDGE STECKLER:  Mr. Goff, could you refresh my memory,

6    too?  What date are we talking about?

7        THE WITNESS:  March 24th.

8        JUDGE STECKLER:  Thank you.

9    Q    BY MR. WIESE:  All right.  Mr. Goff, tell me what you

10   remember happening on March 24th?

11   A    We had discussed side letters, fixing up some side letters

12   that were in the past agreement.  I don't think there was real

13   dispute about what was in those or what might need to be

14   changed.  The employer wanted to take a 20-minute caucus to just

15   clean them up and come back with something.

16   Q    And, Mr. Goff, before you go any further:  What period of

17   time are we talking about on March 24th?

18   A    That was about -- I think we took a break -- it was around

19   12:10, 12:15 in the afternoon.

20   Q    Mm-hmm.

21   A    They took a break.  We called several times, because they

22   were taking more than 20 minutes.  They came back, 2:40 I think

23   it was, in the afternoon.  When they came back, the side letters

24   had not been changed or worked on.  We discussed some cursory

25   issues, including things that don't matter anymore, like the --

1    how do you say it -- Elizabethan room, and some seniority issues

2    that took place there.  Also about housekeepers going into rooms

3    before room inspectors, because there were concerns about tips.

4    And I think that took about another 30 to 40 minutes, and then

5    we broke again.

6    Q    And when you broke again, who called for that caucus?

7    A    The employer.

8    Q    Okay.  And did they say what that caucus was for?

9    A    Well, actually, maybe mutual.

10   Q    Okay.

11   A    Nancy Goldman and Arch Stokes -- they still hadn't come to

12   a conclusion on getting the letters cleaned up.  There were a

13   number of appendixes, some of them really outdated, and so they

14   were going to go back and do that.  They left us for the rest of

15   the day, even though, in the morning, we had told them we had to

16   leave at 4.  We stayed until about 4:15 or 4:20, after several

17   calls to their secretary, who said that they would be there soon

18   they were making some copies.  As we were getting into the

19   elevator and the door closing, we were handed what ends up now

20   to be what was deemed as the final -- last, best, and final

21   offer.

22   Q    Did you have a chance to review that last, best, and final

23   offer?

24   A    I know Nancy --

25       MR. TERRELL:  Wait a minute, objection to the question

1   because it is not limited in time.

2       COURT REPORTER:  It is not what?

3       MR. TERRELL:  Not limited in time.

4       COURT REPORTER:  Thank you.

5       MR. TERRELL:  You said, "Did you have a chance to review

6   that document?"

7       JUDGE STECKLER:  I think that is the follow-up question.

8       MR. TERRELL:  Okay.

9       THE WITNESS:  Yes, I did have a chance to review it.

10  Q    BY MR. WIESE:  And when did you review that document?

11  A    Right after negotiations, very briefly, in the parking lot,

12  but mostly in the ride home.  I was driving and Nancy Goldman

13  was going over it with me.

14  Q    Um-hmm.

15  A    We noticed that there really weren't any differences to the

16  agreement, other than that there was a signature page.  The

17  letters of agreement had not been changed; they were exactly the

18  same.  And there were now a number of pie charts included.  And

19  I believe them to be -- the initial pie charts, or at least some

20  of the initial pie charts we got on the first day that we got

21  pie charts.

22  Q    All right.  Did the employer leave negotiations again, like

23  this, after March 24th?

24      MR. TERRELL:  Objection to qualifying "like this."  I don't

25  know what "like this" means.

1      JUDGE STECKLER:  Can you rephrase just a little bit?

2      MR. WIESE:  Mm-hmm.

3      JUDGE STECKLER:  Thank you.

4    Q    BY MR. WIESE:  Were there ever any times, after March 24th,

5    where the employer left negotiations early without telling the

6    Union?

7    A    On two occasions that I can remember.

8    Q    Okay, and when was the next one after March 24th?

9    A    It was April 16th.

10   Q    And what happened at the end of negotiations on April 16th?

11   A    The parties had had some discussion during the morning.  I

12   believe the Union had made some new proposals.  Michael Henry

13   was negotiating for the company on this occasion.  He left the

14   room, and 40, maybe 50 minutes later, Brian Brandt called him to

15   ask him when they were coming, I think because we were deciding

16   whether we had time to take lunch or whatever.  And he said that

17   they were done for the day and that they weren't coming back.

18   Q    And what happened after Brian talked to Mr. Henry?  What

19   did the Union do that day?

20   A    That might be the day that we leafleted, but we left.

21   Q    Okay.  And after April 16th, did the same thing happen

22   again at negotiations?

23   A    On April 28th.

24   Q    And what happened at the end of the day on April 28th?

25   A    Pretty much the same thing.  We had gone back and forth a

1    little bit.  It was -- Michael Henry, again, was the negotiator

2    for the company.  They left for a caucus.  More than an hour

3    later, I believe, Brian Brandt, the President of Local 21,

4    called Michael Henry.  And he also said the same thing, that

5    they were done for the day.  So we had been left sitting there -

6    - and we left.

7    Q    Sir, I am showing you what has been marked as 23(a) and

8    (b).

9    (Witness proffered documents.)

10   Q    BY MR. WIESE:  All right, so starting with 23(a), do you

11   recognize this document?

12   A    Mmm --

13   Q    And you can take a minute to look through it -- looking at

14   23(a) --

15   A    Oh, I am sorry, is that this one?

16   Q    -- yes.

17   A    The little one?

18   Q    Yes.

19   A    I am sorry, didn't see the numbers there for a second,

20   sorry.  This is -- these are the Union's proposals.

21   Q    And when is this first proposal from?

22   A    Excuse me?

23   Q    When is this first proposal from?  Do you recognize --

24   A    Yes, 1/20, January 20th of 2015.

25   Q    And what about the proposal on General Counsel Exhibit --

1       MR. WIESE:  I will offer General Counsel Exhibit 23(a).

2       MR. TERRELL:  Can I voir dire, please?

3       JUDGE STECKLER:  Go ahead.

4                     VOIR DIRE EXAMINATION

5    Q    BY MR. TERRELL:  Looking at GC 23(a), on the first page

6    there, it looks like some handwriting.  Is this part of the

7    exhibit?

8    A    Oh, I am sorry, I didn't know you were talking to me.

9    Q    Okay, on the first page of GC 23(a) there's some

10   handwritten words or letters in the top left corner.  Do you

11   know whose handwriting that is?

12   A    I do not.  I mean, it looks slightly like mine, but I am

13   not positive that it is mine.

14   Q    On the second page, there are three handwritten notations

15   at the top.  It looks like "ampersand" or "tic-tac-toe" symbol,

16   "hash tag," whatever you want to call it, with a "1."  Do you

17   recognize that handwriting?

18   A    That is -- I don't know, no, it is definitely not mine.

19   Q    And then, over on the right, it says "hours," the word

20   "hours" underlined twice.  Do you recognize that handwriting?

21   A    I do not.

22   Q    Were these two items that I just asked you about, on the

23   second page, were those handwritten entries on the document at

24   the time that you handed it to the employer in the bargaining

25   room?

1   A    I don't know, but I don't believe so.

2   Q    Okay.  And then, going back to the first page, the

3   handwritten notation that appears there, was that handwritten

4   notation on a blank piece of paper that was handed to the

5   employer when this document was given to the employer?

6   A    Not that I know of, no.

7   Q    Okay.  And then, on the second page, going back to the

8   second page, you see the date -- someone has handwritten in

9   "1/20/15."  Do you recognize that handwriting?

10  A    It may be Nancy Goldman's, but I really don't know.

11  Q    Was that on the document at the time that it was handed to

12  the employer in the bargaining session?

13  A    I am not sure.

14  Q    On page 3, typed, are "Items 1, 2, 3, and 4," and then

15  below "4," handwritten, is the entry "2. Period of discipline

16  notices to be reduced to one year."  Do you know whose

17  handwriting that it?

18  A    I can't say for sure, but I do believe that might be Nancy

19  Goldman's.

20  Q    Was that handwritten entry on the document when it was

21  handed to the employer?

22  A    My recollection is this was an addition to our proposal,

23  something she had missed, so I believe this was given to the

24  employer at the time.

25  Q    It was an addition to the proposal?

1    A    When we were going through the proposals, I think she

2    realized she had forgotten to type something in. I think that is

3    what this is.

4    Q    Okay, you are not sure, but you think this is Nancy

5    Goldman's handwriting?

6    A    Exactly.

7    Q    And so she would have written this.  If she, in fact, was

8    the one who wrote this, she would have written this on the

9    document that she retained, and that you then gave to counsel

10   for the General Counsel to mark as an exhibit, correct?

11   A    I am assuming.

12   Q    Did Nancy go around the table and handwrite in on the copy

13   that the employer had?

14   A    Normally, if she -- I can only go by what I have seen her

15   do in the past -- if she realizes --

16   Q    I am not asking about what she did in the past.

17   A    Okay.

18   Q    I am asking you about what happened there that day.

19   A    I really don't know, can't say.

20   Q    So you don't know whether this was on the document that the

21   employer received or not, do you?

22   A    I don't.

23   Q    Nor do you know if any of the other handwritten entries we

24   have talked about were on the document that the employer

25   received.  You don't know that, do you?

1   A     I can't say that for sure, no.

2   Q     Okay.  Page 5, the top, at the right, on item number 9,

3   someone has written in here, "over nights."  You don't know who

4   wrote that, either, do you?

5   A     I am sorry, what page?

6   Q     Page 5, item 9 at the top, over on the right, someone has

7   handwritten the words "over nights."  You don't know who wrote

8   that, do you?

9   A     I don't.

10  Q     Nor do you know if that was on the document that was given

11  to the employer, correct?

12  A     I really don't know.

13  Q     Okay.

14        MR. TERRELL:  We object to this document because there are

15  so many handwritten entries on it.  We don't know who made the

16  handwritten entries.  We don't know if it was given to the

17  employer in this form or not.

18        JUDGE STECKLER:  I have a couple of questions, Mr. Goff.

19        Where did you get the document from?

20        THE WITNESS:  This is the document that we used as a

21  proposal, so Nancy Goldman, the President of Local 17 in

22  Minneapolis, would have generated this.

23        JUDGE STECKLER:  Regarding the additions of the handwritten

24  items on here, is this what is kept in your records at the Union

25  office?

1      THE WITNESS:  It would be, yes.

2      JUDGE STECKLER:  And is this something that you keep in

3  your normal course of business?

4      THE WITNESS:  We would keep all proposals, yes.

5      JUDGE STECKLER:  So this is the Union's copy?

6      THE WITNESS:  I believe it is, yes.

7      JUDGE STECKLER:  Okay, so this doesn't necessarily mean

8  that this is exactly what you gave the employer, but the

9  typewritten proposals are what you gave to the employer on

10  January 20th?

11      THE WITNESS:  Yes.

12      MR. WIESE:  Your Honor, at this point, I mean -- so

13  actually this was an inadvertent error on my part.  The top --

14  page 1 is actually my handwriting.  That shouldn't have made it

15  on the document.  And then, as far as the rest of the

16  handwriting goes, I mean, I am not offering it for the truth of

17  any of those handwritten sections in the contract.  So what I

18  would propose is removing page 1 from that exhibit and then

19  offering this contract proposal for the truth of the matter

20  asserted, excluding the handwritten notes that may be in there.

21      MR. TERRELL:  That is fair.

22      JUDGE STECKLER:  Okay, General Counsel 23(a) is admitted,

23  with those exclusions.

24  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 23(a).)

25      JUDGE STECKLER:  Please proceed, Mr. Wiese.

1    Q    BY MR. WIESE:  So, Mr. Goff, turning your attention to

2    General Counsel Exhibit 23(b).

3    A    Yes.

4    Q    Do you recognize this document?

5    A    This looks like a -- what would appear to be a full

6    proposal, a full contract --

7    Q    Mm-hmm.

8    A    -- generated at Local 17.

9    Q    Do you recall about when -- or was this a proposal that was

10   given to the employer?

11   A    I believe it was, yes.

12   Q    Okay.  And do you recall about when this proposal would

13   have been given to the employer?

14   A    I think that it probably was given some time after the

15   first meeting and the second meeting, because the first meeting,

16   we didn't really get to any meat and potatoes.  The second

17   meeting, we left after an hour or less because they wouldn't

18   negotiate.  So it was either around February 5th or February

19   13th.

20   Q    Okay.

21       MR. WIESE:  I will offer General Counsel Exhibit 23(b),

22   with the same stipulation that we talked about with regard to

23   General Counsel Exhibit 23(a) and the handwriting on that

24   document.

25       JUDGE STECKLER:  Okay, Mr. Terrell is taking a quick look

1   so we will hold for just a second here.

2   (Pause.)

3        MR. TERRELL:  Okay, with the understanding, no objection.

4        JUDGE STECKLER:  Okay, with that stipulation, 23(b) is

5   admitted.

6   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 23(b).)

7   Q    BY MR. WIESE:  Showing you what has been marked as 23(c)

8   and (d).  Starting with General Counsel Exhibit 23(c), could you

9   identify this document?

10  (Witness proffered documents.)

11  A    This is a proposal for insurance and wages made by the

12  Union.

13  Q    And when do you remember this proposal being given to the

14  employer -- or was it -- excuse me -- was this proposal given to

15  the employer?

16  A    Yes.

17  Q    And do you remember about when that would have been?

18  A    I would imagine at the beginning of negotiations.  I

19  believe it was the 20th of January.

20  Q    The -- Mr. Goff, directing your attention to the top of

21  that document, is the date on there -- does that look like the

22  date?

23  A    Oh, I see, yes.  "Local 21 Wage/Benefit Proposal of

24  February 19, 2015."

25  Q    So, having looked at that --

1  A    Oh, okay, I remember.

2  Q    -- does that help you remember when it would have been --

3  A    I do.  I am sorry.

4  Q    Go ahead.

5  A    We didn't get into these subjects until later --

6  Q    Okay.

7  A    -- yeah.

8  Q    Okay.

9       JUDGE STECKLER:  Why does it say "Local 21"?

10      THE WITNESS:  Local 21, Your Honor, is the local here in

11 Rochester and Local 17 is in Minneapolis.  But the President of

12 Local 17 and myself, from Minneapolis, we helped them negotiate.

13 So, I know it is a little confusing, but Local 21 is the local

14 here, and Brian Brandt, in the back of the room, is the

15 president.

16      JUDGE STECKLER:  Okay.

17      MR. WIESE:  I will offer General Counsel Exhibit 23(c).

18      MR. TERRELL:  No objection.

19      JUDGE STECKLER:  Twenty-three(c) is admitted.

20 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 23(c).)

21 Q    BY MR. WIESE:  Turning your attention to General Counsel

22 Exhibit 23(d).  And you can take a minute to look at the

23 document and let me know when you are ready.

24 A    Yes.

25 Q    Okay.  Do you recognize this document, Mr. Goff?

1    A    I do.

2    Q    And what is it?

3    A    It is a proposal from the Union, on February 27th, and it

4    is regards to new classifications and promotions, and their

5    probationary period.

6    Q    I will offer General Counsel Exhibit 23(d).

7        MR. TERRELL:  No objection.

8        JUDGE STECKLER:  General Counsel 23(d) is admitted.

9    (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 23(d).)

10   Q    BY MR. WIESE:  Showing you what has been marked as General

11   Counsel 23(e) and (f).  Starting with General Counsel Exhibit

12   23(e), do you recognize this document, Mr. Goff?

13   (Witness proffered documents.)

14   A    Yes.

15   Q    And what is it?

16   A    It is a counter-proposal to the Company from Local 21.

17   Q    And when was that counter-proposal made?

18   A    In April -- April 16th of 2015.

19       MR. WIESE:  I will offer General Counsel Exhibit 23(e),

20   again with the same caveats as to the handwriting that applied

21   to the previous General Counsel Exhibits 23.

22       MR. TERRELL:  There's a lot of handwriting on this.

23       MR. WIESE:  This is the best I got.

24       MR. TERRELL:  So Your Honor's view would be to ignore any

25   of the handwritten entries when taking this document -- exhibit

1    -- into consideration?

2        JUDGE STECKLER:  Yes, sir.

3        MR. TERRELL:  With that understanding, no objection.

4        JUDGE STECKLER:  GC Exhibit 23(e) is admitted.

5    (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 23(e).)

6    Q    BY MR. WIESE:  And then turning your attention, finally, to

7    General Counsel Exhibit 23(f).  Do you recognize this document,

8    Mr. Goff?

9    A    I do.  It is a proposal that the Union made, in the

10   September negotiations, to Michael Henry.

11   Q    And then looking at the italics in response, those

12   sections, do you recognize what those are?

13   A    These are responses from Michael Henry, to the Union,

14   regarding its proposals -- its overall proposals.

15       MR. WIESE:  I will offer General Counsel Exhibit 23(f) into

16   evidence.

17       MR. TERRELL:  A quick voir dire.

18                      VOIR DIRE EXAMINATION

19   Q    BY MR. TERRELL:  This document has been red-lined?  Do you

20   know who did the red-lining?

21   A    Let me look at it again.  Is there a particular page you

22   are having me look at?

23   Q    Well, the whole document is in, you know, red-line review

24   mode.  And there's just a couple of comments in the margin.  I

25   am just asking if you know who did the red-lining?

1  A    I believe that anything that is in italics came from the

2  Company, or Michael Henry.  And it looks -- at least for the

3  first one I am looking at -- that the comment here is regarding

4  a typo, it is in the italics part, because that is the response

5  --

6  Q    But you don't know whether --

7  A    -- I am sorry.

8  Q    -- I mean, do you know whether Michael Henry put that

9  comment in there, or whether somebody who received this from the

10 Union put that comment in there?

11 A    I don't believe anyone that received this put that comment

12 in there.

13 Q    All right.

14     MR. TERRELL:  Apart from the red-line comments, we have no

15 problem with the document.

16     MR. WIESE:  Right.  And that's fine excluding those on the

17 --

18     JUDGE STECKLER:  Because it points out some spelling

19 errors.  GC Exhibit 23(f) is admitted as stated.

20 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 23(f).)

21     MR. WIESE:  So, Your Honor, the following line of questions

22 is in support of Complaint allegation 12(b).

23 Q    BY MR. WIESE:  Mr. Goff, I would like to talk to you about

24 negotiations regarding Union leave for employees.  Prior to

25 these current negotiations, what was the prior contract proposal

1    for Union leave for employees?  And you can take a look at

2    General Counsel Exhibit 2, if you would like, it is the prior

3    contract.

4    A    Yes.  You said the "prior contract," I have --

5         COURT REPORTER:  Here is 2.

6    (Witness proffered document.)

7         THE WITNESS:  -- the Union's proposal -- thank you.  Do you

8    know what page that might be found on?

9    Q    BY MR. WIESE:  Yes, I was just looking for that.

10   (Pause.)

11        MR. WIESE:  Oh, here we go.

12   Q    BY MR. WIESE:  So using the pagination that I have added,

13   it is on page 12 of 52.

14   A    Twelve of 52?

15   Q    Yes.

16   A    This is meal periods on this particular thing.

17   Q    Using this --

18   A    I am sorry.

19   Q    -- the pagination that is at the bottom of the document, so

20   where it says, you know, 1 of 52, page 12 of 52, in the lower

21   right-hand corner?

22   A    Oh, 12 of 52, I am sorry.

23   Q    It is all right.

24   A    I was looking at page 12.

25   Q    Yeah.

1      JUDGE STECKLER:  Here's my copy.

2      THE WITNESS:  I have it.

3      JUDGE STECKLER:  You have it, okay.

4      THE WITNESS:  Thank you.  I was looking at page 12 instead

5   of --

6   Q    BY MR. WIESE:  Okay.  And --

7   A    So, yes, I see it.

8   Q    So looking at that, what was the prior proposal for union

9   leave for employees?

10  A    Past proposal?

11  Q    Or the past contract, thank you.

12  A    That the employer agreed to grant necessary time off,

13  without pay or loss of seniority rights, for any employees

14  designated to go to Union convention, or other Union business.

15  The employer required a two-week notice.  And as long as there

16  wasn't a disruption to the employer's business, it would be

17  approved.

18  Q    And the Union convention that is referenced in this

19  proposal, what is that Union convention?

20  A    Every five years our International Union holds a delegate

21  convention.  Delegates come from all parts of the United States,

22  Canada, Guam, and Puerto Rico to discuss Union matters, agree on

23  a number of subjects like dues increases, any changes to the

24  constitution.  And that happens, like I said, every five years.

25  Q    How long is that convention?

P 00349

1    A    Normally, it is three days.

2    Q    And are there travel days associated with going to the

3    convention?

4    A    I have never been to a convention like that that's been

5    close to home, so there are travel days, a day there and a day

6    back.

7    Q    And turning your attention to -- well, actually, we don't

8    even need to do that.  What was the employer proposing to do

9    with regard to Union leave in its proposals?

10    A    The employer was proposing to limit the time off, or leave,

11    to go to a Union convention or other Union activities, to three

12    days.  And if an employee was not returned back to work within

13    three days, or right after the three days, there would be a loss

14    of seniority to them.

15    Q    And when did this topic come up in negotiations?

16    A    I believe it was in the very first proposal.  I am not sure

17    that we talked about it until probably February 5th or possibly

18    February 13th.

19    Q    And why was this proposal an issue for the Union?

20        MR. TERRELL:  Wait, wait, why was the proposal initiated by

21    the Union?

22        MR. WIESE:  Why was it an issue for the Union?

23        MR. TERRELL:  Oh, an issue for the Union, sorry.

24        THE WITNESS:  We like our members to be able to participate

25    in delegate meetings, conventions.  We think it is important for

P 00350

1   not only their expansion as a member, but it lends them a

2   democratic voice at our International convention.  And so we

3   find it really important to have people be allowed to do this

4   once every five years.

5   Q    BY MR. WIESE:  And how would this proposal have meant

6   employees risking losing their seniority?

7   A    I think it put a chilling effect on it.  I wouldn't go if I

8   was going to lose my seniority, that's my money, that's how I

9   get to work.  So I think that it would actually have a chilling

10  effect on anyone wishing to go to a convention.  Our last one

11  was in Boston.

12  Q    Did the Union object to this Union leave proposal when it

13  was brought up at the bargaining table?

14  A    Strenuously.

15  Q    And when did the Union first object?

16  A    When it was first brought up, which I believe was probably

17  the 5th, but I am not positive, but I believe it was the 5th.  I

18  think we might have seen it before then, but we were definitely

19  always against it.

20  Q    And did anyone from the employer's side of the table ever

21  provide an explanation of why this Union leave provision was

22  being sought?

23  A    They wanted it.

24  Q    Who said that?

25  A    Michael Henry.

1    Q    Do you recall about when he said that?

2    A    Either on the 5th or the 13th, I believe.

3         MR. WIESE:  Your Honor, the following line of questions is

4    in support of Complaint allegations 12(c) and (d).

5    Q    BY MR. WIESE:  So, Mr. Goff, I would now like to talk with

6    you about the parties' negotiations over wages.  But first I

7    would like to talk to you about the prior wage provisions in the

8    contract.  Could you explain how the wages worked in the prior

9    contract?

10   A    Well, it was done on what we generally call a "wage grid."

11   So when someone is hired, they started at a start rate.  After a

12   certain amount of time, usually 12 months, they go to a new

13   rate, 2 years, 36 months -- it is different in different

14   contracts, but I believe in this contract we went up to 60

15   months, if I recollect.  But there were also -- so you would get

16   a raise basically on your longevity, but then the contract

17   itself, year to year, had wage increases.  So there was a wage

18   increase in the contract year, as well.  So you may get as many

19   as two raises in a year, depending on when you got hired.

20   Q    And when the topic of wages came up during these

21   negotiations, what was the employer proposing to do with the

22   wage structure?

23   A    The employer was proposing to increase the start rate, I

24   believe maybe in all classifications, certainly in many of the

25   classifications.  They were proposing to do away with what we

1   call the "steps" -- the 12-month, 24-month, the 36-month -- and

2   simply have wage increases based on the contract year, 2014,

3   2015, 2016, whatever.

4   Q    Mm-hmm.

5   A    Also, in that proposal, that proposal was made strictly for

6   people who had not been hired yet, for prospective new hires.

7   And our concern about it was that starting at a higher rate was

8   one thing, but then having wage increases every contract year

9   flattened out the increases.  And so it was what we would call a

10  two-tier wage system.

11  (Witness proffered document.)

12  Q    So, for example, looking at what has been marked as General

13  Counsel Exhibit 6(g), and if you look at pages -- let's go 52 of

14  150, again using those numbers in the bottom right-hand corner.

15  A    Okay, 52, oh, yes, okay.

16  Q    So using this appendix, could you describe how this kind of

17  two-tier wage system would be -- would have worked?

18  A    Well, if I look at the top line, which would be a second

19  cook, their new 2015 starting rate would be $15.50.  It looks

20  like that would be the same starting rate in 2016 as well.  They

21  would go up 16 cents in '17 and so on over the course of five

22  years.  But those are, it looks to me, the only wage increases.

23  Q    And is it your understanding that this -- that these wage

24  rates that we are talking about here -- these are only for new

25  hires?

1  A    That is my understanding, yes.

2  Q    And what about the wages for the current employees, who are

3  already working there?

4  A    I asked that question a number of times, because Michael

5  Henry stated that wage increases would be given on merit.

6  Q    And do you recall when he said that -- or when that topic

7  came up?

8  A    I believe it was February 13th, or possibly February 26th.

9  Q    How many times did you ask Mr. Henry about the merit

10  increases?

11  A    Between Nancy Goldman and myself, I know it was a minimum

12  of eight times.  We had had asked -- and what I specifically

13  asked was:  "Is there a floor to this, and is there a ceiling?

14  If it is going to be done on merit, how does that look to our

15  present members?  We know what you are offering for prospective

16  new members, but we are very unclear about what the present

17  workers would get."  So we wanted to know, is there a base wage,

18  let's say 1 percent, and then you get merit on top of that, and

19  does that go up to, what, 5 percent?  We didn't know.  And so

20  that was a major question of ours.

21  Q    And in response to the questions about merit increases, did

22  the employer provide any information?

23  A    We asked how merit increases would be given, and Michael

24  Henry said that the merit increases would be given based on an

25  evaluation.  And so we asked for a copy of the evaluation form

1    that they intended to you.

2    (Witness proffered document.)

3    Q    Showing you what has been marked as General Counsel Exhibit

4    19.  So looking at, I guess, starting on page 3 and then going

5    back to page 5, do you recognize what this document is?

6    A    Page 3, page 4, and page 5 is the evaluation form.  They

7    call it "Performance Management Process."  But it was the form

8    that they provided to the Union in order -- I guess people would

9    be rated on this in order to get their raises.

10        MR. WIESE:  I will offer General Counsel Exhibit 19.

11        MR. TERRELL:  No objection.

12        JUDGE STECKLER:  General Counsel 19 is admitted.

13   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 19.)

14   Q    BY MR. WIESE:  Did the Union have any issues with this

15   specific performance review?

16   A    I think we generally -- well, we did.  First of all, we

17   generally have issues with performance reviews in the respect

18   that they are subjective, and each manager has a different

19   viewpoint about each employee and they are subjective.  So, just

20   on the fact of that, we don't care for them very much.  But,

21   more specifically, if people were going to be rated through this

22   procedure in order to get a merit increase, I would have to

23   assume that there's points attributed to each of the issues that

24   are listed on this form, and it doesn't fit every

25   classification.  One size does not fit all at a hotel.

1   Dishwashers don't see guests, generally speaking, where servers

2   and bartenders do.  Certain classifications are more likely to

3   be able to give ideas or add or subtract to the efficiency of a

4   hotel.  Like a cook can watch their product and add to the

5   efficiency of a hotel, where other classifications really may

6   not be able to do that.  So this particular review really, in a

7   way, hemmed in some people into getting either low scores or no

8   scores, and that would possibly affect their evaluation, which

9   thereby would affect their wage increase.  So, yeah, we had a

10  problem with it.

11  Q    Do you remember whether these concerns were raised at the

12  bargaining table?

13  A    They were.

14  Q    And who raised them?

15  A    Nancy Goldman and -- and I, I believe I did.

16  Q    And do you remember about when that happened during the

17  bargaining?

18  A    I believe that was -- I would say it was either the 27th of

19  February, in that area, or the first meeting we had in March,

20  which would have been the 16th, I believe, the 16th of March.

21  Q    And when -- as negotiations progressed -- when did the pie

22  charts come into the picture?

23  A    Late March, I believe, the pie charts came in, after this

24  merit increase was discussed and we received this information,

25  the pie charts were brought in, initially, as a way to answer

1  our questions about the floor and the ceiling.  We had made a

2  point of asking, many times, about the floor and the ceiling,

3  and initially we were told that the pie charts would be our

4  answer.  The pie charts quickly turned from an answer about a

5  question, how it would affect our members, to the actual wage

6  proposal by management, and we never heard about the merit

7  increases again.

8  Q    Did anyone from the Union ever request individual pie

9  charts for each employee?

10  A    Absolutely not.

11  Q    So if you could take a look at General Counsel Exhibit

12  10(a)?

13  A    Yes.

14  Q    And this is just a sample pie chart.  So what were the

15  Union's issues with the contract?

16  A    Well, as I recall, the initial pie charts that were brought

17  into negotiations -- excuse me -- were pie charts specific to

18  the people who were in the room, meaning the Union worker

19  committee.  The workers looked at those pie charts and quickly

20  determined for themselves that there were a lot of mistakes in

21  those, sometimes in the amount of wage somebody was getting.  I

22  think there was even one person, who was a server, and it didn't

23  reflect the increase in minimum wage, for example.  It also --

24  it showed that people who were on-call or worked less than full

25  time, or the full time definition for benefits in the contract,

1  were attributed with things like vacation and holiday, and the

2  things that they were not be eligible for unless they were a

3  full time regular worker.  So we had concerns with very first

4  charts that we saw.

5  Q    And how were these concerns addressed?

6  A    At the bargaining table.  Nancy Goldman and I brought it up

7  to Arch Stokes, who looked at them, recognized that there were

8  issues with them.  He turned to -- I want to say it was Leslie,

9  but I am not positive who the finance person at the time was,

10  sitting at table -- but I think it was Leslie, and said "Can we

11  correct these?  We have got to get these corrected," you know,

12  "The Union's right."  And those were then shoved to the side.

13      MR. TERRELL:  Those were what?

14      THE WITNESS:  I am sorry, those were put to the side,

15  because they were going to be corrected.

16  Q    BY MR. WIESE:  Did the Union receive another set of pie

17  charts?

18  A    We did.

19  Q    And when?

20  A    I believe it was the next negotiating session.  We received

21  two big boxes of pie charts.

22  Q    And were there issues with the second set of pie charts

23  that you received?

24  A    Besides the enormity of them, I believe there was as many

25  as 450 workers, give or take a few.  Many of the pie charts,

1    they were set up for a five-year period, so there were as many

2    as 13 pages per worker, which is just a little under 6,000 pages

3    total.  So we had concerns with the amount of information being

4    provided to us.  But we also had issues with some of the math

5    and some of the things that were attributed to people.  This was

6    presented to us -- there's a big block that is presented as base

7    pay and overtime, but the overtime couldn't be broken out.  So

8    we didn't know how much was base pay and overtime.  We also

9    didn't know how the overtime was calculated, especially going

10   into the future.  We can understand how it might be calculated

11   to the past, or even to the present, to that date, but to the

12   future -- we couldn't understand that.  Everyone was attributed

13   with things like jury duty and funeral pay, and a number of

14   other things, but the math, in many cases, didn't add up,

15   including the fact that, in the future, for a number of people,

16   the state minimum wage was not included.  It has gone up several

17   times in the last year or so, and it is due to go up again in

18   August.

19   Q    And when you said there were 450 employees at the time, who

20   -- which properties were in the bargaining unit?

21   A    Well, total, because we also got them for TCS.  So the

22   unit, I believe by then, was broken into two groups.  But still,

23   for us, 200 and -- or 450 people -- in the hotels there was 250,

24   give or take people.

25   Q    And these concerns that you were talking about, with the

P 00359

167

1  overtime and the bereavement leave and the jury duty, were these

2  concerns raised at the table at the time you got the second pie

3  charts?

4  A    Yes, they were.

5  Q    Who raised them?

6  A    Nancy Goldman.

7  Q    How did the employer respond to that?

8  A    "Martin asked for these as an answer."

9  Q    Who said that?

10  A    Arch Stokes.

11       JUDGE STECKLER:  I am sorry, could you repeat that?

12       THE WITNESS:  I am sorry, Arch Stokes.

13       JUDGE STECKLER:  Before that, what did he say?

14       THE WITNESS:  Oh, he said that Martin had asked for these

15  pie charts as an answer to his inquiry about -- about a floor

16  and a ceiling to wage increases on merit.

17       JUDGE STECKLER:  Okay, thank you.

18       THE WITNESS:  You are welcome.

19  Q    BY MR. WIESE:  Besides these pie charts and the wage offer

20  in appendix A of the employer's March 24th offer, were wages

21  being reduced for any current employees?

22  A    The pie charts had what looked like to us to be some

23  reductions.  But, specifically speaking, the banquet servers

24  were being asked to take as much as a 50 percent wage decrease.

25  Q    And how were their wages being changed?

1  A    Banquet servers normally would get the state minimum wage,

2  and then a portion of the service charge, which would be the

3  majority of their earnings.  It was being proposed by the

4  employer, initially, if I recollect correctly, that those

5  workers would get $12 per hour.  I believe, at the next session

6  they changed it to 15, which would still be somewhere between 35

7  and 50 percent of a wage decrease.

8  Q    Do you recall a negotiating session where several banquet

9  servers attended?

10  A    I do.

11  Q    And do you recall the topic of service charges coming up

12  that day?

13  A    Yes.

14  Q    Okay.  What was discussed regarding service charges?

15  A    Well, the company said that they would probably still

16  charge a service charge, but that they would keep that for

17  themselves, that they wanted to remain competitive.  That Joe

18  Powers as one of their competitors, also Gus Chafoulias another

19  competitor, didn't have to pay what they were paying.  And they

20  -- let me see -- I think that's about it, I can't -- I'm --

21  Q    Just drawing a blank right now?

22  A    I am sorry.

23      MR. WIESE:  Well, let's move on.  So looking at, Your

24  Honor, this line of questioning is in support of Complaint

25  allegations 12(e) through (h).  Mr. Goff --

P 00361

1      MR. TERRELL:  I am sorry, 12 what, please?

2      MR. WIESE:  (e) through (h).

3  Q    BY MR. WIESE:  All right, actually before we move on, do

4  you recall there being any disagreement, on the employer's side

5  of the table, regarding the service charges, that day when the

6  banquet servers were at the bargaining table?

7  A    Yeah.

8  Q    Tell me what you recall about that.

9  A    Yes.  The proposal was to do away with the service charge,

10 except that the Company keeps the service charge.

11 Q    And who was proposing that?  Who was talking about that?

12 A    Arch Stokes, and I believe Bill Bunce was part of this

13 conversation.  But at one particular time, when Arch was

14 speaking about that was their proposal and that's how they

15 intended to do it, Bill Bunce chimed in and said that -- that

16 the Company, at times, would decide if part of the service

17 charge was attributed to workers.  And my recollection is Art

18 Stokes looked a little befuddled by that.  They had a little

19 discussion between them, and Bill Bunce reiterated that the

20 employer may, at times, give a portion of the service charge to

21 workers.  That was not their proposal, but that is what they

22 said at the table.

23 Q    And who would decide whether employees would get a portion

24 of the service charge, according to Mr. Bunce?

25 A    The Company would.

1  Q    Was there ever any further clarification about what would

2  happen with service charges?

3  A    No, there never was.

4  Q    All right.

5       MR. WIESE:  So now, Your Honor, I would like to turn to a

6  line of questioning in support of Complaint allegations 12(e)

7  through (h).

8  Q    BY MR. WIESE:  And Mr. Goff, I would like to talk about

9  some of the information requests in this case.  Did the Union

10 ever request information from the employer about the cost of

11 health care?

12 A    Yes.

13 (Witness proffered document.)

14 Q    BY MR. WIESE:  Showing you what has been marked as General

15 Counsel Exhibit 20.  Just take a minute.  Are you done reviewing

16 the document?

17 A    I have seen something like this -- yes.

18 Q    What is this document?

19 A    It is a chain of e-mail letters between Nancy Goldman and

20 Michael Henry, copying various people.  And it concerns the

21 employer's quantification of the health care proposal.

22 Q    And looking at the figures in the e-mail starting on page

23 1, and going over to page 2, it looks like the employer provided

24 some information about the cost of health care.  What was the

25 issue with this information that was provided?

1    A    Yes.  This is what the employer provided, and it is

2    information regarding health care coverage, but it includes non-

3    Union participants in the employer's health care plan.  They

4    were not broken out separately, so we didn't know what the cost

5    that our members generated were -- was -- for this health care

6    plan.

7    Q    And was this something that the Union brought to the

8    employer's attention?

9    A    Yes.

10   Q    Were those numbers for the -- the Union-member only cost

11   for the health care, was that information ever provided?

12   A    Never.

13        MR. WIESE:  Offer General Counsel Exhibit 20.

14        MR. TERRELL:  No objection.

15        JUDGE STECKLER:  General Counsel Exhibit 20 is admitted.

16   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 20.)

17   Q    BY MR. WIESE:  Did the Union ever request information about

18   the cost of the employer's vacation proposals?

19   A    Yes, we did.

20   (Witness proffered document.)

21   Q    Showing you what has been marked as General Counsel Exhibit

22   21.

23   Q    Okay.  Mr. Goff, do you recognize this document?

24   A    Yes, it is an e-mail from Nancy Goldman to Michael Henry

25   and Arch Stokes.

1  Q    And what is this e-mail about?

2  A    About the quantification value for a proposal that was

3  accepted by the Union on vacation.

4       MR. WIESE:  I will offer General Counsel Exhibit 21.

5       MR. TERRELL:  Hold on.

6       JUDGE STECKLER:  Without the little bit at the top

7  regarding "from Martin to Tyler"?

8       MR. WIESE:  Yes.

9       MR. TERRELL:  No objection.

10      JUDGE STECKLER:  General Counsel 21 is admitted.

11 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 21.)

12 (Witness proffered document.)

13 Q    BY MR. WIESE:  Showing you what has been marked as General

14 Counsel Exhibit 22.  Do you recognize this document?

15 A    Yes, it is a chain of e-mails between Nancy Goldman and

16 Michael Henry.

17 Q    And looking at the second e-mail in that chain, that starts

18 on the bottom of page 1 and goes over to page 2, what is that --

19 yeah, dated October 20, 2015, what is that?

20 A    This is an e-mail from Nancy Goldman to Michael Henry, once

21 again asking for quantifications of the cost to the employer for

22 vacation for the five-year proposed contract.

23 Q    And so the response -- the section listed "Response," is

24 that what the employer -- the information the employer had given

25 you previously -- or had given you about the cost of that

1  vacation proposal?

2  A    This bottom part seems to be the response of what was

3  called a ballpark estimate of the vacation costs at $84,000 per

4  year.

5  Q    And when did you get that ballpark estimate about, do you

6  recall?

7  A    This is October 20th.

8  Q    And are you aware, was that before or after a Complaint

9  issued in this case?

10  A    That was after the Complaint was issued by the Labor Board.

11      MR. WIESE:  I will offer General Counsel Exhibit 22.

12      MR. TERRELL:  I need a clarification on GC 22.

13                    VOIR DIRE EXAMINATION

14  Q    BY MR. TERRELL:  The e-mail at the bottom, from Nancy

15  Goldman to Michael Henry, Nancy writes, "Michael, is this for

16  each year or five years?"  And then what appears below that is

17  cut-and-pasted out of the Response that the company gave to the

18  Union's September 24 Response, is that right?

19  A    I am not sure what you mean by cut-and-pasted, if you could

20  --

21  Q    All right.  There's an exhibit that has come into evidence,

22  and it was the -- it is GC 23(f).

23  A    GC 23(f).

24  Q    Okay, do you have that in front of you?

25  A    I do, yes.

1    Q    All right.  The non-italicized text in this document, it

2    constitutes the Union's proposal made on September 24, correct?

3    A    I believe so, yes.

4    Q    And the italicized response is below that by the Union --

5    excuse me, by the Respondent -- forgive me -- by Mr. Henry?

6    A    Yes.

7    Q    In response to your 9/24 proposal?

8    A    I believe so, yes.

9    Q    And on the fourth page of this exhibit you see, at the top

10   of the page, "Number 90 discussed," and then below that,

11   "Response."

12   A    Ninety response, yes.

13   Q    Okay, so that piece, at the top of page 4, is cut-and-

14   pasted into this e-mail by Nancy to Michael Henry on October 20?

15   A    I believe -- I believe she probably -- from the answer that

16   she got -- must have done that.

17   Q    I am just trying to understand this document.

18   A    It appears to be that, I didn't generate it.

19   Q    Okay.

20        MR. TERRELL:  No objection.

21        JUDGE STECKLER:  General Counsel 22 is admitted.

22   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 22.)

23                    CONTINUED DIRECT EXAMINATION

24   Q    BY MR. WIESE:  Just a couple of follow-up questions.

25   Looking at General Counsel's 23(f), Mr. Goff?

1    A    Yes.

2    Q    So that's the Union's proposal from September 24th, does

3    that look right?

4    A    It was the proposal we made on the last day that we saw

5    that, yes.

6    Q    And then this response, the responses below from the

7    employer, did you get those after you had made the proposal?

8    A    Yes.

9         MR. WIESE:  No further questions.

10        Did you --

11        MS. BURGESS:  Can we go off the record for just a second,

12   Your Honor?

13        JUDGE STECKLER:  I will give you about two minutes.

14   (Off the record.)

15        JUDGE STECKLER:  On the record.

16        MR. WIESE:  Just a handful of brief questions, Your Honor.

17   Q    BY MR. WIESE:  So after the expiration of the prior

18   collective bargaining agreement in February, are you aware

19   whether the employer stopped providing step increases for

20   employees?

21   A    Yes, they did stop.

22   Q    Did the Union ever agree with the employer to stop

23   providing those increases?

24   A    No, we did not.  We brought it up at the table more than

25   once.

P 00368

1    MR. WIESE:  Okay, nothing further.

2    JUDGE STECKLER:  Mr. Terrell, do you need a few minutes?

3    MR. TERRELL:  I would like to see the <u>Jencks</u> affidavit, if

4  there is one.

5    MR. WIESE:  All right, let the record reflect that I am

6  providing a copy of Mr. Goff's affidavit provided to the Board.

7  It is 26 pages in length.

8    MR. TERRELL:  This will take me a while to read.

9    JUDGE STECKLER:  Let's see, can you --

10    MR. TERRELL:  I am sorry?

11    JUDGE STECKLER:  We will go back on the record at 3:40.

12    MR. TERRELL:  Three forty?  Okay.

13    MR. WIESE:  Your Honor, I also, I guess, in the interests

14  of full disclosure, I also have -- so I have bargaining -- I

15  know that Mr. Terrell just requested the affidavit, but I have

16  bargaining notes from Mr. Goff that are also, I believe,

17  required to be produced under <u>Jencks</u>, and then also e-mails that

18  are -- also e-mails that have been redacted with the names of

19  employees who aren't testifying in this case, from Mr. Goff.

20    MR. TERRELL:  Okay, so these are exhibits to this

21  affidavit?

22    MR. WIESE:  No, they are just -- they are statements that

23  fall under the scope of <u>Jencks</u>, that --

24    MR. TERRELL:  Okay.

25    MR. WIESE:  -- that aren't affidavits.

1       MR. TERRELL:  Okay.

2       Are there any other affidavits?

3       MR. WIESE:  No.

4       MR. TERRELL:  This stack of e-mails is about an inch and a

5   half thick.

6       MR. WIESE:  I think there's 130 of them.

7       MR. TERRELL:  A hundred and thirty?

8       MR. WIESE:  Or a 130 pages.

9       MR. TERRELL:  A hundred and thirty pages.

10      And then the handwritten notes are double-sided, two-sided,

11  pretty hard to read.

12      MR. WIESE:  I think they're about 40 pages.

13      MR. TERRELL:  I am going to need at least -- well, I am

14  going to need until 4 o'clock, Your Honor, less than an hour?

15      JUDGE STECKLER:  I think that would be appropriate.

16      MR. TERRELL:  Okay.

17      JUDGE STECKLER:  We will go off the record until 4.

18  (Off the record.)

19      JUDGE STECKLER:  We'll be back on the record.

20      Mr. Terrell, I think you were about to cross-examine, Mr.

21  Goff.

22      MR. TERRELL:  Thank you.

23      JUDGE STECKLER:  Now, Mr. Goff, we took a break, so you're

24  still under oath.

25      Thank you, sir.

1                    CROSS-EXAMINATION

2   Q    BY MR. TERRELL:  Good afternoon, Mr. Goff.

3   A    Good afternoon.

4   Q    Before the so-called formal negotiations began on January

5   20, there were a number of discussions in 2014 regarding the

6   upcoming collective bargaining, correct?

7   A    I attended three meetings.

8   Q    Okay.  Now there was an initial meeting with several of the

9   executives of the hotel, in which the topic of food and beverage

10  costs were discussed.  Do you recall those meetings?

11  A    I do.  That was the second meeting I attended.

12  Q    Okay.  Were you in the meeting with Javon Bea, in that

13  meeting?

14  A    Which was the earlier meeting, yes.

15  Q    Okay.  And, again, they talked about the food and beverage

16  cost and they talked about their competition here in the

17  Rochester area, right?

18  A    The first meeting was more about the competition.  The

19  second meeting was a presentation by the employer through a

20  computer generated --

21  Q    Power point presentation?

22  A    -- power point presentation, yes.

23  Q    Showing various costs?

24  A    Yes.

25  Q    And they talked about the competition.  The competition

1   being a company called "Canadian Honker," right?

2   A     Yes.

3   Q     And you referred to Joe Powers when you were talking about

4   the discussion regarding the hotels' competition, and you

5   referred to -- Joe Powers is Canadian Honker, right?

6   A     That's my understanding.  He's the owner or operator.

7   Q     Right, and he's in direct competition with the Kahler

8   Hotels, isn't he because he provides convention or banquet

9   services in the Rochester area?

10  A     Not in a hotel setting, but he does do convention or

11  catering of some sort.  I don't know exactly what his

12  circumstances --

13  Q     Well, you're aware also that the Kahler Hotels also do off-

14  site banquet service.  You're aware of that, aren't you?

15  A     Yes.

16  Q     Okay.  So they are in direct head-to-head competition in

17  that regard?

18  A     As far as I understand, yes.

19  Q     And so customers who want to purchase banquet services --

20  they could have their banquet in a big room in the hotel or they

21  could have their banquet in a big room somewhere else, right?

22  A     Yes or outside I suppose as --

23  Q     And these customers are purchasing banquet services.

24  A     That's my understanding on it.

25  Q     And it was discussed with you, the fact that Canadian

P 00372

 1  Honker as well as Gus Chafoulias, who is an operator of other

 2  hotels in the city -- you talked about those competitors as

 3  well, correct?

 4  A    They do, and, yes, I mentioned that.

 5  Q    Right, right.  And they made it clear to you that their

 6  competition -- that they were struggling to compete with these

 7  other competitors, Gus Chafoulias, Joe Powers, doing business as

 8  Canadian Honkers.  They discussed that with you, didn't they?

 9  A    Yes.

10  Q    And they explained that because of that severe competition,

11  they -- the company, the Kahler Hotels, the employer, needed to

12  make changes in its labor costs.  They have made that point.

13  I'm not asking if you agreed with it or not, I'm only asking

14  isn't it true that they discussed this with you?

15  A    They mentioned and talked about their concerns, yes.

16  Q    Okay.  And, in fact, he gave you what -- or the employer

17  gave you what you have referred to as "a wish list"?

18  A    Yes.

19  Q    Okay.  And the wish list was aimed at trying to reduce

20  these costs to become more competitive, correct?

21  A    I don't know that that's what the whole wish list was

22  concerned with, but --

23  Q    But that was certainly included within that wish list,

24  right?

25  A    At least some of it, yes.

1  Q    And, of course, I'm not saying you agreed with it or had to

2  accept it; and, of course, you didn't, right?  But it's a good

3  thing that they gave it to your early, isn't it?    It gave you

4  more time to think about their proposal, gave you more time to

5  plan on how you were going to respond.

6        MR. WIESE:  Objection:  compound question.

7        MR. TERRELL:  I'll break it down.

8        JUDGE STECKLER:  Thank you.

9  Q    BY MR. TERRELL: It's a good thing, isn't it, that they gave

10  this to you early, isn't it?

11  A    I didn't see that was any benefit at all.

12  Q    It gave you more time to think about their proposal, right?

13  A    Well, we didn't know what their proposal was at that time.

14  Q    Well, he told you in his wish list what he wanted.  I'm not

15  saying it was a complete proposal, but he told you what he was

16  looking for, didn't he?

17  A    Are you talking about the first meeting in the wish list or

18  --

19  Q    I'm talking about the wish list that was provided to you --

20        MR. WIESE:  Your Honor --

21        MR. TERRELL:  -- at some point in 2014.

22        JUDGE STECKLER:  Would it be helpful if we had the list in

23  front of us?

24        MR. TERRELL:  Yes, it was an exhibit

25        You saw it.  I'm not going to ask any specific questions

1  about the document.

2      MR. WIESE:  Okay.

3  Q    BY MR. TERRELL:  I'm just -- you remember -- you know the

4  document I'm referring to.

5  A    I do.  I just want to be clear that you're talking about

6  the first meeting or the second, because they were drastically

7  different type of meetings.

8  Q    Well, they were they both in 2014, right?

9  A    I believe so, yes.

10  Q    In fact, they were quite early in 2014, weren't they?

11  A    I don't --

12  Q    Like in March.

13  A    I think it was March, yah.

14  Q    Okay.  And in one of those meetings, they gave you the wish

15  list?

16  A    Yes.

17  Q    Okay.  And so you knew up front well in advance of the

18  formal bargaining what they were looking for.

19  A    Yes, and some of that had changed, but yes.

20  Q    And that's an advantage to you, is it not?  I'm not saying

21  that you agree with it, but it's an advantage for you to know

22  early on what your opponent wants, so that you can plan your

23  counter-proposals, correct?

24  A    I guess I didn't see it as an advantage or a disadvantage,

25  it was simply information that Javon Bea wanted to impart upon

1   us.

2   Q    Okay, now, apart from those very early meetings in March of

3   2014, prior to 2015, this contract had always been negotiated by

4   Brian Brandt of Local 17 here in Rochester, correct?

5   A    No.

6   Q    Well, you never attended any prior negotiations, correct?

7   A    Correct.

8   Q    Did Local 21 become involved in any of the prior

9   negotiations to your knowledge?  To your knowledge, because you

10  weren't here.

11  A    Well, I was intimately involved with the Local.  I know who

12  was here.  Brian Brandt was not the negotiator.

13  Q    Okay, but the contract before 2015, before the bargaining

14  sessions had started on January 20, 2015, those negotiations

15  prior to that were always negotiated by Local 17 here in

16  Rochester, right?

17  A    Only one or two other.  I attended one -- I attended one

18  just before this present one, and I attended one -- either the

19  one before that or the one before that with a different leader

20  of this Local and his attorney.

21  Q    Okay.  You attended, but it was a Local 17 negotiated

22  contracts, the previous contracts, correct?

23  A    No, only the Sunstone.

24      MR. WIESE:  Just for clarity of the record, are you talking

25  -- when you say "Local 17," are you talking about the Rochester

1    Local or the Minneapolis.

2    Q    BY MR. TERRELL:  Local 17 is the Rochester Local, right?

3    A    No.

4    Q    Local 21 is --

5    A    Local 21 is the Rochester.

6    Q    Okay, forgive me, I miss-spoke then.

7    A    Okay.

8    Q    So Local 21 is the Rochester Local.

9    A    Yes.

10    Q    And Local 17 are the city slickers from Minneapolis, right?

11    A    Yes, we are.

12    Q    Okay.  So the city slickers came down in January to

13    negotiate this contract in 2015?

14    A    Yes.

15    Q    Okay.  And all of those negotiations were attended by you

16    and by your President, Nancy Goldman.

17    A    Correct.

18    Q    The two of you basically took over the negotiations from

19    Local 21?

20    A    Well, yes, we --

21    Q    Okay.

22    A    Yes.

23    Q    And you indicated that you were only somewhat familiar with

24    the bargaining unit here in Rochester.  Do you recall that

25    testimony?

1    A    I do.

2    Q    Okay.  Now at the end of the day, at the end of the

3    negotiations, isn't it true that there were really only a

4    handful of major changes that the employer was seeking --

5         MR. WIESE:  Objection:  vague.

6         MR. TERRELL:  -- specific -- I haven't finished my

7    question.

8    Q    BY MR. TERRELL:  Specifically, they changed the wage

9    structure, right?  Of course, they proposed wages going forward,

10   correct?

11   A    They proposed a wage proposal, yes.

12   Q    Okay.  And they did propose a major change in how banquet

13   servers are to be compensated?

14   A    Yes.

15   Q    They didn't change the health insurance benefit, correct?

16   Or they didn't propose a change in the health insurance benefit,

17   correct?

18   A    I don't believe -- I think they were looking for something

19   else.  That's what we were told.  I don't know that they made

20   any direct proposals to make any changes.

21   Q    Let's talk about that health insurance proposal.  I mean,

22   the health insurance provision as it existed in the old

23   contract.  The old contract is General Counsel Exhibit 2, and

24   I'll tell you where it is.

25        JUDGE STECKLER:  It's here.

1  (Witness proffered the document.)

2  Q    BY MR. TERRELL:  So on page -- and I'm referring to the

3  pagination at the bottom right corner of the document, page 19

4  and 52 is Article 11 "Insurance Benefits."  Do you see that?

5  A    Yes, I do.

6  Q    Now, again, this is the contract negotiated in 2011 for the

7  period 2011 to 2014, right?

8  A    Yes.

9  Q    And did I hear you say you attended maybe one meeting in

10 the negotiation of this contract?

11 A    The Sunstone agreement?

12 Q    Yes.

13 A    No, I attended those meetings.  I had -- what I was

14 referring to is even further back history.  I attended some

15 meetings with another leader of this Local and his lawyer.

16 Q    So you were -- you sat in on the meetings in 2011 to

17 negotiate this 2011 -- 2014 contract?

18 A    Yes, I did.

19 Q    Okay.  So you're familiar, I would assume, with this

20 provision on health insurance?

21 A    Fairly much, yes.

22 Q    Okay.  And this provision, it's fair to say, gives

23 virtually total control to the employer to determine the benefit

24 as well as the cost contributions by the employer, correct?

25 A    Yes, it does.

1    Q    And it also even allows the employer to modify or even

2    eliminate the benefits, correct?  I'll draw your attention to

3    the fourth line -- or third line, third going into the fourth

4    line, "The employer has the right to modify or eliminate these

5    benefits, including providers, and increase employee

6    contributions to same," correct?

7    A    That's what it says, yes.

8    Q    Okay, and your union agreed to this?  Or, rather, I should

9    say, Local 17, with some assistance -- Local 21 with some

10   assistance from Local 17, agreed to this provision, correct?

11   A    Yes.

12   Q    Okay.  The only limitation really is that whatever the

13   employer under this provision going forward during the term of

14   the contract, whatever it provided for the non-union -- or for

15   the non-union employees -- whatever it provided for the non-

16   union employees would have to be provided for the union

17   employees.

18   Q    Could you restate that?

19   A    Yes, I'm sorry, I mangled that.

20   Q    Isn't it true the only restriction in this Article 11 on

21   insurance benefits, is that whatever the employer provided to

22   the non-union employees, the employer had to provide the same to

23   the union employees.  And I'll draw your attention to the next

24   sentence:  "Said changes or increases in contributions shall be

25   the same as those applicable to all other employees of the

1    employer."

2    A    Yes, I was just reading that line, yes.

3    Q    Okay.

4    A    And your union also waived in 2011 the ability to grieve or

5    arbitrate concerning the health benefit or any decision made

6    regarding the health benefit during the term of this agreement.

7    A    That would be 11.2, yes.

8    Q    Okay.  Unless there was an express violation of the

9    specific terms.

10    A    Correct.

11    Q    Okay, all right.

12    Now the employer in the negotiations in 2015, also made a

13    proposal, as you appear to have understood it, relating to wages

14    by which the employer would retain the right to give increases

15    based on merit review.  That was your understanding I believe as

16    you testified to what the employer at one point in these

17    negotiations was proposing.

18    A    My understand was that that was the wage proposal for

19    present employees.

20    Q    Okay.  And that was a proposal that the employer made,

21    right?

22    A    Yes, it was.

23    Q    Okay.  And you could have and I suppose -- and you did make

24    the counter-proposal, correct?

25    A    I believe we did, yes.

1  Q    All right.  And neither has been agreed to or implemented

2  at this time, correct?

3  A    Correct.

4  Q    So it's just a proposal, right, that the employer made?

5  A    That was one of several.

6  Q    Okay.  And then you, yourself, at the table, raised some

7  questions about how do we understand where the floor is or the

8  ceiling, with respect to the increases that might be granted

9  through this review process.

10  A    I did, and I believe Nancy Goldman did as well.

11  Q    Okay.  And you asked for that?

12  A    Yes.

13  Q    Okay.  And whether you liked the pie charts or not, they

14  were provided to you and it was explained they were provided to

15  you as a means of assisting and answering that question that you

16  had.  That's true, isn't it?

17  A    Not exactly.

18  Q    I'm not asking you if you liked it or not --

19  A    I understand.

20  Q    All right.

21  A    But, no, that is not exactly --

22  Q    Okay.

23  A    -- the way it was brought to our attention.

24  Q    You rattled off these dates and times that you say the

25  employer was late, and I really quite impressed how you did

1    that.  You had no notes in front of you.  You must have crammed

2    for the test before coming in here today.

3    A    I looked at notes and other things.

4    Q    Okay.  Did you look at anything other than the bargaining

5    notes?

6    A    Partly my recollection, and also like my appointment book,

7    recollections of conversations I had with Nancy on the way back

8    from negotiations.

9    Q    So it's really basically just your recollections, right?

10   A    That, along with notes and other materials.

11   Q    Now you made a comment at one time, at one point that you

12   don't recall the employer giving an explanation or an answer why

13   they were late, but on some of those occasions, at least, it was

14   evident what they were doing -- preparing the pie charts for one

15   thing.

16   A    We didn't ask to sit there while they prepared pie charts.

17   We were there to negotiate.

18   Q    Let me ask you this:  During all these bargaining sessions,

19   and there were -- how many were there, the formal sessions in

20   2015?  There were --

21   A    Eleven.

22   Q    -- 11 of them from January 20 all the way to September 24.

23   And some of them were full day sessions or nearly full day

24   sessions?

25   A    Some were, yes.

P 00383

1    Q    Okay.  And several times during the course of that

2    bargaining, you went through every single provision in the

3    contract, or in the proposal by the employer, correct?

4    A    Unfortunately, yes.

5    Q    All -- unfortunately -- okay, well, you talked about them,

6    right?  You had an opportunity to raise issues with respect to

7    each and every one of the 146 enumerated paragraphs in the

8    document, correct?

9    A    Well, I guess --

10   Q    That's a "yes" or "no" question, sir.

11        You  had an opportunity to go through each and every one of

12   the 146 enumerated paragraphs in the proposal, correct?

13        MR. WIESE:  Objection, Your Honor:  vague.  I don't know

14   what proposal we're talking about.

15        MR. TERRELL:  The employer's proposal, the one you have

16   referred to as the last, best and final offered on March 24, as

17   Exhibit 6(g), and it has 146 enumerated paragraphs.

18   Q    BY MR. TERRELL:  Are you familiar with that document, sir?

19   A    I am.

20   Q    Okay.  And you went through on several occasions each and

21   every one of those enumerated paragraphs, correct?

22   A    Yes.

23   Q    Okay.  And also the Appendixes Though, I think, A, B, C, D,

24   E, F Appendixes -- eight of them, is that right?

25   A    Let's see, there's "" --

1    Q    A, B, C, D, E, F, G, H, I, J -- 10 Appendixes.

2    A    And here's a "K."

3    Q    A "K" -- 11.

4         Now attached to that proposal, Exhibit 6(g), were pie

5    charts, right?

6    A    I'm sorry, 6(g)?

7    Q    Six-G.

8    A    Give me a second.

9         I don't know if I have a 6(g).

10   (Pause.)

11   (Witness proffered the document.)

12        THE WITNESS:  I have a 6(a).  Hold on.

13   Q    BY MR. TERRELL:  It's a thick one.

14        JUDGE STECKLER:  Okay, I've got a 6(g) here.

15        THE WITNESS:  Okay, thank you.  I don't know that I still

16   have that one.

17   Q    BY MR. TERRELL:  There were pie charts attached to that as

18   well, correct?

19   A    Yes.

20   Q    Okay, and these were by position pie charts as opposed to

21   pie charts with the name of an individual employee on the pie

22   chart, correct?

23   A    That's what it appears to be, yes.

24   Q    Yes.  So, for example, if you look at page 82 of 150, in

25   Exhibit 6(g), the first pie chart refers to a preventative

1    maintenance employee.  If you flip through the next one, it's a

2    housekeeper, and the next one is an apprentice -- I suppose

3    that's an apprentice in the Engineering Department and so forth,

4    correct?

5    A    Yah, I'm not quite sure what page you're on, but I see that

6    they do have --

7    Q    I'm simply trying to get you to agree with my observation

8    that the bargaining proposals that the employer made contained

9    pie charts that were by position, correct?

10   A    It appears to be, yes.

11   Q    Okay, then the pie charts with the individual names on them

12   -- they were submitted separately, correct?

13   A    Yes.

14   Q    During the course of the bargaining, yes?

15   A    We got pie charts with individuals.

16   Q    Okay, now you testified that the last, best and final

17   offer, which was the one in front of you, the March 24 proposal,

18   was handed to you as you were leaving the bargaining session.

19   You were in the hallway.  Do you recall that testimony?

20   A    Yes, we were in the elevator.

21   Q    Okay.  And that was on March 24, right?

22   A    Correct.

23   Q    Okay.  And you had previous to that received a

24   comprehensive proposal from the employer during the February 26

25   - 27 bargaining sessions, correct?

P 00386

1    A    I believe we did.

2    Q    Okay.  And there were maybe some changes between the

3    February 26 -- 27 proposal and the March 24 proposal, but by and

4    large, they were pretty much --

5        MR. WIESE:  Objection, Your Honor:  vague and best

6    evidence.

7        MR. TERRELL:  I haven't finished the question yet.  I mean,

8    maybe I'll make it clear by the time I get to the end.

9        JUDGE STECKLER:  Finish the question.

10        MR. TERRELL:  I'll rephrase.

11    Q    BY MR. TERRELL:  Do you recall differences between the

12    February 26 proposal and the March 24 proposal?

13    A    I don't know if I recall any -- the specific differences.

14    I've --

15    Q    There were differences, you just don't recall them as you

16    sit there without looking through the documents.  Is that a fair

17    statement?

18    A    Off-hand, I couldn't answer.

19    Q    It's a fair statement, though, that they were pretty

20    similar.

21    A    Generally speaking, they were similar, yes.

22    Q    All right, and then so you had the March 24 proposal and

23    you talked about reading it in the car on the way home and

24    talking about it in the car on the way back to Minneapolis, back

25    to the big city.

P 00387

1   A      The big city, yes.  Nancy Goldman -- I was driving, so I

2   wasn't reading it.

3   Q      Okay

4   A      Nancy Goldman was thumbing through it.

5   Q      She was reading the Exhibit?

6   A      No, she was thumbing through it and --

7   Q      You were talking about it?

8   A      Yah, talking about it is fair enough.

9   Q      And then you probably took it home with you and you read it

10  at home?

11  A      No.

12  Q      Stayed up late at night and poured through every single

13  paragraph, right?

14  A      There was so much paper coming back and forth, no, I did

15  not.

16  Q      Maybe the next day, you read it.

17  A      No.

18  Q      You read it the next day, right, Martin?

19  A      I did not.

20  Q      Okay, you read it though, right?

21  A      I went through it.

22  Q      You went through it.

23  A      Yes.

24  Q      And then you talked about it in the bargaining session on

25  April 16th.  You met again on April 16.  That was the next

1   bargaining day per our stipulation.

2   A    Right.

3   Q    You had it in front of you, you were able to talk about it,

4   right?

5   A    Yes.

6   Q    Okay.  And, again on April 28th, right?

7   A    Yes.

8   Q    And, again on September 24th?

9   A    Correct.

10  Q    Yah, September 24th.

11       That you had it for a good -- April, May, June, July,

12  August, September -- you had it for a good 5 months, didn't you?

13  A    We had it for 5 months.

14  Q    Right.

15  A    And then you made what you called "a proposal" on April

16  16th, right?

17  A    I believe that's the date.

18  Q    And that's in the record at Exhibit 23(e).  Why don't you

19  get that in front of you.

20  A    Twenty-three-E?

21  Q    E -- "E" as in "eagle.

22  (Witness proffered the document.)

23  A    Yes.

24  Q    Okay.  And at the top it says "Unite HERE Local 21 Counter-

25  Proposal April 16, 2015."  Do you see that?

1  A     Yes, I do.

2  Q     Okay.  And these enumerations on the left -- the first is

3  4, then it's 5 -- 31, 37 and so forth.  These refer to the

4  numbers of the provisions in the employer's proposal of March 24

5  that we've been talking about that's in the record as Exhibit

6  6(g), right?

7  A     Six-G, the one -- as far as I know, yes.

8  Q     Okay, well, let's just double check that and make sure

9  we're not "whistling Dixie" as they say.

10       So in your April 16 counter-proposal, your first paragraph

11 refers to number 4, with a little heading there, "Temporary

12 Employees."  And I am looking at Exhibit 6(g) on page 13 of 150

13 and paragraph 4 is temporary employees.  Is that correct?

14 A     Section 4 does say "Temporary Employees."

15 Q     Okay.  So on April 16, you were making a counter-proposal

16 to paragraph number 4 in the employer's last, best and final of

17 March 24, correct?

18 A     It looks like so, yes.

19 Q     Okay.  So there's your proposal and I'm not too concerned

20 at this moment about the substance of it, but that was your

21 proposal on April 16 --

22 A     I believe so, yes.

23 Q     -- with regard to paragraph 4.

24 A     Yes.

25 Q     Okay.  And then you made a proposal regarding number 5.

P 00390

1  Number 5 refers -- you don't refer to the sub-heading in your

2  proposal, you refer to number 5.  But if you go to the

3  employer's proposal, number 5 refers to union insurance

4  benefits.

5  A    I'm going to assume that's what it --

6  Q    No, I want you to look at it.  Look at page 13 of Exhibit

7  6(g).

8  A    Yes.

9  Q    Okay.  And you see the topic in paragraph number 5 on that

10 page is "Union Insurance Benefits."  Do you see that?

11 A    I see that as Section 5, yes.

12 Q    Right.  And on April 16, your response to the proposal was

13 "reject any change."

14 A    Yes, number 5.

15 Q    You rejected any change.

16 A    It says, "number 5," yes.

17 Q    Right.  And then number 31, you don't identify the topic,

18 but you do provide the number, number 31 and your response on

19 April 16 was "reject any change."  Is that correct?

20 A    Probationary period, yes.

21 Q    So you rejected any change to the probationary period.

22 A    Correct.

23 Q    Number 37 -- again, you don't refer in your April 16

24 proposal to the topic, but you refer to the number, number 37.

25 If you go back to the employer's proposal, number 37 deals with

1   the topic of 18 months no discipline.  I think this is what a

2   slate wiped clean type proposal?

3        MR. WIESE:  Your Honor, I'm going to object at this point.

4   This is cumulative and I'd also object to relevance.

5        MR. TERRELL:  Talking about --

6        JUDGE STECKLER:  Where are you going with it, Mr. Terrell?

7   Maybe that will help out.

8        MR. TERRELL:  This is part of the 8(a)(5) allegation.  I'm

9   going to be comparing what was proposed on April 16th to what

10  was proposed or supposedly proposed later in September.

11       We're looking at this proposal dated April 16th.  It's

12  somewhat ambiguous because they just have numbers without any

13  reference to content, so I'm just trying to clarify by referring

14  back to the employer's proposal what the substance of these

15  proposals on April 16th were.

16       JUDGE STECKLER:  Okay, I'm going to allow and let's see

17  where it goes.

18       MR. TERRELL:  Okay, all right.

19  Q    BY MR. TERRELL:  So with respect to item 37, the company

20  proposed 18 months, you counter-proposed reducing that from 18

21  to 12 months, correct?

22  A    To subset, yes.

23  Q    Okay.

24       Forty-two relates to the grievance and arbitration

25  procedure, and you proposed the addition of some language, is

1  that correct?

2  A    I believe so.

3  Q    Okay, paragraph 51 -- in the employer's proposal, 51

4  relates to leave of absence and your response on April 16, in

5  Exhibit 23(e) was "reject any change to current language."  Is

6  that correct?

7  A    Yes.

8  Q    Okay.  And then 54 -- that relates to the union leave.  And

9  you rejected the limit of three working days.

10  A    Yes, three working days and the loss of seniority.

11  Q    So you rejected the limit of three working days?

12  A    And loss of seniority, yes.

13  Q    Well, it doesn't say that, does it?  It just says "reject

14  of three working days."

15  A    That was the employer's proposal though.

16  Q    And that was the only difference -- well, I'll get back to

17  that a little bit later.  I want to get through this first.

18       So on April 16, all you did was reject the limit of three

19  days.  You didn't propose as an alternative, 10 days or 6 days

20  or 12 days, did you?

21  A    I don't know if these are meant to be headings and subject

22  matter to be discussed or if this is actually an answer to every

23  aspect of every cause.

24  Q    Well, this is your document, sir.

25  A    I understand.

1   Q    And you called it a counter-proposal and you gave it and

2   dated it April 16, right?

3   A    Yes.

4   Q    And you were referring in this document to number 54, which

5   is a reference to paragraph number 54 in the employer's last,

6   best and final on March 24, right?

7   A    Yes.

8   Q    And you rejected the employer's limit of 3 days, but you

9   did not propose a different number of days, did you?

10       MS. BURGESS:  Objection, Your Honor.  First of all, the

11  document speaks for itself in terms of what the Union's position

12  was.  So going through each item and having him read what the

13  document says is really -- I mean, there's --

14       MR. TERRELL:  Well, I have --

15       MS. BURGESS:  And, also, he attempted to clarify when he

16  was, you know, answering his question, that they had an

17  additional objection, which isn't reflected on the document.

18  That's what his testimony is for.  And so that is being miss-

19  stated as well.

20       JUDGE STECKLER:  Okay.  I heard Mr. Stokes' comment about

21  one lawyer at a time too.

22       MR. TERRELL:  That was my objection.

23       JUDGE STECKLER:  That was going to be your objection next.

24       Could you rephrase the question a little bit, Mr. Terrell?

25       MR. TERRELL:  Sure.

1  Q    BY MR. TERRELL:  Again, drawing your attention to your

2  document that you provided at the table on April 16, 2015,

3  Exhibit GC 23(e), you did not propose -- it's self-evident.

4       MR. TERRELL:  Counsel is correct, the document does speak

5  for itself.

6  Q    BY MR. TERRELL:  You did not propose in this document any

7  different number of days, did you?

8  A    No.

9  Q    And you didn't verbally propose a different number of days

10 either, did you, across the table?

11 A    I doubt we did.

12 Q    Okay.

13      Sixty-six -- again, looking at your document of April 16,

14 you rejected the deletion of daily overtime.

15 A    Yes.

16 Q    Number 76 -- you rejected any change to current language in

17 our paragraph number 76.

18      JUDGE STECKLER:  Could you say that again, please, Mr.

19 Terrell?

20 Q    BY MR. TERRELL:  In the Union's document, dated April 16,

21 which is Exhibit 23(e) in response to the employer's proposal at

22 paragraph 76 of the employer's proposal marked Exhibit 6(g), the

23 Union rejected any change to current language, correct?

24 A    Rejected any change, yes, to current language, yes.

25      I was trying to understand what you were saying there for a

1    second.

2    Q    Okay.  And number 79, the next one -- I'm going down your

3    April 16th proposal.

4    A    I understand.

5    Q    Number 79 -- you rejected any change to the no-cost meals,

6    correct?

7    A    Yes.

8    Q    Number 90 -- you have a reference on discussion -- we'll

9    come back to that.

10    Number 91 -- you have another reference that you wanted to

11    discuss, whatever the topic is in paragraph 91.

12    Paragraph 93 -- you wanted to add some language, correct?

13    A    Yes.

14    Q    And you also wanted to reject a deletion that the employer

15    had made, correct?

16    A    Yes.

17    Q    Number 100 -- you wanted to add some language, you wanted

18    to add a cap it looks like?

19    A    I believe we wanted to add  no cap.

20    Q    Okay, and so forth and so on.

21    Okay, I'm going to now compare this document to what you

22    call the proposal made on September 24.  And I'll draw your

23    attention to the next exhibit, 23(f).

24    A    Give me a second.

25    (Pause.)

1  A    I found it.

2  Q    Okay, now on -- we've talked about this exhibit 23(f)

3  earlier, and I want to make sure we're singing in the same key

4  here.  This document -- the italicized portions of this document

5  are the responses by Mr. Henry, correct?

6  A    I believe that to be so.

7  Q    Okay.  So everything above each of the italicized responses

8  and non-italics is the -- was in the original document from the

9  Union that was labeled, as shown at the top, "Unite HERE Local

10  21 Counter-Proposal 9/24/2015."

11  A    I believe so, yes.

12  Q    Okay.  And it tracks almost identically your April 16

13  proposal in terms of the numbers, for example, if you still have

14  23(e) in front of you --

15  A    I do, yes.

16  Q    And you have 23(f) in front of you.

17  A    Yes, and 23(f), yes, I'm sorry.

18  Q    Okay.  And both of them, the first thing -- the first item

19  you refer to in both was paragraph number 4, "Temporary

20  Employees," correct?

21  A    Yes.

22  Q    And your proposal did not change between April 16 and April

23  -- and September 24, did it?

24  A    I don't believe so.

25  Q    It's the exact same language, right?

1    A    Yes.

2    Q    Okay, we're up to the next one, number 31.  On April 16,

3    you said "reject any change."  On 9/24, you said "reject 90-day

4    probationary."  That's to say there's no change there, is there?

5    A    No.

6    Q    Your position did not change.

7    A    It did not.

8    Q    The next one is number 37.  On April 16, you said "reject

9    any change" -- number 37, yes.  Forgive me, number 37 -- on

10   April 16, you said "reduce 18 months to 12 months."  On

11   September 24, you said the exact same thing, "reduce 18 months

12   to 12 months."

13   A    Yes.

14   Q    You made no changes.

15   A    No.

16   Q    Okay.

17        Number 42 is the next one and the exact same language you

18   provided on April 16 is what you provided on September 24,

19   correct?

20   A    Yes.

21   Q    The next one is 51.  On April 16, you said "reject any

22   change to current language."  On September 24, you said the

23   exact same thing, "reject any change to current leave language."

24   You added the word "leave" to get the little context, but it's

25   the same position by the Union, correct?

1    A    Yes.

2    Q    Number 54, on April 16, you said "reject limit of three

3    working days."  On 54, on September 24, you did make a slight

4    move.  You said, "reject limit of three working days proposed up

5    to 6 months."

6    A    Yes.

7    Q    All right.

8         Number 66 is the next one.  On April 16, you said "reject

9    limit of three working days.

10   A    I'm sorry, which one?

11   Q    Forgive me, I miss-spoke -- 66.  On April 16, you said,

12   "reject deletion of daily overtime."  On September 24, you had

13   the same position, "reject deletion of daily overtime."

14   A    I couldn't see the number, excuse me.  Yes.

15   Q    No change, okay.

16        Number 76 -- in April, you said, "reject any change to

17   current language."  In September, you said the same thing,

18   "reject any change to current language," correct?

19   A    Yes.

20   Q    Number 79 -- in April, you said, "change cost to no cost."

21   In September, same position, no change.  You said, "change cost

22   to no cost."

23   A    Yes.

24   Q    No change position, correct?

25        Number 90 is simply -- in your proposal, it simply says,

1    "discuss" --

2        JUDGE STECKLER:  Hold on a second for the Court Reporter.

3        COURT REPORTER:  I just didn't hear an answer to change --

4        MR. TERRELL:  To 79.

5        JUDGE STECKLER:  Paragraph 79.

6        THE WITNESS:  Change cost to no cost.

7    Q    BY MR. TERRELL:  There was no change in your position on

8    number 79 --

9    A    It's the same.

10   Q    -- from April to September, correct?

11   A    It's the same.

12   Q    Okay.  The next one is number 90.  All you put was the word

13   "discuss" in your April 16 proposal.

14       And then in your September proposal --

15   A    I didn't answer.  I didn't know if that was a question.

16   Q    Okay, forgive me.  Let me back up and make sure the record

17   is clear.

18       In your April 16 proposal at number 90, you simply put

19   "discuss," correct?

20   A    Yes, but I believe because we were asking for a

21   quantification.

22   Q    Right.  So let's now look at the September proposal, 23(f).

23   You have 90, "discuss."  And then in parenthesis, you did add,

24   "The Union requested clarification of this proposal," right?

25   A    Yes.

1   Q   And that proposal relates to vacation, right?  Number 90?

2   A   I want to make sure before I answer.

3       Yes.

4   Q   And I'm going to come back to that, because you had

5 separate testimony on that and some separate e-mails.  I'm going

6 to come back to that.

7       You didn't change your position on vacations, you just

8 simply wanted to discuss it and you wanted to discuss it you

9 said in April, and you wanted to discuss it in September?

10  A   Yes.

11  Q   Number 91 -- excuse me, number -- yah, 91 -- in April, you

12 have an entry for 91, and you just say, "discussed." Do you see

13 that?

14  A   On 23(e).

15  Q   Correct.

16  A   I see that, yes.

17  Q   Right.  Your September proposal does not include a

18 reference to 91.

19  A   It does not.

20  Q   Okay.

21     JUDGE STECKLER:  Mr. Terrell, could this possibly be

22 handled in the brief instead of making these -- drawing these

23 conclusions?

24     MR. TERRELL:  I'll speed it up.

25     JUDGE STECKLER:  Okay, thank you.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

1      MR. TERRELL:  I understand what you're asking.

2   Q    BY MR. TERRELL:  So whatever discussion needs you had

3   regarding paragraph 91, apparently, there was no further need

4   for discussion by September.  Is that a fair assumption?

5   A    I'm going to assume it.  I don't know why it's not in

6   there.

7   Q    Okay.

8   A    I'm not sure what the issue was.  It's unclear.

9   Q    Okay, and your April 16 -- can you point to any significant

10  changes in your September 24 proposal, Mr. Goff?

11  A    I'm not sure that I can without going through it, but what

12  I can point to is on April 16th, the company left the table and

13  never came back.  There was no discussion about many of these

14  things, so I don't know -- I can't imagine why we would change

15  those until we  had discussion.

16  Q    Well, we're talking about April 16, but there was another

17  meeting on April 28, correct?

18  A    Yes.

19  Q    Well -- and so you had -- you gave the company your April

20  16 proposal on April 16, and then on April 28, and then you went

21  for several  more months without any meetings at all, right?

22  A    Yes, they left on April 28th as well, and ending

23  negotiations.

24  Q    Isn't it true that it was the employer that asked the Union

25  to come back to the table on September 24?

1    A    I don't know.

2    Q    You didn't meet in May?

3    A    I'm sorry?

4    Q    You did not meet in May, you did not meet in June, you did

5    not meet in July, you did not meet in August.  And then the

6    Union -- the company asked you back to the table on September

7    24, correct?

8    A    I don't know who asked who.  I know -- or why.

9    Q    And then you made this proposal or what you called a

10   proposal on September 24, but you can't point to any significant

11   changes or moves from April 16 to September 24.

12        MR. WIESE:  Objection, Your Honor.  The document speaks for

13   itself.

14        JUDGE STECKLER:  I think that will be something to include

15   in your brief, Mr. Terrell.

16   Q    BY MR. TERRELL:  However the Textile Care Services contract

17   was negotiated over the summer months, correct?

18   A    Correct.

19   Q    With your union?

20   A    With Local 21, with Nancy Goldman as the negotiator, yes.

21   Q    Okay, and agreement was successfully reached, correct?

22   A    Happily, yes.

23   Q    Okay.

24        You made a health insurance proposal on February 19, and

25   that is in the record at Exhibit 23(c).  Do you recall that?

1  A    I believe there was a proposal.  I believe there was a

2  three-part proposal.  It was Local 17's Union health care, so

3  the Minneapolis health care.  I believe we asked for a change in

4  the present employer's health care on the costs; and I believe

5  there was a "Plan B," but I don't -- I'd have to pull this

6  document to take a look, but it's my recollection.

7  Q    All right.

8      Am I correct in understanding, after you made your February

9  19 insurance proposal, your position on your proposal didn't

10 change after that, did it?  And I know there was two plans.

11 There was a Local 17 plan and a "Plan B" that was in one

12 proposal, right?

13 A    I think we wanted for quantification without non-union

14 members being included.  How could we make a change?

15 Q    I'll get to that.  I'll get to that.

16     But you didn't make any other changes in your insurance

17 proposal, did you?

18 A    I don't recollect.

19 Q    Okay.

20     Let's talk about what you just mentioned.  You said that

21 you wanted the company's proposal that segregated what the

22 company pays for union employees versus non-union employees, is

23 that right?

24     MR. WIESE:  Objection, Your Honor:  miss-states previous

25 testimony.

1    MR. TERRELL:  I asked him if that was correct.  He can

2  correct me.

3    JUDGE STECKLER:  I'm not sure I understood the question,

4  Mr. Terrell.  Could you repeat it, please.

5    MR. TERRELL:  I'll withdraw it and rephrase.

6  Q   BY MR. TERRELL:  Let me draw your attention to GC 20.  This

7  is the 5-page e-mail exchange that you previously identified.

8  A   I have it.

9  Q   Do you have that in front of you?

10 A   I do.

11 Q   And the subject heading, I believe, throughout all of these

12 e-mails is "Local 17 and Union National Plan B Health Insurance

13 Proposal," correct?

14 A   I believe these are two of three proposals made, yes.

15 Q   Okay, well, right now, I'm just asking you about this chain

16 of e-mails.  Am I correct in stating for the record that through

17 all these e-mail chains, the subject line was, and remained the

18 same, "Local 17 and Union National Plan B Health Insurance

19 Proposal"?

20 A   Yes.

21 Q   Okay.  And the e-mail chain starts on the fifth page with

22 Michael Henry's e-mail to Nancy Goldman on March 20, and he

23 says, "Dear Nancy, We have researched your alternate proposal

24 for health care" --

25    MR. WIESE:  Objection, Your Honor:  document speaks for

P 00405

 1  itself.

 2      MR. TERRELL:  I'm just laying the foundation for  my

 3  question.

 4      JUDGE STECKLER:  Can you go ahead and ask your question --

 5      MR. TERRELL:  Okay.

 6      JUDGE STECKLER:  -- pointing out what relevant point you

 7  want him to look at.

 8      MR. TERRELL:  I will.

 9  Q   BY MR. TERRELL:  Your -- again, the first e-mail is from

10  Michael Henry, and he is referencing your health care proposal

11  presented on March 16, correct?

12  A   On page 5?

13  Q   Yah, do you see that?

14  A   I do, yes.

15  Q   Okay.  And he says, "Your proposal has been reviewed and

16  rejected.  The proposed plan would increase our cost greater

17  than a million dollars."  And do you recall receiving this?

18  A   Well, I recall talking about Nancy Goldman about it.  She

19  received it.

20  Q   And you were copied on the e-mail, weren't you?

21  A   I'm not sure that I -- I probably -- I received it.

22  Q   You received it.

23      I mean, your name appears here in the "To:" line.

24  A   I know, I just don't remember, as a lot of times, I walk

25  into her office and get it from her --

1  Q    Okay.

2  A    -- on this.  I saw --

3  Q    But you were --

4  A    But I saw it.

5  Q    You were aware that the employer rejected your proposal,

6  and you are aware that the employer told you -- informed you

7  that your proposed plan would increase their cost by over a

8  million dollars.

9  A    I was aware of the proposal, I was aware that the employer

10  said it was a  million dollars without quantitative proof; and

11  it is very unclear still to me this day whether non-union

12  employees were taken out of that in particular.

13  Q    We'll get to that.  We'll get to that.

14      So Nancy, at the bottom of page 4, she asked a very

15  reasonable question.

16  A    On page what?  Bottom of --

17  Q    Bottom of page 4.  We're still on Exhibit GC 4.

18  A    Yes, I just didn't hear what page you said.

19  Q    So Nancy asked a very relevant question.  She said, "Which

20  proposal are you referring to, Unite Care Plan B or the Local 17

21  plan, and is the cost of greater than a million dollars for one

22  year or for the proposed 5 years?"  So she asked that question,

23  right?

24  A    Yes.

25  Q    And then Mr. Henry responded 6 six days later on Marc 25 --

1  no, excuse me, March 31, which is at the bottom of page 3.  So

2  he responded 6 days later, right?

3      JUDGE STECKLER:  Mr. Terrell, are we just going to review

4  what's in there or are you going to get to the point shortly?

5      MR. TERRELL:  We'll get to it.  I'm laying a foundation.

6      THE WITNESS:  Okay, so on the bottom of page 3 is what

7  you're --

8  Q    BY MR. TERRELL:  Yes, that's Mr. Henry's response to you

9  and it was -- it was 6 days after Nancy's question, correct?

10 A    March 31st -- that's, yes.

11 Q    Is that a "yes"?

12 A    Yes, yes.

13 Q    Okay.  And he responded that -- both of the plans were

14 greater than a million dollars for over the life of the proposed

15 contract.

16 A    Yes.

17 Q    So that was the answer to Nancy's question, wasn't it?

18 A    That was his answer.

19 Q    Okay.

20 A    And then Nancy responded the same date, "Please send me

21 your calculation."  That's the next e-mail, right, on March 31,

22 at 1:22 p.m., Nancy responded, "Please send me your

23 calculation."

24 A    Oh, yes, yah, I was looking on the wrong -- yah, yes.

25 Q    All right.  And then Michael provided you the calculation

P 00408

1   on April 4, three days -- 4 days later, right?

2   A      What page are you on now?

3   Q      At the bottom of the page 1, Michael Henry's e-mail of

4   April 4, "Hello, Nancy, Please see the below information," and

5   he provided calculations.   Correct?

6   A      There are calculations there, yes.

7   Q      All right.

8          And he showed you that he calculated -- and, of course,

9   your proposal would have required contributions based on hours

10  worked by employees, correct?

11  A      I'm not really sure how the "Plan B" works, because that's

12  our international plan.   The Local -- our Local plan, which we

13  actually have two -- one would be based on hours reported on a

14  3-month rolling average, and the other plan that we have is a

15  set monthly contribution by the employer.

16  Q      Okay.   I mean, it appears from Mr. Henry's calculation that

17  the Local 17 plan is based on hours worked.   Do you agree with

18  me?   Because if you look at the bottom of page 1, he has the

19  calculation, "Regular hours worked in 2014, overtime hours

20  worked 2014, other hours worked, 2014" and then he provides what

21  appear to be the contribution rates.    And then he is -- he

22  provided you with a calculation and it shows on the top of the

23  second page that the proposed Local 17 cost was $2.3 million.

24  Am I interpreting this correctly?

25  A      I think so, yes.

P 00409

1    Q    Okay.  And then the "Plan B" cost -- he provided a separate

2    calculation, which may be in the category that you described as

3    some sort of fixed number; and he provided you with a

4    calculation of $2.4 million.  Is that correct?  Do you see that?

5    A    Other than what you just said about the fixed number, I was

6    referring to the two Local 17 plans.  I am not sure with the B

7    Plan -- is our international plan.  I'm not sure how that is

8    calculated, by whether it's hours or number, I don't know.

9    Q    All right.  In any event, this is the calculation Mr. Henry

10   provided to you, correct?

11   A    Yes.

12   Q    Okay.  And he also gave you the numbers for the actual

13   cost.  He referred to it as "actual total cost."  And you'll see

14   in both sets of calculations, he provided you with the number,

15   $939,058.80.  Do you see that?

16   A    I see that.

17   Q    And he then provided the difference between what your plan

18   would cost per his calculation, and what his current actual

19   costs were under the company's plan of $939,000.  Do you see

20   that?

21   A    I see that.

22   Q    Okay.  And then -- so Michael sent you that calculation on

23   April 4; and then on April 6, which is the last e-mail, Nancy

24   responded, correct?

25   A    On April 6th, you said?

P 00410

1    Q    Yes, the first page on page 1 of Exhibit GC 20.

2    A    Oh, okay.

3         MR. WIESE:  Your Honor, I'm going to renew my objection.

4         JUDGE STECKLER:  Yes.

5         Mr. Terrell, I've asked you a couple of times to cut to the

6    chase here.

7         MR. TERRELL:  I'm cutting to the chase.

8         JUDGE STECKLER:  Okay.  I did the same thing as a trial

9    attorney, I understand, but where are we going with this?

10        MR. TERRELL:  I'll get there.

11        JUDGE STECKLER:  Today, please.

12        MR. TERRELL:  Yes.

13   Q    BY MR. TERRELL:  And this is where you referred to earlier

14   not having the difference between what the Union -- let me back

15   up.

16        You are aware of the fact that the employer provided for

17   those union and non-union employees, correct?

18   A    In their overall health care plan?

19   Q    Yes.

20   A    It's my understanding that the managers were in the same

21   health care plan as the workers.

22   Q    Okay.  And we looked earlier at the insurance benefit

23   provision in Article 11 of the expired contract.  We talked

24   about that, remember, just a few minutes ago --

25   A    Yes.

1    Q    -- or a half hour ago.  And the only restriction on the

2    employer's insurance benefit plan was whatever the non-union

3    were given, the union employees had to be given the same.  Do

4    you recall that?

5    A    That was in the old contract, yes.

6    Q    Right.  And the company was proposing to remain with the

7    same plan.

8    A    The same expensive plan, yes.

9    Q    All right.  And Nancy's response -- all she was asking for

10   was a breakdown between the cost to the employer, of what the

11   employer paid for non-union employees versus union employees,

12   correct?

13   A    In  her April 6th letter?

14   Q    Yes.

15   A    Well, what she is saying here is that our plans don't allow

16   for non-union participation.

17   Q    Right.  She says, "Thank you; however, neither of our

18   proposed plans allow for non-union participation, so your

19   figures are somewhat skewed.  Perhaps a more accurate

20   quantification would have been a more realistic response to such

21   an important and costly to the employees issue."  So she was

22   asking for a breakdown of what the union -- or what the employer

23   was providing for the union employees versus what the employer

24   paid for the non-union employees, correct?

25   A    That's correct, we don't represent the non-union.

1    Q    Fine.

2         Had Michael provided that information -- remember, the

3    total that was paid by the employer to both union and non-union

4    was the $939,058.80.  Remember that?

5    A    I do.

6    Q    So if Michael had provided an answer to Nancy's question,

7    that is, if Michael had deducted from the $939,058.80 what was

8    contributed to the non-union employees, that number would have

9    shrunk, wouldn't it?

10   A    I'm going to suppose so, but -- you're asking me to add

11   this all up right --

12   Q    No, no, no, I'm not asking you a math question.

13   A    I wasn't that good in math.

14   Q    I'm just asking you a very simple question.  If Michael, as

15   Nancy requested, had deducted from the $939,058.80, that number

16   would have shrunk, would have gotten smaller.

17   A    I would imagine it was.  We --

18   Q    All right.

19   A    -- don't --

20   Q    Wasn't that self-evident?

21        JUDGE STECKLER:  Mr. Terrell, wasn't it self-evident from

22   the documents then?

23        MR. TERRELL:  From the context of the entire understanding

24   of what was being asked for.

25   Q    BY MR. TERRELL:  Nancy was asking for a -- wanted a

1    breakdown of the difference between what was contributed to the

2    union employees and what was contributed to the non-union

3    employees. Correct?

4        MR. WIESE:  Your Honor, objection:  asked and answered.

5        JUDGE STECKLER:  I think it was answered.

6        Mr. Terrell, could you move on to something else?

7    Q    BY MR. TERRELL:  Michael explained this at the table, did

8    he not, that if he reduced -- if he deducted the amount paid for

9    the non-union employees, the difference between the Union's

10   proposal and the status quo of the employer's proposal would be

11   even greater.

12   A    Say that again.

13   Q    Okay.

14   A    I lost you on that one.

15   Q    Isn't it true that at the bargaining table, Mr. Henry

16   explained, in response to this very question that Nancy was

17   asking in her e-mail -- he had previously explained that this

18   calculation was provided, and that if he was to deduct from that

19   calculation what the employer contributed to the non-union

20   employers -- to the non-union employees, excuse me, the

21   difference between the Union's proposal and the employer's

22   status quo would be even greater.

23   A    I guess I'm really still not understanding your question.

24   And, I'm sorry, you're losing me there.  But are you asking me

25   if they deducted the non-union from the numbers that he gave us,

1    that the number by nature would be smaller?

2    Q    Correct.

3    A    I would imagine that it would be.  What we wanted to know

4    what was that number, because we wanted to make -- we cannot

5    make a proper proposal or counter-proposal or even accept their

6    proposal without understanding what we're dealing with.  And if

7    we don't know what we're dealing with, we're just taking a "pig

8    in a poke."

9    Q    The employer told you that its cost was $939,000, right?

10   A    They told us that.

11   Q    Right.  And they also told you that that included -- in

12   fact, Michael said it in his e-mail that that included what the

13   employer contributes to both union and non-union employees.

14        MR. WIESE:  Objection:  asked and answered.

15        JUDGE STECKLER:  It's also self-evident from the document.

16        MR. TERRELL:  Go ahead.

17        JUDGE STECKLER:  No, his objection is sustained.

18        MR. TERRELL:  Oh, sorry.

19        All right, beyond those questions, I think this document

20   does speak for itself.

21   Q    BY MR. TERRELL:  I'm going to draw your attention to the

22   previous contract, expired contract, Exhibit GC 2, page 12.

23   A    Actual page 12 or 12 of --

24   Q    Yes.

25   A    Okay.

1   Q     Twelve of.

2   A     Twelve of?

3   Q     Yes.

4   A     Twelve of 52.

5   Q     Right.

6   A     Okay.

7   Q     And then the employer's last, best and final, Exhibit 6(g),

8   paragraph 54.

9         Let me know when you have both of these in front of you.

10  A     Oh, I'm sorry, you want me to take this proposal and what

11  was it, 6(g)?

12  Q     Six-G, which is the employer's last, best and final.

13  (Witness proffered the documents.)

14  A     And what page do you want me to refer to on 6(g)?

15  Q     On 6(g), look at page 29.

16  (Pause.)

17  A     Page 40 of 150 or page 29 itself?

18  Q     Page 29 of 150.

19  A     Oh.

20  (Pause.)

21  A     Okay, I'm on that page.

22  Q     Okay, and I'm drawing your attention to paragraph 54 in

23  6(g), "Time Off for Union Activity."

24  A     Okay, yes.

25  Q     And I'm going to compare that to the old contract, which is

1    General Counsel Exhibit 2, on page 12 of 52.

2    (Pause.)

3    Q    Are you at page 12 of 52 in Exhibit GC 2?

4    A    I am.

5    Q    Okay.  Do you see paragraph 2.

6    A    Yes, number 2?

7    Q    Yah, the employer agrees to grant necessary time off

8    without pay or loss of seniority?  Do you see that?

9    A    I do.

10    Q    That was the existing language in the contract that was

11    negotiated in 2011, correct?

12    A    Yes.

13    Q    And that language made a reference to "without pay or loss

14    of seniority."

15    A    Yes, it did.

16    Q    All right, I want you to compare that paragraph to

17    paragraph 54 in the employer's proposal and tell me what

18    differences you see between those two provisions.

19        MR. WIESE:  Objection, Your Honor.  The document speaks for

20    itself.

21        JUDGE STECKLER:  Sustained.

22    Q    BY MR. TERRELL:  Isn't it true that the only difference is

23    that in 54, the employer inserted a 3-day limit?

24        MR. WIESE:  Same objection.

25        JUDGE STECKLER:  I think you can argue that on the brief,

1  Mr. Terrell.

2      MR. TERRELL:  I'm sorry.

3      JUDGE STECKLER:  You can argue that on the brief, Mr.

4  Terrell.

5  Q    BY MR. TERRELL:  The loss of seniority language was already

6  in the contract, wasn't it, Mr. Goff?

7      MR. WIESE:  Same objection.

8      JUDGE STECKLER:  Are you referring to GC 2?

9      MR. TERRELL:  Yes.

10      JUDGE STECKLER:  So, it's already there in the document?

11      MR. TERRELL:  It's in the document.

12      JUDGE STECKLER:  Sustained.

13      MR. TERRELL:  Okay.

14  Q    BY MR. TERRELL:  When the employer proposed a limit of 3

15  days to union leave activity --

16  A    Yes.

17  Q    -- the Union did not make a counter-proposal?

18  A    No, we did not.

19  Q    Okay.

20      Isn't it true that Mr. Henry or Mr. Stokes never said at

21  the bargaining table, "If you're not back from the union

22  convention in 3 days, you will lose all seniority."

23  A    Actually, Mr. Henry said that we would decide on a case by

24  case basis.

25  Q    With respect to loss of seniority?

1    A    Loss of seniority, yes, sir.

2    Q    Okay.

3        MR. TERRELL:  The last questions have to do with Exhibit GC

4    20 -- 22.

5        JUDGE STECKLER:  Twenty and 22 or just 22?

6        MR. TERRELL:  Twenty-two, just 22.

7        JUDGE STECKLER:  Okay.

8    (Witness proffered the document.)

9        THE WITNESS:  Did you say GC 20 and 22.

10       MR. TERRELL:  No, just 22.

11       THE WITNESS:  Okay, yes.

12   Q    BY MR. TERRELL:  Okay, and on the first page, we're looking

13   at this e-mail from Nancy Goldman to Michael Henry, and we

14   talked about this earlier when we went through a voir dire on

15   this document.  Nancy had cut and pasted this block at the

16   bottom of page 1, where it says, "Paragraph 90 -- discuss union

17   requested the quantification of this proposal."

18   A    It looks like it was taken out of that other document.

19   Q    Right, and that other document is General Counsel Exhibit

20   23(f).  And if you go to the fourth page of 23(f), you'll see

21   this paragraph, which says, "90 discuss union requested the

22   quantification of this proposal."  And then you see the

23   italicized paragraph that starts with the word, "response."  And

24   that was, again, written by Mr. Henry, correct?

25   A    I believe so, yes.

1  Q    Okay.

2  A    Yah.

3  Q    And so in this e-mail sent on October 20 by Nancy Goldman

4  to Michael, she cut and pasted his response on number 90.

5  A    That's what it appears to be, yes.

6  Q    And number 90 refers to the vacation proposal, correct?

7  A    Yes.

8  Q    Okay.  And when I say, "number 90," I'm referring to the

9  employer's proposal on March 24.  And the Union had requested a

10  quantification.

11  A    Correct.

12  Q    And the Union had responded that it was difficult and

13  impossible to make a quantification of vacation because in the

14  future, there are unknown variables, correct?

15  A    That the employer said that?

16  Q    The employer, when asked for a quantification of the

17  company's vacation proposal, the employer indicated that it was

18  difficult to make that quantification because you're dealing

19  with future unknown variables.

20  A    I believe that was said and that because of what our

21  concerns were about the pie charts and trying to figure out what

22  OT in the future would be.

23  Q    Well, I'm talking about the vacation proposal.

24  A    I understand.  I'm just saying in our mind, that's what it

25  was.

P 00420

1    Q    Right.  Because in the future, you don't know -- you cannot

2    know how many employees will be at what level of vacation

3    entitlement at any given point in the future, correct?

4    A    I don't believe that we asked for an absolute.  I think

5    that -- I don't know that we ever asked for an absolute.  But,

6    yes, I do understand the conundrum.

7    Q    Right, and that was expressed to you at the table in

8    response to your request for quantification.  It was expressed

9    to you that there was a difficulty in making that quantification

10   because of the future unknown variables.

11   A    I can't testify that it was said at the table; it may have

12   been.  I believe that it was said at some point in some

13   fashion.

14   Q    Okay.  But Mr. Henry did, in fact, provide you with a best

15   estimate in this document.  He gave you a number -- $84,000; and

16   he qualified his quantification accordingly?

17   A    We have no qualms I don't believe with the ballpark figure,

18   as it were; it was the timing of it, it was after the Board had

19   made a determination in this case.  And, for us, that is the

20   Union, to make honest, decent, understandable proposals, we have

21   to understand what kind of money we're dealing with; and that

22   was our concern in negotiations.

23   Q    And Mr. Henry answered your question, did he not?  He

24   responded in the final e-mail at the top on Exhibit GC 22, he

25   responded, "The information provided is the ballpark estimate of

1    the potential yearly cost" --

2        MR. WIESE:  Objection, Your Honor, the document speaks for

3    itself.

4        MR. TERRELL:  Well, it's a short part of it.  I'm just

5    asking this witness did he not answer the question that Nancy

6    raised in her October 20 e-mail?

7        THE WITNESS:  A day --

8        JUDGE STECKLER:  Just a second.

9        The document speaks for itself, (a); and, (b), I think this

10    is something that you can argue in the brief.

11        I think where you're going with this, Mr. Terrell, and

12    correct me if I'm wrong, that you're going to -- that the

13    information was provided at this point, is that correct?

14        MR. TERRELL:  Yes.

15        JUDGE STECKLER:  Okay, I think the document speaks for

16    itself in that respect; and I would encourage you to argue this

17    on your brief instead.

18        MR. TERRELL:  Very good, Your Honor.

19    Q    BY MR. TERRALL:  This, by the way, was a proposal made by

20    the employer that improved the vacation benefit, correct?

21    A    I believe the employer had made this possibly at the first

22    or second meeting.

23    Q    You didn't answer my question.

24    A    Oh, I'm sorry.

25    Q    This was a proposal made by the employer and this proposal

1    was an improvement made by the employer of the previous vacation

2    benefit?

3    A    Correct.

4    Q    And you were asking for a quantification of what that

5    improved cost would be?

6    A    Correct.

7    Q    All right.

8         MR. TERRELL:  I have nothing further.

9         JUDGE STECKLER:  Do you need a couple of minutes before you

10   go to redirect?

11        MR. WIESE:  That would be wonderful, Your Honor.

12        JUDGE STECKLER:  How about 5 minutes?

13        MR. WIESE:  That should be sufficient.

14        JUDGE STECKLER:  We'll go off the record for 5 minutes and

15   everybody takes a deep breath and stretches.

16   (Off the record.)

17        JUDGE STECKLER:  We're back on the record.

18        General counsel is ready for redirect.

19        Mr. Goff, during the break, you didn't discuss your

20   testimony with anybody and you are still under oath.

21                              REDIRECT EXAMINATION

22   Q    BY MR. WIESE:  So, Mr. Goff, I have a couple of follow-up

23   questions based off of questions that were asked by Mr. Terrell.

24        So I believe Mr. Terrell might have asked you something

25   about the wage charts being a response to your request for a

1  floor and ceiling.  Do you recall that?

2  A    I do.

3  Q    And in your understanding, were these wage charts in

4  response to that request?

5  A    The pie charts, you mean?

6  Q    Yes, yes.

7  A    Well, it was stated that, but that isn't what they were.

8  Q    And what were they based off of your understanding?

9  A    They were new proposals for wages for each individual in

10  the group.

11  Q    So another thing that we -- that Mr. Terrell asked you

12  about was, and spent some time going over, was each proposal in

13  all of these contract offers, or at least the Union's contract

14  offers.  Whose idea was it to go through the offers, proposal by

15  proposal, for each bargaining session?

16  A    Well, Arch Stokes wanted to go through the company's

17  proposal and the Union's proposal side by side, even though the

18  vast majority of the old contract was not in dispute in any way.

19  More than that is he wanted to change to a system of sections

20  instead of articles with numbers, which made it quite confusing

21  -- one of the reasons it took us nearly two days to go through

22  the old contract.  It took us nearly two days of going through

23  because we couldn't mesh up articles to sections in a very easy

24  manner.

25  Q    Did this include going over articles that weren't in

P 00424

1    dispute between the parties?

2    A    Almost all of them were not in dispute, certainly many of

3    them.

4    Q    Mr. Goff, turning to the vacation request for information,

5    why did you request quantification of the employer's vacation

6    costs?

7    A    The employer made a proposal early in negotiations that we

8    recognized had money attributed to it.  It was a more generous

9    vacation package than had been in a previous contract.  And from

10   our position, if money is going to be put on the table, we will

11   accept it and maybe be able to move it around at a later date.

12   And, therefore, if the company has a concern about their costs,

13   let's say, on health care, we might be able to take that money

14   that's already been given to us and move that into health care,

15   thereby getting what we want; because, frankly, the vacation

16   adjustment was not anything that anyone ever mentioned to us as

17   far as our membership goes.  So it was really how can we make

18   honest, real proposals and make adjustments and be progressive

19   without being -- without having the information available to us.

20   Q    Another thing that Mr. Terrell spent a lot of time going

21   over was the Union's lack of -- alleged lack of movement between

22   its April 16th and September 24th proposals.  How much time was

23   spent at negotiations on April 16th going over the union's

24   proposal?  Or let me rephrase.

25        Was the Union's proposal, if you remember, on April 16th --

P 00425

1    was that given to the employer at the bargaining table that day?

2    A    I believe yes, that it was.

3    Q    And was -- do you recall when in the day it was given to

4    the employer?

5    A    Almost always proposals were traded off pretty early in the

6    day unless there was some sort of change to be made, but in the

7    morning.

8    Q    And on April 16, was that a day when the employer left

9    negotiations early without providing notice to the Union?

10   A    We had gone through our proposal.  They left to caucus to

11   look at our proposal and cancelled the rest of the day.

12   Q    And then when the parties met on April 28th, what happened

13   in negotiations that day?

14   A    The day was not that long, for one thing.  We wanted to go

15   again through our proposals.  A number of the proposals that we

16   made were never addressed in any way, shape or form, other than

17   to say "no."  And we wanted to talk about proposals that not

18   only might be able to get around some of the concerns that the

19   employer had -- we were trying to be progressive, which was

20   suggested by the company that we look for new and inventive ways

21   to make proposals, and we did that.  It doesn't mean that they

22   had to agree to them, but we never had a deep conversation about

23   any of them.  And on that last day, the 28th of April, they went

24   into caucus once again, and that was that.

25   Q    Mr. Goff, is -- the Union's health care plan, both I guess

P 00426

1   the International plan and the Local 17 plan -- are those even

2   open to non-union employees?

3   A    No, they are not.

4   Q    And did you ever receive the quantification costs for the

5   Local 17 plan for only union employees?  Did you ever receive

6   that information?

7   A    We never did.

8   Q    And what about for the International plan -- did you ever

9   receive that information?

10  A    No, we did not.

11       MR. WIESE:  Nothing further, Your Honor.

12       JUDGE STECKLER:  Do you have any recross?

13       MR. TERRELL:  No.

14       JUDGE STECKLER:  Mr. Goff, you will be excused.

15       You might be recalled at some point I have a feeling.  So

16  please do not discuss your testimony with anybody until this

17  hearing is over.

18       THE WITNESS:  I understand.

19       JUDGE STECKLER:  Thank you, sir.

20  (Witness excused.)

21       JUDGE STECKLER:  That seems like that's it for the day.

22       I think General Counsel probably wants back the documents.

23       MR. WIESE:  Yes.

24       MR. TERRELL:  I will make a request that the documents

25  consisted of pages -- 130 I think he said of e-mails, plus a 26-

1  page affidavit.  And, you know, I asked for 40 minutes or 50

2  minutes.  There's no way in the world that we can review that

3  much volume of paper in 50 minutes, please prepare for cross-

4  examination.  We would like to keep these overnight and have a

5  look at them overnight.

6      MR. WIESE:  Your Honor, the General Counsel objects to

7  that.

8      JUDGE STECKLER:  And the witness has been excused, so --

9  and you've excused him, so --

10      MR. TERRELL:  I may call him in my case.

11      I mean, the reality is we're dealing with a system that

12  doesn't allow for discovery.  It's --

13      JUDGE STECKLER:  I understand the system quite well.

14      MR. TERRELL:  I know you do.  And so you're aware of my

15  complaint that due process is seriously jeopardized when we're

16  handed this much paper between direct examination and cross-

17  examination without unnecessarily slowing down -- it would take

18  3 hours to really go through this adequately, but I'm not going

19  to ask for 3 hours' delay in the middle of the hearing day.  So

20  I think it's a reasonable request that we have this --

21      JUDGE STECKLER:  How much time do you need to review it.

22      MR. TERRELL:  Overnight.

23      JUDGE STECKLER:  That's a long time, and you've got to

24  sleep sometime.

25      MR. TERRELL:  Well, I'm going to sleep and I'm going to eat

1  dinner.

2      JUDGE STECKLER:  Yes, and get a couple drinks.

3      MR. TERRELL:  And I'm going to have a couple drinks, and

4  I'm going to talk to witnesses.

5      JUDGE STECKLER:  Yes, I would --

6      MR. TERRELL:  So I'm not going to spend all that time on

7  it, but, you know --

8      JUDGE STECKLER:  I understand.

9      Give me about 2 minutes to think about this.  Let's go off

10 the record for 2 minutes.

11 (Off the record.)

12     JUDGE STECKLER:  Back on the record.

13     MS. BURGESS:  Your Honor, may I be heard on this before you

14 rule?

15     JUDGE STECKLER:  Certainly, go ahead, Mr. Burgess.

16     MS. BURGESS:  You know the purpose of Jencks is for cross-

17 examination.  And Respondent has already cross-examined Mr.

18 Goff.  I'm not sure they would be entitled to it if they recall

19 him in their case in chief.  And they did just fine, I think,

20 with, you know, the review that they had.  Having them keep it

21 overnight is -- would not be appropriate once the witness has

22 been released from the witness stand and the questioning has

23 been completed.  It's for purposes of cross-examination only,

24 and that has been concluded now.

25     JUDGE STECKLER:  Mr. Terrell, do you have any other

1    argument besides due process?

2        MR. TERRELL:  My due process argument is still the same.

3    It is provided for cross-examination, that's the form and format

4    of the rule; but it is grossly unrealistic to expect that on

5    cross-examination, I can go through this in a meaningful way

6    without stopping the hearing for an inordinate period of time.

7    I mean, it's absurd that we have to stop for 50 minutes as it

8    is, but that's the nature of the beast because there's no

9    discovery.  But I didn't ask for anything more than 50 minutes.

10   But in asking for 50 minutes and taking 50 minutes, I didn't

11   have a chance to go through this.

12       JUDGE STECKLER:  And co-counsel did not go through the --

13       MR. TERRELL:  This is open, you know, we're beyond the

14   investigation stage, they have redacted the employees' names.

15   This is material that is relevant to this case, and in the

16   interest of due process, I should have an adequate opportunity

17   to review and examine this.  I'm not going to stop cross-

18   examination, but I can call him as a witness in my case.

19       JUDGE STECKLER:  Yes.

20       MS. BURGESS:  And that's an objection he should have made

21   at the time.  If he didn't have enough time to review the

22   documents to be prepared for cross-examination, he should have

23   made the objection at that point and asked for more time; and

24   the General Counsel would have been fine with that.

25       MR. TERRELL:  It would have been fine stopping the hearing

1  for 3 hours.

2      MS. BURGESS:  It would be up to the Judge's discretion.

3      JUDGE STECKLER:  I don't think we would have stopped for 3

4  hours, but you do have co-counsel there to assist you.  So -- or

5  at least that's what we were advised earlier.  So I think since

6  -- if you recall him, you're not entitled to have the documents

7  again as your witness.

8      If the General Counsel calls him again, then you're

9  entitled to look at the documents again.

10      MR. TERRELL:  Only if the General Counsel calls him.

11      JUDGE STECKLER:  But when you call him, if you call him as

12  your witness, you are not entitled to do so.

13      So at this time, I'm requesting --

14      MR. TERRELL:  What authority is there for that proposition?

15      JUDGE STECKLER:  Well, what is the authority for yours?

16      MR. TERRELL:  My authority is that there is in the

17  procedure as a gesture toward due process that we have the time

18  and we were able to examine what the General Counsel developed

19  in the investigation related to the testimony of this witness.

20      It is physically impossible, unless we take a break for 3

21  hours, for me to go through this vast amount of material and

22  properly, in the interests of due process, properly digest what

23  is in here that may help my case.  And that's not an unimportant

24  consideration that this material is provided to help my case.  I

25  haven't been given under the structure of how this hearing

1    operates a due process opportunity to examine these materials.

2         MS. BURGESS:  Your Honor --

3         JUDGE STECKLER:  Mr. Terrell, when I asked you if you were

4    ready, you said you were.  Now, if you needed more time, I'm

5    sorry, but you should have asked me at that time.

6         MR. TERRELL:  So you would have granted me a 3-hour delay?

7         JUDGE STECKLER:  Not three, but I think between you and Mr.

8    Stokes, you could have managed in an hour to an hour and a half.

9         So I think at this point, it's better to turn things back

10   over.  If General Counsel calls him again, you'll have another

11   opportunity.  And if you need more time, please ask for it, and

12   the same for the rest of the hearing.

13        MR. TERRELL:  Okay, well we preserve respectfully an

14   objection on the record to your ruling.

15        JUDGE STECKLER:  I know, you want a running objection.

16   Yes, you do get a running objection to that.

17        But we need to set a time for tomorrow morning.  At what

18   time?

19        MR. WIESE:  Could I get that affidavit back too?

20        MR. TERRELL:  Oh, I'm sorry.

21        MR. WIESE:  Before we get off the record, Your Honor, for

22   the evening, I would just like to talk about what sort of

23   arrangements are going to be made for entering -- or potentially

24   entering General Counsel Exhibit 29, which is the electronic

25   copies of all of the pie charts.

1    JUDGE STECKLER:  Yes.

2    MS. BURGESS:  So we provided those to Respondent's counsel

3  by e-mail on Friday, and that's -- these are just the

4  electronic, you know, the zip drive versions of what they've had

5  since Friday.  Now there are already additional documents here,

6  but, you know, our arguments regarding the pie charts are

7  limited to the pie charts that are in evidence.  So -- and just

8  the general macro issue of the pie charts themselves.

9    JUDGE STECKLER:  So you do not need to admit GC 29?  Is

10  that what you're saying?

11    MR. WIESE:  No, Your Honor.  I would like General Counsel

12  29 to be admitted for any and all relevant purposes.

13    MS. BURGESS:  For completeness.

14    JUDGE STECKLER:  I'll tell you what, Mr. Terrell, you've

15  got GC 29 now, your little drive.

16    MR. TERRELL:  They e-mailed it to us, so --

17    JUDGE STECKLER:  Well, I'm not going to admit it right now.

18  What I was going to suggest is that Mr. Terrell, you've got --

19  we don't have to admit it right now, we don't have to admit it

20  the first thing tomorrow morning.

21    When would it be reasonable for us to discuss admission of

22  this document, if it's necessary?

23    MR. TERRELL:  Let us discuss it over night and we'll get

24  back to you in the morning.

25    JUDGE STECKLER:  That's quite all right.  So the issue is

1    not foreclosed and we'll discuss before we get testimony

2    tomorrow morning.

3        MR. WIESE:  Okay.

4        The next issue -- do we have anything else before we

5    discuss time tomorrow morning?

6        MR. TERRELL:  No, not that I know of.

7        JUDGE STECKLER:  Okay, proposed time?

8        MR. TERRELL:  You know, we're getting into that part of the

9    case where we need to spend time with witnesses, so, I would

10   propose 9.

11       JUDGE STECKLER:  Is that okay with General Counsel, since

12   we know now that we can stay past 5?

13       MR. WIESE:  Yes, I guess having the option to stay past 5,

14   I'm fine with starting at 9.

15       JUDGE STECKLER:  Okay, the only thing I'm going to tell you

16   is that I'm not staying past 5:30 tomorrow, okay.

17       MR. WIESE:  Well --

18       JUDGE STECKLER:  We'll stay as late as we need to Thursday

19   night.

20       MR. WIESE:  Okay.

21       JUDGE STECKLER:  Okay.

22       So 9 it is and we'll do 9 for the rest of the time we're

23   here.  Is that acceptable?

24       MR. TERRELL:  Okay.  And then we're ending at 12:30 on

25   Friday?

1        JUDGE STECKLER:  Two.

2        MR. TERRELL:  Oh, I thought it was 12:30.

3        JUDGE STECKLER:  Was it 12:30.

4        MR. WIESE:  Yes, I think we need to be out of the room by

5   1.

6        MS. BURGESS:  I think they need the room at 2.

7        JUDGE STECKLER:  Oh, okay, I'm sorry.

8        MS. BURGESS:  So probably need to close by 1-ish or so if

9   that's --

10       JUDGE STECKLER:  Okay, that's -- if that --

11       MS. BURGESS:  But Mr. Terrell might need to leave, I'm not

12  sure.

13       JUDGE STECKLER:  Okay and you probably have a flight to

14  Atlanta?

15       MR. TERRELL:  Yes, we too would -- if we went to 2, in any

16  event, it would be really pressing it for us.

17       MS. BURGESS:  Would 1 be doable, though, Mr. Terrell?

18       MR. TERRELL:  Probably.

19       JUDGE STECKLER:  We can see --

20       MS. BURGESS:  Yes, we might be finished.

21       JUDGE STECKLER:  We may be finished early.  We'll see how

22  it goes.

23  (Simultaneous conversation.)

24       MR. TERRELL:  But we have to leave -- we have to stop at

25  12:30, right?

1       JUDGE STECKLER:  Let's see how we run and then make a

2   decision on Friday, but I'd like not to go past.  We can't be in

3   here too, so 12:30 seems reasonable.

4       MR. WIESE:  Okay.

5       JUDGE STECKLER:  If it's okay with General Counsel also.

6       MR. TERRELL:  Okay.

7       JUDGE STECKLER:  So okay, we've reached agreement on

8   something.

9       Speaking of which, the last thing before we get off the

10  record, you guys have started to hearing testimony from both

11  sides a little bit.  This is always an opportunity for

12  settlement.  If you need a settlement Judge, we can get one.

13  (No response.)

14      JUDGE STECKLER:  I'm not seeing any takers.

15      In that case, I'll see you guys at 9 and we'll go off the

16  record.

17  (Whereupon, 5:45 p.m. the trial in the above entitled matter

18  recessed to resume tomorrow, December 16, 2015, in the same

19  place at 9:00 a.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          This is to certify that the attached proceedings before the

3    National Labor Relations Board, Region 18, Case 18-CA-151245,

4    Richfield Hospitality, Inc., as managing agent for Kahler

5    Hotels, LLC and Unite HERE International Union Local 21, in

6    Rochester, Minnesota on December 15, 2015, was held according to

7    the record, and that this is the original, complete and true and

8    accurate transcript that has been compared to the recording, at

9    the hearing; and that the exhibits are complete and no exhibits

10   received in evidence or in the rejected exhibit files are

11   missing.

12

13                    *Sandra Moberg Walls*

14                    Sandra Moberg Walls

15                    Official Reporter

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

RICHFIELD HOSPITALITY, INC., AS
MANAGING AGENT FOR KAHLER HOTELS, LLC,

              Respondent,

and                               Case No. 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21,

              Charging Party.

Pages: 245 through 445 (Volume 2 of 3)

Date: December 16, 2015

Place: Rochester, Minnesota

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC 20005
(888)777-6690

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

**In the Matter of:**

**RICHFIELD HOSPITALITY, INC., AS**
**MANAGING AGENT FOR KAHLER HOTELS, LLC,**

                    **Respondent,**
**and**                                    **Case No. 18-CA-151245**

**UNITE HERE INTERNATIONAL UNION**
**LOCAL 21,**

                    **Charging Party.**


        The above entitled matter resumed trial, pursuant to

adjournment, before The Honorable Sharon L. Steckler,

Administrative Law Judge, in Conference Room 3101A of the

Olmstead County Government Center, 151 - 4th Street SE,

Rochester, Minnesota, on Wednesday, December 16, 2015, at 9:35

a.m.

1                          **A P P E A R A N C E S**

2        **On behalf of the NLRB, Counsel for the General Counsel:**

3        TYLER J. WIESE, ESQ.

4        NICHOLE L. BURGESS, ESQ.

5        National Labor Relations Board, Region 18

6        212 3rd Avenue South, Suite 200

7        Minneapolis, Minnesota  55403

8        (612)348-1757

9        tyler.wiese@nlrb.gov

10       nichole.burgess@nlrb.gov

11       **On behalf of the Charging Party:**

12       **MARTIN GOFF, Sr. Vice President**

13       Director of Organizing

14       UNITE HERE International Union Local 17

15       312 Central Avenue, Suite 444

16       Minneapolis, Minnesota  55414

17       (612)379-4730, Ext 14

18       mgoff@here17.org

19

20

21

22

23       (Appearances continued on page 3.)

24

25

1                  **A P P E A R A N C E S** (continued):

2          **On behalf of the Respondent:**

3          KARL M. TERRELL, ESQ.

4          ARCH Y. STOKES, ESQ.

5          Stokes Wagner Hunt Maretz & Terrell

6          One Atlantic Center

7          Suite 2400

8          1201 West Peachtree Street

9          Atlanta, Georgia  30309

10         O: (404)766-0076

11         kterrell@stokeswagner.com

12         astokes@stokeswagner.com

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2  **WITNESSES**              **DIRECT** **CROSS** **REDIRECT** **RECROSS** **VOIR DIRE**

3  Graham Brandon            258    305    310

4  Kelli Johnston           313    328    336       337

5  Kelly Schroeder          338    365    398

6  Linda Henry              404

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00442

```
1                        E X H I B I T S

2    EXHIBIT                   IDENTIFIED            IN EVIDENCE

3    General Counsel's

4      25(a)                                           416

5      25(b)                                           419

6      25(c)                                           427

7      25(d)                                           431

8      25(e)                                           434

9      25(f)                                           436

10     26                                              321

11     27                                              266

12     29                                              250

13     40                                              284

14     41                                              284

15

16   Respondent's

17     1                        400                    419

18

19   Joint

20     1 (Amended - pg 253)

21

22

23

24

25
```

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00443

1                    P R O C E E D I N G S

2                                        9:35 a.m.

3        JUDGE STECKLER:  We're on the record.

4        Good morning.

5        This is the second day of hearings in Richfield

6    Hospitality.  When we left yesterday, there was a question

7    regarding GC 29, and Respondent's position on that.

8        Have you had an opportunity to review that, Mr. Terrell?

9        MR. TERRELL:  Yes, we'll produce those.  Or, I mean, we'll

10   --

11       JUDGE STECKLER:  Admit into the record?

12       MR. STOKES:  Now you want to confirm though the zip --

13   we've been given the same thing?

14       MR. TERRELL:  They are all -- yes, it's already been given

15   to the Court Reporter.

16       MS. BURGESS:  Uh-huh.

17       JUDGE STECKLER:  So you have no objection?

18       MR. TERRELL:  No objection, Your Honor.

19       JUDGE STECKLER:  Okay.

20       GC 29 is admitted.

21   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 29.)

22       MR. WIESE:  So the only remaining issue in relation to that

23   are the pie charts that we got yesterday at the hearing, so I

24   don't know --

25       MR. TERRELL:  I want to make a statement on that to that

1    effect --

2        MR. WIESE:  Okay.

3        MR. TERRELL:  -- when we're on the record.

4        JUDGE STECKLER:  We are on the record.

5        MR. TERRELL:  Oh, we are on the record.

6        JUDGE STECKLER:  Surprise.

7        MR. TERRELL:  Yes, we -- Respondent does not object to

8    admission into evidence of GC 29, which constitutes the

9    individual pie charts from the Union, and those are the pie

10   charts that were provided to the Union during bargaining.  In

11   addition to the pie charts on that electronic drive, there is a

12   subset of additional individual pie charts that were also

13   provided to the Union during bargaining; however, when the Union

14   left the bargaining room that day, they left this particular

15   subset stack of pie charts behind.  Respondent retained those

16   pie charts and we produced them yesterday -- or, rather, day

17   before yesterday -- to Counsel for the General Counsel.  And we

18   should introduce those into evidence as well.

19       MR. WIESE:  Yes, I agree with that.  I'm just not -- I

20   mean, we can either --

21       MS. BURGESS:  I mean, having the requisite number of copies

22   is the only issue at this point --

23       MR. WIESE:  Right.

24       MS. BURGESS:  -- because there's about 13 colored pages for

25   each, and I don't recall how many documents there are, but would

1   you -- how would you like to handle that, Your Honor?  Could we

2   --

3       JUDGE STECKLER:  At some point at a break today or the

4   first thing tomorrow morning, if you need to go copy at a FedEx

5   office or someplace like that --

6       MR. WIESE:  Okay.

7       JUDGE STECKLER:  Mr. Terrell, do you have any objection to

8   that plan?

9       MR. TERRELL:  No.

10       MR. WIESE:  Okay.  All right.

11       MS. BURGESS:  Could I make a suggestion?

12       I don't know if -- your client, I assume, has copy machines

13   at the hotel or whatever.  Would that be do-able if we just gave

14   you those back and you made those copies?

15       MR. TERRELL:  I suppose so.

16       MR. WIESE:  Okay.

17       JUDGE STECKLER:  I'll inquire further.

18       MR. WIESE:  Okay.

19       MS. BURGESS:  Okay.

20       JUDGE STECKLER:  Any other preliminary matters before we

21   call a witness?

22       MR. WIESE:  Two, briefly, Your Honor:  The first is with

23   regard to Joint Exhibit 1.

24       JUDGE STECKLER:  I'm sorry, just one moment, sorry.

25       Who is the gentleman in the back?

1      MR. WIESE:  He is going to be my first witness, so I

2  suppose --

3      JUDGE STECKLER:  Yes, I think while we're discussing these

4  matters, he should be out of the room.

5      MR. WIESE:  Okay, okay.

6      Graham, if you'll -- thanks.

7  (Pause.)

8      JUDGE STECKLER:  Okay.

9      Mr. Wiese, I'm sorry to interrupt you.

10      MR. WIESE:  No, no, that's -- my apologies, Judge.

11      So with regard to Joint Exhibit 1, there were a couple of

12  supervisors or agents who didn't have last names.  We were able

13  to reach agreement on what their last names are.  The first is

14  for Mattie, last name "unknown," the Restaurant Manager.  Her

15  last name is Eggimann, which is E-G-G-I-M-A-N-N.

16      COURT REPORTER:  Mattie?

17      MR. WIESE:  Yes, Mattie.  It's already listed on there, but

18  it's M-A-T-T-I-E.

19      COURT REPORTER:  Thanks.

20      MR. WIESE:  And the other one is Jeffrey last name

21  "unknown".  He's a Maintenance Manager.  And his last name is

22  Burns, B-U-R-N-S.  I believe we reached an agreement on that.

23      JUDGE STECKLER:  Any others that we need to cover.

24      MR. TERRELL:  No objection.

25      JUDGE STECKLER:  Okay, Joint Exhibit 1 is amended to

1  reflect these changes.

2      MR. WIESE:  And the last item that I wanted to just check

3  in on is the <u>subpoena duces tecum</u> request 3, which is for the

4  documents that refer to the Union access at the hotel; 4, which

5  refers to documents related to the granting of wage increases;

6  and I think there is one e-mail that you said existed that we

7  entered -- or we entered an e-mail on that in the record

8  yesterday.

9      MR. TERRELL:  Yes, what exhibit number was that?

10      MR. WIESE:  That was number 5.

11      MR. TERRELL:  GC 5?

12      MR. WIESE:  Yes, GC 5.

13      MR. TERRELL:  Okay, on <u>subpoena duces tecum</u> request number

14  4, the e-mail that came into evidence yesterday as General

15  Counsel Exhibit 5 -- that in fact is the e-mail that Mr. Henry

16  had in mind that would be responsive to that subpoena.

17      MR. WIESE:  Okay.

18      MR. TERRELL:  There are no other e-mails.  That's the e-

19  mail.

20      MR. WIESE:  Okay.

21      MR. TERRELL:  Regarding <u>subpoena duce tecum</u> item number 3,

22  e-mails regarding union access, Mr. Henry looked again

23  yesterday, could not find it, but he has the hotel's IT

24  individual, IT expert, searching for it as we speak.

25      MR. WIESE:  Okay.

1     MR. TERRELL:  If we can locate it, we'll produce it, if we

2   can't, we can't.

3     MR. WIESE:  Okay.

4     And then the last one I think was number 10, discipline and

5   terminations due to attendance issues since September 1st.

6     MR. TERRELL:  We believe we have produced all that we can

7   locate.

8     MR. WIESE:  Okay.

9     MR. TERRELL:  And the set that we have produced -- correct

10  me if I'm wrong, Michael -- does not include involuntary

11  terminations for no-call/no-show.

12    MR. MICHAEL HENRY:  Correct, it doesn't include --

13    COURT REPORTER:  You're not on the record.  Did you want it

14  on the record?

15    MR. MICHAEL HENRY:  I'm sorry.

16    Yes, that does not include associates that were voluntary

17  terminated, where they have had two consecutive days of no-

18  call/no-show.

19    MR. TERRELL:  So the set we produced are disciplines for

20  attendance violations, which is how we read and understood your

21  subpoena, and that's what we produced.

22    MR. WIESE:  Well, I guess it seems like an employee no-

23  call/no-showing would fall under a reasonable definition of an

24  attendance issue in my view.

25    MR. TERRELL:  Well, the hotel -- I -- and Mr. Henry can

1    testify to this -- the hotel's practice is to treat a no-

2    call/no-show, two no-call/no-shows as an involuntary

3    termination.

4        MR. WIESE:  Well, a voluntary resignation or an involuntary

5    termination?

6        MR. TERRELL:  Involuntary termination.

7        MS. BURGESS:  Excuse me --

8        MR. TERRELL:  Excuse me, I miss-spoke, I miss-spoke.  I

9    meant voluntary termination.  In other words, the employee

10   doesn't show up for work two days in a row and he or she is

11   gone.

12       MS. BURGESS:  Okay.  Well, that's -- I understand that you

13   --

14       JUDGE STECKLER:  I tell you what, Mr. Wiese can respond.

15       MS. BURGESS:  Okay.

16       MR. WIESE:  I mean I think under any reasonable definition

17   of discipline and terminations due to attendance issues, these

18   individuals would fall under that.  I mean, regardless of

19   whatever term Respondent may use.  I guess if I need to, I'll

20   amend my subpoena to cover voluntary resignations.

21       JUDGE STECKLER:  Mr. Terrell, you look like you have a

22   solution.

23       MR. TERRELL:  Well, I'm working on it.

24       JUDGE STECKLER:  Okay.

25   (Pause.)

P 00450

1      MR. TERRELL:  We will provide the documentation that we

2  have.

3      MR. WIESE:  Okay.

4      MR. TERRELL:  And we'll provide that.

5      MR. WIESE:  All right, thank you.  All right.

6      Judge, that's all I have for pre-trial.

7      JUDGE STECKLER:  Okay.

8      Mr. Terrell --

9      MS. BURGESS:  Should we get the witness?

10      JUDGE STECKLER:  I was going to check if Mr. Terrell had

11  any issues to discuss.

12      Mr. Terrell, do you have any preliminary issues?

13      MR. TERRELL:  I'm sorry.

14      JUDGE STECKLER:  Do you have any preliminary issues?

15      MR. TERRELL:  I do not.

16      JUDGE STECKLER:  Okay.

17      Ms. Burgess, please get the next -- the witness then.

18  (Pause.)

19      JUDGE STECKLER:  Please come up here.

20      Raise your right hand.

21  (WITNESS SWORN:  GRAHAM BRANDON)

22      JUDGE STECKLER:  Please state your name for the record.

23      THE WITNESS:  Graham Brandon.

24      JUDGE STECKLER:  Mr. Wiese, you may proceed.

25      MR. WIESE:  Okay.

1                          DIRECT EXAMINATION

2  Q    BY MR. WIESE:  Mr. Brandon, what is your current

3  occupation?

4  A    I'm a lead cook.

5  Q    Where do you work?

6  A    Baha Beach in Biloxi, Mississippi.

7  Q    Have you previously work in Rochester, Minnesota?

8  A    Yes, I have.

9  Q    Where have you worked?

10 A    I have worked at TGI Fridays as well as the Marriott.

11 Q    And when did you work at the Marriott?

12 A    I started May 16th of 2011.

13 Q    And when did you cease working there?

14 A    August 10th of this year.

15 Q    And during your time working at the Marriott, what

16 positions did you hold?

17 A    Initially, I held the Cook position and after a couple of

18 years, was promoted to the Lead Cook position.

19 Q    And how were you selected to the Lead Cook position?

20 A    I was given the promotion from Chef Pascal Presa based on

21 merit.

22 Q    And about when did that happen?

23 A    Approximately the summer of 2013, possibly the fall.

24 Q    As a Lead Cook at the Marriott, what did you do?

25 A    I supported the cook's line through rushes, whether it be

1  lunch, breakfast or dinner.   I, a lot of times, ran a hot

2  Italian buffet; I did the higher-end prep items, and,

3  essentially, assisted the Head Chef in any items that he was

4  unable to get to.

5  Q    While working at the Rochester Marriott, did you have any

6  involvement with the Union?

7  A    Yes, I did.

8  Q    What specifically?

9  A    Around the summer of 2013, I became a shop steward.

10  Q    And how many shop steward were there at the Marriott?

11  A    Other than myself, there was one in the Housekeeping

12  Department.

13  Q    What did you do as a shop steward?

14  A    As a shop steward, essentially, I would answer questions

15  about the union contract for both management as well as co-

16  workers; if need be, would represent a union co-worker in a

17  disciplinary action.

18  Q    As a union steward, who did you deal with from management?

19  A    Literally, everyone.  Chef Pascal Presa would come to me

20  with questions; more often, it would be one of the head chefs at

21  the Marriott or one of the front-of-the-house managers or

22  supervisors; but ranging from Chef Revard [phonetic] to Molenger

23  [phonetic] to Essar to Ulrich, front-of-the-house manager,

24  Mattie Eggimann, Jamey Clark [phonetic], a supervisor.  I can

25  remember all of those very clearly coming to me with questions

1   about a union contract.

2   Q     Let's transition to your other roles in the Union.  What

3   other roles did you have?

4   A     Yah, shortly after becoming a trustee -- or, I mean, after

5   becoming a shop steward, I also took the position as a trustee.

6   Q     What did you do as a union trustee?

7   A     As a trustee, I attended executive board meetings and just

8   played a further role in the Union, more of a mouthpiece.

9   Q     And any other involvement with the Union?

10  A     You know, eventually, this year, I served as a member on

11  the negotiation -- the Contract Negotiation Committee.

12  Q     And what was your role as an employee on the Contract

13  Negotiation Committee?

14  A     In effect, to serve as a witness, to give my input during

15  caucus, and, you know, to represent the news that was

16  appropriate to share with my union co-workers.

17  Q     Okay, and how many negotiation sessions did you attend?

18  A     I would say approximately 10.

19  Q     And just generally, how would you describe negotiation?

20  A     Negotiations got to be where they were just extremely

21  heated.  It was a very chaotic, very unpleasant, anxious

22  environment; a lot of squabbling back and forth, very little

23  conclusions to anything being offered, yah.

24         MR. WIESE:  So, Your Honor, the following line of questions

25  is in support of Complaint allegation 12(d).

1    Q    BY MR. WIESE:  So, Mr. Brandon, in the sessions that you

2    attended, do you recall the employer ever showing up late?

3    A    Almost every time, if not every single time.

4    Q    And how late would the employer show up?

5    A    Anywhere from a half an hour to I believe the latest would

6    have been an hour and a half -- two hours.

7    Q    Do you remember ever -- remember any union negotiators

8    objecting to the employer showing up late?

9    A    I cannot remember that specifically.

10   Q    Do you ever recall whether the employer ever gave notice

11   that they were going to be late to any bargaining sessions?

12   A    I mean, typically, we would come in and Nancy or Martin

13   would inform us that, you know, the hotel management is running

14   a little bit behind; but the half hour oftentimes that was

15   originally proposed would turn into much longer.

16   Q    Okay.  Are there any instances where you ever recall the

17   employer leaving negotiations early without telling the Union?

18   A    I remember very, very long caucuses that originally were

19   going to be an hour that turned into two or three hours.  The

20   most severe case I remember was the caucus that was taken

21   somewhere in early afternoon and management didn't return to the

22   conference room until after 5 o'clock when Nancy and Martin had

23   already -- they had to leave by that time.

24   Q    Did you leave with Nancy and Martin that day?

25   A    Yes, we all left around the same time, yah.

1   Q    What happened that day as you were leaving?

2   A    As we were leaving, management did walk in and wanted to

3   continue negotiations, but Martin and Nancy already made it very

4   clear they had obligations they had to be home for.

5        MR. WIESE:  So,  Your Honor, the following line of

6   questions supports Complaint allegations 12(c) and (d).

7   Q    BY MR. WIESE:  So, Mr. Brandon, I'd like to talk to you

8   about the employer's wage proposal.  When do you remember the

9   topic of wages coming up in negotiations?

10  A    It was the latter end of our meetings -- I would have to

11  say around March maybe.

12  Q    Okay.

13  A    February -- March.

14       MR. WIESE:  I'm just going to get a copy of the joint

15  stipulation in front of you.

16  (Witness proffered the document.)

17  Q    BY MR. WIESE:  This has the bargaining dates on there.

18  A    Okay.

19  Q    In case you want to reference any specific dates.

20  A    Yah, yah.

21       MR. TERRELL:  I'm sorry, what document did you hand him?

22       MR. WIESE:  Just Joint Exhibit 1.

23       MR. TERRELL:  Okay.

24  Q    BY MR. WIESE:  What do you remember about the employer's

25  wage proposals?

1  A    I remember the wage proposals being very unclear.  I know

2  that there was a series of pie graphs presented to us.  Each

3  series had different percentages within the pie graph.  Some of

4  these percentages represented rather arbitrary items, such as

5  bereavement time and some things that none of us had ever used;

6  but either way, the percentages would fluctuate and every time

7  the pie graph was different.

8  Q    Do you remember anyone from the employer's side of the

9  negotiating table talking about merit increases while you were

10  at bargaining --

11  A    I remember Nancy and Martin bringing that up, that if, you

12  know, ownership and management was not too keen on giving

13  raises, that perhaps we could do merit-based raises, yah.

14  Q    And what about from the employer's side of the table, did

15  anybody ever bring up merit raises?

16  A    Not that I recall.

17  Q    And you mentioned pie charts coming in to negotiations.

18  Did you get more than one set of pie charts?

19  A    At least three, I believe.

20  Q    Who presented the pie charts for the employer?

21  A    Attorney, Arch Stokes.

22  Q    And how were they presented -- the pie charts?

23  A    You know, a copy was given to each member of the

24  negotiation committee.  Everyone at the table had a copy in

25  front of them.

1  Q    Do you remember Mr. Stokes or anybody else from the

2  employer's side of the negotiating table explaining what the pie

3  charts actually meant or represented?

4  A    To my understanding, it was to be the following year a

5  representation of all of our wages, not just including your

6  hourly pay, but an expression of how much insurance is and

7  everything that goes into our full wage.

8  Q    Did you have a chance to review the pie charts that you

9  received?

10 A    I did.

11 Q    Were those pie charts ever accurate?

12 A    What I would say is that the pie charts contradicted what

13 was in the contract, because on one hand I had a contract that

14 was expressing that if you hadn't been there for 5 years, then I

15 believe your pay was going to be reduced; but if you had been

16 there for 5 years, then you were going to get what this pie

17 graph was saying; but every time, the pie graph had a different

18 number.   And so I was very, very, very confused as to whether I

19 was looking at getting a small raise or keeping my wage as is or

20 if I was going to go backwards with my wages.

21     MR. WIESE:  Your Honor, the following line of questioning

22 is in support of Complaint allegation 12(b).

23     MR. TERRELL:  12(d)?

24     MR. WIESE:  12(b), as in "boy."

25     MR. TERRELL:  Okay.

1   Q    BY MR. WIESE:  Do you remember, Mr. Brandon, the employer

2   ever bringing up any changes to the current union leave in the

3   contract?

4   A    Yah.   There was -- they wanted a shorter amount of days.

5   The Union wanted I think it was 5 days, and ownership wanted

6   only 3, something to that effect.

7   Q    Did the union ever -- any union representatives ever agree

8   to the 3-day limit at any negotiating sessions that you

9   attended?

10  A    I think it ended up just one of those that never got fully

11  addressed.

12       MR. TERRELL:  I'm sorry, I didn't hear your last response.

13       THE WITNESS:  I don't believe any conclusion ever came of

14  it.

15       MR. TERRELL:  Okay.

16  Q    BY MR. WIESE:  And do you recall any of the employer

17  representatives ever providing an explanation at the bargaining

18  table --

19  A    No.

20  Q    -- as to why --

21  A    No.

22  Q    -- they wanted to limit it to 3 days?

23  A    No.

24  Q    Okay, all right.

25       I'll just ask that you let me finish  my question before

1    you --

2    A    Sorry.

3    Q    That's okay.

4        MR. WIESE:  So, Your Honor, the following line of questions

5    is in support of Complaint allegation 6(a).

6    Q    BY MR. WIESE:  Mr. Brandon, while you were serving on the

7    negotiating committee, did you receive any discipline?

8    A    Yes, I did.

9    Q    Showing the witness what's been marked as General Counsel

10   Exhibit 23 -- or, excuse me, 27.

11   (Witness proffered the document.)

12   Q    Mr. Brandon, do you recognize this document?

13   A    Yes, I do.

14   Q    And what is it?

15   A    This is something that originally was given to me as a

16   record of conversation by Chef Ulrich.

17   Q    All right, okay.

18       MR. WIESE:  I'll offer General Counsel Exhibit 27,

19   excluding the "Exhibit 3" at the bottom.

20       JUDGE STECKLER:  Any objection, Mr. Terrell?

21       MR. TERRELL:  No.

22       JUDGE STECKLER:  GC Exhibit 27 received.

23   (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 27.)

24   Q    BY MR. WIESE:  So, Mr. Brandon, what led to you receiving

25   this -- the discipline in General Counsel Exhibit 27.

267

```
 1   A     I suffered from heat exhaustion the prior day at work.

 2   Q     So what --

 3   A     And it caused me to miss the following day, that Monday.

 4   Q     All right.  So that Monday would be February 16th?

 5   A     Yes.

 6   Q     Okay.

 7         So let's talk about what happened on February 15th.

 8         MR. TERRELL:  Fifteen or 16?

 9         MR. WIESE:  Fifteen.

10   Q     BY MR. WIESE:  What happened when you came into work on

11   February 15?

12   A     I came into work at 5 o'clock in the morning, checked out

13   the kitchen keys to open up the doors.  Upon opening the doors

14   to the kitchen, I felt the greatest loft of heat I've ever felt

15   in my life.  I immediately assumed that all of the kitchen

16   machines must have been left on, checked them, they were not.

17   In fact, the heater vents were blowing very, very, very, very

18   powerful, and it was extremely hot in the kitchen, hotter than I

19   had felt in any kitchen or any environment whatsoever.

20   Q     How long have you worked as a cook?

21   A     About 9 years.

22   Q     Was this hotter than any kitchen you had worked in during

23   those 9 years?

24   A     I've worked in kitchens by New Orleans, where, you know, we

25   had a thermometer on line that read 110 degrees consistently.
```

1    This was immeasurably hotter than that.

2    Q    What did you do when you realized how hot the kitchen was

3    that morning?

4    A    I immediately informed the manager on duty, Sue Riley

5    [phonetic].  She told me there was nothing she could do.  I

6    therefore -- I called the Kahler myself and asked to speak to

7    Maintenance.  They did come over and told me they had no

8    knowledge of how to turn down the thermostat.

9    Q    What did you do after the maintenance person came over?

10   A    I continued to work.

11   Q    Were you by yourself in the kitchen?

12   A    Yes, I was.

13   Q    And did you have any other conversations about the heat

14   with anybody?

15   A    At I believe 7 a.m. is when Maintenance arrived for the

16   Marriott property itself, spoke with an individual named

17   Mizorate [phonetic], requested that he please turn it down.  He

18   told me that he could not as he was afraid of being reprimanded

19   if he turned it down, because they had so many complaints the

20   night before of the restaurant being cold.

21   Q    And after you spoke with Mizorate [phonetic], did you

22   continue working?

23   A    Yes.

24   Q    And did you have any other conversations with anybody after

25   talking with Mizorate[phonetic]?

1   A    Yah, it was around -- approximately around 8 o'clock in the

2   morning, I spoke with Sophia Stensrud, who was the first

3   supervisor who showed up.  I expressed to her how hot it was and

4   that I was unable to work under those conditions, that she was

5   going to have to turn it down, and she refused.

6   Q    And what is Sophia Stensrud's position, do you know?

7   A    She is a friend of the house supervisor to the best of my

8   knowledge.

9   Q    And that conversation that you had with Ms. Stensrud --

10  where did it take place?  Do you recall?

11  A    Over by the Room Service desk.

12  Q    And after you spoke with Ms. Stensrud, did you talk with

13  anybody else about the heat in the kitchen?

14  A    Yah, I think it must have been about 8:30, I spoke with

15  Chef Robert about it -- Chef Ulrich.

16  Q    Thank you.

17       Where did you speak with Mr. Ulrich?

18  A    I spoke with him initially in his office explaining the

19  conditions, and he came out of his office and came to the line.

20  Q    What happened when you and Chef Ulrich arrived on the

21  kitchen line?

22  A    He literally just turned to me and said, "Graham, this is

23  entirely too hot for anyone to work.  You can't work like this."

24  And he started turning my flat top grill, my hot top grill and

25  all of the machinery off.

1   Q   And what did you do?

2   A   I said, "Chef, we can't turn this off.  I have orders I

3  have to cook."

4   Q   And what did he do at that point?

5   A   He said, "Well, we have to do something about this."

6   Q   And what happened after Chef Ulrich left the kitchen?

7   A   I continued to cook and eventually shortly thereafter was

8  overwhelmed by the dizziness and nausea and attempted to make it

9  to the bathroom to get sick and didn't make it.  And I vomited

10  in the trash can next to the cook's line.  And I noticed some

11  blood in my vomit.

12   Q   What did you do after vomiting?

13   A   I went and took a break.  I told Chef Robert, I told Sophia

14  what had happened.  I mentioned the blood in the vomit and I

15  went and took a break at the Room Service desk.

16   Q   And while you were taking a break out at the Room Service

17  desk, did you speak with anyone while you were sitting there?

18   A   Michael Henry walked by and noticed immediately that I

19  wasn't looking well and asked me, you know, if I was feeling

20  okay.  I told him, "No," I explained that I had just gotten sick

21  and vomited some blood in the trash can, just that, you know, it

22  had been really hot all morning, and that I didn't, you know,

23  understand why I was so sick, but, yah, that I was very, very

24  ill.

25   Q   And do you remember, did Mr. Henry respond to that?

P 00464

1    A    Yah, he was concerned, and I know that he spoke with Chef

2    Robert.  And basically the conclusion was that someone was going

3    to come in to replace me.

4    Q    Did Mr. Henry excuse you from work?

5    A    No.

6    Q    How long were you in the lobby?

7    A    About 10 minutes.

8    Q    And what did you do after leaving the lobby?

9    A    I went back to work and cooked.  The servers needed food

10    cooked.

11    Q    How long were you able to keep working that morning?

12    A    I ended up working all the way up to 11.  I was asked to

13    call a cook to see if he would come in early, he said he would,

14    he did not.  So I cooked all the way up to 11.

15    Q    And in between when you went out to the lobby and when you

16    left work that day, did you get sick again?

17    A    Yah, I got sick again, and this must have been shortly

18    after 9, and I knew I was going to get sick.  I made it upstairs

19    to the break room.  I got sick in the toilet again, vomiting and

20    there was still blood coming up in my vomit.  I was extremely

21    busy, and I thought to Google my symptoms, and it came up,

22    "boom, heat exhaustion."  And I knew right away that's what I

23    had.

24    Q    And what did you do after getting sick for a second time?

25    A    I came down and I told Chef Robert, I said, "Chef, I can't

P 00465

1   cook anymore.   I can't stay on the line, I can't continue to

2   cook.   I've got to go home."   He assured me that August was

3   going to come.

4   Q    Who is "August"?

5   A    I'm sorry, he was the cook that I was asked to call to

6   replace me.

7   Q    Did you call August that morning?

8   A    I called him that morning, yes.

9   Q    And did he end up coming in early that morning?

10  A    No, he came in right at 11.   He was scheduled to come in at

11  11 and that was the time he came.

12  Q    And what happened when August came in at 11?

13  A    By this time, Mizorate[phonetic] -- sometime after 9

14  o'clock or around 10 o'clock -- Mizorate[phonetic] had told me

15  that, "Graham, I finally -- I was able to turn the heat down.

16  So when August got there at 11, I was already so overwhelmed

17  with illness, when he got there, I immediately left, as I had

18  permission to do.

19  Q    And how did you get home from work that day?

20  A    So I went outside and I called a cab.   I didn't feel safe

21  driving or walking.   I called a cab and they said they'd on the

22  way.   And then I called my son, and I said, "Would you please

23  get some ice packs out of the freezer, I have heat exhaustion

24  from work this morning, I'm coming home," so --

25  Q    And what happened when you got home?

P 00466

1    A    When I got home, I laid on the couch.  My son took care of

2    me, he put ice packs on me, took my temperature.   I was running

3    over 102 fever.  And I passed out -- just -- yah.

4    Q    When did you wake up again?

5    A    I didn't coherently wake up until I guess around 6:15 the

6    next morning.  My son woke me up telling me that my alarm for

7    work had been going off.

8    Q    How did you feel when you woke up the next morning?

9    A    I felt like I was dying.

10   Q    Were you scheduled to work that day?

11   A    I was scheduled to work at 7.

12   Q    And what did you do after you woke up?

13   A    As soon as I woke and, you know, and realized how I was

14   still feeling, I was so weak that I had my son actually call

15   Chef Robert.  And he called Chef Robert, I remember him leaving

16   him a message, and I texted Chef Robert something in the effect,

17   "I feel like I'm dying, can you please have another cook come

18   in?"

19   Q    What did you do after you texted Chef Robert Ulrich?

20   A    I fell back to sleep.

21   Q    And what did you do that after -- or the rest of the day

22   that day?

23   A    I mean, I slept in a coma-like state for the rest of the

24   day.  Sometime in late afternoon, I did wake up.  I felt much

25   better.  I could tell my fever had broken, but knew that I had

1    gone through something pretty severe.  So I did call Mayo Clinic

2    to speak to a nurse.

3

4    A    Yah, she was a triage nurse, and she told me that,

5    obviously, my symptoms were heat exhaustion.  She was glad to

6    hear that my fever had broken, that was very, very good

7    substantial news, and told me that if any symptoms whatsoever,

8    you know, reoccurred, that I was to immediately call 911 and

9    take an ambulance to the emergency room.  I asked her, I said,

10   "Well, can I return to work tomorrow?"  She said "That's up to

11   you.  If you don't have a fever and no symptoms are there, you

12   know, you can."

13   Q    Did you work a schedule the next day?

14   A    Yes.

15   Q    And when you worked on the next day, February 17th, did any

16   managers come to talk to you about missing work the previous

17   day?

18   A    No.

19   Q    Did you have any further discussions with managers about

20   missing work on February 16th?

21   A    I did.  It was the following, I think, Friday, so the 20th,

22   I guess, I saw Chad Decker.  And I had been keeping my eye out

23   for Michael Henry, to talk with him, as he was my head of Human

24   Resources and I wanted to speak with him.  So I saw Chad, who

25   was a manager with Human Resources, and I stopped him and asked

1    if Michael was available to speak with.

2    Q    Where did you have this conversation with Chad?

3    A    On the back line in the kitchen.

4    Q    Was anybody else present for the conversation?

5    A    No, just Chad and I.

6    Q    And who said what during that conversation?

7    A    Well, Chad said, "Is there anything I can help you with,

8    Michael's busy today?"  And I said, "Yah, I guess so," and I

9    proceeded to tell him the issue that I was concerned there was

10   some rumors possibly floating around that I might be reprimanded

11   for, you know, not calling in I believe two hours ahead of time

12   on Monday.  I spoke with him at length about the situation,

13   about exactly what happened, as I just did here.

14   Q    Mmm-hmm.

15   A    He told me, "Graham, I don't' see any -- you don't have a

16   pattern of missing shifts or anything of that matter, so I don't

17   feel that you should be written up."  He said, "Graham, I don't

18   think you have anything to worry about, I don't think you should

19   be written up for that."

20   Q    Were you able to speak with Michael Henry that day after

21   talking to Chad Becker?

22   A    No.

23   Q    All right.  Did you have any further conversations with

24   management after speaking with Mr. Decker?

25   A    The next Thursday, I did.

1    Q    What happened that day?

2    A    Thursday morning, Chef Robert came up to me -- Chef Ulrich

3    came up to me and had a very concerned look on his face.  He

4    said, "Graham, we need to talk."   I followed him into the

5    office.  He proceeded to tell me that Michael Henry wanted there

6    to be a firm discipline about that incident on the 16th.  And

7    he said, "I feel comfortable writing you a record of

8    conversation."  I said, "As long as it's a record of

9    conversation, and not discipline, I'm completely comfortable

10   with that as well."  And we agreed on that and I walked out of

11   the office.

12   Q    What is a "record of conversation"?

13   A    A "record of conversation" is effectually a coaching tool.

14   Sometimes it can be when there's been a change in policy.  We

15   want employees to come through the side door instead of the back

16   door, so change in policy, we'll do a record of conversation.

17   It can be where someone made a minor mistake not worthy of

18   discipline, but that could use a coaching tool.  So you say,

19   "Next time, let's do this" and there's a record of conversation

20   that that was had.

21   Q    Okay.  Now after you told Chef Ulrich that you'd be okay

22   with a record of conversation, was that the end of that

23   conversation?

24   A    No.  Shortly after he came up to me and he looked really

25   worried, he said, "Graham, we've got to talk," we go into the

1   office again.   He said "Michael says that this cannot be a

2   record of conversation, it must be a formal discipline."   And he

3   informed me that if I won't comply and discipline you myself,

4   that he will come down and make sure that the write-up is given

5   to me himself.

6   Q    Did Chef Ulrich say why it was that Michael Henry had told

7   him that you needed a more formal discipline?

8   A    He said that Michael claimed I had a pattern of attendance

9   issues.  So I said to Chef Robert, "I do? I'm not aware of that.

10  I don't believe that I do."  He shrugged his shoulders as if he

11  wasn't aware of any either.

12  Q    Did you have a meeting -- another meeting that day about

13  the attendance issues?

14  A    Yah, at that point, I knew that it was clear that Robert

15  was going to have to write me up.  Later that afternoon, he

16  called me into the office.  It was a rather awkward thing.

17  Sophia Stensrud was in there as a witness and they presented a

18  write-up to me that did not have -- there were boxes for "verbal

19  warning, first warning, second warning," so on and so forth.  It

20  didn't have any check mark in any of those boxes.  And,

21  regardless, I told him I did not feel comfortable signing the

22  write-up.

23  Q    Okay.

24       So looking at General Counsel Exhibit 27, the discipline

25  next to you, were any of those boxes, "the verbal warning, first

1  warning, second warning, final warning, suspension or

2  termination" -- had any of those been checked --

3  A    No.

4  Q    -- at that meeting?

5  A    That's exactly what I'm speaking of.  Yah, none of those

6  had been checked.  And I did make the comment to him and Sophia

7  that, in addition, that I merely wasn't going to sign it because

8  I didn't agree with it, but also that why would I sign something

9  that doesn't even have a clear level of discipline; because

10 after I sign it, they could put whatever they want.

11 A    Uh-huh, and did either Chef Ulrich or Sophia Stensrud tell

12 you what level of discipline it was going to be?

13 A    At one point, Chef Robert said, "Okay, if I could make

14 sure, Graham, for you that it's just the first step, you know,

15 would you sign it then?"  And I still said -- I said "no, no."

16 Q    What happened after -- first of all, where was that meeting

17 that you're talking about?

18 A    In his office.

19 Q    In whose office?

20 A    Chef Ulrich's office.

21 Q    All right.

22     And was that basically the end of the meeting after they

23 presented the discipline and you refused to sign it?

24 A    Yes.

25 Q    Okay, all right.

1        What did you do after finding out about this discipline?

2    A    As soon as I got off, I immediately informed the Union

3    President, Brian Brandt; and, to my knowledge, he filed a

4    grievance that afternoon.

5    Q    Actually, before we start talking about the grievance, Mr.

6    Brandon, I'd like to ask you about some of the writing on this

7    document, on General Counsel Exhibit 27.

8    A    Mmm-hmm.

9    Q    So I know you said that none of the boxes were checked in

10   when you saw it, when you initially received the discipline.

11   What about that handwriting at the top?

12       MR. TERRELL:  At the top?

13       MR. WIESE:  It's difficult to read, but I think it says

14   "Documentation states changed."

15       THE WITNESS:  "States changed to first written warning."

16   Q    BY MR. WIESE:  Was that on the document?  Was that

17   handwriting on the document when --

18   A    No, none of that was, no, none of that was there.

19   Q    What about the handwritten explanation below that?

20   A    That was there, yes.

21   Q    Okay.

22   A    And may I add something, just a commentary?

23       We had a record of conversation, all of the cooks, a couple

24   of years ago, about the proper protocol if you are to call in,

25   and it is to call in to the Head Chef, not to call in to a

1    fellow cook.

2    Q    Mmm-hmm.

3    A    I would never call in to a union co-worker to report

4    illness.

5    Q    Okay, all right.

6         So after you contacted Mr. Brandt and told him about the

7    discipline, did you receive any further communication about your

8    discipline for missing work on February 16th?

9    A    We were to have a grievance meeting.  I don't believe we

10    had that grievance meeting until almost 2 months later.

11    Q    And between when you had the grievance meeting and you

12    received a version of General Counsel Exhibit 27, did you find

13    out what level of discipline you were being given?

14    A    Yah, Brian let me know that I was being put on a final

15    warning.

16    Q    And what was your reaction to that?

17    A    I said, "That's absolutely unacceptable.  I don't have any

18    prior write-ups of similar nature.  Why would we be skipping

19    four steps here or skipping three?"

20    Q    So you mentioned that there was a grievance meeting?    Is

21    that right?

22    A    Yes.

23    Q    And who was present at that grievance meeting?

24    A    Myself, Brian, Tyler Kase and Michael Henry.

25    Q    And where did that meeting take place?

1   A    In Michael Henry's office.

2   Q    What do you remember happening at that meeting?

3   A    I remember, you know, Brian essentially saying, "What was

4   so egregious that cause this to be the final warning?"  Michael

5   said that there's a pattern.  Brian asked for explanation and

6   Mr. Henry provided for him a write-up from about a year prior

7   that had actually been, to my knowledge, expunged by Mr. Henry

8   himself.

9        MR. WIESE:  Can we go off the record for a second, Judge?

10       JUDGE STECKLER:  About 60 seconds.

11       MR. WIESE:  Okay, thank you.

12       JUDGE STECKLER:  Off the record.

13   (Off the record.)

14       JUDGE STECKLER:  We're back on the record.

15       Mr. Wiese, you may continue.

16       MR. WIESE:  Okay.

17       I am showing the witness what has been marked as General

18   Counsel Exhibits 40 and 41.

19   (Witness proffered the documents.)

20   Q    BY MR. WIESE:  So let's start with General Counsel Exhibit

21   40.  Do you recognize this document?

22   A    Yes, I do.

23   Q    What is it?

24   A    It was a write-up that I received through Chef Pascal Presa

25   that was given to me.  I -- my son broke his ankle, I had to

1    miss work.  I had a doctor's appointment that I let me work know

2    about several days ahead of time.  I had an illness.  Anyway, I

3    had doctor's notes for all of these issues.  So when I received

4    this, I did not even go to the Union, I went directly to Michael

5    Henry himself.

6    Q    And what happened during your discussion with Mr. Henry?

7    A    Michael said that he would review it, assured me that he

8    would get back to me in a couple of days and he would take a

9    look at it.   And he said that he had never seen it before,

10   which to me indicates that Chef Pascal Presa had just simply

11   documented the write-up, had it issued to me and didn't follow

12   proper protocol of having it first approved through HR.  He had

13   just given me the write-up.

14        So Michael wasn't aware of it and he said he would take a

15   look at it.  Two days later, he came to me and said, "Graham,

16   it's taken care of, it's off your record."

17   Q    All right.  And looking at this, so it looks like General

18   Counsel Exhibit 40 and 41 are documenting the same discipline.

19        MR. TERRELL:  Objection:  leading.

20   Q    BY MR. WIESE:  Well, do -- so take a chance to review the

21   documents, Mr. Brandon, and tell me if General Counsel Exhibit

22   40 and 41 are documenting the same --

23   A    Okay, what I would say is that the one that has my writing

24   on the bottom saying, "This is grossly inaccurate, and I have

25   excuses, doctor's notes, et cetera," -- that was the one that

P 00476

1   was issued to me that day.  This is obviously a copy of the one

2   that was issued to me that day.   This one with this handwriting

3   here I have never seen; however, the last time I saw any of this

4   would have been at our meeting on 4/29.

5       MR. TERRELL:  What is the witness referring to when giving

6   that response?

7       THE WITNESS:  Well, it's written right here:

8   "Documentation changed on 4/29 where they had taken it from a

9   final warning to a first written."  Says here it was a second

10  written --

11      MR. TERRELL:  Never mind.

12  Q   BY MR. WIESE:  So the document with the handwriting on the

13  bottom, General Counsel 41 -- that's the version that you had

14  seen before?

15  A   Right, and the last time I saw this in our grievance

16  meeting, when Michael presented it to us, he showed to myself

17  and to Mr. Brandt that he had clearly written on the top corner

18  here, "This has been removed from Graham's file," and that no

19  longer is here.

20      MR. TERRELL:  Which document is the witness referring to?

21      MR. WIESE:  General Counsel Exhibit 41.

22      MR. TERRELL:  Okay.

23      THE WITNESS:  Yah, he notated that he removed it from my

24  file and that notation is no longer there.

25      MR. WIESE:  And, Your Honor, both of these documents were

1  turned over pursuant to the subpoena and I hadn't seen these

2  before -- before the hearing today.

3  Q    BY MR. WIESE:  And have you -- so jumping over now to

4  General Counsel Exhibit 40, had you ever seen that -- the

5  handwriting on that document?  I believe it says, "Remains in

6  file as indications of pattern of behavior."   Have you ever

7  seen that before?

8  A    No.

9      MR. WIESE:  I'll offer General Counsel Exhibits 40 and 41.

10     MR. TERRELL:  No objection.

11     JUDGE STECKLER:  GC 40 and 41 are admitted.

12 (EXHIBITS RECEIVED:  GENERAL COUNSEL'S 40 and 41.)

13 Q    BY MR. WIESE:  So what happened after Mr. Henry brought up

14 the discipline in General Counsel Exhibit 41?

15 A    We discussed how Michael had written at the top of this it

16 had been removed from my file, Mr. Brandt said, "Well, if it's

17 been removed from his file, then why is it in the trash?  And

18 instead it's on your desk right now when it should have been in

19 a trash can almost a year ago."  Michael looked at his desk and

20 removed the piece of paper.

21 Q    And after Mr. Henry removed the piece of paper, what

22 happened next in the meeting?

23 A    Michael demanded some sort of proof of this attendance

24 record that was so bad, and Michael claimed that he had spoken

25 to a supervisor who said I had an attendance issue.

1    Q    When you said -- did Michael demand proof of the attendance

2    issue or --

3    A    I'm sorry, Brian demanded proof of the attendance issue,

4    sorry.

5    Q    And what was Mr. Henry's response to that?

6    A    That he had spoken with a supervisor who said that I had an

7    attendance issue.

8    Q    And was that the end of the meeting?

9    A    No, I responded.  I said, "Well, that's impossible that a

10   supervisor is saying that about me because I don't have an

11   attendance issue.  Who is this supervisor?"  He told me he

12   couldn't name who the supervisor was, but that there was, in

13   fact, one who had given him ample reason to think that I had an

14   attendance issue.  And then essentially the meeting ended.

15   Q    And what did you do after that meeting?

16   A    I went back to work.

17   Q    When you went back to work, did you speak with any

18   managers?

19   A    Rather promptly, after returning to work, I spoke with Chef

20   Robert, who pulled me into his office.

21   Q    How long after the meeting did you speak with Chef Ulrich?

22   A    Probably within a half an hour to an hour.

23   Q    Okay.  And when you went into Chef Ulrich's office, what

24   happened in there?

25   A    He told me that Michael was telling him that he needed to

1   do a very thorough investigation in my attendance, check the

2   time clocks, and that he needed to go back in the computer and

3   check all and any of my attendance issues over the past year.

4   Q    Did he tell you when Mr. Henry had requested this from him?

5   A    He had just requested it.

6   Q    Did Mr. Henry say why he wanted --

7        MR. TERRELL:  Objection.

8   Q    BY MR. WIESE:  Or Mr. Ulrich say why?

9        MR. WIESE:  Is there an objection on the --

10       MR. TERRELL:  I objected and then he corrected his

11  question.  So he can proceed.

12       JUDGE STECKLER:  Okay.

13       THE WITNESS:  So what is the question again?  Sorry.

14  Q    BY MR. WIESE:  Did Mr. Ulrich say why Mr. Henry had

15  requested the attendance from -- for you?

16       MR. TERRELL:  Want to what?

17       Excuse me.  I didn't hear your question.

18       MR. WIESE:  Yah, poor question.

19  Q    BY MR. WIESE:  Did Mr. Ulrich tell you why Mr. Henry had

20  requested him to look at your disciplinary record?

21  A    To prove an attendance issue with me.

22  Q    All right.

23       And what happened after your conversation with Mr. Ulrich?

24  A    Well, Mr. Ulrich -- Chef Ulrich -- he assured me, he said,

25  "Graham, I'm going to -- this is my job and I have to do this.

1   I don't think I'm going to come up with anything, but anything I

2   do come up with, I'm going to be honest about it and I'm going

3   to have to present it.  So just to let you know, if anything

4   comes up, it will be -- you know, I'm going to have to let

5   Michael know."

6   Q    Did you follow up with Chef Ulrich regarding your

7   attendance?

8   A    Yah, shortly thereafter, whether it was a few days or a

9   week, he brought me into the office, and said, "Graham, I want

10   you to see this before I send it to Mike.  This is your

11   attendance record over the last year."  He showed it to me and

12   it included the absence, obviously, on the 16th.  Other than

13   that, it had one 15-minute tardy in a year's time, in which I

14   had called ahead of time to inform them I would be slightly

15   tardy.

16   Q    Do you know what happened with your grievance over this

17   discipline?

18   A    Eventually, I heard from Brian Brandt that it had been

19   dropped down to a -- I think a first written, which I think says

20   it here, yah.

21   Q    Okay.  Were you a part of the settlement discussions?

22   A    No, I was not.

23   Q    Do you agree with the grievance settlement?

24   A    No, I do not.

25   Q    Why not?

1  A    I don't believe that I should be disciplined for incurring

2  an injury at work the day prior, because of that injury that I

3  incurred because of unfair circumstance -- or unsafe

4  circumstances at work, unsafe conditions at work that caused me

5  to miss the next day of work that put me into the state where I

6  was unable to call 2 hours ahead of time.  I don't believe that

7  I should have any reprimand whatsoever.

8  Q    Are there other co-workers in the kitchen who have

9  attendance issues --

10  A    Absolutely.

11  Q    Who specifically?

12  A    A cook named August Short, as well as another cook, names

13  Derek Kotvask.

14  Q    What do you remember with August Short's attendance?

15  A    August for a very long period would come in 10 minutes late

16  every single day, every single day.  And on a bi-weekly basis

17  was calling in saying, "I'm going to be a half hour late.  I'm

18  going to be an hour late."  He was having car trouble

19  incessantly.  So he was late every day.  The worst thing I can

20  remember was being told by Chef Robert that he had shown up to

21  work an hour and a half late one day, was obviously inebriated;

22  and Chef Robert told me that they sent him home before upper

23  management caught wind of it.

24  Q    And do you remember about when that happened?

25  A    I think that was probably around March.

1    Q    March of what year?

2    A    Of this year.

3    Q    And you mentioned I think that Mr. Short had been showing

4    up late for a very long period.  What period of time are you

5    talking about?

6    A    I would say from -- it started in the winter, so let's say

7    January through August of last time I worked there.

8    Q    Are you aware of whether he received any discipline for any

9    of this?

10   A    I'm aware that he did not.

11        MR. TERRELL:  Objection.  Basis: foundation.

12        It sounds like we're eliciting hearsay here.

13        JUDGE STECKLER:  You can ask a follow-up question to

14   clarify.

15        MR. WIESE:  Well, I --

16        MR. TERRELL:  He's asking if this witness is aware of

17   whether August Short was disciplined.  There is no reason why

18   this employee would normally know that.

19        THE WITNESS:  Yes, there is.

20        JUDGE STECKLER:  I think --

21        MR. WIESE:  Your Honor, I'll handle that question.  Thank

22   you.

23        MR. TERRELL:  A foundation should be laid.

24        JUDGE STECKLER:  Do --

25        MR. WIESE:  I was going to ask a follow-up question to --

1      JUDGE STECKLER:  All right.

2      Go ahead with the follow-up question to clarify, Mr. Wiese.

3      MR. WIESE:  Okay.

4   Q    BY MR. WIESE:  How are you aware that he didn't receive

5   discipline?

6   A    As a shop steward, any discipline that goes through my shop

7   obviously has to go to Brian Brandt.  Any discipline goes

8   through Brian Brandt.  He would make me aware of it and ask me

9   about it before filing any grievance.

10      MR. TERRELL:  Hearsay.  I have an objection to this

11   testimony.  Basis is foundation, his knowledge is words spoken

12   to him by Brian Brandt, an out-of-court witness.  This is

13   attempted -- there is an attempt here to offer for the truth of

14   the matter asserted that August Short had an attendance issue

15   and was not disciplined.  At least, I assume that's where this

16   is going.

17      MR. WIESE:  Well, Your Honor, I mean I guess --

18      JUDGE STECKLER:  Well, I think later we'll have documents

19   on that fact, so I'm going to allow it for now, and then if

20   there are any problems later on, you can object again.

21      MR. TERRELL:  Okay.

22      Well, my objection is to the hearsay nature of this

23   testimony.

24      JUDGE STECKLER:  Okay.

25      MR. TERRELL:  It should not be offered for the truth of the

1   matter asserted regarding a discipline of Mr. Short.

2        JUDGE STECKLER:  Okay, you're overruled.

3        We'll continue.

4        MR. WIESE:  Okay.

5        I mean, if there are documents, they can be produced,

6   right?  I don't have any documents reflecting any attendance

7   discipline from Mr. Short.

8        JUDGE STECKLER:  So if you do have some information, Mr.

9   Terrell, we'll expect it in your case in chief.

10        MR. TERRELL:  Well, I'm hearing this now for the first

11   time, so we'll look into it.

12        JUDGE STECKLER:  Okay.

13   Q    BY MR. WIESE:  Are there any other employees who you are

14   aware of who had attendance issues --

15   A    Yah, Derek Kotvask.

16   Q    Okay, and what was going on with Mr. Kotvask -- how do you

17   say the last name?

18   A    To the best of my knowledge it is "Kotvask."  I never heard

19   him or anyone else pronounce it, but from the spelling of it,

20   that's how I would pronounce it.

21   Q    Okay, to Mr. Kotvask's attendance?

22   A    He was scheduled to work either 3 to 11 or 3:30 to 11:30.

23   That was his shift.  And he was never able to make it to work

24   before 4 o'clock.  And this was an almost every day basis as

25   well.

1    Q    Over what period of time are we talking about?

2    A    I would say that ceased in March, so we're talking about

3    January through March -- probably before January.

4    Q    Of what year?

5    A    Of 2014, so before January of 2015; so this was going on

6    for I would say 6 months, where, you know, Derek was -- and he

7    had some excuse, but I don't know.

8    Q    And are you aware of whether Mr. Kotvask was disciplined

9    for any of these --

10    MR. TERRELL:  Objection: hearsay.

11    JUDGE STECKLER:  He's asking what his knowledge is.

12    Please proceed.

13    THE WITNESS:  As a shop steward, I'm unaware that he was

14    ever disciplined for any attendance issues.

15    Q    BY MR. WIESE:  Did either Mr. Short or Mr. Kotvask have any

16    role with the Union?

17    A    No.

18    MR. WIESE:  Your Honor, the following line of questions is

19    in support of Complaint allegation 12(j).

20    Q    BY MR. WIESE:  Mr. Brandon, I'd like to talk about the

21    bulletin boards at the Marriott.

22    Prior to these current negotiations, did the Union have a

23    practice of posting union materials on bulletin boards in the

24    Marriott Hotel?

25    A    Yes.

1   Q    And where, specifically, had the Union posted materials?

2   A    In four specific spots:  one on a bulletin board that is

3   specifically just for union information in the break room;

4   another spot that is a bulletin board by the Restaurant

5   Manager's office; another spot was the window of the Head Chef's

6   office; and the final spot would be at the clock-in where

7   employees punch in.

8   Q    How often would union materials be posted in these

9   locations?

10   A    I would say about once a month.

11   Q    And how long would they stay up for?

12   A    Until -- for a long, long time I guess.

13       MR. TERRELL:  Objection.  I believe the testimony -- or the

14   questions are leading to misleading testimony because he's

15   identified four spaces, but the question doesn't elicit in which

16   of those four spaces.

17       JUDGE STECKLER:  Mr. Wiese, can you cure that, please?

18       MR. WIESE:  Yes.

19   Q    BY MR. WIESE:  So starting with the union bulletin board,

20   how long would union flyers stay up in that location?

21   A    Until a union representative came and replaced it to put a

22   new one.

23   Q    And what about the bulletin board outside the Chef's

24   office?

25   A    That would be the same.

1  Q    And the bulletin board on the -- was it the Chef's window?

2  Was that --

3  A    You just said the Chef's office.

4  Q    Right.

5  A    That was the window.  Then there was the one by the

6  Restaurant Manager's office.

7  Q    Okay.

8  A    On that bulletin board.  That would be the same.  It would

9  stay until the next union flyer came out.

10  Q    And what about the location by the clock?  How long would

11  it stay up?

12  A    It would stay up until it was replaced by the next one.

13  Q    Do you know who would post these materials?

14  A    Typically, Linda Henry.

15  Q    Did you ever post any union materials in any of these

16  locations?

17  A    Yes.

18  Q    Which ones?

19  A    I posted them on the bulletin board outside the Restaurant

20  Manager's office, as well as the union bulletin board in the

21  break room.

22  Q    Did this -- did you notice any changes in the union flyers

23  during negotiations, where they were showing up?

24  A    Where they were showing up?

25  Q    Yes, yes, what was happening with union flyers during

1  negotiations?

2  A    I notice that once they were put up, they did not stay up

3  very long at all.

4  Q    And how do you know this?

5  A    You know, either we would see them posted up and then

6  shortly thereafter, they would disappear; or Linda would contact

7  me on my break and let me know that, "Hey, I'm coming to post

8  them up."  And by the time I got up there to look at it, it was

9  gone.

10  Q    Which locations did you notice this happening at?

11  A    So the two main staples where always the postings would be

12  would be the Restaurant Manager's bulletin board and the union

13  bulletin board in the break room.  After a pattern of them being

14  taken down routinely, we just posted them at those two spots.

15  Q    And where -- did you ever post any union materials during

16  these contract negotiations?

17  A    Yes.

18  Q    How long -- where would you post the materials?

19  A    Just --

20      MR. TERRELL:  Objection.  There's already been previous

21  testimony he's only done it once, and the question is eliciting

22  multiple times.

23      JUDGE STECKLER:  I'm sorry.

24      How many times did you post on union bulletin boards?

25      THE WITNESS:  Many times.

1      JUDGE STECKLER:  And how many times did you post regarding

2  the negotiations?

3      THE WITNESS:  Many times.

4      JUDGE STECKLER:  And on which bulletin boards did you post?

5      THE WITNESS:  I would post them on the bulletin board

6  outside the Restaurant Manager's and the bulletin board that was

7  specifically the union bulletin board in the break room.

8      JUDGE STECKLER:  Okay.

9      Mr. Wiese, you may continue

10  Q    BY MR. WIESE:  How long would you postings stay up at these

11  locations?

12  A    You know, 5 -- 10 -- 15 minutes -- a half hour at the

13  longest.

14  Q    Were there -- on these bulletin boards that we're talking

15  about, specifically the one in the break room and the one

16  outside the Restaurant Manager's office, were there any

17  materials from outside organizations on these bulletin boards?

18  A    Absolutely.  You know, sometimes there would be a

19  fundraiser.  I remember one guy had cancer -- the restaurant

20  supervisor knew a guy who had cancer, so they posted up a

21  fundraiser.  I remember posting myself a flyer for a manager at

22  the Kahler, Tommy Robinson, who had lost his home in a fire, and

23  I posted up a flyer.

24      MR. TERRELL:  Can I make an objection, please?

25      Can we -- the question did not distinguish between posting

1    on the restaurant location versus the union bulletin board

2    location.  I think that distinction needs to be made.

3         MR. WIESE:  Okay.

4    Q    BY MR. WIESE:  Which location was this posted on out of

5    those two?

6    A    On the bulletin board by the Restaurant Manager's office.

7    Q    Was it also posted on the other bulletin board?

8    A    Not on the union one.  The union was just specifically for

9    union information.

10   Q    Okay, all right.

11   A    But the bulletin board outside the Restaurant Manager's is

12   where we would also have some general flyers, you know, someone

13   is looking for a T.V. or, you know, looking for a roommate.

14   I've seen, you know, flyers up there looking for a roommate.

15   But, you know, specifically, I had one for Tommy Robinson, you

16   know, looking -- he needed a new bed, a couch and all sorts of

17   furniture.

18   Q    And when did you post that flyer for Tommy Robinson?

19   A    I can't remember specifically the date, but it was sometime

20   in the spring.

21   Q    The spring of which year?

22   A    Of this year, sorry, yah.

23        MR. WIESE:  Your Honor, the following line of questions in

24   support of Complaint allegation 5(a).

25   Q    BY MR. WIESE:  Did you ever have any conversations with

1   managers outside of negotiations about bulletin boards?

2   A    Yes.

3   Q    Who did you talk with?

4   A    My Restaurant Manager, Mattie Eggimann, I believe it is,

5   had a conversation with me about a flyer that I had posted at

6   the bulletin on the Restaurant Manager's -- or by the Restaurant

7   Manager's office.

8   Q    And when did this conversation take place?

9   A    I believe this was in April, I believe.

10  Q    And where did that conversation take place?

11  A    It took place -- I was on the cook's like, and she said,

12  "Graham, may I speak with you, please?"  So I went and spoke

13  with her by the Restaurant Manager's office.

14  Q    Was anybody else present for that conversation?

15  A    No, it was a private conversation between she and I.

16  Q    And what happened during that conversation?

17  A    She was very, very pleasant, very, very polite; just told

18  me, "Graham, I know you're doing your job that you have with the

19  Union, and I realize that you posted the flyer over there," she

20  said, "but Human Resources has told me that I am to remove any

21  and all union flyers on this bulletin board.  And I'd like to

22  give you the option to go ahead and take it down yourself so you

23  can reuse it, but, if you don't, I'm going to have to remove

24  it."

25  Q    And what was your response?

1    A    My response was, I said, "Mattie, thank you very much for

2    being honest with me and being polite about it and not just

3    tearing it down."    I said, "You know, I will go ahead and I

4    will remove it myself."

5    Q    Was that the end of the conversation?

6    A    I believe so.  I thanked her again for her being

7    professional about it, and yah.

8    Q    And after that --

9    A    That was it.

10    Q    And after that conversation, did you take down the union

11    flyer?

12    A    I did.

13    Q    Okay.

14        MR. WIESE:  Your Honor, the following line of questions is

15    in support of Complaint allegation 5(b).

16    Q    BY MR. WIESE:  So shifting gears again, I'd like to talk

17    about the step increases at the Marriott -- the step wage

18    increases at the Marriott.

19        In your role as union steward, did you ever have any

20    conversations with employees who were not receiving step

21    increases in the spring of 2015?

22    A    Yes, Derek Kotvask -- I believe his one-year anniversary

23    was May 1st.  I remember this because it was May Day.  And he

24    had come to me probably a month or so prior to May 1st in

25    regards to whether or not he would receive his raise.  He told

1    me that he had heard rumors that HR was  not allowing step

2    increases while we were in negotiations because we were not

3    under contract.

4        MR. TERRELL:  Forgive me.

5        Can you give me the last name of this individual?

6        THE WITNESS:  K-O-T-V-A-S-K.  I might be missing a letter,

7    but that's fairly close.

8    Q    BY MR. WIESE:  Was this the only time that Mr. Kotvask

9    brought this up with you?

10   A    He brought it up with me several times.  He was very, very

11   upset about it and had a job offer elsewhere and was very

12   seriously thinking about quitting over the issue.

13   Q    Over what period of time was he bringing this up?

14   A    You know, so it would have been, you know, a month prior to

15   May 1st, all the way through -- certainly, well through the end

16   of May and on to the next month, because he didn't get the

17   increase, and so he kept bringing it up.

18   Q    Did you talk with any managers about Mr. Kotvask not

19   getting his increases?

20   A    I talked to Chef Robert several times about it.  He

21   actually addressed me and said, "You know, HR is saying that

22   they cannot give him a raise because of we're not under

23   contract, you know, what do you know of this?"  I told them what

24   I knew of it, that Brian said that that was not the case, that

25   the step increases still had to, you know, go into effect.  I

P 00494

1    reassured Derek and Chef Ulrich that he would get his raise,

2    that we would just have to grieve it, and that Derek would have

3    to take photos of his pay stub to provide to me so I could give

4    it to Brian so we could grieve it.

5    Q    So how many times specifically do you remember talking with

6    Chef Ulrich about this?

7    A    Oh, at least a half a dozen times.

8    Q    And where did these conversations take place?

9    A    In his office.

10   Q    When did the first one take place?

11   A    Probably, you know, 2 or 3 weeks before May 1st.

12   Q    What about the last one?

13   A    Probably sometime in June.

14   Q    And what specifically do you remember Chef Ulrich saying

15   about the step increases?

16        MR. TERRELL:  Objection.

17        THE WITNESS:  You know --

18        MR. TERRELL:  -- asked and answered.  Objection:  asked

19   and answered.

20        JUDGE STECKLER:  Is it to a specific conversation?

21        MR. WIESE:  Well, yes.  I may have must miss-heard, but I

22   didn't recall him answering or saying specifically what Chef

23   Ulrich had said.

24        MR. TERRELL:  Yes, he said that HR said we can't give the

25   raise because we're not under contract.  That was his testimony

1    about what Chef Ulrich said.  The witness is nodding in

2    agreement with me.

3         JUDGE STECKLER:  Was there at any time a point when Chef

4    Ulrich said anything different in these conversations?

5         THE WITNESS:  In regards to it being that HR said he

6    couldn't get his raise, no.  I mean, he always maintained that,

7    "Well, Human Resources is saying that he can't get his raise."

8    And I would say, "Well, the Union is saying that he can."  And

9    Chef Robert would say, "Oh, boy, I wish we could get him that

10   raise so we could keep Derek, because, you know, we need him."

11   It's very hard to find employees in this town, the unemployment

12   rate that we have.

13        JUDGE STECKLER:  So was there any -- in the four

14   conversations that you had, were any of the conversations

15   different?

16        THE WITNESS:  The first one was him actually coming to me

17   for advice about the contract.  After that, it was him following

18   up, "Hey, did you hear anything new?"

19        JUDGE STECKLER:  I mean with Chef Ulrich, not Derek.

20        THE WITNESS:  That's what I'm talking about, yah, with Chef

21   Ulrich, because he came to me.  They both came to me about

22   advice, about basically how to get the raise.  Chef Ulrich

23   wanted him to get the raise so that he would not be a

24   disgruntled employee.  So, you know, basically, thereafter, it

25   was a follow-up, "Hey, have you heard anything new about Derek

1  getting his raise?"  Other than that, it would be, "You know,

2  Derek is in a really bad mood today because of that raise.  I

3  wish we could get him that raise, but HR says we can't," you

4  know, that sort of thing.

5       JUDGE STECKLER:  So it was more of the same?

6       THE WITNESS:  Yah, basically.

7       JUDGE STECKLER:  Okay.

8       Does that answer your question, Mr. Terrell?

9       MR. TERRELL:  Yes.

10      JUDGE STECKLER:  Okay.

11      Mr. Wiese, I think we've covered it.

12      MR. WIESE:  Okay.

13  Q    BY MR. WIESE:  Besides your conversations with Chef Ulrich,

14  did you have conversations with any other manager about step

15  increases?

16  A    Not a direct conversation, but there was one time where I

17  took a break and there happened to be some union members

18  picketing outside.  So there was a small circle of people,

19  maybe, you know, half a dozen of us, including Jeff Burns,

20  manager and in charge of engineering.  He just kind of shook his

21  head, you know, at the people doing the picketing and said, "you

22  know, all they've got to do is sign the contract and they'll all

23  get their raises."

24      JUDGE STECKLER:  I'm sorry, who said that?

25      THE WITNESS:  Jeff Burns, head of Engineering for the

1  Marriott.

2       JUDGE STECKLER:  Okay.

3  Q    BY MR. WIESE:  And do you remember about when this

4  conversation -- or when this happened, this event?

5  A    Yah, it was getting warmer, so this must have been probably

6  May.

7       MR. WIESE:  Could we go off the record for just a minute?

8       JUDGE STECKLER:  How long is a minute?

9       MR. WIESE:  One minute.

10      JUDGE STECKLER:  Okay.

11  (Off the record.)

12      JUDGE STECKLER:  Okay, we're back on the record.

13      MR. WIESE:  I have no further questions.

14      JUDGE STECKLER:  Mr. Terrell, do you have questions?

15      MR. TERRELL:  I do, but I would first like to see all of

16  the Jencks affidavits as well as all documents referenced or

17  attached referenced in the Jencks affidavits.

18      MR. WIESE:  So I'm turning over to Mr. Terrell Mr.

19  Brandon's Affidavit, which is 10 pages in length, along with e-

20  mails that he sent me, all of which have to deal with I believe

21  scheduling meetings between the two of us, and they are about

22  one line in length.  There are it looks like right around 30

23  pages of brief e-mail exchanges.

24      JUDGE STECKLER:  Okay.

25      How much time would you like?

1      MR. TERRELL:  I would like an hour.

2      JUDGE STECKLER:  An hour?

3      MR. TERRELL:  Yes.

4      JUDGE STECKLER:  Okay, if you can shorten that, will you

5  let us know?

6      MR. TERRELL:  Yes.

7      JUDGE STECKLER:  We'll do an hour.  That will be -- 12

8  o'clock okay?

9      MR. TERRELL:  12:03.

10      JUDGE STECKLER:  You are being extremely precise, okay.

11      Off the record.

12  (Off the record.)

13      JUDGE STECKLER:  Back on the record.

14      Mr. Terrell is ready for cross.

15      MR. TERRELL:  Yes.

16      JUDGE STECKLER:  I'll remind the witness that he is still

17  under oath.

18      The witness needs to get back on the stand.

19      Mr. Terrell is ready for cross.

20      MR. TERRELL:  Yes.

21      JUDGE STECKLER:  I'll remind the witness that he's still

22  under oath.

23                      CROSS-EXAMINATION

24  Q    BY MR. TERRELL:  Are you ready?

25  A    Yes, sir.

1   Q    Good afternoon -- or good morning.

2        A couple of questions for you.  Do you recall your

3   testimony concerning the -- you testified the employer was late

4   to some of the bargaining sessions.  Do you recall that

5   testimony?

6   A    Yes.

7   Q    And do you recall testifying that, in response to the

8   question did the Union object, and you said you could not

9   recall.  Do you recall that testimony?

10  A    Yes.

11  Q    And do you recall testifying if the Union ever -- if the

12  employer, excuse me -- you were asked, did the employer ever

13  give notice, and do you recall testifying that Nancy Goldman or

14  Martin would tell you that management would be late?  Do you

15  recall that testimony?

16  A    Yes.  Yes.

17  Q    But you never spoke directly with management or anybody in

18  management about times of arrival, did you?

19  A    I mean, I remember Michael coming in and saying, "Hey guys,

20  you know, just give us a little bit longer, we'll" --

21  Q    I'm sorry?

22  A    I remember Michael coming in, very politely walking in and

23  saying, you know, "We'll be with you shortly," you know, just

24  that sort of thing.

25  Q    Okay.  It was apparent that neither Nancy Goldman or Martin

1    Goff had spoken with somebody in management because they

2    reported to you.

3    A    Yes.

4    Q    Okay, thank you, sir.

5         Ask you a question or two about the pie charts.

6    A    Mmm-hmm.

7    Q    Okay.  You recall, of course, that during the bargaining

8    session, if errors were found on the pie charts, somebody on the

9    bargaining committee would point that out.

10        MR. WIESE:  Objection.

11        MR. TERRELL:  What's the objection?

12        MR. WIESE:  Speculation -- they would point them out.

13        MR. TERRELL:  Yes, I --

14        JUDGE STECKLER:  Are you saying the Union bargaining

15   committee would point that out to the team?

16        MR. TERRELL:  I'm referring to the bargaining sessions, and

17   I'm asking -- let me rephrase it just because I lost track of

18   how I asked it originally.

19   Q    BY MR. TERRELL:  During the bargaining sessions, do you

20   recall employees in the bargaining committee room pointing to

21   errors in the pie chart?

22   A    Yes.

23   Q    And isn't it true that when those errors were pointed out,

24   they were looked at and reviewed by management at that point in

25   time?

1    A    I believe so.  That they were planning on reviewing them

2    and presenting new ones the next time.

3    Q    And isn't it true that when errors were pointed out, that

4    management corrected those errors that day?

5    A    That day?

6    Q    Yes.

7    A    I don't believe so.

8    Q    Isn't it true that if not that day, shortly thereafter?

9    A    At the next meeting perhaps.

10   Q    Okay.  You testified to what you called a not direct

11   conversation, but a statement you overheard by Jeff Burns.

12   A    Yah.

13   Q    Do you recall that testimony?

14   A    Yes, sir.

15   Q    And is -- are we clear on the record that this was not a

16   conversation you had with Mr. Burns, but it was just something

17   you overheard him say?

18   A    Yes.

19        MR. TERRELL:  No further questions, Your Honor.

20        JUDGE STECKLER:  Let me ask you a little bit about your

21   conversation, what you heard from Mr. Burns.  How many employees

22   were out picketing -- leafleting that day, excuse me?

23        THE WITNESS:  How many -- you know, it was 15 to 20.  If I

24   had to approximate, 15.

25        JUDGE STECKLER:  How far away were you from Mr. Burns at

1    the time you heard him say that?

2        THE WITNESS:  You know maybe 5 feet.  It was a little

3    circle of people about the size of this little table area right

4    here.

5        JUDGE STECKLER:  How much noise was there outside?

6        THE WITNESS:  People were picketing, so there was some

7    yelling, but it was said closely enough to me that it was very

8    clear what he said.

9        JUDGE STECKLER:  About how loud was his voice?

10        THE WITNESS:  Loud enough so that it would be heard by

11    several people.

12        JUDGE STECKLER:  Was it conversation level or higher than

13    that?

14        THE WITNESS:  Higher than conversation level, like the

15    volume I'm using right now so that all of you will hear me.

16        JUDGE STECKLER:  And were there other people out on the

17    street at the time?

18        THE WITNESS:  I mean, we weren't necessarily in the street.

19    We were in the loading dock, so everyone in this, you know,

20    group of people would have heard what he said. The picketers

21    would not have heard what he said.

22        JUDGE STECKLER:  How far away were the picketers?

23        THE WITNESS:  You know, probably a good 20 feet, if not a

24    little bit more.  So I would definitely say it was not intended

25    for the picketers to hear.

1       JUDGE STECKLER:  Was he saying it to anybody in particular?

2   Was there anyone with him?

3       THE WITNESS:  No, he was just saying it to the group of us,

4   because we were all, obviously, watching the same thing.

5       JUDGE STECKLER:  Was he looking at you? Looking away?  I --

6       THE WITNESS:  To the best of my recollection, I remember

7   him glancing at me, yes.

8       JUDGE STECKLER:  In regards to that absence on February

9   16th --

10      THE WITNESS:  Mmm-hmm.

11      JUDGE STECKLER:  -- did you ever ask for any Worker's

12  Compensation in relationship to that illness?

13      THE WITNESS:  No.

14      JUDGE STECKLER:  I have no further questions at this time.

15      If you have any redirect, Mr. Wiese.

16      MR. WIESE:  Just briefly, Your Honor.

17                      REDIRECT EXAMINATION

18  Q    BY MR. WIESE:  So Mr. Brandon, Mr. Terrell was asking you

19  questions about pie charts at negotiations, and you -- I believe

20  you said that you recalled corrections being made to some of

21  those pie charts, is that accurate?

22  A    What I remember was that, you know, the pie charts would be

23  different the next time, assumably that they had taken a better

24  look at them and made them more accurate.

25  Q    At negotiations, did -- do you remember the Union taking

1  time to go through every single pie chart for every single

2  employee that was presented?

3

4       MR. TERRELL:  Objection:  leading.

5       JUDGE STECKLER:  Can you rephrase a little bit, Mr. Wiese?

6  Q    BY MR. WIESE:  Did the Union go through every pie chart at

7  negotiations?

8  A    No, there were almost 500 employees.  No.

9  Q    Okay.

10      JUDGE STECKLER:  No further questions?

11      MR. TERRELL:  No further questions.

12      JUDGE STECKLER:  Mr. Terrell, do you have any recross?

13      MR. TERRELL:  Yes -- hold on -- no, no further questions.

14      JUDGE STECKLER:  Do you guys want to take a lunch break

15  here?

16      MS. BURGESS:  No.

17      MR. TERRELL:  Do you have a witness?

18      JUDGE STECKLER:  Do you have one more witness?

19      MS. BURGESS:  Yes, Your Honor.  Can I just --  she should

20  be here, if she's not out there right now, in the next couple of

21  minutes.  It would be great if we could -- her testimony is

22  going to be relatively short, less than a half hour.  If we

23  could get through hers and then we'd be happy to turn over the

24  Jencks statements so they could look at them over lunch.

25  They're also very short.  And then we wouldn't have to waste the

1    Court's time and can come back on the record and get busy with

2    cross.

3         JUDGE STECKLER:  Any objection, Mr. Terrell?

4         MR. TERRELL:  Yes.

5         JUDGE STECKLER:  Yes?

6         MR. TERRELL:  Yes.

7         JUDGE STECKLER:  Oh, that's okay?

8         MR. TERRELL:  If she's here, if the witness is here, that's

9    fine.

10        JUDGE STECKLER:  Okay.

11        In the meantime, sir, you'll get to step down.  Do not

12   discuss your testimony with anybody until the conclusion of the

13   hearing.

14        THE WITNESS:  Yes, ma'am.

15   (Witness excused.)

16   (Pause.)

17        JUDGE STECKLER:  Okay, we're on the record.

18        General Counsel may call its next witness.

19        MR. WIESE:  Yes, Your Honor, General Counsel calls Kelli

20   Johnston to the stand.

21        JUDGE STECKLER:  Ms. Johnston, can you please raise your

22   right hand?

23   (WITNESS SWORN:  KELLI JOHNSTON)

24        JUDGE STECKLER:  Please state your full name for the

25   record.

1      THE WITNESS:  Kelli Johnston. K-E-L-L-I  J-O-H-N-S-T-O-N.

2                    DIRECT EXAMINATION

3   Q    BY MR. WIESE:  Ms. Johnston, what is your current

4   occupation?

5   A    I'm a banquet server at the Rochester Marriott.

6   Q    How long have you been a banquet server at the Rochester

7   Marriott?

8   A    Sixteen years.

9   Q    Have you worked at any other properties besides the

10  Rochester Marriott?

11  A    I also worked the Kahler Grand Hotel.  In our department,

12  we are able to be scheduled at both hotels for those purposes of

13  business.

14  Q    In the banquet department?

15  A    Yes.

16  Q    Okay, thanks.

17       During that time -- during the 16 years that you've worked

18  in the banquet department, how many hours per year have you

19  averaged working?

20  A    Approximately a thousand per year.  It does vary.

21  Q    What do you in your position as a banquet server?

22  A    We deal with all the special reserved parties, the

23  functions, weddings, such as that.  We are scheduled ahead of

24  time.  We come in to set the room up.  When the guests arrive,

25  we serve the meal.  When that's finished, we clean up the room.

1    I'm also a bartender there.

2    Q    Have you worked in any other positions at any of the hotels

3    in this bargaining unit, besides banquet?

4    A    No.

5    Q    During your time working for the hotels, have you held any

6    positions with the Union?

7    A    Yes.

8    Q    What positions?

9    A    I've been on four negotiating committees.  I'm also

10    currently the Vice-President of the Union.  I've been that for

11    about two years.  Before that, I was trustee for about two

12    years, and I've been the Union steward for about five.

13    Q    And are you the only employee Vice-President in the

14    bargaining unit?

15    A    Yes.

16    Q    And what does that position entail?

17    A    We have monthly board meetings, checking out any finances,

18    any discussion, decisions that might need to be made by the

19    Union.

20    Q    And how were you selected to be the Vice-President?

21    A    I was appointed.  We did have a gentleman who had retired

22    so they were in need, and being that I was trustee, I was

23    appointed up from them.

24    Q    What about your role as union steward?  How long have you

25    been a union steward for?

1   A    About 5 years.

2   Q    And what do you do as a union steward?

3   A    Be available if any of the employees have questions about

4   something that's going on, be available if somebody wants to

5   have their Weingarten Rights in case of a disciplinary action to

6   come into a meeting, to observe.

7   Q    What about your role on the negotiating committee?  You

8   said you've been in negotiations for 4 contracts, is that right?

9   A    I believe so, yah.

10  Q    And what is your role in that committee?

11  A    Our committee goes to all the negotiating meetings, listen

12  to, add input if needed.  Report back to the employees with --

13  if they have questions how things are going.

14  Q    Were you part of the negotiating committee for these most

15  recent negotiations?

16  A    Yes.

17  Q    And how many negotiating sessions have you attended?

18  A    Eleven.

19      MR. WIESE:  Your Honor, the following line of questions is

20  in support of Complaint allegation 6(b).

21  Q    BY MR. WIESE:  So, Ms. Johnston, I'd like to talk to you

22  about the hours that you were getting in the banquet department

23  during negotiations.   What were your work hours like in the

24  banquet department in January?

25  A    We had slowed down quite a bit.  We weren't really getting

1  very many hours at all.

2  Q    Did you talk to any managers about getting more hours?

3  A    I had spoke with Kate Uuland.

4  Q    And when did you speak with Ms. Uuland?

5  A    End of January.

6  Q    And where did this conversation take place?

7  A    In the subway level in front of Heritage Halls.

8  Q    In which hotel?

9  A    The Kahler Grand.

10  Q    And was anybody else present for that conversation?

11  A    No.

12  Q    And what did Ms. Uuland say to you during that

13  conversation?

14  A    She said Ericka at Crossings was looking for -- she had

15  been bartending and in need of a bartender, so she would let her

16  know.

17  Q    And what prompted her to say that?

18  A    I had asked Kate about getting some extra hours in other

19  departments.

20  Q    And what did you do after that conversation -- or was that

21  the end of the conversation?

22  A    That was the end of the conversation there.

23  Q    And what did you do after that conversation?

24  A    I had -- it was either then or the next day I went over to

25  Crossings to -- because I had never met Ericka -- went and spoke

1    with her.  And she said yes they did have a bartender out.

2    Q    What is The Crossings?

3    A    It's a restaurant/bar over in the Kahler Inn and Suites.

4    Q    And you mentioned that you had a conversation with Ericka,

5    is that right?

6    A    Yes.

7    Q    And where was that conversation?

8    A    In the bar area and then we moved over by her office

9    because she needed to grab the work schedule.

10   Q    And what specifically happened during that conversation

11   with Ericka, as best as you can recall.

12   A    She had said, Yah, there was a bartender out," and she had

13   looked at the schedule and saw that she did have an opening on

14   that Monday, and she would have me work that.

15   Q    Did you accept that bartending shift?

16   A    Yes.

17   Q    And was there anybody else present for that conversation?

18   A    No.

19   Q    Did you, in fact, work the bartending shift at The

20   Crossings the next Monday?

21   A    Yes.

22   Q    And do you recall what day that was you worked?

23   A    Oh -- not off the top of my head I can't think of the date.

24   Sorry.

25   Q    That's okay.

1      Did you get any feedback on how you did in that shift,

2   bartending shift, at Kahler Inn and Suites?

3   A    The next day I worked a function and Kate said she got an

4   e-mail back from Ericka and said I had positive remarks, that I

5   was a team player.

6   Q    And when you took this shift at The Crossings, did you have

7   to fill out any transfer paperwork?

8   A    No.

9   Q    What did you have to do to get the shift?

10  A    I just spoke with Ericka.

11  Q    Did you do anything beyond having the conversation with

12  Ericka that we just talked about?

13  A    At that time to get the work shift, no, I had spoke with

14  Kate, and then Ericka, and after that, she put me on the work

15  shift.

16  Q    And after you took this bartending shift at The Crossings,

17  did the hours in the banquet department improve in February?

18  A    No.

19  Q    And did you have to file for unemployment at that time?

20  A    I ended up filing unemployment.

21  Q    Have you had to file for unemployment in the past?

22  A    Yah, a few years back.

23  Q    In February, did you hear about opportunities for more

24  hours in other areas?

25  A    I had spoken to a co-worker, a lady I worked with,

319

1    Michelle, in The Crossings, and said that there was a bartender

2    going to be out and he should have hours available there.

3    Q    Do you remember when in negotiations this would have

4    occurred, and actually --

5    A    Should have been the 26th, I think, of February.

6    Q    Okay.  All right.

7         Did you speak with any managers after having that the

8    conversation with Michelle?

9    A    I spoke with Tyler Kase.

10        MR. TERRELL:  What --

11        COURT REPORTER:  I'm sorry?

12        MR. TERRELL:  I heard her -- spoke with Tyler Kase.

13        THE WITNESS:  Yes.

14   Q    BY MR. WIESE:  When did you speak with Mr. Kase?

15   A    That day, we had a break during negotiations and I met him

16   in the back hall.

17   Q    The back hall of where?

18   A    Back hall -- we met in Centennial Halls where there were

19   some sales offices and phone reservations are at.

20   Q    Was this at the -- which hotel was this at?

21   A    At the Kahler Grand.  I'm sorry.

22   Q    No, that's fine.

23        Was anybody else present for that conversation with Mr.

24   Kase?

25   A    No.

1   Q    And what happened during that conversation?

2   A    I mentioned to him that Michelle said a bartender was out

3   and he said that would be fine, he would pass the word on.  He

4   wasn't able to guarantee me hours and that he has to speak with

5   the manager in charge.

6   Q    Who -- do you know who the manager was that he -- or who is

7   the manager in charge of The Crossings?

8   A    That's Ericka.

9   Q    And what did you do after this -- or did -- excuse me, did

10  Mr. Kase say anything else during that conversation that you

11  recall?

12  A    Not that I recall.

13  Q    What did you do after the conversation with Mr. Kase?

14  A    After that, the day went on.  The next day, the 27th, I had

15  sent Ericka a text message to let her know just in case she

16  didn't get the message.

17  Q    What were you letting Ericka know?

18  A    That I heard that there was going to be a bartender out and

19  I wanted -- was interested in the hours.

20  Q    Showing you what's been marked as General Counsel Exhibit

21  26.

22  (Witness proffered document.)

23       MR. TERRELL:  Hold on a second.

24  (Pause.)

25  Q    BY MR. WIESE:  Do you recognize this?

1  A    Yes.

2  Q    And what is it?

3  A    That's a copy from my cell phone text message to Ericka.

4  Q    Okay.  And so this is -- is this a picture of your phone?

5  Or what is this?

6  A    This was forwarded, yah.

7  Q    Okay.

8      MR. WIESE:  I'll offer General Counsel Exhibit 26.

9      MR. TERRELL:  No objection.

10     JUDGE STECKLER:  GC 26 is admitted.

11  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 26.)

12  Q    BY MR. WIESE:  Did you ever get a response from Ericka to

13  your text on February 27th?

14  A    No.

15  Q    Did you ever -- did you text Ericka again about those

16  bartending hours?

17  A    On March 9th, I did.  I found out from Michelle that Derek

18  Shot, a junior, another bartender, was working over there at

19  that time.

20  Q    And when did you find that out from Michelle?

21  A    That was on March 9th during negotiations again.

22  Q    And who is this banquet -- who is Derek Shot?

23  A    He is an employee over at the Kahler in the banquet

24  department.

25  Q    Does Mr. Shot hold any positions in the Union?

1   A    No.

2   Q    Is he on the bargaining committee?

3   A    No.

4   Q    What did you do after you got the information about Mr.

5   Shot having the -- having worked the bartending hours at The

6   Crossings?

7   A    Well, I had sent Ericka another text, and then I had also

8   ran into Tyler again and asked him what was up.

9   Q    When was that conversation -- you're talking about Tyler

10  Kase?

11  A    Yes.

12  Q    When was that conversation with Mr. Kase?

13  A    That was again in the back hall. We had taken a break and I

14  was going out to have a cigarette.

15  Q    And was anybody else present for that conversation?

16  A    Hannah Michaels.

17       MR. TERRELL:  Who?

18       THE WITNESS:  Hannah Michaels.

19  Q    BY MR. WIESE:  And what do you recall from that

20  conversation with Mr. Kase?

21  A    Well, I had told him I heard that Derek was working the

22  hours.  He told me that I was not getting any hours because I

23  had said that I would not work night shifts.

24  Q    When he said that you weren't getting hours because you

25  wouldn't work nights, how did you respond?

1  A    I was a little shocked.  I had never said that before.  I

2  told him, "No, I've never said it."

3  Q    Do you, in fact, work nights as a banquet server at the

4  Marriott?

5  A    Yes.

6  Q    How often?

7  A    Approximately two days a week.  Again, that varies.

8  Q    Besides the one shift that we talked about in The Crossings

9  in January, did you work any other bartending shifts at The

10  Crossings?

11  A    No.

12  Q    And after not getting hours in the bartending area at The

13  Crossings, did you look for work in other areas of the hotels?

14  A    I spoke with -- I found out housekeeping was short a house

15  person and I had spoke with Crystal about that.

16  Q    Who is Crystal?

17  A    She's a manager in housekeeping at the Rochester Marriott.

18  Q    And when did you talk with Crystal?

19  A    Approximately beginning of April, maybe mid-April.

20  Q    And where did that conversation -- are we talking about

21  Crystal Adcox?

22  A    Yes.

23  Q    When did -- where did that conversation take place?

24  A    In the housekeeping area at the Marriott.

25  Q    Was anyone else present for that conversation?

P 00517

1  A     No.

2  Q     And what do you remember being said during that

3  conversation?

4  A     I just said that I was interested.  I had heard about us

5  being short a house person, and she said, "Yah, that would

6  probably be great."  They'd had people on overtime.  She said I

7  had to fill out a, I believe it was called a "path," it's a

8  piece of paper saying -- requesting hours in a different

9  department.

10 Q     And after -- are you familiar with the path?  Do you know

11 what that is?

12 A     I -- that's the first time I've ever filled it out.

13 Q     So after your conversation with Ms. Adcox, did you fill out

14 paperwork to work in the housekeeping department at the

15 Marriott?

16 A     Yes, that day I went over.

17 Q     And where did you fill that paperwork out?

18 A     At Human Resources at the Kahler.

19 Q     Who did you turn that paperwork into?

20 A     I'm not sure of her name.  It was just a gal that sits at

21 the desk in there.

22 Q     And when you got the transfer paperwork, who did you get it

23 from?

24 A     From the same lady.

25 Q     Did you ever receive any housekeeping hours at the Marriott

1    after filling out that transfer paperwork?

2    A    No.

3    Q    Did you have any further conversations with anyone about

4    getting hours in the housekeeping department after filling out

5    that transfer paperwork?

6    A    I had spoke with Zach.  He's a house person.  He's --

7         MR. TERRELL:  Zach?

8         THE WITNESS:  I don't know Zach's last name off-hand.

9         MR. TERRELL:  Z-A-K or Z-A-C-K?

10        THE WITNESS:  Z-A-C-K or Z-A-C-H, possibly.

11        MR. TERRELL:  Okay.

12        THE WITNESS:  He had come by and he said, "Hey, where are

13   you at?" he said. "How come you haven't trained with us yet?"

14   And I said I didn't think that there was any hours available,

15   and he said, "No," he said, "I'm on overtime getting kind of

16   tired," and then he -- we went back and he showed where -- how

17   their -- their schedule is different than ours, but he had

18   showed me where they overlap a little bit, or not overlap but

19   they're short the hours as a house person.

20   Q    BY MR. WIESE:  And did you get any house -- or first of

21   all, did you say when this conversation with Zach occurred?

22   A    Oh, would have been probably maybe a couple weeks after I

23   filled the paperwork out.

24   Q    And did you get any housekeeping hours at the Marriott

25   after your conversation with Zach?

1   A    No.

2   Q    So after you worked -- I'd like to talk about the

3   bartending shift for a second at The Crossings that you worked.

4   After you worked that shift in January, did you ever tell anyone

5   that you did not want to go back to working at The Crossings?

6   A    No.

7   Q    Did you ever -- were you ever offered any bartending shifts

8   at any other restaurants?

9   A    No.

10  Q    What about Salute, or Salute' ?

11  A    Salute'?  No, I wasn't.  As far as I know they were full

12  staffed down there.

13  Q    Have you ever told any managers or have you ever declined a

14  shift because it's been too busy?

15  A    No.

16       MR. TERRELL:  Objection:  leading.

17       JUDGE STECKLER:  Can you rephrase, Mr. --

18       MR. TERRELL:  Well --

19       JUDGE STECKLER:  She's already answered.

20       MR. TERRELL:  She's already answered it, but I would just

21  ask that he not lead so much, please.

22  Q    BY MR. WIESE:  Aside from the first shift you worked at The

23  Crossings, were you ever offered any additional shifts at that

24  restaurant?

25  A    No.

1  Q    How long have you worked as a bartender for?

2  A    Twenty-six years.  Since I was 18.

3  Q    And as a bartender --

4      MR. WIESE:  Nothing further.

5      MR. TERRELL:  Jencks affidavits, all of them, and any

6  attachments or documents referenced therein.

7  (Pause.)

8      MR. WIESE:  I'm handing over to Respondent's counsel Kelli

9  Johnston's affidavit.  It is seven pages in length, along with

10  two scheduling e-mails between myself and Ms. Johnston.

11      MR. TERRELL:  So an hour for lunch, give me an extra

12  fifteen minutes to cover what we need to do.

13      JUDGE STECKLER:  Well, yesterday we took forty-five minutes

14  for lunch, so --

15      MR. TERRELL:  Yes, well, appreciate also we're hearing so

16  much evidence for the first time.  We have other work to do to

17  get ready to put on our case.  So I'm just asking for an hour

18  and fifteen minutes.

19      JUDGE STECKLER: Let's make it an hour, and if you need

20  more, come back and we'll address it, how's that?

21      MR. TERRELL:  Okay.

22      JUDGE STECKLER:  So let's synchronize our watches, 1:25,

23  yes.

24  (At 12:25 p.m., the hearing in the above-entitled matter

25  recessed for lunch, to resume at 1:25 p.m.)

1    JUDGE STECKLER:  We're back on the record after lunch.

2    While were out, Mr. Stokes came in and advised that Mr.

3  Terrell needed about ten extra minutes, which we gave, so that's

4  why we're getting back on the record now.

5    Ms. Johnston, I'll have to remind you that you're under

6  oath, so Mr. Terrell, you may proceed.

7    MR. TERRELL:  Thank you.

8                    CROSS-EXAMINATION

9  Q    BY MR. TERRELL:  Good afternoon.

10    You testified in the beginning to your experience you've

11  worked at the Marriott for 16 years.

12  A    Yes.

13  Q    Primarily as a server, but you've also done some

14  bartending.

15  A    I'm senior bartender.

16  Q    In the banquet department.

17  A    Yes.

18  Q    What percentage of your time over the 16 years was server

19  work and what percentage of time would you estimate was

20  bartender -- banquet bartender work?

21  A    Oh, it's a little hard because it varies.  I guess I'd have

22  to say maybe 60/40, 60 being server, 40 being bartender.  My

23  earlier years, first 5 to 10 years, were a lot more bar shifts.

24  Q    And you do banquet work at other properties and businesses

25  around town as well, don't you?

1   A    No.

2   Q    You -- do you ever work for Canadian Honker?

3   A    No.  I had worked one function one time for the Ramada

4   Hotel and that was it.

5   Q    That was it.  When was that?

6   A    Three -- 4 years ago.  It was quite a while ago.

7   Q    Okay.  There's nothing to prevent you from picking up hours

8   at these other places in town, is there?

9   A    No.

10   Q    When you do bartending in the banquets department, or

11   bartending for a preset function, the bar is certainly smaller,

12   so it's a moveable, portable bar typically, is it not?

13   A    Yes.

14   Q    And it's a smaller bar than the bar that you find in

15   Crossings or Salute' in the other fixed bars in the hotel,

16   that's true, right?

17   A    Smaller lengthwise, yes.

18   Q    And also fewer drinks.  Not as many drinks are typically

19   served from a bartender from a banquet bartender bar, correct?

20   A    No.

21   Q    You don't -- isn't it true that in a restaurant like -- in

22   a bar restaurant like Crossings or Salute', which is in

23   Marriott, right?

24   A    Crossings is Kahler Inn and Suites, Salute' is in Marriott,

25   yes.

1    Q    Isn't it true that the range of drinks, mixed drinks

2    offered to the public in those bars is greater than what is

3    typically offered in a bartender -- in a banquet bartender

4    situation?

5    A    The range of liquor, yes.

6    Q    Okay, and the range of mixed drinks as well, correct?

7    A    The -- yes, if you're talking the amount of concoctions I

8    would say, yes.

9    Q    And I'm not suggesting you don't have this knowledge, I'm

10   just asking this question about the different types of bars, and

11   so to work in a bar like Crossings at the Kahler Inns and Suites

12   or Salute' in the Marriott, to work there you have to have the

13   knowledge of how to make all the drinks that those bars offer to

14   the customers, correct?

15   A    You'd be trained in if you didn't have it, but, yes,

16   there's a larger range.

17   Q    Okay.  And I'm not suggesting that you don't know how to do

18   that, I'm just asking about the differences between those bars

19   and the bars you typically work in the banquet situation.  Okay.

20   You had never worked for Ericka Scrabeck before the time that

21   you worked the shift with her that you testified about.

22   A    No.

23   Q    And you didn't know her otherwise.

24   A    No.

25   Q    When you met her on that occasion that you worked in her

1  bar, was that the first time that you'd ever met her?

2  A    Yes.

3  Q    And so when you went in to work -- and you mentioned that

4  you have to be trained in when you work at a bar like that, and

5  that's what you were doing on that occasion when you worked that

6  shift in The Crossings bar, you were being trained, right?

7  A    I was under no supervision, no.

8  Q    Well, you testified -- you recall testifying that you spoke

9  with Kate Uuland, I believe the next day, and Kate informed you

10  that she got a report back from Ericka to the effect that your

11  performance had been fine.

12  A    Yes.

13  Q    Do you recall that testimony?

14  A    Yes.

15  Q    Okay, so there was obviously some observation of you.

16  Maybe you were working unsupervised, but your performance was

17  measured and observed, correct?

18  A    Oh, yes.

19  Q    And did you train on drinks?  Did you have to review the

20  menu and make sure you knew the recipes before working in that,

21  or in the course of working that shift did you learn what drinks

22  were to be served and how to prepare them?

23  A    There were a couple items they had on the -- like a special

24  flyer that they were having there and I went through those on my

25  own, yah.

1    Q    Okay. So that was -- we could call that a training shift?

2    A    Mmm-hmm.

3    Q    Is that a "yes."

4    A    I suppose.

5    Q    Is that a "yes."

6         JUDGE STECKLER:  I don't think --

7         THE WITNESS:  We disagree on it because I worked -- like I

8    said, within -- I was trained for approximately one hour.  After

9    that I was on my own.  I went to the customers myself.  A

10   typical training with a waitress would be you go with another

11   server and you help them, observe them, until you know -- so

12   other than that, no, I've taken tables alone, I waited on

13   customers.

14   Q    BY MR. TERRELL:  And this was a Monday, right?

15   A    Yes.

16   Q    It was during the day.

17   A    Yes.

18   Q    So the bar wasn't very busy or crowded at that time, was

19   it?

20   A    No.

21   Q    And you did not fill out a transfer request or any HR

22   paperwork before doing that shift, is that correct?

23   A    Correct.

24   Q    Now you then testified that some time later you had a

25   conversation with Kate and you testified that Kate said that

P 00526

1  Ericka said you did not fill out transfer paperwork relating to

2  other shifts.  Do you recall giving that testimony?

3      MR. WIESE:  Objection.  Miss-states prior testimony.

4      JUDGE STECKLER:  What --

5  Q   BY MR. TERRELL:  Do you recall having a conversation after

6  you worked that shift in Crossings, do you recall having a

7  conversation with Kate Uuland again about getting other work in

8  The Crossings bar, or getting other shifts?

9  A   I don't remember if it was with Kate.  I found out from

10 Michelle in negotiations that a bartender was going to be out,

11 there was hours available.

12 Q   Right.  And you testified that Ericka, at some point, said

13 to you that -- or excuse me, that someone said to you that

14 Ericka said you did not fill out the paperwork?

15 A   No.

16     MR. WIESE:  Objection.

17     MR. TERRELL:  All right, the record will speak for itself.

18 I'm asking the witness --

19     JUDGE STECKLER:  Right, because I don't recall that

20 testimony either, so.

21     MR. TERRELL:  All right.

22 Q   BY MR. TERRELL:  When did you -- well, strike that.

23     You were told by Crystal Adcox -- when you were seeking a

24 position in the housekeeping department, you were told by

25 Crystal Adcox that you needed to fill out some paper in Human

1   Resources office, do you recall that?

2   A    Yes.

3   Q    Okay.  And you were told at a previous -- on a previous

4   occasion, were you not, that you needed to get paperwork filled

5   out from the HR department.

6       MR. WIESE:  Objection:  vague.

7   Q    BY MR. TERRELL:  Were you told previously that you needed

8   to fill out paperwork from the HR department?

9       JUDGE STECKLER:  Mr. Terrell --

10      THE WITNESS:  No.

11      JUDGE STECKLER:  Well -- I was going to ask for a

12   clarification there.

13      MR. TERRELL:  Previous to the conversation with Crystal

14   Adcox.

15      JUDGE STECKLER:  About which job?

16      MR. TERRELL:  Any job.

17      THE WITNESS:  No.  That's the only time I've been told I

18   should have to fill out a paperwork.

19      MR. TERRELL:  All right.

20   Q    BY MR. TERRELL:  And then you testified that you spoke with

21   Taylor -- Tyler Kase on February 26, do you recall that

22   testimony?

23   A    Ah, yah.

24   Q    And you recall testifying and you brought the exhibit with

25   you of a text message to Ericka Scrabeck, do you recall that

1  testimony?

2  A    Yes.

3  Q    And do you have that exhibit in front of you?

4  A    Yes.

5  Q    It's Exhibit GC 26 and am I reading this correctly as I

6  look at it, that you sent her a text message on February 27 and

7  on March 9?

8  A    Yes.

9  Q    And I see Ericka's name at the top.  Could you read into

10 the record the phone number that you had in your phone for

11 Ericka?

12 A    507-202-2156.

13 Q    And that's the number you had stored in your phone?

14 A    Yes.

15 Q    And when you sent these text messages to Ericka you used

16 that number.

17 A    Yes.

18 Q    Okay.

19     JUDGE STECKLER:  Ms. Johnston, did you know if her number

20 had changed at any time?

21     MR. TERRELL:  I'm sorry, Your Honor, I can't hear your

22 question.

23     JUDGE STECKLER:  I'm sorry.

24     Ms. Johnston, did you know if, at any time, her number had

25 changed during that period?

1        THE WITNESS:  No.

2        JUDGE STECKLER:  Okay.

3        Go ahead, Mr. Terrell.  I'm sorry I interrupted.

4        MR. TERRELL:  What's that?

5        JUDGE STECKLER:  I'm sorry I interrupted.  Go ahead.

6        MR. TERRELL:  That's all I have, Your Honor.

7        JUDGE STECKLER:  Any redirect?

8                    REDIRECT EXAMINATION

9    Q    BY MR. WIESE:  How many years have you been bartending, Ms.

10   Johnston?

11   A    In my lifetime --

12       MR. TERRELL:  Objection:  asked and answered.

13       THE WITNESS:  Twenty-six.

14       MR. TERRELL:  Twenty-six.

15       JUDGE STECKLER:  I think she's already testified to 26

16   years experience.

17   Q    BY MR. WIESE:  How many of those years have you spent -- or

18   have you spent any of that time bartending at a full bar?

19   A    Oh, yes, most of my life.

20   Q    And the texts that you sent that are referenced in General

21   Counsel Exhibit 26, did you receive any messages back saying

22   that those text messages hadn't been delivered or were

23   undeliverable?

24   A    No.

25       MR. WIESE:  Nothing further.

1          JUDGE STECKLER:  Any recross?

2                         RECROSS-EXAMINATION

3    Q    BY MR. TERRELL:  You said that most of your life you have

4    worked full bars, but wasn't that really during the first 10

5    years then after that you mostly worked as banquet bartender,

6    correct?

7    A    No, during the time of employment with Rochester Marriott,

8    I also worked for the Stewartville American Legion bartending.

9    Q    The what?

10   A    Stewartville American Legion.

11   Q    Okay.

12   A    Bartending out there, and doing janitorial work as well.

13   Q    Okay.

14        MR. TERRELL:  Thank you.

15        JUDGE STECKLER:  Any further questions?

16        MR. TERRELL:  No further questions.

17        JUDGE STECKLER:  Ms. Johnston, you're excused, however

18   please do not discuss your testimony with anyone else until the

19   hearing is over.

20        THE WITNESS:  Okay.

21        JUDGE STECKLER:  Thank you.

22        THE WITNESS:  Do you want me to take this?

23        JUDGE STECKLER:  No, you can leave it there, our trusted

24   Court Reporter will take care of it.

25        JUDGE STECKLER:  Thank you.

1   (Witness excused from stand.)

2        MS. BURGESS:  I'll go get the other witness.

3        JUDGE STECKLER:  Okay.

4   (Pause.)

5        JUDGE STECKLER:  Good afternoon.

6   (WITNESS SWORN:  KELLY SCHROEDER)

7        JUDGE STECKLER:  Thank you.

8        Please state your name for the record.

9        THE WITNESS:  Kelly Schroeder.

10       MR. TERRELL:  I'm sorry, could we get spelling of your last

11  name, please?

12       THE WITNESS:  Yes.  S-C-H-R-O-E-D-E-R.  Kelly, K-E-L-L-Y.

13                      DIRECT EXAMINATION

14  Q    BY MR. WIESE:  Good afternoon, Ms. Schroeder.

15  A    Hi.

16  Q    What is your current occupation?

17  A    I'm a barista, and a barista trainer at Starbuck's.

18  Q    How long have you -- or which Starbuck's?

19  A    In the Kahler Grand.

20  Q    How long have you been a barista at the Kahler Grand?

21  A    For 4 and one-half years.

22  Q    What do you do in that position?

23  A    I make coffee, clean, I train other employees, stock.

24  Q    Have you worked at any other positions at any of the hotels

25  here, either the Kahler Grand, or the Marriott, Residence Inn,

P 00532

1    or Kahler Inn and Suites?

2    A    Yes.

3    Q    Which positions have you worked?

4    A    I have worked as a server and a bartender in the Lord

5    Essex.  I have also worked as a server and a bartender in the

6    Martini's, and I worked as a server in the Grand Grill.  I have

7    also worked functions, and I've also worked phones and food

8    running in room service.

9    Q    Which hotels have you worked at?

10    A    Only the Kahler Grand.

11    Q    When did you start working at the Kahler Grand?

12    A    October 8th -- October 13, 2008.

13    Q    During your time working at the Kahler Grand, have you held

14    any positions with the Union?

15    A    Yes.

16    Q    What positions?

17    A    I was a trustee for two or three years up until March of

18    2015, when I became a Board member, and I also started -- I'm

19    doing my first contract negotiations this year as well.

20    Q    Your current role as a Union Board Member, what does that

21    entail?

22    A    I go to the meetings, review the minutes and the

23    financials, and then I also kind of talk to other -- my co-

24    workers about what is going on with the Union, important

25    information.

P 00533

1  Q    So you also mentioned that you're on the bargaining

2  committee.  What do you do in that role?

3  A    I show up and I take notes and I just make sure that

4  everything as far as, you know, the old contract is -- changes

5  that weren't meant to be put into the new proposals, things like

6  that, that they weren't changed on accident, those sorts of

7  things.

8  Q    How many bargaining sessions have you attended as a member

9  of the negotiating committee?

10  A    I went to all of them, and that was eleven.

11      MR. WIESE:  Your Honor, the following line of questions is

12  in support of Complaint allegations 12(i)and (j).

13  Q    BY MR. WIESE:  So, Ms. Schroeder, I'd like to talk to you

14  about the bulletin boards.  So where are bulletin boards located

15  in the Kahler Grand?

16  A    They are located in all of the departments, or most of the

17  departments.

18  Q    Does that include the Starbuck's where you work?

19  A    Yes.

20  Q    Can you name some of the other departments where there are

21  bulletin boards?

22  A    There's a bulletin board in the cafeteria, there is one in

23  Lord Essex, there's a shared one between room service and the

24  kitchen, there is one that is shared between Martini's and the

25  Grand Grill, there is one in functions, and there is one in

1  housekeeping, and there is one in maintenance, and those are the

2  only ones that I'm aware of in the Kahler.

3  Q    Prior to this most recent round of negotiations starting in

4  -- this most recent round of negotiations, what was your

5  understanding of the past practice regarding Union materials on

6  the bulletin boards at the Kahler hotel?

7  A    I thought it was normal.

8  Q    Did you see Union materials on these bulletin boards?

9  A    Very frequently.

10  Q    Which ones of the ones that you've mentioned?

11  A    In the departments that I've worked at, also because, you

12  know, we work there, you see them, so any time that you would

13  walk by one, I mean, they would just be there.  They were in

14  Lords Essex, they were in the Grand Grill, Martini's one, they

15  were in the room service one, they've been in Starbuck's one,

16  they've been in functions ones.

17      MR. TERRELL:  Excuse me, Tyler, what allegation of the

18  complaint are you targeting?

19      MR. WIESE:  I thought we were talking about 12 (i) and (j),

20  but --

21      MR. TERRELL:  12(j).  I don't see 12 (i) in the this

22  exchange.

23      MR. WIESE:  Okay.

24  Q    BY MR. WIESE:  Okay, let's talk about the Starbuck's

25  bulletin boards specifically.

P 00535

1        Prior to these negotiations, how often would you see Union

2   materials on that Starbuck's bulletin board?

3   A    Very often, at least once a month.

4   Q    Have there been other non-union materials on the Starbuck's

5   bulletin board?

6   A    Yes.

7   Q    Like what?

8   A    All of the employee's phone numbers are on there, the

9   company would put up the <u>Kahler Care Keys</u>, which is just like

10  their daily little happy bulletin board posting that they post

11  every day.  We would have our safety bingo would be up there, we

12  have had -- our one manager would put up quotes for us every

13  day.

14       MR. TERRELL:  What was that?

15       THE WITNESS:  Quotes, like sayings.

16       MR. TERRELL:  Oh.  Okay.

17       THE WITNESS:  We keep our Jimmy John's menu up there.

18  We've had Girl Scout flyers up there, things that are kind of

19  important to the people that work in the department.

20  Q    BY MR. WIESE:  And have you posted any materials on that

21  bulletin board in Starbuck's?

22  A    I have.

23  Q    How many times?

24  A    At least twice.

25  Q    And when was the first time that you did it?

1  A    Around -- I don't know the date for sure -- but during the

2  beginning of the contract negotiations.

3  Q    So are you talking in 2015?

4  A    Umm, yes.  There was also one in 2014, that I'm aware that

5  I posted as well.

6  Q    What about the one in 2014?

7  A    That just -- well -- I posted one in 2014.

8  Q    And then I believe you said you posted one at the beginning

9  of negotiations in 2015?

10  A    Yes.

11  Q    Was there another one after that?

12  A    There was one, but it wasn't -- it was Union material, yes,

13  I did.

14  Q    And do you recall about when that was?

15  A    I don't remember the dates.

16  Q    Okay.  Who typically posts Union materials on the bulletin

17  boards?

18  A    Linda Henry.

19  Q    Now how long have the -- when you see Union flyers on the

20  bulletin board in Starbuck's, how long have they stayed up there

21  for?

22  A    Typically, they would stay up there until, you know, it's

23  past the date that something was happening, like a meeting or

24  something, and then you know anybody would just take it down and

25  throw it, you know, if it's a past event.

P 00537

1  Q    So if there was a meeting in May, let's see, a posting for

2  a meeting in May, how long would that stay up for?

3  A    You know a couple days after it.  I would typically pull

4  them down, you know, after the meeting is over.

5  Q    Have things with regards to Union flyers on the bulletin

6  board -- has that changed since these negotiations have started

7  in 2015?

8  A    Yes.

9  Q    And how has it changed?

10  A    They've been coming down.

11  Q    When did you first notice this happening?

12  A    It actually started in 2014.

13  Q    Oh, okay.  What happened in 2014?

14  A    In September of 2014, we extended the contract for 6

15  months, so around that time we started having meetings to kind

16  of let the members know what was going on.  So I obviously am

17  aware that they're going to be put up because, you know, I go to

18  the Board meetings and I talk to Linda Henry.  So she would say,

19  you know, "Did you see the flyer" --

20     MR. TERRELL:  Objection.  Objection:  eliciting hearsay,

21  Your Honor.  She's about to testify to something Linda Henry

22  told her for the truth of the matter asserted concerning the

23  issue of Union notices coming down.

24     JUDGE STECKLER:  She can testify to the circumstances, sir,

25  and what prompted her action.  So I'm going to overrule the

1  objection.

2      Go ahead. You may answer. Do you need the question again?

3      THE WITNESS:  No.

4      JUDGE STECKLER:  Okay.

5      THE WITNESS:  So she would ask if I had seen the bulletin

6  boards, and I would say that I have not, and she would say,

7  "Well, I'm going to post another one."  I would see them then,

8  you know, a day or a couple days later, and then they would be

9  vanished.  I mean they would just disappear again.

10  Q    BY MR. WIESE:  Was this different than how things had been

11  in the past Starbuck's bulletin boards?

12  A    Yes.

13  Q    How?

14  A    Because I'm the one who pulled them down, and I only pulled

15  them down till after, you know, it's unnecessary to keep up

16  there anymore.

17  Q    And did this continue to happen into 2015?

18  A    Yes.  It started happening again.

19  Q    Okay. And when did it start happening again?

20  A    As soon as the negotiations started again or shortly after

21  the negotiations started again.

22  Q    Were there ever any occasions where you saw a manager with

23  the Union flyer?

24  A    Yes.

25  Q    In that manager's possession?

1    A    Yes.

2    Q    When did that happen?

3    A    That happened in April, I believe or May, of this year.

4    Q    And what do you remember happening that day?

5    A    I was working on the bar, I was making drinks, it was

6    really busy.  I saw Linda Henry come in.  I knew she was coming

7    in, we had talked about it I believe a week prior at our

8    meeting, and so I knew she was coming in.  She walked to the

9    back room, she left maybe a minute later, I kept working.  About

10   maybe fifteen minutes later, I saw Mary Kay Costello walk past

11   me.  I obviously didn't see exactly where she went, but when she

12   walked past me again leaving the room she was actually holding

13   the Union flyer and it was pinned to her leg, and I could

14   clearly see at the top where it says "Unite HERE" in the red

15   letters.

16   Q    Was Ms. Costello acting differently than she normally does

17   when she was in Starbuck's that day?

18   A    Yes.

19   Q    How so?

20   A    She is the kind of person who is just very, very friendly.

21   She's a very bubbly person.  She has never, in my life, except

22   for that time, ever not acknowledged my presence.  She always

23   says, "Hi," she always asks, "How are you today, how are you

24   doing, how are things going?"  She'll ask about my husband or my

25   children, she's a very, very friendly person, so it was really

1  odd for her to just completely kind of ignore me.  Even when

2  it's busy, she always will at least say hello.  She's a polite,

3  nice person.

4  Q    Have you ever seen a manager with a Union flyer in

5  Starbuck's in the past?

6      MR. TERRELL:  Sir?

7  Q    BY MR. WIESE:  Had you ever seen a manager with a Union

8  flyer in the Starbuck's in the past?

9  A    Prior to that, no.

10 Q    What did you do after you saw Ms. Costello walk out of the

11 Starbuck's with the Union flyer?

12 A    I waited for a little bit of a lull, so then I was able to

13 take my break.  I went to the back room and saw, you know, that

14 it was, in fact, gone off of the board. I then called Linda

15 Henry, and I said, "I just saw Mary Kay walk out with a flyer"

16 and then Linda was -- sounded like she was crying, she was very

17 upset.  She said that she had just gotten yelled at and told

18 that she was no longer going to be able to access --

19     MR. TERRELL:  Objection.  Hearsay.

20     JUDGE STECKLER:  She can testify to what she told her, and

21 it could be present state of mind, so I'm going to allow it and

22 I'll give it the weight it deserves.

23     MR. TERRELL:  We object it coming in for the truth of any

24 matter asserted, however.

25     JUDGE STECKLER:  You'll get a running objection.

1          MR. TERRELL:  Thank you.

2          JUDGE STECKLER:  Is that okay?

3          MR. TERRELL:  Yes.

4          JUDGE STECKLER:  Okay.

5          I'm sorry, Ms. Johnston, could you -- before you tell me

6     what happened with Ms. Henry I do have a question.  Where in

7     Starbuck's is this bulletin board?

8          THE WITNESS:  It's actually in a back room.  So we have

9     like our main kind of café area where we make all of our drinks.

10    It's, you know -- there's a whole wall separating it, so I mean

11    you have to -- it's like a separate room.  There's a door.  It's

12    not open to the public.  I mean you actually have to walk into a

13    door to access that board.

14         JUDGE STECKLER:  Okay.

15         And now you were telling us about your conversation with

16    Ms. Henry.

17         THE WITNESS:  Yes.

18         JUDGE STECKLER:  Okay, please continue.

19         THE WITNESS:  She was really upset.  She had told me that

20    she was pretty much chewed out and that she was not going to be

21    able to access any of the bulletin boards.  She would not be

22    allowed to walk in any of the common spaces, which would

23    essentially mean that she could not post in any of them,

24    including the actual Union bulletin board because you can only

25    get to that from accessing a public space.

P 00542

1      MR. TERRELL:  Your Honor, we move to strike the testimony

2  to the extent that it is offered for the truth of the matter

3  asserted, that these things the witness just described were said

4  to Linda Henry.

5      JUDGE STECKLER:  And --

6      MR. WIESE:  Well, may I respond?

7      JUDGE STECKLER:  Go ahead, Mr. Wiese.

8      MR. WIESE:  I mean, well for one, this is just

9  corroborating testimony that's going to be coming in later this

10  afternoon.  It's, as you mentioned, I believe it's present sense

11  impression of what had occurred with Ms. Henry and --

12      JUDGE STECKLER:  Well, I think Mr. Terrell I gave you the

13  running objection at the beginning.  I understand you're

14  renewing your objection at this time.

15      MR. TERRELL:  Yes.

16      JUDGE STECKLER:  So we'll continue running.  And if you

17  want to argue on the brief about what weight I should give it, I

18  would welcome the argument.

19      MR. TERRELL:  Certainly.  Thank you.

20  Q    BY MR. WIESE:  So, actually I had a follow-up question

21  after the Judge's question, what -- how often have -- did you

22  see -- or have you seen Mary Kay Costello in Starbuck's?

23  A    Frequently enough.

24  Q    So when you say "frequently," like how often?  Just best

25  estimate.

1    A    I had seen Mary Kay in Starbuck's at least probably ten or

2    fifteen times ordering coffee.

3    Q    Mmm-hmm.

4    A    Otherwise, she's been in Starbuck's coming to a couple

5    times meet up with Michael Henry, who sometimes gets her coffee

6    for her, and then she's been down there a few other times just

7    meeting with other people -- I don't know who they are -- or,

8    you know, in our store meetings she's been present to -- for

9    sure one of our, like, just employees-only store meeting to kind

10   of take notes and stuff for that.

11   Q    Okay.  So did the topic -- moving past that incident in

12   April -- or March -- did the topic of bulletin boards come up at

13   any negotiating sessions that you attended?

14   A    They did.

15   Q    And do you recall about when that came up in negotiations?

16   A    Yes, it was, you know -- I don't remember the date exactly.

17   Q    Okay.

18   A    It was, I believe, between the months of March and May.

19   Q    All right, tell us what you remember happening at

20   negotiations.

21   A    So we had -- I had brought it up to Martin and Nancy when

22   they got there about how Linda had been treated, and what had

23   been happening.  And after the day's negotiating was finished,

24   Brian and Michael Henry and Nancy started having their own

25   personal conversation.  Everybody in the room was all having

1  their own conversations, and they started discussing -- they

2  were kind of right behind me -- and they started discussing, you

3  know, what I had brought up in the beginning of the day.  And

4  Michael Henry said he didn't know anything about it, and that,

5  you know, this was the first he was hearing about it, and really

6  just denying that he really knew that any of this had even

7  happened at all.  And so I decided at that point to get up and

8  insert myself in the conversation, and I said, "You know.  You

9  know exactly what's going on.  You guys are being "f'ing"

10  shady."  And I had yelled it. And the whole room stopped talking

11  and the whole room got up and kind of gathered around him and

12  kind of waited for a response from him.

13  Q    And do you remember if Mr. Henry had any response after you

14  said that?

15  A    He did, but I don't remember what it was.  I had a really

16  big adrenaline rush.  I have never really yelled at a superior

17  before and it kind of just -- my mind kind of shut down.

18       MR. WIESE:  So, Your Honor, the following line of questions

19  is in support of Complaint allegation 5(f).

20  Q    BY MR. WIESE:  Have you heard any managers talk to any of

21  your co-workers about step increases under the contract?

22       JUDGE STECKLER:  Just one moment.

23       I just want to make sure you guys are not witnesses.  The

24  two people there -- okay?  Thank you.

25       Go ahead, Mr. Wiese.  Would you please repeat?

1        MR. WIESE:  Yes.

2   Q    BY MR. WIESE:  Ms. Schroeder, have you ever heard any

3   managers talk to any employees about step increases?

4   A    Yes.

5   Q    And when have you heard this?

6   A    June 19, 2015.

7   Q    And where did that -- where were you when this incident

8   took place?

9   A    Human resources.

10  Q    And why were you in human resources that day?

11  A    I was trying to get my check figured out.  I wasn't being

12  paid the appropriate overtime based on my premium wage that I

13  was being paid for my work.

14  Q    What happened when you arrived at the HR office?

15  A    I went in.  I wasn't really able to be helped at that time,

16  but I had kind of sat in there for a while just waiting for an

17  answer, and then the door was open to Mary Kay's office, and

18  Michael Henry and Mary Kay were having a discussion with one of

19  the Marriott housekeepers.

20  Q    And where were you when this discussion was taking place?

21  A    There is a kind of a -- there is like the HR office, and

22  that is actually in the middle of two other offices, so Mary

23  Kay's office is connected and then Chad Decker's office is

24  connected, and so their doors to, you know -- from the main room

25  to each of those rooms, and then each of those rooms also have

1   their own exit as well as Human Resources into a common, like,

2   hallway.

3   Q    And so -- and where were you during this?

4   A    I started off in the middle HR office.    And then at the

5   end of it, I actually ended up in the hallway.

6   Q    What did you hear Mr. Henry and Ms. Costello saying to the

7   employee during this conversation?

8   A    Well, the employee had asked -- was expressing her concern

9   that she had not received her wage increase yet, her step

10  increase, and Michael Henry said that "We don't have a contract

11  right now, the Union will not agree to this offer that's a very

12  fair offer, you know, you really need to call Brian and tell him

13  that he needs to accept everything.    This is a great proposal,

14  everything is really, really competitive," and then at some

15  point the conversation switched to, "You know, you'd be really,

16  really good management material, have you ever thought of

17  becoming a supervisor?"    And they kind of just kept saying

18  pretty much the same things over and over again.    And I listened

19  to the conversation for a good fifteen minutes, and then my

20  break was up so I mean I had to get going.

21  Q    Was the door to Ms. Costello's office open during that

22  conversation?

23  A    Inside of HR that was, yes.

24  Q    And what about the door to the hallway?

25  A    The immediate door to the hallway was shut, but there are

1   slots underneath the door, however there is another door that

2   separates those two parts of the hallway, that was open, so --

3   Q    Could you clearly hear what was being said?

4   A    I could clearly hear what was being stated, yes.

5   Q    When you were in the main room?

6   A    Yes.

7   Q    And what about in the hallway?

8        MR. TERRELL:  Objection:  leading.

9        THE WITNESS:  I could hear everything.  There were several

10  doors that were open.  I mean everything was clear.  Half the

11  conversation I heard I was in the hallway.

12       JUDGE STECKLER:  I have a question.

13       Kelli, did you feel like you were kind of listening in a

14  little bit.

15       THE WITNESS:  I did.

16       JUDGE STECKLER:  Okay.

17       Go ahead.

18  Q    BY MR. WIESE:  Were you interested in the topic of step

19  increases at that time?

20  A    Very much so.

21  Q    Why?

22  A    Well, I kind of feel like, you know, with what was being

23  said, I really felt that it was my duty to explain to her that

24  the contract that the company had proposed was not fair, and it

25  was not good.  I really wanted to set the record straight.  That

1    was really, really important for her to hear, I thought, from

2    somebody who was actually on the same level that she is.  You

3    know, we're on the same level.

4    Q    Is this why you waited?

5    A    It is.  And I would also like to say that if they wanted to

6    have a private conversation they could have shut three doors.

7    There was only one door out of four shut.  They could have shut

8    three of them.

9    Q    And so how long were you listening to this conversation

10   for?

11   A    Fifteen minutes at least, I'd say -- 15, almost twenty.

12   Q    And who did most of the talking during that conversation?

13   A    Mostly, Michael Henry, but Mary Kay did talk too.

14   Q    And what did you do after that conversation -- or after

15   leaving?

16   A    After leaving, I texted Brian immediately and told him

17   exactly what had happened and exactly what was heard.

18       MR. WIESE:  All right, Your Honor, the following line of

19   questions is in support of Complaint allegation 12(a).

20   Q    BY MR. WIESE:  Ms. Schroeder, at the contract negotiations

21   that you attended, did the employer ever show up late to any of

22   those sessions?

23   A    Yes.

24   Q    How many times?

25   A    I'd say at least half.

1   Q    And how late were they?

2   A    It could be anywhere from 10 minutes to, you know, almost a

3   couple hours.

4   Q    Do you ever recall any Union representatives objecting to

5   the employer showing up late at these sessions?

6   A    I do.

7   Q    Who do you recall?

8   A    Nancy.

9   Q    And what would -- are you talking about Nancy Goldman?

10  A    Yes.

11  Q    What would Ms. Goldman say?

12  A    She was very colorful about it.  She would tell them every

13  single session that "You're wasting our time," a little more

14  colorfully than that, but she --

15      JUDGE STECKLER:  Go -- if you recall, could you give us the

16  exact words?  We don't care if it's bad language.

17      THE WITNESS:  Verbatim, I don't remember what exactly she

18  said, but it was basically to the tune of, "You're wasting

19  everybody's time," and "You have everybody out of here working

20  why can't you just show up on time," you know --

21  Q    BY MR. WIESE:  Do you know whether the employer ever

22  provided notice that it was going to be late at any of these

23  sessions?

24  A    I think a couple of them in the morning they said they were

25  printing, you know they were making some copies, things like

1    that, that would normally be, you know, it's like, okay, you're

2    going to make a couple of copies but, you know, being a couple

3    hours late coming in with, you know, five or six or ten copies

4    for twenty-two people to share, that doesn't really seem

5    excusable to me.

6    Q    Were you in the bargaining room when you were told that

7    they were going to making copies?

8    A    Yes.

9    Q    Are there ever any occasions where you remember the

10   employer's negotiators leaving early without telling the Union?

11   A    Yes.

12        MR. TERRELL:  Objection:  foundation.

13        For the part of the question about leaving early without

14   telling the Union they were leaving early, she -- a foundation

15   needs to be established that she knows this.

16        JUDGE STECKLER:  Why don't we break it up?

17        Was there a time when the -- that you recall that the

18   employer left negotiations early?

19        THE WITNESS:  Yes.

20        JUDGE STECKLER:  Okay.

21        Mr. Wiese, you can pick it up.

22   Q    BY MR. WIESE:  What happened that time?  Or when was that,

23   first?

24   A    I don't --

25   Q    Or actually, here let me -- see if this will help you out.

1    (Witness proffered document.)

2    Q    So this is Joint Exhibit --

3        MR. TERRELL:  Your Honor, what's -- I don't know what he's

4    showing her and --

5        MR. WIESE:  It's Joint Exhibit 1, Mr. Terrell.

6        MR. TERRELL:  Okay.

7        But you must first establish that there is a need to

8    refresh recollection before showing --

9        MR. WIESE:  The exhibit is in evidence.

10        MR. TERRELL:  It's in evidence, but you're showing it to a

11    witness, and you -- if the purpose of giving it to her is to

12    refresh recollection, you must first establish that her

13    recollection needs to be refreshed.  And there hasn't been

14    testimony to establish that.

15        MR. WIESE:  May I respond, Your Honor?

16        JUDGE STECKLER:  Please.

17        MR. WIESE:  The exhibit is in evidence.  She's allowed to

18    look at the evidence that's in the record.  She hasn't responded

19    specifically when the date is.  I just asked -- I was in the

20    process of asking that question, and then I wanted to show her

21    evidence that's already in the record about when the bargaining

22    dates were.  It doesn't say anything on that stipulation about

23    which sessions the employer left early, it's just a way for her

24    to be specific about when the sessions were.

25        JUDGE STECKLER:  I think it goes to the credibility of the

1  witness, witness' recollection of dates, so I'll weight it based

2  on that.

3        I'm sorry, Mr. Wiese, go ahead.

4  Q    BY MR. WIESE:  So you can look at Joint Exhibit 1 if you'd

5  like -- this has the dates that the parties have agreed to that

6  negotiations took place.

7        When do you recall the employer leaving negotiations early?

8  A    April 28th.

9  Q    And what do you recall happening that day?

10 A    They had left -- I need to think for a minute here.

11 Q    No, that's fine.

12 A    Okay.

13 (Pause.)

14 A    So they had left to make some copies. They were going to

15 make copies for everybody in the session.  We waited for, I

16 believe, 2 hours, maybe two and a half hours, for them to

17 return.  Actually at the beginning of that day, they were told -

18 - I was there when they were told that Martin and Nancy had to

19 be gone by 5:00 that evening.  And they -- actually it was 5:15

20 or 5:30, I believe, and you know, the Union said "We're going to

21 stop this.  We're not going to wait around for them any longer."

22 And then when Martin and Nancy were at the elevators leaving,

23 the company had showed up with two copies of the contract that

24 they were proposing, only two.  They gave one to Nancy and they

25 gave one to Brian Brandt.

1  Q    Do you remember who handed those contract offers to the

2  Union representatives?

3  A    I didn't see it, but I was told.

4  Q    Okay.  Is it your understanding that the contract offer

5  that the Union representatives received that day was the

6  employer's --

7       MR. TERRELL:  Objection:  leading.

8  Q    BY MR. WIESE:  -- last, best, and final offer?

9       MR. TERRELL:  Objection:  leading.

10      JUDGE STECKLER:  Please rephrase.

11 Q    BY MR. WIESE:  If you are aware, what contract offer was it

12 that the Union representatives were handed that day?

13      MR. TERRELL:  Objection:  leading.

14      She hasn't testified that it was a contract offer.

15      JUDGE STECKLER:  I thought she -- what documents did they

16 receive that day?

17      THE WITNESS:  That day, they just received another contract

18 like any other contract they have every single -- almost every

19 single negotiation session that we had gotten a brand new

20 contract.

21      JUDGE STECKLER:  How were you made aware that it was a

22 contract?

23      THE WITNESS:  I was told.  Brian Brandt came back into the

24 room.  Martin and Nancy left.  Brian came back in.  All the

25 negotiation members were still in there.

1        MR. TERRELL:  Move to strike: hearsay.

2        JUDGE STECKLER:  I think it's present sense impression.

3   It's just what she was told and what happened afterwards.

4        So let me -- so was Brian -- was it Brian that came in and

5   told you that?

6        THE WITNESS:  Mmm-hmm.

7        JUDGE STECKLER:  What happened after that -- was it Brian?

8        THE WITNESS:  Yes.

9        JUDGE STECKLER:  She said "yes."  I'm sorry, it doesn't

10  pick up "Mmm-hmm's" and "Uh-huh's" very well. So Brian came in,

11  and what happened after that?

12       THE WITNESS:  Then we all left.  We all went home.  We were

13  going to set up some more dates to negotiate again.  That was

14  it. That was it, there was no -- nothing.  It was just, we are

15  going to meet again.

16       JUDGE STECKLER:  And how -- if you recall, how long were

17  you waiting?

18       THE WITNESS:  Two, two and a half hours for them to come

19  back into the room.

20       JUDGE STECKLER:  And why do you remember April 28th

21  specifically?

22       THE WITNESS:  It was the last negotiation session that we

23  had until the most -- the very last one that we had.  So we

24  waited several months in between, so we had this one, and then

25  after that they all -- nothing happened.  And then the company

1  decided to come back in September to negotiate some more.

2      JUDGE STECKLER:  Mr. Wiese, you may continue.

3      MR. WIESE:  Okay.

4      All right.  So, Your Honor, the following line of questions

5  is in support of Complaint allegations 12( c ) and (d).

6  Q    BY MR. WIESE:  Ms. Schroeder, do you remember the employer

7  presenting pie charts at negotiations?

8  A    I do.

9  Q    And how many sets of pie charts did you receive?

10 A    We received six pie charts per Union employee for of the

11 hotels, so boxes and boxes and boxes of pie charts.

12 Q    Is it your understanding that these pie charts represented

13 the employer's wage offer?

14 A    Yes.

15 Q    Why is that?

16 A    Because on them they showed percentage increases throughout

17 the years of, I guess, the contract term that they were

18 proposing.

19 Q    And did you have a chance to review your pie chart?

20 A    I did.

21 Q    And were there issues with your pie chart?

22 A    There were.

23 Q    What were they?

24 A    My base pay was wrong to start.  There were -- I mean

25 specifically that was what was wrong at the very, you know, the

1   bottom level.  My wage was wrong.  They had it that I was being

2   paid more than what I'm actually getting paid as my actual wage.

3   Q    Were there any other issues with the pie charts that you

4   saw?

5   A    Yeah, in it, they had what it was the "TSWTRW" total wage -

6   - I don't know.  It -- they had on there for every employee

7   bereavement pay, jury duty; they had -- I mean -- I'm -- I don't

8   know.  It was like Chinese.  I mean, it didn't make any sense.

9   It really didn't make any sense.  I didn't understand how that,

10  you know, it's not -- were they writing every individual

11  person's pie chart into the contract because I thought that

12  that's what we were doing, and that's what the contract

13  negotiations were to negotiate a contract, and a pie chart's not

14  going in a contract.

15  Q    And did any of the Union representatives ever raise any of

16  the objections -- these objections at the table?

17  A    Yeah.

18  Q    Who?

19  A    Brian did.  Nancy certainly did.

20  Q    And did the employer attempt to explain any more about

21  these pie charts?

22  A    They did.

23  Q    Who did that?

24  A    Leslie did.  Leslie tried to explain it.

25  Q    And how did that go?

P 00557

1  A    Not well.

2  Q    Could you elaborate?

3  A    She sounded like after the first time that Nancy spoke to

4  her -- I know Nancy's kind of, you know, an aggressive kind of

5  person.  Leslie is not.  She kind of sounded like she was almost

6  going to start crying even though it wasn't, you know, mean,

7  it's just Nancy's kind of a loud, you know, kind of person.  But

8  Leslie wasn't really able to even answer the questions as to why

9  because I don't really think there was a "why".  I don't think

10  the "why" was ever explained.

11  Q    Do you remember Nancy raising a lot of objections about

12  these pie charts?

13  A    Yes.

14    MR. WIESE:  Nothing further.

15    JUDGE STECKLER:  Mr. Terrell, cross?

16    MR. TERRELL:  I'd like to see all of the Jencks affidavits,

17  and anything attached to reference.

18    MR. WIESE:  Seven page affidavit -- yes, 7-page affidavit,

19  looks like about 20 pages of bargaining notes, and one one-line

20  e-mail.

21    MR. TERRELL:  Twenty pages of bargaining notes. I'm going

22  to need about an hour for this, Your Honor.

23    MR. WIESE:  Your Honor --

24    JUDGE STECKLER:  Let me ask Mr. Terrell, how's the

25  handwriting on the bargaining notes?

P 00558

1       MR. TERRELL:  I'm sorry?

2       JUDGE STECKLER:  How's the handwriting on the bargaining

3   notes?

4       MR. TERRELL:  It's not too bad.

5       JUDGE STECKLER:  Legible?

6       MR. TERRELL:  It's not too bad.

7       JUDGE STECKLER:  Okay, you didn't go to medical school, did

8   you?

9       THE WITNESS:  No, ma'am.

10      JUDGE STECKLER:  Okay, good news.

11      An hour?  How about forty-five and give me a holler at that

12   time and see how you've progressed.

13      MR. TERRELL:  Okay.   Thank you.

14      JUDGE STECKLER:  Okay, thank you.

15      So we'll reconvene by 3:15.

16      We will be off the record.

17  (Off the record.)

18      JUDGE STECKLER:  We're back on the record.

19      Ms. Schroeder has taken her seat.  Ms. Schroeder, please

20   remember that you are still under oath.  Mr. Terrell, are you

21   ready for your cross?

22      MR. TERRELL:  Yes.

23                          CROSS-EXAMINATION

24   Q   BY MR. TERRELL:  Good afternoon.

25   A   Hi.

1     MR. TERRELL:  I want to first ask the witness some

2  questions about the bargaining notes that she took that I was

3  handed.  Of course, I only have one copy, so I need to approach

4  the witness so I can ask her questions about the document.

5     JUDGE STECKLER:  Okay, unless General Counsel has an extra

6  copy that they can put in front of her.

7     MR. WIESE:  We do, Judge.

8     MR. TERRELL:  I may still need to approach the witness at

9  points because the pages aren't numbered.

10     JUDGE STECKLER:  Okay.

11     MR. TERRELL:  Maybe we could do that now?  Might make

12  things easier.

13     MR. WIESE:  Well, what would you like to do?

14     JUDGE STECKLER:  How many pages are there?

15     MR. TERRELL:  I haven't counted them, but I could hand-

16  write the numbers on here --

17     JUDGE STECKLER:  Okay.

18     MR. TERRELL:  -- for the one that will go into evidence.

19     JUDGE STECKLER:  Do you want to admit it as evidence.

20     MR. TERRELL:  Maybe.  I'm not sure.  If it does go into

21  evidence, we would certainly want to.

22     JUDGE STECKLER:  Certainly.  Can we all start numbering?

23     MR. WIESE:  Mmm-hmm.

24     JUDGE STECKLER:  We'll go off the record for about one

25  minute so everybody can start numbering.

1  (Off the record.)

2      JUDGE STECKLER:  Back on the record.

3      In the mean time, the parties numbered --

4      MR. TERRELL:  Sorry?

5      JUDGE STECKLER:  I'm just clarifying on the record that the

6  parties have numbered three copies of Ms. Schroeder's bargaining

7  notes.

8      MR. TERRELL:  Okay.

9      JUDGE STECKLER:  And you said that you wanted to question

10  her about that, Mr. Terrell.

11      MR. TERRELL:  Yes, and I'll hand her one of the numbered

12  copies.  They have 47 pages.

13  (Witness proffered document.)

14  Q     BY MR. TERRELL:  Ms. Schroeder, these bargaining notes that

15  we've placed in front of you, is all of this in your

16  handwriting?

17  A     I can take a minute to look through it for you.

18  Q     Sure.

19  (Pause.)

20  A     No, it's not.

21  Q     What's not in your handwriting?

22  A     There are -- me and Leah Riley were writing to each other

23  back and forth and so those were in there just as --

24  Q     Okay, where in this document is handwriting by Leah Riley?

25  A     Page --

1   Q     Refer to the page numbers.

2   A     Page 25 and 26.

3   Q     Okay, let me -- let me ask you, on page 25, the top half of

4   that page, the handwriting appears to be larger, is that her

5   handwriting?

6   A     Actually, everything on the page is her handwriting except

7   for two statements I wrote.

8   Q     Which are your two statements?

9   A     I wrote "Everywhere is", and "It's not that great", and

10  "And our managers are fucking idiots".

11  Q     Okay.  But everything else on this particular page is her

12  handwriting?

13  A     Correct.

14  Q     And page 26, there's just one, two, three, four, five

15  words.  Whose handwriting is that?

16  A     That is hers.

17  Q     That's hers.  Okay.  Is there anybody else's handwriting on

18  any other page other than yours?

19  A     Only the numbers that you guys numbered.

20  Q     Okay.  All right. Now --

21  A     That I see.

22  Q     I'm sorry?

23  A     That I see for right now, I didn't notice anything else.

24  Oh, and my name on the very first page was, I think, written by

25  someone in order to keep them separate from somebody else's.

1    Q    Where it says "Kelli 'S'"?

2    A    Mmm-hmm.

3    Q    Someone else wrote that.

4    A    Yeah.

5    Q    But the names above, it looks like "Mike", "Charissa",

6    "Paul", "Chad", "Mary Kay", you wrote those names?

7    A    Correct.

8    Q    And are those names of other persons who were attending

9    this particular session?

10   A    Correct.

11   Q    And over the top left corner there are two dates -- what

12   appear to be dates -- that are legible and it looks like there's

13   a date above that that maybe was cut off by the photocopying,

14   but the dates I can see are 2/5 and 2/13.  Are those dates?

15   A    Yes.

16   Q    What do those dates indicate?

17   A    To -- I don't exactly recall, but I believe they were

18   sessions attended or I believe that they were the sessions

19   attended.

20   Q    Well, the notes on the rest of page one, are these notes

21   from a session that you were actually sitting in?

22   A    Yes.

23   Q    And what session was that?

24   A    I don't know, it's not dated.

25   Q    Would it have been on February 13 or after February 13?

1   A    I believe so.

2   Q    Okay.  So you were not in the January 20 meeting or the

3   January 29 meeting?

4   A    I was at all the meetings.

5   Q    You sure about that?

6   A    I thought I was at all of the meetings that we were all

7   present for, all of the negotiation members.  I went to all of

8   the meetings.

9   Q    You testified under oath an hour ago that you attended

10  eleven meetings.  Do you recall that testimony?

11  A    I do.

12  Q    Do you recall giving an affidavit to the National Labor

13  Relations Board on June 29 of this year?

14  A    I do.

15  Q    Isn't it true that at that time -- do you recall that when

16  you gave that affidavit you were giving your statement under

17  oath at that time?

18  A    I do.

19  Q    Just like you're giving your statement under oath today.

20  A    Yes, sir.

21  Q    Isn't it true that you testified at that time that you had

22  only attended six meetings?

23  A    I believe it was six to eight, but yes I'm -- it is correct

24  that that is what I answered.

25  Q    So you testified under oath that you attended six, eight,

1    or eleven.  Which is it?

2    A    In my --

3         MR. WIESE:  Objection: argumentative.  I mean her testimony

4    speaks for itself.

5         MR. TERRELL:  I'm asking a question.  She's testified to

6    three different numbers.

7         JUDGE STECKLER:  What's your best recollection on the

8    number of sessions that you attended?

9         THE WITNESS:  To be honest, ma'am, I have no idea.  I have

10   three children.  I have two jobs. I have a very, very busy life.

11   I work opposite shifts from my husband keeping things, tracked,

12   you know -- it's kind of hard for me to recall exact numbers.

13        MR. TERRELL:  Well, do you --

14        JUDGE STECKLER:  Let me ask one more question, Mr. Terrell.

15        MR. TERRELL:  Okay.

16        JUDGE STECKLER:  If that's the case, what made you say

17   eleven in the beginning?

18        THE WITNESS:  I know that there have been eleven sessions

19   and I know that I've attended all of the sessions that have

20   been, you know, open for us to attend, all the negotiation

21   committee members.  What I had said in June is accurate.  If

22   that is what I believed was the truth then, that is what I

23   believed was the truth then. Obviously some things aren't

24   exactly crystal clear.

25   Q    BY MR. TERRELL:  So is it now your testimony you only

1  attended six meetings?

2      JUDGE STECKLER:  I think that was --

3      THE WITNESS:  No.

4      JUDGE STECKLER:  I think that was "no."

5      THE WITNESS:  I testified today that I attended eleven, all

6  the sessions, but --

7  Q   BY MR. TERRELL:  Are you aware that all of the sessions,

8  with the exception of the September session, that all of the

9  sessions that took place occurred before you gave this affidavit

10  in June?

11  A   Yes.

12  Q   And, in June, which was closer in time to the sessions --

13      MR. WIESE:  Mr. Terrell, could you tell me what you're

14  pointing to in the affidavit?

15      MR. TERRELL:  Yes.

16      On page 2, line four, and five, and six.

17      MR. WIESE:  Okay.

18  Q   BY MR. TERRELL:  In June, when you gave this affidavit, it

19  was closer in time to your actual attendance at the bargaining

20  sessions, correct?

21  A   Correct.

22  Q   And your memory would have been better in June than it is

23  today, correct?

24  A   That was my daughter's birthday, so, no, not necessarily.

25  There's a lot going on in June.

1    Q    Well, ma'am, I understand you have a busy life.  It is

2    important for you to be as accurate and to testify honestly as

3    you started out when you responded to the Judge.  Honestly, you

4    said you were busy and you weren't sure, but these are important

5    matters to the people in this room, and we need you to be

6    accurate and honest.

7         So was it six meetings or was it eleven?

8    A    I attended every session, every session.

9    Q    Okay.  You didn't take any notes, though, on January 20 or

10   January 29, did you?  You're not sure if you took the ones here

11   on the 13th or the 5th or whenever.

12   A    As you can see they're not really dated.

13   Q    Well you do have dates in here.  So on the first page,

14   again, we have the ambiguous date references in the top left

15   corner. And I'd like you to flip through and show me the next

16   date.  I will tell you what date I find.  On page 9, I see a

17   date reference to 2/13/15, February 13, 2015. Do you see that?

18   A    Yes.

19   Q    Are we to understand that the notes that follow after your

20   entry of 2/13/15 are notes you took on February 13, 2015?

21   A    I would assume so.  I put the date there.

22   Q    Okay.  Well, I can only assume.  You know, because these

23   are your notes, right?

24   A    Yes, sir.

25   Q    And are we to -- am I to assume -- I'm asking you for what

1  you know -- I'm the one making an assumption and I'm asking for

2  you to correct it or affirm it.  Am I correct in assuming that

3  the pages that precede page 9 were taken by you at a previous

4  bargaining session?

5  A    Yes, they did.

6  Q    So the first eight pages is one bargaining session, right?

7  A    Yes.

8        MR. WIESE:  Objection.

9        THE WITNESS:  I believe so.

10       MR. WIESE:  That mischaracterizes the testimony.

11       MR. TERRELL:  No, I don't think it does.  She said pretty

12  clearly that all the pages preceding page 9 were taken at one

13  bargaining session, right?

14       THE WITNESS:  These might not have been in order.  I don't

15  really know.  I can't honestly answer that.

16  Q    BY MR. TERRELL:  On page 9 you did, though, handwrite the

17  date entry 2/13/15, right?

18       MR. WIESE:  Objection:  asked and answered.

19       MR. TERRELL:  Well, I'm just laying a foundation for my

20  next question.

21       JUDGE STECKLER:  Laying a foundation, go ahead, Mr.

22  Terrell.

23       You can answer, please.

24       THE WITNESS:  On page 9 I did write the date, yes.

25  Q    BY MR. TERRELL:  All right.  And then the next page, page

1  10, the date at the top is 2/26.  Is that your handwriting?

2  A    Yes, sir.

3  Q    And that indicates that this is the date of this meeting

4  for the notes that follow that date entry, is that correct?

5  A    Correct.

6  Q    And then we go to page 17.  And the date -- I see a date

7  entry at the top right corner, Friday February 27, is that

8  correct?

9  A    Correct.

10  Q    Is that your handwriting?

11  A    Yes, sir.

12  Q    And are the notes on this page, that follow from this page,

13  taken on that date of February 27?

14  A    Yes, sir.

15  Q    The next page I see is page 23.  That is the next page with

16  a date entry that I see is page 23, please you look at it

17  yourself and see if I'm correct in stating this, the next date

18  entry is March 16, 2015 on page 23, is that correct?

19  A    Correct.

20  Q    And if you would continue flipping through until we hit

21  another date.  I'll tell you the first one I see.  If you see

22  one sooner, let me know.  The next one I see is page 34, and

23  that's March 24, is that correct?

24  A    Correct.

25  Q    So is that your handwriting?

1   A    Yes.

2   Q    So the notes that follow March 24 are your notes from the

3   bargaining session on March 24, is that correct?

4   A    Correct.

5   Q    The next date entry I see is on page 40, and that date

6   entry appears to be April 16, 2015, is that your handwriting?

7   A    Correct.

8   Q    And are these notes that follow that date entry, the notes

9   that you took on that day?

10  A    Yes.

11  Q    The next and last date entry I see if April 28, which is on

12  page 46.  Is that your handwriting?

13  A    Yes, sir.

14  Q    And is that the next date entry?

15  A    Yes, sir.

16  Q    And the notes here that follow are the notes that you took

17  on April 28.

18  A    Yes, sir.

19  Q    Now, I noticed that, in going through these dates, there

20  were only two dates that were back to back, and that was

21  February 26 and February 27.  Do you agree with that?

22  A    No, I don't believe so.

23  Q    You agree that February 26 --

24  A    Oh, February.

25  Q    -- and February 27 are back to back days, correct?

1    A    Yes, I do.

2    Q    Isn't it true that -- to the best of your knowledge, to the

3    best of your attendance, isn't it true that those were the only

4    two days in the bargaining throughout in which the parties met

5    for two consecutive days?

6         MR. WIESE:  I'm going to object, Your Honor.  I mean we

7    have a stipulation that has the bargaining dates on here.

8         MR. TERRELL:  This is foundation for another question, Your

9    Honor.

10        JUDGE STECKLER:  Okay.

11        THE WITNESS:  Sure.  I mean I don't know.  I don't know.

12   Q    BY MR. TERRELL:  So, isn't it true that, to the best of

13   your knowledge, that there were only two days of bargaining that

14   were held consecutively back to back days?

15   A    To the best of my knowledge, I can't answer that question.

16   Q    Well you've got the document in front of you.  Are there

17   any dates in the document in front of you that reflect back to

18   back consecutive days of bargaining?

19   A    I can't answer that question.

20   Q    Why not?  It's right there in front of you.

21   A    I don't know.  I don't see dates.

22   Q    Well we just went through the dates.  We identified that

23   dates and you testified that you hand wrote those dates, and you

24   testified you hand wrote those dates on the dates of the

25   bargaining.

1          MR. WIESE:  I'm going to object, Your Honor.  I mean we

2     went through every single date in this contract proposal.  The

3     document speaks for itself.

4          MR. TERRELL:  Your Honor, I would appreciate counsel not

5     making speaking objections that are intended to coach the

6     witness.

7          JUDGE STECKLER:  Well I understand the nature of his

8     objection.  It's --

9          Ms. Schroeder?

10         THE WITNESS:  Yes.

11         JUDGE STECKLER:  Based on the testimony you just gave about

12    your document, when you went through the dates, can you recall

13    any dates being back to back other than 2/26 and 2/27 of this

14    year?

15         THE WITNESS:  Can I recall it?  Not really.  I don't even

16    honestly recall these two being back to back. There's just --

17    it's in my notes, so these obviously were back to back.  I don't

18    --

19         JUDGE STECKLER:  Are you saying you don't have an

20    independent recollection?

21         THE WITNESS:  I don't have an independent recollection of

22    it.

23         JUDGE STECKLER:  Does that help a little bit, Mr. Terrell?

24         MR. TERRELL:  That's her answer.  That's her answer.

25    Q    BY MR. TERRELL:  Isn't it true that the company, quite a

1  few times, asked for back to back bargaining dates, and that

2  that request was refused by the Union?

3       MR. WIESE:  Objection:  foundation.

4       JUDGE STECKLER:  I think it's cross.  I'll go ahead and let

5  --

6       MR. TERRELL:  Plus this witness testified she is a trustee

7  and very active, and that she said she attended all the

8  bargaining sessions.

9  Q    BY MR. TERRELL:  So my question to you is, isn't it true

10  that the company, the employer, the hotel, isn't it true that

11  they asked repeatedly for back to back meetings to facilitate

12  bargaining and the Union refused, with one exception, February

13  26 and 27.  Isn't that true?

14       JUDGE STECKLER:  Let me ask -- Mr. Terrell, can I ask a

15  question about your question?  I know.  Very unique

16  circumstances.  Are you saying that in bargaining, these

17  requests were made?

18       MR. TERRELL:  Yes.

19       JUDGE STECKLER:  Okay.

20       MR. TERRELL:  That's the premise of my question.

21       JUDGE STECKLER:  Okay.

22       MR. TERRELL:  I'm asking this witness if she is aware of

23  that.

24       JUDGE STECKLER:  Okay, well it didn't -- you didn't say

25  that it was during the bargaining sessions because there could

1  have been written communications as well, but there --

2       MR. TERRELL:  In any --

3       JUDGE STECKLER:  Just for a point of clarification.

4  Q    BY MR. TERRELL:  In any way, shape or form, were you made

5  aware that the company requested, whether in writing or

6  verbally, were you made aware that the company requested back to

7  back consecutive days of bargaining to facilitate bargaining,

8  and that those requests were denied, with one exception,

9  February 26 and 27?  Were you aware of that?

10 A    Yes.

11 Q    And you were aware -- okay.  I'll leave it right there.

12      Now, I want to ask you a few questions about what I find in

13 these notes.  The first several sessions that you have here,

14 there was a lot of talk about the TCS contract.

15 A    Correct.

16 Q    Is that a yes?

17 A    Yes.

18 Q    The Textile Care Services.

19 A    Yes.

20 Q    And, in fact, Textile Care Services personnel were

21 attending those sessions, correct?

22 A    Yes.

23 Q    Are you aware that subsequently in the summer of 2015 that

24 Nancy Goldman, Martin Goff, Arch Stokes, who is sitting here

25 with me, met and agreed on a collective bargaining agreement --

1    separate collective bargaining agreement for Textile Care

2    Services?

3    A    Yes.

4    Q    Did you attend any of those sessions?

5    A    For TCS?

6    Q    Yes.

7    A    Separately?

8    Q    Yes.

9    A    No.

10    Q    You didn't attend those sessions?

11    A    No -- no.

12    Q    But you aware that a contract was successfully reached

13    there, in those negotiations.

14    A    Yes.

15    Q    Are you aware that pie charts were attached to, and made a

16    part of, those -- the collective bargaining agreement that was

17    reached at Textile Care Services?

18        MR. WIESE:  Objection, Your Honor:  relevance.

19        MR. TERRELL:  If she knows.  I'm asking her if she knows.

20    And it is relevant in this case because this case is all about

21    pie charts it seems.  And we're talking about the same

22    negotiators, the same parties.

23        MR. WIESE:  Well, then I'm going to object on best

24    evidence.  I mean if they want to talk about the TCS contract

25    and they have a copy of it --

1        MR. TERRELL:  -- by asking this witness that question.

2        JUDGE STECKLER:  Let me think for just a moment, here.

3   We're talking about the TCS contract -- if she was not a part of

4   that contract negotiation, are you asking her this as the Union

5   trustee or --

6        MR. TERRELL:  Yes.  She is aware of the contract, she is

7   aware of the negotiations, she is aware it was successful, she's

8   a trustee with the Union.

9        JUDGE STECKLER:  I think the question, then, is have you

10  seen a copy of the TCS contract?

11       THE WITNESS:  I saw the book.  I did not see its contents.

12       MR. TERRELL:  Is --

13       JUDGE STECKLER:  Does that give you the answer?

14       THE WITNESS:  I saw it was orange.

15  Q    BY MR. TERRELL:  When you saw it, did you observe that

16  there were pie charts attached to it?

17  A    Like I said, no.  I only saw the outside of the book.

18  Q    Okay.

19       Now on the bargaining session on February 26, which starts

20  at page 10, and if you would look over to page 11, a little less

21  than half way down you start to see numbers on the left-hand

22  column.  The first one I can really make out is a number, and

23  has the letter "S", so S-5, S-9, S-15, and then a little over

24  half way down, you'll see it runs sequentially, 16, 17, 18, et

25  cetera.  Again, this is your handwriting.

1   A    Yes.

2   Q    And these numbers that you wrote here -- they correspond to

3   the numbers in the company's proposal, correct?

4   A    Correct.

5   Q    All right.  And I observe on page 11, 12, there is

6   something that's written that is unrelated to your notes.  It

7   appears to collective bargaining, is that a fair statement?

8   A    Oh, it's -- it was just my personal opinion.

9   Q    On page 12.

10  A    Yes, sir.

11  Q    There are one, two, three, four, five, six words totally on

12  that page, and it's just your opinion.

13  A    Yes.

14  Q    It's not your intent to capture what was going on in the

15  collective bargaining.

16  A    It was my reaction to what was going on.

17  Q    Okay.  So on page 11, skipping over page 12, and then

18  picking up again on page 13.  The last section number on page 11

19  is number 27, the first one on page 13 -- looks like you skipped

20  over 28, maybe that's because you were expressing your feelings

21  while that part of the discussion was going on on page 12; but

22  then on page 13 you picked up with 29 and it goes sequentially

23  29, 30, 31, all the way through number 146 on page 17.

24       Have I accurately described what appears here?

25  A    So far.  I could read through the numbers if you give me

1    some -- a couple minutes.

2    Q    Well, you don't need twenty minutes.

3    A    No, I --

4    Q    You see at the top of page 13 you have number 29?

5    A    Can I read through the numbers just to make sure they're

6    all in order, and I didn't -- because sometimes numbers get

7    skipped.

8    Q    Okay.

9    A    For some things we can't negotiate immediately.

10    (Pause.)

11        THE WITNESS:  It doesn't -- what number did you say it went

12    sequentially to?

13    Q    BY MR. TERRELL:  Well, here's what I'm observing, first of

14    all, back on page 11 it starts at 5, runs through 27, on page 13

15    it starts at 29 and runs through 46, correct?

16    A    Yes.

17    Q    Then on page 14 it picks up with 47 and runs through 76,

18    correct?

19    A    Yes.

20    Q    And on page 15, it picks up with 77 and runs through 100.

21    A    Incorrect.

22    Q    101.

23    A    No.

24    Q    Well, then what is that?

25    A    Missing 91.

1  Q    Missing 91 -- okay, missing 91.  But then it continues on

2  through 101 on page 15, correct?

3  A    Correct.

4  Q    Then on page 16 it picks up with 102 and runs through 130,

5  correct?

6  A    Correct.

7  Q    And then looks like you skipped over 131 through 134,

8  correct?

9  A    Correct.

10  Q    And then on page 17 you picked up with number 135 and

11  carried on down to 146.

12       MR. WIESE:  Objection, Your Honor.  I mean the document

13  speaks for itself.

14       MR. TERRELL:  Document's not in evidence.

15       MR. WIESE:  Well --

16  Q    BY MR. TERRELL:  Is that correct, 146?

17       JUDGE STECKLER:  Well, I think under the circumstances

18  since -- any other person who is going to read this record after

19  us is going to want to know this, so at some point we're going

20  to have to put it in.

21       MR. TERRELL:  Okay.

22  Q    BY MR. TERRELL:  Right now, I just want to get your

23  correction, down through -- confirmation -- down through number

24  146.

25  A    Yes.

1  Q    So all of these provisions were discussed during the course

2  of this bargaining session?

3  A    Well this is separate ones, but -- separate bargaining

4  sessions, but yes.

5  Q    Well all of this happened on -- oh, actually you're

6  correct.  The last set from 135 through 146, that was discussed

7  the following day on February 27, correct?

8  A    Correct.

9  Q    Okay. On page 18, you have letters out to the left that

10  appear to me to indicate speakers.

11  A    Yes.

12  Q    "N" would be Nancy?

13  A    Yes.

14  Q    "M" would be Martin Goff?

15  A    Yes.

16  Q    Okay --

17  A    Well, no. There are two "M's".

18  Q    Well there's "MH", is Michael Henry, correct?

19  A    Yes, and "MU" is Martin from the Union.

20  Q    "MU" is Martin?

21  A    "MU", and the page before I have a little key.

22  Q    Where is that?

23  A    That I started doing -- on the page before, page 17.

24  Q    On page 16?

25  A    And it shows -- 17.

1  Q    Wait, I'm sorry, on page -- what page?

2  A    17, the start of the day.

3  Q    Oh, I see.  So "MU" stands for Martin with the Union.

4  A    Yes.

5  Q    Got it.  Okay.  Now at this point in the negotiations on

6  February 27, bottom of page 17, top of page 18, you were talking

7  -- the group, the parties, were talking about wages, correct?

8  A    Umm -- it appears to be so.

9  Q    And at the top of page 18 you have "MH continued".  In

10  other words you were writing down what Michael Henry was saying

11  in a continuation of his comments.

12  A    Yes.

13  Q    And Mr. Henry, at that point, made the comment that "needs

14  will be met, currently above competitive rates".  Do you see

15  that -- where you wrote that?

16  A    I do.

17  Q    And that was Michael Henry referring to the company's wages

18  and he was asserting -- I'm not asking if you to agree with it

19  or not, I'm just asking you, isn't it true that Mr. Henry

20  asserted that the wages were currently above competitive rate?

21  A    Correct.

22  Q    And then Martin Goff asked the question, "how does this

23  affect our current members", is that -- did I read correctly

24  what Martin Goff said at that point?

25  A    You read that correctly.

388

1  Q    And the pie charts were in the discussion at that point,

2  were they not?  You had seen pie charts, they had been presented

3  to you up to that point?  Or some of them had.

4  A    I can't testify to that with certainty.  If that was on

5  this day or a different day.

6  Q    Okay. On page 20, top of the page you'll see more exchanges

7  between Martin and Mr. Henry, and on the one, two, three, four,

8  fifth line down, Martin Goff stated the question "what is the

9  floor and what is the ceiling", do you see that?

10 A    Yes.

11 Q    Did I read that correctly?

12 A    Yes.

13 Q    And is that what Martin, in fact, asked?

14 A    Yes.  There's a lot of stuff that does get missing because

15 I can't write that fast, so -- but yes.

16 Q    I understand.  I understand.  You're not a stenographer.

17 A    No.

18 Q    On March 16, page 23, you made a note that a federal

19 mediator was present during that bargaining session, correct?

20 A    Correct.

21 Q    And it's true, isn't it, that it was the company that

22 requested to have the mediator present.

23 A    I am not -- I don't know.

24 Q    Isn't it true that the Union did not want the mediator

25 there, and expressed opposition to the idea of having the

1   mediator present, isn't that true?

2   A    I do not know.

3   Q    On page 27, which would be part of the March 16 bargaining

4   session -- first of all, let me confirm your agreement with that

5   premise.  The notes you took on page 27 are part of the March 16

6   discussions, correct?

7   A    Correct.

8   Q    With the mediator present, correct?

9   A    Yes.

10  Q    Did the mediator speak privately with the Union during the

11  Union's caucus at any point on that day?

12       JUDGE STECKLER:  Mr. Terrell, I'm going to --

13       MR. TERRELL:  I'm not going to ask any questions about

14  discussions with the mediator.

15       JUDGE STECKLER:  Okay.

16       MR. TERRELL:  I'm just establishing that the mediator was

17  present.

18       JUDGE STECKLER:  Okay.

19       THE WITNESS:  She was present.

20  Q    BY MR. TERRELL: In your private caucuses?

21  A    She left ours to go to theirs, yes.

22  Q    She was in yours as well, correct?

23  A    For a few minutes.

24  Q    For just a few minutes?

25  A    I mean that's what I remember her, but I usually take my

1    breaks right when we caucus, I go smoke.

2    Q    Oh.

3    A    So that's usually after sitting through an hour or two.

4    Q    So she may have been in the meeting -- in the caucus

5    sessions with the Union for longer.  You don't know because you

6    were outside smoking, is that right?

7    A    It's possible.  There wasn't a lot we were discussing.

8    Q    Okay.  And you had -- I'm not going to ask you about what

9    was said with the mediator in the caucus, but there were words

10   exchanged, there was discussion with the mediator in your

11   caucus, correct?

12        MR. WIESE:  I'm going to object.

13        MR. TERRELL:  I'm not asking about the content.  Just

14   confirming that the mediator was not just sitting there --

15        JUDGE STECKLER:  I think --

16        MR. TERRELL:  -- like a potted plant, but was actually

17   conversing.

18        JUDGE STECKLER:  It's sufficient to know that the mediator

19   was there.  I think given all of our experiences with mediation,

20   we know mediators don't just sit.

21        MR. TERRELL:  Okay.

22        JUDGE STECKLER:  So I -- and the -- frankly I'm not sure of

23   the relevance of any conversations with the mediator.

24   Q    BY MR. TERRELL:  All right, page 27, one of the major

25   topics in the negotiations was the compensation for the banquet

1  staff, correct?

2  A    Correct.

3  Q    And that was being discussed on this day it appears,

4  correct?

5  A    I believe I saw it later -- could I just have a minute to

6  read.

7        MR. WIESE:  Can we clarify which date we're talking about?

8        MR. TERRELL:  Yes, March 16.

9        JUDGE STECKLER:  Still on March 16.

10  (Pause.)

11        THE WITNESS:  Yes, we were.

12  Q    BY MR. TERRELL:  Okay, and at the bottom of page 27 you

13  have a speaker designated with an "A".  Would that be Arch

14  Stokes?

15  A    Yes.

16  Q    And Arch Stokes made the comment during his speaking and

17  presentation turn, close to the bottom, third and fourth line

18  from the bottom, that the employer is "at a competitive

19  disadvantage".  Do you see that statement that you wrote?

20  A    Yes.

21  Q    And he was referring to the employer's competitive

22  disadvantage in the banquet world, correct?

23  A    Correct.

24  Q    On page 33, that's the last page of the March 16 session,

25  correct?

1  A    Umm -- yes.

2  Q    And your last entry on page 33 refers to comments that Arch

3  Stokes was making, correct?

4  A    Yes.

5  Q    And he said at that point, "revising pie charts".

6  A    Correct.

7  Q    And he said that because errors or mistakes had been

8  pointed out in the pie charts.  Pie charts prior to Arch making

9  that comment, correct?

10  A    Correct.

11  Q    And he said he was revising.

12  A    Yes.

13  Q    And then the next line on page 33 says, "schedule, 3/24,

14  9:30", and that was simply your note that that was the next

15  scheduled meeting, right?

16  A    Correct.

17  Q    And then the next page is March 24. Correct?

18  A    Yes.

19  Q    Page 34. And "L" is Leslie, so Leslie Hohmann was in

20  attendance at that session, correct?

21  A    Yes.

22  Q    And you have a note here explaining pie charts.

23  A    Yes.

24  Q    By Leslie Hohmann.

25  A    Yes.

1    Q    And it's not true, is it, that Leslie Hohmann was about to

2    cry or crying.  You said that, but that's not true, is it?

3    A    She appeared to be unless that's just the way she is, but I

4    had talked to her several times about my errors and my paycheck

5    and she doesn't talk to me like that when I have private

6    conversations with her, so --

7    Q    And then after that, the next line entry says -- is an "N"

8    for Nancy and you went back to the proposals, and you began

9    discussing section numbers again, correct?

10   A    Correct.

11   Q    And those are the numbers that follow, and they start with

12   131 it looks like, or maybe 127, correct?

13   A    Umm, I'm sorry, could you restate what you said?

14   Q    Yes, I'm sorry, I'm on page 34, middle of the page down,

15   after Nancy says "go back to proposals", page 127, and then we

16   once again see a series of -- sequential series of numbers going

17   down the left side of the page, do you see that?

18   A    Yes.

19   Q    And the numbers continue on page 35 through number 168,

20   correct?

21   A    Not sequentially.  They're missing quite a few, but --

22   Q    Okay.  And there are entries out to the side of many of

23   them referencing "TA".  Do you see all the "TA" references?

24   A    Yes.

25   Q    And we saw a lot of "TA" references when we went through

P 00587

1   the first series of section numbers, didn't we?

2   A    Yes.

3   Q    We saw "TA" and we saw "reject", and on page 35 we see the

4   word "hold" on some of them, do you see that?

5   A    Yes.

6   Q    But you also see probably -- at least on page 35 you see

7   more "TA's" than anything else, is that right?

8   A    Yes.

9   Q    And "TA" means tentative agreement, right?

10  A    Correct.   Tentative, yes.

11  Q    Page 36 the numbering continues from 178 through 208,

12  correct?

13  A    It's missing some in there, but yes.

14  Q    And it's mostly "TA's" with a few "holds", correct?

15  A    Correct.

16  Q    Now this is March 24.  You didn't make a notation that --

17  as to what time the meeting on March 24 started, did you?

18  A    I did not.

19  Q    In most of the places you don't do that, do you?  You did

20  in some places, but not every place, correct?

21  A    That is correct.

22  Q    It appears on page 37 you took a caucus, at least that's

23  referenced at the top of the page, correct?

24  A    Correct.

25  Q    And then a little over two -- a little over two-thirds --

1    about two-thirds of the way down it looks like you reconvened at

2    2:15.

3    A    Correct.

4    Q    Then the numbering continues on page 38 from 164 to 188.

5    Correct?

6        MR. WIESE:  I'm going to object.  I mean this document

7    speaks for itself, especially as to the numbers.  I mean if

8    there's a question about a specific number, or skipping numbers,

9    we can go through it, but otherwise --

10        MR. TERRELL:  It's a simple question.

11        JUDGE STECKLER:  That's not addressing Mr. Wiese's

12    concerns.  I mean I know it's a simple question, but where are

13    you going with this?

14        MR. TERRELL:  Well, I'll speed it up.

15    Q    BY MR. TERRELL:  So you continued discussing specific

16    provisions for the rest of this day, correct?

17    A    Correct.

18    Q    And then you met again on April 16 as reflected on page 40,

19    correct?

20    A    Correct.

21    Q    And that session ended on page 45, and the last note you

22    have there is "Michael Henry wishes to meet April 28, 9:30 a.m."

23    A    Yes.

24    Q    And then your last two pages are your notes from the April

25    28 meeting, correct?

P 00589

1   A    Correct.

2   Q    And you did not note the time of the start of that meeting

3   or the time of the end of that meeting, did you?

4   A    No.

5   Q    Now, we can see, from reviewing these notes, that on

6   several of the days you were going through the company's

7   proposals paragraph by paragraph, correct?

8   A    Correct.

9   Q    And the company's positions moved from proposal to

10  proposal.  I'm not asking precisely or how they moved, but all

11  I'm asking is a very simple question, it is true that, on some

12  of the provisions in the proposals, the company made a movement

13  as it went from proposal to proposal to proposal, and from

14  meeting to meeting to meeting, correct?

15      MR. WIESE:  Objection:  relevance.

16      I mean we aren't arguing surface bargaining here. It's

17  specific proposals.

18      JUDGE STECKLER:  I was about to ask the same question, Mr.

19  Terrell.  Would you clarify for me?

20      MR. TERRELL:  Well, that is true.  That is true.  The

21  complaint does not allege surface bargaining, but there are

22  8(a)(5) allegations in this case so I think it's certainly

23  relevant to ask that question.

24      JUDGE STECKLER:  Since we're not here to have to deal with

25  surface bargaining, and it shows that there have been some TA's,

 1   and from what you've said, I'm sure that your -- your witnesses

 2   will testify, based on their notes, where the movement was.  I

 3   don't know that asking this witness any further questions about

 4   that would be helpful.

 5        MR. TERRELL:  Are you sustaining the objection?

 6        JUDGE STECKLER:  In a word, yes.

 7   Q   BY MR. TERRELL:  Nancy Goldman and Martin Goff both live in

 8   Minneapolis, correct?

 9   A   I believe they live in the Twin Cities.  I don't know what

10   city they live in.

11   Q   Okay.  But you know they had to drive quite a distance to

12   get here for the bargaining sessions.

13   A   Yes.

14   Q   Isn't it true that they often left at 5 in order to make

15   the drive back?

16   A   Umm -- they left, yes.

17   Q   Isn't it true that they sometimes left at 4 p.m. and stated

18   they had to leave at 4 p.m.

19   A   I don't remember they ever stated -- stating they had to

20   leave at 4, no.

21   Q   But you're aware they did leave at 4 on some occasions,

22   correct?

23   A   When there was nothing left to discuss, yes sir.

24   Q   Isn't it true that Martin Goff said he had to leave because

25   he had a dog locked in his apartment or his house?

1  A    I just remember once he had to leave -- they had to leave

2  by 5 p.m.  He had a reason.  I don't recall what it was.

3  Q    You don't recall whether it was a dog or not.

4  A    No.

5      MR. TERRELL:  I have nothing further.  Thank you.

6      JUDGE STECKLER:  Do you want to offer that as an exhibit,

7  Mr. Wiese?

8      MR. WIESE:  Well, yes, I do.  But before I do, I do have a

9  couple of brief questions about it.

10                    REDIRECT EXAMINATION

11  Q    BY MR. WIESE:  So if you turn to -- if you turn to page 2

12  of this document.

13  A    Yes.

14  Q    I know Mr. Terrell spent a lot of time going over dates,

15  and one of the things that he talked about with you was what

16  certain dates mean in the contract.  So if you look at the upper

17  right-hand corner of that document on page 2.

18  A    Yes.

19  Q    Do you see what that says?

20  A    This is backwards.

21  Q    Okay.  Well, so -- what date is up there?

22  A    One-29.

23  Q    And looking at this, does this appear to be your bargaining

24  notes from January 29?

25  A    It is.

1  Q    And below that do you see a date?

2  A    I do.

3  Q    And what date is that?

4  A    February 5th.

5  Q    Again, looking at what's below that, do those appear to be

6  your bargaining notes?

7  A    Definitely is.

8  Q    From February 5th?

9  A    Yes.

10  Q    And then I'd just like to turn to page 39 of those

11  bargaining notes.

12  A    Yes.

13  Q    And I believe these are the bargaining notes from -- I

14  think these are the notes from March 24.  Yes, if you look at

15  page 34, and then turn to page 39.  Do these appear to be the

16  notes from March 24?

17  A    Yes.

18  Q    And at the bottom of that document do you see where is says

19  "caucus"?

20  A    Yes.

21  Q    Is that a caucus the employer took?

22  A    Umm, yes.

23  Q    And below that it says "didn't come back".  What's that in

24  reference to?

25  A    Well it's not us because we didn't leave.  We stayed there,

1  so that would be in reference to the employer not returning.

2      MR. WIESE:  I'll offer -- well, I guess this isn't marked.

3  Do you want to mark it as your exhibit or my exhibit?

4      MR. TERRELL:  We'll mark it as our exhibit.  So it will be

5  Exhibit R 1.

6  (EXHIBIT MARKED:  RESPONDENT'S 1.)

7      JUDGE STECKLER:  Okay, and does the Court Reporter have two

8  copies?

9      MR. TERRELL:  Does the what, I'm sorry?

10      JUDGE STECKLER:  Does the Court Reporter have two copies?

11      MR. TERRELL:  I want a copy.

12      MR. WIESE:  Well, I can give her my copy when she's done.

13  I don't have any further questions for this witness.

14      JUDGE STECKLER:  Okay, and Mr. Terrell is done.

15      Ms. Schroeder, thank you for coming in today.  You're going

16  to be excused, but please do not discuss your testimony with

17  anybody until after the whole trial is over.

18      THE WITNESS:  Okay.

19      JUDGE STECKLER:  Thank you so much for your time.

20      THE WITNESS:  Thank you.

21  (Witness excused from stand.)

22      JUDGE STECKLER:  We've got 5 after 4 -- about seven minutes

23  after 4. What's the next witness?

24      MR. WIESE:  I --

25      JUDGE STECKLER:  Ms. Schroeder, you have to -- you can't

1  even hear me say all this fun stuff.  You'll have to come back

2  for a different hearing to understand procedure at work.

3      MR. WIESE:  So, Judge, I have one witness left in my case

4  in chief.  She is going to be testifying solely about union

5  flyer and access issues, so I --

6      JUDGE STECKLER:  Short?

7      MR. WIESE:  Yes, I'd say half an hour probably.

8      JUDGE STECKLER:  And then --

9      MR. WIESE:  I mean we --

10     JUDGE STECKLER:  Mr. Terrell, you don't need -- of course

11 you're kind of flying blind just to say how long it would take

12 to prepare.

13     MR. TERRELL:  I don't even know who they're talking about.

14 Of course, I'm flying blind.

15     JUDGE STECKLER:  Can you give us a hint?

16     MR. WIESE:  We can give you a preview.  It's going to be

17 Linda Henry.  That shouldn't be a huge surprise. Linda Henry.

18     JUDGE STECKLER:  And except for Union access, she won't be

19 discussing --

20     MR. WIESE:  No bargaining.

21     JUDGE STECKLER:  -- bargaining, et cetera.

22     MR. WIESE:  No bargaining, no.

23     JUDGE STECKLER:  So there's not much to discuss.

24     MR. WIESE:  No, there's just a couple -- I mean --

25     MS. BURGESS:  A handful of incidents.

1    MR. WIESE:  Handful of 8(a)(1)s and then just generally

2    access and flyers.

3    JUDGE STECKLER:  I think -- yes, I think we should go ahead

4    and try to wrap up.

5    MR. WIESE:  I mean, she's here right now.

6    JUDGE STECKLER:  Yes, and then this way we can try to wrap

7    up the GC's case in chief and proceed with Respondent's case in

8    the morning.   Do you have any objection to that, Mr. Terrell?

9    MR. TERRELL:  No.

10   JUDGE STECKLER:  Okay.  In that case -- you said it was

11   Linda Henry that's coming?

12   MR. WIESE:  Yes.

13   MS. BURGESS:  I'll get her.

14   MR. TERRELL:  Before we go on the record -- can we go off

15   the record?

16   JUDGE STECKLER:  Yes.

17   (Off the record.)

18   JUDGE STECKLER:  We'll be back on the record.

19   During a short break, Mr. Terrell produced documents to Mr.

20   Wiese, and it's my understanding that these are the no-call/no-

21   show attendance records?

22   MR. TERRELL:  These are terminations for attendance and,

23   interestingly, one of the terminated employees was Derek Kotvask

24   that Mr. Graham Brandon testified about this morning as having

25   never been disciplined for attendance.  He was actually --

1      JUDGE STECKLER:  We'll -- I'm sure we'll --

2      MR. TERRELL:  -- terminated for attendance.  I just thought

3  you would be interested to know that.

4      JUDGE STECKLER:  I'm sure we'll be discussing that in your

5  case in chief.

6      MR. TERRELL:  Okay.

7      JUDGE STECKLER:  So I appreciate the information.  And Mr.

8  Wiese, I'm sure you'll be -- yes, Mr. Wiese, I'm sure you'll be

9  reviewing it.  In the mean time --

10      MR. WIESE:  There's just one thing that I want to make

11  clear on the record.  So, as of now, do I have all discipline

12  and terminations issued to employees due to attendance issues

13  since September 2013?

14  (Pause.)

15      MR. TERRELL:  Your Honor, I've just been made aware that I

16  have -- are we still on the record?

17      JUDGE STECKLER:  Yes.

18      MR. TERRELL:  I've just been made aware we have additional

19  documents related to terminations for no-call/no-show.  It's

20  actually a fairly lengthy list, three pages.  I'm going to guess

21  there are maybe twenty, twenty-five --

22      JUDGE STECKLER:  Over what time period?

23      MR. TERRELL:  That is a good question -- last year and a

24  half.  Now, we -- I'm sure that Mr. Wiese is going to want the

25  Personnel Action Forms that go behind these documents and we

1  will provide that.

2      JUDGE STECKLER:  Okay.

3      MR. TERRELL:  But I'm nonetheless giving him the list of

4  names.

5      JUDGE STECKLER:  Okay, that would be helpful.  Would that

6  be probably tomorrow that we would have those documents --

7      MR. TERRELL:  We will do our best.

8      JUDGE STECKLER:  -- for the GC?  Well that's all I can ask.

9      Okay, so our next witness is Linda Henry, is that correct?

10 Okay.

11 (WITNESS SWORN:  LINDA HENRY)

12     JUDGE STECKLER:  Please state your full name for the

13 record.

14     THE WITNESS:  Linda Henry.

15     JUDGE STECKLER:  I'm sorry, I'm hiding behind the computer

16 again.  Mr. Wiese, you may proceed.

17     MR. WIESE:  Thank you.

18                          DIRECT EXAMINATION

19 Q    BY MR. WIESE:  Good afternoon, Ms. Henry.

20 A    Good afternoon.

21 Q    What is your current occupation?

22 A    I am a Union representative for Local 21, Unite HERE, part-

23 time, and I also have a part-time job at HyVee Barlow's.

24 Q    Is your Union representative position -- is that a paid

25 position?

1    A    Yes.

2    Q    And how long have you been in that position for?

3    A    I started at the full time position February of 2011, and

4    it went to a part-time position September of 2013.

5    Q    What do you do as a Union representative?

6    A    I talk with the members about any problems they might be

7    having, I go into the different break rooms, and at the

8    different hotels, and at TCS, the Textile Care Service laundry,

9    talk with members, help them in any way I can.  If they have

10   grievances then I turn those over to Brian Brandt, who's the

11   president and also the -- my boss.

12   Q    And do you have any other positions with the Union besides

13   being the Union representative?

14   A    I'm the secretary/treasurer.

15   Q    And how long have you been the secretary/treasurer for?

16   A    I believe since 2007 or 2008.

17   Q    What do you do as a secretary/treasurer?

18   A    I am co-signer on all of the checks, so I write out all the

19   checks for bills, and paychecks, I take notes or minutes at --

20   or minutes, at all of the meetings, and send those minutes to

21   Brian via e-mail.  And do other things around the office.

22   Q    Being a Union representative for Local 21, do you know the

23   bargaining units that are part of Local 21?

24   A    Yes.

25   Q    What are they?

1   A     There is -- at the hotels, there is the Kahler Grand Hotel,

2   the Kahler Inn and Suites, the Residence Inn, the Marriott

3   Downtown, and the Holiday Inn downtown, the Textile Care

4   Services laundry, and then there's a couple of clubs and bars,

5   VFW, Eagles.

6   Q    Does the Holiday Inn, does that have its own collective

7   bargaining agreement, separate from the Kahler hotels?

8   A     Yes, it does.

9   Q    And prior to becoming a Union representative, did you work

10  at any of the hotels in the Kahler bargaining unit?

11  A     Yes, I did.  I worked at the Kahler hotel, and I --

12  Q    What did you -- go ahead.

13  A     In the Bakery Basket, which was part of the Coffee House

14  and later became the Grand Grill.

15  Q    How long did you work in the Bakery Basket for?

16  A     Twenty-five and a half years.

17        MR. WIESE:  Your Honor, the following line of questions is

18  in support of Complaint allegations 12(i),(j),and (l).

19  Q    BY MR. WIESE:  So in your role as Union representative,

20  have you historically been able to access each of the four hotel

21  properties?

22  A     Yes.

23  Q    And does this include after you ceased being an employee at

24  the Kahler Grand Hotel?

25  A     Yes.

1    Q    And have you been able to hang flyers at all of these

2    properties?

3    A    Yes, I have.

4    Q    And during these contract negotiations, have you had any

5    issues with accessing areas of these -- any of these hotels that

6    you've previously been able to access?

7    A    Yes, I have.

8    Q    And which hotels specifically?

9    A    The Marriott and the Kahler Grand.

10   Q    And have you had any issues with posting flyers in areas

11   where you've been able to post flyers prior to these

12   negotiations?

13   A    Yes, I have.

14   Q    At which properties?

15   A    The same two hotels.

16   Q    Let's start with access -- with your access to the Kahler

17   Grand.

18        MR. TERRELL:  Forgive me, is your question directed to the

19   period prior to the negotiations?

20        MR. WIESE:  Correct.

21        MR. TERRELL:  Thank you.

22        MR. WIESE:  Correct.  Yes, when I use the term

23   historically, I'm talking about, you know, prior to these

24   negotiations in 2015.

25   Q    BY MR. WIESE:  At the Kahler Grand, historically where did

1  you go as a Union representative?  What areas did you visit?

2  A    I visited the cafeteria, the housekeeping break room, the

3  maintenance break room -- or at least that's what we call it,

4  it's actually outside of their locker rooms -- and also into

5  Starbuck's.

6  Q    As you walk between these break rooms did you have to walk

7  through -- where did you have to walk to visit between these

8  break rooms?

9  A    I had to walk through the dish room, the kitchen, the

10  Kahler Grand -- the Grand Grill, I'm sorry, and through the

11  office areas up on the second floor.

12  Q    When you're talking about the office areas, do you know

13  whose offices you are walking by?

14  A    I think it is -- I don't remember.

15  Q    Okay.

16  A    Umm -- I don't remember their names.

17  Q    But generally do you know whose offices those were?

18  A    Yes.

19  Q    Who were they offices for?

20  A    It was the places that did the reservations mostly, going

21  through into the housekeeping area.

22  Q    And you mentioned several break rooms.  In which of those

23  break rooms did you post flyers?

24  A    In all of them.

25  Q    And prior to accessing the Kahler Grand Hotel, did you

1  always call or e-mail Human Resources to let them know you were

2  visiting?

3      MR. TERRELL:  Objection:  relevance.

4      JUDGE STECKLER:  I'm sorry, what was --

5      MR. WIESE:  I'm just asking whether she provided notice

6  prior to visiting the hotels.  One of the -- I mean the access -

7  - well --

8      JUDGE STECKLER:  I think the answer could be relevant here,

9  so I'd like to hear it.

10     MR. WIESE:  Would you like --

11     THE WITNESS:  Yes, I did.

12  Q    BY MR. WIESE:  And how much notice would you give?

13  A    I either e-mailed the day before or the morning of.

14  Q    And how often did you visit the Kahler Grand before these

15  negotiations?

16  A    About once a week.

17  Q    And what about posting flyers?

18  A    Prior to negotiations, once a month.

19  Q    And when you visited the Kahler Grand, do you remember

20  running into managers?

21  A    Yes, many of them.

22  Q    And again we're talking prior to these negotiations.

23  A    Yes.

24  Q    Who are managers that you remember running into?

25  A    Some of them are no longer there, but I ran into Michael

1    Henry from HR, I ran into Mary Kay, and Chad from HR, Tyler, who

2    is the food and beverage director, Scott Mauer, the director of

3    operations at the hotels, Josipa, housekeeping manager, Tamela

4    and Crystal over at the Marriott.  I'm sure there's more.

5    Hannah from the Coffee -- or the Grand Grill, I'm sorry.

6    Q    Mmm-hmm.

7    A    Umm --

8    Q    Those are the ones that you can remember.

9    A    Yes, off hand.

10   Q    So let's talk about the Marriott hotel.  Where have you

11   historically visited at the Marriott hotel?

12   A    They have one break room on the, I think it's the, second

13   floor, and that's where I normally went to visit with the

14   members.

15   Q    And how often would you visit the Marriott?

16   A    Once a week.

17   Q    What about posting flyers?  Where did you post flyers at

18   the Marriott

19   A    In their break room on the bulletin board, and also there's

20   a bulletin board outside the banquet area over there, by the

21   banquet kitchen, I would post on that bulletin board and also

22   there's a bulletin board outside the housekeeping manager's

23   office where I would post flyers.

24       MR. TERRELL:  I'd like to raise an objection or relevance.

25   I don't believe your allegations relate to any posting or access

1  issues involving the Marriott.  I believe your allegations

2  relate to and involve only the Kahler Grand.  If I'm wrong about

3  that, please show me where in the complaint the Marriott --

4  there's a Marriott access or poster flying issue.

5      JUDGE STECKLER:  We're discussing -- we're discussing --

6      MR. WIESE:  It says "Respondent", so Respondent is -- I

7  mean the facility is plural.

8      JUDGE STECKLER:  Mr. Wiese, I'm going to respond here.

9  Twelve --

10      MR. WIESE:  Excuse me.

11      JUDGE STECKLER:  -- it's paragraph 12, correct?

12      MR. WIESE:  Yes.

13      JUDGE STECKLER:  And we're looking at paragraphs (i) and

14  (j)?

15      MR. WIESE:  Mmm-hmm.

16      JUDGE STECKLER:  And (i) says Respondent "changed its

17  policies regarding Union representatives access to its

18  facilities".  It doesn't say which hotel.  And then (j) says,

19  "changed its policies regarding posting of Union materials on

20  bulletin boards".  Again, it doesn't say which facilities.  Am I

21  -- and that's the Amended Complaint on page 7.  Do you have

22  something further on that, Mr. Terrell?

23      MR. TERRELL:  I think I may be thinking of the pre-amended

24  complaint.

25      JUDGE STECKLER:  Yes, this is the complaint that was issued

1  on November 25th, and you filed an answer last week, as I

2  recall.

3      MR. TERRELL:  Okay. The complaint says what the complaint

4  says.

5      JUDGE STECKLER:  Okay. So we have that clarification. Mr.

6  Wiese, would you like to continue?

7      MR. WIESE:  Just briefly before we continue, I notice there

8  is a typo in the complaint.  I'd like to make an oral amendment

9  to Complaint paragraph 12(j) to include "2015" after "March

10  25th".

11     JUDGE STECKLER:  Any objection?

12     MR. TERRELL:  It's his Complaint.

13     JUDGE STECKLER:  Okay, the Complaint is so amended to

14  reflect that, although it -- we can also glean from the context

15  that all of the events occurred in 2015, is that correct, Mr.

16  Terrell?

17     MR. TERRELL:  That would seem to be the case.

18     JUDGE STECKLER:  All the allegations occurred in 2015.

19     MR. TERRELL:  That seems to be the case.

20     JUDGE STECKLER:  The complaint is so amended to reflect

21  that.

22  Q    BY MR. WIESE:  All right, so Ms. Henry, I think we were

23  talking about flyers at the Marriott.  Could you tell me again -

24  - or did you --

25     MR. TERRELL:  Objection:  asked and answered.

1        JUDGE STECKLER:  Let's go ahead.

2    Q    BY MR. WIESE:  Did you finish talking about all the areas

3    where flyers were posted?

4    A    I don't remember.

5    Q    Well, could you tell me again where those flyers --

6        JUDGE STECKLER:  I think -- let me check.  I've got my

7    notes here.  One break room on the second floor, was where you

8    went to visit members, posted once a week, poster flyer at their

9    break room, a bulletin board outside of banquet area, and then

10   outside -- and that's where I stopped.

11       THE WITNESS:  Outside of the housekeeping office, and also

12   in the kitchen area there's a bulletin board for the employees.

13   Q    BY MR. WIESE:  And do you recall any managers ever seeing

14   you in the Marriott hotel?

15   A    Yes.

16   Q    Who?

17   A    Prior to?

18   Q    Yes, prior to negotiations.

19   A    Umm -- well I stated earlier Crystal, and Scott Mauer was

20   also over there many times, Tamela who used to be the

21   housekeeping manager and now I'm not sure what her title is, but

22   she's more down at the front desk now.  Tamela.

23       JUDGE STECKLER:  That rhymes with Pamela, right?

24       THE WITNESS:  Yes.  And I don't remember all the other

25   names.  The ones that aren't there any longer.

1    Q    BY MR. WIESE:  And so historically when you've posted

2    flyers at the Kahler Grand hotel, would those flyers still be up

3    the next time that you visited the property?

4         MR. TERRELL:  Objection:  leading.

5         JUDGE STECKLER:  Please rephrase.

6         Let me ask her a quick question here.  When you visited on

7    subsequent times after the -- you posted, what was the status of

8    the flyers on the bulletin boards, if you know?

9         THE WITNESS:  Prior to negotiations?

10        JUDGE STECKLER:  Yes, Ma'am.

11        THE WITNESS:  They were always there and I'd take them down

12   after the meeting.

13   Q    BY MR. WIESE:  And was that the same -- did that -- what

14   would --

15        MR. TERRELL:  I want to state another objection to this

16   line of questioning.  When asking about where post -- the

17   removal of posters and flyers, I think a distinction should be

18   made as to where they were posted.  There's no allegation in

19   this complaint that flyers were removed from the designated

20   Union boards.  The complaint only goes to disputed locations,

21   but I believe the record is clearly established already that

22   there were designated Union boards, and there's not an

23   allegation that flyers or posters were removed from the

24   designated Union boards, so I would respectfully request that in

25   the questioning we make that distinction.

1      MR. WIESE:  Well I think the complaint allegation speaks

2  for itself.  I mean any area -- any area that -- where flyers

3  have historically been posted, we are alleging that there --

4      JUDGE STECKLER:  I think it's based on past practice, so

5  you know, as to -- can we reach a stipulation?  Is there a

6  stipulation available that it was not --

7      MR. WIESE:  No, there isn't, and in fact, I think we've had

8  testimony -- well, I -- not going there.

9      JUDGE STECKLER:  Okay, well I think we'll let the testimony

10  continue as it is right now, Mr. Terrell, and if you'd like to

11  ask on cross, you're certainly welcome to, how's that?

12     MR. TERRELL:  Okay.

13     JUDGE STECKLER:  Okay.

14  Q    BY MR. WIESE:  And the same question that the Judge asked

15  as it applies to the Marriott, what's your answer to that

16  question?

17  A    The flyers were still hanging at the next time.

18  Q    Mmm-hmm.

19  A    Prior to negotiations, yes.  After negotiations, no.

20  Q    So let's talk about when you first started noticing things

21  changing.  When did you first have issue with accessing the

22  Kahler Grand hotel?

23     MR. TERRELL:  Objection:  leading.  Assuming the answer.

24     MS. BURGESS:  Your Honor, may I be heard on this?  I think

25  there's a little misunderstanding about what "leading" is.  Just

1   because --

2       JUDGE STECKLER:  Well -- I'll tell you what, let me go

3   ahead.  When, if ever, did you notice a change?

4       THE WITNESS:  First time I noticed a change was the end of

5   March.

6   Q   BY MR. WIESE:  Do you remember providing notice to the

7   employer before visiting the property at the end of March?

8   A   Yes, I do.

9   Q   I'm showing you what's been marked as General Counsel

10  Exhibit 25(a).

11  (Witness proffered document.)

12  A   Thank you.

13  Q   Do you recognize this document?

14  A   Yes, I do.

15  Q   And what is it?

16  A   It's my e-mail to Michael Henry and Mary Kay that I would

17  be at the Kahler -- Kahler Inn and Suites and the Marriott on

18  the following day.

19  Q   And where it says "Kahler", what hotel are you referring

20  to?

21  A   Kahler Grand.

22      MR. WIESE:  I'll offer General Counsel Exhibit 25(a).

23      MR. TERRELL:  No objection.

24      JUDGE STECKLER:  25(a) is admitted.

25  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 25(a).)

1   Q    BY MR. WIESE:  What happened when you visited the Kahler

2   Grand on March 26?

3   A    I went to the Kahler housekeeping area between 7:30 and

4   8:00 that morning, and I was visiting with the members there,

5   and they're all coming in at that time, they all start work at

6   8:00, they're all coming in, going into their locker room,

7   taking their coats off, that sort of thing, and then they sit

8   around their tables up there and talk, and I just talk with them

9   at that time.  And then at 8:00 when they go to punch in, I

10  start leaving.

11       MR. TERRELL:  What was that last statement, I'm sorry?

12       THE WITNESS:  At 8:00 when they go to start punching in the

13  time clock, then I pick up my stuff and start to leave.

14  Q    BY MR. WIESE:  What happened when you left the break room

15  on March 26th?

16  A    As I was going out the door, Chad from HR came -- was

17  coming in the doorway, and I said "Hi" to him, and he said "Hi"

18  back, and then I started walking down the hallway.

19  Q    And what happened as you were walking down the hallway?

20  A    When I reached the end of the hall, Chad evidently had gone

21  through the dispatch area and met me at the end, and asked me

22  what I was doing, and I said I was visiting with the members,

23  and he said you're not supposed to be in that break room.

24  Q    And what was your response when he said, you weren't

25  supposed to be in that break room?

1   A    I said, nobody's ever told me that before.  I've been

2   coming up here for a long time.

3   Q    Do you remember anything else from that conversation with

4   Chad?

5   A    Umm -- no, I don't think so. I don't remember anything else

6   at this time.

7   Q    And what did you do after -- of what happened after this

8   exchange?

9   A    I left the area and went outside of the hotel and I don't

10  remember if I texted or called Brian, but I did one of the two

11  to tell him what happened.

12  Q    Did you have any other incidents accessing the Kahler Grand

13  Hotel after March 26th?

14  A    Yes.  In early April the 2nd I believe.

15  Q    Do you remember providing notice before you visited the

16  hotel that day?

17  A    Yes, I did.

18  Q    Showing you what's been marked as General Counsel 25(b).

19  (Witness proffered document.)

20  Q    Do you recognize this document, Ms. Henry?

21  A    Yes.

22  Q    And what is it?

23  A    It's my e-mail to Michael Henry, Mary Kay, and Charissa GC,

24  who was at TCS at the time, stating that I would be at TCS, the

25  Kahler, and Kahler Inn and Suites on Thursday.

1      MR. WIESE:  All right, I'll offer General Counsel Exhibit

2    25(b).

3      MR. TERRELL:  No objection.

4      JUDGE STECKLER:  Twenty-five -- did we admit 25(a) -- 25(b)

5    -- just to be sure, 25(a) and 25(b) are admitted.

6    (EXHIBIT RECEIVED: GENERAL COUNSEL'S 25(b).)

7      JUDGE STECKLER:  And did we admit R1?  We didn't? Did we

8    admit R1, Respondent 1?  Did we admit that document?

9      MR. TERRELL:  I'm sorry, which one?

10     JUDGE STECKLER:  Respondent 1.

11     MR. TERRELL:  Respondent 1 -- oh --

12     JUDGE STECKLER:  The bargaining --

13     MR. TERRELL:  I thought we did, but why don't we just do it

14   again.

15     JUDGE STECKLER:  Okay.  It's admitted.  Okay.

16   (EXHIBIT RECEIVED:  RESPONDENT'S 1.)

17     JUDGE STECKLER:  Okay, Mr. Wiese, I'm sorry to keep

18   interrupting.

19     MR. WIESE:  That's all right.

20   Q    BY MR. WIESE:  So what happened on April 2nd at the Kahler

21   Grand Hotel?

22   A    I was in the cafeteria break room, and I was going to go

23   down -- it was around noon -- and I was going to go down to the

24   maintenance area where they take their breaks.

25   Q    Where do you have to walk to get from the cafeteria to the

1    maintenance area?

2    A    I have to walk through the dish room and then part of the

3    kitchen.

4    Q    What happened while you -- what happened after you left the

5    cafeteria?

6    A    As I was approaching the kitchen area I saw Mike --

7        MR. TERRELL:  As you were approaching where, I'm sorry?

8        THE WITNESS:  The kitchen area.

9        MR. TERRELL:  Okay.

10        THE WITNESS:  I saw Mike Bale, who is a cook there, and Deb

11   from Room Service, and they were standing near the place where I

12   was going to turn, and I said hello to them, and they said

13   what're you doing, and I said oh just handing flyers out, and I

14   had one in my hand and I just kind of looked at it, you know,

15   showed them what I was doing, and then I walked on.

16   Q    What happened after you walked on?

17   A    I walked about four or five steps and I was at the top of

18   the stairs to go downstairs to go down to the maintenance break

19   room, and Seth, the Sous Chef, caught me at the top and said I

20   was not allowed to talk to his employees while they were on

21   duty.

22   Q    Was anybody --

23        JUDGE STECKLER:  Who was it?  I'm sorry?

24        THE WITNESS:  Seth.  He's a sous chef.

25        JUDGE STECKLER:  Okay.

1    Q    BY MR. WIESE:  And what was your response when the Sous

2    Chef said you weren't allowed to talk to employees on duty?

3    A    I said that he probably didn't understand that I worked

4    there for 25, and that I worked with these people, and I wasn't

5    going to walk past them and not acknowledge them saying "Hello."

6    Q    And how long had your conversation been with those two

7    employees?

8    A    Maybe ten seconds at the most.

9    Q    Did he say anything else to you that you recall?

10    A    He said you're not allowed to hand them flyers, and I said

11    I just showed it to them, I didn't really hand anything to them,

12    and it was quick.

13    Q    Was there any discussion about your walking through the

14    kitchen area?

15    A    He said something about me walking through the kitchen

16    area.  I said it's the only way I can get down to the downstairs

17    break room, or any other break room in that hotel.

18    Q    And is the kitchen area an area that you'd walked through

19    previously as a Union representative?

20    A    Yes.

21    Q    How often?

22    A    Many times.

23    Q    Every time?

24    A    Every time.

25    Q    How did that conversation end with Chef Essar?

1    A    He said he was going to call HR.

2    Q    And was that the end of the conversation?

3    A    Yes. I said, okay, and I walked downstairs.

4    Q    Was anybody present for this conversation with Chef Essar?

5    A    I'm guessing Mike Bale and Deb were still there and could

6    hear it, but I didn't talk to them afterwards about it.

7    Q    How far away were you from where you had been talking to

8    them when you talked to Chef Essar?

9    A    Maybe from me to you.

10    JUDGE STECKLER:  So about how many feet is that?

11    THE WITNESS:  I don't know.

12    MR. WIESE:  A dozen.  About a dozen, fifteen feet.

13    MR. TERRELL:  Fifteen feet.

14    JUDGE STECKLER:  I would say -- I was going to say

15    something else, but -- that's not even the size of a small

16    bedroom.  That's at the most eight feet.

17    MR. TERRELL:  At most eight feet.

18    JUDGE STECKLER:  Let's get -- do you want to get out a

19    ruler?

20    MR. TERRELL:  From where the witness is sitting to where

21    Tyler is sitting is more than eight feet.  I'm five foot ten --

22    THE WITNESS:  I was going to say ten feet --

23    MR. TERRELL:  -- and I could stretch at least three times.

24    THE WITNESS:  -- but I don't want to argue.

25    JUDGE STECKLER:  Okay so it's at least eight feet, no more

P 00616

 1   than fifteen feet.

 2       MR. WIESE:  Somewhere between eight and fifteen feet.

 3       MR. TERRELL:  It's a lot more than eight feet.

 4       THE WITNESS:  Yes.

 5       JUDGE STECKLER:  Some -- how loud was the conversation?

 6       THE WITNESS:  It was just normal tone of voice.

 7       JUDGE STECKLER:  Was it noisy in there?

 8       THE WITNESS:  No, not in that area.

 9       JUDGE STECKLER:  Okay.

10       MR. WIESE:  So, Your Honor, the following line of questions

11   is in support of complaint allegation 5(b).

12   Q   BY MR. WIESE:  So what did you do after that conversation

13   with Chef Essar?

14   A   I walked down the stairs and into the maintenance break

15   area.

16   Q   Were there any employees present in the maintenance break

17   area?

18   A   Yes, two maintenance guys, Dan Solberg, and Dick Darst.

19   Q   What did you do when you got to the maintenance break room?

20   A   I started telling them what had just happened when, within

21   moments, Mary Kay from HR and Seth came in.

22   Q   And what happened when Mary Kay Costello and Seth came in?

23       MR. TERRELL:  And who else?

24       THE WITNESS:  Mary Kay and Seth, the Sous Chef.

25       MR. TERRELL:  Okay.

1   Q    BY MR. WIESE:   What happened when they came in the break

2   room?

3   A    Mary Kay started what I call yelling at me, because it was

4   in a very loud voice, about how I was not allowed to go into

5   these break rooms any more.   That I'm only allowed in the

6   cafeteria, and I'm also only allowed to post notices or flyers

7   in the cafeteria.

8   Q    And were the two maintenance employees that you mentioned

9   earlier, were they still in the break room while Ms. Costello

10  was yelling at you?

11  A    Yes.

12  Q    And how --

13       MR. TERRELL:   Objection to the characterization.   She said

14  in a "loud voice," she did not say "yelling."

15       JUDGE STECKLER:   I think she initially said "yelling."

16       MR. TERRELL:   I heard loud voice, but the record will speak

17  for itself.

18  Q    BY MR. WIESE:   Would you like me to repeat the question?

19  A    Yes, please.

20  Q    Were the maintenance employees still in the break room

21  while Ms. Costello was yelling at you?

22  A    Yes.

23  Q    How far away were they?   Roughly.

24  A    Ten feet.

25  Q    And how did you respond to Ms. Costello yelling at you?

1    A    I told her that I've been posting things in the break --

2    all the break rooms all this time, and I didn't understand what

3    the problem was.

4    Q    Did she respond to that?

5    A    She said, we've discussed this in negotiations and you know

6    better.   I said, I never heard anything about that in

7    negotiations.

8    Q    Was that the end of the conversation?

9    A    I believe so.

10    Q    What happened after that conversation?

11    A    She left and I went over and talked with the maintenance

12    guys.

13    Q    What was the -- what were the employees reactions?

14    A    They were in disbelief that she would talk that way to me.

15    Q    And what did you -- what did you do after leaving the

16    maintenance break room that day?

17    A    I --

18    Q    If you recall.

19    A    -- do not recall.

20    Q    Okay.

21    A    I probably went home and told Brian what happened.

22    MR. TERRELL:  Objection: speculation.  She said she doesn't

23    recall and then she's testifying as to what she probably did.

24    JUDGE STECKLER:  Yes, I understand.  Yes, I agree, we'll

25    sustain that objection .

1  Q    BY MR. WIESE:  Was there another incident after April 2nd

2  at the Kahler Grand Hotel?

3  A    Yes --

4       MR. TERRELL:  Was there an allegation in the complaint that

5  relates to what you're about to ask?

6       MR. WIESE:  Yes.

7       MR. TERRELL:  Where?

8       MR. WIESE:  Allegation 5(c).  You can answer the question.

9       THE WITNESS:  Yes.  A few days later, I don't remember

10 exactly.  I believe it was the 7th of April.

11 Q    BY MR. WIESE:  Did you provide notice to the employer

12 before visiting on April 7th, if you recall?

13 A    Yes, I did.

14 Q    Showing you what's been marked as General Counsel Exhibit

15 25(c).

16 (Witness proffered document.)

17 Q    Do you recognize this document?

18 A    Yes, I do.

19 Q    And what is it?

20 A    It's my e-mail to Michael Henry, and Mary Kay, and Mandy at

21 TCS.

22 Q    Who is Mandy Jacobson?

23 A    Mandy is the manager out at TCS now.

24      MR. WIESE:  I'll offer General Counsel Exhibit 25 (c).

25      MR. TERRELL:  No objection.

1      JUDGE STECKLER:  GC 25 (c) is admitted.

2  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 25 (c).)

3  Q    BY MR. WIESE:  What happened on April 7th at the Kahler

4  Grand Hotel?

5  A    I was up in the housekeeping break room again, and it was

6  over the noon hour, probably around 1:00.

7  Q    All right, and what happened later up in the housekeeping

8  break room that day?

9  A    Yes, I'm thinking that I'm wrong in what I just said.  I

10  think it was in the morning again.

11  Q    Okay.

12  A    Around 7:30 -- 8:00.

13  Q    Okay, well regardless of what time it was --

14  A    Okay.

15  Q    -- do you recall what happened when you were in the

16  housekeeping break room on April 7th?

17  A    Yes.

18  Q    So tell me what happened.

19  A    Josipa, the manager of the housekeepers there, came in and

20  told me that I wasn't supposed to be in that break room any

21  more.

22  Q    And when Josipa told you this, were there any employees in

23  the break room?

24  A    Yes, probably eight or ten of them.

25  Q    And where were they the employees -- well, first of all,

P 00621

1    actually how big is the break room up there?

2    A    Very small.  It's probably less than half of this room

3    size.

4    Q    So if you had to give -- okay.  And where were the

5    employees during this conversation?

6    A    They were sitting at their tables up there.

7    Q    What else do you remember from that conversation with

8    Josipa?

9    A    I told her that nobody's ever told me that I'm not supposed

10   to be in that break room, and that I've been coming in there all

11   along so I didn't see what was wrong with it.

12   Q    And had you -- had Josipa seen you in that break room

13   before?

14   A    Many times.  In fact, we'd had several conversations in

15   there.

16   Q    What did you do after your conversation with Josipa that

17   day?

18   A    Well it was 8:00, so it was the time that I would be

19   leaving anyway, so I said, well, we'll talk later, and I just

20   left.

21   Q    And after that incident on April 7th, do you remember the

22   topic of your access coming up in negotiations?

23   A    Yes.  Before that, after I left the break room that day --

24   Q    Mmm-hmm.

25   A    -- I called Brian and let him know what was going on, or

1   what had happened, and he said this will be a topic of

2   discussion at the next negotiations.

3   Q    Okay.

4   A    On the 16th.

5   Q    All right.  And do you recall what happened -- or at the

6   negotiations on April 16th, what was discussed regarding your

7   access?

8   A    Yes, nothing was brought up during the actual negotiations,

9   but in the afternoon when we had been on a caucus, the

10  management had gone on a caucus to do some work on some of the -

11  - their paperwork, and Michael Henry came in, I think around 2

12  or so, and came in to state that they were going to need more

13  time to work on the stuff that had been asked for, and so he

14  said that we were going to end the negotiations for the day.

15  Q    And what happened after he ended negotiations for the day?

16  A    While he was still there, Brian and Nancy and -- Nancy

17  Goldman, Brian Brandt, and Martin Goff all said that they needed

18  to talk to Michael about some incidents that had occurred at the

19  hotels with me.

20  Q    And what would -- were you there, what was Mr. Henry's

21  response?

22  A    He said he couldn't believe that that happened.  And so I

23  spoke up and said, well I have witnesses to at least the last

24  one that happened, and the maintenance guys -- one of the

25  maintenance guys was in the negotiations, he's sitting right

1  over there.

2  Q    Was that the end of the conversation?

3  A    Michael looked over at Dan Solberg and Dan said yes it did

4  happen.

5       MR. TERRELL:  Who?  Dan?

6       THE WITNESS:  Dan Solberg is one of the maintenance guys

7  that was in the room when it happened, and also in our

8  negotiations.

9  Q    BY MR. WIESE:  And was that the end of the conversation

10 after Mr. Solberg spoke?

11 A    Michael Henry said he would look into it.

12 Q    And after the -- this discussion outside of negotiations on

13 April 16th, did you have any further incidents with accessing

14 either the Kahler Grand or the Marriott?

15 A    Yes, umm --

16      MR. TERRELL:  Objection.  Is there an allegation in the

17 complaint that relates to some incident that happened after

18 this?

19      JUDGE STECKLER:  I think the allegation 12 says "since".

20      MR. TERRELL:  I'm sorry.

21      JUDGE STECKLER:  The allegation's in paragraph 12 --

22      MR. TERRELL:  No, the allegation's in paragraph 5, (a),

23 (b), and (c), and we just heard testimony on 5(a), 5(b), and

24 5(c).

25      JUDGE STECKLER:  And then those are the 8(a)(1)s, but it's

1  also part of the -- isn't it part of the 8(a)(5)s, that --

2  regarding changing policies regarding Union representative's

3  access to facilities and posting materials on bulletin boards?

4      MR. WIESE: Yes, it is, Your Honor. And there's also -- I

5  was just going to say, the Complaint allegation 5(e), and it's

6  just the line of testimony also supports that.

7      JUDGE STECKLER:  Okay.

8      We're going to proceed.

9  Q    BY MR. WIESE:  Do you recall providing notice to -- okay,

10 all right, I'm showing you what's been marked as General Counsel

11 Exhibit 25(d).

12 (Witness proffered the document.)

13 Q    Do you recognize this document?

14 A    Yes, I do.

15 Q    And what is it?

16 A    It's my e-mail to Michael Henry and Mary Kay and Mandy that

17 I would be at the Kahler, the Textile Care Services, Kahler Inns

18 and Suites and Residence Inn on the following day, on Thursday.

19     MR. WIESE:  Offer General Counsel's Exhibit 26(d).

20     MR. TERRELL:  No objection.

21     JUDGE STECKLER:  Twenty-five (d) is admitted -- GC.

22 (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 25(d).)

23 Q    BY MR. WIESE:  Do you recall what happened when you visited

24 the Kahler Grand Hotel on June 4th?

25 A    Yes, I was up in the Kahler --

1   Q    Okay.

2   A    -- housekeeping, again.

3   Q    Yes, tell me what happened when you were up in the

4   housekeeping area.

5   A    Okay.  I was talking with Mary Lewis and a group of others

6   around their noon hour, which is about 1 o'clock.  And we

7   chatted for several minutes.  And when it was time for them to

8   go back to work, they had left the room.  And just as I was

9   picking my things up, because there wasn't anybody else in the

10  room at the time to leave, one of the other housekeepers came in

11  and started asking me a question; but before she could get it

12  out, we were interrupted.

13  Q    And who interrupted you?

14  A    Michael Henry, Josipa, Mary Kay and Scott Mauer.

15  Q    What happened when they interrupted you?

16  A    Michael Henry -- Michael Henry told me that I was no longer

17  welcome in that break room, that I made the employees

18  uncomfortable.

19  Q    And was the employee that you had been talking to -- was

20  she present when Mr. Henry said this?

21  A    I believe she was at that time, but I think she left

22  immediately after that.

23  Q    And what was your response to what Mr. Henry said about not

24  being welcome in the break room?

25  A    I said I found it to be funny that the employees felt

1    uncomfortable around me; when they all talk to me, they are all

2    friendly, they all ask me questions.  I didn't feel like I ever

3    was, you know, making anybody feel uncomfortable.

4    Q    Do you recall anything else from that conversation?

5    A    Yes, Michael Henry said, "It doesn't matter what, because

6    they have come into my office and they've told me this.  And so,

7    you are not allowed up here anymore."

8    Q    Was that the end of the conversation?

9    A    No, I said that things like -- something about changing

10   during negotiation, and that's not supposed to happen.

11   Q    Okay, all right.

12   A    Also, I said -- sorry, I just remembered what else I said.

13   I said, "And it took four of you to come up here and kick me out

14   of this break room."

15   Q    Was that the end of the conversation?

16   A    Michael Henry said, "We're not kicking you out, we're just

17   asking you to leave."

18   Q    What happened after he said that?

19   A    I left.

20   Q    And after this incident on June 4th, were there any other

21   incidents that you recall?

22   A    Yes, there was a time towards the end of June at the

23   Marriott.

24   Q    Showing you what's been marked as General Counsel Exhibit

25   25(e).

1  (Witness proffered the document.)

2  Q    Do you recognize this document?

3  A    Yes, I do.

4  Q    And what is it?

5  A    It's an e-mail to Michael Henry and Mary Costello that I

6  would be at the Kahler Inn and Suites and from 11 o'clock to

7  12:15, and at the Marriott until 1 o'clock.

8  Q    Why does this e-mail have times listed on it?

9  A    Because Michael Henry asked me to start giving him the

10  exact times I was going to be at the different locations.

11       MR. WIESE:  Offer General Counsel Exhibit 25(e).

12       MR. TERRELL:  No objection.

13       JUDGE STECKLER:  Exhibit 25(e) is admitted.

14  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 25(e).)

15  Q    BY MR. WIESE:  What do you recall happening at the Marriott

16  on June 24th?

17  A    I was hanging I believe negotiation updates or postings

18  about a meeting, and I don't remember which.  And I was going to

19  the banquet area and the housekeeping area to hang them on their

20  bulletin boards.

21  Q    Is this an area where you have posted flyers in the past?

22  A    Many times.

23  Q    And what happened when you were up there posting flyers?

24  A    As I was walking towards the area to post, Crystal was

25  coming down the hall the other way, and she's the supervisor for

 1   the housekeepers there, and she told me I wasn't allowed back

 2   there.

 3   Q    Were there any employees present for that conversation?

 4   A    Just Crystal and one of her supervisors.

 5   Q    And what did you do after that conversation?

 6   A    I said I've always been hanging the notices up before and I

 7   was just going back to the banquet.

 8   Q    And after you said that, do you remember what you did that

 9   day?

10   A    She said I'm not allowed back there anymore and so I left

11   and texted Brian and let him know what happened.

12   Q    Was this the last incident that happened?

13   A    No, there was another one in September.

14   Q    And where did this one take place?

15   A    I cannot remember this one, I'm sorry.

16   Q    Okay.

17        I'm showing you what's been marked as General Counsel's

18   Exhibit 25(f).

19   (Witness proffered the document.)

20   Q    Do you recognize this document?

21   A    Yes, it's an e-mail to Michael Henry and Mary Kay that I

22   will be at the Kahler and the Marriott today between 11 and

23   1:30.

24   Q    All right.

25        MR. WIESE:  I'll offer General Counsel Exhibit 25(f).

1    MR. TERRELL:  No objection.

2    JUDGE STECKLER:  GC 25(f) is admitted.

3  (EXHIBIT RECEIVED:  GENERAL COUNSEL'S 25(f).)

4  Q    BY MR. WIESE:  After looking at this e-mail, does it help

5  you jog your recollection about what happened in September?

6  A    Yes.

7  Q    Okay.  Tell me what happened on September 2nd.

8  A    I was up in the Kahler housekeeping area again, and Josipa

9  Came in and told me I wasn't allowed up there.

10  Q    Were there any employees present when she told this?

11  A    Yes, Mary Lewis and several of her friends that each lunch

12  together.

13  Q    Did she say anything else besides the fact that you weren't

14  welcome in the break room?

15  A    I said that I thought that since the charges had been sent

16  to them about the charges that we had against Richfield

17  Hospitality, that things would have changed and I would be

18  allowed up there.

19  Q    Okay, and did Josipa say anything else during that

20  conversation?

21  A    Josipa said she doesn't know anything about that and would

22  I please come to HR to see Michael Henry.

23  Q    Did you go to HR with Josipa after she said that?

24  A    I did.

25  Q    Okay, and what happened when you got up to HR?

1   A    She told Michael that I had been up in the housekeeping

2   break room again, and turned me over to him.

3   Q    And was that the most recent incident, the one on September

4   2nd?  Were there any after that?

5   A    Yes.

6   Q    That was the most recent incident?

7   A    I believe so.

8   Q    Okay.

9       To your knowledge, did the Union ever agree with the

10   employer to change the past practice with regard to your

11   accessing the Kahler Grand Hotel?

12   A    No.

13   Q    What about the Marriott Hotel?

14   A    No.

15   Q    And what about posting flyers at the Kahler Grand Hotel,

16   did the Union ever agree with the employer to change your past

17   practice?

18   A    No.

19   Q    And what about at the Marriott Hotel?

20   A    No.

21       MR. WIESE:  Nothing further.

22       MR. TERRELL:  Jencks affidavits, please.

23       MS. BURGESS:  Your Honor, I have a 25-page affidavit;

24   however, I would ask -- a lot of this has to do with bargaining.

25   We didn't ask her any questions about bargaining.  Any testimony

P 00631

1   about that would obviously be beyond the scope of direct, with

2   the exception to the one reference to the session where there

3   was a discussion at the end about the access issues.  But,

4   otherwise, I believe that this document should be redacted, and

5   then it's a much shorter deal, it's just about the access

6   issues.  So that's what I would propose to do, and then turn

7   this over.

8        And then there's two pages of notes regarding the incidents

9   that testified about, which would fall under <u>Jencks</u>.

10       MR. TERRELL:  I don't think it should be redacted.

11       MS. BURGESS:  It would be beyond the scope of direct.  We

12   asked her nothing about negotiations, so you couldn't go there

13   anyway.

14       MR. TERRELL:  Well, there was one.

15       MS. BURGESS:  Right, and I said I would leave that in.

16       MR. TERRELL:  How am I supposed to know that it's been left

17   --

18       JUDGE STECKLER:  The Judge can do an <u>in camera</u> inspection.

19       MR. TERRELL:  What's the harm in me reading it?

20       MS. BURGESS:  Because it's -- you can't ask her questions

21   about it, and it would just take up so much extra time, which

22   you've already asked for.

23       So the Judge can do an <u>in camera</u> inspection of the

24   redaction versus the original, if you have any concerns about

25   that.

1    MR. TERRELL:  Well, the Judge might allow me to do a little

2  beyond cross -- I mean, beyond the scope of direct.  That's

3  certainly not unheard of.

4    MS. BURGESS:  Well, evidentiary --

5    MR. TERRELL:  In NLRB litigation, particularly since the

6  negotiations are certainly a huge topic in this case.  I mean,

7  this witness may know, and I can certainly call her in my case

8  in chief, but she's here now.

9    MS. BURGESS:  You can certainly call her, but you're not

10  entitled to her affidavit if you call her during your case in

11  chief, so that doesn't help you.  And it is --

12    JUDGE STECKLER:  Can you all address me instead of having

13  some cross-colloquy.

14    MR. TERRELL:  I'm sorry, Your Honor.

15    MS. BURGESS:  I'm sorry, Your Honor.

16    JUDGE STECKLER:  Address me instead of fighting with each

17  other.

18    MR. TERRELL:  Your Honor, I couldn't hear you, I'm sorry.

19    JUDGE STECKLER:  If you guys wouldn't mind addressing me

20  instead of fighting with each other.

21    MR. TERRELL:  Oh, certainly.

22    JUDGE STECKLER:  Any further comments on this issue?

23    MS. BURGESS:  I would say that the bargaining is an issue.

24  Our theory of the case is very discreet.  It regards two

25  specific proposals that we allege to be 8(a)(5).  It's not an

1 overall surface bargaining case.  And each of the bargaining

2 sessions that are referenced in here really have no relevance

3 and she didn't testify about it.  So he really can't -- it's

4 beyond the scope of direct, which is a very basic principle of

5 evidence.

6      MR. TERRELL:  All that said, Your Honor, I still don't

7 understand what the big deal is?  Why not allow me to read it?

8      MS. BURGESS:  And, Your Honor, I guess --

9      MR. TERRELL:  I may be prohibited from going into much of

10 it on cross, but I see no harm in allowing me to read it.

11     MS. BURGESS:  Your Honor, if he can't go into it on cross,

12 and we're trying to expedite the hearing, so that -- I think we

13 all agreed that we wanted to finish with General Counsel's case

14 in chief at least tonight.

15     JUDGE STECKLER:  Let me take a look at some things here.

16 Hang on just a few moments.

17 (Pause.)

18     JUDGE STECKLER:  The direction I get from Caterpillar, 313

19 NLRB 626, a 1993 case.  The Board held when the General Counsel

20 assts that material in the Jencks statement does not relate to

21 the subject matter of the witness' testimony on direct exam, the

22 Judge must inspect the statement in camera and excise the

23 portion of the statement that does not relate to the testimony.

24 The Judge may exercise discretion in this respect.

25     MR. TERRELL:  So what is your discretion?

1        MS. BURGESS:  If Your Honor would like to do the redaction,

2    I'm totally fine with that.

3        JUDGE STECKLER:  Does someone have a black marker?

4        MS. BURGESS:  I do.

5        JUDGE STECKLER:  Okay.

6        Now I do have some discretion to leave in a few things if I

7    think that they are relevant to -- and I need to hear testimony

8    on that.

9        So given the time of the day, what I would like to do is do

10   this overnight, where I can give it appropriate time, and we'll

11   take some time first thing in the morning, so Mr. Terrell can

12   have some time to review this.

13       Under this circumstance, can we convene at 8:30?

14       MR. TERRELL:  Well, we --

15       JUDGE STECKLER:  I know you've had some problems in getting

16   to your witnesses, Mr. Terrell.

17       MR. TERRELL:  I mean, that's huge -- you know, we're

18   basically making this up on the fly, corralling witnesses, and

19   we've got a lot of work to do.  And every minute is going to

20   help, so I really would prefer a 9 a.m. start.

21       JUDGE STECKLER:  Okay.

22       MS. BURGESS:  Well, we can do 8:30, Your Honor.

23       MR. WIESE:  Yes.

24       MS. BURGESS:  So it's up to you.

25       Or could we go late tomorrow night?

1    MR. TERRELL:  Well, we've got virtually all of our

2    witnesses we need to prepare.

3    JUDGE STECKLER:  Right.

4    And from our previous conference calls, I understand Mr.

5    Henry is not available at all last week?

6    MR. TERRELL:  Last week?

7    JUDGE STECKLER:  Last week.  Wasn't he out recruiting last

8    week?

9    MR. TERRELL:  That's correct, Mr. Henry was in the

10   Philippines.

11   MS. BURGESS:  Well, Your Honor, I would just note for the

12   record that this case has been scheduled for trial for quite

13   some time now, so their scheduling issues really are their own.

14   MR. TERRELL:  Well, but it's also the reality that we don't

15   know what your case is all about from the scant sentenced in

16   your complaint until we actually hear the testimony.

17   JUDGE STECKLER:  Wait a minute, wait a minute.

18   Remember, I said no cross-colloquy.

19   MR. TERRELL:  I was directing this to you.

20   JUDGE STECKLER:  Oh, okay, thank you -- and for that

21   clarification.

22   Yes, this is going to take me some time.  If General

23   Counsel doesn't mind, if you have an extra copy so I can compare

24   as I go through.

25   MR. WIESE:  Mmm-hmm.  Although --

1      JUDGE STECKLER:  Brings me back to my FOIA days.

2      MR. TERRELL:  Pardon me?

3      JUDGE STECKLER:  To my FOIA days.

4      MR. TERRELL:  So we're done for the day, Your Honor, right?

5      JUDGE STECKLER:  In just a moment when I get an extra copy

6   of -- and then tomorrow morning, I tell you what -- and tomorrow

7   morning, what I will do is I'll try to be here as early as

8   possible, so General Counsel can make copies of the redacted

9   statement, so that we won't waste any time --

10      MR. TERRELL:  Okay.

11      JUDGE STECKLER:  -- when we go on the record at 9.

12      MR. TERRELL:  At 9.

13      JUDGE STECKLER:  Since you said 9, I try to be cooperative.

14      MR. TERRELL:  Thank you.

15      MR. WIESE:  Okay, yes, that's fine.

16      JUDGE STECKLER:  But we'll try to go as late as possible

17   tomorrow evening, pending bathroom breaks --

18      MR. TERRELL:  Okay.

19      JUDGE STECKLER:  I was going to say something back from my

20   nursing days, but that won't be appropriate.

21      Anything else before we go off the record?

22      MR. TERRELL:  No, Your Honor.

23      MS. BURGESS:  No, Your Honor.

24      MR. WIESE:  No, Your Honor.

25      JUDGE STECKLER:  Thank you.

P 00637

1        MR. TERRELL:  Thank you.

2        JUDGE STECKLER:  I just wanted to remind the witness, Ms.

3   Henry, you are excused till the morning.  Please do not discuss

4   your testimony with anyone during this time period.

5        We'll see you in the morning.

6        THE WITNESS:  Okay.

7        JUDGE STECKLER:  And now we're off the record.

8   (Whereupon, at 5:20 p.m., the hearing adjourned to resume

9   tomorrow, December 17, 2015, at 9 a.m. in the same place.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2        This is to certify that the attached proceedings before the

3    National Labor Relations Board, Region 18, Case 18-CA-151245,

4    Richfield Hospitality, Inc., as managing agent for Kahler

5    Hotels, LLC and Unite HERE International Union Local 21, in

6    Rochester, Minnesota, on December 16, 2015, was held according

7    to the record, and that this is the original, complete and true

8    and accurate transcript that has been compared to the recording,

9    at the hearing; and that the exhibits are complete and no

10   exhibits received in evidence or in the rejected exhibit files

11   are missing.

12

13              *Sandra Moberg Walls*

14              Sandra Moberg Walls

15              Official Reporter

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

In the Matter of:

RICHFIELD HOSPITALITY, INC., AS
MANAGING AGENT FOR KAHLER HOTELS, LLC,

        Respondent,

and                               Case No. 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21,

        Charging Party.

Pages: 446 through 694 (Volume 3 of 3)

Date: December 17, 2015

Place: Rochester, Minnesota

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00640

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

**In the Matter of:**

**RICHFIELD HOSPITALITY, INC., AS**
**MANAGING AGENT FOR KAHLER HOTELS, LLC,**

       **Respondent,**

**and**                        **Case No. 18-CA-151245**

**UNITE HERE INTERNATIONAL UNION**
**LOCAL 21,**

       **Charging Party.**


The above entitled matter resumed trial, pursuant to

adjournment, before The Honorable Sharon L. Steckler,

Administrative Law Judge, in Conference Room 3101A of the

Olmstead County Government Center, 151 - 4th Street SE,

Rochester, Minnesota, on Thursday, December 17, 2015, at 9:12

a.m.

```
 1                     A P P E A R A N C E S

 2        On behalf of the NLRB, Counsel for the General Counsel:

 3        TYLER J. WIESE, ESQ.

 4        NICHOLE L. BURGESS, ESQ.

 5        National Labor Relations Board, Region 18

 6        212 3rd Avenue South, Suite 200

 7        Minneapolis, Minnesota  55403

 8        (612)348-1757

 9        tyler.wiese@nlrb.gov

10        nichole.burgess@nlrb.gov

11        On behalf of the Charging Party:

12        MARTIN GOFF, Sr. Vice President

13        Director of Organizing

14        UNITE HERE International Union Local 17

15        312 Central Avenue, Suite 444

16        Minneapolis, Minnesota  55414

17        (612)379-4730, Ext 14

18        mgoff@here17.org

19

20

21

22

23    (Appearances continued on page 3.)

24

25
```

1          **A P P E A R A N C E S** (continued):

2     **On behalf of the Respondent:**

3     KARL M. TERRELL, ESQ.

4     ARCH Y. STOKES, ESQ.

5     Stokes Wagner Hunt Maretz & Terrell

6     One Atlantic Center

7     Suite 2400

8     1201 West Peachtree Street

9     Atlanta, Georgia  30309

10    O: (404)766-0076

11    kterrell@stokeswagner.com

12    astokes@stokeswagner.com

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2  **WITNESSES**          **DIRECT** **CROSS** **REDIRECT** **RECROSS** **VOIR DIRE**

3  Linda Henry                      457

4  (Recalled)

5  Leslie Hohmann       465   493   501              474

6  Michael Henry        505                          561

7  (Recalled)

8  Ericka Scrabeck      587   600   607              601

9  Mary Kay Costello    610   621                    614

10  Crystal Adcox        626   631   635

11  Arch Stokes          641   671

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00644

```
 1                    E X H I B I T S

 2   EXHIBIT                    IDENTIFIED            IN EVIDENCE

 3   General Counsel's

 4    31                                                 585

 5    33                                                 603

 6    34                                                 585

 7    39(d)-(f) and (h)-(m)                              584

 8    43                                                 584

 9    44(a) - (f)                                        584

10    45(a) - (c)                                        584

11

12   Respondent's

13    2                         459

14   (R 2 split: Part 1 and Part 2)690

15    2(Part 1)                                          690

16    2(Part 2)-REJECTED pg 690)

17    3                         469                      478

18    4                                                  486

19    5                                                  493

20    6                                                  565

21    7                         582                      584

22    8                         582                      584

23    9                         582                      584

24   10                         582                      584

25   11                         582                      584
```

```
1                    E X H I B I T S (continued)

2    EXHIBIT                    IDENTIFIED              IN EVIDENCE

3    Respondent's

4    12                            582                      584

5    13                                                     615

6    14                            650                      670

7    15                                                     669

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00646

1                       P R O C E E D I N G S

2                                            9:12 a.m.

3        JUDGE STECKLER:  Thank you.  Good morning.

4        This is the third day of the trial in Richfield

5   Hospitality.

6        As we left yesterday there was disputes about whether to

7   produce the affidavit of Ms. Linda Henry, and I determined at

8   the end of the day that I would redact the portions to which she

9   did not testify. I have done so, and what we need to do now is

10  produce to Mr. Terrell pages 1 and 2, and pages 20 through 25.

11  So I will direct General Counsel to make copies of those pages

12  as I do have some redactions on a couple of the pages.  The rest

13  of the affidavit is not relevant to her testimony.

14       So I'll give -- I'm going to hand General Counsel a copy,

15  General Counsel will also be directed to retain a copy of the

16  unredacted statement, as well as a copy of the redactions.

17       MR. WIESE:  Okay, Your Honor.

18       JUDGE STECKLER:  And I will review before I give to Mr.

19  Terrell to ensure that everything that I wanted redacted is

20  redacted, and, likewise, everything that's supposed to be

21  produced will be produced.

22       With that, Ms. Burgess or Mr. Wiese, I'll give you the

23  affidavit.

24       And we'll go off the record.  Thank you.

25  (Off the record.)

1    JUDGE STECKLER:  We're back on the record briefly.

2    We were discussing off the record about production of the

3  affidavit.  General Counsel will produce specifically the pages

4  1 and 2, and 20 through 25, without the intervening pages which

5  were all redacted by me.

6    In addition, there are some additional Jencks statements

7  from Ms. Henry.  One is her notes regarding access issues from

8  what Mr. Wiese told me, and then you said there were bargaining

9  notes as well?

10    MR. WIESE:  Yes, Your Honor, and then a handful of e-mails.

11    MS. BURGESS:  And the same argument should apply to the

12  bargaining notes.

13    THE COURT REPORTER:  I'm not picking you up.  Need to be by

14  mic.

15    MR. WIESE:  Well, I mean as the portions of the bargaining

16  -- the bargaining portions of her affidavit are, you know,

17  deemed to be outside the scope of her -- the Jencks production.

18  I mean, I would make the same argument as to the bargaining

19  notes being required to be produced.

20    JUDGE STECKLER:  I think -- so Mr. Terrell, you'd like an

21  in camera review on that, wouldn't you?

22    MR. TERRELL:  These -- we have no particular objection.

23    JUDGE STECKLER:  Do you need them or not?

24    MR. TERRELL:  The bargaining notes?

25    JUDGE STECKLER:  Yes, sir.

1       MR. TERRELL:  By Ms. Henry, I'd like to look at them, yes.

2       JUDGE STECKLER:  Okay, then I'll have to redact again, and

3   review for redaction.  So while you guys are making copies of

4   that, I'll review.

5       MR. WIESE: Okay.

6       JUDGE STECKLER:  To make -- to ensure that we're not going

7   off of what she was not discussing on direct.

8       MR. TERRELL:  Okay.

9       MR. WIESE:  Are we still on the record?

10      THE COURT REPORTER:  Yes, we are.

11      JUDGE STECKLER:  Okay, so you're going to give --

12      MR. WIESE:  I'm handing Mr. Terrell the access notes and

13  the e-mails and -- a handful of e-mails that I received from Ms.

14  Henry.

15      JUDGE STECKLER:  Okay.

16      And I didn't bring back the marker, so everything's going

17  to be redacted in purple.

18      MR. WIESE:  And I'm handing the Judge a copy of Ms. Henry's

19  --

20      JUDGE STECKLER:  Okay, are these paginated at all?

21      MR. WIESE:  They are not.

22      JUDGE STECKLER:  Okay, I'm going to put page numbers on

23  them before I start.

24      MR. WIESE:  Okay.

25      JUDGE STECKLER:  Okay, and with -- so I have her bargaining

1    notes to review for redactions.  And with that, General Counsel

2    will make copies to produce of the affidavit.

3         We're off the record.

4    (Off the record.)

5         JUDGE STECKLER:  Thank you, we're back on the record.

6         I've reviewed the bargaining notes by Linda Henry. There is

7    only one page that is relevant.  I wrote page numbers on here.

8    This document, again, will be preserved by the General Counsel.

9    And the only page that needs to be produced out of my pagination

10   and copied with my pagination on the bottom is page 45; and that

11   is it.

12        So, Mr. Wiese, I will give you the paginated copy of Ms.

13   Henry's bargaining notes at this time for making copies for Mr.

14   Terrell.

15        That's it, thank you.  We'll be off the record for a

16   moment.

17   (Off the record.)

18        JUDGE STECKLER:  We're back on the record.

19        General Counsel, do you have documents to produce to Mr.

20   Terrell?

21        MR. WIESE:  Yes, Your Honor, I have the page 45 of Ms.

22   Henry's bargaining notes that you ordered to be produced.

23        MS. BURGESS:  And we had already provided the redacted

24   version of the affidavit a few minutes ago and --

25        JUDGE STECKLER:  Okay.

1          Mr. Terrell, how long would you like to review?

2          MR. TERRELL:  I'm sorry?

3          JUDGE STECKLER:  How long would you like to review?

4          MR. TERRELL:  Just another five minutes.

5          JUDGE STECKLER:  Okay, we'll be off the record for 5

6     minutes, then, thank you.

7     (Off the record.)

8          JUDGE STECKLER:  We're back on the record.

9     (WITNESS RECALLED:  LINDA HENRY)

10         JUDGE STECKLER:  Good morning, Ms. Henry, you've retaken

11    the stand.  Please remember that you are still under oath.

12         JUDGE STECKLER:  Mr. Terrell, you may cross.

13         MR. TERRELL:  Thank you.  I just have a few questions.

14         Oh, before we begin, before we go forward with this

15    witness, I wanted to take care of a subpoena issue.  We stated

16    yesterday -- we provided yesterday a list, and the highlighted

17    names on that list are the employees who were voluntarily

18    separated by virtue of being a no-call/no-show for 2 days in a

19    row, and I said we would provide the personnel action forms for

20    each of the names on the list and I do have that this morning,

21    and so I've handed them out to General Counsel.

22         MR. WIESE:  Just clarifying for my purposes, so the names

23    that aren't highlighted on this list are other employees who

24    have received attendance discipline, but are not --

25         MR. TERRELL:  But the names on the list that are not

1  highlighted --

2      MR. HENRY:  Are on the list.  There's an action form for

3  all on the list.

4      MR. WIESE:  Okay.

5      JUDGE STECKLER:  Mr. Henry, you're going to have to get

6  closer to a mic.

7      MR. HENRY:  I'm sorry.

8      THE COURT REPORTER:  I didn't get that.

9      MR. HENRY:  I'm sorry.

10     The list that was presented, all the associates on that

11  list you have an actual form for them.

12     MR. WIESE:  Okay, right, okay I got it.  Thank you.

13     JUDGE STECKLER:  Thank you, Mr. Terrell, we appreciate

14  that.

15     MR. TERRELL:  Yes.

16                     CROSS-EXAMINATION

17  Q    BY MR. TERRELL:  Good morning.

18  A    Good morning.

19  Q    The collective bargaining agreement for the hotels, the one

20  that expired, there is a provision in that agreement that

21  relates to the bulletin boards, is that correct?

22  A    Yes.

23  Q    And at the Kahler Grand Hotel, in the employee cafeteria,

24  there is a board in the employee cafeteria that is designated

25  for the Union, that's correct, isn't it?

1    A    Yes.

2    Q    Similarly at the Marriott, in the employee break room at

3    the Marriott, there's also a board designated for the Union's

4    use in putting up whatever notices they would like, correct?

5    A    I believe so, yes.

6    Q    Okay.  Just one other question, you -- or one of the line

7    of questions -- you testified yesterday that you are the

8    business representative for Textile Care Services.

9    A    Yes.

10   Q    And has that remained the case?  Are you still the business

11   representative for Textile Care Services following the

12   separation of that unit into a separate bargaining unit?

13   A    Yes.  They're still under our same Local 21, and I still am

14   a representative out there.

15   Q    Okay.  And did you -- you attended the collective

16   bargaining sessions at Textile Care Services, didn't you?

17   A    I did.

18   Q    And an agreement was reached.

19   A    It was.

20   Q    For the bargaining unit.

21        I want to hand you what I will represent is a copy of the

22   final agreement.

23   (Witness proffered document.)

24   A    Thank you.

25        THE COURT REPORTER:  Do you want that marked?

1      MR. TERRELL:  Yes, I do. I'd like to mark this as Exhibit R

2  2.

3  (EXHIBIT MARKED:  RESPONDENT'S 2.)

4  Q    BY MR. TERRELL:  Who was the lead negotiator for the

5  company in the bargaining sessions for the Textile Services

6  collective bargaining agreement?

7  A    For the company?  Paul.

8  Q    Paul Jewison?

9  A    Yes.

10 Q    At the bargaining table was Mr. Stokes, who is sitting here

11 to my left, in the bargaining?

12 A    Yes, he was.

13 Q    And did he participate in the negotiations?

14 A    Yes, he did.

15 Q    Did he lead them with Paul?

16 A    Yes.

17 Q    I've handed you what's been marked as Exhibit R 2.  I think

18 if you flip to page 34 you'll see the signature lines.

19 A    Yes.

20 Q    Do you recognize the signature lines for Brian Brandt,

21 Nancy Goldman and Martin Goff?

22 A    Yes.

23 Q    Is this collective bargaining agreement that the parties

24 entered into on August 20, 2015?

25 A    Yes.

1    Q    How many bargaining sessions did it take to reach this

2    agreement after the bargaining unit was separated?

3    A    Three.

4    Q    Three.  And you see attached to this bargaining agreement a

5    series of pie charts, do you see that?

6    A    Yes.

7    Q    And these pie charts were made a part of the collective

8    bargaining agreement, correct?

9    A    I'm -- I don't believe the pie charts are in our collective

10   bargaining agreement booklet.

11   Q    They were provided to the Union during the bargaining,

12   correct?

13   A    They were provided during the initial bargaining that was

14   taking place when we were still part of the Kahler properties.

15   Q    And -- but whether they're in the booklet or not, these pie

16   charts are part of the contract, true?

17   A    I -- no, I can't answer that.

18   Q    Very good.

19        MR. TERRELL:  Your Honor, we move into evidence Exhibit R

20   2.

21        JUDGE STECKLER:  Relevance?

22        MR. TERRELL:  Well, the Textile Care Services collective

23   bargaining agreement was negotiated during the formal

24   negotiations for the hotel.  At that point, they were in the

25   same bargaining unit --

1        JUDGE STECKLER:  During that summer, summer of 2015,

2    correct?

3        MR. TERRELL:  I'm sorry?

4        JUDGE STECKLER:  Summer of 2015, correct?  During the

5    summer.

6        MR. TERRELL:  It was finalized during the negotiations in

7    the summer of 2015 following the Regional Director's ruling that

8    it should proceed as a separate bargaining unit pursuant to the

9    unit clarification decision, but the bargaining for this

10   agreement initially was being bargained at the bargaining table

11   with the hotel bargaining unit.

12       This is an 8(a)(5) case, and we submit the relevance of the

13   agreement that we've placed in front of this witness, who has

14   identified it, as definitely relevant because it shows that the

15   parties were able to reach an agreement, so we submit it for

16   that purpose.

17       JUDGE STECKLER:  General Counsel?

18       MR. WIESE:  Judge, I mean I don't believe that this

19   agreement is relevant.  I also don't think -- if I heard right

20   from Mrs.  Henry, or Ms. Henry, wasn't able to fully identify

21   the entire document.  And I mean what occurred in the -- what

22   Respondent requested to be a separate bargaining unit isn't

23   relevant to what's happening here.  And, again, I don't want to

24   sound like a broken record on this, but this isn't an overall

25   surface bargaining case.  We're dealing with distinct proposals

1  related to wages and union leave, and time spent at the

2  bargaining table for a completely different bargaining unit, and

3  so the relevance of a collective bargaining agreement for a

4  different bargaining unit -- I mean, there seems to be none in

5  my view.

6      MR. TERRELL:  Your Honor, may I be heard?

7      JUDGE STECKLER:  Certainly, sir.

8      MR. TERRELL:  Mr. Wiese says that this is not a surface

9  bargaining case, however there at least six identifiable -- more

10 than that, actually -- 8(a)(5) allegations.  One of those

11 8(a)(5) allegations is that the company unlawfully refused to

12 meet again in October and November.  So the allegations in this

13 case are intended to present a depiction that the employer is an

14 intransigent bargainer, that it bargained in bad faith.

15     Mr. Wiese's opening statement in his opening argument in

16 this case -- he used the phrase that this is a case about an

17 employer that wants what it wants, and so that's the case that

18 we are defending.  And it is highly relevant to show that the

19 Textile Care Services bargaining unit, which was a part of this

20 bargaining for the hotel, it was separated, but it was the same

21 parties who were bargaining. It was Local -- it was the same

22 negotiators, Martin Goff, Brian Brandt and Nancy Goldman, and it

23 was the same negotiators at the table, Arch Stokes, Paul

24 Jewison.  Paul Jewison was in the bargaining negotiations before

25 the separation of the unit.  It is also relevant in that pie

1    charts were used during the negotiations and presented during

2    the negotiations, and we will have testimony that they were, in

3    fact, made a part of the contract.  Whether the Union put them

4    in their booklet or not, that's up to the Union, but they are a

5    part of the contract.

6        So we submit, respectfully, that this is a highly relevant

7    document and highly relevant testimony that's already been

8    allowed to come in.  There was no objection to Ms. Henry's -- to

9    the questions directed to Ms. Henry regarding this document and

10    she has identified, so we submit that it's relevant and go in

11    evidence.

12        JUDGE STECKLER:  But she's also disputed whether the pie

13    charts were part of it.

14        What I would like to do is hold off on admission, and re-

15    suggest it with one of your witnesses.

16        MR. TERRELL:  We will do that.

17        JUDGE STECKLER:  Thank you.

18        MR. TERRELL:  I have nothing further for Ms. Henry.

19        JUDGE STECKLER:  Thank you.  Ms. Henry, thank you for your

20    time.  You may step down.  Please do not discuss --

21        MR. WIESE:  No redirect, Your Honor.

22        JUDGE STECKLER:  Oh, I'm sorry, I was getting --

23        MR. WIESE:  That's all right.

24        JUDGE STECKLER:  Please do not discuss your testimony with

25    anyone until the hearing is over, which may be a while.

    1        THE WITNESS:  Okay.  Thank you.

    2        JUDGE STECKLER:  Thank you.

    3  (Witness excused from stand.)

    4        JUDGE STECKLER:  And is that the close of the General

    5  Counsel's case?

    6        MR. WIESE:  Yes, it is, subject to rebuttal --

    7        JUDGE STECKLER:  Of course.

    8        MR. WIESE:  -- if necessary.

    9        JUDGE STECKLER:  Of course.

   10        MR. WIESE:  Yes, I'm --

   11        JUDGE STECKLER:  Do you have any motions that you need to

   12  make at this time?

   13        MR. WIESE:  No.  No, Your Honor.

   14        JUDGE STECKLER:  I understand Respondent's first witness is

   15  here.

   16        MR. TERRELL:  Yes.

   17        JUDGE STECKLER:  However, before we go to that, I mentioned

   18  at the beginning of the hearing, I would again talk to the

   19  parties about settlement.  This is still an opportunity for you

   20  to discuss with each other ways to make the -- make the season

   21  bright, so to speak.  To borrow from what's going on on

   22  television all day long.

   23      I won't stop the hearing at this time, but if it any time

   24  you would like to stop to discuss, please let me know and I'll

   25  be happy to do so.

1  (No response.)

2      JUDGE STECKLER:  Hearing nothing, I assume that means "no."

3      In that case, Mr. Terrell, would you like to call your

4  first witness?

5      MR. TERRELL:  Yes, we call Leslie Hohmann.

6  (Pause.)

7      JUDGE STECKLER:  Please have a seat.

8  (WITNESS SWORN:  LESLIE HOHMANN)

9      JUDGE STECKLER:  Please state your full name for the

10  record, and please spell your last name also.

11      THE WITNESS:  My name is Leslie Hohmann.  L-E-S-L-I-E, H-O-

12  H-M-A-N-N.

13      MR. WIESE:  And, Your Honor, I apologize for interrupting

14  at this point, but could we have the witness remove her notes

15  from the table, or the notes that are --

16      THE WITNESS:  We were talking about calculations.

17  Certainly.

18      MR. WIESE:  Thank you.

19      JUDGE STECKLER:  Okay, Mr. Terrell, Ms. Hohmann is yours.

20                      DIRECT EXAMINATION

21  Q   BY MR. TERRELL:  Good morning.

22  A   Good morning.

23  Q   Ms. Hohmann, where do you work and what is your job?

24  A   I'm the chief financial officer for Kahler Hospitality.

25  Q   And are you responsible for the hotels?

1   A    I am responsible for all the financial operations for the

2   hotels, yes.

3   Q    Including the Kahler Grand --

4        MR. TERRELL:  Objection:  leading.

5   Q    BY MR. TERRELL:  Which hotels, please.

6        JUDGE STECKLER:  It's just preliminary information.  Go

7   ahead.

8        THE WITNESS:  I'm responsible for the financials for the

9   Rochester Marriott, the Rochester Residence Inn, the Kahler

10  Grand Hotel, and the Kahler Inn and Suites.

11  Q    BY MR. TERRELL:  And what functions do you provide in that

12  capacity?

13  A    We prepare all payroll for all employees, we prepare

14  budgets, we prepare monthly financial reports, we prepare

15  payments to the Union for their employees, we prepare all

16  financial calculated documents that go out of the Kahler Hotels.

17  Q    Okay.  Did you have any involvement or role to play in the

18  collective bargaining negotiations that took place in 2014 and

19  2015?

20  A    Yes.

21  Q    And what was your role?

22  A    My role was to compile documents from the payroll

23  department, from the Union agreement book, and to help assemble

24  the wage proposal from a financial calculation for preparations

25  to meet with the Union representatives, with Nancy and Brian

1    specifically.

2    Q    Did you participate in the preparation of the wage

3    proposal?

4    A    Yes, I did.

5         MR. TERRELL:  I'd like to show the witness Exhibit 6(g).

6    (Witness proffered document.)

7    Q    BY MR. TERRELL:  And this document -- this document has --

8    is already -- already been identified in the record as the

9    employer's last, best, and final offer on March 24, 2015.  And

10   if I could direct your attention to page 51 of 150, using the

11   pagination you see at the bottom right. And starting with this

12   page and going over the next several pages, could you please

13   identify this part of the proposal?

14   A    Certainly.  These were the pages that were provided to the

15   Union that would have gone in the Union handbook at the

16   completion of the negotiations for the wage rates by position by

17   hotel, for the 2015 year and the following subsequent five

18   years.

19   Q    All right.  And then starting on page 52 we see, I guess

20   you could call it, a schedule of positions and wages.  Could you

21   -- what wages do these figures on this schedule represent?

22   A    The 2015 column was the wage that would be in place at the

23   beginning of the agreement, and the following years were

24   escalated based upon the wages starting in the 2015 year in this

25   report.

1   Q    Now would these be the wages paid to all employees in these

2   --

3        MR. WIESE:  Objection:  leading.

4        MR. TERRELL:  I don't think that was leading.  I'm asking

5   her a question that calls for a yes or no answer.  Would these

6   wages be the wages applicable --

7        JUDGE STECKLER:  Mr. Wiese, I allowed you a lot of latitude

8   too, so --

9        MR. WIESE:  These were the type of questions that I was

10  getting objections to, Your Honor.

11       JUDGE STECKLER:  Is this a foundational question?

12       MR. TERRELL:  Yes.

13       JUDGE STECKLER:  Okay, go ahead.

14  Q    BY MR. TERRELL:  Do these wages, as set forth on this

15  schedule apply to all of the employees in the hotel?

16  A    These -- my understanding is these are the starting wages

17  for the employees in the agreement.

18  Q    Was there a separate proposal relating to the then current

19  employees?

20  A    Yes.

21  Q    Would you please explain that?

22  A    We prepared an Excel file listing --

23  Q    You prepared a what?

24  A    There was an Excel file prepared with all employees as of

25  March that were on the Union payroll.  And that file was used

1  individually for every named individual with their seniority

2  date, their -- basically, so the date of hire, the length of

3  service, their position in the exact Union category that they

4  were under in the CBA, and their individual wage projection to

5  the end of 2020, by individual, a multi-hundred line document

6  with the proposed wages by individual.

7  Q    Okay.

8       MR. TERRELL:  One moment, please.

9       Tyler, I'm going to hand you at this document. I had given

10 it to the day before yesterday.

11      MR. WIESE:  Mmm-mmm.

12      MR. TERRELL:  I only have four right now.

13      MR. WIESE:  Okay.

14      MR. TERRELL:  I can give you mine if you don't have yours -

15 - there you go.

16      MR. WIESE:  Is this --

17 (EXHIBIT MARKED:  RESPONDENT'S 3.)

18 Q    BY MR. TERRELL:  Ms. Hohmann, in your last response, you

19 mentioned an Excel spread sheet.

20 A    Yes.

21 (Witness proffered document.)

22 Q    I've handed you what we've marked as Exhibit R 3.  Is this

23 the Excel spread sheet you were referring to?

24 A    Yes, it is.

25 Q    If you would, please, and -- well, let me ask this question

1   first, was this document presented to the Union during the

2   course of bargaining?

3   A    Yes.

4   Q    Did you participate in any of the meetings with the

5   bargaining -- with the Union in the bargaining sessions?

6   A    I was in limited sessions for the larger discussion of work

7   rules and other topics, however I did have this document, and

8   presented it, and Martin and Brian and Nancy were in the room.

9   Q    You presented this document marked R3 --

10  A    Yes.

11  Q    -- to the Union?

12  A    Yes, I did.

13  Q    Did -- there appears to be quite a bit of information on

14  here.

15  A    Yes.

16  Q    And so I would like you to first explain to Her Honor

17  orienting her to his spread sheet and how it works, and the

18  information that it showed and provided.

19  A    Absolutely.

20       The far left column would be the payroll entity, whether it

21  was the Kahler or the Marriott or the Residence Inn, example.

22  The second --

23       JUDGE STECKLER:  Before you go -- so "KG" is the Kahler

24  Grand?

25       THE WITNESS:  Yes.  Kahler Grand.  "MAR" is the Marriott.

1    JUDGE STECKLER:  Okay.

2    THE WITNESS:  "RI" is the Residence Inn and "KIS" is the

3    Kahler Inn and Suites.

4    JUDGE STECKLER:  Okay.  Go ahead.

5    THE WITNESS:  It already was getting small so we were

6    compressing a little bit.

7    JUDGE STECKLER:  Yes.

8    THE WITNESS:  The second column is the employee's last name

9    according to their payroll file, first name, the rate in effect

10   for that employee at the time we pulled the data out of the ADP

11   payroll system.  The next column is the employee's job title.

12   And then the other column was kind of a tool we used for the

13   look-up in the mathematicals.  Then the next column is the

14   service date for original date of hire for vesting of benefits

15   according to the Union agreement.  The following column includes

16   the dates of service that trigger the eligibility for different

17   benefit tiers within the collective bargaining agreement.  The

18   next column was the 2015 proposed rate that included the

19   negotiation and the updates to the minimum wage for the State of

20   Minnesota.  And then the following five columns:  rate-16, rate-

21   17, rate 18, 19, and rate-20 relate to 2016 -- 2017, et cetera

22   for the proposed rate offered for each named individual in our

23   bargaining unit agreement.  The following column takes the

24   current wage in what is column four on this document, and shows

25   the rate of increase for the dollar per hour increase between

1  the rate at the time the agreement was pulled and the rate

2  offered in the agreement for 2016 -- or 2015.  And then it shows

3  the first year rate increase, and then it shows every year the

4  escalated rate increase for that named individual out to 2020.

5      So in that first column, it would show for the section

6  here, for banquet server in the first section, it would show a

7  rate going from $8 an hour as a tipped employee to an increased

8  hourly rate of 87.5 percent to the proposed $15 an hour.  And it

9  does this likewise for every housekeeper, every bell person,

10 every cook in our bargaining unit on the subsequent pages.

11     On the far right column are notes that I had used in the

12 calculation.  It may say that it was a red-line employee, the

13 rate was a minimum wage adjusted, it was a rate of annual

14 increase of -- from this dollar or this percent, and so it was -

15 - we went to the effort of doing the calculations at an

16 individual level using these computations.

17 Q    BY MR. TERRELL:  In the top right area of the first page of

18 Exhibit R 3, there's a reference to a meeting date "3-6-15".

19 What is that a reference to?

20 A    I prepared this document for meetings scheduled on that

21 date.

22 Q    Now, Ms. Hohmann. there has been a lot of testimony in this

23 case about pie charts. And the pie charts are in evidence.  Are

24 there pie charts attached to the proposal, which is marked

25 Exhibit 6(g), the first exhibit you looked at?

1    A    Oh, yes.  There are definitely pie charts.

2    Q    Did you prepare those pie charts?

3    A    I did.

4    Q    And did you prepare any other pie charts in addition to the

5    pie chart set that you see attached to that proposal?

6    A    I prepared pie charts for the hotel and all of the Textile

7    plant worker employees.

8    Q    Okay.

9    A    Based upon the status of the bargaining in March.

10    Q    Did you prepare pie charts for the individual employees?

11    A    I did, and one for each year from the current year to the

12    end of 2020, customized for every employee based upon their date

13    of service, the triggers in the bargaining agreement that

14    spelled out the number of vacation days, or other dates of

15    personal time triggered on various anniversary dates in the

16    collective bargaining agreement.

17    Q    Okay.

18    A    But they were multiple years per person times several

19    hundred Union employees.

20    Q    What I'd like to have you do now is describe to Her Honor

21    how the pie charts were created, and the processed you went

22    through in creating the pie charts.  Did you prepare any

23    document for your use in how you made those calculations?

24    A    I did.  I prepared a Word document with -- recapping the

25    terms so I would, as I went through each one, know, for example,

1    at eight years there's an additional day, at twenty years this

2    additional day was given, and it's a fairly complicated labor

3    agreement and I wanted to have one source document in front of

4    me to prepare them to make sure because I was pulling from

5    payroll files, from Union agreements, from seniority tables, and

6    so I needed one document as a master document to reference those

7    terms.

8    Q    I'm going to hand you a document marked Exhibit R 4 and ask

9    you if this is the document you're referring to now?

10   (Witness proffered document.)

11        JUDGE STECKLER:  Did we admit 3 yet?

12        MR. WIESE:  Are you going to enter R 3?

13        MR. TERRELL:  Yes.  I'll do that right now.  Your Honor, we

14   move into evidence Exhibit R 3, please.

15        MR. WIESE:  Voir Dire, briefly.

16        JUDGE STECKLER:  Okay.

17                    VOIR DIRE EXAMINATION

18   Q    BY MR. WIESE:  Ms. Hohmann, my name if Tyler Wiese.  I'm an

19   attorney with the Labor Board.  So looking at the upper left-

20   hand corner of the first page of R 3, it says "requested by L21

21   for representative wage by current Union employee as of 3-1".

22   Did you enter that information on the document?

23   A    I did.  We were using the March 1st Union employee roster.

24   Q    Okay.  All right.  And then turning to -- I guess the

25   document isn't paginated, but turning to page four of the

1    document, starting on page four and going to page five --

2    A    Mmm-hmm.

3    Q    -- it looks like these are just the -- these are all for

4    TCS employees, is that right?   Textile Care Services.

5    A    Yes.   At the point this document was prepared it was a

6    single agreement.

7    Q    And so, with regard to the TCS employees at the end -- we

8    went through all these columns for the hotel employees up to, I

9    guess, comments, but then it looks like there's a set of six

10   more columns after that for the TCS employees.   Do you see what

11   I'm talking about?

12   A    I do.

13   Q    What do those columns represent?

14   A    My recollection is that it represented the net change based

15   upon the months of service factors.   If you look at the months

16   of service factored in column six, it is a factor of -- in the

17   fifteen column, one times the months of service.   It was a

18   calculation tool to calculate the rates and the lift of

19   increase.   So you see the 385 in column 15 equals the months of

20   service column.                              It just factors

21   differently on the page.

22   Q    And then those numbers are increasing by -- as we go -- so

23   what are those -- what do those columns represent, the 15, 16,

24   17, 18, 19, and 20?

25   A    They were a ratio of the months of service and percentages

P 00670

1  used in the increase column.

2  Q    Do you know what those ratios were?

3  A    Well, if I'm looking at the 15, it's one times 385 months,

4  and then in the out months it would appear that it's 1.5 times

5  was the change.  The Union -- or the TCS was operating -- we had

6  different wage categories in our look-up tables because their

7  positions are on group 1, 2, 3, 4, and 5.  And they're not

8  alphabetically named positions like we have in the hotel, and it

9  was a mathematical V look-up table tool for us as we prepared

10  the Excel file.  It's not really relevant to your discussion.

11  Q    All right.  Well, what about the -- there's another column

12  that I have a question about, for the TCS employees, the group

13  column, what is that about?  It's right next to job title --

14  A    The --

15  Q    -- in between --

16  A    The categories in the manufacturing plant have production

17  1, production 2, production 3, 4, 5, 6, 7.  We don't have the

18  bellman or the same alphabetical categories, and so they're

19  groups by numerical category in the textile plant.  Not relevant

20  to the calculations for the hotels.

21  Q    I'm sorry, so --

22  A    Different positions category.

23  Q    And just one more brief question about this document, so

24  the "MW" column and, again, going to the first page of the

25  document now.  I didn't quite catch what that was about.  What

1  does that column represent?

2  A    We used that as a tool to do some of the V look-ups we

3  needed to do between our --

4  Q    What look-ups?

5  A    In Excel --

6  Q    Yes.

7  A    -- they're called value look-ups.

8  Q    Okay.

9  A    And you use a numeric or an alpha field in one Excel file,

10  and you can use -- we had many tables coming from different

11  payroll systems and so that got the names to an exact match and

12  we used that field to do some look-ups into other tables.  It's

13  -- it did not drive a calculation.  It helped pull in the dates

14  of service.  It was purely a calculation field in Excel for the

15  operator of the file.  It's not material to the final

16  calculation.

17  Q    And so what does a "Y" mean in that column?

18  A    It's how it pulled the last name, first name position from

19  another table I have, to get the values to the same to calculate

20  the numbers.  It was a calculation tool just from Excel

21  operating the file.  It's not a relevant tool to the date that

22  was provided into the Union proposal.

23       MR. WIESE:  I guess I have no objection to this document,

24  for what it is.

25       JUDGE STECKLER:  Okay.  Respondent's 3 is admitted.

1    (EXHIBIT RECEIVED:  RESPONDENT'S 3.).

2                 CONTINUED DIRECT EXAMINATION

3    Q    BY MR. TERRELL:  Ms. Hohmann, was this -- I mean you've

4    already testified that it was shown to the Union, did you

5    explain the document to the Union?

6    A    Yes, I did.

7    Q    And was the data in this document marked R 3, was the data

8    in this document used in creating the individual pie charts?

9    A    Yes, it was.

10   Q    Now, I want to go back to my larger question, which is to

11   have you explain how you created the individual pie charts.  And

12   maybe it's helpful if we have in front of you a sample of the

13   individual pie charts, which have already come into evidence and

14   are marked Exhibit 10(a) through, I think, (l).

15   (Witness proffered documents.)

16   A    Thank you.

17   Q    And I've also put in front of you Exhibit R 4.  Tell us

18   again what Exhibit R 4, how that was used?

19   A    I created Exhibit R 4 as a tool to have the sources that I

20   used pull the calculations so, for example, in my assumptions

21   for pulling together the Union charts I used 2004 payroll hours

22   --

23   Q    2004?

24   A    14, I'm sorry.

25   Q    Okay.

1    A    -- 2014 actual hours worked at straight time, and then I

2    used 2014 hours paid at overtime rates.  I used the calculations

3    for how many minutes would be on the clock or off the clock.  I

4    used calculations for whether it was a tipped employee which

5    gets $3.50 extra per vacation hour.  I pulled data from vacation

6    tables showing that after one year of service the employees get

7    one week of vacation, after three years two weeks, after nine

8    years three, and after fifteen years of service they got four

9    weeks, so I needed to look at the anniversary date for every

10   individual we did a chart for, for all Union employees, and say

11   in year five in 2019 will the employee at that point have been

12   with us three, nine, fifteen, and then add one day to their

13   benefit bucket.  We did the same thing for the holiday pay, and

14   assumed eight hours for the six holidays.  For sick and vacation

15   time in our collective bargaining agreement, and my note here

16   specifies I pulled that from page 18 of the bargaining

17   agreement, if you -- the employee was hired on the CBA that was

18   in force presently, if they were hired before September 1st of

19   2005 they got eighty hours of sick or personal time, at -- hired

20   after September 1, 2005 was forty hours, and at eight year

21   anniversary they added one day, a second day was given to them

22   in their sixteen year bucket, and a third day was given to them

23   in their benefit package at the twenty year.  So I had that in

24   writing so I had all of this in one document in front of me as I

25   did their individual chart.  Some of the early charts had -- and

1    the Union will remember this -- jury duty and bereavement on the

2    second round of charts we created for the Union --

3         MR. WIESE:  Objection.

4         JUDGE STECKLER:  What's the objection?  She's --

5         MR. WIESE:  The objection is to her testimony about what

6    the Union remembers --

7         THE WITNESS:  I --

8         MR. WIESE:  -- or may remember.

9         MR. TERRELL:  Well I believe the witness was describing --

10   her comment was the Union will remember this as a way of

11   introducing what she was about to say and what she was about to

12   describe is a change that she made in response to a comment or

13   reaction by the Union.

14        JUDGE STECKLER:  So it's your assumption that the Union

15   would remember this, right?

16        THE WITNESS:  It's my assumption?

17        JUDGE STECKLER:  Okay, go ahead and continue your answer,

18   Ms. Hohmann.

19        THE WITNESS:  We had done initial charts for the bargaining

20   table representatives for the Union, and at that point Ms.

21   Goldman had said, I don't want jury duty on those charts and she

22   was very vociferous and very adamant that I not have the jury

23   duty and to make -- to get to a compromise and to move forward

24   on getting the charts I said fine, I will do charts for the

25   entire Union demographic, the next set will remove the jury duty

1  and it will remove the bereavement because we can't predict will

2  have a relative die or when they go on jury duty, and if it's

3  going to get things moving along I will remove all those from a

4  second round of charts we do that extend beyond the bargaining

5  table employees to the entire population.  So we did a second

6  set of charts that excluded those calculations at the request of

7  Ms. Goldman.

8  Q    BY MR. TERRELL:  And those charts were provided to the

9  Union?

10  A    Oh, yes.

11  Q    All right --

12  A    And to go further, the calculations included -- and on page

13  2 of reference R 4, we included payroll taxes, we included

14  health and welfare insurance, we included the worker's comp

15  insurance, and we included benefit charges per hour as a tool in

16  showing what the compensation package per Union employee would

17  be under the terms of the agreement to 2020.  Each chart was

18  created based upon everybody's individual hire date, position,

19  and the initial wage in the proposal.

20  Q    I'd like you to -- I put in front of you Exhibit -- GC

21  Exhibit 10(a), which is the first of the pie charts in evidence,

22  and this is a pie chart for an individual by the name of Andrew

23  Vacura, lead cook.

24  A    Yes.

25  Q    And it also says at the top, "DOH 2-27-05", is that date of

1    hire?

2    A    Correct.

3    Q    And then to the right of that, a little bit lower, you say

4    "TRW $30.10".  What is "TRW" mean?

5    A    Total real wage.

6    Q    Total real wage.

7    A    Which would factor actual cash payment plus the benefit.

8    Other benefits that the hotel as an employer paid for the

9    benefit of that employee based upon their actual cash wage.

10    Q    Okay.  And so we see the pie chart, and we see the largest

11    wedge is $20.58.

12    A    Mmm-hmm.

13    Q    And then if you flip to the second page it's the same pie

14    chart, but columns are added.

15    A    Yes.

16    Q    Can you point us to -- the number for the large wedge is

17    $20.58, can you show us where that number is in the columns to

18    the left?

19    A     It would be on the fifth row down in the row that reads,

20    "total compensable productive work time" and the number would be

21    in the column reference to hourly rate.

22    Q    Okay now, help us understand this.  In that same column,

23    the first row is base pay, $18.82, fifth row down is the $20.58,

24    which is also reflected on the pie chart.  Please describe the

25    difference between these two numbers.

1    A    It factors in the fact that we are paying the employee

2    roughly on an eight hour shift for thirty minutes of break time,

3    for non-productive work time, including the hours worked and the

4    break time that we're paying for factors into an effective

5    hourly wage that goes from $18.82 to $20.58.

6    Q    Okay.

7    A    Based upon the annual cost of thirty minutes per day.

8    Q    Okay.

9    A    Scheduled shift.

10   Q    Now, a few of the pie charts that came into evidence -- I

11   don't think Mr. Vacura's is one of them -- well, let me first of

12   all establish this foundation for this document we're looking

13   at.  Did you do pie charts for every year?  I believe you

14   testified to that already.

15   A    I did.

16   Q    And do we see that here with Exhibit 10?

17   A    The set that relates to Mr. Vacura would, in fact, go out

18   to page 13 of 13, yes.  There was one set for every year and

19   then on page 13 of 13 was a summary that spanned years 2015 to

20   2020.

21   Q    Now it appears on this pie charts -- or set of pie charts,

22   that Mr. Vacura received a real wage increase for every year, is

23   that correct?

24   A    The actual wage rate in 2016 and 2017 are both at $19.10,

25   and then the wage goes back to $19.39 in year 2018, and there is

1  an escalation in those years, yes.

2  Q    So this individual received an increase every year?

3  A    Except between 16 --

4       MR. WIESE:  Objection:  leading.

5       THE WITNESS:  -- except between 2016 --

6       MR. WIESE:  Objection:  leading.

7       JUDGE STECKLER:  I think --

8       MS. BURGESS:  Can you instruct the witness to stop talking

9  when an objection is made please, Your Honor.

10      JUDGE STECKLER:  Ms. Hohmann, please -- I'm sorry --

11      THE WITNESS:  I'm having a hard time hearing.

12      JUDGE STECKLER:  Okay, we'll try to speak up too.

13      THE WITNESS:  Okay.

14      JUDGE STECKLER:  But if Mr. Wiese objects, please stop and

15  then -- so that I can give a ruling.

16      THE WITNESS:  Certainly.

17      JUDGE STECKLER:  Thank you.  Mr. Terrell, could you

18  rephrase that question a little bit for us?

19      MR. TERRELL:  I'll ask a different question.

20  Q    BY MR. TERRELL:  Well, did Mr. Vacura receive an increase

21  in real wage every year?

22  A    This schedule would show that in 2016 his rate was $19.19,

23  and in 2017 his rate -- pardon me, $19.10, in both 2016 and 17,

24  although there are wages in other years in 2016 and 2017 these

25  calculations were done at the same rate.  And that would be on

1   pages four and six, on row one, column three.

2   Q    And you're referring to the base pay rate, which is the

3   first row, on the third column?

4   A    Yes.  For the base pay.

5   Q    With respect to that particular number --

6   A    Yes.

7   Q    -- that is, the base pay hourly rate, did the company's

8   proposal propose any decreases?

9   A    On the base rate?

10  Q    Yes.

11  A    No. Absolutely not.

12  Q    Now, among these pie charts in evidence as Exhibit 10,

13  there are a few examples, and they were pointed out on the

14  record earlier, where the real wage number decreased slightly in

15  some years.

16  A    Yes.

17  Q    Could you explain to Her Honor why that occurred?

18  A    Yes.  Part of the calculations in -- that I used to go out

19  to 2020 included a health insurance increase.  I assumed a three

20  percent per year employer cost increase in our health insurance.

21  In a year, where the wage effective rate may have been going up

22  two percent, the effective hourly wage included the three

23  percent benefit increase, and it created negative increase

24  purely by the function of the non-cash wage benefits that that

25  employee receives.

 1   Q     Okay. During the -- with respect to your participation in

 2   the collective bargaining negotiations, were you involved in any

 3   presentations relating to the cost of operating the banquet

 4   department?

 5   A     Yes.

 6   Q     And was your involvement in that during the formal

 7   bargaining in 2015?

 8   A     I was brought into the room for a specific session, yes.

 9         MR. TERRELL:  Your Honor, I'd like to move into evidence

10   Exhibit R 4, please.

11         MR. WIESE:  No objection, Your Honor.

12         JUDGE STECKLER:  Respondent's 4 is admitted.

13   (EXHIBIT RECEIVED:  RESPONDENT'S 4.)

14   (Witness proffered document.)

15         THE WITNESS:  Thank you.

16   Q     BY MR. TERRELL:  I've handed you what has been marked as

17   Exhibit R 5.  Do you recognize this document?

18   A     I do.

19   Q     What is this document?

20   A     This was a prepared document covering for the Kahler Grand

21   Hotel, our banquet cost as of 2014 and the document had data

22   that had been gathered competitively about our pricing and other

23   pricing for banquet events in the market.

24   Q     And was this document presented and shown in the

25   bargaining?

1  A    My understanding was, yes, it was shown.

2  Q    Okay.

3       JUDGE STECKLER:  Do you know --

4  Q    BY MR. TERRELL:  Who created this document --

5       JUDGE STECKLER:  Just a minute.

6       THE WITNESS:  I was in the room when I saw it on the wall

7  in the bargaining session.

8       JUDGE STECKLER:  Do you know -- recall which bargaining

9  session?  Not from the notes.

10      THE WITNESS:  I would have to look at my calendar, but it

11 was approximately the middle of March.  I'm going to say --

12      JUDGE STECKLER:  Okay, middle of March is --

13      MR. TERRELL:  To the best of your recollection.

14      THE WITNESS:  -- middle of March, 3/16 --

15      JUDGE STECKLER:  Okay.

16      THE WITNESS:  -- 3/20.

17      JUDGE STECKLER:  Okay.

18 Q    BY MR. TERRELL:  Did you create this document?

19 A    My team provided some of the cost information and the

20 information into the document, yes.

21 Q    And so you've said this was presented during the 2015

22 bargaining.  Was this document prepared, or was it shown to the

23 Union at some earlier point?

24 A    Scott Mauer and Bill Bunce had discussed banquet revenue

25 and competitive information in sessions that I did not fully sit

P 00682

1    through, but my understanding from the preparation of the

2    material is that that material was, in fact, reviewed with the

3    Union by Mr. Bunce and Mr. Mauer.

4    Q     And who is Mr. Bunce?

5    A     Mr. Bunce was, at the time of the March sessions, he was

6    the area general manager for Richfield Hospitality in charge of

7    running the operations of the hotel.

8    Q     Okay, and who is Mr. Scott Mauer?

9    A     Mr. Scott Mauer is currently the General Manager of the

10   Kahler Grand Hotel.

11   Q     What was his position prior to that?

12   A     Mr. Mauer has been the General Manager in the Kahler Grand

13   Hotel or the Marriott Hotel for the last several years.

14   Q     The data on the first page is March 2014.  Is that an

15   indication of when this was created?

16   A     Yes.

17   Q     What was the purpose of creating this document?

18   A     There were significant discussions tied to our banquet

19   operation. The general thesis of the document is that it -- our

20   customers have a significant amount of price sensitivity and it

21   talks about our largest competitor in the banquet and catering

22   space, and it references that competitor on --

23        MR. WIESE:  Your Honor, I'm going to object to the

24   relevance of this line of testimony and the exhibit.

25        MR. TERRELL:  It directly relates to the wage proposal that

1    the company made.

2        JUDGE STECKLER:  Please go ahead, Mr. Terrell.

3        THE WITNESS:  The document relates to pricing for banquet

4    and catering events in the Rochester market of which we are a

5    bidder, and we bid frequently against a company called "Canadian

6    Honker," and they are referenced on the third to last page of

7    this document.  This document talked about our cost for food and

8    other operations to sell our events of which labor is a piece of

9    that, is skewed heavily toward food and other ancillary costs

10   that also go into a banquet event. Our union associates in the

11   banquet and catering area are currently at an hourly rate and

12   have a different compensation package than we proposed in the

13   agreement, and our agreement takes the wage, in most cases, from

14   $8 to $15 an hour, and as part of our proposal it repackaged

15   that wage to match further what the rest of the market in

16   banqueting and catering in the Rochester environment was doing,

17   and that particular company that we do most of our banquet and

18   catering work bidding against, pays the employees a straight

19   hourly wage.

20   Q    BY MR. TERRELL:  I want to --

21   A    And this dealt with that, us, them, and the pricing for

22   banquet in the larger area including the metropolitan

23   Minneapolis area as a reference point.

24   Q    I want to try to make one aspect of this clear, what is a

25   service charge?

1    A    A service charge, for example, would be nineteen percent.

2    Typically on an event for --

3    Q    Let's --

4    A    -- based upon the purchase price of the event, the number

5    of meals, times the rate --

6    Q    Okay.

7    A    -- adding any audiovisual or any other charges, and the

8    customer is asked to pay a fee, based upon their purchase price,

9    that is then distributed based upon the Union agreement

10   partially to our employees.

11   Q    As food costs go up what impact, if any, does that have on

12   the service fee?

13   A    As food costs go up and pricing remains stationary, and

14   food costs go up and we increase our prices, the payouts to the

15   employees also go up.

16   Q    What did you know -- in preparing this and presenting this,

17   what did you know about how your competition uses the service

18   fee, or uses a service fee?

19   A    They collect a service fee, but my understanding is that

20   the competitor that I've referenced does not distribute any of

21   that fee to their associates.  They collect it, but none is

22   distributed.  It's a straight hourly wage path.

23       MS. BURGESS:  Objection, Your Honor:  foundation.  How does

24   this witness know what her competitors do in terms of their

25   service charge.

1      MR. TERRELL:  Your Honor, I thought we just had the role of

2  one attorney, one witness.

3      JUDGE STECKLER:  That's true.

4      MS. BURGESS:  Your Honor, I am co-counsel here, and --

5      JUDGE STECKLER:  I understand, Ms. Burgess, but I won't

6  allow Mr. Stokes to jump in either, so I appreciate your

7  cooperation with that.

8      Let me ask a couple of clarifications here just to move

9  things along a bit.  On this exhibit, had you done any wage

10  surveys?

11      THE WITNESS:  Yes.

12      JUDGE STECKLER:  Okay.  Was that a basis for preparation

13  for this document?

14      THE WITNESS:  Yes.

15      MR. TERRELL:  Your Honor, I'm not sure we got her answer to

16  your question about, did the company perform a wage survey.

17      JUDGE STECKLER:  Oh, she said yes.

18      MR. TERRELL:  She said yes, but did it get on the record?

19      COURT REPORTER:  Yes, it did.

20      MR. TERRELL:  Thank you.

21      JUDGE STECKLER:  So in looking at page 4 -- I think it's

22  page 4, with the -- maybe it's five, with the break --

23      THE WITNESS:  Yes.

24      JUDGE STECKLER:  Break, breakfast, lunch, dinner,

25  reception.  You're saying that your price for bagels is minus

1    16.03 percent.  Does that mean that your price is 16.03 percent

2    less than the competitor's price for bagels?

3        THE WITNESS:  No.  Typically our prices are lower.

4        JUDGE STECKLER:  So this is saying that your price is that

5    much less.

6        THE WITNESS:  No.  I wish to stand correcting.  Our

7    competitor's prices generally are less than our prices, not more

8    for individual items.

9        JUDGE STECKLER:  Okay, so if I came down to the Starbuck's

10    and it says 5.03, that's not a negative number so that's more.

11        THE WITNESS:  For Starbuck's is more.

12        JUDGE STECKLER:  Okay, and then if you go to the next page,

13    you've graphed that out, is that correct?

14        THE WITNESS:  Umm, this was graphed out.  I personally did

15    not do this chart.  This was graphed out using -- by category.

16    We review our business by, what I'll call meal period, and this

17    would be breakfast, lunch, dinner, and an evening reception, so

18    this was our average prices against competitive hotel.  This

19    particular slide was to the Minneapolis market hotels.

20        JUDGE STECKLER:  And so let me make sure I'm understanding

21    -- this document was presented to the Union, is that your

22    testimony?

23        THE WITNESS:  Yes.

24        JUDGE STECKLER:  Okay.  Mr. Terrell, you may proceed.

25        MR. TERRELL:  No further questions.

493

1      JUDGE STECKLER:  On anything?

2      MR. TERRELL:  Pardon me?

3      JUDGE STECKLER:  On anything?

4      MR. TERRELL:  No further questions.

5      JUDGE STECKLER:  Okay.

6      MR. WIESE:  Judge, can I get maybe two minutes --

7      JUDGE STECKLER:  Oh --

8      MR. WIESE:  -- to prepare for cross?

9      MR. TERRELL:  Oh, I do want to move Exhibit R 5 into

10  evidence.

11      JUDGE STECKLER:  Okay, certainly.  R 5 is admitted.

12      MR. WIESE:  No objection.

13      JUDGE STECKLER:  Oh, sorry.  Sorry, Mr. Wiese.  I jumped

14  the gun.

15      MR. WIESE:  That's okay.

16      JUDGE STECKLER:  Yes, it's admitted.

17  (EXHIBIT RECEIVED:  RESPONDENT'S 5.)

18      JUDGE STECKLER:  Let's go off the record for a couple of

19  minutes.

20  (Off the record.)

21      JUDGE STECKLER:  We're going to be back on the record. Mr.

22  Wiese, please proceed.

23                      CROSS-EXAMINATION

24  Q    BY MR. WIESE:  Good morning, Ms. Hohmann.  So I'd first

25  like to talk about the pie charts a little bit.  So I believe

P 00688

1  you said the pie charts had to be customized for each employee,

2  is that right?

3  A    Yes, that's correct.

4  Q    And, in fact, they were so complicated that you had to

5  include comments for each individual employee as reflected in

6  Respondent Exhibit 3, is that right?

7  A    We included comments.

8  Q    Right.  And if you flip over to the TCS, Textile Care

9  Services, there aren't any comments for employees listed on --

10  in the TCS unit, are there?

11  A    Not on this document, no.

12  Q    And turning your attention to Respondent Exhibit 4, the

13  date on that document is March 20, 2015 -- I'll wait for you to

14  get there.

15  A    Yes.

16  Q    The date on that document is March 20, 2015, is that right?

17  A    Yes,

18  Q    That's after the date on Respondent Exhibit 3, isn't that

19  right?

20  A    It is after the date on Respondent 3, yes, that is correct.

21  Q    Now we spent some time talking about pie charts.  Those pie

22  charts, however many sets there were, were only provided to the

23  Union in paper copy, is that right?

24  A    Yes.

25  Q    You never provided the Excel copy that you used?

1  A    My understanding was that they needed to be provided in

2  paper, so that --

3  Q    That's not the question I asked, Ms. Hohmann.  I asked

4  whether they were provided in electronic copy.

5  A    I was not asked to provide the documents in an electronic

6  copy to the Union.

7  Q    And so you didn't provide them an electronic copy to the

8  Union.

9  A    We provided them all in printed color form.  My

10  understanding was that the Union wanted them, I'll call it

11  camera ready, to be able to hand out to their employees without

12  having to pay to reprint those documents.

13     MR. WIESE:  I'm going to object, Your Honor.  This is non-

14  responsive answer.

15     JUDGE STECKLER:  Ms. Hohmann --

16     MR. WIESE:  The question --

17     JUDGE STECKLER:  Let me -- let me -- how did you get that

18  understanding?

19     THE WITNESS:  I was there, in a room, where I was told --

20  and the Union was in the room -- that they -- I needed to have

21  printed materials because they would be expensive and we want

22  you to get them done and printed for our people, bargaining

23  people.

24     JUDGE STECKLER:  And who said that?

25     THE WITNESS:  And I'm going to recall that it was Nancy who

1    asked me to do that.

2       JUDGE STECKLER:  Nancy Goldman?

3       THE WITNESS:  Yes.  I was not asked by the Union to provide

4    them electronically, I was asked to provide them in paper form,

5    which I did.  I was not asked to provide them electronically.

6       JUDGE STECKLER:  Okay.  Go ahead, Mr. Wiese.

7    Q    BY MR. WIESE:  Looking at Respondent Exhibit 4, did you

8    provide this document to the Union?

9    A    This document, I did review line by line verbally with the

10   Union in a meeting, with the pie charts.

11   Q    That's not the question I asked, Mr. Hohmann.  I asked

12   whether you provided this specific document to the Union.

13   A    I read off this piece of paper in a meeting with the Union.

14   I do not recall providing this to the Union on the 20th of

15   March.

16   Q    I'll ask the question again --

17      MR. TERRELL:  Objection.  She gave the answer.

18      JUDGE STECKLER:  I think that was asked and answered, Mr.

19   Wiese.

20      MR. WIESE:  She -- she's saying she read off the document.

21   She has not answered my question of whether this document was

22   provided to the Union.

23      MR. TERRELL:  She did --

24      MR. WIESE:  As far as I'm hearing.

25      MR. TERRELL:  She said she did not provide the paper.  She

1    read from it to the Union.

2        JUDGE STECKLER:  Did you ever provide it to the Union?

3        THE WITNESS:  No.

4        JUDGE STECKLER:  Okay.

5    Q    BY MR. WIESE:  I believe, and correct me if I'm

6    mischaracterizing your testimony, you said that there is a set

7    of pie charts that exists without jury duty on them, is that

8    right?

9    A    Yes.

10   Q    And bereavement leave.

11   A    Yes.

12   Q    You don't have those pie charts, do you?

13   A    Several of them are in evidence on GC Exhibit 10(a).

14   Q    Okay, well show me in GC Exhibit 10 the pie charts that

15   don't have jury duty or funeral leave listed on them.

16   A    If you go to page 3 -- page 3 -- or page 4, rather.  An

17   example, for Andrew Vacura, page 4 of 13, under Andrew,

18   on the line that says "jury duty", it would be the fourth line

19   under "total compensable productive time worked", the row is

20   there but all of the dollar amounts were taken out for both jury

21   duty and bereavement in the document.

22   Q    Okay.  So you don't have a copy of the first set of pie

23   charts that encompass the employer's wage offer, do you?

24   A    I handed all of those out in a room at a meeting.

25   Q    And do you retain a set of those documents?

1    A    I did not retain a set of those documents.

2    Q    And the --

3    A    That were --

4    Q    Oh.

5    A    -- that were physically handed out at that meeting.

6    Q    You don't retain a set of the second set of documents that

7    were provided either, do you?

8    A    I have electronic copies of documents.

9    Q    Of those documents?

10    A    Yes.

11        MR. WIESE:  I would ask that those documents be produced

12    pursuant to my subpoena.

13        MR. TERRELL:  If, in fact, you have them to produce, we

14    could do that.  It was my understanding we did not have

15    electronic copies.

16        THE WITNESS:  We have on some -- we have a lot of them.  On

17    some of them we used the same template and just would go in and

18    change the employee name and the date of hire, so I would say

19    that eighty percent of them are unique, and some we used the

20    template, and just did the next employee.

21        MR. TERRELL:  So -- could we go off the record and get this

22    straightened out?

23        JUDGE STECKLER: I think so.  Let's have some off the record

24    discussion, so that you guys can work something out here.

25    (Brief discussion held off the record.)

P 00693

1          JUDGE STECKLER:  Back on the record.

2          We had a short off the record discussion regarding the

3     retained pie charts.

4          General Counsel, it's my understanding that you're

5     declining electronic production at this time since you have a

6     complete copy of the hard copies.

7          MR. WIESE:  Yes, Your Honor.

8          MR. TERRELL:  And just let the record reflect that as was,

9     I believe, identified before we went off the record, Ms. Hohmann

10    has the electronic template and has, I believe if I understand

11    what was said, 80 percent of electronically saved and could be

12    produced and turned over and the other 20 percent could be

13    recreated by simply applying the template, and we offered to

14    provide those to General Counsel, but General Counsel has

15    declined.

16         JUDGE STECKLER:  Okay.

17         So, Mr. Wiese, you may pick up your cross.

18    Q    BY MR. WIESE:  I just have one more line of questions. So

19    you were talking about how health care impacts the TRW figures

20    in the pie charts, is that right?

21    A    Yes.

22    Q    And if I understood you correctly, the pie charts are just

23    a downward in a certain year because there's a three percent

24    increase that you banked in for health care, is that right?

25    A     I used a three percent annual increase assumption.

1   Q    And so that three percent increase would affect the TRW

2   figure, is that right?

3   A    Not the cash wage, but the TRW wage, yes.

4   Q    Okay.  Okay.

5        MR. WIESE:  No further questions.

6        JUDGE STECKLER:  Mr. Terrell, do you have any redirect?

7        MR. TERRELL:  One minute, Your Honor.

8   (Pause.)

9        MR. TERRELL:  Nothing further.

10       JUDGE STECKLER:  Nothing further?

11       MR. TERRELL:  Nothing further.

12       JUDGE STECKLER:  Ms. Hohmann, I do have a couple of

13  questions.  On Respondent's Exhibit 4, item number 7 talks about

14  the vacation table.

15       THE WITNESS:  Yes.

16       JUDGE STECKLER:  So you were able to prorate based on a

17  full time equivalent, which is 200 -- 2080 hours per year, and

18  then looking at the individual's number of hours worked, so

19  based on that can you pull together an estimate of what vacation

20  costs would be?

21       THE WITNESS:  We did by employee, everybody's individual

22  table, prorate that.

23       JUDGE STECKLER:  I think you're going to have to speak into

24  the mic.

25       THE WITNESS:  I'm sorry.  In the Excel files you used for

1  every individual employee, the prorations were done based upon

2  using the 2014 hours worked and their vesting table from

3  collective bargaining agreement, page 14.

4      JUDGE STECKLER:  So you could calculate the vacation costs

5  for all employees and just put it in one document?

6      THE WITNESS:  It's not a fast process because it's fairly -

7  - everybody's got a different hours worked, especially in some

8  of the food service operation.  It's not possible, it's a very,

9  very long and slow.

10      JUDGE STECKLER:  Okay. Thank you.  Any further questions?

11  Mr. Terrell?

12      MR. TERRELL:  Yes, Your Honor.

13                      REDIRECT EXAMINATION

14  Q   BY MR. TERRELL:  What kind of turnover does the hotel -- do

15  the hotels have?

16      MR. WIESE:  Objection:  foundation.

17      JUDGE STECKLER:  I know where he's going with this.  It's

18  about my question on vacation.

19      MR. WIESE:  Okay.

20  Q   BY MR. TERRELL:  What kind of turnover does the hotel -- do

21  the hotels have?

22  A   The hotels have different turnover rates.  Some hotels turn

23  at fifty percent or more per year.

24  Q   Now in -- fifty percent or more?

25  A   That would be my understanding.  Now in calculating the pie

1    charts as you just explained to Her Honor, you were able to make

2    a vacation cost or vacation pay element calculation for each of

3    the five years going forward, correct?

4    A    Yes.

5    Q    If you asked the question, as you sit here today, can you

6    project over the next five years the vacation costs subject to

7    turnover, can you predict that cost?

8    A    Yes.

9    Q    Can you predict it -- how would you be able to predict it

10    given the fact that there is turnover?  In other words, the pie

11    charts assume that the employee will still be there in --

12        MR. WIESE:  Objection:  leading.

13    Q    BY MR. TERRELL:  -- would that necessarily be the case?

14        JUDGE STECKLER:  I'm going to allow her to answer.

15        THE WITNESS:  It's a very manual process, and there would

16    have to be some assumptions agreed in that respect.  My

17    assumption when I did the pie charts is my assumption as an

18    employer, is that current employees are our current employees,

19    and I based all of the pie charts assuming that that employee

20    for the charts would, in fact, be with us from March of 2015

21    until the end of the 2020 bargaining agreement.  That was a

22    baseline assumption I made.

23        MR. TERRELL:  Okay.

24    Q    BY MR. TERRELL:  In the real world, as you sit here today

25    and think over the next 5 years, can you make that same

1  assumption?

2  A    There are already changes in our employees from the March

3  '15 agreement data that we used, and employees who were Union

4  employees with us in March who are no longer with us today.

5    MR. TERRELL:  Thank you.

6    JUDGE STECKLER:  Mr. Wiese, do you have any recross?

7    MR. WIESE:  No, Your Honor.

8    JUDGE STECKLER:  Hang on just a second, Ms. Hohmann, I'm

9  seeing if I've got any other questions before I let you go -- I

10  have no further questions either.

11    Thank you for your time today.  You're excused.  Please

12  remember that you are not allowed to discuss your testimony

13  until the hearing is over.

14    THE WITNESS:  Understood.

15    JUDGE STECKLER:  Thank you, ma'am.

16  (Witness excused from stand.)

17    MR. TERRELL:  Can we have just a few minutes break, Your

18  Honor?

19    JUDGE STECKLER:  Five minutes sufficient?  We'll do a five

20  minute bathroom break.

21    Off the record.

22  (Brief recess taken.)

23    JUDGE STECKLER:  We're back on the record.

24    Mr. Terrell -- is it Terrell or Terrell?

25    MR. TERRELL:  Terrell.

1          JUDGE STECKLER:  Mr. Terrell, please call your next

2   witness.

3          MR. TERRELL:  Okay.

4          Mr. Stokes will examine our next witness, Michael Henry.

5          MR. STOKES:  It's a good question, because he has a cousin,

6   who is also a lawyer who has the same last name and pronounces

7   it the other way.

8          JUDGE STECKLER:  And I was going to say -- he teaches legal

9   research and writing.

10         MR. STOKES:  We call Michael Henry.

11         MR. TERRELL:  You're talking about Timothy Terrell.

12         JUDGE STECKLER:  Yes.

13         MR. TERRELL:  Yes, I know Timothy Terrell.  He was a

14   professor at Emory when I went to law school at Emory.

15         JUDGE STECKLER:  You're dating yourself.

16         MR. TERRELL:  But that's not my cousin -- another Terrell.

17         JUDGE STECKLER:  Mr. Henry.

18         COURT REPORTER:  Excuse me.

19   (Off the record.)

20         JUDGE STECKLER:  Thank you.

21         We're back on the record.

22   (WITNESS RECALLED:  MICHAEL HENRY)

23          JUDGE STECKLER:  Mr. Henry, you've been here before.

24   Please remember that you are still under oath.

25         THE WITNESS:  Yes, ma'am.

1                    DIRECT EXAMINATION

2    Q    BY MR. STOKES:  Mr. Henry, I'm not going to go through your

3    background again, because you've already testified to that.

4         Would you please state to Her Honor what you recall about

5    the company's explanation of its wage proposal during collective

6    bargaining negotiations in March of 2015?

7    A    Certainly.

8         Before we went to our meetings, and as we went through and

9    prepared for this process through looking at a wage, one of the

10   things that Mr. Wiese asked about earlier was wage surveys and

11   what that entails.  We did an extensive wage survey covering

12   this market and recognizing too as well that our market kind of

13   feeds outside of the Rochester area.  We checked in different

14   areas about different aspects of the jobs that we have provided

15   covered under the CBA, and also those are not covered under the

16   CBA.

17        What we did was we called each hotel, we verified exactly,

18   you know, what departments they have employed there as it

19   compares to what we have available in our respective hotels

20   here.  Based on that information -- I'll give an example -- we

21   have a line cook or a cook would be starting out at say, for

22   example, at the Holiday Inn or one of those other properties

23   that have line cooks starting out at about between 9 and 10.50;

24   while we start somewhere at about 15.00 or 15.05 or somewhere

25   around that market.

1    Housekeeping staff -- as we went through the wage survey,

2    we found that we had housekeepers that we started off at 9.91;

3    and other hotels before the -- at the time, there was not an

4    increase in the minimum wage, we are starting out at 8 -- 8.50,

5    to get their employees started there.

6    So what we did was we took that information, that detailed

7    information and look at where we were.  And the good thing for

8    us is that -- and we're very proud of this -- is that we're far

9    better than all of the properties here within our market.  And

10   we're excited about doing that.  But what we also found out as

11   we went through the whole process with everyone that was getting

12   caught up to us was the fact that now they are also increasing

13   their wages too as well as to become competitive with us, to

14   kind of steal away our employees.  And with Rochester being such

15   a very tight market with a minimum at the time probably about 2

16   percent unemployment, it truly impacts what we can do in terms

17   of recruiting and getting personnel in and it impacts

18   significantly turnover.

19   So that was explained throughout the whole bargaining

20   process; and I know on the 16th, we had a presentation that we

21   talked about the wage survey, we talked about what we did, what

22   we accomplished and how we came to our decision in improving and

23   then adding our starting wages to make it significantly more --

24   significantly increased, so we can attract more workers too as

25   well, and to retain those that we have currently working with

1   us; because we're finding out that our turnover is significantly

2   impacted by those new employees that we're having -- that comes

3   on board, moving to greener pastures, if they can truly find

4   that.

5   Q    So what was the position of the company with respect to the

6   wage proposals being a two-tiered proposal?

7   A    Well, you know, I think the most important thing for us to

8   do is we want to retain our employees.  And we recognize that

9   those folks that are already there -- they have earned their --

10  the Union did a great job of making sure that their wages are

11  where they are.  And we want to make sure that we're able to

12  maintain that.  So what we did was -- we're saying that we want

13  to make sure that those folks are taken care of and we continue

14  to maintain that throughout the life of the contract; and, as a

15  result, they are reflected in the proposal for the increases

16  that were associated with their wages.  Though it may seem

17  minimal, the percentage as we move forward -- we still kept them

18  increased during that time period because they are significantly

19  above market.  We wanted to make sure that those folks that were

20  getting it are at least at market or just a little bit above

21  market, so that we can say that we're truly more competitive

22  than are other properties that are working with us.  And that

23  was explained during the bargaining session.

24  Q    When you say "that was explained," please state for Her

25  Honor whether you explained that in the bargaining sessions to

1  the Union.

2  A    Yes, I did explain that in the bargaining sessions.

3  Q    So what person explained what you just testified to to the

4  Union?

5  A    I did that in the bargaining sessions.

6  Q    And was there an exchange back and forth, questions and

7  answers between you and the Union?

8  A    There was significant exchange between us and the Union.

9  Martin had a significant amount of questions, Nancy did.  There

10  were some of the associates that were there representing as part

11  of the bargaining unit -- had questions and concerns.  The folks

12  from TCS, who were associated with the bargaining unit at the

13  time, looked at their salaries.  We had, you know, caucus

14  discussions with regards to the wages and the starting wages and

15  how that impacts everyone.  We had significant discussion where

16  that was concerned, yes.

17  Q    And was the Union in favor of opposed to a wage proposal

18  that substantially increased starting rates, but did not

19  substantially increase, and in some case, proposed zero, very

20  low or low increases for existing employees?

21  A    There were none --

22      MR. WIESE:  Objection:  vague.

23      JUDGE STECKLER:  I think it's a kind of compound question.

24      MR. STOKES:  I'll be happy to say the same question again.

25      JUDGE STECKLER:  No, I'm not asking you to say -- I'm

1    asking you to rephrase it, so -- it's kind of compound.

2          MR. STOKES:  I'll be happy to, Your Honor.

3    Q    BY MR. STOKES:  Was the Union opposed or in favor of your

4    proposal to increase starting rates substantially, and not

5    increase existing employees' rates substantially?

6    A    They were not -- and if I can explain, Your Honor, one of

7    the things that we did as we looked through the whole wage

8    survey and where we were currently with regards to u starting

9    wages and the folks that were impacted, we realized too as well

10   that there were probably about 20 to 30 percent of our folks

11   that would be -- that are currently employed that would have

12   benefitted too as well from our proposal with the new start

13   rate; because what we'll do automatically would have to increase

14   their start wage too as well to get them to a point where at

15   least they are comparable with the folks that are coming on

16   board.  So you were looking at the proposal that would impact

17   not only the new hires, but also folks that are currently

18   employed, especially within the Housekeeping Department and some

19   other areas.  They were not supportive of that and were not

20   supportive of the fact that we had to some degree -- I'll give

21   an example:  With the engineering team and some of our food and

22   beverage culinary staff members -- they currently are probably

23   about $22.00 an hour as a cook.  And what we're saying for those

24   people, that we considered to be red-lined, if you go and leave

25   that job to go somewhere else, you will not get paid $20.00 an

1    hour to start that job.  So we are saying that we are paying a

2    favorable rate in order for us to be sustainable throughout the

3    business.  All we are asking you to do is to be able to support

4    us as we move forward in getting folks on board, so we can

5    continue to be competitive within our market.

6    Q    But despite your arguments, the Union opposed that

7    position, correct?

8    A    That's correct.

9        MR. WIESE:  Objection:  leading.

10        JUDGE STECKLER:  I think he already made it clear that the

11    Union didn't go for it.

12        MR. STOKES:  Thank you.

13    Q    BY MR. STOKES:  With respect to the company's position o

14    banquets, which would have proposed a substantial reduction in

15    the annual income that a banquet server made, could you please

16    explain for Her Honor what was communicated to the Union

17    concerning the position that the company was taking to change

18    the method of compensation for banquet employees to be more like

19    competitors?

20    A    Yah, one of the things that we looked at when we dealt with

21    banquets was I know that our banquet staff, you know, works a

22    very limited amount of hours for the year, and I think their

23    compensation is a very, very unusual compensation package that

24    they have going.  And we recognize the impact that, you know,

25    making this change would have on adjusting to the differences

1  associated with the pay.  But one of the things that we were

2  projecting was the fact that if we're able to -- typically,

3  right now, what you have with the banquet server is that they

4  are paid either at minimum wage or just slightly above too as

5  well.  And I know that when we did our wage survey, that the

6  Canadian Honker and some other catering folks that are within

7  our market -- they pay somewhere between 11, sometimes $12.00 an

8  hour without the service charge or if there are gratuities

9  associated with it, then they get that as well.

10      But what we found was that if we're able to even make up a

11  very favorable offer to those folks that are working with us,

12  somewhere in the mean of $15.00 is what we went to towards the -

13  - or our last proposal for those folks who will work with us,

14  that would help to offset some of the concerns that were

15  associated with that loss of revenue from the quote/unquote

16  "service charges" that were associated there.  I know that

17  presentation did not sit very well, but our -- right now,

18  currently, we lost all five of the major business for this year

19  that we typically would have because of our pricing and because

20  of how our pricing structure was too as well which impacted what

21  we're doing.  I know that some people don't believe that, but

22  that is part of the fact.

23      One of the challenges that we find is that as we move

24  forward and in order for you to become more competitive, we have

25  to make sure that we have a pricing structure that can compete

1  with those folks that are out there too as well --

2      JUDGE STECKLER:  Mr. Henry, I --

3      THE WITNESS:  -- that benefits us as we move ahead.

4      JUDGE STECKLER:  -- want to make sure I'm understanding

5  this correctly.

6      Is this something that you discussed with the Union at the

7  table?

8      THE WITNESS:  Yes.

9      JUDGE STECKLER:  Can you just tell me when, based on the

10  best of your recollection, when you -- you're giving us a good

11  indication of what was behind the employer's strategy, but was

12  this exactly what you said at the table?

13      THE WITNESS:  In March 2014, we had a meeting with Nancy,

14  Martin -- we a couple other business representatives from the

15  Union that came down to the hotels.  That was the initial

16  discussion where banquets were concerned.  On 2014 -- March

17  2014, we did a presentation when at then current Executive Chef,

18  Pascal Presa, was there or Scott Mauer, Bill Bunce, as Leslie

19  Hohmann testified to earlier, and we went through the whole

20  presentation.  There was a subsequent meeting with Nancy, Martin

21  and I think Javon -- I'm not sure who else was involved with

22  that meeting, but discussing the same thing as a follow-up.  And

23  at that time, they promised that they will make sure that they

24  are doing some things to get the rest of the hotels and the rest

25  of these businesses unionized and to make sure that we'll be

513

1   competitive and all those things were discussed.

2       Then as we moved in more to negotiations the following

3   year, 2015, in January, once we started off and towards this

4   aspect of the wages and benefits, we discussed that again at

5   length, starting in February all the way through the last and

6   final proposal.

7   Q   BY MR. STOKES:  February of what year?

8   A   February of 2015, I'm sorry.

9       JUDGE STECKLER:  I think that was clear from what he said.

10  Q   BY MR. STOKES:  Now tell Her Honor whether what you've

11  testified to as your reasoning for making a certain proposal was

12  communicated to the Union in collective bargaining negotiations?

13      JUDGE STECKLER:  I think that's what I just asked him is --

14      MR. STOKES:  And what is the answer to that?

15      THE WITNESS:  Yes.

16      JUDGE STECKLER:  He's already said that he had and he

17  identified which times he did.

18  Q   BY MR. STOKES:  And tell Your Honor whether what Leslie

19  Hohmann testified to concerning a wage proposal and the

20  reasoning behind the wage proposal was communicated to the Union

21  in the collective bargaining negotiations.

22      MR. WIESE:  I'm going to object, Your Honor.

23      Leslie Hohmann's testimony speaks for itself.  If he wants

24  to corroborate her testimony, he can ask specific questions

25  about what was asked of Ms. Hohmann just wholesale.

1      JUDGE STECKLER:  Yes, I think --

2      MR. STOKES:  That's an inappropriate objection.  It is not

3   efficacious, but I'll do what you want me to do, Your Honor.

4   There's no basis in law for that objection anywhere.

5      JUDGE STECKLER:  Well, regardless of your concepts, I

6   really would like to hear something more specific from -- on

7   direct.

8      MR. STOKES:  Well, I have to start off someplace before I

9   get specific.  So I said, "What Leslie Hohmann testified in

10   front of Your Honor concerning the bases for the proposal in his

11   presence, was that communicated to the Union?"  Then I go from

12   the general to the specific, because I have to lay a foundation

13   for his knowledge of that.

14      JUDGE STECKLER:  I think he's established that he was there

15   and he's -- he heard Ms. Hohmann even in his prior testimony, so

16   I think we can proceed from there.

17      MR. STOKES:  Well, in his prior testimony, he didn't

18   testify to anything that Ms. Hohmann testified to.

19      JUDGE STECKLER:  He testified --

20      MR. STOKES:  In this case, I'm trying to make the record

21   complete.  We're on the defense.  I'm just trying to make the

22   record complete from our perspective.  To lay the foundation for

23   what he heard Ms. Hohmann say, I have to start off by saying,

24   you know, "Did Ms. Hohmann, what she testified that she told you

25   today were the bases for the wage proposal -- did you observe

1   that in the collective bargaining negotiations?"  His prior

2   testimony, he wasn't testifying to what she said, because she

3   hadn't testified yet.  That's all I'm trying to do is lay the

4   foundation.

5        JUDGE STECKLER:  Are you -- so all you're asking for is him

6   to validate that what Ms. Hohmann was correct?

7        THE WITNESS:  In his presence, that he was there.

8        JUDGE STECKLER:  So let's just cut to the chase then.

9        Mr. Henry, you heard -- you were present during Ms.

10  Hohmann's testimony this morning?

11       THE WITNESS:  Yes.

12       JUDGE STECKLER:  And based on your recollections, was her

13  testimony accurate?

14       THE WITNESS:  Yes.

15       MR. STOKES:  Thank you, Your Honor.

16  Q    BY MR. STOKES:  And so during the --

17       MR. WIESE:  Your Honor, I'd just like to note for the

18  record, and I don't know if this is going to be clear in the

19  record or not, but I don't believe Mr. Henry was here for Ms.

20  Hohmann's entire testimony.

21       THE WITNESS:  I was actually.

22       MR. WIESE:  You were here the entire time?

23       JUDGE STECKLER:  He was not here for all of Ms. Henry's to

24  my recollection.

25       THE WITNESS:  Right.

1      MR. WIESE:  Okay, okay, my apologies.  I just wanted to

2   make that clear.

3   Q    BY MR. STOKES:  In the collective bargaining negotiations,

4   when Ms. Hohmann made a presentation, did she use any audio

5   visual aids?

6   A    Yes, she used -- we had a Power Point presentation on the

7   wall on a screen in the meeting room, yes.

8   Q    And was there -- were there any audio visual aids used in

9   connection with banquets?

10  A    Yes, there was.

11  Q    And I show you what has been marked as -- and received as

12  Respondent's 5, and I ask you if you can identify that document.

13  (Witness proffered the document.)

14  A    Yes,

15  Q    Was that Power Point presentation presented to the Union in

16  your presence and in Ms. Hohmann's presence?

17  A    Yes, this looks like it.

18  Q    Now, Mr. Henry, would you please explain to Her Honor

19  whether in those sessions -- that session of negotiations in

20  which that presentation was made, did the subject of whether our

21  existing banquet servers working for a competitor come up?

22  A    Yes, it did.

23  Q    Please explain that to Her Honor.

24  A    Well, throughout this process, there were conversations

25  across the table regarding just the costs and just how that

1    impacts each of the servers that were associated with our

2    banquets department.  And it was identified that during that

3    time, there are others who have worked in other areas with other

4    companies associated with banquets, which typical banquet folks

5    do anyway, because of the limited amount of work that they

6    typically would have at any one particular location.  So it was

7    identified that folks within our banquet team also works for our

8    competitors at various times.

9    Q    And did the subject of whether they were working for a

10   strict hourly wage versus what Kahler paid them, an hourly wage,

11   plus a service charge, come up?

12   A    Yes.

13   Q    Please explain that.

14   A    There were two sets of circumstances.  I know that what

15   transpired was that you had folks who were working for straight

16   wages within banquets; there are others who also work and

17   whatever their relationships were in some of those

18   circumstances, were paid some form of gratuity or were paid in

19   addition to their normal hourly wages, but nothing was defined

20   as to exactly how that worked out.

21   Q    Now directing your attention to the subject of the pie

22   charts, please explain to Her Honor whether the -- it came up in

23   your presence that questions were raised concerning the accuracy

24   of certain pie charts.

25   A    Yes, there were questions with regards to certain pie

1  charts.

2  Q    And what, if anything, did the company do to respond to any

3  questions raised by the Union concerning the pie charts?

4  A    Well, as the questions came about with the folks that were

5  sitting around the table, they were noted.  And as we went

6  through the whole process, we took that information.  If Leslie

7  was not in the room, we would go back to her and have her make

8  the adjustments and have the paperwork brought back for those

9  that were on the larger scale that needed to be corrected.  We

10  had those prepared -- corrected and prepared and brought to the

11  next session.

12  Q    And how much time was devoted to doing that, to responding

13  to the Union's inquiries?

14  A    Quite a bit.  We wanted to make sure that everything that

15  we put forward was understood and was as accurate as we possibly

16  could be.  We understand the importance of, you know, of wages,

17  and how it impacts our associates.  It is something that is

18  critical.  One of the biggest things that I find within my sole

19  responsibility is to make sure that that aspect of all of our

20  associates are keen and we're paying special attention to it and

21  make sure that's taken care of.

22  Q    When the wage proposal was made showing substantial

23  increases for starting rates and rather small increases, and

24  sometimes zero increases, for those in the existing bargaining

25  unit, did anybody from the Union want an explanation of how our

P 00713

1  proposal applied to specific union members?

2  A    Yes.

3       MR. WIESE:  Objection, Your Honor:  vague.

4       JUDGE STECKLER:  When was this taking place?

5       MR. STOKES:  In March of 2015.

6       JUDGE STECKLER:  Okay, we're still in March of 2015, okay.

7  At the first session or the second session?

8       MR. STOKES:  Either session, because it came up every

9  session.

10      JUDGE STECKLER:  Well, you just told  him the answer, so --

11      MR. STOKES:  Well, see what the witness says.

12      JUDGE STECKLER:  What was your recollection of when this

13 came up?

14      THE WITNESS:  It did come up --

15      JUDGE STECKLER:  If it came up at all.

16      THE WITNESS:  It did.  Actually, I remember it coming up

17 even the first time on the 27th, which before we went into the -

18 -

19      JUDGE STECKLER:  February 27th?

20      THE WITNESS:  February 27th session.  Martin raised the

21 question, "How does a" --

22 Q    BY MR. STOKES:  I'm sorry, who asked that question?

23 A    Martin Goff.

24 Q    What did he ask?

25 A    He asked specifically, "My concern is you putting all these

1    wonderful things, and you're increasing starting wages, it's

2    great for the starting people and I think it's wonderful; but

3    what about those people that are in this room currently?  How

4    does your proposal impact those folks in the room?"

5    Q    And what did the company do in response to Martin Goff's

6    specific request for how the company's wage proposal

7    specifically applied to individuals in the bargaining unit?

8         MR. WIESE:  Objection, Your Honor.  That's

9    mischaracterizing the testimony.

10        JUDGE STECKLER:  Rephrase a little bit, please, Mr. Stokes.

11   Q    BY MR. STOKES:  What did the company do in response to his

12   request?

13   A    Well, what we did was Leslie and I got together, and she

14   pulled all the information that we possibly could find on every

15   single -- our current employee at the time under the bargaining

16   unit, looked at their salary, their years of service.  We did --

17   and from that, we produced the pie charts that impacted our

18   proposal as we go through for the five -- proposed 5 years of

19   the contract.

20   Q    And when, if at any time, after Martin Goff's specific

21   request for this application of the company's wage proposal --

22   when did the pie charts get presented?

23        MR. WIESE:  Objection, Your Honor:  mischaracterizes the

24   testimony.

25        JUDGE STECKLER:  Could you repeat the question, again, Mr.

1    Stokes.

2        MR. STOKES:  I'm sorry, I couldn't hear you.  I'm so old,

3    it's hard for me to hear.

4        JUDGE STECKLER:  Could you repeat the question, again, Mr.

5    Stokes, and let me evaluate it?

6        MR. STOKES:  Yes, Your Honor, be happy to.

7    Q    BY MR. STOKES:  When, in relation to after Martin Goff's

8    request for this information to show how it applied to the

9    members he represents, when did the company present those pie

10   charts?

11   A    We made sure that we had them available at our next meeting

12   -- at our next meeting, we have those available.

13   Q    And explain to Her Honor how, if in any way, they were

14   distributed?

15   A    Well, fortunately for us, we had members of the collective

16   bargaining agreement sitting around our table, so we were

17   fortunate enough to be able to have pie charts prepared

18   specifically for those folks that were in the room and were

19   brought in and given to those folks for their review along with

20   the Union so we can have a discussion about it.

21   Q    And did you then do that?

22   A    Yes, we did.

23   Q    And did that cause later for you to have a meeting in March

24   when Leslie explained how the pie charts were prepared?

25   A    Yes, it did.

1  Q    Do you have any knowledge as to whether pie charts were

2  also prepared for the Textile Care Services workers that were

3  still in the bargaining agreement before the National Labor

4  Relations Board ruled in April that they should be separated

5  out?

6  A    Yes, the pie charts were prepared for those folks that were

7  sitting in the room from Textile Care Services as well.

8  Q    Now there's been some question concerning whether the

9  company was late for negotiations.  Now would you please explain

10  to Her Honor whether the company was late for negotiations?

11  A    Well, I don't know how we could be late when we are holding

12  the meetings are our property.  We had them scheduled to be at

13  our meeting rooms.  There are several times that within the

14  meetings that there were calls made to either myself or say --

15  indicating that either Nancy was running late or Martin was

16  running late.  There are times that we have asked for -- when we

17  were scheduling out the date, could we meet on consecutive

18  dates; that there were challenges with regard to getting that

19  scheduled, because they were not able to schedule consecutive

20  days.  We've asked to be able to work later in some afternoons,

21  and because of whatever concerns --

22      MR. WIESE:  We're going to object, Your Honor.  This is

23  non-responsive to the question of whether the Union -- whether

24  the Union's contention that the employer --

25      JUDGE STECKLER:  Was late.  Limit it to the late.  I think

1    that's what you asked.

2    Q    BY MR. STOKES:  So were we late?

3    A    We were not late.

4    Q    And please tell Her Honor whether we specifically requested

5    that the Union negotiate with us two days in a row?

6    A    Yes, we have.

7    Q    And do you know whether the Union agreed or did not agree

8    to do that, other than on one occasion?

9    A    They were not able to other than the one occasion that

10   happened.

11   Q    And please explain to Her Honor specifically what Martin

12   Goff said about his desire to leave before 5 o'clock, and

13   usually around 4 o'clock every day?

14        JUDGE STECKLER:  Isn't that -- didn't you just tell him

15   what he said?

16        MR. STOKES:  I'm sorry?

17        JUDGE STECKLER:  Didn't you just tell him what he said, Mr.

18   Stokes?

19        MR. STOKES:  No, I didn't tell him.  I said -- no, I'm

20   asking --

21        JUDGE STECKLER:  Please explain.

22        MR. STOKES:  I did not.  I said please explain what, if

23   anything, Martin Goff said concerning his leaving -- I'm talking

24   about the rationale basis for it.

25        JUDGE STECKLER:  And then you --

1      Mr. Henry, was there a time when Mr. Goff had a discussion

2   with you about leaving early?

3      THE WITNESS:  Well, the --

4      JUDGE STECKLER:  Or leaving at a specific time each day?

5      THE WITNESS:  There were specific requests from Nancy and

6   Martin about the time that they had to leave.

7      JUDGE STECKLER:  And what time was that?

8      THE WITNESS:  It varied.  They were typical -- there was a

9   time that they had to go pick up a car, they had issues with

10  their dogs that they had to go pick up, it varies.

11     JUDGE STECKLER:  So it varied what time they would say?

12     THE WITNESS:  They say either 4, 4:30 or 5.

13     JUDGE STECKLER:  When do you recall having these

14  discussions?

15     THE WITNESS:  Within the bargaining sessions.

16     JUDGE STECKLER:  How often did you have these discussions?

17     THE WITNESS:  Well, pretty much each day, we'd try to get

18  an idea of exactly what time they will be staying until.

19     JUDGE STECKLER:  Okay, so were there any discussions about

20  the future bargaining sessions as well during those times?

21     THE WITNESS:  Yes, there were.

22     JUDGE STECKLER:  Okay.

23  Q   BY MR. STOKES:  Please explain to Her Honor how often, if

24  ever, we -- the company offered to negotiate late each day

25  because of getting everybody together?

1    A    We have made offers to negotiate late, but it was never --

2    we were never able to do it.

3    Q    What, if anything, did the Union say about getting back to

4    Minneapolis because of the traffic?

5        MR. WIESE:  Objection.  He hasn't mentioned anything about

6    that.  He's --

7        JUDGE STECKLER:  He said, what, if anything, was mentioned

8    to that --

9        MR. WIESE:  -- leading question.

10       MR. STOKES:  What did they say?

11       MR. WIESE:  Okay.

12       THE WITNESS:  They say that they'll prefer to leave early

13   enough so they could beat the traffic getting home.

14   Q    BY MR. STOKES:  With respect to the caucuses that occurred

15   during the negotiations in which you were present, please

16   explain to Her Honor exactly how that worked.

17   A    From each session, there were times that either the Union

18   representative asked for a caucus either to review items that we

19   were covering to go through different proposals or things that

20   we've shared during our presentation of what our proposals were.

21   As we were discussing them -- items that were getting TA'd,

22   items that they had concerns about before they were TA'd, they

23   would caucus and meet about some of those things.

24       As we moved closer and closer into the more discussion on

25   wages and additional changes that we were proposing, then we

P 00720

1    also had -- asked for caucuses so we can go back and make some

2    adjustments.  For example, with the pie charts, where we were

3    able to go back and make the adjustments to those and have them

4    brought back so we could review them.  There were times that we

5    went to caucus on their proposal that they have given to us too

6    as well; as we went through them, so we can kind of discuss the

7    things that we think, you know, would help us too as well as we

8    move -- to show some movement as we move ahead in the

9    negotiations.  So we did caucus quite a few times on both sides

10   with regard to the different items and things that were

11   transpiring there.

12   Q    Sir, during the collective bargaining negotiations, were

13   any subjects considered off-limits, like grievances or

14   complaints about management or scheduling or anything like that?

15   A    Nothing was off-limits, we expressed that we wanted to

16   discuss everything, let's get everything on the table so that we

17   can move forward with the process.

18   Q    So, indeed, were grievances discussed in collective

19   bargaining negotiations?

20   A    Yes, they were.

21   Q    Were complaints about members of management discussed?

22        MR. WIESE:  Objection:  leading.

23        JUDGE STECKLER:  What's the relevance, Mr. Stokes?

24        MR. STOKES:  Because every single subject was covered in

25   totality.

1      JUDGE STECKLER:  Well, this is not a --

2      MR. STOKES:  And there were not limits.  And in many

3  collective bargaining negotiations, as Your Honor knows, the

4  parties at the outset -- I would say 50 percent of the time, the

5  parties at the outset say, "Grievances and arbitrations and

6  things like that are going to be discussed at another time."

7  This was not the case here.

8      JUDGE STECKLER:  I don't think there's any allegations

9  regarding surface bargaining, as has been mentioned in the past,

10  nor is there an issue regarding impasse at this point either.

11  It sounds like -- plus, we already have significant testimony

12  about there were a number of tentative agreements reached at the

13  table.  So I think we need to get specific towards the specific

14  complaint allegations.

15      MR. STOKES:  Very well.  The tentative agreements related

16  to the contract itself.

17      JUDGE STECKLER:  Yes.

18      MR. STOKES:  I was saying there's another category that

19  comes up in bargaining that often in some bargaining circles,

20  they say, "Well, we're not going to talk about these at this

21  table."  I just wanted to --

22      JUDGE STECKLER:  I don't think -- I think he's already

23  answered that question, so --

24      MR. STOKES:  Very well.

25      JUDGE STECKLER:  -- we can move on to the next topic.

CASE 0:17-cv-03978-WMW-DTS   Doc. 1-2   Filed 08/25/17   Page 532 of 1459

528

1       MR. STOKES:  Very well, thank you, Your Honor.

2   Q   BY MR. STOKES:  Were each and every provision of the

3   collective bargaining offers by management discussed at the

4   table?

5   A   Yes.

6   Q   Were there any subjects not discussed?

7       JUDGE STECKLER:  I think he's already answered that

8   everything was discussed.

9       MR. STOKES:  Very well.

10  Q   BY MR. STOKES:  Now with respect to -- there was one caucus

11  that was testified to during the Counsel for the General

12  Counsel's case in chief that took a long time.  Could you please

13  -- do you remember a caucus that we had that took more than an

14  hour or maybe even more than 2 hours?

15  A   Yes.

16      MR. WIESE:  Object.

17      JUDGE STECKLER:  Could you give him the date, please?

18      MR. STOKES:  In March of 2015.

19  Q   BY MR. STOKES:  Do you remember that?

20      JUDGE STECKLER:  What date was that, Mr. Henry?

21      THE WITNESS:  Yes, Your Honor.  My recollection, I think

22  that was March 24th.

23  Q   BY MR. STOKES:  And could you please explain to Her Honor

24  what happened from your perspective during that caucus?

25  A   During that caucus -- I know that before the caucus, if I

1  could back up for a little bit, Your Honor -- before that

2  caucus, we had very good discussions, very strong discussions

3  about various aspects of the proposal and the different things

4  that was brought to your attention, especially as it impacted

5  that wage proposal that we had brought up.

6      This was a follow-up from some really good conversations

7  and they had some -- the Union had some changes that they wanted

8  to have as part of the proposal.  So what we did is we went

9  ahead and we identified some typographical errors and different

10  things that we needed to adjust too as well to the proposal.

11     So we went back and had some discussions and we were

12  working feverishly about getting some of those changes done and

13  then how that impacts the presentation that we would put on the

14  table.  Unfortunately, as things go, you know -- I know that Mr.

15  Stokes kept in contact with Nancy and informed her that we're

16  behind and we're a little bit delayed.  But we were feverishly

17  working on getting everything compiled as much as we possibly

18  can to impact the request of the Union at the time in terms of

19  the changes that they wanted us to make to the proposal.

20  Q    Mr. Henry, during all your collective bargaining

21  negotiations with the Union, when, if ever, did Nancy Goldman or

22  Martin Goff or anybody on the Union's side say, "Meet with us

23  more hours than you're meeting with us."

24  A    Never did.

25  Q    When, if ever, did Nancy Goldman or Martin Goff or anybody

P 00724

1    on the Union's side say, "You're showing up too late or you're

2    not staying long enough."

3         MR. WIESE:  Objection:  leading.

4         JUDGE STECKLER:  I'm going to allow it.

5         Go ahead.

6         THE WITNESS:  They never did.

7    Q    BY MR. STOKES:  Now you began meeting with Brian Brandt,

8    the President of Local 21, in 2014, did you not?

9    A    That is correct, yes.

10   Q    Please explain to Her Honor what meetings or negotiations

11   you had with him in 2014?

12   A    There was a series of meetings with Brian including Nancy

13   as well -- but starting out with probably about March 14th when

14   we had this presentation.  But beyond then, we had several

15   discussion moving forward.  I think one of the -- the big thing

16   that sparked some of those discussions and kind of identified

17   the differences between TCS and the hotels started out the early

18   part of -- probably about May -- June, somewhere around there,

19   having discussions about where we are with regards to the

20   upcoming negotiations, the extensions.  We met periodically

21   throughout that year, 2014, on several different occasions

22   discussing different things from the difference in businesses

23   between the hotels; we've mentioned at the time too as well

24   about, you know, probably having separate contracts for full

25   service, as to limited service and then also TCS, as we moved

1  forward with some of those discussions.  We talked about, you

2  know, what we can do too as well too to -- broke up pretty good

3  contracts starting as we moved forward to make sure that there's

4  something that's going to be effective and beneficial for both

5  parties as we move ahead with forging up a positive

6  relationship.

7  Q    Did there come a point in time, in which the President of

8  Local 21 appeared no longer to be the negotiator for the Union?

9  A    Yes.

10     MR. WIESE:  Objection:  relevance.

11     JUDGE STECKLER:  That's a good question.

12     Mr. Stokes, what the relevance?

13     MR. STOKES:  The relevance is that any of the delays and

14  problems that occurred in the negotiation, we respectfully

15  invite Your Honor to consider occurred in part because Local 17

16  came down from Minneapolis and tried to foist whatever standards

17  they had in hotel collective bargaining agreements in

18  Minneapolis on to the negotiations of a contract that both Nancy

19  Goldman and Martin Goff specifically disavowed ever having

20  negotiated.  And that created an immediate problem in

21  communicating with respect to wages, with respect to health

22  care, with respect to the banquet compensation and some of the

23  issues that Counsel for the General Counsel has raised.  If

24  Brian -- our position is respectfully if Brian Brandt had been

25  allowed to continue to negotiate with Michael Henry, they would

1    have a contract today.

2        JUDGE STECKLER:  Are you saying that you wanted to handpick

3    who represented the Union?

4        MR. STOKES:  I'm sorry.

5        JUDGE STECKLER:  Are you saying that you're trying to

6    handpick who represented the Union?

7        MR. STOKES:  No, I'm not -- well, first of all, she doesn't

8    represent Local 21.  She's an International Vice President that

9    has political jurisdiction over that, had never in 50 years,

10    represented them.  All I'm saying is sine qua non, Local 17 is

11    saying, "Well, we want to negotiate from the perspective of

12    Minneapolis."  That's what created -- if that had happened, they

13    probably would have a contract today; and that's relevant to

14    Your Honor's determination about all these allegations of

15    information and this, that and the other thing, for, simply,

16    because Brian Brandt was shuttled to the side. That also

17    affected his relationship with his members.  And you can see it

18    in the notes.

19        JUDGE STECKLER:  Well, I --

20        MR. STOKES:  You can see it in the notes that Counsel for

21    the General Counsel introduced.

22        JUDGE STECKLER:  Well, I think -- Mr. Wiese, do you have a

23    response here?

24        MR. WIESE:  Well, I do.  I mean, we're presenting a limited

25    case here.  It's the wage proposals, union leave and times --

1  you know, whether they showed up late and left early from the

2  bargaining table.  I mean, who they had for negotiations,

3  whether they reached an agreement, I mean, "pre-" these

4  discussions that they had in 2014 -- none of it is at all

5  relevant to their wage proposals, their union leave proposals,

6  and whether they left bargaining early and arrived late at their

7  bargaining sessions in 2015.

8       JUDGE STECKLER:  I think under the standard of 8(a)(5),

9  it's an objective standard, it's not a subjective standard.  And

10  saying that had "X" person been at the table is kind of

11  speculative as to what -- we need to focus more on what happened

12  through the negotiations, what was said at the table, rather

13  than going into what if Mr. Brandt was left alone.

14      MR. STOKES:  With all due respect,  it is our position that

15  as a matter of fact and law, the negotiations actually started

16  in 2014, and I understand that Counsel for the General Counsel

17  will be at odds with that.  So Your Honor can determine for

18  herself whether collective bargaining and negotiations with

19  Local 21, and the employer actually started before Local 17's

20  representatives got involved.

21      And, secondly, we make an offer of proof that there will be

22  specific testimony that Local 17 regularly referred to the

23  Minneapolis contract; and, thirdly, I'll make an offer of proof

24  that one of my partners was negotiating a hotel contract at the

25  Radisson in Minneapolis, and Nancy Goldman would attempt to use

P 00728

1  provisions from that contract in this contract that had been

2  around for 50 years in the health care area alone;

3      And she would regularly -- I'll make an offer of proof and

4  I'll be happy to testify to this -- regularly say, "We don't

5  have a collective bargaining agreement in the Twin Cities with a

6  hotel that has a health care package or language like they do in

7  this contract.  And Brian had no objection to that, but she did.

8  So there was a dichotomy.  So that created --

9      JUDGE STECKLER:  Well, I think, Mr. Stokes, then that's

10 going to go to what was said at the table, not necessarily the

11 relationship between the fact that they were from Minneapolis.

12 We've heard testimony as well that the competitive area for the

13 hotel was also considered into the Twin Cities area.

14     MR. STOKES:  Very well.

15     JUDGE STECKLER:  So I think we can just stick with the

16 objectives of what happened at the tables, rather than going

17 into speculative modes.

18     MR. STOKES:  Be happy to.

19     JUDGE STECKLER:  Thank you, sir.

20 Q   BY MR. STOKES:  Mr. Henry, how often, if ever, did Nancy

21 Goldman, when she became the lead negotiator in 2015, reference

22 whatever the standards were in collective bargaining at the

23 hotels she represented in Minneapolis?

24 A   In pretty much every session.

25 Q   And how often did she reference that specifically with

1  respect to wages?

2  A    All the time.

3  Q    How often did she reference that with respect, if in any

4  way, with respect to health and welfare?

5  A    In all the meetings that we discussed it.

6  Q    How often did she reference that with respect to banquets?

7  A    In all the meetings, she discussed it.

8  Q    Now directing your attention to your dealings with Mr.

9  Brandt in 2014, please describe for the record how many meetings

10 you had with him concerning your collective bargaining in 2014?

11     MR. WIESE:  I'm going to make a standing objection to

12 relevance to any further questions about meetings in 2014.

13     JUDGE STECKLER:  We'll give you a running objection.

14     Go ahead, please.

15     THE WITNESS:  I don't know the number off-hand how many

16 times we met regarding it, but I know that it was more than -- I

17 would say it was more than about eight -- ten times.

18 Q    BY MR. STOKES:  And how many times did you communicate with

19 him the issue with respect to the compensation of banquet

20 employees?

21 A    As we heated up in the discussion, I can't -- I don't

22 remember the number, but whenever that came up, we discussed it.

23 Q    In 2014?

24 A    Yes.

25 Q    Directing you attention to your conclusion that the

1    competition, rightly or wrongly, that the competition was paying

2    wage rates that were substantially less than the wage rates you

3    were paying in your hotels, how often did that subject get

4    discussed with Brian Brandt?

5    A    As often as we discussed wages.

6    Q    When the collective bargaining agreement extension, which

7    was negotiated in December or so or when -- I mean, in August --

8    A    Yah, the extension was discussed the early part of the

9    year.  I think we discussed it in January or February 2014, to

10   have it extended through the following year, 2015.

11   Q    Through February 28th --

12   A    Twenty-eight, yes, correct.

13   Q    -- 2015.

14   A    Yes.

15   Q    Approximately a 6-month extension?

16   A    That is correct.

17   Q    After the contract was extended, did the Union request an

18   additional extension?

19   A    After the contract was -- I did not get a request for --

20   Q    After February 28th.

21   A    I did not get a request from them.  They have asked -- I

22   know that in bargaining session, we made it clear to them that

23   there will not be an extension.

24   Q    The company took the position that the contract expired?

25   A    Correct.

1  Q    On March 1 --

2  A    Correct.

3  Q    -- 2015.

4  A    Correct.

5  Q    What, if anything, did the Union communicate concerning

6  striking and picketing and after that?

7      MR. WIESE:  Objection:  relevance.

8      JUDGE STECKLER:  I don't know that that is relevant to the

9  discussion.  There's no 8(b)(4) activity that's alleged

10      MR. STOKES:  Well, it's relevant as to whether, for

11  example, specifically relevant as a matter of law if those are

12  the facts as to whether the incremental increases were, indeed,

13  part of any collective bargaining agreement that would be

14  applicable thereafter.  And so it would be something Your Honor

15  would want to hear.  How you deal with that is up to you.  But

16  there is an allegation by the Counsel for the General Counsel

17  that even after the contract expired, they wanted provisions of

18  the contract to continue to apply.  On the other hand, the no-

19  strike/no-lockout provision did not apply did not apply; and,

20  similarly, the Union engaged in picketing and demonstrations and

21  corporate campaigns thereafter on a regular basis as if there's

22  no contract.

23      JUDGE STECKLER:  Well, I think there are two -- I think

24  we're talking about apples and oranges here, because strikes and

25  arbitration provisions, as you well know, Mr. Stokes, are

1   handled differently than possibly wages.  So I think we need --

2   you know just having what might be -- what may or may  not be

3   PCA in terms of strikes and picketing -- strike threats and

4   picketing, don't seem to be relevant here to the 8(a)(5).  I

5   think we're talking -- even though -- you know, if we were

6   talking about the -- well, let me strike that because that's

7   purely speculative too.

8       So let's try to stick to, you know, if there were

9   statements made at the table regarding striking and picketing,

10  that's fine.  We can take that information in terms of

11  discussing negotiations; but let's not talk about what the

12  employees were doing out there unless it has something specific

13  to do with the allegations.

14      MR. STOKES:  Very well.

15  Q   BY MR. STOKES:  At the table, isn't it true that Nancy

16  Goldman said, "Well, we can strike now"?

17      MR. WIESE:  Objection:  leading.

18      JUDGE STECKLER:  What, if anything, did Nancy Goldman say

19  about striking, and, if so, when?

20      THE WITNESS:  Nancy did threaten to strike at our meetings.

21  She did it, I think, once or twice, I don't remember how often,

22  but it happened in meetings in March and also in April.

23  Q   BY MR. STOKES:  Indicating that there was no contract in

24  place prohibiting her --

25      MR. WIESE:  Objection:  leading.

1      JUDGE STECKLER:  I think we've already established that,

2  Mr. Stokes.

3      MR. STOKES:  Very well.

4  Q    BY MR. STOKES:  Now, sir, with respect to the negotiations

5  that occurred from April through September, please explain to

6  Her Honor, who requested the negotiations in September?

7  A    The employer requested the meeting in September.

8  Q    Did you meet with the Union in April?

9  A    Yes, we did.

10  Q    And did the positions of the parties change?

11  A    No, they did not.

12      JUDGE STECKLER:  Regarding what?

13      MR. STOKES:  Every single issue that was on the table in

14  March.  Based upon what was on the table in March, all the TAs,

15  all the rejections.  Did any of those change from March to

16  April.

17      JUDGE STECKLER:  Do you have any notes that would help you

18  recall that?

19      THE WITNESS:  Yah, I think I might.

20      MR. STOKES:  I'm sorry.

21      JUDGE STECKLER:  I asked him if he had any notes that might

22  help him recall that, and he said it might.

23      MR. WIESE:  May I speak on this, Your Honor?

24      JUDGE STECKLER:  Okay.

25      MR. WIESE:  I mean, we have -- so we have the employer's --

540

1    what they've said is their last, best and final proposal from

2    March 24th.  And then we have the Union -- the comprehensive set

3    of the Union's proposals.  Those proposals speak for themselves

4    whether there's been any changes or not to their terms, and with

5    respect to the September proposal from the Union, the employer's

6    response to that proposal.

7        MR. STOKES:  If the company is being accused of having some

8    form of anti-union animus because of a certain pattern of

9    behavior, no matter how scattergun it may be, his position as

10   the negotiator concerning whether he met with them in April and

11   the Union's position and his position changed is relevant as we

12   move forward to September.

13       MR. WIESE:  I'm not making a relevance objection, I'm

14   making an objection that we have the proposals that demonstrate

15   that Mr. Stokes has asked.

16       JUDGE STECKLER:  You're saying that's the best evidence.

17       MR. WIESE:  Yes, and what Mr. Henry can't remember.

18       JUDGE STECKLER:  I think it's well-taken.  I think the

19   proposals speak for themselves.  The employer claims that

20   certain things are not proposals, the Union does.  Those are

21   going to be determinations in the briefs, so I would encourage

22   you to argue it in the brief rather than characterizing it, you

23   know, that way.

24       MR. STOKES:  Am I, therefore, prohibiting from asking the

25   question, "When you met with them on April the 16th, did the

1    Union's proposal change from what had previously been on the

2    table?"

3         JUDGE STECKLER:  I think he does not specifically recall

4    first the date, because he -- before that, he said he might need

5    to look at his notes.  So the suggestion of April 16th is kind

6    of "jumping the gun."

7         I'm sorry, just a minute, Mr. Henry.  I don't mean to

8    squelch.

9         THE WITNESS:  No, that's fine.

10        JUDGE STECKLER:  I know there's something you really want

11   to get out, but I think that under the circumstances, we need

12   to be very specific about what was said and when, and that's

13   going to be the basis for my decision, looking at the documents,

14   looking at the testimony, not blanket statements.

15        So I would appreciate getting down to the brass tacks

16   rather than a general statement.

17   Q    BY MR. STOKES:  This is a specific question:  Did you meet

18   with the Union in the month of April?

19   A    Yes, I did.

20   Q    Did you meet more than once?

21   A    Yes, I did.  We met twice in April.

22   Q    When was the next time you met with the Union?

23   A    September 24th.

24   Q    How did it come about that you had a meeting in September?

25        JUDGE STECKLER:  I think that has already been discussed,

1    that the company requested negotiations.

2    Q    BY MR. STOKES:  Did the Union call, text, e-mail, do

3    anything to request a meeting with you between April and

4    September?

5    A    No.

6    Q    When you met with them in September, was your position any

7    different than it had been on any issue?

8    A    No, it wasn't.

9    Q    Was the Union's position any different on any issue?

10   A    No, there wasn't.

11        MR. WIESE:  Objection.

12        JUDGE STECKLER:  Is it your belief that the Union's

13   position had not changed?

14        THE WITNESS:  It was the identical proposal that they sent

15   in April to what we got in September.

16        JUDGE STECKLER:  That's his position, and he's allowed to

17   testify to that.

18        MR. STOKES:  Thank you.

19        JUDGE STECKLER:  So we'll move along.

20        MR. STOKES:  Yes, Your Honor, I shall.

21        Well, I really wanted to do that instead of going through

22   all 140-some position.

23        JUDGE STECKLER:  And I think -- presuming that there's

24   bargaining notes, wouldn't his bargaining notes reflect that, if

25   he has any?

1          MR. STOKES:  Well --

2          JUDGE STECKLER:  Let me not state that as a question, since

3     we are not at that point.  Presuming that there are bargaining

4     notes, it would be reflected in the bargaining notes.  And then

5     let's kind of move ahead -- which would be the best evidence.

6          MR. STOKES:  With all due respect, Your Honor, I actually

7     believe that the best bargaining unit notes would be a video of

8     what everybody said in collective bargaining negotiations.

9          JUDGE STECKLER:  Was there one?

10         MR. STOKES:  We don't normally have that.

11         JUDGE STECKLER:  I'm glad to hear that.

12         MR. STOKES:  I have had audio, and I have had a Court

13    Reporter in Denver one time, a Court Reporter typed --

14         JUDGE STECKLER:  What about this one?

15         MR. STOKES:  We have no disputes.  In this case, your

16    inquiry about -- or your assumption that if there are bargaining

17    notes, wouldn't they reflect that, it is my humble experience in

18    45 years, that bargaining units -- bargaining unit notes of

19    bargaining issues are often -- the answer to your question is

20    no.  The bargaining notes don't always reflect everything that

21    happened at the table, even on the positions.

22         JUDGE STECKLER:  No, I'm not saying that.  If something was

23    TA'd --

24         MR. STOKES:  Well, sometimes they are wrong.

25         JUDGE STECKLER:  I know, and sometimes, you know, you have

1    -- get in a dozen different bargaining notes, and then you find

2    out.

3        MR. STOKES:  Right.

4        JUDGE STECKLER:  So that's what I'm saying is that the

5    bargaining notes would reflect if there had been agreements.

6        MR. STOKES:  We're in favor of Your Honor having all the

7    bargaining unit notes you can, and I think that 90 percent of

8    the time, you'll get, you know, somewhat of a flavor of the

9    negotiations.  But bargaining unit notes, in my humble

10   experience, unless there's a stenographer or a video or an audio

11   tape, do not, in answer to your question, my 45 years say they

12   do not reflect everything that went on.  And, sometimes, the

13   bargaining unit notes from this side or that side are biased.

14   And you know that I know that.  And so I'm saying the answer to

15   your question is no.

16       JUDGE STECKLER:  Also, everything is biased.

17       MR. STOKES:  Well, that's why I say --

18       JUDGE STECKLER:  And so what I'm saying is is that we have

19   now -- we have testimony from Mr. Henry that it's his position

20   that the Union hadn't changed its position.

21       And what I'm  trying to avoid is using the transcript as a

22   basis for an impasse trial that I have to come back for later

23   on.  So are we all in agreement on that?

24       MR. STOKES:  Well, actually, the Union represented on

25   several occasions --

1      JUDGE STECKLER:  I see Mr. Terrell covering up his lips.

2      MR. STOKES:  -- in bargaining that we were at impasse.

3      JUDGE STECKLER:  Okay, well, and that's --

4      MR. WIESE:   Your Honor, I would ask that that be struck.

5      JUDGE STECKLER:  Well, you know, I'm sorry, it is -- for

6  what it's worth, it's his comments, you know.  If he wants to

7  make that statement when he's on the stand later, if he's on the

8  stand, we'll take it.

9      MR. STOKES:  The President of the Union was quoted in the

10  paper as saying that.  And they know that.

11      JUDGE STECKLER:  Well, it's not -- obviously, it's not an

12  allegation here.

13      MR. STOKES:  Anyway --

14      JUDGE STECKLER:  So, at any point, what I'm saying is just

15  that if there's something else relevant to these discussions

16  that we'd like to bring up specifically --

17      MR. STOKES:  Very well.

18      JUDGE STECKLER:  -- please do so; otherwise let's keep

19  moving.

20      MR. STOKES:  Yes, ma'am, I should be happy to do that.

21  Q    BY MR. STOKES:  Mr. Henry, in the course of collective

22  bargaining unit negotiations, particularly in the month of

23  March, the subject of leave for -- to attend a union convention

24  came up.  Do you recall that?

25  A    Yes, I do.

1  Q    And what was the position of management and what was the

2  position of labor?

3  A    We -- our position, we proposed to add just three days for

4  the leave; and the Union didn't -- rejected that proposal.

5  Q    Is there anything complicated about it?  The Union wanted

6  one position and, as Counsel for the General Counsel likes to

7  say, the documents speak for themselves, is there anything

8  complicated about the position that management took as opposed

9  to the position the Union took.

10    MR. WIESE:  Objection:  relevance.

11    JUDGE STECKLER:  It's not a matter of complicated.  It is

12  not a matter complicated.

13    MR. STOKES:  Well, he used the phrase "complicated about

14  the pie charts" and I take issue of his characterization of

15  that.  They are not complicated at all.

16    JUDGE STECKLER:  Only for people who have experience in

17  Excel.

18    MR. STOKES:  Well --

19    JUDGE STECKLER:  You know, it was a good thing to have Ms.

20  Hohmann's testimony.

21    Let's talk specifically about the leave for union

22  conventions.  What -- when did you first present this proposal?

23    THE WITNESS:  I can't remember the exact time in

24  bargaining, but the only thing that we did with the proposal, as

25  you go through, the old contract -- all we did was added three

1    days to it.  All the language remains the same.

2        JUDGE STECKLER:  So you specified the number of days for

3    union leave?

4        THE WITNESS:  That's correct, that's right.

5        JUDGE STECKLER:  What, if anything, was the Union's

6    response and when?

7        THE WITNESS:  Well, they didn't make a counter-proposal as

8    to say, "Well, could we make it 5 days or could we make it 10?"

9    They just said that they reject it.

10       JUDGE STECKLER:  Did they say they wanted to keep the same

11   language?

12       THE WITNESS:  I don't recall them saying that.  I don't

13   recall, I'm sorry.

14       JUDGE STECKLER:  What, if anything, did the Union say about

15   the relationship between union seniority and union leave --

16   between seniority with their employer and leave?

17       THE WITNESS:  Well, the language -- if I could look back at

18   it, the language doesn't say anything about it.  It says that

19   without loss of seniority, that's what the language says in

20   there.

21       JUDGE STECKLER:  In the -- well, I'll tell you -- which

22   exhibit is the first proposal, GC 2?

23       MR. WIESE:  Six (a)

24       THE WITNESS:  Six (a) is the employer's proposal.

25       MR. WIESE:  And that was only for TCS.

1    MR. TERRELL:  Is Your Honor referring to the union leave

2  provision in the old contract?

3    JUDGE STECKLER:  No, in the new contract.

4    MR. TERRELL:  In the new proposal by the company?

5    JUDGE STECKLER:  In the new proposal for a CBA, the one

6  that --

7    MR. TERRELL:  Six (g) -- not 6(a), it's 6(g).

8    JUDGE STECKLER:  It's 6(g), I'm sorry.

9    MR. WIESE:  Well, 6(g) -- you asked for the initial

10  contract proposal, is that right, Your Honor?

11    JUDGE STECKLER:  Yes.

12    MR. WIESE:  Okay, the initial contract proposal, the first

13  one that we've entered is General Counsel 6(a).  It's from

14  January -- well, it will be in the record.  But, anyways, 6(a)

15  is the initial -- the employer's initial proposal --

16    JUDGE STECKLER:  Okay, so --

17    MR. WIESE:  -- as it relates to TCS.

18    JUDGE STECKLER:  So do you have that in front of you now?

19    THE WITNESS:  I have 6(g), and 6(g) is what I'm looking at.

20  This is our proposal, this one here.

21    MR. TERRELL:  Are you sure it's not in the 23(b)?

22    MR. WIESE:  That's the Union's proposal -- 6(a).

23  (Pause.)

24    JUDGE STECKLER:  Does anyone recall what page this was on

25  so we can help Mr. Henry out?

1        MR. WIESE:  I know what it says what you're looking for.

2        THE WITNESS:  I know what it says too, I just want make

3    sure that I've read it correctly.  I just don't want to --

4    (Pause.)

5        THE WITNESS:  Okay, "Time off for union activities."

6    That's on page 29 of 150 on General Counsel Exhibit 6(g), and

7    the language that's limited to three working days without pay or

8    loss of seniority.  That's what our proposal says.

9        JUDGE STECKLER:  Okay.

10        Mr. Stokes, did you have further questions on that issue?

11        MR. STOKES:  Again, was there any -- I mean, management

12    took one position, the Union took another position substantively

13    on language that was similar to the old contract.

14        JUDGE STECKLER:  What's the question?

15        MR. STOKES:  And the question is there was no --

16        MR. WIESE:  I'm going to object here.  It isn't a question.

17        JUDGE STECKLER:  No, he -- I said so what's the question,

18    so he's asking what --

19        MR. STOKES:  There is no -- like Counsel for the General

20    Counsel thinks the pie charts are complicated.  There was no --

21    nothing complicated about management position versus the Union's

22    position in the union leave proposal by the company, was there.

23        JUDGE STECKLER:  In your opinion, is it complicated?

24        THE WITNESS:  No, it's not.  It's a typical -- if I may

25    expound, Your Honor, may I?

P 00744

1        JUDGE STECKLER:  I think that that was kind of "yes" or

2   "no," Mr. Henry.

3        THE WITNESS:  Yes, but if I could expound.

4        JUDGE STECKLER:  I think if it's not complicated, then I

5   don't need an explanation.

6        THE WITNESS:  Okay.

7        JUDGE STECKLER:  If it's complicated, then I need an answer

8   or explanation.

9        THE WITNESS:  Fair enough.

10  Q    BY MR. STOKES:  Was there anything concerning loss of

11  seniority?

12       MR. WIESE:  Objection.  The proposal speaks for itself.

13       JUDGE STECKLER:  I agree.  It's plain language.  It's not -

14  - according to you, it's not complicated, so --

15       MR. STOKES:  It isn't.

16  Q    BY MR. STOKES:  And directing your attention to Graham

17  Brandon, could you please explain to Your Honor how, if in any

18  way, he was disciplined?

19  A    His disciplinary action came about, the one in question for

20  us, I think 4/29, if it was grieved -- he was disciplined on

21  February 25 of 2015.  It was grieved.  We finally had a

22  grievance meeting on the 29th.

23       The reason why it took so long --

24       MR. WIESE:  Objection, Your Honor.  His answer is non-

25  responsive.

1      JUDGE STECKLER:  I'm sorry, what was the question again?

2      MR. STOKES:  Please explain to Her Honor how it came about

3  that Graham Brandon was disciplined?

4      JUDGE STECKLER:  Well, which discipline are we talking

5  about?  There was a discipline the previous year.

6      MR. STOKES:  In any way, shape or form.

7      JUDGE STECKLER:  Well, that's a little --

8      MR. STOKES:  I mean on his watch.

9      JUDGE STECKLER:  Well, I think I can -- I think Mr.

10  Terrell's suggestion --

11      MR. STOKES:  Okay, in February, okay.

12      JUDGE STECKLER:  February of 2015.

13      Let's get the document out so that we're all on the same

14  page as well.

15      MR. WIESE:  It's General Counsel Exhibit 27.

16      JUDGE STECKLER:  Is that -- oh, I remember what it looks

17  like, thank you.

18      MR. TERRELL:  Your Honor, there is more than one exhibit.

19      JUDGE STECKLER:  I wanted to start with that one though.

20      Let me Stokes start with that one.  How's that?

21      MR. STOKES:  Very well, Your Honor.

22      Go ahead and you can give is -- is that the exhibit?

23      JUDGE STECKLER:  He's got a copy of it.

24      COURT REPORTER:  He has it.

25      JUDGE STECKLER:  The Court Reporter kindly provided Mr.

1    Henry with a copy.  It's in front of him now.

2        Mr. Stokes, please proceed.

3    (Witness proffered the document.)

4    Q    BY MR. STOKES:  Directing your attention to GC 27, could

5    you please explain the bases for Graham Brandon's discipline?

6    A    This disciplinary action came about after several

7    conversations with Graham's manager.  Apparently, there's been

8    some challenges associated with his --

9        MR. WIESE:  Objection:  vague.

10       What conversations are we talking about?  When did they

11   take place.

12       THE WITNESS:  I'm going to explain that.

13       MR. WIESE:  Okay.

14       JUDGE STECKLER:  And who was Graham's manager at the time?

15       THE WITNESS:  It's Robert Ulrich, Executive Chef at the

16   Marriott.

17       JUDGE STECKLER:  Okay.

18       Please continue.

19       THE WITNESS:  This conversation happened with Graham

20   Brandon's manager, Robert Ulrich, who at the time was the

21   Executive Chef at the Marriott.

22       He had voiced some concerns to me with regards to

23   attendance issues with Graham.  I asked him before this

24   documentation was prepared just to make sure that he had

25   everything adequately documented.  And he told me that he did.

1    He said he text messages, he had --

2        MR. WIESE:  Objection:  hearsay.

3        JUDGE STECKLER:  He can explain the basis of the

4    conversation.

5        Go ahead.

6        THE WITNESS:  So the basis of the conversation was how it

7    is impacting the business and the other co-workers that are

8    associated within his -- within the department.  And I expressed

9    to him that if he has that much concern, and if he has the

10   documentation, to move ahead with getting the disciplinary

11   action prepared.  That's how that came about.

12   Q    BY MR. STOKES:  What, if anything, did any discipline of

13   Graham Brandon have to do with his activities on behalf of the

14   Union?

15   A    Nothing.

16   Q    Did you have meetings with Graham Brandon concerning his

17   discipline?

18   A    Yes, I did.  I did have a grievance meeting with him and

19   Brian Brandt in my office with Tyler Kase, who is the Food and

20   Beverage Director, regarding this disciplinary action.  And

21   there are other disciplinary actions that we had conversations

22   about prior to us having this conversation.

23   Q    And was Brian Brandt present for those as well?

24   A    Yes, he was.

25   Q    How many meetings did you have with Brian Brandt concerning

1    the discipline of Graham Brandon?

2         MR. WIESE:  Objection:  vague.

3         JUDGE STECKLER:  It asks for numbers, I'll allow it.

4         MR. WIESE:  Okay.

5         THE WITNESS:  With this current -- with this one that I

6    have in front of  me, General Counsel Exhibit 27, I know that I

7    met with Brian and Graham I think once on this matter.  And then

8    the others, probably about three or four -- four others -- three

9    others, I think.

10        JUDGE STECKLER:  What are the others?

11        THE WITNESS:  Other disciplinary actions prior to this,

12   Your Honor, prior to February 25th -- have to do with his

13   performance, issues having to do with also attendance --

14        MR. WIESE:  Objection:  vague.  I mean if -- what

15   disciplines are we talking about?

16        JUDGE STECKLER:  So you -- let me ask this:  Have you

17   produced all the discipline to General Counsel regarding his

18   alleged performance issues?

19        THE WITNESS:  Yes, it's in his file.

20        JUDGE STECKLER:  As part of his personnel file?

21        THE WITNESS:  Yes.

22        JUDGE STECKLER:  Okay.  So we'll discuss that at some

23   point, I'm sure.

24        So let me make sure I'm understanding this.  So you met a

25   couple of times with Brandt and Brandon?

P 00749

 1      THE WITNESS:  Correct.

 2      JUDGE STECKLER:  And the Food and Beverage Director was

 3  there all these times too?

 4      THE WITNESS:  No,  he wasn't there at all those times, no.

 5      JUDGE STECKLER:  Just the first time.

 6      THE WITNESS:  Just the one on the 29th, yes.

 7      JUDGE STECKLER:  Okay.

 8      THE WITNESS:  On April 29th, on General Counsel 27, that

 9  has the documentation --

10      JUDGE STECKLER:  Okay.  So let me make sure I'm

11  understanding correctly.  On April 29th, it was the F and B

12  Director and Brian Brandt and Graham Brandon?

13      THE WITNESS:  Correct.

14      JUDGE STECKLER:  Okay, because I'm blond.

15      Okay, please continue.

16  Q   BY MR. STOKES:  And was the matter settled with the Union

17  at that time?

18  A   Yes, it was.

19  Q   And did everybody agree with the reduction of the

20  discipline at that time?

21  A   In my office, they did, yes.

22  Q   Mr. Brandon agreed?

23  A   Yes.

24  Q   Mr. Brandt agreed?

25  A   Yes.

1    Q    There's an individual that testified, named, Kelli Johnston

2    -- was it Johnston or Johnson?

3    A    Johnston.

4    Q    With a "T"?

5    A    With a "T," yes.

6    Q    Thank you.

7         There was an allegation that she was not getting more

8    hours.  What do you know about that?

9    A    My understanding from speaking with all parties involved,

10   she wasn't getting hours, because it seemed as if she didn't

11   want the hours.

12        MR. WIESE:  Objection: foundation.

13        JUDGE STECKLER:  It's his opinion.

14        Continue.

15   Q    BY MR. STOKES:  What's the basis for your conclusion that

16   you think there's no problem with her not getting hours?

17   A    In conducting an investigation, and I'm understanding

18   exactly what transpired with the whole process, there were

19   availability of hours at Crossings, and I know that my

20   understanding is that her availability to work the hours that

21   were available were limited.  Her availability to follow up with

22   her --

23        MR. WIESE:  Objection:  foundation.

24        JUDGE STECKLER:  Save it for cross, Mr. Wiese.

25        MR. WIESE:  All right.

1       THE WITNESS:  Following up with the investigation with her

2   statement on the houseman position that she requested that she

3   wanted to do, there was no follow-up also from her end to as

4   well whether or not she had an interest in getting the job done

5   or to be able to work in that capacity.

6   Q    BY MR. STOKES:  Would you please explain for Her Honor the

7   transfer request process.

8   A    The transfer request process is in place just to make sure

9   that we're able to manage the movement from -- of one associate

10  from one property to the next or from one department to the

11  next, based on their interests in the available positions that

12  are there currently posted at each hotel.

13      What should happen is the interested party or employee

14  would go to the Human Resources office, collect the Transfer

15  Request Form, have that filled out, have a conversation with

16  their manager, have that signed off by that manager, and then

17  brought back to the Human Resources office.  Then that will be

18  submitted to the hiring manager, and then that hiring manager

19  would go back and continue an interview with the interested

20  party, and they will make a decision primarily based on their

21  person's qualifications or skill set to get into that role.

22      Then that person would identify at the end of the day

23  whether or not that person is accepted in the job or we are

24  denying the transfer, and that information is filed in the

25  personnel file.

P 00752

1  Q    And what happened with respect to Kelli Johnston and any

2  supposed transfer request?

3  A    We have not seen one.

4  Q    Would you -- the Union made a request for quantifications

5  of our vacation position.

6  A    Yes.

7  Q    Would you please explain to Her Honor what, if anything,

8  you did and said to the Union in that regard?

9  A    Upon that request, when we talked about it in negotiations,

10  we discussed with Nancy that, you know, we're not able to give a

11  specific dollar amount to say blankety, this is what the cost

12  will be year over year over year.  And I explained to her that

13  because of the significant amount of turnover that we have and

14  we have no way of knowing exactly what each person would be and

15  the role that they will play for any period of time over the

16  life of the contract what that number would be.  We currently

17  have probably about 20 percent of our population that I suppose

18  or think would be retiring because they have been with the

19  company about 20 -- between 20 to 30 years.  So they are at the

20  point --

21      MR. WIESE:  Objection:  speculation.

22      JUDGE STECKLER:  He's the HR Manager.  He can testify to

23  what his understanding is of turnover in his properties.

24      THE WITNESS:  So with that in mind and with the current

25  circumstances that we're dealing with right now, with a limited

1    -- low unemployment and with our starting wage, the way in which

2    it is, and we've been kind of rotating through employees in our

3    basic positions, it's very difficult for us to be able to make

4    that assumption; and I shared that with her.  She said to me

5    that "It's okay, I understand, just give me a ballpark number."

6         JUDGE STECKLER:  When did this conversation take place?

7         THE WITNESS:  In negotiations.

8         JUDGE STECKLER:  Which -- do you remember which session?

9         THE WITNESS:  I can't specifically say which session, but I

10   know that it occurred between February and March.

11        JUDGE STECKLER:  Mr. Stokes, you may continue.

12   Q    BY MR. STOKES:  What, if anything, did Kelli Johnston's

13   being in the Union or having some position with the Union have

14   to do with how she was treated at the hotel?

15   A    Nothing.

16   Q    Now, Mr. Henry, I'd like to show you what has been marked

17   as Respondent's 6, for identification.

18        MR. STOKES:  Can you get a copy to -- to Tyler as well.

19        JUDGE STECKLER:  Is it paginated?

20        MR. STOKES:  Yes.

21        JUDGE STECKLER:  Thank you.

22   (Witness proffered the document.)

23   Q    BY MR. STOKES:  I show you what has been marked as

24   Respondent's 6, a copy of which has been given to the Counsel

25   for the General Counsel, and ask you if you can identify that

1  document?

2  A    Yes, I can.  It's --

3  Q    What is it?

4  A    This is our bargaining notes.

5  Q    From what date to what date?

6  A    From January 20, 2015 and I think it should have it all the

7  way through the -- bear with me here -- through September 24,

8  2015.

9  Q    Who did you designate as the note taker for the sessions of

10  collective bargaining and negotiations that took place in the

11  year 2015?

12  A    Mary Kay Costello.

13  Q    And who is Mary Kay Costello?

14  A    Mary Kay Costello is our Human Resource and Organizational

15  Development Manager.

16  Q    And have you had a chance to review these?

17  A    Yes, I have.

18  Q    Are these the notes that she took during those bargaining

19  sessions?

20  A    Yes, it is.

21      MR. STOKES:  I would offer Respondent's 6.

22      MR. WIESE:  Your Honor, I'd appreciate -- I have to look

23  through these.

24      JUDGE STECKLER:  Okay, let's go off the record for a

25  moment.

1    (Off the record.)

2        JUDGE STECKLER:  Back on the record.

3        MR. WIESE:  Your Honor, I'm -- first of all, let me voir

4    dire.

5        JUDGE STECKLER:  Okay.

6        Please proceed.

7                        VOIR DIRE EXAMINATION

8    Q    BY MR WIESE:  So looking at the bargaining notes for the --

9    it looks like February 5, 2015, those are handwritten bargaining

10   notes, is that right?

11   A    You're saying February 5th?

12   Q    Yes, it starts on page 13.

13   A    Okay.

14   Q    Beginning on page 13, going to page 36.

15   A    Yes.

16   Q    Do you know whose handwriting that is?

17   A    This is Mary Kay Costello's.

18   Q    And is that same -- I note that there's another set of

19   handwritten notes starting on page 97.  And then those go on for

20   a ways to page 133, it looks like.

21   A    You said 97, right?

22   Q    Yes.

23   A    Yes.

24   Q    Is that also Ms. Costello's handwriting?

25   A    Yes, it is.

1        MR. WIESE:  Your Honor, I'm going to object.  These are

2   Mary Kay Costello's bargaining notes.   If they want to enter

3   Ms. Costello's bargaining notes, we should have Ms. Costello

4   testify --

5        MR. STOKES:  I'm sorry, Tyler, would you speak up.  I

6   apologize.

7        MR. WIESE:  Yes, I will. No, that's all right

8        MR. STOKES:  You have a tendency sometimes to fade.  And my

9   ears have started fading before you started fading.

10       MR. WIESE:  Well, anyways, so these -- so, Your Honor, I'm

11  objecting on the grounds that these are Mary Kay Costello's

12  bargaining notes, and that if we're going to enter them, we

13  should have Mary Kay Costello authenticate them, that they are

14  her notes, that we can talk about her procedure that she

15  followed for creating these notes, none of which Mr. Henry is

16  able to testify to.

17       JUDGE STECKLER:  Well, we --

18       MR. STOKES:  Our position is that it's a waste of time, but

19  Mary Kay Costello is here, and we can take the extra time to put

20  her on the stand and authenticate that, but there's been no

21  challenge to the efficacy that this particular witness has

22  reviewed and says these are the notes that someone under his

23  supervisor took.  But, if Your Honor insists, Mary Kay Costello

24  is here.

25       JUDGE STECKLER:  Well, what I'm about to --

1      MR. STOKES:  And we can go through the process of her

2  authenticating them, but it just adds another witness

3  unnecessarily based upon what we've said.

4      If she were not under the direct control of Michael Henry

5  and had not been told to take the notes, and he had not then

6  said, "These are the notes that I know that she took," it might

7  be different.  But --

8      JUDGE STECKLER:  I think -- are you saying that this is a

9  business record?

10      MR. STOKES:  I'm saying that they are taken in the regular

11  course of the negotiations, yes.

12      JUDGE STECKLER:  Would you like to question Mr. Henry on

13  that so that we can clarify this.

14      MR. STOKES:  Yes, Your Honor, I'll be happy to.

15                    CONTINUED DIRECT EXAMINATION

16  Q    BY MR. STOKES:  Mr. Henry, were these notes taken in the

17  regular course of the collective bargaining negotiations and

18  under your supervision?

19  A    Yes.

20  Q    And were they maintained in your office?

21  A    Yes.

22      MR. STOKES:  And, by the way, I have the originals in case

23  counsel wants to compare the copies to the original.  But,

24  again, out of an abundance of caution, Mary Kay Costello is

25  here.  If people insist on putting her on the stand, we can do

 1   that.  We're working hard to try to finish this case, if we can.

 2        JUDGE STECKLER:  Have you reviewed every single page of

 3   this document, Mr. Henry?

 4        THE WITNESS:  Yes, I had to, yes.

 5        JUDGE STECKLER:  Did you keep any separate notes yourself?

 6        THE WITNESS:  No, she was my note taker, so --

 7        JUDGE STECKLER:  So every -- so you didn't have to take any

 8   separate notes?

 9        THE WITNESS:  No.

10        JUDGE STECKLER:  How often did you review this document?

11        THE WITNESS:  At the end of each bargaining session, I

12   review them.  When she would prepare the typed edition, I also

13   review those.

14        JUDGE STECKLER:  Do you know why there's some handwritten

15   and some not?

16        THE WITNESS:  For whatever reason, I don't know what

17   happened to -- on the February 5th, we were -- I thought we had

18   typed notes as well, and we just couldn't find them.  So she had

19   her typed -- or her handwritten notes as backup.

20        JUDGE STECKLER:  How do you know that this is her

21   handwriting?

22        THE WITNESS:  She's worked with me for the last 2 years.

23   We've been in numerous meetings in which she's been my note

24   taker.  She's been the person that follows through with all the

25   items that we follow through in the office.

1    JUDGE STECKLER:  And you find this to be a true and

2  accurate copy of her notes?

3    THE WITNESS:  Yes, I do, ma'am.

4    JUDGE STECKLER:  And how were they maintained at the

5  facility?

6    THE WITNESS:  They were kept in a file cabinet in Mary

7  Kay's office in the file that we have marked for our Union

8  negotiations.

9    JUDGE STECKLER:  Any further questions?

10    MR. STOKES:  No, Your Honor.

11    JUDGE STECKLER:  Any more voir dire?  Or as they say in

12  Texas, "voir dire."

13    MR. WIESE:  No, Your Honor, but I --

14    JUDGE STECKLER:  You are going to strenuously object.

15  We'll take a running objection on that.

16    Respondent's 6 is admitted.

17  (EXHIBIT RECEIVED:  RESPONDENT'S 6.)

18    MR. STOKES:  Thank you, Your Honor.

19    If Counsel for the General Counsel want to talk to Mary Kay

20  Costello, she's right outside.   He can go through them with her

21  if he wants.

22    JUDGE STECKLER:  It's about 12:35.  How much more do you

23  have?

24    MR. STOKES:  About 2 minutes.  I just have two questions.

25    JUDGE STECKLER:  Okay, that's fine.

1    Q     BY MR. STOKES:  Mr. Henry, would you please describe your

2    response to the Union's information request for a quantification

3    of the Union's insurance proposal versus the company's current

4    cost?

5    A     Could you repeat the question?  I'm sorry.

6    Q     Sure.

7          Describe your response to the Union's request for

8    information for quantification of the Union's insurance proposal

9    versus the current company's cost?

10   A     Well, their proposal was submitted to me, and what I did

11   was I responded with the calculations.  And based on the hours

12   worked times their numbers that they gave to us would reflect

13   the cost for us as an employer as we are responsible or both

14   union and non-union employees.

15         So my response to them impacted that there would be a over

16   a million dollar cost to us annually for their insurance

17   proposal.

18   Q     If you would look at GC 20, please, sir.

19   (Witness proffered the document.)

20   A     I've got it.

21   Q     Do you see that?

22   A     Yes, sir.

23   Q     Does that reflect your response to the Union's request for

24   quantification of the insurance cost?

25   A     Yes, it does.

1    Q    Now there came a point in time after September the 24th of

2    2015, in which you indicated to the Union you didn't want to

3    meet with them anymore.

4         Please explain to Her Honor the bases for that position?

5    A    Well, the bases for the position was as we reviewed their

6    proposal to us on our meeting on September 24th, we recognized

7    that we had gone through all the items that they have listed on

8    their proposal, and there has been no change from either their

9    side or our side during that time period that requires us to

10   meet again.  And I explained in my e-mail to Nancy, Martin and

11   Brian that we're more than willing to meet and to continue

12   conversation if they were willing to bring back something to the

13   table that we're able to -- that would force us to move from our

14   current position.

15   Q    Now there came a point in time in which you made some

16   changes with respect to bulletin boards.  Explain how that came

17   about?

18   A    One of the challenges that came about with the bulletin

19   boards -- we've heard -- for example, in the Starbuck's area, we

20   have a community bulletin board that was there that is still

21   there and still, in fact, there.  And a few of our managers were

22   walking through and getting coffee, like we normally do, and

23   noticed that there were union flyers posted on the community

24   bulletin board in the Starbuck's area.  We've noticed too as

25   well that in quite a few areas, that a lot of the -- the

1    department bulletin boards also became blanketed with union

2    flyers covering schedule, covering information from the company.

3    And so we said that we wanted to go back to make sure that we're

4    managing through the boards as effectively as we possibly can.

5    Q    So what is the position of the company with respect to the

6    Union's right to post notices to their members on bulletin board

7    or bulletin boards?

8    A    You know, we welcome the communication.  I know that's an

9    important part of us doing our business, and they are a partner

10   with us.  I think it's important that we are able to continue

11   that process.  And what we did was say that "We encourage you to

12   use your union boards.  You have your boards, you've been using

13   them all along, continue to do so; but please leave those boards

14   available for us to be able to work and to post information

15   that's pertaining to the company and the things that we are

16   projecting too as well and not to over-- not to cover them with

17   their notices."

18   Q    Now, during the negotiations, did  the Union ever raise the

19   question of the fact that the company paid for health care for

20   both union and non-union employees?

21   A    That conversation came about when we were discussing the

22   cost of the Union's proposal.  And I think one of the things

23   that we shared -- I shared with them, I said, "I understand

24   that.  I know that your union proposal only impacts the union

25   staff members, but, from our perspective, it's our

P 00763

1   responsibility to cover both.  If we did, in fact, take that

2   number out from the non-union employees, what would impact your

3   costs will be even greater to us if we removed that number from

4   the numbers that we provided them."

5   Q    Thank you.

6        MR. STOKES:  I have nothing further, Your Honor, at this

7   time.

8        MR. WIESE:  Can we break for lunch?

9        JUDGE STECKLER:  Yes.

10       And I know you're going to probably need some time to go

11  through these notes.  How long do you need?

12       MR. WIESE:  I guess --

13       JUDGE STECKLER:  So let's say 45 minutes for lunch, plus --

14       MR. WIESE:  An hour I think should be good for lunch.

15       MR. STOKES:  I don't care, whatever you want to do.

16       JUDGE STECKLER:  Okay.

17       So let's reconvene at quarter till 2, and if you need more

18  time at that time, you may request it.

19       MR. WIESE:  Okay, thank you, Judge.

20       JUDGE STECKLER:  Thank you.

21       We'll be off the record.

22  (Off the record.)

23       JUDGE STECKLER:  Back on the record.

24       Mr. Henry, when  come back, you'll still be under oath and

25  please don't discuss your testimony with anyone in the meantime.

1    Thank you.

2    Now we're off the record.

3    (Whereupon, at 12:45 p.m., the trial recessed for lunch to

4    reconvene at 1:45 p.m. in the same place.)

5    JUDGE STECKLER:  We're back on the record.

6    Mr. Henry has taken the stand again.

7    Mr. Henry, please recall that you're still under oath.

8    THE WITNESS:  Okay.

9    JUDGE STECKLER:  And, Mr. Wiese, you're up.

10    MR. WIESE:  Okay.

11    So what I have here are a collection of documents that were

12    produced pursuant to the subpoena.    I can either enter them

13    through Mr. Henry or if we're willing to stipulate to their

14    admission --

15    JUDGE STECKLER:  Are these the disciplinary documents?

16    MR. WIESE:  Well, there's some -- there's an array of

17    documents.

18    General Counsel's Exhibit 31 is a copy of the overtime

19    records for the Marriott were produced pursuant to subpoena.

20    MR. WIESE:  General Counsel Exhibit 34 is an e-mail

21    exchange regarding Kelli Johnston that was produced pursuant to

22    the subpoena.

23    And then General Counsel Exhibit 39(d), (e), (f), (h), (i),

24    (j), (k), (l) and (m) are disciplinary records that were

25    produced pursuant to the subpoena.

1    And I would request a stipulation before we get off the

2    record as to the fact that the disciplinary records in here that

3    relate to Mr. Kotvask are all of the disciplinary records that

4    were produced on behalf of him.

5        MR. TERRELL:  And what you just handed me is Exhibit GC 39.

6        MR. WIESE:  Yes.

7        MR. TERRELL:  Relates to Walter Hardy.

8        MR. WIESE:  Right, but that -- so there are disciplines for

9    employees other than Derek Kotvask in there, but the disciplines

10   that are in there for Mr. Kotvask represent all the disciplines,

11   so we can identify those specifically.

12       MR. TERRELL:  Well, we only produced.

13       MR. WIESE:  Well, the attendance disciplines.

14       MR. TERRELL:  Wait a minute.

15       We only produced disciplines related to attendance for

16   employees who were disciplined for attendance.  One of those

17   employees was Derek Kotvask, and we produced his records

18   relating to his discipline, and they are at page (h) through --

19   well, actually you have it looks like you have it marked here as

20   GC 39(h) and GC 39(i) --

21       MR. WIESE:  And then 39(j).

22       MR. TERRELL:  -- and 39(j).

23       So I think we can stipulate that these are all of the

24   attendance disciplines for Mr. Kotvask, but I know we can't

25   stipulate at this moment whether these are all the disciplines

1    for Mr. Kotvask, there may have been others.  But we -- in

2    responding to your subpoena, we only produced attendance

3    disciplines.

4        MR. WIESE:  Right, and I would be fine with limiting it to

5    just the attendance disciplines for Mr. Kotvask.

6        MR. TERRELL:  That there may have been others, but we

7    weren't asked to produce them.

8        JUDGE STECKLER:  Other disciplinaries.

9        MR. TERRELL:  Other disciplinary actions against Mr.

10   Kotvask.  There may be some, there may not be.  I don't know as

11   I sit here at the moment, but I know that were just three

12   disciplines for attendance of Mr. Kotvask.

13       MR. WIESE:  And I would agree with that stipulation.

14       JUDGE STECKLER:  Okay, so stipulated for which documents?

15       MR. WIESE:  That General Counsel Exhibits 39(h), 39(i) and

16   39(j) represent all of the attendance disciplines that were

17   issued to Mr. Kotvask.

18       MR. TERRELL:  Now we produced other disciplines for

19   attendee for other employees and I see that Exhibit 39 has some

20   of those marked Exhibit 39.  The first one I see is (d) or is

21   that an "A"?

22       MR. WIESE:  No, that's a "D".

23       MR. TERRELL:  Well, what happened to "A", "B" and "C".

24       MR. WIESE:  Well, we marked them and then chose not to

25   introduce them.

1        MR. TERRELL:  Well, no, if you're -- he's not going to put

2   in a selective group of attendance disciplines and not put all

3   of them in.  That's "dirty pool."

4        JUDGE STECKLER:  Well, I think if you'd like to present the

5   others on redirect, that would be fine.

6        MR. TERRELL:  Well, why don't we just get rid of the issue

7   now.  Let's just put them all in by stipulation.  And that would

8   include, by the way -- that would include also all the PAFs,

9   Personnel Action Forms, that we provided this morning in

10  response to the subpoena for employees who were terminated for

11  or voluntarily separated for no-call/no-shows.

12       JUDGE STECKLER:  I would want to try to keep those separate

13  from this type of -- Mr. Wiese?

14       MR. WIESE:  Well, these are the -- I think there are two

15  issues going on here.  The first I would like to resolve is

16  whether we can agree to the stipulation as to Mr. Kotvask.

17       JUDGE STECKLER:  I think that's been agreed to.

18       MR. WIESE:  Okay.

19       JUDGE STECKLER:  Subject to the fact that it only is a

20  discipline for attendance.

21       MR. WIESE:  Okay.

22       JUDGE STECKLER:  Is that correct, Mr. Terrell?

23       MR. TERRELL:  Yes, yes.

24       MR. WIESE:  Okay, all right.

25       And then as far as the other -- I mean, these are the

1    disciplines that the General Counsel is entering as part of its

2    case.  If there are other disciplines that Respondent would like

3    to enter, they can enter those as part of --

4        MR. TERRELL:  Well, you asked for a stipulation and I'm

5    refusing to stipulate unless you put all of them in, and that's

6    --

7        JUDGE STECKLER:  So you won't stipulate to Kotvask either

8    unless everything is all in one --

9        MR. TERRELL:  I'll stipulate, singularly, to the three

10   attendance disciplines that were given to Kotvask.  I'm not

11   going to stipulate to a hodge-podge or a cherry-picked group of

12   disciplines.  I will stipulate to Counsel for the General

13   Counsel introducing all of them that we produced in response to

14   their subpoena.

15       JUDGE STECKLER:  Okay, well we don't have to have a

16   stipulation.  We can enter them into the record separately then;

17   except -- so we'll proceed from there.

18       Are there any other documents, Mr. Wiese?

19       MR. WIESE:  There are.  So the remainder of my documents

20   are disciplinary records that were produced at various times, so

21   they are split off a little bit.

22       JUDGE STECKLER:  I'll tell you what, before you give them

23   out, since there's not going to be a stipulation, we'll take

24   them individually pursuant to testimony.

25       MR. WIESE:  Okay.

1    MS. BURGESS:  May I be heard on this, Your Honor?

2    JUDGE STECKLER:  Could you --

3    MS. BURGESS:  On this issue, I'm not going to -- I'm not

4  for purposes of examining the witness, but --

5    JUDGE STECKLER:  Okay, go ahead.

6    MS. BURGESS:  Okay.

7    So these documents were all produced pursuant to the

8  subpoena that was issued by the General Counsel.  At a minimum,

9  I would expect that Respondent could stipulate to the

10  authenticity and admissibility of these documents.  It's up to

11  the General Counsel to decide, you know, what documents we want

12  to enter into our case in chief.  But they were produced

13  pursuant to subpoena, they are Respondent's documents; so our

14  plan was just to put them in the record and not have a bunch of

15  testimony and waste a bunch of time on them.  It's just an

16  argument we want to make on brief.  And they are free to

17  introduce whatever additional documents they want.  But these

18  are the ones that are relevant to our case.

19    MR. TERRELL:  And we would prefer that they all go in

20  together; and so I will not stipulate.  She will have to go

21  through the questioning.

22    MS. BURGESS:  I mean, Your Honor can take the documents

23  just without the testimony, knowing that they were produced

24  pursuant to a subpoena issued in this case, and they were

25  produced by Respondent.

1      JUDGE STECKLER:  And the document --

2      MS. BURGESS:  Speak for themselves.

3      JUDGE STECKLER:  Mr. Terrell, do you think that the

4  documents speak for themselves?  Or do you think there needs to

5  be testimony?

6      MR. TERRELL:  That may be an argument for the brief, I

7  don't know.

8      JUDGE STECKLER:  Well, I don't want to get to the point

9  where we're looking at, what, January 1st, getting copies of the

10  transcript; and all of a sudden, we have what I would call

11  "buyer's remorse."

12     MS. BURGESS:  Your Honor, I would say that we are only

13  offering the documents for what they say on their face.  We're

14  offering them and contending that they speak for themselves.  So

15  any arguments that we make are going to be only based on what is

16  in the documents themselves.

17     JUDGE STECKLER:  Well, this is --

18     MS. BURGESS:  They are already in the record.  I mean, it's

19  already in the record that we have produced these documents

20  pursuant to subpoena.

21     JUDGE STECKLER:  Let's move on, let's get a little bit of

22  testimony on them, and see if we can't get things.  So if we

23  need to -- we'll get the testimony, we'll get authenticized and

24  then see what else happens.  So, I think we've spent enough time

25  on it.

1    MR. TERRELL:  Let me say it this way:  We will stipulate to

2  the authentic, provided we have a reciprocal stipulation as to

3  authenticity as to the discipline -- as to the other discipline

4  --

5    JUDGE STECKLER:  Any other discipline that you produce to

6  the General Counsel pursuant to the subpoena.

7    MR. TERRELL:  I'm sorry.

8    JUDGE STECKLER:  That whatever you've produced to the

9  General Counsel, pursuant to the subpoena, that they would

10  stipulate that it is authentic as well?

11    MR. TERRELL:  Yes.  We'll stipulate to the authentic of

12  39(d) through whatever the last letter is -- "M," provided they

13  stipulate to the authenticity of the remainder of the attendance

14  disciplines, including the no-call/no-show terminations.

15    JUDGE STECKLER:  Mr. Wiese, "yes" -- "no"?

16    MR. WIESE:  Sure.  Yes, sounds good.

17    JUDGE STECKLER:  Okay.

18    MR. TERRELL:  All right.

19    JUDGE STECKLER:  I think that sounds like a fair deal.

20    MR. TERRELL:  Can we just deal with it right now rather

21  than dealing with it -- I don't want to come back and later and

22  put ours in.  Can we just go ahead and get them all in now.

23  We'll put them in as three separate exhibit numbers?

24    JUDGE STECKLER:  That would be fine with me.

25    MR. WIESE:  Okay.

1      JUDGE STECKLER:  Okay, so we'll do that.  Do you have

2  additional, Mr. Wiese --

3      MR. WIESE:  I do.

4      JUDGE STECKLER:  -- have Mr. Terrell enter his --

5      MR. WIESE:  Besides General Counsel Exhibit 39, I have

6  General Counsel Exhibit 43.

7      MR. TERRELL:  Now she was asking about the other -- before

8  you move -- is this an attendance?

9      JUDGE STECKLER:  Yes.

10     MR. TERRELL:  Okay, what about 39(a), (b) and (c), and 39

11  whatever comes after the letter "M"?

12     MR. WIESE:  Well, if you want to enter those disciplines --

13     MS. BURGESS:  Right, we're not going to object to them

14  entering any ones that they want to enter.

15     JUDGE STECKLER:  In GC 39, are they in the same order that

16  they were produced to you?

17     MR. WIESE:  I can't represent that, Your Honor, that they

18  are in the same order.  I mean -- just one second.

19  (Pause.)

20     MR. WIESE:  These are the remaining disciplines that I'm

21  aware of that are not included in General Counsel Exhibit 39.

22     So I also have General Counsel Exhibit 44(a), (b), (c), (d)

23  and -- oh, wait.

24     MR. TERRELL:  There was an "N" -- you gave me an "N."

25     MR. WIESE:  I did.  This is for 44.

1       Could you collate those, so they are --

2  (Pause.)

3       MR. WIESE:  All right, while we're getting 44 in order,

4  I'll pass out 45.  General Counsel Exhibit 45(a), (b) and (c).

5  (Pause.)

6       MR. WIESE:  All right.  We also have General Counsel

7  Exhibits 44(a) through (f) -- is that right, Nicole?

8       MS. BURGESS:  Yes.

9       MR. WIESE:  General Counsel Exhibits 44(a) through (f),

10  which are more attendance disciplines.

11       MR. TERRELL:  Now these are the ones you are not planning

12  to introduce?

13       MR. WIESE:  No, so the documents that I -- that area in

14  right now are the ones that I'm introducing.  That's the entire

15  set.

16       MR. TERRELL:  I just want to get clarification on what

17  you're saying.

18       MR. WIESE:  The entire set of documents that I want

19  produced or that I want to be entered into evidence.

20       MR. TERRELL:  But you are not introducing 39(d) -- or

21  excuse me, 39(a), (b), (c), (g) and (n).

22       MR. WIESE:  Correct.

23       MR. TERRELL:  But you are introducing 39(d), (e), (f), (h),

24  (i), (j), (k), (l) and (m)?

25       MR. WIESE:  That's also correct.

1           MR. TERRELL:  Okay.

2           Now then you're introducing 44(a), (b), (c), (d), (e) and

3     (f).

4           MR. WIESE:  Mmm-hmm.

5           MR. TERRELL:  And 45(a), (b) and (c)?

6           MR. WIESE:  Yes.

7           MR. TERRELL:  And 43?

8           MR. WIESE:  Yes.

9           MR. TERRELL:  Are there additional discipline -- attendance

10    disciplines that we have provided you that are not included in

11    the ones I just went through that you said are your exhibits?

12          MR. WIESE:  There is.  I mean, there's the entire stack

13    that -- the --

14          MS. BURGESS:  The no-call/no-shows.

15          MR. WIESE:  -- the no-call/no-shows that were produced, but

16    I wasn't --

17          MR. TERRELL:  Any others?

18          MR. WIESE:  Not that I'm aware of.

19          MR. TERRELL:  Well, you were given our documents in

20    response to your subpoena.  So I'm asking you are there any

21    other attendance disciplines that we gave you that you have not

22    presented here for introduction?

23          MR. WIESE:  Not that I'm aware of at this time.  That's --

24    I mean, that's the answer.

25          MR. TERRELL:  Okay.  All right.  So we will need to double

1  check that, and I don't think I can do that at this moment.

2      JUDGE STECKLER:  Do you want to take 10 minutes to review

3  before we proceed on the record?

4      MR. TERRELL:  I can't do it in 10 minutes either.  We'll

5  have to do it towards the end of the day or in the morning, if

6  we're still here in the morning.  So I can't do it in 10

7  minutes.

8      But I would reserve -- let me put it this way:  I will

9  reserve the right to confirm the accuracy of General Counsel's

10  representation that --

11      JUDGE STECKLER:  Okay.  And if there's something that's

12  inadvertently been left out, then you can --

13      MR. TERRELL:  Then I will supply it.

14      JUDGE STECKLER:  That would be excellent.

15      MR. TERRELL:  Okay, I will supply it.

16      JUDGE STECKLER:  Okay, appreciate that.

17      MR. TERRELL:  All right.

18      So we will stipulate to the authenticity of the ones I just

19  ran through and identified as the ones that the General Counsel

20  wants to put in.

21      JUDGE STECKLER:  Okay.  And now which ones do you want in?

22      MR. TERRELL:  Okay, now I have my -- and I guess I should

23  give them different -- I should give them Respondent exhibit

24  numbers.

25      MS. BURGESS:  Yes.

1          MR. WIESE:  Yes.

2          JUDGE STECKLER:  Yes, for the purpose of clarity.

3          MR. TERRELL:  Okay.

4          JUDGE STECKLER:  Especially when they go into the computer,

5     if you have got GC labels on them, the computer goes "ape," if a

6     computer can do that.

7          MR. TERRELL:  Okay.

8          Was my last number "6"?

9          COURT REPORTER:  Yes.

10         MR. WIESE:  Yes.

11    (EXHIBITS MARKED:  RESPONDENT'S 7 through 12.)

12         JUDGE STECKLER:  Okay, go off the record.

13    (Off the record.)

14         JUDGE STECKLER:  We're on the record.

15         Mr. Wiese, are you ready to proceed with cross?

16         MR. WIESE:  We offer --

17         MR. TERRELL:  I'm sorry, did we get on the record our

18    stipulation on these documents?  And I wanted to go ahead and

19    introduce the "R" exhibits.

20         JUDGE STECKLER:  Okay, so we've got the "GC" exhibits, now

21    we've got to get the "R" Exhibits.

22         MR. TERRELL:  Okay.

23         JUDGE STECKLER:  And we'll approve in one package.

24         MR. TERRELL:  Okay.

25         So in addition to the discipline -- in addition to the

1    attendance disciplines that General Counsel wants in evidence,

2    we wish to move into evidence exhibit R 7, which was previously

3    marked as GC 39(a);

4         We wish to move into evidence Exhibit R 8, previously

5    marked as GC 39(b);

6         We wish to move into evidence exhibit R 9, previously

7    marked as GC 39(c);

8         We wish to move in exhibit R 10, previously marked as GC

9    Exhibit 39(g); and

10        We move in exhibit R 11, previously marked GC 39(n); and

11        We move in exhibit R 12, which is the 3-page list of no-

12    call/no-show terminations with the Personnel Action Form

13    backups.

14        We'll move all this into evidence and they can move their

15    stuff into evidence as well.

16        JUDGE STECKLER:  Okay.

17        So Mr. Wiese previously listed out 39(d), et cetera, which

18    the Court Reporter has copies; 44(a) through (f); 45(a) and

19    through (c); and then

20        For Respondent's, it's 7 through --

21        MR. TERRELL:  Seven through 12.

22        JUDGE STECKLER:   -- 7 through 12.

23        The documents will be admitted, and the parties agree to

24    the authenticity as disciplinary actions for attendance up to

25    and including terminations.

1    (EXHIBITS RECEIVED:  GENERAL COUNSEL'S 39(d), (e), (f),

2        (h), (i), (j), (k), (l), (m);

3        GENERAL COUNSEL'S 43;

4        GENERAL COUNSEL'S 44(a) through (f);

5        GENERAL COUNSEL'S 45(a) through (c).)

6    (EXHIBITS RECEIVED:  RESPONDENT'S 7 through 12.)

7        MR. TERRELL:  With only one minor caveat and I can't recall

8    if we have this on the record or not.   We reserve the right to

9    confirm General Counsel's representation that the "R" exhibits,

10   R 7 through 12, together with the GC Exhibits, constitutes the

11   entire universe of attendance disciplines that Respondent

12   produced in response to their subpoena.

13       JUDGE STECKLER:  Okay, and I think we agreed to that

14   before.

15       MR. WIESE:  And the only other outstanding issue I think is

16   just General Counsel Exhibit 31 and 34, which I offer -- were

17   also produced pursuant to the subpoena.  I handed those out

18   before we got into the disciplinary mess.  But that's -- GC 31

19   are the overtime hours for the Marriott housekeeping department

20   that was produced pursuant to General Counsel's subpoena request

21   -- General Counsel subpoena request number 5, as reflected in

22   General Counsel Exhibit 37.

23       JUDGE STECKLER:  Thirty-seven.

24       MR. WIESE:  And then also General Counsel Exhibit 34, which

25   was responsive to subpoena request.  I believe that was in

1    response to subpoena request number 7, as part of Kelli

2    Johnston's personnel file.

3        So I would offer both of those into evidence as well.

4        MR. TERRELL:  No objection.

5        JUDGE STECKLER:  Those documents are admitted as well.

6    (EXHIBITS RECEIVED:  GENERAL COUNSEL'S 31 and 34.)

7        MR. WIESE:  All right.

8        And I don't have any cross-examination beyond that for Mr.

9    Henry.

10       JUDGE STECKLER:  Okay, so you're admitting them for the

11   authenticity, but are you admitting them then for -- based on

12   their face that they say what they are supposed to say?

13       MR. WIESE:  Right, that their discipline was that --

14       JUDGE STECKLER:  Is the best evidence.

15       MR. WIESE:  Right, of their discipline.

16       JUDGE STECKLER:  Okay.

17       MR. WIESE:  Well, are you talking about for the discipline

18   or for all the documents that are being --

19       JUDGE STECKLER:  All the documents, and, particularly, the

20   disciplines.

21       MR. WIESE:  Right, that these are disciplines that were

22   produced by Respondent pursuant to a subpoena, and they were

23   kept in, you know, a personnel file, regular course of business,

24   that they can be, you know, offered as -- or relied upon as

25   evidence that these employees were disciplined.

1    MR. TERRELL:  That's not a problem.

2    JUDGE STECKLER:  Okay.

3    Any other cross-examination?

4    MR. WIESE:  No.  No, Your Honor.

5    JUDGE STECKLER:  Okay.

6    Mr. Terrell, do you have further questions?  Excuse me, Mr.

7    Stokes.  I'm looking straight at Mr. Terrell, and, Mr. Stokes,

8    you're right there.

9    MR. STOKES:  I have no more questions.

10    JUDGE STECKLER:  Mr. Henry, you're out of the hot seat.

11    Thank you for your time.

12    As you know, do not discuss your testimony with any of the

13    other witnesses until this hearing is over.

14    (Witness excused from the stand.)

15    JUDGE STECKLER:  Mr. Terrell, can you tell me who you are

16    calling next?

17    MR. TERRELL:  Yes, we're calling Ericka Scrabeck.

18    JUDGE STECKLER:  Can you or Mr. Stokes give me an

19    indication of approximately how many more witnesses.

20    MR. STOKES:  We have three more witnesses and they are

21    short.

22    JUDGE STECKLER:  Okay, thank you for that information.

23    And Mr. Henry is getting the witness.

24    MR. TERRELL:  Okay, I think he is.

25    JUDGE STECKLER:  Yes, he is.  He's very efficient.

1          Please have a seat up here, please.

2     (Pause.)

3          JUDGE STECKLER:  Thank you.

4          Please raise your right hand.

5     (WITNESS SWORN:  ERICKA SCRABECK)

6          JUDGE STECKLER:  Please state your name and spell it for

7     the record?

8          THE WITNESS:  Ericka Scrabeck, E-R-I-C-K-A  S-C-R-A-B-E-C-

9     K.

10          JUDGE STECKLER:  Mr. Terrell, are you inquiring?

11          MR. TERRELL:  Yes.

12          JUDGE STECKLER:  Okay.

13                         DIRECT EXAMINATION

14     Q    BY MR. TERRELL:  Good afternoon.

15     A    Good afternoon.

16     Q    Where are you employed, Ms. Scrabeck?

17     A    I am employed with the Kahler Hospitality Group.  I work in

18     Crossings Bistro and Bar as the Food and Beverage Manager there.

19     Q    Okay.  And which hotel is that in?

20     A    Kahler Inn and Suites.

21     Q    Okay.

22          And there's -- you said there's a bar?

23     A    Yes, it's a restaurant/bar, yes.

24     Q    Okay.  Do you know Kelli Johnston?

25     A    I do, yes.

1  Q    Okay.  How do you -- what do you know of her in terms of

2  who she is and where she works?

3  A    I know she works in the Banquets Department over at the

4  Marriott.

5  Q    Different hotel?

6  A    Different hotel, yes.  And due to this situation, I know

7  that she is a union steward as well as a union employee.  That's

8  about all I know of her.

9  Q    When did you learn that she was a union steward or a union

10  --

11  A    When this situation came up.

12  Q    When you say, "this situation" --

13  A    With her bringing up not being able to transfer to

14  Crossings or why I'm here.

15  Q    Okay.  All right, we'll come back to that.

16  A    Okay.

17  Q    When did you first begin your employment at Kahler?

18  A    I worked for the retail department.  I was hired I think

19  June of 2014, and then I transferred as a full time Kahler

20  Hospitality Group employee in September of 2014.

21  Q    Oka, and since September of 2014, you were at Kahler Inns

22  and Suites?

23  A    Yes, I started out as supervisor and then took over as

24  manager in December.

25  Q    Okay.  And where were you before September of 2014?

589

1   A     I worked in the floral department.

2   Q     In the where?

3   A     The floral department.  We had a floral shop.

4   Q     Okay, where is the floral shop?

5   A     It was in the Kahler Grand.

6   Q     In the Kahler Grand.

7   A     Yes.

8   Q     Okay, all right.

9         Did there come a time that Kelli Johnston expressed an

10  interest to you in working in the Crossings Bar?

11  A     No.

12  Q     Did you become aware at some point that she had an interest

13  in working at the Crossings Bar?

14  A     The only time I had heard that there was an interest was I

15  needed a bartender.  I had a full time bartender going on

16  vacation for a month.

17  Q     Okay.  Let's slow up and what you're saying.

18  A     Okay.

19  Q     You had a full time bartender going on vacation for a

20  month.

21  A     Yes.

22  Q     What was that person's name?

23  A     Nick Miller.

24  Q     Okay, do you recall approximately when that month was?

25  A     He left on February 29th of 2015.

P 00784

1   Q    Okay.  And that's when he went on his month vacation?

2   A    Yes, not the 29th, the 27th.  There is no 29, sorry.

3   Q    The last odd numbered month.

4   A    Yah.

5   Q    Okay, so Mr. Miller was going on vacation and then you said

6   something about a meeting.

7   A    Yah, we have weekly food and beverage manager meetings

8   where we all get together, discuss what's going on in all of our

9   restaurants and --

10  Q    Who typically attends that meeting?

11  A    It would be the food and beverage managers of each

12  restaurant, our food and beverage director, Tyler; banquets

13  manager and then any chefs that are available at the time for

14  those particular restaurants.

15  Q    Okay.  The meeting in question -- did that meeting occur

16  before or after February 27th?

17  A    It was before, , it was before, probably a week before.

18  Q    Okay.  And you indicated you brought something up in that

19  meeting that relates to what we're talking about.

20  A    Yes.  I brought up that I had been looking -- I needed to

21  find somebody because -- to fill in for Nick's position.  Nick

22  wasn't sure he was going to go on vacation, so I didn't know if

23  I needed somebody; but it ended up he was going, and I needed

24  somebody to fill in that position as soon as possible.

25  Q    Okay, so you raised that to the group?

1   A    Yes.

2   Q    And what did you hear, if anything, in response?

3   A    The other managers for the other restaurants didn't have

4   anybody available.  Kelli said that she would have some people

5   in banquets available, if, you know, I wanted to speak to them.

6        MR. WIESE:  Who was this?  Who said that?

7        THE WITNESS:  Not Kelli, sorry -- Katie.

8   Q    BY MR. TERRELL:  Who is Katie?

9   A    Kate Uuland was the banquets manager at the time.

10  Q    Okay, so Katie Uuland indicated she had some people who

11  might be interested?

12  A    Yes.

13  Q    Okay.  Was that the end of the discussion on that topic on

14  that day at that time?

15  A    Yes, at that time, yes.

16  Q    Okay, what happened next?

17  A    Katie let me know that she did have somebody named, "Kelli"

18  who was interested.

19  Q    Excuse me.  Did you know who Kelli was at that point?

20  A    I had no idea who Kelli was.

21  Q    Had you ever met her before?

22  A    Never.

23  Q    Okay.  Did you know anything -- you mentioned earlier that

24  you learned at some point related to this law suit that she was

25  a Union steward.

1  A    Yes.

2  Q    You didn't even know who she was at that point?

3  A    No, I did not.

4  Q    Okay, in my most recent questioning, I was referring to

5  Kelli Johnston.

6       When you had that conversation in the F & B meeting, did

7  Katie Uuland, who happened to be Banquets Director, mention

8  Kelli and others by name -- Kelli Johnston?

9  A    No, she had she had some people who might be interested.  I

10 figured she was going to go back and ask people if they were

11 interested in picking up some hours at Crossings.

12      Katie then came to me and told me, you know, she had Kelli

13 available, who would like to pick up some hours.  She told me

14 that Kelli had not worked in a regular bar environment in quite

15 a while, so she might be a little rusty, but, you know, "Give

16 her a try."  And I said I would.

17 Q    Did Katie mention to you at that point that -- anything

18 about Kelli Johnston's union affiliation?

19 A    No, not at all.

20 Q    Did anyone else mention to you at that --

21 A    Not at all.

22 Q    -- about her union affiliation?

23 A    No.

24 Q    Okay.

25      What happened next?

P 00787

1   A    I set something up with Katie and I had Kelli come over.

2   She worked during the day for an hour or so, not even a full

3   shift, and took maybe one or two tables during that time, and

4   that was it.

5   Q    Was this daytime or nighttime?

6   A    Daytime.

7   Q    Was the bar busy?

8   A    It was not busy.

9   Q    Okay.

10       You mentioned a minute ago that Katie indicated she hadn't

11   worked in a full bar in some time and may be rusty.

12   A    Yes.

13   Q    Could you explain that further, particularly the

14   distinction, if any, between what banquet bartender does and

15   what a bartender in a bar like Crossings bar does?

16   A    Oka.

17       MR. WIESE:  Objection:  foundation.

18       MR. TERRELL:  This is a manager of the bar.

19       JUDGE STECKLER:  That's a GC manager.

20       MR. WIESE:  Of the Crossings bar.

21       JUDGE STECKLER:  Crossings, yes, so she's --

22       MR. WIESE:  What is her banquet experience?

23   Q    BY MR. TERRELL:  Are you aware of the banquet department --

24   A    Yes, I am.

25   Q    Have you observed the banquet operations at the hotel?

1   A   Yes, I have.

2   Q   Are you familiar with the type of work that banquet

3   bartenders perform

4   A   Yes, I am.

5   Q   Okay.  I'd like then to re-ask the same question:  Can you

6   speak to the differences between being a banquet bartender and a

7   bartender in a bar like Crossings?

8   A   The difference being at a banquet bar, you have a smaller

9   amount of liquors, beers to work with, a smaller variety of

10   drinks to make.  You aren't getting -- you are having people

11   come up to you and getting drinks.  You are not having people

12   putting in orders and ordering from you at the bar, so you're

13   not getting multiple orders from multiple different directions.

14       I am -- at our bar, you need to know specialty drink

15   recipes, recipes for regular cocktails, normal cocktails that

16   you would get anywhere.  You have to know a variety of beers by

17   the bottle; you have to know a variety of beers by tap and know

18   how to answer questions about all of those; whereas, they don't

19   have that big of a variety at a banquets bar.

20   Q   Okay.  The bartenders in the Crossings restaurant -- how

21   are they compensated?

22   A   They are paid hourly and they do get tips as well from

23   patrons and from servers.

24   Q   Okay.  Are you familiar with the compensation system in the

25   banquets department?

1  A    Not entirely.  I know that they do get -- they have -- I do

2  believe they get part of the overall gratuity from the entire

3  party.

4  Q    Okay.  How does the overall gratuity, as you put it, in the

5  banquets department differ from the tips or gratuities that

6  servers and bartenders in Crossings receive?

7  A    It's a higher percentage.  The tips that my employees

8  receive are based on guest perception; where it is set at a

9  banquet.

10  Q    The banquet, it's set.

11  A    Yes.

12  Q    And then Crossings --

13  A    They can get a quarter or they can get, you know, 50

14  percent of the bill.

15  Q    Okay, so Kelli Johnston came in and you said that she

16  worked just a short shift.

17  A    Yes.

18  Q    What was the purpose of her coming in and working that

19  shift?

20  A    It was just for me to see what her abilities were and if I

21  thought she was a good fit for the position, the substitute

22  position.

23  Q    Okay.  Now you mentioned earlier that Katie Uuland

24  indicated that there may be others.

25  A    Yes.

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00790

1  Q    Did any others come forward?

2  A    To Katie, yes, not to me directly.

3  Q    And did Katie refer anybody else to your --

4  A    Yes, Derek Shot.

5  Q    Derek Shot.  Okay, did Derek do a tryout as well?

6  A    Yes, he did.  He worked a full night shift and he did well.

7  He worked well with us and worked well with the customers.

8  Q    How did Kelli Johnston do in her tryout?

9  A    She only had a couple of tables, so I really didn't get to

10  see a whole lot, but she did -- I mean, for the couple tables

11  she did have, it was fine.

12  Q    Okay.

13       And you did say that Nick Miller did go on this vacation?

14  A    Yes, he did.

15  Q    Did you end up giving any more hours to either Kelli

16  Johnston or to Derek Shot?

17  A    Kelli, no; Derek, yes.  He ended up working about four to -

18  - I'd say three to five shifts, because he did have some banquet

19  shifts, some parties that came up; so three to five shifts for

20  the next 3 to 4 weeks.

21  Q    Did he permanently transfer in --

22  A    No, he did not.

23  Q    -- in to your department?

24  A    No.

25  Q    Okay.  Did he do any work in your department other than

1  filling in for Mr. Miller?

2  A    No, he did not.

3  Q    Okay.  Why did you select Mr. Shots for those additional

4  shifts, rather than Ms. Johnston?

5  A    In just talking to him, he was, you know, very interested

6  in doing it.  He did a great job and he caught on to like all of

7  our recipes and everything really well.  He was great under

8  pressure, and he had the availability I needed at the time.

9  Q    At the time that you made the decision to use Mr. Shot,

10  were you aware that Kelli Johnston had some affiliation with the

11  Union apart from just being a member?

12  A    None at all.  I was a new manager.  I had no idea who any -

13  - half of anybody was at the time.

14  Q    Was Mr. Shot a member of the Union?

15  A    As an employee.  As -- other than that, I have no idea.

16  Q    Okay.

17       Did you ever -- after that one shift that Kelli worked for

18  you, did she ever approach you again either by phone, text or in

19  person?

20  A    No she did not.

21  Q    You never received a text from her?

22  A    Never.

23  Q    Could you tell us what your phone number is?

24  A    It's 507-202-1256.

25  Q    That's your phone number -- do you have your phone there?

1  A    Yes.

2  Q    Okay.

3       MR. TERRELL:  Your Honor, I would like in some way to

4  establish that her phone number is different from the phone

5  number that Kelli Johnston dialed.

6       JUDGE STECKLER:  The text --

7       MR. TERRELL:  The record shows that General Counsel Exhibit

8  26, on the face of it, shows that the number she texted for

9  Ericka is 507-202-2156.  This witness just testified that her

10 phone number -- the last four digits are 1256, so --

11      JUDGE STECKLER:  I think you can argue that on the brief.

12      MR. TERRELL:  Well, I want to make sure that we have in

13 evidence acceptable to everybody that Ms. -- that Ms. Scrabeck's

14 phone number ends with 1256, rather than 2156.

15      I could do this --

16      JUDGE STECKLER:  You're saying the numbers are transposed?

17      MR. TERRELL:  Pardon me?

18      JUDGE STECKLER:  You're saying the numbers were transposed?

19      MR. TERRELL:  Yes.  But I want it to be clear in the record

20 that her phone number -- you know, she's not just making this up

21 -- that her phone number is 507-202-1256, which I am dialing on

22 my phone here.

23      JUDGE STECKLER:  Is your phone on?

24      THE WITNESS:  Yes, it is.

25      MR. TERRELL:  And showing it to Counsel for the General

1   Counsel --

2       MR. WIESE:  Yes, yes.

3       MR. TERRELL:  -- that that's the number I'm dialing.

4       THE WITNESS:  Oh, wait.  Hold on.  My phone is locked.  I

5   don't know.  Okay.

6       MR. TERRELL:  Are you getting my phone number?

7       THE WITNESS:  Yes.

8   (Witness' phone that she is holding in her hand is ringing.)

9       MR. TERRELL:  Let the record reflect that her phone is

10  ringing.

11      JUDGE STECKLER:  Okay.

12      Let me ask you a question in relation -- how long have you

13  had that phone number?

14      THE WITNESS:  I've had it since, I think, 2009 or 2010.

15      JUDGE STECKLER:  Okay.

16      Please proceed, Mr. Terrell.

17      MR. TERRELL:  Thank you.

18  (Pause.)

19      MR. TERRELL:  That's all I have,  Your Honor.

20      MS. BURGESS:  Can we have one minute, Your Honor.

21      JUDGE STECKLER:  Certainly.

22      We'll go off the record for one minute.

23  (Off the record.)

24      JUDGE STECKLER:  We're back on the record.

25      Mr. Wiese, we're ready for your cross.

P 00794

1      MR. WIESE:  Okay.

2                          CROSS-EXAMINATION

3   Q    BY MR. WIESE:  Good afternoon, Ms. Scrabeck.

4   A    Hi.

5   Q    My name is Tyler Wiese.  I'm an attorney with the Labor

6   Board.

7   A    Okay.

8   Q    Showing you what has been marked as General Counsel Exhibit

9   33.

10  (Witness proffered the document.)

11     JUDGE STECKLER:  I don't have one.

12     Thank you.

13  Q    BY MR. WIESE:  Ms. Scrabeck, do you recognize this

14  document?

15  A    I know what this form is, yes.

16  Q    Okay.  And where it says, "Department Head" at the bottom,

17  would those -- are those your initials?

18  A    They are not.

19  Q    Okay, they are not your initials, all right.

20     And you've never seen this specific --

21  A    I have not.

22  Q    -- form then.

23     Okay, all right.

24     Can you identify what this is?

25  A    Yes.

1    Q    Just generally the form?

2    A    Yes, I can, yes.

3    Q    Okay, and what is it?

4    A    It's a Personnel Action Form.  We do this to -- in this

5    case, where it says, "Add bartender," it would be adding a

6    secondary code for billing purposes.

7    Q    Mmm-hmm.

8    A    It's not a transfer, but, like, if I had somebody come in

9    and substitute as a server and they are from a different

10   department, say like laundry or, you know, housekeeping or

11   whatever, we would put in a secondary code, so I could transfer

12   those hours or their department could transfer hours to me, vice

13   versa.

14       MR. WIESE:  I'll offer this document.  I understand that

15   the witness can't identify this document specifically, however,

16   it was produced pursuant to the subpoena as part of Kelly

17   Johnston's personnel file.

18       MR. TERRELL:  If I could just ask some follow-up questions

19   just for clarity on what this document is.

20       JUDGE STECKLER:  Then let's -- are you doing this as a voir

21   dire or --

22       MR. TERRELL:  Yes, in the nature of a voir dire.

23       JUDGE STECKLER:  Okay.

24                        VOIR DIRE EXAMINATION

25   Q    BY MR. TERRELL:  You said you are familiar with this type

1    of document.

2    A    Yes.

3    Q    This is not a document that's processed -- is this a

4    document processed by you in your department?

5    A    If I was going to add a secondary code to one of my

6    employees, then, yes, I would use this document.

7    Q    Okay.  Now you used the term "secondary code," which is --

8    A    Yah.

9    Q    -- kind of an industry buzz word or industry term.

10    A    Yes.

11    Q    Is the simple purpose of this simply to be able to pay an

12    employee both -- the fact that they have done hours in --

13    A    In a different department.

14    Q    -- two different departments?

15    A    Yes.

16    Q    Okay.

17         The date of this document, you'll see at the top, appears

18    to be January 28, 2015.  I mean, do you see that?

19    A    I see that, yes, yes, I do.

20    Q    You see that.  Is that around the time that Kelli Johnston

21    worked in your bar?

22    A    No.

23    Q    Is it your understanding that this document would have been

24    executed in preparation for her coming in to do a shift?

25    A    Not to my knowledge, because I didn't even know about Kelli

1  Johnston until after -- until the end of February, early March.

2  Q    Do you know whose initials these are in the bottom, where

3  it says "property."

4  A    Department -- a "K."  I don't know who that is.  Director

5  of HR -- I would assume that was Michael, Michael Henry, but I'm

6  not positive, I don't recognize them.

7  Q    Okay.

8      MR. TERRELL:  Well, we'll stipulate to the authenticity of

9  this document as having come out of Kelli Johnston's personnel

10 file.

11     JUDGE STECKLER:  Okay.

12     GC 33 is admitted.

13 (EXHIBIT RECEIVED: GENERAL COUNSEL'S 33.)

14                    CONTINUED CROSS-EXAMINATION

15 Q    BY MR. WIESE:  So Ms. Scrabeck, I'd like to talk to you

16 about Ms. Johnston's availability in March when Mr. Mick Miller

17 was out of The Crossings bartending department.

18 A    Okay.

19 Q    So I believe you said that you spoke with Mr. Shot and

20 found out that he was available during that time period for

21 three to five shifts, is that right?

22 A    Well, I told him that he -- I would need him for these

23 amount of days, and, obviously, the banquets department would

24 come first, so if he couldn't work, then he should just let me

25 know.  But, yah.

1  Q    And so you had a conversation with Mr. Shot about his

2  availability --

3  A    After his trial period, after his trying it out and seeing

4  how he worked out, yes.

5  Q    You didn't have any similar conversations with Kelli

6  Johnston, did you?

7  A    No.

8  Q    Are you familiar with the concept of seniority?

9  A    Yes.

10  Q    And you know that that's a very important thing for the

11  Union with employees, isn't that right?

12  A    Correct.

13  Q    And it's something that you are supposed to follow when you

14  are scheduling employees, isn't that right?

15  A    Yes.

16      MR. TERRELL:  Objection:  no foundation and absent some

17  collective bargaining provision that would apply in terms of

18  seniority here, these questions are irrelevant.

19      JUDGE STECKLER:  Well, I think she said that she

20  understands the concept of seniority.

21      MR. TERRELL:  Understands the concept, but the question

22  presupposes that there's some collective bargaining provision

23  that would entitle Ms. Johnston on the basis of seniority, and

24  there is no such provision.

25      JUDGE STECKLER:  Mr. Wiese?

1      MR. WIESE:  Well, if -- I mean, the witness has answered my

2  questions about seniority and that seniority is important in

3  scheduling.  I mean, if there's --

4      JUDGE STECKLER:  Well, I guess the follow-up question then

5  is whether it's scheduled by seniority.

6      MR. WIESE:  What's that?

7      JUDGE STECKLER:  Whether they distribute shifts by

8  seniority.

9      MR. WIESE:  Right, well, I guess, I mean, it goes to the

10  general concept of seniority and the importance that that is to

11  Union employees.  But it also goes towards Ms. Johnston's

12  experience as a bartender.  I'm going to be --

13      JUDGE STECKLER:  Well, we can get into that.

14      MR. WIESE:  Well, going into those questions.

15      JUDGE STECKLER:  Unless you can establish that there's been

16  a past practice of scheduling by seniority or a collective

17  bargaining provision, even though we know that it's important to

18  the Union.

19      MR. WIESE:  Okay.

20  Q    BY MR. WIESE:  Ms. Scrabeck, have you ever worked as a

21  bartender?

22  A    Yes, I have.

23  Q    Okay, over what period of time?

24  A    Years.  From the time I was 21 until I decided to go into

25  restaurant management.

P 00800

1   Q     Okay, and when was that?

2   A     Which part?

3   Q     The restaurant manager, when you shifted from a bartender

4   to a restaurant manager.

5   A     Probably 2008.

6   Q     Okay, so how many years was that?

7   A     Probably more than I want to admit, but let's see, 2008 --

8   how --

9         JUDGE STECKLER:  We can do the math.

10        THE WITNESS:  -- probably 12.

11        JUDGE STECKLER:  That's fine.

12        THE WITNESS:  Twelve years.

13        MR. WIESE:  Okay.

14        THE WITNESS:  On and off, yah, 12 years.

15  Q     BY MR. WIESE:  Okay, any of that time as a banquet

16  bartender?

17  A     No.

18  Q     So you talked about the performance of Mr. Shot versus Ms.

19  Johnston, when they were bartending.

20  A     Yes.

21  Q     Were you working while Ms. Johnston was bartending?

22  A     Yes.

23  Q     Okay.  And what about Mr. Shot?  Were you --

24  A     Yes.

25  Q     -- working that evening as well?  Okay.

607

1      MR. WIESE:  Nothing further.

2      JUDGE STECKLER:  Do you have any redirect?

3      MR. TERRELL:  Redirect, yes, Your Honor.

4                 REDIRECT EXAMINATION

5  Q   BY MR. TERRELL:  With regard to the selection of Mr. Shot,

6  in trying out Mr. Shot and then trying out Ms. Johnston, were

7  you aware of any seniority rule that applied to your selection

8  between the two of them?

9  A   I knew of seniority, but I did not know my selection

10  depended on their seniority, and I had no idea who was senior in

11  their department.  I had no knowledge of the employees in that

12  department at all.

13  Q   Okay.  Did anyone from HR tell you that you needed to

14  follow seniority?

15  A   No.

16  Q   Okay.  Do you even have -- or do you have a seniority list

17  of the bar -- of the banquet employees in your --

18  A   I do not, no.

19  Q   -- department?

20  A   No.

21  Q   Okay.

22      Now what role, if any, did Ms. Johnston's union affiliation

23  play in your decision?

24  A   Absolutely --

25      MR. WIESE:  Objection:  asked and answered.

1      JUDGE STECKLER:  Yes, she has already testified that she

2  didn't know, so --

3      MR. TERRELL:  Okay, fair enough.

4      Thank you.

5      JUDGE STECKLER:  Any further recross?

6      MR. WIESE:  No, Your Honor.

7      JUDGE STECKLER:  I have a couple questions.

8      THE WITNESS:  Okay.

9      JUDGE STECKLER:  On the day that Kelli Johnston worked in

10  your department, did you have any conversation with her during

11  that time?

12  A    Just passing conversation.  I'm -- like how is she doing,

13  you know, how things -- she felt things were going, I guess.

14  Q    Did you take that opportunity to ask her about her other

15  experiences?

16  A    Not that I recollect, no.

17  Q    Were there -- what happened that you didn't call her back

18  for a bigger trial?

19  A    I guess it had to do with just, you know -- I guess I call

20  it a "gut feeling" about a person I guess, that it's just a

21  personal thing, I don't know.  There wasn't anything specific I

22  guess, but I don't feel like she had a long enough, like, I

23  guess trial period, if you want to call her that, because she

24  couldn't stay late enough to work longer.  She could only work a

25  short amount of time during the day.

1        JUDGE STECKLER:  Okay.  Had you asked her if she could do a

2   different time?

3        THE WITNESS:  Not that I recollect, no.

4        JUDGE STECKLER:  Any other questions from you, Mr. Terrell?

5        MR. TERRELL:  No.

6        JUDGE STECKLER:  Anything from you, Mr. Wiese, based on my

7   questions?

8        MR. WIESE:  No, nothing further.

9        JUDGE STECKLER:  Okay.

10       Ma'am, thank you for coming in today.  You are excused.

11   Please remember that you can't discuss your testimony with

12   anybody until the hearing is over.

13       THE WITNESS:  Okay.

14       JUDGE STECKLER:  Thank you.

15   (Witness excused.)

16       MR. TERRELL:  Your Honor, we have two more short witnesses,

17   but we're going to -- I need a few additional minutes because of

18   the scheduling of people getting over here.

19       JUDGE STECKLER:  Okay, so --

20       MR. TERRELL:  A 10-minute break?

21       JUDGE STECKLER:  That's fine.  I think we all could use a

22   stretch break.   It's the middle of the afternoon.

23       MR. TERRELL:  Okay, thank you.

24       JUDGE STECKLER:  Off the record.

25   (Off the record.)

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

1      JUDGE STECKLER:  We're back on the record.

2      Please raise your right hand.

3  (WITNESS SWORN:  MARY KAY COSTELLO)

4      JUDGE STECKLER:  Please state your full name and spell it

5  for the record.

6      THE WITNESS:  Mary Kay Costello, M-A-R-Y K-A-Y C-O-S-T-E-L-

7  L-O.

8                         DIRECT EXAMINATION

9  Q    BY MR. TERRELL:  Where are you employed?

10 A    I'm employed at the Kahler Hospitality Group.

11 Q    And what is your position?

12 A    Human Resources Manager.

13 Q    Okay, over all four hotels?

14 A    Over all four hotels, yes.

15 Q    Okay.

16     Could you hand the witness General Counsel Exhibit 33.

17     COURT REPORTER:  Sure.

18     JUDGE STECKLER:  I've got one here.  Oh, the Court Reporter

19 has got one for you too.

20 (Witness proffered document.)

21 Q    Are you familiar with this document -- or this form; first,

22 the form in front of you?

23 A    Yes, I am.

24 Q    Personnel Action Form.  What is this form?  What is its use

25 and purpose?

1  A    It's use is a communication tool for expectations of what

2  might happen to team members, whether they are hired, whatever;

3  also for anybody who has a -- not necessarily a change in their

4  job, but could have a multi -- hold multi-positions within the

5  company.  And in this particular one, it is a communication

6  saying that we know that Kelli in our world is a banquet server,

7  but she is going to take on another job code as a bartender for

8  Crossings; and that's what this document is stating.

9  Q    Okay.  Who are the initials at the bottom of this document?

10  A    That's Kate Uuland and Mandy Cutshall.

11  Q    And who is Kate Uuland?

12  A    She is the banquet manager.

13  Q    Okay.  And then the other initial you said is Mandy

14  someone?

15  A    Yes, Amanda Cutshall.  She is our assistant in the HR

16  office.

17  Q    Okay.  Now if an employee transfers permanently from one

18  department to another, do you just simply do a PAF?

19  A    No, not at all.

20  Q    What else is required in that instance?

21  A    We have a transfer request form that the team member picks

22  up in our Human Resources office, fills out the appropriate

23  information on the transfer request, and then presents that

24  transfer request to their manager.  That has to happen before it

25  is turned into Human Resources.

1    Q    Okay.

2         I want to show you an exhibit here.

3    (Witness proffered the document.)

4    Q    Is this the transfer request form that you were speaking

5    of?

6    A    Yes, sir.

7    Q    And if an employee wishes to move from one department to

8    another, what is the first thing the employee must do?

9    A    The employee, first off, should discuss it with their

10   manager; but the next step would come up to pick up the form.

11   Q    Where would they pick up the form?

12   A    In Human Resources.

13   Q    Okay.  And then, typically, if we are there, we instruct

14   them, "Make sure you fill it out completely before returning it

15   back to HR."

16   Q    Okay, and in filling it out completely beyond simply

17   filling out the information at the top, do they need to -- well,

18   you see here on the bottom, it says "Management Endorsement."

19   It requires the signature of a manager, right?

20   A    Yes, it does.

21   Q    Who is responsible for getting that signature?

22   A    The team member.

23   Q    The employee?

24   A    The employee, yes.

25   Q    Now did Kelli Johnston ever come to your office, the HR

1  office, and request or obtain a transfer request form?

2  A    Yes, she did.

3  Q    And how do you know that?

4  A    I was the only one in the office at the time.  I was

5  sitting in my office, and she was next to the -- we have a stand

6  with all kinds of information for employees and she picked that

7  up from there.

8  Q    Okay.  Did you have any conversation with her at that time

9  about what she was up to?

10  A    Not at that time, no.

11  Q    Okay.  So she picked up the transfer request form.

12  A    Yes.

13  Q    Did you see her take it with her?

14  A    Yes, yup.

15  Q    Okay.  Did she ever return the form?

16  A    No, not to me.  I have not seen that form.

17  Q    Okay.  Now what I've given you, marked Exhibit R 13 is

18  actually one -- two -- three -- four -- five -- all five of

19  these -- are these examples of transfer request forms?

20  A    Yes, they are.

21  Q    Okay.  Are all five of these filled out with a manager's

22  signature?

23  A    Yes, they are, sir.

24  Q    Okay.  And is it your practice in the Human Resources

25  Department to keep and maintain these forms in your office?

1    A    Yes, they go in the employee file.

2    Q    In the employee's personnel files?

3    A    Yes.

4    Q    Okay.  Is that a regular, routine practice that you make in

5    having these forms?

6    A    Yes, sir.

7    Q    Are these forms in the files maintained and kept up to

8    date?

9    A    Yes, sir.

10    Q    In your ordinary practice in managing the Human Resources

11    office and paperwork, do you rely on these forms?

12    A    Yes, we do.

13    Q    Okay.  Now I asked you previously --

14         MR. TERRELL:  First of all, I'd like to move Exhibit R-13

15    into evidence.

16         MR. WIESE:  I don't have any -- actually voir dire briefly.

17         JUDGE STECKLER:  Go ahead.

18                        VOIR DIRE EXAMINATION

19    Q    BY MR. WIESE:  Were you in charge of compiling these

20    documents for production for this hearing?

21    A    This particular list.

22    Q    Yes, these five transfer requests?

23    A    No, I did not.

24    Q    Okay.

25         MR. WIESE:  Well, I guess I'd like a -- I'm fine with these

1  coming in with the stipulation that these are all the transfer

2  requests that were produced pursuant to my subpoena.

3      MR. TERRELL:  That's not why we're offering them.  I'm just

4  offering them as examples of transfer request forms, and

5  establishing through this witness that these are documents

6  maintained in the ordinary course of the Human Resources

7  Department.

8      JUDGE STECKLER:  If you have others that you want to admit

9  on cross, Mr. Wiese, we can do that.

10      MR. WIESE:  Well, I don't have others, that's --

11      JUDGE STECKLER:  Okay.

12      MR. WIESE:  I mean, that's what I'm trying to get

13  established is that this is --

14      JUDGE STECKLER:  Okay, you can ask her that on cross then,

15  if these were the only documents now.

16      MR. WIESE:  Okay.

17      JUDGE STECKLER:  R 13 is admitted.

18  (EXHIBIT RECEIVED:  RESPONDENT'S 13.)

19      MR. TERRELL:  Thank you.

20                  CONTINUED DIRECT EXAMINATION

21  Q   BY MR. TERRELL:  So I asked you a moment ago if Kelli

22  Johnston ever returned a transfer request form, and you said,

23  "No, she did not."  Did you check the records in determining

24  that?

25  A   I sure did, and I've looked in her personnel file.  We have

1    a medical file with private information, possibly getting

2    misplaced in there, and I've looked high and low everywhere and

3    I cannot find it.

4    Q    Do you have any other knowledge from any other independent

5    source that she did, in fact, turn in a transfer request form to

6    your office?

7    A    No, I don't have any other source of having it there in

8    that office, no.

9    Q    Okay.

10       I want to show you another document that's in evidence,

11   Exhibit GC 34.

12   (Witness proffered the document.)

13   Q    This appears to be an e-mail exchange between you and

14   Crystal Adcox.  Do you recall this e-mail exchange?

15   A    Yes, I do.

16   Q    Okay.  It was initiated by you to Crystal, and you wrote,

17   "Kelli came over here saying that she is going to start training

18   for a houseman position.  Is that correct?  I have filled out a

19   PAF for secondary job code.  Is that what you need me to do?

20   Please advise."  Why did you ask that question, "Is that what

21   you need me to do?"  Why did you ask that to Crystal Adcox --

22   and before you answer that, we should probably clarify, who is

23   Crystal Adcox?

24   A    Crystal Adcox is the Housekeeping Manager of the Rochester

25   Marriott.

617

1  Q    Okay.  So why did you ask Crystal Adcox in this e-mail, the

2  Housekeeping Manager at Marriott, "Is that what you need me to

3  do?" -- that is fill out a PAF for a secondary job code?  What

4  did you ask her that question?

5  A    Specifically, because when a team member approaches me

6  about something, I have to go back to the manager and verify, is

7  this -- you know, "Is this what you need me to do before I go

8  ahead and make an assumption?"  So when Kelli came over and

9  discussed -- she stopped in and said, "I interviewed for a

10 position."  And, you know, that just seemed odd to me, because I

11 didn't know this was going on.  They usually all come through HR

12 with our positions that we have posted.  So I just thought,

13 "Okay, so maybe she's trying to pick up some hours in

14 housekeeping," and then that would be the assumption where I

15 would fill out one of these for a secondary job code.

16 Q    And you're holding up and referring to the PAF --

17 A    The PAF.

18 Q    -- that we talked about a minute ago?

19 A    Yup, mm-hmm, this is exactly what I was going to do for her

20 to create a secondary job code.

21 Q    Okay.  And then Crystal Adcox responded, "If you feel like

22 she would be a good candidate."  And then she said, "I had some

23 attitude issues with her in banquets."

24     Before I ask specifically about that, do you know of your

25 own knowledge whether Kelli Johnston ever worked in housekeeping

1  at any time?

2  A    Before this?

3  Q    No, after this?

4  A    After this.

5  Q    Yes.

6  A    No, I have no knowledge of that.

7  Q    Okay.  Did you make any decisions one way or the other

8  regarding Kelli Johnston working in the Housekeeping Department?

9  A    No.

10  Q    Did you do anything with this information that Crystal

11  Adcox provided to you in connection with Kelli Johnston's

12  apparent interest in working in the Housekeeping Department?

13  A    I did not.  And, as noted, I didn't hear anything, so I

14  wasn't clear what the situation was, so I didn't do anything.

15  Q    Okay.  And this -- you're referring to the handwritten

16  note?

17  A    And the note -- the dialogue.  I just sent something to

18  Michael, "Hey, I just want you to know."  I never heard

19  anything.  Due to lack of clarity, I didn't do anything about

20  it.

21  Q    Okay, so you're referring to the e-mail at the top,

22  "Dialogue between Crystal and I.  I never did anything do -- you

23  meant "D-U-E" -- due to" --

24  A    Yes, I did.

25  Q    -- "due to the lack of clarity."

1   A      Yah.

2   Q      And why did you characterize this as "lack of clarity"?

3   A      Because I -- really, you know, comparing Kelli's thing and

4   then Crystal just giving me this statement, I didn't pursue it.

5   Typically, the manager and the employee would pursue

6   conversation --

7   Q      Okay.

8   A      -- not me.

9   Q      So did you have any further involvement in Kelli's apparent

10  interest in a housekeeping position?

11  A      No, sir.

12  Q      Do you know -- do you have any awareness of anybody in your

13  department, including Michael Henry, having any involvement in

14  Kelli's apparent interest in the Housekeeping Department?

15  A      No, sir.

16  Q      Is this your handwritten note on the document?

17  A      Yes, it is.

18  Q      Can you tell us what you were saying there?

19  A      Yah.  "She came into the office and stated that she

20  interviewed with Crystal and started her training as a houseman

21  this week" -- and this is just a note to myself as you can tell

22  -- "that prompted the e-mail to Crystal."  I try to take notes,

23  so I keep my head straight when I'm dealing with employees, so I

24  don't miss anything.  So that was my note for me.

25  Q      And where did you put this note?

1    A    It had to be in her personnel file.

2    Q    In Kelli's personnel file?

3    A    Yes, sir.

4    Q    So this note -- was this note intended for anyone else to

5    read, or just for your own memory keeping purposes?

6    A    For my own memory keeping purposes.

7    Q    Okay.  You state here that Kelli came into your office, and

8    Kelli stated to you that she interviewed with Crystal, and

9    starts her training as houseman this week.  Did you know

10   anything else about the subject matter in that sentence other

11   than what you learned from speaking with Kelli?

12   A    No.

13   Q    Okay.  And then you write, "this prompted" -- what is the

14   next word?

15   A    It prompted the e-mail to Crystal.  So that's my --

16   Q    Oh, and you're referring --

17   A    -- to this.  I'm referring to all of this.

18   Q    Okay.

19   A    Yup.

20   Q    Okay.

21        MR. TERRELL:  Nothing further.

22        JUDGE STECKLER:  Cross?

23        MR. WIESE:  Just a minute off the record?

24        JUDGE STECKLER:  Go off the record for a moment.

25   (Off the record.)

1        JUDGE STECKLER:  Back on the record.

2                         CROSS-EXAMINATION

3    Q    BY MR. WIESE:  Good afternoon, Ms. Costello.

4        My name is Tyler Wiese.  I'm an attorney with the National

5    Labor Relations Board.

6    A    Hello.

7    Q    Okay, I'd like to have you take a look at General Counsel's

8    Exhibit 34, and, specifically, page 2, the bottom e-mail, and

9    we'll work our way up the e-mail chain here.

10       So the -- I believe you said you were -- what prompted this

11   e-mail was a conversation that you had with Kelli Johnston, and

12   that's what the posted not is on the front?

13   A    Yes.

14   Q    So the order of these events is you had a conversation with

15   Kelli Johnston?

16   A    Yes.

17   Q    Is that right?

18   A    Yup.

19   Q    And then you sent the e-mail to Crystal Adcox.

20   A    To Crystal, yes, sir.

21   Q    And then Crystal replied to you.

22   A    Yes.

23   Q    And then you forwarded it to Michael Henry?

24   A    Note that that started in April, and then we had Union

25   negotiations, which prompted some of this conversation.  So

1   that's when I forwarded it to Michael Henry.

2   Q    Okay.  But did you do anything else with this e-mail from

3   Crystal besides forward it to Michael Henry, to your knowledge?

4   A    To my knowledge, no.

5   Q    Okay.  And looking at your initial e-mail to Crystal Adcox,

6   it says that you, according to this, have filled out a PAF for a

7   secondary job code correct?

8   A    Yes.

9   Q    Okay.

10  A    But just because it means I filled it out, didn't mean I

11  didn't do anything with it.

12  Q    That's not what I'm --

13  A    Okay, I just want to be clear.

14  Q    That you had filled out a PAF at the time you sent that e-

15  mail.

16  A    Yah.

17  Q    So that's correct.

18  A    So it's sitting on my desk, yes.

19  Q    And it was filled out at that point, all right.

20       So you received this e-mail from Crystal Adcox on April

21  6th, the second e-mail on this chain, is that right?

22  A    Yes.

23  Q    Okay.

24  A    It looks like the same day I sent it to her.

25  Q    And she's --

1    A    She's responding.

2    Q    In her e-mail, she's asking you if Kelli Johnston would be

3    a good candidate to be a housekeeper, is that right?

4    A    To be a houseman.

5    Q    Yes, a houseman.

6    A    Yah, she is asking me that.

7    Q    Right, and you never responded to that question.

8    A    Mmm-hmm.

9    Q    Okay.

10    JUDGE STECKLER:  Is that a "no"?

11    THE WITNESS:  No, sorry.

12    Q    BY MR. WIESE:  You never did anything further.

13    A    Unless I had a phone conversation with her.

14    Q    But you don't recall making a phone call?

15    A    I don't recall that.

16    Q    Okay, so it just sat in your in-box until May 5th?

17    A    Yes, because it would have been her decision whether to

18    hire her or not.

19    Q    But it doesn't -- she's asking you if Kelli Johnston would

20    be a good candidate.  And you never responded to that, did you?

21    A    No, I did not.

22    Q    And you didn't do anything with that until you forwarded it

23    to Michael Henry about one month later, isn't that right?

24    A    That looks correct.

25    Q    Okay.  And you said the reason that you respond -- or that

1   you forwarded to Michael Henry at that time, was because of

2   something that was going on with union negotiations, isn't that

3   right?

4   A    That's what I believe to be true, yes.

5   Q    And Mr. Henry requested that you forward that e-mail to

6   him?

7   A    No, I don't believe so.  I think that the conversation came

8   up during union negotiations about this, and I just wanted him

9   to know what happened.  That's what I believe happened to the

10  best of my knowledge.

11  Q    Do you know what union negotiations this topic came up at?

12  A    Not specifically, no.

13  Q    And you can look at -- well --

14  A    No, I just can't specifically, even though I took all the

15  notes, I can't even tell you.

16  Q    All right.

17       MR. WIESE:  Nothing further.

18       JUDGE STECKLER:  Any redirect?

19       MR. TERRELL:  No, Your Honor.

20       JUDGE STECKLER:  Maybe you can help me out with something,

21  Ms. Costello.

22       I'm looking at General Counsel 33.

23       THE WITNESS:  Yes.

24       JUDGE STECKLER:  Given your experience with the employer,

25  why would this form be filled out in January of -- late January

1   2015?

2       THE WITNESS:  Okay, so assuming that the two managers had

3   conversation, you know, one would have been Kate with Ericka,

4   Ericka saying that she's going to need help, because we knew we

5   had a team member who was going on a lengthy vacation; so they

6   are being proactive in getting this secondary job code taken

7   care of, because depending when this all falls, it could be the

8   pay period and different things, we want to make sure we can get

9   the secondary job code in the system, so that when she does

10  work, she can punch and that we can track the hours

11  appropriately.  That is not unusual if something like that

12  happens.

13      JUDGE STECKLER:  Okay, thank you.

14      THE WITNESS:  Mmm-hmm.

15      JUDGE STECKLER:  Any further questions, Mr. Terrell?

16      MR. TERRELL:  No.

17      JUDGE STECKLER:  Mr. Wiese?

18      MR. WIESE:  No, Your Honor.

19      JUDGE STECKLER:  Ms. Costello, thank you for coming in

20  today.  You will be excused.

21      Please do not discuss your testimony until the trial is

22  over.

23      THE WITNESS:  Thank you.

24  (Witness excused.)

25      MR. TERRELL:  Get our next witness.

```
 1        JUDGE STECKLER:  Okay, we'll go off the record for a
 2   moment.
 3   (Off the record.)
 4        JUDGE STECKLER:  We are back on the record.
 5        Please raise your right hand.
 6   (WITNESS SWORN:  CRYSTAL ADCOX)
 7        JUDGE STECKLER:  Please state your name and spell it for
 8   the record.
 9        THE WITNESS:  Crystal Adcox, C-R-Y-S-T-A-L  A-D-C-O-X.
10        JUDGE STECKLER:  Mr. Terrell.
11                      DIRECT EXAMINATION
12   Q    BY MR. TERRELL:  Where are you employed?
13   A    At the Marriott Hotel.
14   Q    Okay, and what is your position there?
15   A    I'm the Housekeeping Manager.
16   Q    Okay.
17        Do you know Kelli Johnston?
18   A    Yes.
19   Q    How do you know Kelli Johnston?
20   A    She works in the Banquet Department, which is located next
21   to the Housekeeping Department
22   Q    Okay, housekeepers clean rooms and the Banquet Department
23   does what it does, but you don't work together?
24   A    No.
25   Q    Did Kelli Johnston ever approach you and inquire about a
```

1  position in your department?

2  A    Yes.

3  Q    Do you recall approximately or roughly when that

4  conversation took place?

5  A    I don't -- sometime earlier this year.

6  Q    I'm sorry?

7  A    Sometime earlier this year.  I don't recall the exact month

8  or day.

9  Q    Okay.  Tell us what you recall about that conversation?

10  A    Kelli approached me in regards to questioning about the

11  houseman position, and I explained to her the hours, the

12  description, what, you know, what amount of weight she had to

13  pull or lift, kind of explain just everything about the job duty

14  and that's basically is what we discussed.

15  Q    Okay.  And did you speak with her about what she would need

16  to do in order to acquire work in the Housekeeping Department?

17  A    I referred her to speak with the HR Department.

18  Q    And for what purpose?

19  A    When someone inquires about another job in a different

20  department, you need to fill out a transfer form.

21  Q    Okay.

22  A    And before anything takes place, an interview or a sit-down

23  about further description of the job, the transfer form needs to

24  be filled out.

25  Q    You said you discussed the transform with her?

628

1    A    I did not.  I just sent her to inquire about the position

2    with the HR Department.

3    Q    Was it your impression that Ms. Johnston was seeking a

4    permanent transfer?

5    A    When she approached me, she had indicated that she wanted

6    something more stable due to hours and not getting enough hours

7    in banquets.

8    Q    Okay. Did you have any further conversation with Kelli

9    Johnston after that conversation?

10   A    No.

11   Q    Did you -- did there come a point after this conversation

12   where you made a decision one way or the other to have her come

13   in to your department?

14   A    No.

15   Q    If she had come in to your department, what would have had

16   to have happened for her to have come into your department?

17   A    Her manager would -- well, basically, I would be waiting on

18   a transfer form to see that her manager approved her to -- for

19   the position to move over to my department.

20   Q    Did that ever happen?

21   A    No.  I never received any documentation.

22   Q    Okay.  Do you recall an e-mail exchange with Mary Kay

23   Costello about Kelli Johnston's apparent interest in your

24   department?

25   A    Today, I recalled it today.

P 00823

1    Q    Okay.

2         MR. TERRELL:  Could you show the witness Exhibit GC 34,

3    please.

4    (Witness proffered the document.)

5    Q    BY MR. TERRELL:  And if you would turn to the second page -

6    - or actually, the bottom of the first page, going into the

7    second page, this is an e-mail from Mary Costello to you,

8    correct?

9    A    Yes.

10   Q    Okay.  And we can see that Mary Costello informed you in

11   the e-mail that "Kelli came over here saying that she is going

12   to start training for a houseman position.  Is that correct?"

13   And then Mary Kay Costello said, "I have filled out a PAF for a

14   secondary job code.  Is that what you need me to do?  Please

15   advise."  And then, is this your response that we see up above

16   that on the first page?

17   A    Yes.

18   Q    Your first sentence says, "If you feel like she would be a

19   good candidate." And then you said, "I had some attitude issues

20   with her in banquets."  Was that the end of your exchange with

21   Mary Kay on this topic?

22   A    No.

23   Q    Okay, what did you have -- do you recall further exchanges?

24   A    Yes, in person.

25   Q    Okay, what do you recall?

1    A    I spoke with Mary Kay in regards to just kind of pondering

2    why she was going to be starting the houseman position.  I did

3    not conduct an interview or ask her, you know, the proper

4    interview questions that I would ask.  So that's what I

5    discussed with Mary Kay.

6    Q    Okay.  So the conversation you describe with Kelli was not

7    an interview?

8    A    No, it was outside in the hallway, she by-passed me and

9    asked me about the job openings posted, and I let her know what

10   the description was, what she would be, you know, needing to do

11   in -- being a houseman and what the hours were.

12   Q    Okay, and did you have any further discussion of any kind

13   whatsoever with Kelli Johnston?

14   A    Not in regards to that position.

15   Q    Not in regards to this, okay.

16        Now Mary Kay Costello, however, did inform you that she had

17   filled out a PAF for a secondary job code.  Did she forward that

18   PAF to you?

19   A    No.

20   Q    Would there be any reason for her to do that?

21   A    No.

22        MR. WIESE:  Objection:  speculation.

23        MR. TERRELL:  Well, I mean, in the ordinary course of how

24   the business operates, would there be any business reason --

25        JUDGE STECKLER:  I think she said she never received it,

1   and I think that's sufficient.

2        MR. TERRELL:  Okay.

3   Q    BY MR. TERRELL:  Okay, apart from that subsequent

4   conversation you recall with Mary Kay, did you have any

5   discussions with anybody, apart from today, of course -- did you

6   have any further discussions with anyone, either Kelli or Mary

7   Kay or Michael Henry or anyone about Kelli's apparent interest

8   in working in your department?

9   A    No.

10       MR. TERRELL:  Nothing further.

11   Thank you.

12   THE WITNESS:  Thank you.

13   JUDGE STECKLER:  Mr. Wiese, do you need a few moments?

14   MR. WIESE:  Yes, just a minute off the record, Your Honor.

15   JUDGE STECKLER:  Okay, we'll go off the record here.

16   (Off the record.)

17   JUDGE STECKLER:  Okay, we'll be back on the record.

18   Mr. Wiese, you may proceed.

19                    CROSS-EXAMINATION

20   Q    BY MR. WIESE:  Good afternoon, Ms. Adcox.

21   My name is Tyler Wiese.  I'm an attorney with the Labor

22   Board.

23   A    Good afternoon.

24   Q    Hi.

25   So I'd like to turn your attention to General Counsel

1    Exhibit 34.  It's the e-mail that we were looking at earlier.

2        So in your reply to Ms. Costello, you reference some

3    attitude issues with Kelli in banquets.  Do you see where -- do

4    you see what I'm talking about?

5    A    Yes.

6    Q    What is your experience -- do you supervise Ms. Johnston in

7    banquets?

8    A    No.

9    Q    So these attitude issues -- or how did you learn of these

10   attitude issues that you're talking about here?

11   A    Kelli Johnston is located right next to the Housekeeping

12   Department in banquets, so that is how we see each other.

13   Q    When you reference "attitude issues," are you talking about

14   complaints that she's made about her working conditions?

15   A    No.

16   Q    Are they complaints that she's made about Kate Uuland that

17   you've heard about?

18   A    No.

19   Q    Are they related to any efforts that she has made -- or any

20   complaints that she has made about her wages?

21   A    No.

22   Q    What about the hours that she has to work?

23   A    No.

24   Q    Have you ever heard Ms. Johnston raise any concerns with

25   regard to the Collective Bargaining Agreement between Richfield

1   Hospitality and the Union?

2   A    No.

3   Q    So when you talk about attitude issues, what are you

4   talking about then?  What were you referencing?

5   A    When we would make contact with each other, that is where I

6   have seen her display some attitude.

7   Q    So what kind of contact are we talking about where she has

8   displayed this attitude?

9   A    During like morning stand-ups.  I hold my stand-ups in

10  housekeeping, and she tends to, you know, say things to my

11  housekeepers or to myself.  If we're being too loud or -- in

12  that case, it's just the way she approached us or the way she

13  has made a comment to us if we are holding our meetings, during

14  our meetings, so that is why I stated that.

15  Q    So what is a "stand-up"?

16  A    A "stand-up" is where  my whole team comes together and we

17  talk about the day, what to prepare for, what rooms they have

18  and so forth -- motivate my team.

19  Q    What specifically do you recall Ms. Johnston saying that

20  led to these -- that led to you writing to Mary Kay Costello

21  that she had attitude issues, as best you can recall?

22  A    The last one I recall is, for instance, in the morning, I

23  motivate my team, we have music, we do stretches; and like it's

24  the way she approaches us to tell us if we're being too loud or

25  if we can close our door.  It's like the way she approaches it,

1    her body language or her actions of the things that she, you

2    know, she did that day.

3    Q    Any other instances besides that one that you can recall at

4    this time that led to you writing that?

5    A    Not at this time.

6    Q    When you wrote to Ms. Costello on April 6th, when you wrote

7    that e-mail, you were looking for guidance from Ms. Costello

8    over whether Kelli Johnston would be a good candidate, isn't

9    that right, for housekeeping?

10   A    Yes.

11   Q    And you never received any response from Ms. Costello in

12   regards to that inquiry, did you?

13   A    Not through e-mail, but when we talked, yes.

14   Q    And what response did you receive from Ms. Costello about

15   whether she would be a good candidate?

16       MR. TERRELL:  Objection:  assumes that she got a response.

17   He hasn't established that yet.

18       JUDGE STECKLER:  What, if any, response did she receive.

19       That's fine.  Go ahead.

20       You may answer.

21   Q    BY MR. WIESE:  So you did have a conversation with Ms.

22   Costello after you -- you recall having a conversation with Ms.

23   Costello after you sent this e-mail, correct?

24   A    After, yes.

25   Q    And during that conversation, did you receive a response

P 00829

1    from Ms. Costello over whether Kelli Johnston would be a good

2    candidate?

3    A    Yes, we talked about how we would -- I would like to

4    conduct an interview.  It wasn't an interview that me and Kelli

5    had, so that's basically what we discussed that we need to see a

6    transfer form, conduct an appropriate interview, ask the

7    questions that I had concerns about, and I never received any

8    transfer form to indicate to even set up an interview with her.

9    Q    After that conversation with Ms. Costello, where you

10   discussed interviewing Kelli Johnston, you didn't contact Ms.

11   Johnston and told her know that you talked about an interview,

12   did you?

13   A    I never spoke with Kelli any further than that day that we

14   discussed the description of the job duties.

15   Q    Okay, so you and Ms. Costello had a discussion about

16   interviewing Kelli Johnston, is that right?

17   A    W had a discussion about receiving a transfer form, so I

18   can perform that interview.

19        MR. WIESE:  Nothing further.

20        JUDGE STECKLER:  Redirect?

21        MR. TERRELL:  Just one or two on follow-up.

22                    REDIRECT EXAMINATION

23   Q    BY MR. TERRELL:  Were you willing to conduct an interview

24   with Kelli Johnston after speaking with Mary Kay?

25   A    Would I be willing to, yes.

1    Q    Were you willing to speak to her, yes?

2    A    Yes.

3    Q    Okay.  You were willing to interview her?

4    A    Yes.

5    Q    But you never got the transfer request form?

6    A    I never did, no.

7    Q    And she never approached you again?

8    A    No.

9         MR. TERRELL:  Nothing further.

10        JUDGE STECKLER:  I do have a few questions.

11        Do you have any recross --

12        MR. WIESE:  I do not, Your Honor.

13        JUDGE STECKLER:  -- before I continue.

14        Ms. Adcox, tell me again how long you have been the

15   Housekeeping Manager?

16        THE WITNESS:  Two years on February 4th.

17        JUDGE STECKLER:  Okay, this past February 4th or this

18   coming February 4th.

19        THE WITNESS:  This upcoming February 4th.

20        JUDGE STECKLER:  Okay, so almost 2 years.

21        What's the turnover like in your department?

22        THE WITNESS:  Housekeeping always has a lot of turnover, so

23   I would say normal.

24        JUDGE STECKLER:  Normal.  Do you have a percentage maybe

25   you can --

1        THE WITNESS:  No, I don't.

2        JUDGE STECKLER:  How often are you training new

3   housekeepers or housemen?

4        THE WITNESS:  I'm not sure.

5        JUDGE STECKLER:  Okay.

6        THE WITNESS:  A couple months.

7        JUDGE STECKLER:  Let's go to a different area then.

8        You were discussing the attitude or you say a little bit in

9   the vernacular, the activity that she was showing.

10       MR. TERRELL:  I'm having trouble hearing you.

11       JUDGE STECKLER:  Oh, I'm sorry.

12       You were talking about her attitude in that e-mail, GC 34,

13   that is still in front of you.  What, if any, opportunity did

14   you have to observe her while she was working in the banquet

15   section?

16       THE WITNESS:  A lot.  Kelli tends to come over and feed us

17   food for housekeeping and say "Hi" to us, and she is very

18   communicative with my housekeepers and feeding them.

19       JUDGE STECKLER:  Were you privy to any of the conversations

20   she had with the housekeepers?

21       THE WITNESS:  No.

22       JUDGE STECKLER:  But she brought food over to you all?

23       THE WITNESS:  She brings food over to the housekeepers,

24   yes.

25       JUDGE STECKLER:  Okay.  How often does she get to do that?

1      THE WITNESS:  I'm not sure, I don't know.

2      JUDGE STECKLER:  So sometimes you are not there when she

3  might have these conversations?

4      THE WITNESS:  Yes.

5      JUDGE STECKLER:  Okay.

6      So what about when she's working on the banquet floor, have

7  you ever seen her working on the banquet floor?

8      THE WITNESS:  No.

9      JUDGE STECKLER:  Have you ever seen her interact with

10  customers in the facility?

11      THE WITNESS:  No.

12      JUDGE STECKLER:  Had you ever -- you said -- you mentioned

13  her body language.  What kind of body language are you talking

14  about?

15      THE WITNESS:  One day, we were having a stand-up meeting,

16  and I was motivating my team, we had music playing, and she

17  didn't like the fact that we were very loud; so it was just the

18  way she walked over, the way she walked and the way she, you

19  know, asked us to be quiet and that -- like that whole case

20  scenario.

21      JUDGE STECKLER:  Was that the first time she asked you to

22  be quiet?

23      THE WITNESS:  Yes, it was the first time we've had --

24      JUDGE STECKLER:  Any other time she's asked you to be

25  quiet?

1    THE WITNESS:  No, not since that day, we've never had any

2  other issue.

3    JUDGE STECKLER:  How many housekeepers did you have in

4  there doing stretches and warming up?

5    THE WITNESS:  I don't know.

6    JUDGE STECKLER:  How big was the room that you were

7  conducting this in?

8    THE WITNESS:  It's a big area, a housekeeping area, so I'm

9  not sure of the square footage, but it's big.

10    JUDGE STECKLER:  Do you know what kind of work Kelli was

11  doing before she came in?

12    THE WITNESS:  No.

13    JUDGE STECKLER:  Did you ask her what prompted it?

14    THE WITNESS:  No.

15    JUDGE STECKLER:  Did you turn it down after that?

16    THE WITNESS:   Oh, yes, of course.

17    JUDGE STECKLER:  Given the fact that you have turnover, are

18  you still willing to interview her?

19    THE WITNESS:  We do have positions open, yes, but we don't

20  have a houseman position open; but we do have housekeeping

21  positions open.

22    JUDGE STECKLER:  What's the difference between a houseman

23  and housekeeper?

24    THE WITNESS:  Housemen -- you have to lift a lot of heavy

25  linen, which, you know, is like 30 -- 40 pounds; you have to

1  push these big dollies around that weigh just as much; a lot of
2  different public areas of stocking and cleaning, so it is quite
3  different than housekeeping.

4      JUDGE STECKLER:  When you raised the attitude issue, what
5  was your concern?

6      THE WITNESS:  My concern was what was she going to offer
7  for our department, if she was going to come in with a positive
8  attitude, motivating our team and, you know, being in a happy
9  environment.  And I really wanted to make sure that we brought
10 someone into our team that can provide that.

11     JUDGE STECKLER:  Okay, and it's my understanding you never
12 talked to her supervisor about this, is that correct?

13     MR. TERRELL:  I'm sorry, Your Honor, I couldn't hear you.

14     JUDGE STECKLER:  I'm sorry, Mr. Terrell.

15     Is it my understanding that you never spoke to her
16 supervisor about how she was working in banquets?

17     THE WITNESS:  No, I never took it up with anyone besides
18 this when she inquired about the job.

19     JUDGE STECKLER:  Okay.

20     Mr. Terrell, do you have any further redirect?

21     MR. TERRELL:  No.

22     JUDGE STECKLER:  Mr. Wiese, any further recross?

23     MR. WIESE:  No, Your Honor.

24     JUDGE STECKLER:  Ms. Adcox, that you for coming in today.

25     Please do not discuss your testimony with anybody until the

1    conclusion of the hearing.  And you are excused.

2        THE WITNESS:  Thank you.

3    (Witness excused.)

4        JUDGE STECKLER:  Okay, we can go off the record for a

5    moment.

6    (Off the record.)

7        JUDGE STECKLER:  We'll be back on the record.

8        Hang on just a second.

9        Please raise your right hand.

10    (WITNESS SWORN:  ARCH STOKES)

11        JUDGE STECKLER:  Thank you.

12        Please state your name and spell it for the record.

13        THE WITNESS:  My name is Arch Stokes, A-R-C-H S-T-O-K-E-S.

14                         DIRECT EXAMINATION

15    Q    BY MR. TERRELL:  Mr. Stokes, we already know that you are

16    counsel for the Respondent in this case, and that you

17    participated in the negotiations for the Collective Bargaining

18    Agreement for the hotels.

19        If you would, first, please, describe for Her Honor your

20    background, your experience in connection with collective

21    bargaining negotiation.

22    A    I've been a lawyer since 1970, and I have engaged in

23    collective bargaining for over -- for about 45 years.

24        I have -- I started working in the hotel business and the

25    restaurant business when I was 14; and pretty much have worked

1    in hotels and restaurants all my life, either as a worker or as

2    a lawyer.

3    Q    Okay.  And why were you hired?  What was your understanding

4    of why you were hired by Richfield Kahler Hotels in connection

5    with the bargaining that took place?

6    A    They asked me if I would assist Michael Henry in

7    negotiating a collective bargaining agreement, and Paul Jewison,

8    who is the head of Textile Care Services.

9    Q    And what was your goal?

10   A    To reach a collective bargaining agreement.

11   Q    And how many negotiation sessions did you participate in?

12   A    For the hotel and a portion when Textile Care Services was

13   in the same sessions -- I think six sessions.

14   Q    Six sessions altogether, including the TCS negotiations?

15   A    The TCS negotiations -- when the National Labor Relations

16   Board ruled that it should be separated out, we negotiated that

17   contract in about three sessions, I believe.

18   Q    Okay, and where were those negotiations held?

19   A    Once the TCS negotiations were -- the TCS unit was

20   separated out, we negotiated at Textile Care Services, which is

21   just a couple of miles from downtown Rochester.

22   Q    Okay.  And with respect to the pie charts for TCS -- were

23   those introduced before or after the separate bargaining began?

24        MS. BURGESS:  Objection:  relevance.

25        MR. TERRELL:  We have gone over this before.

1       JUDGE STECKLER:  Once it's a separate bargaining unit,

2   what's the relevance of TCS?

3       MR. TERRELL:  We've gone over this before.

4       The relevance is that TCS was part of the same bargaining

5   that is at issue in this case.  In fact, all of the sessions in

6   this case, with the exception of the last one on September 24,

7   were sessions involving both the hotels and TCS, same

8   bargaining, pie charts were used, the same proposals were made,

9   except to the extent that differences were necessitated by the

10  differences in the operations of the laundry versus the hotels.

11      You know, the refrain we've heard many times that this is

12  not a surface bargaining case, however, we are accused of

13  bargaining in bad faith.  We are accused of unlawfully refusing

14  to meet again after the September 24 negotiations.  We are

15  accused of arriving late and leaving early.  These are all

16  classic allegations supporting a handful, a series of 8(a)(5)

17  allegations.

18      And so our good faith negotiations has been questioned.

19  Negotiating performance by Mr. Stokes is an issue, so it is

20  highly relevant that Mr. Stokes for the Textile Care Services

21  and Nancy Goldman and Martin Goff and Brian Brandt for this very

22  same Union were successfully able to reach a collective

23  bargaining agreement.  It is evidence of our good faith in

24  bargaining.  And so it is highly relevant to the question of

25  good faith bargaining at the hotels.

1        MS. BURGESS:  Your Honor --

2        JUDGE STECKLER:  I don't need any further argument on it.

3        We can hear testimony up to the point until TCS was

4    separated.  However, every bargaining unit is separate.  TCS is

5    -- the fact that TCS received a contract after it separated from

6    this unit is not relevant to the allegations here.  So any

7    discussion of TCS has to be limited to what happened before TCS

8    separated.

9        MR. TERRELL:  On behalf of Respondent, I make an offer of

10   proof that if allowed to have this witness testify, this witness

11   will testify that to the good faith bargaining that resulted in

12   a contract, and we respectfully submit that evidence.  The

13   testimony should be allowed to come in.

14   Q    BY MR. TERRELL:  Mr. Stokes, with respect to -- and I'll

15   ask the question and if you want to cut me off again --

16       JUDGE STECKLER:  Well, let me get a response from General

17   Counsel on your offer of proof.

18       MR. TERRELL:  Okay.

19       MS. BURGESS:  Your Honor, that offer of proof should be

20   rejected.

21       You are absolutely right.  Whatever happened subsequent to

22   the -- you know, to the breakup of the unit in the TCS

23   negotiations has absolutely no relevance as to whether or not

24   there was good faith bargaining or the discreet violations that

25   General Counsel alleges with respect to the unit that is at

1    issue here.

2        We don't have in the record the evidence of what happened

3    during those negotiation or that they were at all similar, that

4    the issues before the employees in those cases are similar.  It

5    is just not relevant and his offer of proof should be rejected.

6        JUDGE STECKLER:  As I said, any further response, Mr.

7    Terrell, before I rule?

8        MR. TERRELL:  That is our offer of proof, Your Honor.

9        JUDGE STECKLER:  Okay.

10        MR. TERRELL:  She can make that argument in her brief, and

11    we'll make ours.

12        JUDGE STECKLER:  Okay.  I don't think it's what happened

13    after TCS was separated is relevant to the proceedings here.  It

14    may go to all kinds of other factors that relate to that

15    bargaining unit that are not at issue in this case.

16        So I'll expect a running objection here, and I'd like you

17    to move on to the other issues, please.

18        MR. TERRELL:  I do want to ask one more question, and you

19    can rule the same way if you like.

20    Q    BY MR. TERRELL:  Were the pie charts that were originally

21    introduced during the hotel TCS bargainings -- were the pie

22    charts part of the same proposal that resulted in a contract at

23    TCS?  Were those pie charts part of the same proposal that

24    resulted in a contract at TCS.

25        MS. BURGESS:  Objection, Your Honor.  The pie charts that

1  were attached or that are allegedly attached to the TCS contract

2  are not of any relevance here.  And the witness that testified

3  about that said that she did not believe that those pie charts

4  were even included in the final version of the contract.

5      JUDGE STECKLER:  And I see Mr. Stokes want to answer but

6  I'll ask you to wait until we're finished with this.

7      MS. BURGESS:  Moreover -- and if you just give me one

8  second -- the pie charts that are in the document that hasn't

9  even been received in evidence yet, are not broken down by

10 employee, they are by classification; which means that they are

11 distinctly different than the hundreds of pages of individual

12 pie charts that are at issue in our case.

13     MR. TERRELL:  Well, she's incorrect on that, because the

14 pie charts attached to the last, best and final offer by the

15 company to the hotels also attached pie -- position pie charts,

16 not individual pie charts.  So it was done the same way at TCS

17 as it was done at the hotels.

18     And the pie charts appear to be a huge issue or a big issue

19 in this case.  The other side is claiming that they were

20 confusing.  We put on evidence to show that's simply not the

21 case.  And so that's very relevant.  There were the same set of

22 pie charts generated at the same time.  The fact that those pie

23 charts, by position pie charts, were attached to the final

24 agreement at TCS is highly relevant to the issue of the pie

25 charts in connection with the bargaining at the hotel.

1      MS. BURGESS:  The pie charts in the TCS -- Your Honor, if I
2  may, the pie charts, that may or may not have been attached to
3  the TCS contract, have no relevance to what is at issue here.
4  Without us knowing whether they contain the same inaccuracies
5  that these pie charts did, whether the employees were given pie
6  charts that didn't even currently state their current wages,
7  whether the TCS pie charts reflected decreases in employee
8  wages, as our pie charts do here, they are just completely
9  irrelevant.

10     JUDGE STECKLER:  Okay.  I am going to rule the same way.
11  It was part of the previous, up through April, when -- and
12  assuming that TCS was still in the unit at April, any pie charts
13  that were admitted before and a part of GC 29, can stay; but any
14  other discussion of the TCS unit is not relevant to what we're
15  discussing here.

16     MR. TERRELL:  We will make an offer of proof, if allowed to
17  go forward with this testimony, the Respondent will show that
18  the handling of the pie charts between the parties at the
19  bargaining table over the summer of 2015, which was bargaining
20  TCS that continued after the Union showed no further interest in
21  bargaining, that those pie charts, to the extent that there were
22  errors identified, that those errors were adjusted, and that
23  those pie charts were attached to and made a part of the
24  collective bargaining agreement.  And that's what the testimony
25  will establish -- would establish from Mr. Stokes, if allowed to

1   testify.

2       And he would testify further that Nancy Goldman agreed that

3   they were part of the contract, but that she did not want them

4   in the booklet that was the final product for distribution,

5   because of the cost of attaching the colored pie charts.  That

6   was her booklet to her members and that was her choice.  But the

7   testimony would establish that it was part of the agreement; and

8   the pie charts, in fact, have the names at the top of the pie

9   charts, showing that it is TC Services' pie charts, same format

10  and the only difference is different positions.

11      JUDGE STECKLER:  At what point?

12      MR. TERRELL:  Well, during the final three successful

13  collective bargaining unit negotiations between the same

14  parties.

15      JUDGE STECKLER:  Okay, so that's the TCS bargaining unit,

16  correct?

17      MR. TERRELL:  Oh, and I should also point out also that in

18  GC 6 -- Exhibit GC 6(g), which is the employer's last, best and

19  final offer, the Textile Services pie charts were attached to

20  that proposal as well.

21      JUDGE STECKLER:  Okay, so we've got those, but I don't need

22  to see what was agreed to later by the TCS unit.  It is not

23  relevant to what has been going on, particularly after April.

24  The last, best and final was presented on what date?

25      MS. BURGESS:  March 24th.

1      JUDGE STECKLER:  March 24th.  So what happened after the UC

2  hearing and with the three subsequent negotiations limited only

3  to the TCS unit are no longer relevant to what's going on in

4  this unit.

5      MR. TERRELL:  Respondent respectfully objects to your

6  ruling.

7      JUDGE STECKLER:  I appreciate that you said "respectfully."

8  And I'll give -- and we'll consider that a running objection.

9      MR. TERRELL:  All right.

10 Q    BY MR. TERRELL:  Mr. Stokes, you at the outset described a

11 little bit of your background.

12      Have you written on the subject of collective bargaining?

13 A    Yes, I have written the only book that is tailored to

14 collective bargaining negotiations in the hospitality and

15 restaurant industry.  It was published in 1981 and reviewed by

16 the Hotel School and the Labor Relations School at Cornell

17 University.

18 Q    And with respect to Nancy Goldman and Martin Goff, the

19 negotiators for the Union, had you had previous negotiating

20 experiences with those two individuals?

21 A    Yes, and they asked for another copy of my book during the

22 negotiations, and I gave it to them.

23      MS. BURGESS:  Just for clarification, what is the name of

24 the book?  We'd like to know.

25      THE WITNESS:  "The Collective Bargaining Handbook for

1  Hotels, Restaurants and Institutions."

2       MS. BURGESS:  Okay, thank you.

3  Q    BY MR. TERRELL:  So they knew about your book before this

4  recent session?

5  A    I had given them a copy years before and they asked for

6  another copy during the Kahler negotiations.

7       MR. TERRELL:  Put it in.

8       MR. STOKES:  There it is.

9       MR. TERRELL:  Okay.

10      JUDGE STECKLER:  Are we admitting this into the record?

11      MR. TERRELL:  Pardon me?

12      JUDGE STECKLER:  Are we going to be admitting this into the

13  record?

14      MR. TERRELL:  Yes, Your Honor

15      JUDGE STECKLER:  Thank you.

16      MS. BURGESS:  What number is this, Mr. Terrell?

17      MR. TERRELL:  Fourteen, I believe.

18      COURT REPORTER:  It's not marked yet?

19      MR. TERRELL:  Isn't 14 the next number.

20      COURT REPORTER:  I believe so.

21  (EXHIBIT MARKED:  RESPONDENT'S EXHIBIT NO. 14.)

22  (Witness proffered the document.)

23  Q    BY MR. TERRELL:  Is that your book, Mr. Stokes?

24  A    Yes, it's a copy of it.

25  Q    And you gave a copy of this to Nancy Goldman and Martin

1  Goff during the bargaining?

2  A    On more than one occasion, but they asked for another one

3  during these negotiations, and so we gave them another one.

4  Q    Was there any discussion --

5  A    But I had given them another one years before as well.

6  Q    Okay.

7       MR. TERRELL:  We move into evidence Exhibit R 14.

8       MS. BURGESS:  I don't have any specific objection, but I'm

9  just wondering what the relevance of it is?

10      MR. TERRELL:  It was -- the two negotiating parties, the

11 Union negotiators were aware of the book.

12 Q    BY MR. TERRELL:  And, Mr. Stokes, did you discuss the book

13 or any of the substance of the book with Ms. Goldman and Mr.

14 Goff?

15 A    Yes, and the subject came up when we reiterated something

16 that Nancy Goldman already knew, because we had negotiated

17 before with her.

18      And we look at every collective bargaining agreement from

19 four perspectives:

20      1) Cosmetics:  Is it easy to read by supervisors and by

21 employees and we should make changes to eliminate legalistic

22 language and they agreed to that;

23      2) Legalistics:  Does it comply with the law?  For example,

24 the existing collective bargaining in this case some people will

25 say, race, color, creed, sex, national origin, age, handicapped

1  people  [indiscernible]

2      JUDGE STECKLER:  That's going to be a little too fast.

3      THE WITNESS:  Some people will say in an equal opportunity

4  provision, they'll say race, color, creed, sex, national origin,

5  age -- even often seen height, weight, marital status, privacy,

6  affectual preference.  In listing those subjects in litany, the

7  overwhelming majority of collective bargaining agreements leave

8  out a protected group.

9      So the subject came up in these negotiations because I

10  said, "Look, you've left out pregnancy in this, and that's a

11  protected group in the Minnesota law.  You've left out a few

12  other protected groups under Minnesota, so, therefore, let's

13  just use "We will comply with all equal opportunity laws, state,

14  federal and local," you know that apply to the employer.  And

15  that way, you have a living phrase.  So that's an example of a

16  legalistics.

17      Number 3) Substance:  Does the document reflect the deal

18  that the parties have cut; and

19      Fourth 4) Is it capable of Implementation?

20      We published that in 1981 after negotiating a contract in

21  San Francisco that covered 27,000 people; and we have been

22  using the same method of negotiating every since.  Nancy knows

23  it, Martin knows it, and most of the heads of the various

24  locals, with whom I negotiate, know it.

25  Q    BY MR. TERRELL:  If you would, talk about pie charts in

1   connection with the pie charts in these negotiations, to the

2   extent they were discussed in your book and to the extent you

3   have used them in the past.

4   A       In this particular case, the company made an offer that

5   Martin Goff found confusing, because it basically proposed a

6   different wage compensation program from what the old contract

7   had.  And it proposed basically a two-tiered wage proposal.

8   Starting wages are going to be much higher from what they are,

9   and, therefore, a starting wage recipient would get a

10  substantial increase; whereas, existing employees, according --

11  or as the company had done a survey and made the decision in

12  that regard -- the existing employees would get a smaller wage

13  increase.  It might be zero, it might be very low, it might be

14  low for each year of the collective bargaining agreement.

15      So when Martin said he was confused by that, he then said,

16  "Oh, what you're proposing is a two-tiered wage proposal."  We

17  said, "Yes."  And he said, "I got it."  I said, "But we want --

18  and he's talking about the people sitting at the table, and he

19  had over 10 employees that were on the bargaining committee.

20  And he said, "We want to know how your offer that we view as

21  complex," -- as Mr. Tyler does, apparently.  "We want to know

22  how it applies to real people, to the real members."  And I

23  said, "Fine," I've always been in favor of pie charts.  I've got

24  pie charts in collective bargaining agreements in the Bahamas,

25  in New York, Miama, California, Alaska, you know, I've got pie

1  charts in contracts pretty much all over the United States and a

2  few other countries.  Most unions like it, and Teamsters, in

3  particular.

4      MS. BURGESS:  Objection:  relevance.

5      JUDGE STECKLER:  Yes, we don't need to hear about the

6  Teamsters, Mr. Stokes.

7      THE WITNESS:  Okay, sorry, apologize.

8      So I said, "We'll be happy to give you pie charts that in

9  our estimation quantify what the proposal is we have on the

10  table and how it would apply in a total real wage application to

11  people sitting at the table, and we'll do it for the whole

12  bargaining unit."  And he said, "Fine,"  and we did it.

13  Q    BY MR. TERRELL:  Did the subject of errors or

14  miscalculations with respect to the pie charts come up at the

15  table after the pie charts were presented?

16      MS. BURGESS:  Objection.  I would like to know what period

17  of time or what specific bargaining sessions we're talking about

18  here.

19      JUDGE STECKLER:  Can you clarify, Mr. Terrell?

20  Q    BY MR. TERRELL:  The initial pie charts were produced --

21      MS. BURGESS:  Objection:  leading.

22      MR. TERRELL:  I didn't ask the question yet.

23      JUDGE STECKLER:  Well, he didn't finish the question.  Let

24  him finish the question, please.

25  Q    BY MR. TERRELL:  When were the initial pie charts, to the

P 00849

 1  best of your recollection, introduced at the bargaining table?

 2  A    In March of -- I think it was in March of 2015.

 3  Q    Okay.

 4  A    We had two sessions, in one of those sessions.

 5       And yah --

 6       JUDGE STECKLER:  I'm sorry, he only asked when.  So I know

 7  you've got a lot to say -- Mr. --

 8       THE WITNESS:  Well, I thought it was the question he --

 9       MR. TERRELL:  Well, Your Honor, I had asked the question.

10  I'll phrase it again.

11       THE WITNESS:  I'm sorry.

12  Q    BY MR. TERRELL:  After the initial presentation of the pie

13  charts in March, did the issue of errors and corrections come

14  up?

15  A    Sure.  I've never been in collective bargaining

16  negotiations where there weren't math errors somewhere,

17  spellings errors, syntax errors --

18       MS. BURGESS:  Objection:  relevance.

19       THE WITNESS:  -- grammar errors, whatever.

20       MS. BURGESS:  We're talking about this bargaining session,

21  not what happens in all the other ones.

22       JUDGE STECKLER:  Mr. Stokes --

23       THE WITNESS:  I'm trying to answer.

24       JUDGE STECKLER:  Mr. Stokes, I understand that you have a

25  significant amount of experience in the last 45 years.  I think

1    it would be helpful for all of us if you just discussed what

2    happened in these negotiations.  I know you've had so much

3    experience and you'd like to share that with us, but I think for

4    the purposes of this hearing, we want to hear what happened in

5    this --

6        THE WITNESS:  Well, actually we communicated what I just

7    said to them in the negotiations.

8        I said to them, "We're going to give you these pie charts,

9    and I beg you to cross-examine them, criticize them, correct

10   them.  There are going to be math errors, there can be errors of

11   spelling, there can be errors of job classification, whatever

12   errors you find, please, you know, cross-examine them; because

13   at the end of the day, we want the pie charts attached to the

14   collective bargaining agreement to be efficacious."  And we've

15   done that since 1981, and the process is the same, and I told

16   them that.  And so they said, "Okay," and they made the comments

17   that you have heard, Your Honor, about, "Well, I don't get

18   bereavement pay or I didn't take jury duty pay."  We said,

19   "Please give us every single question, criticism, cross-

20   examination you possibly can, because at the end of the day,

21   that's what these bargainings are all about.  We want the pie

22   charts to be efficacious; and Leslie and Michael will respond to

23   every one of your questions.  They will come to the meeting, you

24   can ask them questions, and they will go back and re-do them;

25   and over and over and over and over again until we get it

P 00851

1    right." I said that in these negotiations to them. Of course,

2    they had known that already because I had negotiated with them

3    already.

4    Q    BY MR. TERRELL: In these negotiations, were errors

5    identified and corrections made?

6    A    Every now and then, somebody -- yah, somebody would point

7    out something, "Well this isn't right for me." And we would

8    give it to Michael, and he'd bring it to Leslie, and they would

9    go, you know, make whatever changes were necessary; but the

10   overwhelming majority, were not.

11   Q    Okay. I want to ask you about the scheduling of the

12   bargaining sessions and starting times and ending times. We've

13   certainly heard testimony here about lateness and leaving early.

14   Could you address that issue, please?

15   A    In terms of lateness --

16        JUDGE STECKLER: Just a second.

17        Do you have a specific date you'd like to ask about?

18        MR. TERRELL: I'm sorry?

19        JUDGE STECKLER: Do you have a specific date that you'd

20   like to ask about rather than open-ended question?

21        MR. TERRELL: No, this is an overview question at this

22   point.

23        JUDGE STECKLER: Okay.

24        MR. TERRELL: And that's the way it's come in from the

25   other side, so --

P 00852

1      MS. BURGESS:  Objection.  That mischaracterizes the

2  testimony from the other side, which was very specific as to

3  each date and the number of minutes to hours that the employer

4  was late at each session; so there wasn't general testimony

5  about it, it was very specific, as yours should be.

6      MR. TERRELL:  In any event, that's my question.

7      JUDGE STECKLER:  Mr. Stokes, you attended six bargaining

8  sessions?

9      THE WITNESS:  Yes, Your Honor.

10      JUDGE STECKLER:  How many bargaining sessions with just

11  this group, not the TCS group by itself, how many bargaining

12  sessions did you attend?

13      THE WITNESS:  Well, the TCS group was there while I was

14  there.

15      JUDGE STECKLER:  No, but then you separately did the TCS,

16  is that right?

17      THE WITNESS:  After -- no, no, not -- during all of the six

18  sessions that I was there, the TCS group was there.

19      The decision by the National Labor Relations Board did not

20  occur until I think the 14th or so of April.  And I didn't

21  attend any sessions in April.

22      JUDGE STECKLER:  Okay, before April, starting in February,

23  you attended sessions?

24      THE WITNESS:  Had six sessions, four in February, two in

25  March and TCS was represented at those sessions.  Sometimes they

1   would come and go.

2       JUDGE STECKLER:  So dealing with February and March, can

3   you give us an idea of what the schedules were like?

4       THE WITNESS:  Yes.  Nancy would communicate with me as to

5   when she was going to show up and whether she was going to be on

6   time or not, and sometimes, she'd say, "We're running a little

7   late."  Sometimes we'd tell her, "We're running a little late."

8   And we would generally start -- we would intend to start around

9   10.  I recommended 9.  Because she was driving from Minneapolis,

10  she always wanted to start at 10, as opposed to 9.  I wanted a

11  full day if we could get in a full day, because I wanted to

12  finish the thing by the end of March, if I could, because the

13  existing contract had expired on March 1, so --

14      JUDGE STECKLER:  Okay.  Well, let's stick with the

15  scheduling issue.

16      THE WITNESS:  So we would exchange calls and sometimes e-

17  mails and so forth about when we were showing up and not showing

18  up and who was going to be late and so forth.  Almost every

19  time, both sides would meet somewhere around 10:30; and

20  sometimes, she would be late and sometimes we would be, quote,

21  "late."

22      MS. BURGESS:  Objection.

23      THE WITNESS:  Many times because of the number --

24      MS. BURGESS:  Objection, Your Honor.

25      THE WITNESS:  -- of people --

 1      MS. BURGESS:  When there's an objection, made -- Your

 2  Honor, would you please instruct the witness.

 3      JUDGE STECKLER:  I think Mr. Stokes is aware of that.

 4      What is the objection?

 5      MS. BURGESS:  The objection is as to a lack of foundation,

 6  first of all.  There's absolutely no dates that have been

 7  mentioned in terms of, "Well, we start generally at 10:30, and

 8  she called" -- I mean, this testimony cannot be helpful to the

 9  record.

10      MR. TERRELL:  Your Honor, it's appropriate testimony.

11      If he's not testifying to a specific date, she can take

12  that up on cross.  This witness is testifying in a more general

13  fashion.  I am going to ask questions about at least one

14  specific date.  There's nothing inappropriate about the

15  generalized or the testimony that he is giving that is

16  applicable generally to the overall progress of the

17  negotiations.

18      JUDGE STECKLER:  Okay.

19      Mr. Terrell, could you start that line of questioning,

20  please?

21  Q    BY MR. TERRELL:  Mr. Stokes, did you at any time propose

22  bargaining on consecutive days to the Union?

23  A    Yes, we proposed from the outset -- look, I was flying --

24      JUDGE STECKLER:  Wait a minute.

25      Why are we talking about proposing consecutive days?

1    MR. TERRELL:  This is a relevant issue, Your Honor.  It has

2  to do with the timing and the parties' ability to move

3  efficiently with sufficient time through the collective

4  bargaining.

5    MS. BURGESS:  And I would object, Your Honor.  I mean,

6  General Counsel was put to the task specifically of identifying

7  the Complaint allegation sections that the testimony that they

8  were offering related to.  Respondent has apparently been held

9  to that same standard.  And this -- the back-to-back sessions

10  has absolutely no relevance to any -- any allegation in the

11  Complaint or overall theory.

12    JUDGE STECKLER:  Which -- let me ask specifically, Mr.

13  Terrell, does it go to a Complaint allegation or does it go to

14  an affirmative defense?

15    MR. TERRELL:  It goes to a Complaint allegation where they

16  generally, vaguely allege that we were late often and left early

17  often.  And what we're trying to show is that by attempting to

18  schedule consecutive back-to-back sessions, that it allows the

19  parties over a concentrated period that is lengthier than a

20  single day to get more done.  And so it is highly relevant to

21  this issue.  The vague allegation in the Complaint is intended

22  to suggest that we really weren't interested in bargaining and

23  that we were giving short shrift and short time to bargaining.

24  And it is highly relevant to establish through this witness

25  that, in fact, we were doing just the opposite by seeking

1  consecutive back-to-back days, where more can get done than can

2  get done in a single day.  When you have single day bargaining -

3  -

4      JUDGE STECKLER:  Well, I think --

5      MR. TERRELL:  -- that is separated by lengths of time, the

6  parties have to in many ways reinvent the wheel to catch up to

7  where they left off the previous --

8      JUDGE STECKLER:  Well, I think we've had enough testimony

9  on that point too.  I think Mr. Henry discussed it, I'm trying

10  to remember whether Mr. Goff was asked on cross, so I think we

11  can move on to the more specific, narrow issue.

12      MR. TERRELL:  So you're sustaining her objection.

13      JUDGE STECKLER:  Yes, sir.

14      MR. TERRELL:  Okay, we object to your sustaining her

15  objection respectfully.

16      JUDGE STECKLER:  Okay, we'll give you a continuing running

17  objection.

18  Q    BY MR. TERRELL:  There has been some testimony about one

19  specific incident on March 24 where at the end of the day, the

20  way it has come in from the other side, that Respondent caucused

21  and the caucus extended over two plus hours.  Do you recall the

22  circumstances of that day?

23  A    I do.

24  Q    What happened?

25  A    We caucused to correct pie charts and to make a complete

1    proposal to them.  And it -- we worked very long and Leslie and

2    Michael, in particular, worked very long putting together the

3    proposal and making the copies necessary.  And we were working

4    the entire time of that caucus.  And then, Nancy commented, we

5    said, "Can you work late today?"  and she said, "No, I'm

6    leaving."

7    Q    What was the most difficult issue during the bargaining

8    from your perspective?

9    A    Compensation of banquet employees.

10   Q    And how did that negotiation --

11        MS. BURGESS:  I'm sorry, I'm sorry.

12        Can you just say that again?  I didn't catch it.

13   Compensation of --

14        THE WITNESS:  Compensation of banquet employees.

15        MS. BURGESS:  Of banquet, okay, thank you.

16   Q    BY MR. TERRELL:  And what was driving the employer's

17   proposal in that regard?

18   A    The employer had done a survey of what other competitors

19   were doing; and, in particular, had studied business that it had

20   lost to Joe Powers, a caterer in Rochester that was paying

21   banquet servers a flat hourly rate; and some of our own banquet

22   servers were working for him.  And he, therefore, could price

23   his banquets cheaper than the hotels could; and, therefore, they

24   lost business in that regard; despite the presentation to the

25   Union by Mr. Henry and Leslie Hohmann concerning the

P 00858

1 mathematical legitimacy of their position.  It's a very

2 difficult issue because -- I was a banquet waiter for 10 years,

3 by the way.  But the banquet servers are generally paid in most

4 big city convention hotels an hourly rate, plus what you might

5 call a piece of the action that many call a "service charge."

6 Some workers call it a "banquet gratuity."  It's an automatic

7 charge that the customer doesn't have any choice as to whether

8 to pay, so it's not a tip.  A "tip" is an acronym "to insure

9 promptness." And so whether to tip, and, if so, in what amount

10 is determined at the customer's discretion.

11  Banquet servers get hourly rates at many big convention

12 hotels, plus they get a percentage of what the actual banquet

13 was.  So, for example, some big city banquet workers will make

14 80 to $200,000 a year, working 37 and a half hours a week.  That

15 system of compensation was in place at -- under this collective

16 bargaining agreement.  And management felt substantively that

17 they could do better competitively if they paid banquet servers

18 by the hour.  I had actually negotiated an hourly rate contract

19 with the General President of the Hotel Union, of Unite HERE

20 years before at a hotel in California.

21  So they said, "Why can't we negotiate a flat hourly rate?"

22 Now that flat hourly rate has got to be higher than say a

23 server's hourly rate or maybe a housekeeper's hourly rate

24 usually.  But that being the case, you're still taking away --

25 it's a take-back, and it's a very substantial take-back.  And

1  the reason it's a most difficult issue is no person at the

2  bargaining table wants to sit there and go, "By the way, I'm

3  making an offer that's going to cut out 20 or 30 or 40 or 50

4  percent of your annual income, nobody likes to do that.  But the

5  management had made the decision that they wanted to pay flat

6  hourly rates to their banquet servers just like they pay their

7  cooks, their housekeepers, their front desk people and every

8  other person in the building.  They wanted the same method of

9  compensation.

10      And, unfortunately, in Rochester, it was a major catering

11  competitor that was really getting business from them from the

12  Mayo Clinic and others.  And so that was a problem.  So

13  management made the decision that the final position that

14  management wanted to take at the table was a flat hourly rate

15  for banquets; which meant that the regular banquet servers, that

16  is, the banquet servers whose primary job is a banquet server

17  at, say Kahler Grand; not the part-time banquet that are working

18  at 4 -- 5 different hotels and catering services.  The regular

19  banquet servers that for years  have worked getting a piece of

20  the action -- their income would be hurt dramatically.

21      That was -- if I had to pick one issue, this is the most

22  difficult.  That was the most difficult issue because it was a

23  major --

24      JUDGE STECKLER:  I'm sorry to interrupt --

25      THE WITNESS:  -- take-back.

1      JUDGE STECKLER:  -- Mr. Stokes.  This has been kind of

2  going on a little while, a long narrative.

3      Mr. Terrell, do you have a new question.

4      MR. TERRELL:  Yes.

5      THE WITNESS:  I'm sorry.

6  Q    BY MR. TERRELL:  With respect to the -- shall we say the

7  tone of the negotiations, on a scale from civil and incurious to

8  heated and contentious, how would you characterize from your

9  perspective these negotiations?

10     MS. BURGESS:  Objection:  relevance.

11     THE WITNESS:  In comparison to 45 years of bargaining --

12     MS. BURGESS:  Objection:  relevance.

13     THE WITNESS:  -- it was very civil.  People were very civil

14  to one another.

15     JUDGE STECKLER:  I'm going to allow the answer.  He's

16  already answered.

17  Q    BY MR. TERRELL:  The collective bargaining agreement

18  expired, as established in the record, February 28, 2015.  Were

19  there any discussions --

20  A    Well, technically, 12:01 a.m. on March 1.

21  Q    Okay.  Was there any discussion at the table concerning the

22  effect of that termination of the --

23  A    Nancy Goldman asked if we would agree to an extension of

24  the extension that Nancy had previously negotiated in 2014 with

25  people in management, and the position of management was "no."

1    And she -- and so she said --

2        JUDGE STECKLER:  Is that what was said to her?

3        THE WITNESS:  So she said, "Therefore, I can strike, right

4    and there's no contract, right."

5    Q    BY MR. TERRELL:  I want to show you a document and ask you

6    to identify it.

7        Do we have more than two of these?

8    (Pause.)

9        THE WITNESS:  There are probably some more in those boxes.

10   You might have to dig down.

11       MR. TERRELL:  Your Honor, I --

12       THE WITNESS:  Michael, I think you'll have to look through

13   the boxes and you'll see that they are in there somewhere.  You

14   have to pull all the papers out and then they are probably at

15   the bottom of one of those stacks.

16       JUDGE STECKLER:  Let's go off the record for a moment.

17   (Off the record.)

18       JUDGE STECKLER:  Okay, we're back on the record.

19   Q    BY MR. TERRELL:  Mr. Stokes, we've heard a lot of testimony

20   about -- I would call it "entrenched positions of the parties."

21   Did the Union ever declare impasse or refer to impasse?

22       JUDGE STECKLER:  Stop right there.

23       MS. BURGESS:  Objection.

24       JUDGE STECKLER:  I think we discussed earlier we're not

25   going to discuss impasse.  I appreciate your efforts -- I know,

1   but impasse is not at issue here.  So let's not go there.

2        MR. TERRELL:  I think I'm done.

3        MS. BURGESS:  Oh, my gosh.

4        JUDGE STECKLER:  Okay.

5        I guess we need to take a -- how long do you need?

6        MS. BURGESS:  Yes, just about 10 minutes.  I'd like to use

7   the restroom and just consult briefly.

8        JUDGE STECKLER:  Okay, go ahead, and when you come back,

9   I'll go to the restroom.

10       Off the record.

11  (Off the record.)

12       JUDGE STECKLER:  Okay, we're back on the record.

13       Before Ms. Burgess starts her cross, I believe Mr. Terrell

14  had a document to offer.

15       MR. TERRELL:  Right, the Decision and Order by the Regional

16  Director of Region 18 in the Unit Clarification Petition case

17  that has been discussed in this record.  And we offer it.  And

18  Your Honor indicated over the break that you would take

19  administrative notice of the decision.

20       MR. STOKES:  You have to cite it.

21       JUDGE STECKLER:  What's the --

22       MR. TERRELL:  It's case 18-UC-145757.

23       JUDGE STECKLER:  What's going to be the number, the

24  Respondent's --

25       MR. TERRELL:  It will be Respondent's -- whatever is the

1  next number.  R-14.

2      JUDGE STECKLER:  Okay.  Respondent's 14 is admitted.

3      MS. BURGESS:  Yes, no objection, Your Honor.

4      MR. WIESE:  I know we're on one attorney and one witness

5  rule, but I believe we already have an R 14 in the record.

6      COURT REPORTER:  Oh, we do.

7      MS. BURGESS:  Yes, I think it's the book, Mr. Stokes' book.

8      COURT REPORTER:  Oh, I'm sorry.

9      JUDGE STECKLER:  Oh.

10      MS. BURGESS:  This would be R 15 then.

11      COURT REPORTER:  It is.

12      JUDGE STECKLER:  It's R 15, okay -- corrected.

13      COURT REPORTER:  Yes.

14      JUDGE STECKLER:  Okay, the UC decision has been renumbered

15  to R 15.  R 14 is Mr. Stokes book, which has not been offered,

16  so R 15 is admitted.

17  (EXHIBIT RECEIVED:  RESPONDENT'S 15.)

18      MR. TERRELL:  Oh, I do wish to offer -- I did offer

19  beforehand R 14, the book.

20      MS. BURGESS:  No objection to the extent it was handed

21  across the bargaining table, no objection.

22      JUDGE STECKLER:  Well, what's the relevance, just that they

23  got it?  Are we going to be looking at anything --

24      MR. TERRELL:  And it was discussed, you know, including the

25  concepts in the book.

1     JUDGE STECKLER:  Are we using -- are we going to be taking

2   any notice of what Mr. Stokes' philosophy is based on the book

3   in a brief?

4     MR. TERRELL:  Possible.  I haven't written the brief yet.

5     JUDGE STECKLER:  I know you haven't written the brief yet,

6   but I'm just thinking -- trying to think ahead, because it's a

7   hefty document.

8     MR. TERRELL:  That's true.

9     MS. BURGESS:  I'd be willing to stipulate that the parties

10  discussed the concepts in the book, and those are the employer's

11  approaches to bargaining contracts of this nature.  I mean, I

12  think that's probably what they want to get in the record.

13    JUDGE STECKLER:  Is that a correct assumption?

14    MS. BURGESS:  Not that I wouldn't love a copy of the book.

15    MR. TERRELL:  Then you shall have one.

16    THE WITNESS:  You already gave her one for free.

17    JUDGE STECKLER:  In terms of offering it, I am just

18  thinking is it something that you need other than to say that it

19  was offered and given to the --

20    MR. TERRELL:  You know, it's really hard for me to answer

21  that until I get down to the task of the writing of the brief.

22  So we would like it in now.

23    JUDGE STECKLER:  Well, since Ms. Burgess has no objection,

24  I'm going to allow it in.

25  (EXHIBIT RECEIVED:  RESPONDENT'S 14.)

1      MR. TERRELL:  Thank you.

2      JUDGE STECKLER:  And I guess I've got something to read at

3  the airport.

4      Okay, so that's R 14 is in and R 15, the UC Decision is in.

5      MS. BURGESS:  Can I proceed.

6      JUDGE STECKLER:  Yes, please.

7      MS. BURGESS:  Okay.

8                      CROSS-EXAMINATION

9  Q    BY MR. BURGESS: Good afternoon, Mr. Stokes.

10 A    Good afternoon.

11 Q    Let's see, I'm going to have you take a look really quick

12 at Joint Exhibit 1.  Just want to get clear on --

13 A    I'm sorry, I couldn't hear a word you said.

14      You're going to have me do what?

15 (Witness proffered document.)

16 Q    I just want to have you take a look at Joint Exhibit 1.

17      Can you just identify for me so I'm very clear as to which

18 dates you were present for the bargaining between the parties?

19 A    February and March.

20 Q    Okay, so --

21 A    I said before.

22 Q    So February 5th, 13th, 26th ---

23 A    All the dates in February, all the dates in March.

24 Q    -- 27th, 16th and 24th?

25 A    Correct.

1    Q    Okay, But no dates after that with respect to this

2    contract.   I understand you bargained the TCS contract.

3    A    And no dates before that.

4    Q    Okay.

5    A    Of those negotiations.

6    Q    Okay, just for my edification, when did the bargaining for

7    the TCS contract occur?  What month?

8    A    I thought we weren't supposed to talk about that.

9    Q    I just want to know the dates.  I'm not asking about the

10   substance of the discussions, I just want to know the dates, if

11   you know.

12   A    There were three dates.  We ended up signing a contract in

13   August I believe it was, and I don't remember the exact dates,

14   but we can certainly find those records.

15   Q    Okay.

16   A    Do you need to know about those bargaining -- those

17   negotiations as well?

18   Q    I just wanted to know what the dates were, but you said you

19   signed a contract in August.

20   A    I think we signed the contract in August, and you have a

21   copy of what was offered, but not received, so it would have the

22   date on that.

23   Q    Okay.

24   A    The original was signed on that day.

25   Q    So you, I understand, have been -- actually, it just became

1  clear to me that you have been practicing law for one year

2  longer than I've been alive, 45 years?

3  A    I already told you --

4       JUDGE STECKLER:  Let's not go there.

5       THE WITNESS:  I already told you that I was an old guy.

6  I'm 69 years old and I've been practicing since I was 23.

7  Q    BY MS. BURGESS:  Okay, 1970, right?

8  A    1970 is when I was admitted to the bar.

9  Q    Okay.

10      I have a couple questions about the banquet server issue

11  that you referenced.

12  A    Sure.

13  Q    Isn't it true that both Joe Powers -- well, Joe Powers is

14  not a hotel operator, right, it's just a banquet provider?

15  A    I think you're correct.  I do not know Joe Powers and I've

16  never been to a Joe Powers' catered event, so everything I know

17  is from what my client and people across the table told me.

18  Q    Okay.

19  A    But I think you're correct,  he's a caterer only.

20  Q    Okay.  And the same is true of --

21  A    Apparently, as cheap caterer too.

22  Q    The same is true of Canadian Honker, right?  They -- that's

23  a restaurant.

24  A    I don't know anything about Canadian Honker, except what I

25  heard at the table.

1  Q    Okay, but to your knowledge, they don't also own hotels

2  like the Kahler?

3  A    Yes, ma'am, I think you're correct.

4  Q    Thank you, thank you.

5       Let's see, now in terms of the pie charts, you indicated

6  that you anticipated there would be a number of problems with

7  the accuracy of the pie charts, and there always is, is that

8  right, when you're doing individualized pie charts?

9  A    Well, there's always the problem with inaccuracies in all

10  collective bargaining negotiations, and that's why I said

11  whether it's grammar, syntax, you know, "None of the horses is

12  for sale," not, "None of the horses are for sale." There are

13  errors made in English, grammar, syntax in every single

14  negotiation.  And to -- proofreading is like -- drives you nuts.

15  Q    Yes, and I get that, thank you.

16  A    Pie charts is just one --

17       MS. BURGESS:  Your Honor --

18       THE WITNESS:  Pie charts is just one aspect.

19       JUDGE STECKLER:  Mr. Stokes --

20       MS. BURGESS:  Mr. Stokes --

21       THE WITNESS:  So when you say I anticipate the pie charts,

22  I anticipate all errors.

23       MS. BURGESS:  Right, I understand that, but I want to focus

24  --

25       THE WITNESS:  You know, not just pie charts.

675

1   Q    BY MS. BURGESS:  I want to focus, if we could, just for a

2   minute on just the pie charts.

3        So you anticipated that there would be problems, in

4   addition to all these other problems with the pie charts, and

5   that there would need to be corrections.

6   A    I just wanted to tell the truth and the whole truth, not

7   just part truth.

8   Q    That's something --

9   A    And what I'm telling you is I did not sit down and go,

10  "Aha, I anticipate there are going to be problems with the pie

11  charts."  I anticipate both sides are going to make technical,

12  substantive, silly, stupid errors, and I'm guilty as well, about

13  everything in collective bargaining negotiations.

14  Q    Okay, and that included errors with the pie charts.  Would

15  you agree with that?

16  A    Yes, ma'am, it certainly did.

17  Q    Okay.  And some of those errors we've talked about, like

18  the inclusion of jury duty for everyone every year, and the

19  inclusion of bereavement pay for everyone every year.

20  A    I don't accept that as an error.  People have testified to

21  that, and I've heard that, and I heard people say, "I didn't

22  make jury duty pay."  In quantifying the total remuneration of

23  wages, benefits --

24       MS. BURGESS:  Okay, Your Honor, I'm going to object.  This

25  is a "yes" or "no."

P 00870

1    MR. TERRELL:  Your Honor, is answering the question.  She -

2    -

3    THE WITNESS:  I'm answering your question.

4    MS. BURGESS:  No, I asked if those were the issues --

5    THE WITNESS:  You --

6    (Simultaneous conversation.)

7    JUDGE STECKLER:  Nobody is getting heard.  Stop for a

8    moment.

9    MS. BURGESS:  Your Honor, I wasn't asking if he agreed, I

10    was asking if those were issues that were identified at the

11    bargaining table as errors in these documents.  I don't care if

12    he agrees that should be or should not be included.  I just want

13    to know if those were errors that were identified with these pie

14    charts.

15    JUDGE STECKLER:  So it requires only a "yes" or "no"?

16    MS. BURGESS:  That's correct.

17    JUDGE STECKLER:  Okay, Mr. Stokes, do you want to answer.

18    MR. TERRELL:  The witness is entitled to explain his

19    answer.

20    THE WITNESS:  Your Honor, it's not -- I have to explain,

21    because I've sworn to tell the whole truth

22    JUDGE STECKLER:  Yes, and Mr. Terrell can come back and

23    question on redirect.

24    THE WITNESS:  If you'll read the "costing the contract"

25    section of my book --

1       JUDGE STECKLER:  Mr. Stokes, I've made a ruling here.

2       THE WITNESS:  All right.

3       JUDGE STECKLER:  And Mr. Terrell --

4       THE WITNESS:  Very well, Your Honor.

5       JUDGE STECKLER:  -- will come back and bring that up, I

6  assume.

7       MS. BURGESS:  Okay.

8  Q    BY MS. BURGESS:  So let's just run by that one more time.

9       My question was whether those specific issues were

10  identified as problems.  I'm not asking if you agree that they

11  are problems, I'm asking if the Union identified those as

12  problems with the pie charts?

13  A    The Union, as a generic entity, did not.  Human beings at

14  the table -- when you said "the Union," no, the answer to your

15  question is no.

16  Q    So did Martin Goff identify that as a problem?

17  A    Let me just answer your question.

18  Q    No, this is my question.

19  A    The Union as an entity, did not.

20       JUDGE STECKLER:  Mr. Stokes, I think you answered her

21  question when you said "no."  So please give her an opportunity

22  to finish her next question.

23  Q    BY MS. BURGESS:  Did Martin Goff identify those two issues

24  as problems with the pie charts?

25  A    Only after a worker did, as it applied --

1    Q    Okay, but he did also.

2    A    -- to him or her.

3    Q    That's fine, but he did also.  Do you agree with that?

4    A    He chimed in.

5    Q    Okay, okay.

6         Now I think we've identified that several of the pie charts

7    contained decreases in wages.

8    A    I don't accept that.

9    Q    Well, let's take a look at General Counsel's 10.

10   (Witness proffered the document.)

11   Q    Directing your attention to 10(i), for example, General

12   Counsel Exhibit 10(i), in 2018 -- and I'm just going to ask you

13   if I'm reading this correctly.

14        In the year 2015, for Richard Lammers, bell, his wage rate

15   was 10.39; and then in 2019, his wage rate is 10.26.  Did I read

16   that correctly?

17   A    Forgive me a second.

18        So 10(i) is what year -- you're looking in --

19   Q    I'm looking at year 2019.

20   A    Okay.

21   Q    Did I read this correctly?  Is his wage 10.39 in that year?

22   A    10.39?

23   Q    Yes.

24   A    You viewed it correctly --

25   Q    Thank you.

1    A    --- to the extent that Leslie Hohmann explained it.

2    Q    And then in 2020, is his wage rate listed on your pie chart

3    10.26?

4    A    1020?

5    Q    In 2020, year 2020, the following year.

6    A    Right.

7    Q    Is his wage rate 10.26?

8    A    The net --

9    Q    No, no, no, I'm asking you if the wage rate --

10   A    -- total real wage.  No, ma'am.

11   Q    -- that I'm reading on here is correct?

12   A    You're mistaken, the net real wage result is 10.26.

13   Q    Okay.

14   A    And she factored that in because of the health care

15   increases resulted in a net, but his actual hourly rate, if you

16   looked at his paycheck, his hourly rate would not have been

17   lower than that.  This was pie chart that said, "Okay, how does

18   this apply --

19        MS. BURGESS:  Objection, Your Honor.

20        THE WITNESS:  --  and it --

21        MS. BURGESS:  Completely non-responsive.

22        JUDGE STECKLER:  Let me ask you --

23        THE WITNESS:  We did not propose a wage rate of 10.26.

24        JUDGE STECKLER:  Mr. Stokes, can I ask you a question.

25        THE WITNESS:  Yes.

680

1          JUDGE STECKLER:  I'm on page 6 of GC Exhibit (i), and

2     you're giving me this explanation, if I'm a regular employee in

3     the hotel, how am I supposed to interpret this?

4          THE WITNESS:  That's a great question.

5          JUDGE STECKLER:  And kind of keep it narrow.

6          THE WITNESS:  I've only had this question like 5 million

7     times across the table.  It's a great question.

8          They are supposed to interpret the truth.  And if we say,

9     "Your hourly rate is "X," but we're raising your health care

10    premium to "X + 2" and it makes the net result of your hourly

11    rate to go down, we've got to tell them the truth.  So the net

12    result is that when you add everything together, that hourly

13    rate goes down, just like Leslie Hohmann explained it.  But it's

14    not the hourly rate that's listed --

15    Q    BY MS. BURGESS:  Is it your testimony here --

16         MR. TERRELL:  Your Honor --

17         THE WITNESS:  -- here, but --

18         JUDGE STECKLER:  I'm sorry, Ms. Burgess, let him go ahead.

19         THE WITNESS:  Let me just say one thing.

20         The hourly rate that would be listed as the hourly rate for

21    that person would be the hourly rate that not necessarily 10.26,

22    but Leslie did was say, "Here's the totality of everything, the

23    plus's and the minus's, and this is going to cause this one to

24    appear to go down."  But that's a good question.  So the workers

25    actually said that, they said, "Well, this is a decrease, isn't

P 00875

1  it?" Yes, it is a decrease and the Union specifically said to

2  me, "If you make the health care increases go up, then whatever

3  their rate is has got to go down because they are paying more

4  out of their pocket here, and so, therefore, their rate goes

5  down." And I said, "Yes, you're right."

6  Q    BY MS. BURGESS: Is it your testimony that you discussed

7  these specific pie charts and the specific decreases with the

8  Union at the bargaining table?

9  A    My testimony is this --

10 Q    This is a "yes" or "no." Did you discuss --

11 A    When a worker -- when --

12     MR. TERRELL: Objection, Your Honor. She is interrupting

13 the witness before he even gets started.

14     MS. BURGESS: No, I'm asking --

15     JUDGE STECKLER: I think where we're going with this, Ms.

16 Burgess asked you a "yes" or "no" question. Mr. Terrell can ask

17 for further explanation on redirect.

18     MR. TERRELL: Your Honor, I'm objecting to the fact that

19 she is interrupting him halfway through his initial sentence.

20     JUDGE STECKLER: Well, he's -- what's --

21     MS. BURGESS: He's not responding to my question is the

22 problem, Your Honor.

23     JUDGE STECKLER: I understand Mr. Stokes has a lot of

24 experience that he'd like to share with us, however, it may be

25 best coming from you, Mr. Terrell on a redirect when Ms. Burgess

1    is asking "yes" -- "no" questions.

2        So maybe to help us out, Ms. Burgess, as you start the

3    question, would you say "yes" or "no," blank

4        MR. TERRELL:  Your Honor --

5        THE WITNESS:  The truth is the issue did come up.  I don't

6    remember --

7        JUDGE STECKLER:  Well, Mr. Stokes, there's not a question

8    out right now.

9        THE WITNESS:  I don't remember whether it was this person -

10   -

11       JUDGE STECKLER:  Mr. Stokes --

12       MS. BURGESS:  Your Honor, it's bordering on contemptuous

13   conduct here.

14       JUDGE STECKLER:  What Ms. Burgess is asking for is just a

15   "yes" or "no" answer.  And then Mr. Terrell can come back on

16   redirect and get your explanations.

17       THE WITNESS:  Right.  And all I'm saying is, yes, the issue

18   came up --

19       JUDGE STECKLER:  Wait, stop.

20       THE WITNESS:  -- but I don't know whether it came up with

21   this person.

22       JUDGE STECKLER:  Okay, so that's the answer.

23       We went off -- just a second, I want to make sure that this

24   is on the record.

25       We went off the record for a moment so that the Court

1    Reporter could remind us that we can't all talk at one time.

2    It's a well-taken suggestion, so let's all try to keep our cool.

3    And that's a legal term, by the way.

4         So, Mr. Stokes, it sounds like she is planning to ask you a

5    series of yes or no's; and if you could keep your answer to

6    that, and then Mr. Terrell will bring out your explanations on

7    redirect.

8         Is that --

9         THE WITNESS:  I will do everything in my power to do that,

10   Your Honor, but I have sworn to tell the whole truth, not just

11   part truth.

12        JUDGE STECKLER:  I understand that, and you'll have that

13   opportunity with Mr. Terrell on redirect.

14        Are you saying you -- you're giving me a smile.  It's

15   making me a little nervous here.

16        THE WITNESS:  I'm saying this:  I have heard a lot of

17   people in the years that I've been trying cases say, "Answer

18   'yes' or 'no' -- 2 plus 2 is 4, yes or no?"  It's hard to find

19   another kind of question though than a mathematical question.

20   If I'm sworn to answer her question and she says "Are you saying

21   that this issue was brought up at the bargaining table?"  If

22   she's referring to this human being, I would say, "I don't

23   remember that."

24        JUDGE STECKLER:  And you've got -- you were holding GC

25   Exhibit 10(i) in your hand.

1    THE WITNESS:  Yes, I was holding (i) in my hand, thank you.

2    And I don't know whether Richard Lammers, bell, brought it

3    up, but the exact issue and example that we talked about was

4    brought up, and Leslie Hohmann answered it.

5    JUDGE STECKLER:  And if you can't answer "yes" or "no,"

6    just please say, "I can't say 'yes' or 'no'" and then Mr.

7    Terrell can bring it up for you.

8    THE WITNESS:  As you can see, I'm having trouble with that,

9    but I'll try.

10    JUDGE STECKLER:  I appreciate that and as I've said, I

11    appreciate that you've got a lot of experience and that you're

12    trying to share your experiences with us, but as an experienced

13    trial attorney, you also know that things will go a lot faster,

14    if you just answer her questions "yes" or "no" --

15    THE WITNESS:  Yes, ma'am.

16    JUDGE STECKLER:  And then let Mr. Terrell do the -- clean

17    up whatever is there, like a clean-up batter.

18    MR. TERRELL:  But, Your Honor, I would add that a question

19    can be posed to call for a "yes" or "no" response, but a "yes"

20    or "no" response may not be appropriate or a true response, so

21    the witness should be allowed to answer, "Yes, but" -- and a

22    qualification.  He's certainly entitled to do that.  It would be

23    unfair to not allow him to "comma, but" and then leave it to me

24    on redirect to try to glean what he was going to say, which I

25    didn't hear.  It is a fallacy to say that every question posed

1    as "yes" or "no" can only elicit "yes" or "no."  It's "yes" or

2    "no" and often qualified.

3        JUDGE STECKLER:  Well, let's do this instead:  Then, Mr.

4    Stokes, you can say "'yes' or 'no' and I have a qualification,"

5    and then you can bring it back.

6        THE WITNESS:  Thank you, Your Honor.  I'll be happy to do

7    that.

8        MR. TERRELL:  I won't know what his qualification is if I

9    didn't hear it.  The witness is here --

10        MS. BURGESS:  Your Honor, objection.

11        MR. TERRELL:  -- to testify.

12        THE WITNESS:  Well, you can write down qualifications --

13    she made a good ruling.

14        MS. BURGESS:  This is a ridiculous colloquy.

15        I am cross-examining the witness.  They are not entitled to

16    allow him to expand.  I am entitled to have him answer my

17    question in the fashion in which I put it to him.  I mean, it's

18    -- there's nothing plainer than that.  This is cross-exam.

19        JUDGE STECKLER:  And that's why we've got to this point to

20    try to --

21        Okay, Ms. Burgess, you can pose your next question, please.

22        MS. BURGESS:  Thank you, Your Honor, thank you, Your Honor.

23    Q    BY MR. BURGESS:  Mr. Stokes, isn't it true that it was not

24    the employer's intent to propose wage decreases for any

25    employee?

1   A    Yes, that's true.

2   Q    Thank you.

3   A    Except for banquet employees.

4        MS. BURGESS:  Objection.

5        JUDGE STECKLER:  No, Mr. Stokes, we just discussed --

6        MS. BURGESS:  No, that's fine.  That's fine.  Except for

7   banquet employees, I understand their proposal with respect to

8   banquet employees was to eliminate the service charge that was

9   shared with banquet employees, so that's fine.

10  Q    BY MS. BURGESS:  So you indicated that there were

11  corrections made to the pie charts where there were --

12  A    I'm sorry, there were what made?

13  Q    Corrections.

14  A    I'm sorry, just a little deaf.

15  Q    Corrections made to pie charts where there were errors,

16  correct?

17  A    Well, I didn't make any corrections to --

18  Q    Did your bargaining team --

19  A    -- any pie charts.

20  Q    -- Leslie -- did she make corrections to the pie charts

21  that were in error?  She did --

22  A    I think Leslie --

23  Q    -- you testified.

24  A    -- and Michael heard what workers said --

25       MS. BURGESS:  Objection.  It's a "yes" or "no".

1      THE WITNESS:  -- and modified pie charts.  Whether they are

2    called "corrections," it's your judgment.  I didn't do any math

3    for those pie charts.

4    Q    BY MS. BURGESS:  So the employer modified pie charts where

5    there were errors made?  Is that your testimony?

6    A    At the bargaining table, a couple.

7    Q    Okay.  However, can you point to any documents in the

8    record which correct the pie charts where there were wage

9    decreases that we just discussed?  For example, pie chart 10(i)

10   was a revised pie chart for 10(i) ever created, and, if it was,

11   I would like it to be produced right now, because it's not in

12   our possession.

13   A    I think the record will speak for itself.  I have no idea

14   whether there was -- I know we gave them two or three sets of

15   pie charts and I don't know whether this particular one, 10(i),

16   said one thing on the first batch we gave them and one thing on

17   the batch that you've got in front.

18   Q    Okay.  And it should be in the record --

19   A    But I know this, the Union had at least two sets.

20   Q    Your testimony is that it should be in the record, if there

21   was such a document.  You are not sure, but it --

22   A    No, I'm not saying that.

23   Q    But it should be in the record.

24   A    I'm saying I don't know.  You asked on 10(i).  I don't know

25   what the Union did with the first batch that we gave them.  The

P 00882

1    second batch, which I believe is the batch you're asking me

2    about --

3        MS. BURGESS:  Objection.  That's not responsive to my

4    question.

5        THE WITNESS:  So I don't know.

6        JUDGE STECKLER:  I'd like to hear the answer.

7        Go ahead.

8        THE WITNESS:  I don't know whether 10(i) shows a difference

9    from the one that was first given and this one; or even if there

10   was a previous version of this one.

11   Q    BY MS. BURGESS:  So you don't know if 10(i) was ever

12   corrected?

13   A    I haven't -- I don't accept your premise of your question.

14   Q    Or modified.

15   A    Changed.

16   Q    You don't know if --

17   A    Yah, I don't know.

18   Q    -- 10(i) was ever changed.

19   A    I don't know.

20   Q    And would the same be true for every single pie chart that

21   showed a decrease, you don't know if they were modified?

22   A    I do not know --

23   Q    Okay, thank you.  Thank you.

24   A    -- whether they were modified, that's true.

25   Q    That's responsive.  Thank you.

1     MS. BURGESS:  I don't have anything further, Your Honor.

2     THE WITNESS:  Wait a minute.

3     JUDGE STECKLER:  Mr. Terrell?

4     What?  Are you disappointed?

5     THE WITNESS:  I want more questions.

6     JUDGE STECKLER:  I'm glad to see you  have a sense of

7  humor, Mr. Stokes.

8     You want more questions?  Mr. Terrell, you're back up.  Ask

9  him a few questions, please.

10     MR. TERRELL:  I think he got out what he wanted to get out

11  with those questions.

12     JUDGE STECKLER:  So you have no more redirect?

13     MR. TERRELL:  I have no redirect.

14     THE WITNESS:  Well, they're conspiring -- everybody's

15  conspiring against me.

16     JUDGE STECKLER:  After this is over, you can go to the

17  Marriott bar and discuss it with Mr. Terrell.

18     I have no questions either, Mr. Stokes.  I'm sorry to

19  disappoint you.  And I appreciate your testimony today.

20     You know the drill about the sequestration, so I'm not

21  going to repeat it to you.

22     And you may step down.

23  (Witness excused.)

24     JUDGE STECKLER:  And we'll go off the record for a moment.

25  (Off the record.)

690

1        JUDGE STECKLER:  We're back on the record.

2        Mr. Terrell,  is this the close of your case?

3        MR. TERRELL:  Yes, Your Honor, we have no further

4    witnesses.

5        JUDGE STECKLER:  Does General Counsel have any rebuttal

6    witnesses they would like to call?

7        MR. WIESE:  No, Your Honor.

8        JUDGE STECKLER:  I think you guys made a land speed record

9    here, in spite of what we thought, we thought we were going to

10   be going 4 days, and we're closing now.

11       Give me a moment to check my calendar for setting dates of

12   briefs, and let's go off the record on that point.

13   (Off the record.)

14       JUDGE STECKLER:  We'll be back on the record.

15       We've had some off-the-record discussions about making sure

16   that all exhibits were admitted and that the Court Reporter had

17   all copies necessary to proceed.

18       Based on our off-the-record discussions, Respondent's 2 has

19   been broken up into two parts.  Part 1 is admitted.  Part 2

20   consists of pages 52 to 69, and is being put into the Rejected

21   Exhibits file.

22   (EXHIBIT RECEIVED:  RESPONDENT'S 2(PART 1).)

23   (EXHIBIT REJECTED:  RESPONDENT'S 2(PART 2).)

24       MR. TERRELL:  And if I may explain for the record, Your

25   Honor, R 2 is the TCS Collective Bargaining Agreement.  It was

1  admitted in evidence during Linda Henry's testimony.  Your Honor

2  reserved on attaching or keeping the pie charts as part of that

3  exhibit and was offered as part of that exhibit.  And then in

4  Mr. Stokes' examination, you ruled and we objected to your

5  ruling, but you ruled that he would not be allowed to testify

6  concerning the pie charts being a part of the TCS CBA.  And so

7  the pie chart portion of that CBA is going into the Rejected

8  Evidence file and will be marked as a Rejected Exhibit.

9      JUDGE STECKLER:  Yes, that is correct.

10     MR. WIESE:  The exhibit was offered during Ms. Henry's

11 testimony, it wasn't entered into evidence.

12     JUDGE STECKLER:  Okay.

13     MR. TERRELL:  No, it was -- the CBA was offered.

14     JUDGE STECKLER:  It was offered, yes, but I had not

15 accepted it yet.  But, regardless, at this point, R 2 is entered

16 into evidence as Part 1.  R 2, Part 2, is in the Rejected file.

17     MR. WIESE:  And that's from pages 52 onward, is that right?

18     COURT REPORTER:  It's pages 52 through 69.

19     MR. WIESE:  Okay.

20     JUDGE STECKLER:  Okay.

21     Approximately, how many pages of transcript do we have,

22 Sandy?

23     COURT REPORTER:  Seven hundred.

24     JUDGE STECKLER:  Thank you.

25     I will prepare and file with the Board my decision in this

1    proceeding.  A copy will be served on each of the parties.

2        You are reminded to refer to the Board's rules and

3    regulations for information regarding the filing of briefs and

4    proposed findings for my consideration and regarding procedures

5    before the Board after the issuance of a Judge's decision.

6        Now that all the evidence is in, you have a better

7    opportunity to assess your chances regarding the outcome of the

8    issues that you had at the outset of the hearing.

9        All parties should weigh carefully the risks entailed and

10   decide whether an amicable settlement can be reached on these

11   issues and whether it might offer a more satisfactory solution.

12       And I don't -- Mr. Terrell, I saw you twist your head.   I

13   don't know if that's just an automatic "no" or your neck --

14   you've got a crick.

15       MR. TERRELL:  It's a "no."

16       JUDGE STECKLER:  It's a "no."

17       MR. TERRELL:  At this point, we'll certainly consider it.

18       JUDGE STECKLER:  Okay.

19       I will allow  until January 21, 2015, which is 35 days from

20   today, for the filing of briefs and any proposed findings and

21   conclusions.

22       Briefs should be filed directly with the Judge's Division

23   in Washington, D.C., regardless of whether they are e-mailed or

24   filed.

25       Any requests for an extension of time for filing of briefs

1   should be directed to Deputy Chief, Arthur Amchan in the

2   Washington Division of Judges, and should be served on all other

3   parties.  The positions of other parties regarding the extension

4   should be obtained and set forth in the request.

5       It is the policy of the Division of Judges to grant

6   discretionary extensions only when they are clearly justified.

7   Requests of extensions must contain specific reasons and show

8   that the requesting party cannot reasonably meet the current

9   deadline.

10      Anything further before we go off the record.

11      MR. TERRELL:  No, Your Honor.

12      MR. WIESE:  No, Your Honor.

13      JUDGE STECKLER:  Thank you for your professionalism.

14      There being nothing further, the trial is now closed.

15      We're off the record.

16  (Whereupon, at 6:48 p.m., the trial in the above-entitled matter

17  concluded.)

18

19

20

21

22

23

24

25

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

P 00888

1                    C E R T I F I C A T E

2        This is to certify that the attached proceedings before the

3    National Labor Relations Board, Region 18, Case 18-CA-151245,

4    Richfield Hospitality, Inc., as managing agent for Kahler

5    Hotels, LLC and Unite HERE International Union Local 21, in

6    Rochester, Minnesota, on December 17, 2015, was held according

7    to the record, and that this is the original, complete and true

8    and accurate transcript that has been compared to the recording,

9    at the hearing; and that the exhibits are complete and no

10   exhibits received in evidence or in the rejected exhibit files

11   are missing.

12

13              *Sandra Moberg Walls*

14              Sandra Moberg Walls

15              Official Reporter

16

17

18

19

20

21

22

23

24

25

# OFFICIAL REPORT OF PROCEEDINGS
## before the
# NATIONAL LABOR RELATIONS BOARD

### Volume 1 of
## GENERAL COUNSEL EXHIBITS

In the Matter of:

RICHFIELD HOSPITALITY, INC. AS
MANAGING AGENT FOR KAHLER HOTELS, LLC,

        Respondent,

and                                    Case No. 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21,

        Charging Party.

| Party: | GENERAL COUNSEL 1-3, 5, 6(a) |
|---|---|

Date:      December 15-17, 2015

Place:     Rochester, Minnesota

### Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

**GC 1(a) - 1(a)**

EXHIBIT NO._____RECEIVED__✔__REJECTED_____

CASE NO. **18-CA-151245** CASE NAME ____**Richfield**____

NO. OF PAGES __**54**__ DATE __**12/15/15**__ REPORTER ___**SMW**___

P 00891

## INDEX AND DESCRIPTION OF FORMAL DOCUMENTS

**CASE:**    **RICHFIELD HOSPITALITY, INC. AS MANAGING AGENT FOR KAHLER HOTELS, LLC**
**18-CA-151245**

GENERAL COUNSEL'S EXHIBIT 1(a)    Charge in 18-CA-151245 filed April 29, 2015

1(b)    Affidavit of Service of 1(a) dated April 30, 2015

1(c)    First Amended Charge in 18-CA-151245 filed August 20, 2015

1(d)    Affidavit of Service of 1(c) dated August 21, 2015

1(e)    Second Amended Charge in 18-CA-151245 filed September 1, 2015

1(f)    Affidavit of Service of 1(e) dated September 1, 2015

1(g)    Complaint and Notice of Hearing dated September 3, 2015

1(h)    Affidavit of Service of 1(g) dated September 3, 2015

1(i)    Respondent's Answer to Complaint received September 17, 2015

1(j)    Order Changing Location of Hearing dated October 1, 2015

1(k)    Affidavit of Service of 1(j) dated October 1, 2015

1(l)    Amended Complaint dated November 25, 2105

1(m)    Affidavit of Service of 1(l) dated November 25, 2015

1(n)    Respondent's Answer to Amended Complaint received December 9, 2015

1(o)    Index and Description of Formal Documents

P 00892

GC 1(o)

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC.,
AS MANAGING AGENT FOR KAHLER
HOTELS, LLC                                        Case No.: 18-CA-151245

      and

UNITE HERE INTERNATIONAL UNION
LOCAL 21

---

## ANSWER TO AMENDED COMPLAINT

## DATED NOVEMBER 25, 2015

COMES NOW, the above named Respondent and hereby affirms the responses, answers, denials and affirmative defenses to the original Complaint served in this case, and hereby further responds to the additional enumerated allegations set forth in the Amended Complaint and Notice of Hearing dated November 25, 2015, as follows:

4.    With respect to the four (4) additional individuals named, Respondent denies that Adcox, Essar and Jeffrey LNU are supervisors or agents within the meaning of Sections 2(13) and 2(11) of the Act, and denies that Decker is a supervisor, but may be for limited purposes an agent within the meaning of the Act.

12(i).  Denied.

12(j).  Denied.

12(k).  Denied.

12(l).  Denied.

12(m).  Denied.

Respondent further denies any and all allegations in the Complain and Amended Complaint, except to the extent expressly admitted.

WHEREFORE, Respondent respectfully requests that the Complaint and the Amended Complaint be dismissed with prejudice.


Dated: This 9th day of December 2015.

                              STOKES WAGNER HUNT MARETZ &
                              TERRELL


                              By: /s/ Karl M. Terrell
                                  Karl M. Terrell
                                  1201 W. Peachtree Street
                                  Suite 2400
                                  Atlanta, Georgia 30309
                                  Telephone: (404) 766-0076
                                  Facsimile: (404) 766-8823
                                  kterrell@stokeswagner.com

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC.,
AS MANAGING AGENT FOR KAHLER
HOTELS, LLC                                          Case No.: 18-CA-151245

     and

UNITE HERE INTERNATIONAL UNION
LOCAL 21

_____

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the Answer to Amended Complaint Dated November 25, 2015 was electronically filed with Region 18 and counsel for petitioner below:

Marlin O. Osthus                          Nancy Goldman
Regional Director                         312 Central Avenue
National Labor Relations Board            Suite 444
Region 18                                 Minneapolis, MN 55414-4544
Federal Office Building                   ngoldman@here17.org
212 3rd Avenue South, Suite 200
Minneapolis, MN 55401
marlin.osthus@nlrb.gov


Dated: December 9, 2015.


/s/ Karl M. Terrell_____

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC. AS
MANAGING AGENT FOR KAHLER HOTELS,
LLC

       and                                Case 18-CA-151245

UNITE HERE INTERNATIONAL LOCAL 21

**AFFIDAVIT OF SERVICE OF: Amended Complaint (with forms NLRB-4338 and NLRB-4668 attached)**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on November 25, 2015, I served the above-entitled document(s) by **certified or regular mail,** as noted below, upon the following persons, addressed to them at the following addresses:

MICHAEL HENRY                    **CERTIFIED MAIL, RETURN RECEIPT**
KAHLER HOSPITALITY GROUP       **REQUESTED**
20 SW 2ND AVENUE
ROCHESTER, MN 55902

KARL M. TERRELL                   **REGULAR MAIL**
STOKE WAGNER HUNT MARETZ &
   TERRELL, ALC
ONE ATLANTIC CENTER
1201 W PEACHTREE ST NW SUITE 2400
ATLANTA, GA 30309-3471

MARTIN GOFF                      **CERTIFIED MAIL**
UNITE HERE INT'L LOCAL 21
312 CENTRAL AVE Ste 444
MINNEAPOLIS, MN 55414-4544

| | |
|---|---|
| November 25, 2015 | Olga Bestilny, Designated Agent of NLRB |
| Date | Name |

Signature

P 00896

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

7014 2870 0000 5180 2117

Sent To MICHAEL HENRY
Street & Apt. No. RICHFIELD HOSPITALITY INC. as
or PO Box No. MANAGING AGENT FOR KAHLER
City, State, ZIP+4 20 SW 2ND AV. Rochester MN    HOTELS, LLC
55902

PS Form 3800, July 2014    See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

7014 2870 0000 5180 2100

Sent To MARTIN GOFF UNITE HERE INTL LOCAL 21
Street & Apt. No. 312 Central Av Ste444 Mpls 55414-
or PO Box No.                                        4544
City, State, ZIP+4

PS Form 3800, July 2014    See Reverse for Instructions

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MICHAEL HENRY
KAHLER HOSPITALITY GROUP
20 SWAND AVE.
ROCHESTER, MN 55902

CA 15 1245 / TWICH AMENDED CPT

2. Article Number
(Transfer from service label)          7014 2870 0000 5160 2117

PS Form 3811, July 2013          Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
Josephine Ewell                11/27/15

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

   [postmark: SECTIO ROCHEST NOV 27 2015]

3. Service Type
   ☒ Certified Mail® ☐ Priority Mail Express™
   ☐ Registered      ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)          ☐ Yes

P 00898

UNITED STATES POSTAL SERVICE
ST PAUL MN 551

First Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

28 NOV 2015 PM 5 T

• Sender: Please print your name, address, and ZIP+4® in this box •

RECEIVED
NLRB REGION 18
2015 NOV 30    AM 9:17
MINNEAPOLIS, MINN.

UNITED STATES GOVERNMENT
National Labor Relations Board
Region 18
Federal Office Building
212 3rd Ave South, Suite 200
Minneapolis, MN 55401-2657

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC. AS MANAGING
AGENT FOR KAHLER HOTELS, LLC

and                                                    Case 18-CA-151245

UNITE HERE INTERNATIONAL UNION LOCAL 21

## **AMENDED COMPLAINT**

UNITE HERE International Union Local 21 (the Union) having filed a charge in
Case 18-CA-151245 alleging that Richfield Hospitality, Inc. as Managing Agent for
Kahler Hotels, LLC (Respondent) has been engaging in unfair labor practices as set
forth in the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq.; a Complaint
and Notice of Hearing having issued on September 3, 2015, scheduling a hearing to
begin at 9:00 a.m. on December 15, 2015; and an Order Changing Location of Hearing
having issued on October 1, 2015, setting the hearing in Conference Room 3103A in
the Olmstead County Government Center, 151 Fourth Street S.E., Rochester,
Minnesota, the General Counsel, by the undersigned, pursuant to Section 10(b) of the
National Labor Relations Act (the Act) and Section 102.15 of the Rules and Regulations
of the National Labor Relations Board (the Board), issues this Amended Complaint
alleging that Respondent has violated the Act as described below.

1.(a)  The charge in this proceeding was filed by the Union on April 29, 2015, and
a copy was served by regular mail on Respondent on about that same date.

P 00900

GC \ (1)

(b)  The first amended charge in this proceeding was filed by the Union on August 20, 2015, and a copy was served by regular mail on Respondent on about that same date.

(c)  The second amended charge was filed by the Union on September 1, 2015, and a copy was served by regular mail on Respondent on about that same date.

2.(a)  Respondent is a Colorado corporation and a Minnesota limited liability company and is engaged in the business of providing hospitality services at four hotels in the Rochester, Minnesota area (The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area Hotel, Kahler Inn & Suites, and Residence Inn Rochester Mayo Clinic).

(b)  During the past calendar year, Respondent, in conducting its operations described above in subparagraph (a), derived gross revenues in excess of $500,000.

(c)  During the past calendar year, Respondent, in conducting its operations described above in subparagraph (a), purchased and received at its Rochester, Minnesota area hotels goods and services valued in excess of $50,000 directly from suppliers located outside the State of Minnesota.

(d)  At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

3.  At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

4.  At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and/or agents of Respondent within the meaning of Section 2(13) of the Act:

2

| Michael Henry | - | Human Resources Representative |
| Mary Kay Costello | - | Human Resources Representative |
| Chad Decker | - | Human Resources Representative |
| Robert Ulrich | - | Head Chef |
| Mattie (last name unknown) | - | Restaurant Manager |
| Josipa Jerkovic | - | Housekeeping Manager |
| Crystal Adcox | - | Housekeeping Manager |
| Seth Essar | - | Sous Chef |
| Jeffrey (last name unknown) | - | Maintenance Manager |

5.  Since about April 2015, Respondent has interfered with, restrained or coerced employees in the exercise of rights guaranteed in Section 7 of the Act by engaging in the following acts and conduct:

(a)  In about April 2015, the exact date being unknown, Respondent, by Restaurant Manager Mattie (last name unknown), at the Rochester Marriott Mayo Clinic Area Hotel, threatened an employee by stating that she had been instructed to take down Union fliers anywhere outside of the break room.

(b)  About April 2, 2015, Respondent, by Human Resources Representative Mary Kay, at The Kahler Grand Hotel, threatened Union representative Linda Henry, in the presence of employees, that she could not access the maintenance break room at that hotel.

(c)  About April 7, 2015, Respondent, by Housekeeping Manager Josipa Jerkovic, at The Kahler Grand Hotel, threatened Union representative Linda Henry, in

3

the presence of employees, that she could not access the housekeeping break room at that hotel.

(d)  About early May 2015, the exact date being unknown, Respondent, by Head Chef Robert Ulrich, at the Marriott Rochester Mayo Clinic Area Hotel, threatened an employee by stating that Respondent was not giving wage increases because the Union had not accepted Respondent's contract offer.

(e)  About June 4, 2015, Respondent, by Human Resources Representative Michael Henry, at The Kahler Grand Hotel, threatened Union representative Linda Henry, in the presence of employees, that she could not access the housekeeping break room at that hotel.

(f)  About June 19, 2015, Respondent, by Human Resources Representative Michael Henry, at The Kahler Grand Hotel, threatened an employee by stating that Respondent was not giving wage increases because the Union had not accepted Respondent's contract offer.

6.(a)  In about February 2015, the exact date being unknown, Respondent first disciplined, then reduced the discipline, of its employee Graham Brandon.

(b)  Beginning about February 27, 2015, Respondent has denied work hours to its employee Kelli Johnson.

(c)  In about March 2015, the exact date being unknown, Respondent discontinued its practice of granting employees step wage increases as provided in the collective-bargaining agreement described below in paragraph 7.

(d)  Respondent engaged in the conduct described above in subparagraphs (a) through (c) because the named employees and other employees joined, supported or

4

assisted the Union, and to discourage employees from engaging in those or other

protected concerted activities.

7. The following employees of Respondent, herein called the Unit, constitute a

unit appropriate for the purposes of collective bargaining within the meaning of Section

9(b) of the Act:

> All full-time and regular part-time employees employed in the job
> classifications and at the hotels listed in Appendix A of the most
> recent collective-bargaining agreement, which is effective by its
> terms from October 1, 2011 through August 31, 2014, between the
> Union and Sunstone Hotel Properties, Inc., as agent for The Kahler
> Grand Hotel, Rochester Marriott Mayo Clinic Area Hotel, and Kahler
> Inn & Suites; and all full-time and regular part-time employees
> employed in the job classifications listed in the Memorandum of
> Agreement, which is effective beginning on May 4, 2012, between
> the Union and Sunstone Hotel Properties, Inc., as agent for
> Residence Inn Rochester Mayo Clinic Hotel; excluding all other
> employees, guards and supervisors as defined in the Act.

8. At all material times, the Union has been the exclusive collective-bargaining

agent of the Unit. This recognition has been embodied in the collective-bargaining

agreement which Respondent and the Union voluntarily extended for an additional six

months follow August 13, 2014, and the Memorandum of Agreement referred to above

in paragraph 7.

9. At all material times, based on Section 9(a) of the Act, the Union has been the

exclusive collective-bargaining representative of the Unit.

10. In about October 2013, Respondent became the employer of the employees

in the Unit.

11. At all material times, the Union has requested that Respondent recognize

and bargain with it as the exclusive collective-bargaining representative of the Unit.

5

12. Since about January 29, 2015, Respondent has failed and refused to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of the Unit, in that:

(a) Beginning about January 29, 2015, and on numerous occasions thereafter, Respondent repeatedly showed up late and/or left early during bargaining with the Union.

(b) Beginning about February 5, 2015, and continuing thereafter, Respondent proposed that employees who take leave to attend a Union convention risked losing their seniority but did not similarly propose that employees who take other types of leave also risked losing their seniority.

(c) Beginning about February 27, 2015, and continuing thereafter, Respondent offered an obscure and contradictory wage proposal.

(d) Beginning about February 27, 2015, and continuing thereafter, Respondent sought to undermine the Union by offering the obscure and contradictory wage proposal referred to above in subparagraph (c), which, in effect, allowed Respondent to have unilateral control over wages; refused to answer questions about this proposal; designed the proposal in such a way that it would be impossible for the Union to administer it as part of a final collective-bargaining agreement; and directed employees in the Unit to review with the Union their individualized wage "pie charts" that were internally inconsistent with the terms of Respondent's final offer.

(e) By email dated April 6, 2015, the Union requested that Respondent furnish it with information concerning the cost of the Union's health care proposal limited to Union employees.

6

(f)  By email dated May 5, 2015, the Union requested that Respondent furnish it with information concerning the cost of Respondent's vacation proposal.

(g)  The information requested by the Union, as described above in subparagraphs (e) and (f), is necessary for, and relevant to, the Union's performance of its duties as the exclusive collective-bargaining representative of the Unit.

(h)  Since about April 6 and May 5, 2015, Respondent has refused to provide the Union with the information described above in subparagraphs (e) and (f).

(i)  Since about March 2015, Respondent has changed its policies regarding Union representatives' access to its facilities.

(j)  Since about March 25, Respondent has changed its policies regarding the posting of Union materials on its bulletin boards.

(k)  The subjects set forth above in paragraph 6, subparagraph (c) and paragraph 12, subparagraphs (i) and (j) relate to employee terms and conditions of employment and are mandatory subjects for purposes of collective bargaining.

(l)  Respondent engaged in the conduct described above in paragraph 6, subparagraph (c) and paragraph 12, subparagraphs (i) and (j) unilaterally and without prior notice to the Union or affording the Union an opportunity to bargain with Respondent with respect to this conduct or the effects of this conduct.

(m)  Since about November 11, 2015, Respondent has failed and refused to bargain with the Union by conditioning further meetings on the Union presenting an acceptable proposal to Respondent.

7

13.  By the conduct described above in paragraph 5, Respondent has been interfering with, restraining and coercing employees in the exercise of rights guaranteed in Section 7 of the Act, in violation of Section 8(a)(1) of the Act.

14.  By the conduct described above in paragraph 6, Respondent has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization, in violation of Section 8(a)(1) and (3) of the Act.

15.  By the conduct described above in paragraph 12, Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees, in violation of Section 8(a)(1) and (5) of the Act.

16.  The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

### ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the amended complaint.  The answer must be **received by this office on or before December 9, 2015, or postmarked on or before December 8, 2015**.  Respondent should file an original and four copies of the answer with this office and serve a copy of the answer on each of the other parties.

An answer may also be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **File Case Documents,** enter the NLRB

8

Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the consolidated complaint are true.

9

Dated:  November 25, 2015

MARLIN O. OSTHUS
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 18
FEDERAL OFFICE BUILDING
212 3rd AVENUE SOUTH, SUITE 200
MINNEAPOLIS, MN 55401

Attachments

10

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

**RICHFIELD HOSPITALITY, INC. AS
MANAGING AGENT FOR KAHLER HOTELS,
LLC**

**and**                                  **Case 18-CA-151245**

**UNITE HERE INTERNATIONAL LOCAL 21**

## AFFIDAVIT OF SERVICE OF ORDER CHANGING LOCATION OF HEARING

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on **October 1, 2015,** I served the above-entitled document(s) by **regular mail** upon the following persons, addressed to them at the following addresses:

MARTIN GOFF
UNITE HERE INTERNATIONAL
    LOCAL 21
312 CENTRAL AVE STE 444
MINNEAPOLIS, MN 55414-4544

MICHAEL HENRY
KAHLER HOSPITALITY GROUP
20 SW 2ND AVENUE
ROCHESTER, MN 55902

KARL M. TERRELL
STOKE WAGNER HUNT MARETZ &
    TERRELL, ALC
ONE ATLANTIC CENTER
1201 W PEACHTREE ST NW SUITE 2400
ATLANTA, GA 30309-3471

| | |
|---|---|
| October 1, 2015 | Olga Bestilny, Designated Agent of NLRB |
| Date | Name |
| | *Olga Bestily* |
| | Signature |

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC. AS
MANAGING AGENT FOR KAHLER HOTELS,
LLC

           **and**

UNITE HERE INTERNATIONAL LOCAL 21

Case 18-CA-151245

## ORDER CHANGING LOCATION OF HEARING

    **IT IS HEREBY ORDERED** that the location of the hearing in the above-entitled matter, scheduled for 9:00 AM on December 15, 2015 and consecutive days thereafter, is changed from the NLRB Hearing Room in the Federal Office Building, 212 3rd Ave South, Suite 200, Minneapolis, Minnesota, to **Conference Room 3103 in the Olmsted County Government Center, 151 Fourth Street SE, Rochester, Minnesota**.

    Dated:  October 1, 2015

_____
MARLIN O. OSTHUS
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 18
FEDERAL OFFICE BUILDING
212 THIRD AVENUE SOUTH, SUITE 200
MINNEAPOLIS, MN 55401-2657

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC.,
AS MANAGING AGENT FOR KAHLER
HOTELS, LLC                                    Case No.: 18-CA-151245

     and

UNITE HERE INTERNATIONAL UNION
LOCAL 21

_____

## ANSWER

COMES NOW, the above named Respondent and hereby responds to the enumerated allegations in the complaint and notice of hearing, as follows:

1(a)-(c).        Respondent lacks sufficient information to fully respond to the allegations in paragraphs in 1(a)-(c), and therefore denies same and requests presentation of proof at the hearing by submission of the records demonstrating filing and service.

2(a)-(d).        Admitted.

3.                Admitted.

4.                Admitted.

5(a)-(f).        Respondent denies, with respect to each alleged incident, the occurrence of any threats, or the occurrence of interference, restraint or coercion.

6(a).            Respondent shows discipline was issued and that it was subsequently modified, but denies the occurrence of any interference, restraint or coercion, and denies that the discipline was in any manner intended to discourage, had a tendency to discourage, or in fact discouraged union membership.

6(b).            Denied.

6(c).    Respondent shows that the dollar-amount increases in the expired CBA which took effect on anniversary dates during the term thereof (incorrectly characterized in the complaint as so-called 'step increases'), were intended as increases only during the terms of the CBA (see third affirmative defense). Per the terms of the expired CBA, the increases ceased upon the expiration of the term, and there was therefore no obligation to bargain over the discontinuance.

6(d).    Denied.

7.    Admitted that this paragraph of the complaint accurately identifies the bargaining unit.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted that the union requested that respondent recognize and bargain with the union as the exclusive bargaining representative, but is unable to admit or deny the qualifier "at all material times," as this phrase is not defined. To that extent, the allegation in paragraph 11 is denied.

12(a).    Denied.

12(b).    Denied.

12(c).    Denied.

12(d).    Denied.

12(e).    Respondent admits an email generally fitting this description was received.

12(f).    Respondent has not been able to identify or locate an email fitting this description.

12(g).    Respondent denies the assertion that it failed to provide relevant information.

2

12(h).        Subject to the response to paragraph 12(g), denied. Relevant responses were provided.

12(i).        Respondent acknowledges the legal proposition that wages are a mandatory subject of bargaining. All other allegations in this paragraph are denied.

12(j).        Denied. It is clear in the expired CBA that the anniversary-date increases were only to occur during the term of the expired CBA. See response, above, to paragraph 6(c) and see the third affirmative defense.

13.        Denied.

14.        Denied.

15.        Denied.

16.        Denied.

## AFFIRMATIVE DEFENSES

1.        The complaint fails to state claims upon which relief can be granted or should be granted.

2.        Some or all of the claims should be dismissed based on the six-month statute of limitations.

3.        The claim asserted in paragraphs 6(c), 12 (i) & (j), 14 and 15 – related to Respondent's discontinuance of the anniversary-date increases set forth in Appendix A to the expired CBA – should be dismissed for the following reasons: At page 23 of the expired CBA, addressing "Duration," i.e., the term, the Agreement states clearly that the wage increases in "Appendix A" (including the anniversary-date wage increases set forth therein) are to be in effect only during the term of that Agreement. The specific language reads: "This Agreement shall be effective as

3

P 00914

of October 1, 2011 and continue in full force and effect to and including the 31st day of August, 2014 . . . Wage increases set forth in Appendix A will be effective on the first full pay period after September 1, 2011, the first full pay period after September 1, 2012, the first full pay period after September 1, 2013." In addition:

- Nowhere in the Agreement is there any language reflecting any understanding or agreement that the anniversary-date increases would continue *after* August 31, 2014;

- There is, also, nothing in Appendix A itself that suggests the anniversary-date increases continue after the increases shown for the third year of the contract;

- The anniversary-date increases in Appendix A are, in fact, expressed in fixed dollar amounts, and therefore cannot be construed as so-called 'step increases;' and

- Nothing in the extension agreement, extending the CBA to February 28, 2015, suggests that the anniversary-date increases were to continue after February 28.

In *Finley Hospital,* 362 NLRB No. 102 (2015), the contract at issue had a one-year term with set wage rates. That contract provided also that "during the term of this Agreement," the employees would receive, on their anniversary date, a "3% increase." Board member Johnson, writing in dissent, was plainly correct in stating: "The meaning of 'during the term of this Agreement' is clear. Once the [employees'] pay has been adjusted, there is neither a contractual nor a statutory duty to keep making further post-expiration adjustments. The status of pay is not dynamic. It has moved from one fixed point to another and stays there upon contract expiration. In fact it would be unlawful for the [employer] to make additional raises unilaterally." *See also,* Finley Hospital, 359 NLRB No. 9 (2012); vacated by *NLRB v Noel Canning* (dissenting opinion). The reasoning and application of law by the two dissenting opinions apply with even greater force in the present case.

4

4.    The Complaint's claims are barred by the doctrines of waiver and estoppel.

5.    Any action or omission by Respondent was in good faith and in conformity and in reliance upon state and federal law.

6.    The Board, its investigators, and its Regional Director, have failed and refused to perform their duties to engage in impartial investigation and attempts to conciliate the parties' disputes.

7.    The Board has failed to conduct a complete and independent investigation into the merits of these charges before issuing this Consolidated Complaint.

8.    Respondent has been denied due process because no ULP was ever filed for one or more of the factual allegations in the Consolidated Complaint.

9.    Respondent has been denied due process because it did not receive sufficient notice of one or more of the factual allegations in the Consolidated Complaint.

10.    One or more of the ULPs brought against the Respondent by the Union were filed beyond the statute of limitations.

11.    Comments expressing views held by Respondent's supervisors and agents are protected by section 8(c) of the Act. Such comments may not be used as evidence of the commission of alleged unfair labor practices.

12.    Respondent reserves the right to assert additional affirmative defenses or defenses of which they become knowledgeable during the course of its further investigation and preparation for the hearing, and during the course of the hearing.


WHEREFORE, Respondent respectfully requests that the Amended Consolidated Complaint be dismissed with prejudice.

P 00916

Dated: This 17th day of September 2015.

STOKES WAGNER HUNT MARETZ & TERRELL

By: /s/ Karl M. Terrell
    Karl M. Terrell
    1201 W. Peachtree Street
    Suite 2400
    Atlanta, Georgia 30309
    Telephone: (404) 766-0076
    Facsimile: (404) 766-8823
    kterrell@stokeswagner.com

6

P 00917

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18


RICHFIELD HOSPITALITY, INC.,
AS MANAGING AGENT FOR KAHLER
HOTELS, LLC                                    Case No.: 18-CA-151245


      and

UNITE HERE INTERNATIONAL UNION
LOCAL 21

_____

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the Answer was electronically filed with Region 18 and

emailed to counsel for petitioner below:

Marlin O. Osthus                    Nancy Goldman
Regional Director                   312 Central Avenue
National Labor Relations Board      Suite 444
Region 18                           Minneapolis, MN 55414-4544
Federal Office Building             ngoldman@here17.org
212 3rd Avenue South, Suite 200
Minneapolis, MN 55401
marlin.osthus@nlrb.gov


Dated: September 17, 2015.


/s/ Karl M. Terrell

_____

Karl M. Terrell


7

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC. AS MANAGING
AGENT FOR KAHLER HOTELS, LLC

and                                                    Case 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21

**AFFIDAVIT OF SERVICE OF: Complaint and Notice of Hearing (with forms NLRB-4338 and NLRB-4668 attached)**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on September 3, 2015, I served the above-entitled document(s) by **certified or regular mail,** as noted below, upon the following persons, addressed to them at the following addresses:

MICHAEL HENRY                          **CERTIFIED MAIL, RETURN RECEIPT**
KAHLER HOSPITALITY GROUP               **REQUESTED**
20 SW 2ND AVENUE
ROCHESTER, MN 55902

KARL M. TERRELL                        **REGULAR MAIL**
STOKE WAGNER HUNT MARETZ &
   TERRELL, ALC
ONE ATLANTIC CENTER
1201 W PEACHTREE ST NW SUITE 2400
ATLANTA, GA 30309-3471

MARTIN GOFF                            **CERTIFIED MAIL**
UNITE HERE INTL LOCAL 21
312 CENTRAL AVE STE 444
MINNEAPOLIS, MN 55414-4544

September 3, 2015                       Olga Bestilny, Designated Agent of NLRB
Date                                   Name

                                       Signature

P 00919
GC 1 (n)

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

7014 5180 0000 2870 1523

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To KAHLER HOSPITALITY GROUP/MICHAEL HENRY
Street & Apt. No., or PO Box No. 20 SW 2ND AV
City, State, ZIP+4 ROCHESTER MN 55902

PS Form 3800, July 2014          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

7014 5180 0000 2870 1530

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To MARTIN GOFF UNITEHEREINTL LOCAL 21
Street & Apt. No., or PO Box No. 312 CENTRAL AV STE 444
City, State, ZIP+4 MPLS MN 55414-4544

PS Form 3800, July 2014          See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

KAHLER HOSPITALITY GROUP
MICHAEL HENRY
20 SW 2ND AVE
ROCHESTER MN 55902

CA 151245 CPTNH/TJW/06

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
Donna Given  9-8-15

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail®  ☐ Priority Mail Express™
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ Collect on Delivery

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)    7014 2870 0000 5180 1523

PS Form 3811, July 2013          Domestic Return Receipt

P 00920

RECEIVED
NLRB REGION 18

2015 AUG 32 AM 10: 54

MINNEAPOLIS, MINN.

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 18

RICHFIELD HOSPITALITY, INC. AS MANAGING
AGENT FOR KAHLER HOTELS, LLC

        and                                Case 18-CA-151245

UNITE HERE INTERNATIONAL UNION LOCAL 21

## **COMPLAINT AND NOTICE OF HEARING**

This Complaint and Notice of Hearing is based on a charge filed by UNITE HERE International Union Local 21 (the Union) against Richfield Hospitality, Inc. as Managing Agent for Kahler Hotels, LLC (Respondent).  It is issued pursuant to Section 10(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board (the Board) and alleges that Respondent has violated the Act as described below.

1.(a)  The charge in this proceeding was filed by the Union on April 29, 2015, and a copy was served by regular mail on Respondent on about that same date.

(b)  The first amended charge in this proceeding was filed by the Union on August 20, 2015, and a copy was served by regular mail on Respondent on about that same date.

(c)  The second amended charge was filed by the Union on September 1, 2015, and a copy was served by regular mail on Respondent on about that same date.

2.(a)  Respondent is a Colorado corporation and a Minnesota limited liability company and is engaged in the business of providing hospitality services at four hotels

P 00922
GC \ (g)

in the Rochester, Minnesota area (The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area Hotel, Kahler Inn & Suites, and Residence Inn Rochester Mayo Clinic).

(b) During the past calendar year, Respondent, in conducting its operations described above in subparagraph (a), derived gross revenues in excess of $500,000.

(c) During the past calendar year, Respondent, in conducting its operations described above in subparagraph (a), purchased and received at its Rochester, Minnesota area hotels goods and services valued in excess of $50,000 directly from suppliers located outside the State of Minnesota.

(d) At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

3. At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

4. At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and/or agents of Respondent within the meaning of Section 2(13) of the Act:

| Michael Henry | - | Human Resources Representative |
| Mary Kay | - | Human Resources Representative |
| Robert Ulrich | - | Head Chef |
| Mattie (last name unknown) | - | Restaurant Manager |
| Josepha (last name unknown) | - | Housekeeping Manager |

P 00923

5. Since about April 2015, Respondent has interfered with, restrained or coerced employees in the exercise of rights guaranteed in Section 7 of the Act by engaging in the following acts and conduct:

(a) In about April 2015, the exact date being unknown, Respondent, by Restaurant Manager Mattie (last name unknown), at the Rochester Marriott Mayo Clinic Area Hotel, threatened an employee by stating that she had been instructed to take down Union fliers anywhere outside of the break room.

(b) About April 2, 2015, Respondent, by Human Resources Representative Mary Kay, at The Kahler Grand Hotel, threatened Union representative Linda Henry, in the presence of employees, that she could not access the maintenance break room at that hotel.

(c) About April 7, 2015, Respondent, by Housekeeping Manager Josepha (last name unknown), at The Kahler Grand Hotel, threatened Union representative Linda Henry, in the presence of employees, that she could not access the housekeeping break room at that hotel.

(d) About early May 2015, the exact date being unknown, Respondent, by Head Chef Robert Ulrich, at the Marriott Rochester Mayo Clinic Area Hotel, threatened an employee by stating that Respondent was not giving wage increases because the Union had not accepted Respondent's contract offer.

(e) About June 4, 2015, Respondent, by Human Resources Representative Michael Henry, at The Kahler Grand Hotel, threatened Union representative Linda Henry, in the presence of employees, that she could not access the housekeeping break room at that hotel.

3

(f) About June 19, 2015, Respondent, by Human Resources Representative Michael Henry, at The Kahler Grand Hotel, threatened an employee by stating that Respondent was not giving wage increases because the Union had not accepted Respondent's contract offer.

6.(a) In about February 2015, the exact date being unknown, Respondent first disciplined, then reduced the discipline, of its employee Graham Brandon.

(b) Beginning about February 27, 2015, Respondent has denied work hours to its employee Kelli Johnson.

(c) In about March 2015, the exact date being unknown, Respondent discontinued its practice of granting employees step wage increases as provided in the collective-bargaining agreement described below in paragraph 7.

(d) Respondent engaged in the conduct described above in subparagraphs (a) through (c) because the named employees and other employees joined, supported or assisted the Union, and to discourage employees from engaging in those or other protected concerted activities.

7. The following employees of Respondent, herein called the Unit, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All full-time and regular part-time employees employed in the job classifications and at the hotels listed in Appendix A of the most recent collective-bargaining agreement, which is effective by its terms from October 1, 2011 through August 31, 2014, between the Union and Sunstone Hotel Properties, Inc., as agent for The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area Hotel, and Kahler Inn & Suites; and all full-time and regular part-time employees employed in the job classifications listed in the Memorandum of Agreement, which is effective beginning on May 4, 2012, between the Union and Sunstone Hotel Properties, Inc., as agent for

4

Residence Inn Rochester Mayo Clinic Hotel; excluding all other employees, guards and supervisors as defined in the Act.

8. At all material times, the Union has been the exclusive collective-bargaining agent of the Unit. This recognition has been embodied in the collective-bargaining agreement which Respondent and the Union voluntarily extended for an additional six months follow August 13, 2014, and the Memorandum of Agreement referred to above in paragraph 7.

9. At all material times, based on Section 9(a) of the Act, the Union has been the exclusive collective-bargaining representative of the Unit.

10. In about October 2013, Respondent became the employer of the employees in the Unit.

11. At all material times, the Union has requested that Respondent recognize and bargain with it as the exclusive collective-bargaining representative of the Unit.

12. Since about January 29, 2015, Respondent has failed and refused to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of the Unit, in that:

(a) Beginning about January 29, 2015, and on numerous occasions thereafter, Respondent repeatedly showed up late and/or left early during bargaining with the Union.

(b) Beginning about February 5, 2015, and continuing thereafter, Respondent proposed that employees who take leave to attend a Union convention risked losing their seniority but did not similarly propose that employees who take other types of leave also risked losing their seniority.

5

(c) Beginning about February 27, 2015, and continuing thereafter, Respondent offered an obscure and contradictory wage proposal.

(d) Beginning about February 27, 2015, and continuing thereafter, Respondent sought to undermine the Union by offering the obscure and contradictory wage proposal referred to above in subparagraph (c), which, in effect, allowed Respondent to have unilateral control over wages; refused to answer questions about this proposal; designed the proposal in such a way that it would be impossible for the Union to administer it as part of a final collective-bargaining agreement; and directed employees in the Unit to review with the Union their individualized wage "pie charts" that were internally inconsistent with the terms of Respondent's final offer.

(e) By email dated April 6, 2015, the Union requested that Respondent furnish it with information concerning the cost of the Union's health care proposal limited to Union employees.

(f) By email dated May 5, 2015, the Union requested that Respondent furnish it with information concerning the cost of Respondent's vacation proposal.

(g) The information requested by the Union, as described above in subparagraphs (e) and (f), is necessary for, and relevant to, the Union's performance of its duties as the exclusive collective-bargaining representative of the Unit.

(h) Since about April 6 and May 5, 2015, Respondent has refused to provide the Union with the information described above in subparagraphs (e) and (f).

(i) The subject set forth above in paragraph 6, subparagraph (c) relates to employee terms and conditions of employment and is a mandatory subject of bargaining for purposes of collective bargaining.

6

(j) Respondent engaged in the conduct described above in paragraph 6, subparagraph (c) unilaterally and without prior notice to the Union or affording the Union an opportunity to bargain with Respondent with respect to this conduct or the effects of this conduct.

13. By the conduct described above in paragraph 5, Respondent has been interfering with, restraining and coercing employees in the exercise of rights guaranteed in Section 7 of the Act, in violation of Section 8(a)(1) of the Act.

14. By the conduct described above in paragraph 6, Respondent has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization, in violation of Section 8(a)(1) and (3) of the Act.

15. By the conduct described above in paragraph 12, Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees, in violation of Section 8(a)(1) and (5) of the Act.

16. The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

## ANSWER REQUIREMENT

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint. The answer must be **received by this office on or before September 17, 2015, or postmarked on or before September 16, 2015**. Respondent should file an original and four copies

7

of the answer with this office and serve a copy of the answer on each of the other parties.

An answer may also be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **File Case Documents,** enter the NLRB Case Number, and follow the detailed instructions. The responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is

8

filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **December 15, 2015**, at **9:00 a.m.**, in the **Federal Office Building, NLRB Hearing Room, Suite 200, 212 3rd Avenue South, Minneapolis, Minnesota**, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint. The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.


Dated: September 3, 2015


/s/ Marlin O. Osthus
MARLIN O. OSTHUS
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 18
FEDERAL OFFICE BUILDING
212 3rd AVENUE SOUTH, SUITE 200
MINNEAPOLIS, MN 55401

Attachments

9

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative.** If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement.** The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.     BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.     DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence:** At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits:** Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered in

P 00931

Form NLRB-4668
(6-2014)

evidence. If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**: An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval. Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion. If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument**: You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**: Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ. The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.   AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations. Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:** If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred. You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request. You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:** In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision. The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**: The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

**RICHFIELD HOSPITALITY, INC. AS MANAGING AGENT FOR KAHLER HOTELS, LLC**

        Charged Party

    and

**UNITE HERE INTERNATIONAL LOCAL 21**

        Charging Party

**Case 18-CA-151245**

## AFFIDAVIT OF SERVICE OF SECOND AMENDED CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on September 1, 2015, I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

MICHAEL HENRY
KAHLER HOSPITALITY GROUP
20 SW 2ND AVENUE
ROCHESTER, MN 55902

KARL M. TERRELL
STOKE WAGNER HUNT MARETZ &
TERRELL, ALC
One Atlantic Center
1201 W Peachtree St NW Suite 2400
Atlanta, GA 30309-3471

September 1, 2015
_____
Date

Shane Hose, Designated Agent of NLRB
_____
Name

/s/ Shane Hose
_____
Signature

P 00933
GC1(f)

Form NLRB - 501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**SECOND AMENDED CHARGE AGAINST EMPLOYER**
**INSTRUCTIONS:**

| | DO NOT WRITE IN THIS SPACE | |
|---|---|---|
| | Case | Date Filed |
| | 18-CA-151245 | September 01, 2015 |

File an original of this charge with NLRB Regional Director in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | b. Tel. No. |
|---|---|
| Richfield Hospitality, Inc. as Managing Agent for Kahler Hotels, LLC | (507)285-2708 |
| | c. Cell No. |

| d. Address (street, city, state ZIP code) | e. Employer Representative | f. Fax No. |
|---|---|---|
| 20 SW 2ND AVENUE, ROCHESTER, MN 55902 | MICHAEL HENRY | (507)285-2793 |
| | | g. e-Mail mhenry@kahlerhospitalitygroup.com |
| | | h. Dispute Location (City and State) ROCHESTER, MN |

| i. Type of Establishment (factory, nursing home, hotel) | j. Principal Product or Service | k. Number of workers at dispute location |
|---|---|---|
| Hotels | Hospitality Services | 250 |

l. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (3), (5) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair labor practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (*set forth a clear and concise statement of the facts constituting the alleged unfair labor practices*)

See Attachment A

3. Full name of party filing charge (*if labor organization, give full name, including local name and number*)
UNITE HERE INTERNATIONAL LOCAL 21

| 4a. Address (street and number, city, state, and ZIP code) | 4b. Tel. No. |
|---|---|
| 312 CENTRAL AVE Ste 444, MINNEAPOLIS, MN 55414-4544 | (612)379-4730 |
| | 4c. Cell No. (612)709-0950 |
| | 4d. Fax No. (612)379-8698 |
| | 4e. e-Mail mgoff@here17.org |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (*to be filled in when charge is filed by a labor organization*)

| 6. DECLARATION I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | Tel. No. (612)379-4730 |
|---|---|
| By: _[signature]_ | Office, if any, Cell No. (612)709-0950 |
| (signature of representative or person making charge)     Nancy Goldman Print Name and Title | Fax No. (612)379-8698 |
| Address: 312 CENTRAL AVE Ste 444, MINNEAPOLIS, MN 55414-4544    Date: 9-1-15 | e-Mail ngoldman@here17.org |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

RECEIVED
NLRB REGION 18

2015 AUG 32   AM 10: 54

MINNEAPOLIS, MINN.

P 00935

## ATTACHMENT A

8(a)(5) allegations:

- During all relevant times, the Employer engaged in bad faith bargaining by repeatedly showing up late to bargaining and leaving early without providing notice to the Union.
- During all relevant times, the Employer engaged in bad faith bargaining by proposing that employees who attend union convention risk losing seniority, without loss of seniority for employees who use other types of leave.
- During all relevant times, the Employer engaged in bad faith bargaining by offering an obscure and contradictory wage proposal.
- During all relevant times, the Employer undermined the union through its wage proposal by, *inter alia*, instructing employees to see individual pie charts to determine their wages, transmitting its wage proposal through voluminous and contradictory wage charts, and refusing to answer certain questions about the its wage proposals.
- Since about March 2015, the Employer unilaterally changed the terms of the expired contract by refusing to continue to provide employees step increases in their wages.
- Since about March 26, 2015, the Employer unilaterally changed its past practice of allowing the union to post notices in various locations by limiting the postings to only specific bulletin boards during negotiations.
- Since about March 26, 2015, the Employer unilaterally changed its past practice of allowing the union representative access to areas throughout its facility.
- On about May 6, 2015, and continuing to the date, the Employer has failed to respond to the Union's request for information about the costs of its vacation proposals.
- On about April 6, 2015, and continuing to date, the Employer has failed to respond to the Union's request for information about the cost of its health insurance proposals for bargaining unit employees.

8(a)(3)/(1) allegations:

- On about February 25, 2015, the Employer issued discipline, then lowered this discipline without removing it, to employee Graham Brandon in retaliation for his union and protected concerted activities.
- Since on or about February 27. 2015, the Employer has been denying working hours to employee Kelli Johnston in retaliation for her union and protected concerted activities.
- Since about March 2015, the Employer has been denying wage increases to employees, in retaliation for their union and protected concerted activities.

8(a)(1) allegations:

- On about June 19, the Employer, through Michael Henry, threatened employees that the Union caused the employee not to receive wage increases because the Union had not accepted the Employer's contract offer.
- In about early May, the Employer, through Robert Ulrich, threatened employees that the Employer was not providing wage increases because the Union had not agreed to its contract offer.
- In about April 2015, the Employer, through its restaurant manager, threatened an employee that the Union could no longer post fliers in its facility.
- On about April 2, 2015, the Employer, through Mary Kay, threatened Union representative Linda Henry that she could not access the maintenance breakroom at the Kahler Grand Hotel, in the presence of employees.
- On about April 7, 2015, the Employer, through its housekeeping manager, threatened Union representative Linda Henry that she could not access the housekeeping breakroom at the Kahler Grand Hotel, in the presence of employees.
- On about June 4, the Employer, through Michael Henry, threatened Union representative Linda Henry that she could not access the housekeeping breakroom at the Kahler Grand Hotel, in the presence of employees.



RECEIVED
NLRB REGION 18

2015 AUG 20  PM 4: 25

MINNEAPOLIS, MINN.



P 00937

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

**KAHLER HOSPITALITY GROUP**

       Charged Party

   and

**UNITE HERE INTERNATIONAL LOCAL 21**

      Charging Party

**Case 18-CA-151245**

## AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on August 21, 2015, I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

MICHAEL HENRY
KAHLER HOSPITALITY GROUP
20 SW 2ND AVENUE
ROCHESTER, MN 55902

KARL M. TERRELL
STOKE WAGNER HUNT MARETZ &
TERRELL, ALC
One Atlantic Center
1201 W Peachtree St NW Suite 2400
Atlanta, GA 30309-3471

| August 21, 2015 | Shane Hose, Designated Agent of NLRB |
|---|---|
| Date | Name |

| /s/ Shane Hose |
|---|
| Signature |

P 00938
GC\ (d)

Form NLRB - 501 (2-08)

| | |
|---|---|
| UNITED STATES OF AMERICA<br>NATIONAL LABOR RELATIONS BOARD<br>**FIRST AMENDED CHARGE AGAINST EMPLOYER**<br>INSTRUCTIONS: | **DO NOT WRITE IN THIS SPACE** |

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 18-CA-151245 | August 20, 2015 |

File an original of this charge with NLRB Regional Director in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | | |
|---|---|---|
| a. Name of Employer<br>**KAHLER HOSPITALITY GROUP** | | b. Tel. No.<br>(507)285-2708 |
| | | c. Cell No. |
| d. Address (street, city, state ZIP code)<br>20 SW 2ND AVENUE,<br>ROCHESTER, MN 55902 | e. Employer Representative<br>MICHAEL HENRY | f. Fax No.<br>(507)285-2793 |
| | | g. e-Mail<br>mhenry@kahlerhospitalitygroup.com |
| | | h. Dispute Location (City and State)<br>ROCHESTER, MN |
| i. Type of Establishment (factory, nursing home, hotel)<br>Hotels | j. Principal Product or Service<br>Hospitality services | k. Number of workers at dispute location<br>250 |

l. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1), (3), and (5) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

    *See Attachment A.*

| | |
|---|---|
| 3. Full name of party filing charge (if labor organization, give full name, including local name and number)<br>UNITE HERE INTERNATIONAL LOCAL 21 | |
| 4a. Address (street and number, city, state, and ZIP code)<br>312 CENTRAL AVE Ste 444, MINNEAPOLIS, MN 55414-4544 | 4b. Tel. No.<br>(612)379-4730 |
| | 4c. Cell No.<br>(612)709-0950 |
| | 4d. Fax No.<br>(612)379-8698 |
| | 4e. e-Mail<br>mgoff@here17.org |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)

| | | |
|---|---|---|
| 6. DECLARATION<br>I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.<br><br>By: _____     MARTIN GOFF<br>(signature of representative or person making charge)    Print Name and Title | | Tel. No.<br>(612)379-4730 |
| | | Office, if any, Cell No.<br>(612)709-0950 |
| | | Fax No.<br>(612)379-8698 |
| Address: 312 CENTRAL AVE Ste 444,<br>MINNEAPOLIS, MN 55414-4544 | Date: August 20, 2015 | e-Mail<br>mgoff@here17.org |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

P 00939

RECEIVED
NLRB REGION 18

2015 AUG 20   PM 4:25

MINNEAPOLIS, MINN.



P 00940

## *ATTACHMENT A*

8(a)(5) allegations:

- During all relevant times, the Employer engaged in bad faith bargaining by repeatedly showing up late to bargaining and leaving early without providing notice to the Union.
- During all relevant times, the Employer engaged in bad faith bargaining by proposing that employees who attend union convention risk losing seniority, without loss of seniority for employees who use other types of leave.
- During all relevant times, the Employer engaged in bad faith bargaining by offering an obscure and contradictory wage proposal.
- During all relevant times, the Employer undermined the union through its wage proposal by, *inter alia*, instructing employees to see individual pie charts to determine their wages, transmitting its wage proposal through voluminous and contradictory wage charts, and refusing to answer certain questions about the its wage proposals.
- Since about March 2015, the Employer unilaterally changed the terms of the expired contract by refusing to continue to provide employees step increases in their wages.
- Since about March 26, 2015, the Employer unilaterally changed its past practice of allowing the union to post notices in various locations by limiting the postings to only specific bulletin boards during negotiations.
- Since about March 26, 2015, the Employer unilaterally changed its past practice of allowing the union representative access to areas throughout its facility.
- On about May 6, 2015, and continuing to the date, the Employer has failed to respond to the Union's request for information about the costs of its vacation proposals.
- On about April 6, 2015, and continuing to date, the Employer has failed to respond to the Union's request for information about the cost of its health insurance proposals for bargaining unit employees.

8(a)(3)/(1) allegations:

- On about February 25, 2015, the Employer issued discipline, then lowered this discipline without removing it, to employee Graham Brandon in retaliation for his union and protected concerted activities.
- Since on or about February 27, 2015, the Employer has been denying working hours to employee Kelli Johnston in retaliation for her union and protected concerted activities.
- Since about March 2015, the Employer has been denying wage increases to employees, in retaliation for their union and protected concerted activities.

8(a)(1) allegations:

- On about June 19, the Employer, through Michael Henry, threatened employees that the Union caused the employee not to receive wage increases because the Union had not accepted the Employer's contract offer.
- In about early May, the Employer, through Robert Ulrich, threatened employees that the Employer was not providing wage increases because the Union had not agreed to its contract offer.
- In about April 2015, the Employer, through its restaurant manager, threatened an employee that the Union could no longer post fliers in its facility.
- On about April 2, 2015, the Employer, through Mary Kay, threatened Union representative Linda Henry that she could not access the maintenance breakroom at the Kahler Grand Hotel, in the presence of employees.
- On about April 7, 2015, the Employer, through its housekeeping manager, threatened Union representative Linda Henry that she could not access the housekeeping breakroom at the Kahler Grand Hotel, in the presence of employees.
- On about June 4, the Employer, through Michael Henry, threatened Union representative Linda Henry that she could not access the housekeeping breakroom at the Kahler Grand Hotel, in the presence of employees.



P 00941

RECEIVED
NLRB REGION 18

2015 AUG 20  PM 4: 25

MINNEAPOLIS, MINN.



# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **KAHLER HOSPITALITY GROUP**<br><br>    Charged Party<br><br>    and<br><br>**UNITE HERE INTERNATIONAL LOCAL 21**<br><br>    Charging Party | **Case 18-CA-151245** |

## AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, state under oath that on April 30, 2015, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

MICHAEL HENRY
RICHFIELD HOSPITALITY
20 SW 2ND AVENUE
ROCHESTER, MN 55902

| | |
|---|---|
| April 30, 2015 | Shane Hose, Designated Agent of NLRB |
| Date | Name |

| | |
|---|---|
| | /s/ Shane Hose |
| | Signature |

GC 1(b)

INTERNET
FORM NLRB-501
(2-08)

FORM EXEMPT UNDER 44 U.S.C 3512

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
CHARGE AGAINST EMPLOYER

| DO NOT WRITE IN THIS SPACE | |
| --- | --- |
| Case | Date Filed |
| 18-CA-151245 | April 29, 2015 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer  Kahler Hospitality Group | | b. Tel. No. 507-285-2708 |
| --- | --- | --- |
| | | c. Cell No. |
| d. Address (Street, city, state, and ZIP code)  20 S. W. Second Ave.  Rochester, Mn. 55902 | e. Employer Representative  Michael Henry  Area Managing Director of HR | f. Fax No. 507-285-2793 |
| | | g. e-Mail  mhenry@kahlerhospitalitygrou |
| | | h. Number of workers employed  250 |
| i. Type of Establishment (factory, mine, wholesaler, etc.)  Hotel/Restaurant | j. Identify principal product or service  Lodging and food/beverage services | |

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 8 (a) 1 & 5                                    of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

**2.** Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Since on or about January 20, 2015 and continuing, the employer has bargained in bad faith, refused to bargain, surface bargained and on numerous occasions has failed to provide information and/or correct information that the Union had requested for the purpose of negotiations.

Since on or about April 16, 2015 the employer has discriminated against Union Negotiating Committee members by not offering job advancements that were made available to others.

*please see Appendix "A"

**3.** Full name of party filing charge (If labor organization, give full name, including local name and number)
Unite HERE Local 21

| 4a. Address (Street and number, city, state, and ZIP code)  312 Central Ave SE  suite 444  Minneapolis, Mn 55414 | 4b. Tel. No. 612-379-4730 |
| --- | --- |
| | 4c. Cell No. 612-709-0950 |
| | 4d. Fax No. 612-379-8698 |
| | 4e. e-Mail  mgoff@here17.org |

**5.** Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*   Unite HERE International Union

| 6. DECLARATION  I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.  By _Martin Goff_  (signature of representative or person making charge)    Martin Goff                          (Print/type name and title or office, if any) | Tel. No. 612-379-4730 ext:14 |
| --- | --- |
| | Office, if any, Cell No.  N/A |
| | Fax No.  same as above |
| Address    312 Central Ave SE suite 444 Mpls, Mn 55414              April 28, 2015  (date) | e-Mail  mgoff@here17.org |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is

**APPENDIX "A"**

Since on or about March 17, 2015 and continuing, the Employer has changed past conditions of employment by removing Union postings from bulletin boards.

Since on or about March 17, 2015, the Employer has discriminated against Union Negotiating Committee members by skipping usual steps in discipline.

Since on or about April 16, 2015 the Employer coerced and intimidated probationary employee[s] by instructing them to remove Union buttons.

Since on or about April 16, 2015 the Employer has changed conditions of employment, by ceasing steps in the pay schedule because there isn't a signed contract extension.

Since on or about April 16, 2015 and continuing, the Employer has discriminated against Union Negotiating Committee members by changing past conditions of employment by not offering available work in various departments.

Unite Here
Local 17

Martin Goff    612-379-4730 Ext: 14

EXHIBIT NO. **GC 2** RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **52** DATE **12/15/15** REPORTER **SMW**

*Execution Copy*

# AGREEMENT

## Between

## Sunstone Hotel Properties, Inc.

## And

## UNITE HERE Local 21 AFL-CIO

## Rochester, Minnesota

## October 1, 2011

## to

## August 31, 2014

**GC Exhibit 2**

*Execution Copy*

## TABLE OF CONTENTS

                                                                        PAGE

ARTICLE 1 RECOGNITION ....................................................................1

ARTICLE 2 UNION SECURITY ...............................................................1

ARTICLE 3 SENIORITY .........................................................................3

ARTICLE 4 PROBATIONARY PERIOD ....................................................6

ARTICLE 5 DISCHARGE OR DISCIPLINE .............................................6

ARTICLE 6 GRIEVANCE AND ARBITRATION PROCEDURE ................7

ARTICLE 7 LEAVES OF ABSENCE ........................................................9

ARTICLE 8 WORKWEEK ......................................................................10

ARTICLE 9 HOLIDAYS .........................................................................13

ARTICLE 10 VACATIONS ......................................................................14

ARTICLE 11 INSURANCE BENEFITS ...................................................16

ARTICLE 12 UNIFORMS AND LAUNDRY ............................................16

ARTICLE 13 BULLETIN BOARDS .........................................................16

ARTICLE 14 WAGES .............................................................................17

ARTICLE 15 HEALTH, SAFETY AND SICK BENEFITS ........................18

ARTICLE 16 PENSION ..........................................................................19

ARTICLE 17 UNITE HERE 401(K) .........................................................19

ARTICLE 18 NO STRIKE OR LOCKOUT ..............................................19

ARTICLE 19 MAINTENANCE TOOL ALLOWANCE ..............................20

ARTICLE 20 DISCRIMINATION ............................................................20

ARTICLE 21 RESPECT & DIGNITY ......................................................20

ARTICLE 22 MANAGEMENT RIGHTS ..................................................21

i

*Execution Copy*

ARTICLE 23 LAUNDRY AND DRY CLEANING WORK STABILIZATION ........................21

ARTICLE 24 SUCCESSORSHIP .................................................................................22

ARTICLE 25 LATERAL SERVICE..............................................................................22

ARTICLE 26 ENTIRE AGREEMENT ..........................................................................22

ARTICLE 27 DURATION...........................................................................................23

SIDE LETTER   ........................................................................................................24

APPENDIX "A"  PAYROLL RATES ........................................................................ A-1

APPENDIX "B" DEPARTMENTS AND SENIORITY SECTIONS........................................B-1

APPENDIX "C"  MAINTENANCE ADDENDUM...........................................................C-1

APPENDIX "D"  HOUSEKEEPING ADDENDUM....................................................... D-1

APPENDIX "E"  BANQUET DEPARTMENT ADDENDUM ................................................E-1

APPENDIX "F"  FOOD AND BEVERAGE ADDENDUM....................................................F-1

APPENDIX "G"  TEXTILE CARE SERVICES ADDENDUM ........................................... G-1

APPENDIX "H"  BELL POSITION ADDENDUM ................................................... H-1

APPENDIX "I"  GUEST SERVICE ...........................................................................I-1

APPENDIX "J"  DRUG AND ALCOHOL TESTING...........................................................J-1

APPENDIX "K"  MUTUAL AGREEMENTS  (CUSTOM, PAST PRACTICE,
                LETTERS OF UNDERSTANDING)........................................... K-1

ii

*Execution Copy*

This Agreement made this 1st day of October, 2011 by and between Sunstone Hotel Properties, Inc., as agent for d/b/a The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites, and Textile Care Services located in Rochester, Minnesota, hereinafter referred to as "Employer," and UNITE HERE Local 21 AFL-CIO, hereinafter referred to as "Union."

WHEREAS, it is the desire of the respective parties hereto to avoid disruption in the service and operation of the units covered by this Agreement and to secure the benefits intended to be derived by the Employer, its employees and the Union under these articles of Agreement, it is agreed by and between the Employer and the Union as follows:

## ARTICLE 1
## RECOGNITION

The Employer above named, for and on behalf of the properties above named, recognizes the Union as the exclusive bargaining representative of all employees of the Employer employed at the above-properties in Rochester, Minnesota listed in the classifications set forth in Appendix A, with respect to wages, hours, and all other working conditions. All other employees, including supervisors, managers, administrative employees and confidential employees, are excluded from the bargaining unit.

## ARTICLE 2
## UNION SECURITY

1.      The Employer agrees not to enter into any contract or agreement with the employees herein, individually or collectively, which conflicts with the terms and provisions hereof.

2.      All employees covered by this Agreement who are now or who may hereafter become members of the Union shall, during the life of this agreement, remain members of the Union in good standing or pay fees in lieu thereof as a condition of continued employment. "In good standing" for the purposes of this agreement is defined to mean the payment as required by the Union of a standard initiation fee and standard regular monthly dues relating to the Union's collective bargaining function, applied uniformly to all members of the bargaining unit covered by this Agreement.

Provided, however, temporary summer employees hired between May 1 and September 30 will be exempt for four (4) months from initiation fees normally charged other employees. It is agreed that these temporary positions shall be posted and that any employees who take a temporary position shall not be restricted from bidding on a regular position should one become available. If such employees are retained past September 30, they will be obligated to pay the initiation fee. Such employees will be entitled to all fringe benefits for which they qualify except seniority and insurance.

3.      Employees hired who average ten (10) hours or more per week in a four (4) week

13826232v.2                                      1

*Execution Copy*

period or who have been working under a work permit shall, as a condition of employment, become and remain members in good standing of the Union or pay fees in lieu thereof after thirty (30) calendar days employment. All such employees averaging over said ten (10) hours shall have all of the benefits under this Agreement except as to insurance benefits, and such employees shall average twenty-five (25) hours or more per week. Provided, however, that employees in tip classifications who average twenty (20) hours or more per week will be covered by the insurance benefits. In determining the average, the weekly average shall be determined the last pay period of each month based upon the previous twenty-six (26) week period. The twenty-six (26) week period shall be a floating period.

4.      The Employer shall update the dues checkoff list provided by the Union on a monthly basis to reflect new hires and terminations.

5.      The Employer and the Union agree not to adopt rules or regulations or to engage in practices that conflict with the express terms of this Agreement.

6.      The Employer shall check off monthly Union dues and initiation fees and/or other required fees in a manner according to procedures agreed upon between the representatives of both parties, upon receipt of written authorization form to deduct Union dues or fees signed by the employee. By the twelfth (12th) of each month the Union must submit to the Employer in duplicate a current list of deductions to be made. The Employer agrees to remit such deductions to the Union by the last Friday of the current month after receipt of deduction list. The date of dues deductions may be changed by agreement between the Employer and the Union.

7.      The Employer will send copies of bargaining unit job postings to the Union which may refer candidates for employment. The Employer shall have no obligation to hire any person so referred.

8.      The designated union representative will be allowed to visit the premises of the Employer for the purpose of administering this Agreement.  The Union representative will provide the Human Resources Director or General Manager with as much advance notice as is possible prior to visiting the facility. Upon arriving at the facility, the Union representative will check in at the office. It is agreed that the work of the employees will not be interrupted by such visits.  Union representatives will not meet with employees during working time without the knowledge and permission of the Employer.

9.      New Member Orientation.  The Union or a designated representative will be provided access to newly hired employees on the Employer's premises, after thirty (30) days of employment, to provide information about this Agreement and the employees' rights thereunder. Such access shall be for up to thirty (30) minutes, once per month, at a mutually agreed upon time and location.

10.     Tip Check-Off – the Employer agrees to honor political contribution deduction authorizations from employees in the following form:

I hereby authorize my Employer to deduct from my pay the sum of $___ per pay period and to forward that amount as my voluntary contribution to the UNITE HERE International Political Committee, 275 Seventh Avenue, New York, N.Y. 10001 ("PAC").  My decision to participate in the UNITE HERE PAC is a

13826232v.2                                                              2

*Execution Copy*

voluntary one and I understand that I am under no compulsion to contribute to it, since such contributions are neither a condition of my continued employment or of membership in the Union. I also understand that this authorization may be revoked by me at any time and that it is automatically revoked upon termination of my employment.

The political contribution deduction shall be made once each month during which an employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within thirty (30) days after the last day of the preceding month to the UNITE HERE International Political Committee, 275 Seventh Avenue, New York, N.Y. 10001, accompanied by a form stating the name of each employee for whom a deduction has been made, and the amount deducted. The parties have taken into account the cost of administration of this deduction in negotiating the wage increases and benefits specified in this Agreement.

The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits, or other terms of liability that may arise out of or by reason of action taken by the Employer to comply with this Article.

ARTICLE 3
SENIORITY

1.    Seniority shall be by section (see Appendix B) and by work location (*e.g.*, The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites, or Textile Care Services), except the banquet department as set forth in the Banquet Department addendum. Employees shall not acquire seniority until they have completed their probationary period; then seniority shall revert to the date of employment.

2.    Where qualifications to perform the available work are equal, layoff and recall will be by seniority as defined in paragraph 3.

When recalling employees who have been laid off because of reduction of work force, the Union shall be notified by the Employer of such employees who are to be rehired. If an employee so notified does not report for work within seven (7) days from the date his notice was mailed by certified mail, he shall forfeit seniority unless he has reasonable excuse for his failure. In the event an employee is employed elsewhere when he/she receives a notice to report for work, the employee shall not forfeit his/her seniority by not reporting unless the Employer gives the employee reasonable assurance of at least three (3) months steady employment. However, the employee must immediately notify the Employer and waive his right to the particular job that is open.

3.    Seniority shall mean continuous length of employment with the Employer in the sections listed in Appendix "B." Any employee transferred or re-employed in another section retains but does not accumulate his seniority in his original section and, in addition, commences seniority in his new section.

4.    Where qualifications are equal, employees shall be promoted within their departments on the basis of seniority. Only when a vacancy occurs or a new position is created can seniority be exercised for purposes of shift preference, days off, and server sections.

13826232v.2    3

*Execution Copy*

5.    Except where rotation is practiced, servers shall be given preferential stations on the basis of seniority, provided that they are sufficiently qualified.

6.    As with permanent job openings under section 7, an employee laid off from his/her section shall have preference based on seniority in hiring over any other applicant for other sections of the Employer, even though it may be in another operation, provided qualifications are equal.  Seniority shall be forfeited on the following grounds:

(a)    Voluntarily leaving the employ of the Employer;

(b)    Discharge for proper cause;

(c)    Layoffs in excess of six (6) months; or

(d)    Failure to report for work after a layoff within a reasonable time, not to exceed seven (7) days, after the Employer has notified employee to report for work, as previously provided.

(e)    Absences for any reason longer than one (1) year, unless a longer period is required by the Americans with Disabilities Act.

7.    Permanent job openings in the classifications covered in this Agreement will be posted for a minimum of five (5) days on the Human Resources bulletin board at the Kahler Grand Hotel and in the break rooms at all other facilities covered by this Agreement to advise employees of the opening.  Employees interested in the position must advise the Human Resources office in writing of their desire to be transferred or promoted to the open position. Where qualifications are equal, the opening will be filled by seniority, adhering to the following preferences:

1st    Employees working in the classification at the property where the opening is available;

2nd    Employees working in the classification at other properties;

3rd    Employees working outside of the classification who have demonstrated the skill or potential ability to successfully perform in the position, and who have notified the Employer of their desire to change classifications;

4th    Employees working outside of the classification.

For purposes of scheduling, employees moving to a new location in the same classification shall move to the bottom of the seniority list.  However, prior classification seniority shall be maintained.  If an employee bids for and receives a permanent job vacancy, he/she cannot bid again for a posted job opening for a period of six (6) months.  The six (6) month limitation will not apply to requests for shift preferences or work schedules within a classification and section.  "Qualifications," as used herein, shall be based on the Employer's reasonable judgment of the applicant's skills, abilities, aptitude, and overall work record. Notwithstanding the foregoing, the Employer may postpone a transfer or promotion where it would leave another department with an insufficient number of skilled employees or an

*Execution Copy*

excessive number of vacancies. Until a permanent job opening is filled, the Employer may use its discretion to select an employee to temporarily fill the opening.

A permanent job opening is a vacancy in a position which is scheduled for fifteen (15) or more hours per week on a regular basis. A permanent job opening will not exist when any person who has a seniority claim on that position is on vacation, sick leave or other leave of absence.

Employees who bid and accept a new position have a thirty (30) day trial period. At the end of the trial period if the employee is unable to meet job requirements or is unhappy in the position, he/she will be returned to the previous position. Either the employee or management may initiate the return. In the event management initiates the return, the employee shall have the right to grieve the decision under the Grievance and Arbitration Procedure contained herein, provided however, the Employer has acted in an arbitrary or capricious manner.

Any regular employee within a classification and section may exercise their seniority as it applies to shift preference schedules and/or days off up to forty (40) hours in a work week. In the Maintenance Departments, new hires may be trained on the day shift for up to thirty (30) days before shift preference can be exercised to displace that employee; provided, however, that there will be an automatic extension of an additional thirty (30) days in the event the Employer believes that additional time is required to determine the employee's ability to work off-shifts. Employees shall not be placed on the third shift until supervisor is satisfied the employee is capable of working alone.

8. The Employer shall furnish a complete up to date seniority list to the Union of all employees covered by this Agreement within thirty (30) days following a request from the Union representative.

9. Re-employment of members of the Armed Forces shall be governed by applicable law.

10. The Employer and the Union shall make every effort to provide work for incapacitated employees returning from the Armed Forces.

11. When an employee is transferred to a position outside the coverage of this Agreement, he/she shall retain seniority for thirty (30) days. At the end of such time, seniority shall be forfeited if the employee retains a position outside the unit.

12. In the event the Employer rehires an employee who has been discharged, such employee shall not be reinstated in accordance with his accumulated seniority unless such action is approved by both the Union and the Employer.

13. Retirees working on an on-call or part-time basis shall receive the benefits of this Agreement except those provided under Article 3 and Article 11.

14. If there is a reposting of a section, the Union will be notified and upon request the Employer will explain the reason for the reposting.

*Execution Copy*

## ARTICLE 4
## PROBATIONARY PERIOD

The first sixty (60) days of employment shall be probationary, during which time an employee may be discharged with or without cause and without recourse to the grievance procedure.  An automatic extension of the probationary period of an additional thirty (30) days will apply at the written request of the Employer, in the event the Employer believes that additional time is required to determine the employee's qualifications.


## ARTICLE 5
## DISCHARGE OR DISCIPLINE

1.      No employee will be disciplined or (except for a probationary employee) discharged without just cause.  In the event a meeting is held for disciplinary purposes, the affected employee shall have the right to have a Union steward and/or Union Business Agent present if the employee so requests.

2.      Warning notices and other disciplinary action which are to become part of an employee's file shall be read and signed by the employee. Such signature shall not be an admission of wrongdoing by the employee.

Copies of all warning notices and all other disciplinary action given to employees will be mailed to the Union without delay.  In addition, it is agreed that if a verbal warning results in a written report by a supervisor for the employee's personnel file, a copy of such notice will be given to the employee.

If an employee avoids disciplinary offenses for a period of eighteen (18) consecutive months, offenses in his/her personal record which preceded that time will not be used as a basis for disciplinary action; such discipline may, however, be introduced in any arbitration proceeding involving the employee.

3.      The Employer may decline to give the employee the name of the complaining party, but must, upon request, divulge such information to the Union after the Union has received a copy of the discipline, which information the Union will keep confidential. The Employer will provide this information to the employee at an arbitration hearing if so directed by the arbitrator.

4.      The Employer shall at reasonable times and at reasonable intervals, upon the request of an employee, permit the employee to inspect such employee's personnel file on the employee's own time.

6

*Execution Copy*

## ARTICLE 6
## GRIEVANCE AND ARBITRATION PROCEDURE

1.      The grievance procedure set forth in this Article is established for the specific purpose of providing prompt and amicable means of settlement of all questions arising under the terms of this Agreement or the application of them. Both the Employer and the Union intend to make every effort to settle grievances quickly and amicably and with a minimum of friction.

2.      An employee may, with or without the assistance of a shop steward, first attempt to resolve workplace disputes with the employee's manager. If not resolved informally, the following shall be the grievance procedure:

**Step 1.** The grievance shall be reduced to writing by the Union Business Agent within twenty-one (21) calendar days from the date of the incident giving rise to the grievance, or within twenty-one (21) calendar days of when the employee reasonably should have had knowledge, and shall be furnished to the Human Resources Director. The written grievance shall set forth the facts giving rise to the grievance, including the dates and persons involved, identify the Agreement provisions violated, and state the relief requested.

**Step 2.** The Union Business Agent and the Human Resources Director shall meet within fourteen (14) calendar days of receipt of the written grievance and attempt to settle the grievance. If the grievance is not settled, the Employer shall issue a written response to the grievance within seven (7) calendar days of the meeting. The Employer's failure to issue a written response within this time period shall be considered a denial of the grievance; provided, however, it is the Employer's intent and it will use its best efforts to provide a substantive written response to the grievance within seven (7) calendar days of the grievance meeting.

**Step 3 (Optional).** If the grievance is not settled at Step 2, the Union Business Agent may appeal the grievance to mediation within seven (7) calendar days from the date of the decision rendered in Step 2 by giving written notice of a request for mediation to the Employer and the Federal Mediation and Conciliation Service (FMCS), Minnesota Bureau of Mediation, or other neutral mediation agency. Mediation shall consist of up to two (2) Employer representatives and up to two (2) Union representatives, and a neutral mediator acceptable to both parties, who shall mediate the dispute in an attempt to have the parties reach a settlement. No attorneys or other consultants may participate in the mediation. The proceedings shall be informal and no formal record of the proceedings shall be made. If no settlement is reached, the mediator shall provide the parties with an immediate written advisory decision of the grievance, including the grounds for such decision. All offers to compromise presented during the mediation, as well as any decision of the mediator, shall be confidential and non-admissible in any subsequent proceedings.

**Step 4.** If the grievance is not settled at Step 3, or if the Union Business Agent chooses to skip Step 3, the Union may submit the matter to arbitration within fourteen (14) calendar days of the date of the mediation or the Employer's written response (or failure to respond) to the grievance by furnishing the Employer with a written request for arbitration and proposing therein the names of three (3) arbitrator(s) acceptable to the requesting party. The Union shall also state in writing the matter to be arbitrated and the relief that is sought. If the parties are unable to

*Execution Copy*

agree upon an arbitrator within fourteen (14) days, the Union shall request the FMCS to submit a panel of seven (7) names. The Employer and the Union shall alternate striking one name from the list submitted until only one name remains. The Union shall take the first strike. The cost of securing the list of arbitrators shall be shared equally between the Employer and the Union.

Arbitration shall be handled in the following manner:

The authority of the arbitrator shall be limited solely to the determination of the matter submitted in writing at the time of request for arbitration. The arbitrator shall not have power to add to, subtract from, or modify in any way the terms of this Agreement. If, during the course of the arbitration hearing, either party introduces any facts which were not introduced during any of the steps of the grievance procedure, the other party shall be granted an extension of hearing upon request.

The decision of the arbitrator shall be made not later than thirty (30) days after the submission of post-hearing briefs, and his/her decision shall be final and binding upon both parties and the employee(s) involved.

Expenses of the arbitrator shall be paid equally by the Employer and the Union. If a court reporter is used, the ordering party shall pay the cost thereof, unless the other party requests a copy of the transcript, in which case the cost of the court reporter and transcript shall be paid equally.

The time limitations set forth herein relating to the time for filing a grievance and the demand for arbitration shall be mandatory. Failure to follow said time limitations shall result in the grievance being permanently barred and waived. The time limitations and/or grievance steps provided for herein may be extended or waived by mutual written agreement between the parties.

3.    Mathematical or mechanical mistakes on a paycheck resulting in an under or overpayment of the employee may be corrected within sixty (60) calendar days of the pay day involved. If an error is discovered, it must be corrected by payment within five (5) business days (Monday - Friday); provided, however, that the Employer will make a concerted effort to make the corrected payment sooner than five (5) business days if possible.

4.    The Union shall advise the Employer of the names of the Union Stewards who shall participate in the grievance procedure and who shall be recognized by the Employer as representatives of the employees for purposes of enforcing this Agreement, and who will generally act as representatives on the job of the Union.

The words "Union Steward" shall mean and refer only to employees who are designated by the Union in writing to the Employer as authorized representatives of the employees of a specific department for grievance procedure purposes. Whenever such authorization is withdrawn as to an individual Union steward or a new Union steward is added to the number of those authorized, the Union shall promptly notify the Employer in writing of such action. The Employer and its representatives shall be fully protected with a Union steward so authorized with respect to any grievance as to which he has at any time purported to represent the aggrieved employee and they need not deal with any Union steward not so authorized.

5.    When a grievance requires the attention of a shop steward during working hours,

*Execution Copy*

he/she shall first secure the permission of his/her supervisor.  The handling of all grievances shall be done during working hours, without any deduction from wages of employees who necessarily attend.  The Union agrees to attempt to minimize any disruption to the Employer's operation

## ARTICLE 7
## LEAVES OF ABSENCE

1.　　Employees may be granted unpaid leaves of absence by the Employer for a period of not more than thirty (30) days.  Leaves of absence in excess of thirty (30) days, and any extensions of leaves beyond the thirty (30) days, shall be put into writing by the Employer and a copy kept by the employee, the Employer and the Union.  Requests for such leaves and extensions shall be made to the employee's immediate supervisor.  However, leaves of absence for illness or injury will be granted upon request for absences not to exceed one (1) year, unless a longer period is required by the Americans with Disabilities Act.

Illness or injury which qualifies for leave under the Federal and Family Medical Leave Act will run concurrently with Family and Medical Leave Act leaves.

Employees who have been employed for at least one (1) year may be granted a leave of absence for educational purposes up to twelve (12) months, provided the leave is used for future employment with the Employer, and is approved by management.

2.　　The Employer agrees to grant necessary time off without pay or loss of seniority rights to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business.  The Union agrees to give in writing two (2) weeks notice to the Employer.  It is agreed that there shall be no disruption of the Employer's operation.

3.　　Any employee who is appointed as a full time Business Representative or is elected to a full time office of the Union, or the International Union, shall be given a leave of absence not to exceed a total of six years.

4.　　Disability leaves of absence for employees will be granted in accordance with the recommendation of the attending physician, not to exceed one (1) year unless a longer period is required by the American with Disabilities Act.  Maternity/paternity leaves will not be granted beyond three (3) months unless supported by the attending physician.

5.　　Failure to report for work at the end of the period of a leave of absence is equivalent to resignation.

6.　　Seniority shall accumulate during the period of leave of absence.

7.　　In the event of the death of a member of an employee's immediate family, he/she will be granted time off from work with pay for up to three (3) consecutive days, one of which must be the day of the funeral.  The employee will be paid for that portion of his/her regular week's work which falls within the above three (3) day period if he/she was, under the terms of this Agreement, scheduled to work.  If bereavement leave occurs during an employee's scheduled vacation, the employee will be permitted to substitute bereavement leave in lieu of vacation time.  The Employer may require an employee to provide proof of death.

13826232v.2

9

*Execution Copy*

Immediate family shall mean the employee's father, mother, father-in-law, mother-in-law, spouse, previously declared (on Employer form) same-gender domestic partner, children, stepchildren, stepparents, guardian, brother or sister, grandchild, son-in-law, daughter-in-law, grandparents, half-brother, stepbrother, half-sister, stepsister, current grandparent-in-law, current brother-in-law and current sister-in-law.

In addition to the foregoing paid leave, an employee will be permitted to take one (1) day of unpaid leave in order to serve as a pallbearer. An employee also may take off up to three (3) days without pay to attend the funeral of an aunt or uncle.

8.      Jury Duty: If a regular employee with seniority is summoned for petit or grand jury service, such employee shall be paid the difference between jury pay and the pay the employee would have earned from the Employer for each day of jury duty which falls on a day on which the employee would otherwise be scheduled to work. If on a day the employee would otherwise be working for the Employer, he or she is released from jury duty prior to the end of his or her scheduled shift, the employee will be expected to return to work as soon as possible. No employee shall be required to perform work for the employer during any twenty-four (24) hour period (11:00 p.m. - 11:00 p.m.) during which the employee is required to be present for a petit jury or grand jury service.

To be eligible for benefits under this section, the employee must endorse and turn over to the Employer the check received for jury duty. All hours spent on jury duty will be credited for purposes of calculating vacation and holiday benefits. The Employer will in turn pay the employee the pay the employee would otherwise have earned on that day. Payment for jury duty service will be limited to a maximum of six (6) calendar weeks for each Agreement year.

9.      The Employer is obligated to continue to provide health insurance benefits during an employee's leave of absence under this Article only to the extent required by law (e.g., FMLA or Minnesota Parental Leave Law).

## ARTICLE 8
## WORKWEEK

1.      The basic work week shall consist of five (5) days, forty (40) hours, and two (2) consecutive days of rest within a seven (7)-day period, starting the first shift on Friday of each week; provided, however, this shall not serve as a guarantee of a minimum number of hours or a minimum number or length of shifts. Time and one-half shall be paid after forty (40) hours worked or paid as an approved holiday or vacation day in any one work week. Time and one-half shall be paid for all hours worked on the sixth (6th) and seventh (7) day in a work week to all employees except banquet servers. However, banquet servers will not normally be required to work a sixth (6th) day until all regular full-time servers have been rescheduled for five (5) days. Double time will be paid after forty-eight (48) hours worked or paid as an approved holiday or vacation day in a work week. Employees recalled from layoff to work on the employee's scheduled days of work will be paid straight time.

Time and one-half is to be paid for any hours worked in excess of eight (8) hours worked in a work day. Provided, however, that daily overtime will not apply to function and on-call employees who work less than four (4) days per week. There shall be no pyramiding of

*Execution Copy*

overtime.

Sick leave, paid or unpaid, will not count for purposes of computing overtime.

By mutual agreement between employees and the Employer, nonconsecutive days off may be scheduled. The nonconsecutive days off schedule will not be binding on any other employee. Irrespective of the foregoing, non-consecutive days off may be scheduled for function and on-call personnel.

2.      Any employee in the maintenance departments who is called from home for an emergency condition shall be given two (2) hours minimum pay at time and one-half for such call-in work. Emergency callbacks will be handled on a seniority basis among employees qualified to correct the emergency. Employees shall be paid for all overtime work and shall not be required to take time off for extra time worked.

3.      Employees in the maintenance departments, housekeepers and Kahler PBX operators shall be paid a premium of fifty cents (50¢) for all hours worked between 10:00 p.m. and 6:00 a.m., except for call-in work.

4.      Employees who work beyond their regular daily schedule in any day shall not be required to take time off later in the work week because of such extra hours. The Employer agrees not to schedule employees for work with less than eight (8) hours between shifts, unless mutually agreed upon by the employee and the Employer; provided, however, that this provision shall not apply to employees working split-shifts pursuant to Article 8, Section 11.

5.      The Employer reserves the right to prepare work schedules and to schedule days off. Work schedules and scheduled days off shall be posted in each department as far in advance as possible, but not later than Monday at 5:00 p.m, prior to the beginning of the work week involved. Employees will have until 5:00 p.m. on Tuesday to contest any discrepancies in the schedule. After 5:00 p.m. on Tuesday, the schedule will not be changed except in emergencies and/or for business needs. When cancelling a scheduled shift, the Employer will attempt, at least two (2) hours before the start of the employee's scheduled shift, to speak with the employee directly by calling the phone number in the employee's personnel file; if the Employer gets the employee's voicemail/answering machine or another person answers, the Employer will leave a message. Work schedules and scheduled days off may be changed without notice in case of emergency and/or for business needs. Any employee who reports to work on his scheduled day off at the request of the Employer will be paid time and one-half for all hours worked on that date. Employees who are scheduled in advance to work one or both of their days off, and calls in sick earlier in the week, shall not be eligible for time and one-half on the scheduled day off. In order to secure time off for a doctor's appointment, employees must provide notice of the appointment at least a week prior to the start of the new schedule, except in cases of emergency.

6.      **Temporary Hours Reductions.** In the event it is necessary to reduce staffing on a short term basis because of low occupancy, the Employer will grant employees, at their request, absent days on a voluntary basis.

7.      New extra or additional employees will not be utilized to prevent regular full-time employees from working forty (40) hours during a work week; provided, however, this does not constitute a guarantee of hours.

*Execution Copy*

8.    Employees shall be granted preferential work schedules and preferential days off in accordance with their seniority within the section and the respective units consistent with the efficient operation of the section.

9.    The following reporting pay guarantees will apply:

(a)    A four (4) hour call-in on an employee's day off and a minimum reporting pay on a regular work day of four (4) hours for all employees normally scheduled to work in excess of twenty (20) hours per week.

(b)    Employees who normally are scheduled for twenty (20) or less hours per week or on-call employees including function personnel will be guaranteed two (2) hours.

(c)    A person-called back after having completed his work shift will receive a minimum of two (2) hours call back pay.

(d)    Split-shift employees will receive a three (3) hour guarantee per shift, however, this guarantee would not apply to those employees who choose to voluntarily leave early.

(e)    Employees scheduled or called in for a training session or mandatory meeting will be paid a minimum of two (2) hours at the appropriate rate of pay.

10.    The senior employees in a classification who are on duty shall be given first preference to work overtime. If senior employees on duty in a particular job classification reject an offer of overtime, the junior employees on duty must perform the overtime work. Involuntary overtime will be assigned based on reverse seniority.

An employee working on his/her regular day shall be required to work overtime before an employee who is working on his/her day off.

11.    Lunch periods will be scheduled for a maximum of thirty (30) minutes for all employees, except for food and beverage employees, who will be expected to take lunch when and to the extent that operations permit.

Meal periods shall be an uninterrupted one-half (1/2) hour for which the employee is not to be compensated. If employees are required to work any portion of the meal period, they shall be paid for the entire meal period. Employees are responsible for clocking in and out at the beginning and end of each thirty (30) minute meal period.

The Employer shall provide meals which are palatable and wholesome at a cost to employees which it determines. Employee meals shall be served under clean and sanitary conditions.

12.    Employees shall be entitled to one (1) fifteen (15) minute break for each four (4) hours of work. It is understood, however, that the Employer reserves the right to schedule the breaks. Employees who work overtime beyond the end of their shift will be entitled to an additional fifteen (15) minute break after each additional two (2) hours of overtime worked.

13.    Textile Care Services shall have the option to schedule a four (4) day work week

13826232v.2

12

*Execution Copy*

using ten (10) hour days in accordance with the following:

The work weeks shall consist of four (4) work days and three (3) scheduled days off.

Two (2) days scheduled off to be consecutive.

Hours in excess of ten (10) in a work day or forty (40) in a work week to be paid at one and a half (1-1/2) times base rate. Hours worked on scheduled days off to be paid at one and a half (1-1/2) times base rate.

When computing holiday pay, participating employees will have average days computed using four (4) days per week to a maximum of ten (10) hours.

When computing vacation pay, participating employees will have average days computed using four (4) days per week. Vacation taken in less than full week increments will be computed based on this average day to a maximum of ten (10) hours.

14.     At Textile Care Services, the Employer agrees to give preference to senior employees in selecting shifts. Where operations permit, the Employer will provide a Textile Care Services driver with fourteen (14) days' notice of any reassignment to a new route.

15.     The Employer shall not require an employee to work alone without a reasonable amount of training as provided and determined by the Employer.

## ARTICLE 9
## HOLIDAYS

1.     The following shall be classified as holidays: Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's Day. Any time worked on those days shall be paid for at double time. Management shall have the exclusive right to determine which holidays are to be worked.

Should one of the foregoing holidays fall on Sunday, it will be celebrated on Monday in Textile Care Services. In all other facilities covered by this agreement, Sunday holidays will be celebrated on that day and paid for accordingly.

Should one of the following holidays fall on Saturday, it will be celebrated on Friday in Textile Care Services. In all other facilities covered by this Agreement, Saturday holidays will be celebrated on that day and paid for accordingly.

2.     Holiday pay will be granted to all employees with established seniority irrespective of the day of the week on which it falls. To qualify for pay, an employee must work his regular scheduled work day before and after the holiday. Pay for holidays for employees not scheduled to work will be based on the average daily hours worked by each eligible employee in the twelve (12) week period preceding the holiday up to a maximum of eight (8) hours. An employee who is scheduled to work on a holiday and then fails to report for work will not receive holiday pay unless the absence is an excused absence.

An employee who is absent on the day before or after the holiday on compensable time

13826232v.2

13

(vacation, paid sick-leave, etc.) will not be disqualified if otherwise eligible for holiday pay. In addition, an excused absence on the day before or day after a holiday will not disqualify an employee from receiving holiday pay.

Such hours paid for will be counted as hours worked for overtime purposes if the holiday falls on an employee's regularly scheduled work day.

Employees with seniority who are normally scheduled to work five (5) days will have designated sixth (6th) and seventh (7th) days and such days will not be changed in holiday weeks to avoid payment of overtime for work on the sixth (6th) and seventh (7th) day of a work week. This does not apply to function employees who work on an on call basis.

3.     If the holiday comes during the employee's regularly scheduled vacation the employee shall have the option to convert vacation pay to holiday pay or to receive an extra day's pay.

4.     An employee receiving sick leave pay on leave of absence shall not receive holiday pay.

5.     Regular full time bartenders shall not suffer a loss of pay due to their inability to work at their usual assignment or a related assignment during scheduled hours on an election day.

6.     Employees with eight (8) or more years of service shall be entitled to one (1) paid personal day. Employees with sixteen (16) or more years of service shall be entitled to two (2) paid personal days. Employees with twenty (20) or more years of service shall be entitled to three (3) paid personal days. The paid personal days are to be scheduled by mutual agreement in advance or to cover uncompensated days of sick leave. The paid personal days must be used within the employee's anniversary year. Eligibility is based upon the employee's anniversary date of employment.

Personal days may be scheduled and taken in advance of the employee's anniversary date, subject to repayment by the employee if the employee does not remain an employee until his/her next anniversary date. Each employee's check stub will reflect the employee's personal day balance.

## ARTICLE 10
## VACATIONS

1.     Employees shall receive vacations at the following rates:

After one (1) year of continuous service -     one (1) work week vacation;
After three (3) years continuous service -     two (2) work weeks vacation;
After nine (9) years continuous service -     three (3) work weeks vacation;
After fifteen (15) years continuous service - four (4) work weeks vacation.

2.     Any employee whose average work week during the vacation year is between thirty-eight (38) and forty (40) hours will be paid vacation pay for forty (40) hours. Any employee whose average work week during the vacation year is less than thirty-eight (38) hours

*Execution Copy*

or more than forty (40) hours will be paid vacation pay equal to his average work week. Time spent by members of the Union Negotiating Committee in negotiations for renewal of this Agreement at the time of its expiration shall be included in computing an employee's average work week.

Employees in the server and bellperson sections shall be given the option to use two (2) hours of their accrued vacation pay for each hour on vacation.

<u>Tipped Employee Vacation Adjustment.</u> In addition to their base hourly rates, tipped employees working in the classifications of doorperson, bellperson, bell captain, all servers in functions, room service and all restaurants and lounges, shall be compensated at the rate of three dollars ($3.00) per hour for all vacation hours taken; effective September 1, 2012, this rate will be increased to three dollars and twenty five cents ($3.25); and effective September 1, 2013 this rate will be increased to three dollars and fifty cents ($3.50). "Base rate" for purposes of this Agreement means the wage rate assigned to the position excluding any premiums or differentials.

Employees shall earn vacation on a biweekly basis prorated in accordance with compensable hours for the pay period. The biweekly pay stub shall show total vacation hours accumulated. Employees will be eligible to receive their vacation benefits as they accrue it each pay period, providing, however, it can be scheduled with the employee's supervisor. A maximum of two (2) years' vacation may be accumulated. Once the employee has accumulated the maximum of two (2) years' vacation entitlement he/she shall stop accumulating additional vacation but shall not lose any vacation accumulated. Accumulation shall resume as soon as the employee uses accumulated vacation.

By mutual agreement, Employees may sell up to forty (40) hours of accrued vacation one time during a calendar year.

3.    Fully earned vacation pay shall be paid in advance of the scheduled vacation if requested by the employee at least two (2) weeks in advance.

4.    A vacation sign-up list shall be posted in each work unit at which time employees will sign for vacation between February 15 and March 31 for the period April 1 of the same year to March 31 of the following year. Thereafter, vacations will be selected on a first come, first serve basis and will not be subject to being bumped. Scheduling of vacation shall be arranged so that the functioning of the department shall not be impaired and shall be subject to the Employer's approval. Vacations can be arranged in one (1)-day increments by mutual agreement between the supervisor and the employee involved.

Vacation requests made over forty-eight (48) hours in advance will be honored whenever reasonably possible. The Employer agrees to affirm or deny in writing the employee's written request for vacation within seven (7) days of receiving such request.

Employees will be permitted to take vacation year round, provided, however, that the Employer may require adequate staffing levels to meet business needs.

5.    Vacations shall be taken within the year following the date the employee becomes eligible. In case of emergency, by mutual agreement an employee may work his vacation and

13826232v.2                                    15

*Execution Copy*

receive his vacation pay in addition to wages for the hours worked or arrange his vacation for some other time.

Employees may take their vacations in one (1) hour increments if requested and approved in advance.

6.    If an employee's services are terminated prior to the time of the taking of his vacation, he shall be immediately paid the full amount of his accumulated vacation pay, provided such employee has completed one or more years of service.

7.    If an employee becomes ill during his regularly scheduled vacation and qualifies for sick benefits he may re-schedule his unused vacation.

## ARTICLE 11
## INSURANCE BENEFITS

1.    Employees who satisfy the average hours worked requirements set forth in Article 2, Paragraph 3, will be eligible to participate in the Employer's health and life insurance plans on the same terms and conditions as all other employees of the Employer. The Employer has the right to modify or eliminate these benefits (including providers) and increase the employee contributions to same. Said changes or increases in contributions shall be the same as those applicable to all other employees of the Employer. It is also agreed that the plan year, including enrollment periods, shall be the same as is applicable to all other employees of the Employer.

2.    Except for a violation of the express terms of this Article, any question or dispute in connection with the Employer's health insurance plans is specifically excluded from the grievance and arbitration procedures of this Agreement.

## ARTICLE 12
## UNIFORMS AND LAUNDRY

The Employer agrees to furnish and launder uniforms for all employees who are required to wear them. These uniforms shall not be worn off the premises unless authorized. The employee is expected to treat the uniforms with care. The Employer also agrees to replace, at no cost to the employees, those uniforms which have become permanently stained or worn out.

## ARTICLE 13
## BULLETIN BOARDS

The Union shall be entitled to reasonable use of the bulletin boards of the Employer for the purpose of posting notices of official business. Other matters of interest to employees may be posted if approved by the Employer. It is agreed that the bulletin boards may be locked and a key maintained by the Management.

13826232v 2

16

*Execution Copy*

## ARTICLE 14
## WAGES

1.    A schedule of "Appendix A" covering job classifications and base wage rates is attached and made a part of this Agreement.  Additionally, the parties agree as follows:

(a)    <u>Maintenance Boiler Pay</u> - $1.00 per hour paid for all hours worked to employees with a license, working full-time at a hotel where a license is required. (TCS will continue current practice.)

(b)    If applicable state or federal minimum wage is increased, all bellpersons, doorpersons, and servers will receive the same cents per hour as the minimum wage increase cents per hour.

2.    Except pursuant to the Lateral Service Article of this Agreement (Article 25), an employee required to fill a higher rated job temporarily shall receive the rate for that job while on that job and must be paid such higher rate for at least three-tenths (3/10ths) of an hour.  An employee required to fill a lower job temporarily shall receive his regular rate while on that job.

Employees who request hours in a lower paying job in order to more nearly reach full-time employment will be paid at the rates of the job being performed.

Except pursuant to the Lateral Service Article of this Agreement (Article 25), bargaining unit employees will not be required to temporarily fill in for non-bargaining unit positions.

3.    Employees being paid over scale shall receive the same percentage increase as employees paid on the Agreement's scale.

4.    If any new classifications are added during the life of this Agreement, wages for the same shall be negotiated by letter or addendum and made a part of this Agreement.

5.    All rate increases shall become effective in the first pay period after the employee becomes eligible for the rate increase, it being the intention of the parties that changes in rates of pay not be made during a work week.

6.    Employees who are required to leave their jobs because of occupational injury will receive pay for all hours scheduled to work on the day of the injury or accident.

7.    Banquet servers working cashier/vending functions shall receive the five (5) year snack bar attendant rate of pay.  Senior employees shall have the right to defer such functions to the junior employee provided there are sufficient employees to staff the event.

8.    A split shift shall be defined as any break of more than one (1) hour during working hours.  All split shifts will be completed within a twelve (12) hour period, with the exception of function employees and bellpersons.  A premium of twenty cents (20¢) per hour will be paid for all hours worked on any split-shift except tip classifications.

13826232v.2

17

*Execution Copy*

## ARTICLE 15
## HEALTH, SAFETY AND SICK BENEFITS

1.     All regular employees who have completed their probationary period of employment and attained seniority status will be eligible for sick leave benefits beginning with the second day of absence for actual illness.  However, sick leave will be paid to any employee on the first day of hospitalization and for the first work day of any three (3) or more consecutively scheduled work day absences.

For employees hired prior to September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of eighty (80) hours of sick leave for two thousand eighty (2,080) hours of work or pay during an employee's anniversary year.  The maximum benefit that can be accumulated by such an employee will be three hundred (300) hours.  Upon an employee reaching the maximum balance, the employee may sell up to sixty (60) hours of sick pay at fifty percent (50%) of value on the employee's anniversary date.

For employees hired on or after September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of forty (40) hours of sick leave for two thousand eighty (2,080) hours of work or pay during an employee's anniversary year of employment.  The maximum benefit that can be accumulated by such an employee will be three hundred (300) hours.  Upon an employee reaching the maximum balance, the employee may sell up to sixty (60) hours of sick pay at fifty percent (50%) of value on the employee's anniversary date.

2.     Sick leave may be converted to hours in the instance of an employee becoming ill after having reported for work.  The hours lost by such an employee on that day by reasons of illness will be accumulated to establish eligibility for sick leave after the required waiting period.

Employees in the server and bellperson sections shall be given the option to use two (2) hours of their accrued sick leave for each hour of sick leave provided they meet the sick leave eligibility requirements.

3.     To receive sick pay after three (3) days of illness, an employee must present a doctor's certificate as proof of illness.  Absences due to accidents covered by workers' compensation are not eligible for sick leave benefits; provided, however, that sick leave which has been accumulated can be utilized in connection with workers' compensation benefits in order to permit an employee to receive up to the employee's average income in a combination of workers' compensation and sick leave pay.

4.     The Employer will do everything reasonably possible to create and maintain safe, healthful and sanitary working conditions.  The Union agrees that it will endeavor to have its members observe all of the safety rules.

5.     The Employer may make temporary work reassignments in order to accommodate the light duty or special work requirements of an employee returning to work from a work-related injury or illness.  Such reassignments will be limited to sixty (60) days unless extended by mutual agreement.

6.     The Employer agrees that employees shall be allowed to use any of their accrued sick time for those absences which would be covered by the Family and Medical Leave Act.

13826232v 2

18

*Execution Copy*

## ARTICLE 16
## PENSION

1.     The Employer will continue to maintain and administer a pension plan ("Plan"). The normal pension benefit will be fourteen dollars ($14.00) per month for each year of service. The pension program will be funded by the Employer as required by ERISA and the Internal Revenue Code.  Employees who work beyond age sixty-five (65) will continue to accrue the full benefits subject to the maximum accumulation of forty-five (45) years.

2.     The following is a brief outline of pension eligibility and benefits.  The Plan and Trust Document are the ruling documents in all respects:

Eligibility - Age twenty-one (21), one (1) year of service, and 1,000 hours worked within a twelve (12) month period.

Normal Retirement Age sixty-five (65) and five (5) years of participation.

Early Retirement Age sixty-two (62) and five (5) years of participation.

Disability retirements are available to qualified employees.

The normal pension benefit will be fourteen dollars ($14.00) per month for each year of service up to forty-five (45) years.

There are a number of optional methods for payments of benefits

Vesting occurs after five (5) years of Vesting Service

3.     The Employer shall have the right to amend the Plan from time to time, consistent with the foregoing terms.

## ARTICLE 17
## UNITE HERE 401(k)

Employees will be eligible to participate in the 401(k) plan created and administered by the Union ("Union 401(k) Plan"). The Employer will not match employee contributions to and the Union will be responsible for all the costs of the Union 401(k) Plan, including all costs associated with the administration of the Union 401(k) Plan.

## ARTICLE 18
## NO STRIKE OR LOCKOUT

1.     There shall be no strike, picketing, work stoppage, slow down, sit downs, or cessation of work, including of a sympathy nature, boycotts, or any walk out of any kind or for any reason, including any dispute relating to alleged unfair labor practices, during the term of this Agreement.  The provisions of this Article shall be absolute and shall apply regardless of whether the dispute is subject to arbitration under the provisions of Article 6 of this Agreement.

13826232v.2

19

*Execution Copy*

2.    It will not be a violation of this agreement for employees to refuse to go through a legally authorized picket line in any strike approved by a two-thirds (2/3) vote of the executive board of the Union.

ARTICLE 19
MAINTENANCE TOOL ALLOWANCE

Maintenance employees will be entitled to a tool allowance of up to $325.00 per year to maintain and replace tools required by the Employer. Paid receipts must be presented to the Employer before payment is received by the employee. Employees will be reimbursed within fifteen (15) business days of presenting a receipt.

The tool allowance will be paid to eligible employees who are actively employed on September 1. For those employed less than a full year at that time, the tool allowance will be prorated based on the number of full months worked in the preceding twelve (12) months resulting in one-twelfth (1/12th) of the allowance for each month.

Specialized tools and test equipment required for maintaining equipment, but not listed on the employee tool list will be provided by the employer. These tools will not generally be issued to maintenance employees, but will be stocked in the maintenance shop to be issued on an as needed basis.

ARTICLE 20
DISCRIMINATION

The Employer and the Union agree to abide by the federal law prohibiting discrimination in hiring practices because of sex, race, age, religion, color, national origin or union membership. The Employer further agrees that there shall be no discrimination in regard to tenure, upgrading or work assignments because of sex, race, age, religion, color, national origin or union membership. All employees shall be permitted to wear their official Union button and/or official steward button provided the button is no larger than one and one-quarter (1-1/4) inches in diameter. However, the foregoing limitation on the number and size of buttons worn shall not apply to employees in classifications that are not visible to the public.

ARTICLE 21
RESPECT & DIGNITY

The Union and the Employer recognize that workers in the hospitality industry are professional employees deserving of the highest regard. The Union, the Employer, the non-Union and Union employees will work together to honor the principles of respect, and dignity. The parties and non-Union and Union employees agree that the continued success and operation of this establishment is dependent upon their mutual respect for one another's work.

*Execution Copy*

## ARTICLE 22
## MANAGEMENT RIGHTS

Except as limited by the express provisions of this Agreement, and longstanding mutually agreed written custom and past practice, the management of the business and the direction of the working forces shall rest solely and exclusively with the Employer. This includes, but is not limited to, the right to hire; to determine the quality and quantity of work performed; to determine the number of employees to be employed; to determine the jobs and job classifications; to layoff employees; to assign and delegate work; to maintain and improve efficiency; to promulgate, rescind, revise and require observance of rules, regulations, and other policies; to direct the activities of all employees employed by the Employer; to schedule work and to determine the number of hours to be worked; to determine the methods and equipment to be utilized and the type of service to be provided; to create, combine and to eliminate job classifications; except as limited by Appendix F, to subcontract bargaining unit work including using temporary agency employees for same; and to change, modify or discontinue existing methods of service and equipment to be used or provided.

## ARTICLE 23
## LAUNDRY AND DRY CLEANING WORK STABILIZATION

Notwithstanding any strike, work stoppage, interruption of work or other economic sanction instigated or conducted by the Union or employees against the Employer for any good reason, specifically including the occasion of negotiating new or different terms of collective bargaining agreements, there shall be no work stoppage or interruption of work as relates to materials being processed in the laundry and dry cleaning departments for the use of any public and private hospitals, the Mayo buildings and nursing homes.

If such a strike or work stoppage occurs, the Employer and the Union will cooperate with the other to the end that regular employees of the Employer will be made available for the processing of such uninterrupted work and services of public and private hospitals, the Mayo buildings and nursing homes.

In consideration of the foregoing no-strike agreement, the Employer agrees that it will not process any other work in its laundry and dry cleaning facilities during the term of a strike, so long as the Union and the employees do process, without interruption, all work required for the use of any public and private hospitals, the Mayo buildings and nursing homes.

This Article shall remain in full force and effect for a period equal to the life of this Agreement and/or any renewal thereof plus six (6) months in addition thereto.

Any breach or threatened breach of this Article or any of the terms thereof in addition to any remedies at law or this Agreement shall be subject to suit for specific performance by the Employer or the Union.

13826232v.2

21

*Execution Copy*

## ARTICLE 24
## SUCCESSORSHIP

In the event the owner of a facility covered by this Agreement decides to sell, transfer or assign its interest in any of the three (3) hotels listed on page one (1) of this Agreement, or in Textile Care Services, it will, prior to closing, provide a copy of this Agreement to the purchaser, assignee or transferee. In addition, the Employer will notify the Union and bargain in good faith over the effects of the pending sale, transfer or assignment on bargaining unit employees, prior to closing. The Employer agrees to notify the Union of the owner's intent to sell, transfer or assign its interest at the earliest possible date but in any case, no later than the date, of the execution of the purchase agreement.

## ARTICLE 25
## LATERAL SERVICE

To support the Employer's provision of a high level of service to guests of the hotels covered by this Agreement, a high degree of cooperation with managers and with workers is required. In order to promote cooperation in the workplace, managers and workers are encouraged to develop ongoing communication. Consistent with the needs of the workplace, the Union recognizes that cooperation can be beneficial to both the workers and a hotel.

Management may, using reasonable discretion, utilize a policy of lateral service for limited periods of time to satisfy guests' and the hotel's needs. Lateral service consists of an employee performing work which ordinarily is performed by employees in a different job classification and is designed to allow employees to help where needed until guest or other hotel needs are satisfied.

## ARTICLE 26
## ENTIRE AGREEMENT

This Agreement incorporates the entire understanding between the parties and supersedes all prior agreements, letters of understanding, grievance settlements and past practices between the parties except for those practices identified by the parties in Appendix K that may continue to be relevant. This Agreement shall be modified or amended only by a writing referring to this Agreement executed by both parties setting forth the amendment or modification.

*Execution Copy*

ARTICLE 27
DURATION

This Agreement shall be effective as of October 1, 2011 and continue in full force and effect to and including the 31st day of August, 2014 and continue thereafter from year to year unless either party hereto shall, at least sixty (60) days previous to the termination of any yearly period, notify the other party in writing of its intention to amend, modify or terminate this agreement. By yearly period the parties understand that the anniversary date of this Agreement will be August 31st of any succeeding year unless changed by mutual consent of the parties.

Wage increases set forth in Appendix A will be effective on the first full pay period after September 1, 2011, the first full pay period after September 1, 2012 and the first full pay period after September 1, 2013.

In the event of actual declaration of war by the Congress of the United States, this Agreement may be reopened by either party on sixty (60) days written notice.

IN WITNESS WHEREOF, The Employer and the Union have hereto set their hands this 14th day of October 2011.


SUNSTONE HOTEL PROPERTIES, INC.           UNITE HERE LOCAL 21 AFL-CIO
AS AGENT FOR DBA THE KAHLER
GRAND HOTEL, ROCHESTER
MARRIOTT MAYO CLINIC AREA,
KAHLER INN & SUITES AND
TEXTILE CARE SERVICES


Robert LaCasse                            Brian Brandt
Regional Director of Operations           President / Business Representative


                                          Nancy Goldman
                                          International VP, UNITE HERE


13826232v 2                      23

*Execution Copy*

## SIDE LETTER

Sunstone Hotel Properties, Inc., as agent for  d/b/a The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites and Textile Care Services located in Rochester, Minnesota, ("Employer") and UNITE HERE Local 21 AFL-CIO, enter into this Side Letter to their October 1, 2011 – August 31, 2014 collective bargaining agreement.

As a result of the elimination of the retiree life insurance benefit set forth in the parties' September 1, 2005 to August 31, 2010 collective bargaining agreement, the Employer has agreed that employees who were eligible as of September 1, 2011 or would become eligible by August 31, 2014 for this benefit will receive no later than December 15, 2011, a payment of two hundred and fifty dollars ($250.00) minus applicable legal deductions.

SUNSTONE HOTEL PROPERTIES, INC.                    UNITE HERE LOCAL 21 AFL-CIO
AS AGENT FOR DBA THE KAHLER
GRAND HOTEL, ROCHESTER
MARRIOTT MAYO CLINIC AREA,
KAHLER INN & SUITES AND
TEXTILE CARE SERVICES

_____                           _____
Robert LaCasse                                    Brian Brandt
Regional Director of Operations                   President / Business Representative

                                                  _____
                                                  Nancy Goldman
                                                  International VP, UNITE HERE

13826232v.2                          24

*Execution Copy*

APPENDIX "A"

<u>Payroll Rates</u>

The rates of pay for classifications are set forth below. The hiring rate shall apply to employees transferring to another classification, providing there is no decrease in hourly rate. After an employee who has transferred to another classification completes three (3) months of continuous employment in the new classification, he/she will be granted the appropriate service rate based upon his/her continuous employment with the Employer. Employees will, however, be given credit for actual experience in filling in on the new position towards the three (3) months of continuous employment.

The Employer will have the right to select the individuals who will be classified lead and to determine the number of lead positions and the shifts where they will be utilized. The Employer will also have the right to increase or decrease the number of lead positions in the future. The minimum wage differential for lead positions will be fifty cents (50¢) per hour. Leads shall be responsible for the general direction of employees in the department and ensuring that all tasks are completed.

*Execution Copy*

| Textile Care Services | Sept. 1, 2011 | | | | | Sept. 1, 2012 | | | | | Sept. 1, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo |
| Production I<br>Feeder/Folder<br>Inventory Preparation | 8.76 | 9.90 | 10.66 | 11.51 | 12.25 | 8.76 | 10.10 | 10.87 | 11.74 | 12.50 | 8.76 | 10.30 | 11.09 | 11.97 | 12.75 |
| Production II<br>Cart Handler | 9.10 | 10.30 | 11.09 | 11.87 | 12.68 | 9.10 | 10.51 | 11.31 | 12.11 | 12.93 | 9.10 | 10.72 | 11.54 | 12.35 | 13.19 |
| Production III<br>Janitor<br>Dock Worker<br>Soil Sorter | 9.54 | 10.74 | 11.56 | 12.34 | 13.17 | 9.54 | 10.96 | 11.79 | 12.59 | 13.43 | 9.54 | 11.17 | 12.02 | 12.84 | 13.70 |
| Production IV<br>Dry Cleaner/Presser<br>Mender<br>Wearing Apparel Finisher<br>Checker<br>Washer Machine Op.<br>Soil Sort Cart Dumper | 9.90 | 11.12 | 11.96 | 12.77 | 13.62 | 9.90 | 11.34 | 12.20 | 13.03 | 13.89 | 9.90 | 11.57 | 12.45 | 13.29 | 14.17 |
| Production V<br>Dry Cleaner Machine Operator | 10.98 | 11.99 | 12.89 | 13.69 | 14.58 | 10.98 | 12.22 | 13.15 | 13.96 | 14.87 | 10.98 | 12.47 | 13.41 | 14.24 | 15.16 |
| Production VI<br>Tunnel Machine Operator | 11.28 | 12.30 | 13.24 | 14.03 | 14.93 | 11.28 | 12.55 | 13.50 | 14.31 | 15.23 | 11.28 | 12.80 | 13.77 | 14.59 | 15.54 |
| Distribution VII<br>Commercial Driver | 14.02 | 15.19 | 16.34 | 17.07 | 18.13 | 14.02 | 15.49 | 16.67 | 17.42 | 18.49 | 14.02 | 15.80 | 17.00 | 17.76 | 18.86 |
| Distribution VIII<br>Service Rep / Utility | 14.99 | 16.22 | 17.45 | 18.18 | 19.29 | 14.99 | 16.54 | 17.80 | 18.54 | 19.67 | 14.99 | 16.87 | 18.16 | 18.91 | 20.07 |
| Production IX<br>CDL | 15.80 | 17.16 | 18.46 | 19.10 | 20.26 | 15.80 | 17.50 | 18.83 | 19.49 | 20.66 | 15.80 | 17.85 | 19.21 | 19.88 | 21.08 |
| TCS Maintenance | | | | | | | | | | | | | | | |
| Laundry Specialist | 21.34 | 22.88 | 24.62 | 25.31 | 26.78 | 21.34 | 23.34 | 25.12 | 25.81 | 27.31 | 21.34 | 23.80 | 25.62 | 26.33 | 27.86 |
| Mechanic | 18.53 | 19.93 | 21.45 | 22.16 | 23.47 | 18.53 | 20.33 | 21.88 | 22.61 | 23.94 | 18.53 | 20.74 | 22.32 | 23.06 | 24.42 |
| Apprentice | 16.09 | 17.35 | 18.67 | 19.40 | 20.57 | 16.09 | 17.70 | 19.04 | 19.79 | 20.98 | 16.09 | 18.05 | 19.42 | 20.18 | 21.40 |
| Preventive Maintenance | 14.53 | 15.73 | 16.93 | 17.66 | 18.75 | 14.53 | 16.04 | 17.27 | 18.01 | 19.12 | 14.53 | 16.36 | 17.62 | 18.37 | 19.51 |
| Light/Yard Maintenance | 9.82 | 10.76 | 11.58 | 12.38 | 13.21 | 9.82 | 10.98 | 11.81 | 12.63 | 13.47 | 9.82 | 11.20 | 12.04 | 12.88 | 13.74 |

A-2

1126232v.2

P 00975

*Execution Copy*

| Kahler Hotel | Sept. 1, 2011 | | | | | Sept. 1, 2012 | | | | | Sept. 1, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo |
| **Cooks** | | | | | | | | | | | | | | | |
| 2nd Cook | 15.03 | 16.26 | 17.49 | 18.22 | 19.32 | 15.03 | 16.58 | 17.84 | 18.58 | 19.71 | 15.03 | 16.92 | 18.20 | 18.95 | 20.10 |
| Lead Cook | 13.97 | 15.15 | 16.30 | 17.03 | 18.08 | 13.97 | 15.45 | 16.63 | 17.37 | 18.45 | 13.97 | 15.76 | 16.96 | 17.72 | 18.82 |
| Cook | 13.49 | 14.62 | 15.73 | 16.48 | 17.50 | 13.49 | 14.91 | 16.04 | 16.81 | 17.85 | 13.49 | 15.21 | 16.36 | 17.15 | 18.21 |
| Line Cook | 10.41 | 11.34 | 12.21 | 13.02 | 13.88 | 10.41 | 11.57 | 12.45 | 13.28 | 14.16 | 10.41 | 11.80 | 12.70 | 13.54 | 14.44 |
| **Prep & Serving** | | | | | | | | | | | | | | | |
| Pantry & Veg-Lead | 8.88 | 9.79 | 10.55 | 11.34 | 12.12 | 8.88 | 9.99 | 10.76 | 11.57 | 12.36 | 8.88 | 10.19 | 10.97 | 11.80 | 12.61 |
| Pantry & Veg-Prep | 8.41 | 9.27 | 9.98 | 10.79 | 11.54 | 8.41 | 9.46 | 10.18 | 11.01 | 11.77 | 8.41 | 9.65 | 10.38 | 11.23 | 12.00 |
| Service Bar-Attend | 8.35 | 9.23 | 9.93 | 10.75 | 11.49 | 8.35 | 9.42 | 10.13 | 10.97 | 11.71 | 8.35 | 9.60 | 10.34 | 11.19 | 11.95 |
| Snack Bar-Attend | 10.07 | 11.00 | 11.83 | 12.64 | 13.46 | 10.07 | 11.22 | 12.07 | 12.89 | 13.73 | 10.07 | 11.44 | 12.31 | 13.15 | 14.01 |
| Storeroom Helper | 8.73 | 9.61 | 10.33 | 11.14 | 11.90 | 8.73 | 9.80 | 10.54 | 11.36 | 12.14 | 8.73 | 10.00 | 10.75 | 11.59 | 12.38 |
| Room SV Tele & Setup | 8.78 | 9.68 | 10.41 | 11.22 | 11.96 | 8.78 | 9.87 | 10.62 | 11.44 | 12.20 | 8.78 | 10.07 | 10.83 | 11.67 | 12.45 |
| Room SV Overnight | 10.07 | 11.00 | 11.83 | 12.64 | 13.46 | 10.07 | 11.22 | 12.07 | 12.89 | 13.73 | 10.07 | 11.44 | 12.31 | 13.15 | 14.01 |
| **Banquet Set up** | 8.59 | 9.90 | 10.65 | 11.92 | 12.72 | 8.59 | 10.10 | 10.86 | 12.16 | 12.97 | 8.59 | 10.30 | 11.08 | 12.41 | 13.23 |
| **Sanitation** | | | | | | | | | | | | | | | |
| Busperson | 8.52 | 9.82 | 10.58 | 11.85 | 12.66 | 8.52 | 10.02 | 10.79 | 12.09 | 12.91 | 8.52 | 10.22 | 11.00 | 12.33 | 13.17 |
| Dishmachine Oper & Porter | 8.59 | 9.90 | 10.65 | 11.93 | 12.72 | 8.59 | 10.10 | 10.86 | 12.17 | 12.97 | 8.59 | 10.30 | 11.08 | 12.42 | 13.23 |
| Potwasher | 8.59 | 9.90 | 10.65 | 11.93 | 12.72 | 8.59 | 10.10 | 10.86 | 12.17 | 12.97 | 8.59 | 10.30 | 11.08 | 12.42 | 13.23 |
| **Bartenders** | | | | | | | | | | | | | | | |
| Bartenders | 8.85 | 9.66 | 10.40 | 11.02 | 11.66 | 8.85 | 9.85 | 10.61 | 11.24 | 11.89 | 8.85 | 10.05 | 10.82 | 11.46 | 12.13 |
| Bartenders hired b4 9/1/91 | | | | | 15.40 | | | | | 15.71 | | | | | 16.02 |
| **Rooms** | | | | | | | | | | | | | | | |
| Housekeeper | 9.91 | 10.84 | 11.66 | 12.46 | 13.28 | 9.91 | 11.06 | 11.89 | 12.71 | 13.55 | 9.91 | 11.28 | 12.13 | 12.97 | 13.82 |
| Lobby Porter | 8.23 | 9.08 | 9.77 | 10.61 | 11.32 | 8.23 | 9.26 | 9.97 | 10.82 | 11.55 | 8.23 | 9.44 | 10.17 | 11.04 | 11.78 |
| Door Person | 7.91 | 8.48 | 9.30 | 9.44 | 9.44 | 7.91 | 8.65 | 9.49 | 9.62 | 9.62 | 7.91 | 8.82 | 9.68 | 9.82 | 9.82 |
| PBX Operator | 10.42 | 11.99 | 12.89 | 13.95 | 14.85 | 10.42 | 12.22 | 13.15 | 14.23 | 15.15 | 10.42 | 12.47 | 13.41 | 14.52 | 15.45 |
| **Tip Classifications** | | | | | | | | | | | | | | | |
| Server | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| Bellperson | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| Bell Captain | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| **Maintenance Dept.** | | | | | | | | | | | | | | | |
| Specialist/Lead/Required License | 19.49 | 20.94 | 22.53 | 23.19 | 24.55 | 19.49 | 21.36 | 22.98 | 23.66 | 25.04 | 19.49 | 21.79 | 23.44 | 24.13 | 25.54 |
| Mechanic | 18.52 | 19.93 | 21.44 | 22.16 | 23.46 | 18.52 | 20.33 | 21.87 | 22.61 | 23.93 | 18.52 | 20.74 | 22.31 | 23.06 | 24.41 |
| Apprentice | 16.09 | 17.36 | 18.68 | 19.40 | 20.57 | 16.09 | 17.71 | 19.05 | 19.79 | 20.98 | 16.09 | 18.06 | 19.43 | 20.18 | 21.40 |
| Preventative Maintenance | 14.53 | 15.73 | 16.93 | 17.66 | 18.75 | 14.53 | 16.04 | 17.27 | 18.01 | 19.11 | 14.53 | 16.36 | 17.62 | 18.37 | 19.51 |
| Light/Yard Maintenance | 9.82 | 10.76 | 11.58 | 12.38 | 13.21 | 9.82 | 10.98 | 11.81 | 12.63 | 13.47 | 9.82 | 11.20 | 12.04 | 12.88 | 13.74 |

A-3

P 00976

*Execution Copy*

**Marriott Hotel**

| | Sept. 1, 2011 | | | | | Sept. 1, 2012 | | | | | Sept. 1, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo |
| **Cooks** | | | | | | | | | | | | | | | |
| Lead Cook | 13.97 | 15.15 | 16.30 | 17.03 | 18.08 | 13.97 | 15.45 | 16.63 | 17.37 | 18.45 | 13.97 | 15.76 | 16.96 | 17.72 | 18.82 |
| Cook | 13.49 | 14.62 | 15.73 | 16.48 | 17.50 | 13.49 | 14.91 | 16.04 | 16.81 | 17.85 | 13.49 | 15.21 | 16.36 | 17.15 | 18.21 |
| Line Cook | 10.41 | 11.34 | 12.21 | 13.02 | 13.88 | 10.41 | 11.57 | 12.45 | 13.28 | 14.16 | 10.41 | 11.80 | 12.70 | 13.54 | 14.44 |
| **Prep & Serving** | | | | | | | | | | | | | | | |
| Pantry & Veg-Prep | 8.41 | 9.27 | 9.98 | 10.79 | 11.54 | 8.41 | 9.46 | 10.18 | 11.01 | 11.77 | 8.41 | 9.65 | 10.38 | 11.23 | 12.00 |
| Banquet Set up | 8.59 | 9.90 | 10.65 | 11.93 | 12.72 | 8.59 | 10.10 | 10.86 | 12.17 | 12.97 | 8.59 | 10.30 | 11.08 | 12.42 | 13.23 |
| **Sanitation** | | | | | | | | | | | | | | | |
| Busperson | 8.52 | 9.82 | 10.58 | 11.85 | 12.66 | 8.52 | 10.02 | 10.79 | 12.09 | 12.91 | 8.52 | 10.22 | 11.00 | 12.33 | 13.17 |
| Dishmachine Oper & Porter | 8.59 | 9.90 | 10.65 | 11.93 | 12.72 | 8.59 | 10.10 | 10.86 | 12.17 | 12.97 | 8.59 | 10.30 | 11.08 | 12.42 | 13.23 |
| Potwasher | 8.89 | 9.90 | 10.65 | 11.93 | 12.72 | 8.89 | 10.10 | 10.86 | 12.17 | 12.97 | 8.89 | 10.30 | 11.08 | 12.42 | 13.23 |
| **Bartenders** | | | | | | | | | | | | | | | |
| Bartenders | 8.85 | 9.66 | 10.40 | 11.02 | 11.66 | 8.85 | 9.85 | 10.61 | 11.24 | 11.89 | 8.85 | 10.05 | 10.82 | 11.46 | 12.13 |
| Bartenders hired b4 9/1/91 | | | | | 15.40 | | | | | 15.71 | | | | | 16.02 |
| **Rooms** | | | | | | | | | | | | | | | |
| Housekeeper | 9.91 | 10.84 | 11.66 | 12.46 | 13.28 | 9.91 | 11.06 | 11.89 | 12.71 | 13.55 | 9.91 | 11.28 | 12.13 | 12.97 | 13.82 |
| Lobby Porter | 8.23 | 9.08 | 9.77 | 10.61 | 11.32 | 8.23 | 9.26 | 9.97 | 10.82 | 11.55 | 8.23 | 9.44 | 10.17 | 11.04 | 11.78 |
| Door Person | 7.91 | 8.48 | 9.30 | 9.44 | 9.44 | 7.91 | 8.65 | 9.49 | 9.62 | 9.62 | 7.91 | 8.82 | 9.68 | 9.82 | 9.82 |
| **Tip Classificatons** | | | | | | | | | | | | | | | |
| Server | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| Bellperson | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| **Maintenance Dept.** | | | | | | | | | | | | | | | |
| Specialist/Lead/Required License | 19.49 | 20.94 | 22.53 | 23.19 | 24.55 | 19.49 | 21.36 | 22.98 | 23.66 | 25.04 | 19.49 | 21.79 | 23.44 | 24.13 | 25.54 |
| Mechanic | 18.52 | 19.93 | 21.44 | 22.16 | 23.46 | 18.52 | 20.33 | 21.87 | 22.61 | 23.93 | 18.52 | 20.74 | 22.31 | 23.06 | 24.41 |
| Apprentice | 16.09 | 17.36 | 18.68 | 19.40 | 20.57 | 16.09 | 17.71 | 19.05 | 19.79 | 20.98 | 16.09 | 18.06 | 19.43 | 20.18 | 21.40 |
| Preventative Maintenance | 14.53 | 15.73 | 16.93 | 17.66 | 18.75 | 14.53 | 16.04 | 17.27 | 18.01 | 19.12 | 14.53 | 16.36 | 17.62 | 18.37 | 19.51 |
| Light/Yard Maintenance | 9.82 | 10.76 | 11.58 | 12.38 | 13.21 | 9.82 | 10.98 | 11.81 | 12.63 | 13.47 | 9.82 | 11.20 | 12.04 | 12.88 | 13.74 |

A-4

26232v.2

P 00977

*Execution Copy*

| Kahler Inn & Suites | Sept. 1, 2011 | | | | | Sept. 1, 2012 | | | | | Sept. 1, 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo |
| **Cooks** | | | | | | | | | | | | | | | |
| Lead Cook | 13.97 | 15.15 | 16.30 | 17.03 | 18.08 | 13.97 | 15.45 | 16.63 | 17.37 | 18.45 | 13.97 | 15.76 | 16.96 | 17.72 | 18.82 |
| Cook | 13.49 | 14.62 | 15.73 | 16.48 | 17.50 | 13.49 | 14.91 | 16.04 | 16.81 | 17.85 | 13.49 | 15.21 | 16.36 | 17.15 | 18.21 |
| Line Cook | 10.41 | 11.34 | 12.21 | 13.02 | 13.88 | 10.41 | 11.57 | 12.45 | 13.28 | 14.16 | 10.41 – | 11.80 | 12.70 | 13.54 | 14.44 |
| **Prep & Serving** | | | | | | | | | | | | | | | |
| Pantry & Veg-Prep | 8.41 | 9.27 | 9.98 | 10.79 | 11.54 | 8.41 | 9.46 | 10.18 | 11.01 | 11.77 | 8.41 | 9.65 | 10.38 | 11.23 | 12.00 |
| Service Bar-Attend | 8.35 | 9.23 | 9.93 | 10.75 | 11.49 | 8.35 | 9.42 | 10.13 | 10.97 | 11.71 | 8.35 | 9.60 | 10.34 | 11.19 | 11.95 |
| **Sanitation** | | | | | | | | | | | | | | | |
| Busperson | 8.52 | 9.82 | 10.58 | 11.85 | 12.66 | 8.52 | 10.02 | 10.79 | 12.09 | 12.91 | 8.52 | 10.22 | 11.00 | 12.33 | 13.17 |
| Dishmachine Oper & Porter | 8.59 | 9.90 | 10.65 | 11.93 | 12.72 | 8.59 | 10.10 | 10.86 | 12.17 | 12.97 | 8.59 | 10.30 | 11.08 | 12.42 | 13.23 |
| Potwasher | 8.59 | 9.90 | 10.65 | 11.93 | 12.72 | 8.59 | 10.10 | 10.86 | 12.17 | 12.97 | 8.59 | 10.30 | 11.08 | 12.42 | 13.23 |
| **Rooms** | | | | | | | | | | | | | | | |
| Housekeeper | 9.91 | 10.84 | 11.66 | 12.47 | 13.28 | 9.91 | 11.05 | 11.90 | 12.72 | 13.55 | 9.91 | 11.28 | 12.13 | 12.97 | 13.82 |
| Lobby Porter | 8.23 | 9.08 | 9.77 | 10.61 | 11.32 | 8.23 | 9.26 | 9.97 | 10.82 | 11.55 | 8.23 | 9.44 | 10.17 | 11.04 | 11.78 |
| Door Person | 7.91 | 8.48 | 9.30 | 9.44 | 9.44 | 7.91 | 8.65 | 9.49 | 9.62 | 9.62 | 7.91 | 8.82 | 9.68 | 9.82 | 9.82 |
| **Tip Classificatons** | | | | | | | | | | | | | | | |
| Server | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| Bellperson | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 | 7.25 |
| **Maintenance Dept.** | | | | | | | | | | | | | | | |
| Specialist/Lead/Required License | 19.49 | 20.94 | 22.53 | 23.19 | 24.55 | 19.49 | 21.36 | 22.98 | 23.66 | 25.04 | 19.49 | 21.79 | 23.44 | 24.13 | 25.54 |
| Mechanic | 18.52 | 19.93 | 21.44 | 22.16 | 23.46 | 18.52 | 20.33 | 21.87 | 22.61 | 23.93 | 18.52 | 20.74 | 22.31 | 23.06 | 24.41 |
| Apprentice | 16.09 | 17.36 | 18.68 | 19.40 | 20.57 | 16.09 | 17.71 | 19.05 | 19.79 | 20.98 | 16.09 | 18.06 | 19.43 | 20.18 | 21.40 |
| Preventative Maintenance | 14.53 | 15.73 | 16.93 | 17.66 | 18.75 | 14.53 | 16.04 | 17.27 | 18.01 | 19.12 | 14.53 | 16.36 | 17.62 | 18.37 | 19.51 |
| Light/Yard Maintenance | 9.82 | 10.76 | 11.58 | 12.38 | 13.21 | 9.82 | 10.98 | 11.81 | 12.63 | 13.47 | 9.82 | 11.20 | 12.04 | 12.88 | 13.74 |

A-5

13826232v.2

P 00978

*Execution Copy*

APPENDIX "B"
Departments And Seniority Sections

THE KAHLER GRAND HOTEL

    Food & Beverage Department

- Cooking Section
- Preparation Section
- Room Service Serving Section
- Grand Grill Serving Section
- Function Serving Section
- Function Set-Up
- Sanitation Section
- Bartenders Section
- Stores Section
- Room Service Telephone Section
- Starbucks Section
- U-Club Section
- Martini's

Rooms Department
- PBX Section
- Bellperson, Lobby Porter Section
- Housekeeping Section

Maintenance Department
- Maintenance Section

KAHLER INN & SUITES

Food and Beverage Department
- Cooking Section
- Serving Section
- Sanitation Section

Rooms Department
- Housekeeping Section
- Bellperson Section

Maintenance Department
- Maintenance Section

B-1

13826232v.2

*Execution Copy*

## ROCHESTER MARRIOTT

Food and Beverage Department
- Cooking Section
- Preparation Section
- Serving Section
- Room Service Serving Section
- Function Serving Section
- Function Set-Up
- Sanitation Section
- Bartenders Section
- Stores Section

Rooms Department
- Bellperson, Doorperson Section
- Housekeeping Section

Maintenance Department
- Maintenance Section
- Housekeeping Section

## TEXTILE CARE SERVICES

Production Department
- Receiving Section
- Wash Section
- Flat/Tumble Finishing Section
- Wearing Apparel Finishing Section
- Packaging/Shipping Section
- Dry Cleaning Section
- Utility Section

Distribution Department
- Service Representative Section

Maintenance Department
- Maintenance Section

*Execution Copy*

APPENDIX "C"

MAINTENANCE ADDENDUM

Apprentices in the Maintenance Department will be permitted to take a test to move to the "mechanic" classification after completing two years of service as an apprentice. The apprentice wishing to take the test will furnish the employer with a written request and will be permitted to take the test within thirty (30) calendar days following the written request. The employer will inform the apprentice of the test results within thirty (30) calendar days of taking the test. If the apprentice passes the test he/she will be promoted to the "mechanic" classification.

At Textile Care Services, the laundry specialist classification will require the employee to have a class 1-B boiler license and maintenance electrician's license. The employee will be required to demonstrate skills in electronics to troubleshoot PLC and computer control systems, make programming changes as directed by the equipment manufacturer and repair circuit boards. The employee will be required to demonstrate proficiency in welding and plumbing.

The Employer agrees to provide, at no cost to the employee, for all training and education that is required for maintenance employees to obtain and maintain licensure provided the training is approved by the Employer and the course is successfully completed.

The Employer agrees to employ no more than the following number of employees in the classifications of light/yard maintenance and preventative maintenance:

| Facility | Light/Yard | Preventative |
|---|---|---|
| The Kahler Grand Hotel | 2 | 2 |
| Kahler Inn and Suites | 1 | 1 |
| Rochester Marriott | 1 | 1 |
| TCS | 1 | 3 |

Seniority Rights. The Employer will maintain   separate seniority lists  at each hotel, by classification. A separate seniority list for maintenance employees working at Textile Care Services will be maintained for purposes of all seniority rights.

Staffing and appropriate coverage at all locations will be determined by management.

With the exception of apprentices, advancement to a higher paid classification will only be permitted when a new position opens in a specific classification.

Any and all license requirements will be determined by management and/or applicable law.

C-1

13826232v.2

*Execution Copy*

APPENDIX "D"

Housekeeping Addendum

A housekeeping employee shall not be required to clean more than sixteen (16) rooms within eight (8) hours. When a housekeeping employee cleans eleven (11) or more check outs in a day, the maximum number of assigned rooms shall be reduced by one (1), and when a housekeeping employee cleans fourteen (14) or more check outs in a day, the maximum number of assigned rooms shall be reduced by two (2). Each bedroom or separate sitting room of a suite shall count as one (1) room. Management in its sole discretion may reduce the number of rooms to be cleaned during a shift or assign a houseperson to assist a housekeeping employee with rooms where, for example, rooms are exceptionally dirty or extraordinary cleaning is required.

Except pursuant to the provisions of Article 25, Lateral Service, Room Attendants will not normally be required to perform houseperson work in addition to their normal duties.

Housekeepers assigned to clean rooms on three (3) or more floors during a shift shall have their room quota reduced by one (1) room.

A housekeeping employee who volunteers to clean more than the foregoing amount of rooms within eight (8) hours shall be paid a bought room bonus of seven dollars ($7.00) for each additional room. However, the bought room bonus shall not apply to rooms cleaned during overtime.

Housekeeping supervisors will make reasonable efforts to have housekeepers assigned to the room accompanying them when entering s a checkout room before it is cleaned.

The Employer shall not arbitrarily reassign housekeeping sections.

The Employer will install sharps containers in all Hotel public restrooms.

Bargaining unit employees shall not normally be required to clean up and/or dispose of human or animal waste, vomit or significant blood spill. Employees shall comply with the Employer's procedures whenever they encounter human or animal feces, vomit, or significant blood spill in the workplace, and shall immediately contact a qualified responder who will handle disposal. Where a bargaining unit employee is required to clean human or animal waste, vomit or a significant blood spill, they will receive a six dollar ($6.00) payment.

Hotel employees shall not be required to handle any items that have been placed in a bio-hazard bag. Employees shall contact their supervisor for handling of those items.

In the event Hotel employees encounter improperly discarded syringes or other sharp objects while working, they shall be disposed of in accordance with established policy. The policy will include adequate available "sharps" containers for collection.

D-1

*Execution Copy*

The Employer will provide linen, equipment and cleaning materials which is sufficient for Housekeeping employees to perform their jobs. Room Attendants will not be disciplined where they could not perform a task because they did not have the necessary equipment or supplies.

The Employer will provide assistance to a housekeeper in connection with moving or lifting any furniture weighing more than twenty-five (25) pounds. No Room Attendant will be required to stand on a ladder, bath tub or vanity.

The Employer will provide at least thirty (30) day's notice to the Union and, upon the Union's request, meet and discuss any renovation or new amenities or service standards which will significantly affect the housekeeper's work loads.

13826232v.2

D-2

*Execution Copy*

APPENDIX "E"

Banquet Department Addendum

Banquet Definition. A banquet shall be deemed to be any reserved function with a pre-set menu and a fixed cost, including receptions, supervised by the banquet department.

System-Wide Seniority. For purposes of lay-off, recall and filling available positions, the Employer shall maintain a master seniority list which shall contain the names of all regular full-time and regular part-time banquet servers who work in each of the Employer's hotels. Seniority shall be based on first function worked as a regular server following completion of probation.

Seniority by Location. The Employer will maintain at each location three (3) banquet employee seniority lists for purposes of scheduling at each of the Hotels.

A.   First List.

The First List will contain the names of all regular full-time banquet employees. These employees must be available to work any shift at the Hotel(s), seven days per week. The seniority list for regular full-time banquet employees shall be posted every month.

Although fluctuations in business will have an impact on the Employer's ability to consistently schedule these employees on a full-time basis, it is the intention of the parties to provide First List employees with a reasonable opportunity to work a full-time schedule. Accordingly, the number of employees on the First List will be established and maintained so as to reflect this intention.

B.   Second List.

The Second List will contain the names of banquet employees who are available to work a minimum of three (3) shifts, per week, at the Hotel(s). The days and shifts on which such employees are available will be submitted to management in writing. Second List employees will be on a separate seniority list, which will be posted. Second List employees will be scheduled only after the First List has been exhausted, when necessary, to meet staffing needs, or where use of the First List employees would result in the payment of overtime.

C.   On-Call List.

The On-Call List will contain the names of banquet employees who are called and work on an "as needed" basis at the Hotel(s). On-Call employees may be scheduled when the First and Second Lists have been exhausted, where necessary to meet staffing needs, or where use of First or Second List employees would result in the payment of overtime. Local 21 will check hours worked on a monthly basis to see if hours worked fall under guidelines (average 10 hours/week are subject to dues).

E-1

13826232v.2

*Execution Copy*

D.    Seniority Standing.

1.    First List employees moving to the Second List will be "dove-tailed" based on seniority date. The Second List employees moving to the First List will go to the bottom of the list with seniority based on date of transfer.

2.    First List servers will have preference for scheduling purposes at their own Hotel and preference over Second List and On-Call servers at the other Hotels.

3.    Maximum hours available will be offered to senior First List employees, up to forty (40) hours per week, but no employee will work a triple shift until all First List employees have been offered a double shift.

4.    Any regular server involuntarily cut from a function shall be entitled to bump the least senior server scheduled to work at their home Hotel, in that work week.

5.    Employee requests for days off must be received in writing by noon, forty-eight (48) hours prior to posting of the weekly schedule, and will be duly considered. A regular server will not be disciplined for his/her inability to work a shift if the server is notified less than twenty-four (24) hours before the scheduled shift.

6.    All weekly banquet schedules shall be posted at each of the Hotels. It is understood that employees may be required to work at all locations.

E.    Special Conditions/Scheduling.

Employees will be scheduled by shifts. A shift is defined as a work period of no less than three (3) hours and no more than eight (8) hours. A shift may include working one, or any combination of, the following events:

- Breakfasts

- Coffee Breaks

- Lunches

- Dinners

- Receptions

- Special Events

Banquet Employee Compensation.

A.    Banquet Service Charge.  Banquet servers shall receive fifteen (15%) of the banquet service charge on all functions, including those contracted for at the Civic Center. This service charge applies to food and beverages served to guests who have functions at a hotel covered by this Agreement and does not apply to any other fees and/or charges to guests who have functions at a hotel covered by this Agreement, including but not limited to room fees,

13826232v.2                                    E-2

*Execution Copy*

audio-visual equipment charges, etc.

B.    <u>Service Charges on Guaranteed Meals.</u>    Service charges shall be paid on the guaranteed number of meals paid for by the customer.

C.    <u>Service Charge on Complimentary Functioning.</u>    Servers who work a promotional function for which the Hotel does not charge the guest will be paid a service charge percentage consistent with the above schedule.    The service charge will be calculated on the retail value of the function.

D.    <u>Corkage Fees.</u>    When the Employer collects a corkage fee for guest-supplied alcohol, fifty percent (50%) of that fee shall be added to the service charge pool.    For events where no corkage fee is collected, fifty percent (50%) of the customary fee will be added to the service charge pool.    However, the foregoing shall not apply to off-site events where the customer will not pay the corkage fee.

E.    <u>Cake Cutting.</u>    One-half of the cake plating charge shall be included in the tip pool.

F.    <u>Service Charge Increase.</u>    Should the service charge be increased, the hotel will retain the full increase up to eighteen percent (18%) percent.    Any service charge over eighteen percent (18%) percent will be divided equally between the employees and the hotel.

<u>Tip Pooling System</u>

A.    The service charge will be pooled and divided on a daily basis based on hours worked at each hotel.

Temporary employees shall not be included in the tip pool.

B.    <u>Employer Records.</u>    The employer records on the amount of service charge and method of distribution shall be made available to the Union Representative or designee for purposes of monitoring the tip pooling system.    The Union may request a meeting on a quarterly basis to review the system.

*Execution Copy*

## APPENDIX "F"

### Food and Beverage Addendum

All Employees working in the cook classification will receive a meal during their shift at no cost to the employee.

The lead cook rate of pay will be applied to at least one (1) cook in the Grand Grill, Center Street Country Cafe, and Vino for all hours of operation.

It is agreed there will be no more than one (1) sous chef and one (1) executive chef assigned per shift at each hotel.

Starbucks employees will be paid at the snack bar rate.

The Employer will not subcontract or lease out to another food and beverage operator any kitchen, bar, or restaurant in either the Marriott or Kahler Grand that is subject to this Agreement.

13826232v.2

F-1

*Execution Copy*

APPENDIX "G"

Textile Care Services Addendum

Employees in the janitor classification shall receive the same night shift differential as the maintenance classification.

The Employer shall provide employees working in the soil sort department with OSHA-approved gowns and gloves. Employees shall not remove these items from the premises.

13826232v.2

G-1

*Execution Copy*

## APPENDIX "H"

### Bell Position Addendum

For groups of more than ten (10) people, bellpersons shall receive a portage rate of two dollars ($2.00) per person each coming in and two dollars ($2.00) each for going out if negotiated and collected. It is agreed that these amounts are only minimums.

H-1

13826232v.2

*Execution Copy*

APPENDIX "I"

<u>GUEST SERVICE</u>

The parties agree to supplement the Agreement for the following purposes:

WHEREAS, the parties recognize that premier guest service is essential to the success of the Hotel and its ability to employ persons who are paid competitive wages;

WHEREAS, the parties recognize that because most guest dissatisfaction is not reported, and most dissatisfied guests simply take their business elsewhere, the guest complaints received by the Hotel are a reflection of dissatisfaction by some who have not complained but who will not return to the Hotel;

WHEREAS, the parties agree that the Hotel shall train employees on how to provide premier guest service and that each employee may be expected to successfully complete such training;

WHEREAS, the parties agree that the Hotel should not employ or continue to employ employees who are either unable or unwilling to provide, or who do not provide, premier guest service;

NOW, THEREFORE, the parties agree as follows:

(1)    The Hotel has the right to establish service standards and appearance, grooming, and dress standards that must be adhered to by all employees and managers.

(2)    The parties agree that the Hotel may apply progressive discipline, up to and including discharge, against employees who are the subject of guest complaints other than those set forth in the following paragraph 3 (examples of complaints include, but are not limited to, misplaced luggage, guest room not completely cleaned, mishandled food or beverage order, incorrect credit card charge).

(3)    The parties agree that the Hotel shall have just cause for discharge of any employee who, among other reasons:

a)    Is the subject of two or more legitimate complaints from guests within one year of poor, rude, or discourteous service (examples include, but are not limited to, use of foul language in the presence of a guest, arguing with a guest, indifference to a guest concern, carrying on personal business while a guest is waiting);

b)    Is the subject of one legitimate complaint from a guest of extraordinarily poor, rude, or discourteous guest service (examples include, but are not limited to, directing foul language toward a guest, sexual or other harassment of a guest, refusal to assist a guest, requesting or adding a gratuity);

c)    Fails to pass a course pertaining to the Hotel's service standards;

13826232v.2

I-1

d)    Acts in gross neglect of the Hotel's service standards on one occasion or more, unless the Hotel deems it appropriate to excuse such neglect on a non-precedent setting basis.

The parties further agree that the foregoing are examples and that employees may terminated in  other circumstances, subject to the requirement that the termination be for just cause.

(4)    In the event the Hotel chooses to conduct written or oral testing of employees in connection with guest service training, such tests must be reasonable, job related, and non-discriminatory.  Such tests shall be limited to guest service and communication skills and abilities, as well as employee knowledge of the services and products offered by the Hotel.  The Union shall be permitted to a copy of any tests used in advance of utilization by the Hotel.  The Union shall be permitted to grieve such tests if it believes they are unreasonable, not job related, and/or discriminate on an unlawful basis.

(5)    Where a guest complaint is reduced to writing, the Hotel shall not be required to compel the guest to testify during the grievance and arbitration procedure or reveal the guest's address or telephone number to the Union or to the employee.  The Hotel may introduce into evidence at arbitration written guest complaints.  Upon request of the Union, the Hotel shall provide the Union with a copy of any written guest complaint that resulted in disciplinary action being taken against an employee, with the guest's identity redacted from such copy.  Where the Union wishes to investigate a complaint, the Hotel shall arrange for a conference call between the guest, a representative of the Union, and a representative of Hotel management.  Where, however, an employee has been discharged based on one or more guest complaints the Union shall be permitted to investigate the complaint to the extent permitted by the National Labor Relations Act, as interpreted by the National Labor Relations Board and the courts.

*Execution Copy*

APPENDIX "J"

<u>DRUG AND ALCOHOL TESTING</u>

This Drug and Alcohol Testing Policy is intended to be in accordance with Minnesota law and with the terms of the Agreement.

OBJECTIVE:

The Company strives to maintain a work environment free from the effects of drug and alcohol abuse for the protection of our customers, employees, and the community.

The Company recognizes that alcoholism and other drug dependencies are behavioral/medical problems which can be treated.

POLICY STATEMENTS:

1.     The possession, use, manufacture, transfer, or sale of illegal drugs during work hours, while operating a Company vehicle or on Company premises is prohibited. The Company premises include all SUNSTONE HOTEL PROPERTIES, INC. worksites, including parking facilities. Employees violating this provision may be terminated.

2.     Employees are not permitted to work under the influence of alcohol or any illegal drug. Employees violating this provision are subject to disciplinary action up to and including termination.

3.     Abuse of legally prescribed drugs or controlled substances, or over-the-counter drugs, is prohibited because it may impair an employee's ability to perform his or her job responsibilities. Depending on individual circumstances, this abuse could result in termination.

4.     Employees suffering from drug dependency are encouraged to seek medical treatment. The Human Resources representative may be contacted for referrals for evaluation and/or treatment facilities and the application of Company medical benefits for evaluation and treatment. No employee may suffer reprisals as a result of seeking help. If an employee feels he/she has suffered reprisals, he/she should report it to the Human Resources representative immediately and an appropriate investigation and action will take place.

5.     Every employee will receive a copy of the Drug and Alcohol Testing Policy and will be required to sign an Acknowledgment Form, Attachment A, which will be kept in the employee's personnel file. In addition, the Company shall post notices in appropriate and conspicuous locations at each of its worksites that the Company has adopted a Drug and Alcohol Testing Policy and that copies of the Policy are available for inspection during regular business hours by its employees and job applicants in the Company's Human Resources office.

6.     An employee may be required to undergo drug and alcohol testing when at least two (2) supervisors (if feasible) have reasonable suspicion that the employee:

a)     is under the influence of drugs or alcohol. Factors that may be considered in determining whether an employee is under the influence of drugs and alcohol include but are not

*Execution Copy*

limited to: evidence of repeated errors on the job, Company rule violation, and unsatisfactory time and attendance patterns, if coupled with specific facts and rational inferences drawn from those facts that indicate possible drug use; or

     b)    has violated the Company's written Policy Statements (numbers 1, 2, or 3 above); or

     c)    has had a personal injury while working or has caused a personal injury to another person; or

     d)    has caused a work-related accident or was operating or helping to operate machinery, equipment or vehicles in a work-related accident.

Post-accident or injury testing will be conducted as soon as practical following the accident, but not later than thirty-two (32) hours following the accident.

     7.    Drug and alcohol testing will be accomplished by the collection of hair, urine, and/or blood. The screening of hair, urine, and/or blood samples will be performed by qualified and certified testing laboratories. Testing is done for alcohol and the following drugs and drug classes:

Marijuana metabolites, cocaine metabolites, the opiates morphine and codeine, phencyclidine (PCP, angel dust), and amphetamines (amphetamine and methamphetamine), and/or all other drug classes as described in Schedules I through V of Minn. Stat. Section 152.02.

The detection levels of confirmatory tests shall be those established under Minnesota Rules.

     8.    Every employee has the right to refuse to undergo drug and alcohol testing. Employees who refuse to undergo testing are subject to disciplinary action up to and including termination.

     9.    Any employee who tests positive shall have the right to explain the positive test result of a confirmatory test or request and pay for a confirmatory retest of the original specimen sample.

     10.    If a positive test result on a confirmatory test was the first such result for the employee on a drug or alcohol test by the Company, the employee will be immediately suspended without pay. The employee can be reinstated upon participation in either a drug or alcohol counseling or rehabilitation program, whichever is more appropriate as determined by the Company after consultation with a certified chemical use counselor or a physician trained in the diagnosis and treatment of chemical dependency. The cost for the evaluation will be paid by the Company. Costs for the recommended treatment will be the employee's responsibility. Employees who refuse to participate in the counseling or rehabilitation program or fail to successfully complete the program, as evidenced by withdrawal from the program before its completion or by a positive test result on a confirmatory test after the completion of the program, may be subject to termination.

    J-2

*Execution Copy*

11.     An employee who is referred by the Company for chemical dependency treatment or evaluation or is participating in a chemical dependency treatment program may be requested or required to undergo drug or alcohol testing without prior notice during the evaluation or treatment period and for up to one (1) year following completion of any prescribed chemical dependency treatment program.  An employee testing positive during this period may be subject to termination.

12.     A Medical Review Officer (M.R.O.) will review all test results.  All positive test results shall be confirmed by a Gas Chromatography Mass Spectrometry analysis of the original specimen sample.  The M.R.O. will review and interpret analytical (laboratory) results, validate the results scientifically, and determine if there is a legitimate medical explanation for a positive test result, and notify the Company of the results.  The M.R.O. is a third party licensed physician with specialized knowledge of substance abuse.

13.     The Company reserves the right to change or terminate this Policy and Procedures at any time, after prior notice and negotiation with the Union.  Every employee will be given a copy of the amended policy if a change is made.

14.     Test result reports and other information acquired in the drug and alcohol testing process are confidential information.  Disclosure of the results to third parties may be done with the employee's prior written consent.  Notwithstanding the above, test results may be disclosed to any federal agency or other unit of the United States government as required under federal law, regulation or order, or in accordance with compliance requirements of a federal government contract.  The test results may also be disclosed to a substance abuse treatment facility for the purpose of evaluation or treatment of the employee, or may be disclosed to the Union or other necessary persons in connection with a potential or actual grievance or threatened or actual litigation.  An employee has the right to request and receive from the Company, a copy of the test result report on any drug or alcohol test.

No employee may be required to undergo drug or alcohol testing without the prior approval of the Director of Human Resources or the General Manager or his/her designee.

PROCEDURES:

1.     When at least two (2) supervisors (if feasible) have reasonable suspicion to test an employee as stated in Policy Statement #6, the request must go to the applicable Human Resources representative or his/her designee to arrange for the collection and begin the required paperwork designating the need for hair, urine, and/or blood specimen.

2.     Before a test is administered, the Company will ensure that the employee has completed a Drug and Alcohol Acknowledgment Form.

3.     The employee will go to the collection site and provide a hair, urine, and/or blood specimen and appropriate identification.  The collection site staff will begin the chain of custody paperwork and forward the specimen to the certified laboratory for testing.  If an employee appears impaired and unable to safely go to the collection site on his/her own, the Company will arrange for transportation to the collection site and home following the collection procedure. Under no circumstances should an employee suspected of being impaired be allowed

13826232v.2                                        J-3

*Execution Copy*

to drive. The employee will be reimbursed for any out-of-pocket expense incurred in taking the test, with proper documentation.

4.    Test results will be reviewed to determine if there is evidence of the use of alcohol, drugs or controlled substances and forwarded to the M.R.O. If the specimen sample shows a positive result, the original sample will be kept for additional confirming tests.

5.    The M.R.O. will communicate the results to the Company Human Resources representative.

6.    The Human Resources representative and/or the employee's supervisor will communicate the results of the test to the employee or job applicant, as the case may be, within three working days upon receipt of the results.

7.    If an employee tests positive for drug use, the employee will be notified in writing of his/her right to explain the positive test and the Company may request that the employee indicate any over-the-counter or prescription medication that the individual is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test result.

8.    Within three (3) working days after notice of a positive test result on a confirmatory test, the employee may submit information to the Company, in addition to any information already submitted under paragraph 7, to explain that result, or may request a confirmatory re-test of the original sample at the employee's own expense.

9.    The Human Resources representative will follow up on any recommended treatment and determine whether the employee has successfully completed the treatment.

*Execution Copy*

Attachment A

DRUG AND ALCOHOL POLICY ACKNOWLEDGMENT FORM

I, the undersigned, certify that I have received and read a copy of the Company's Policy regarding drug and alcohol abuse.

As part of my employment with the Company, I understand that my position is subject to drug and alcohol testing and that I may be requested to provide a hair, urine, and/or blood specimen for a drug or alcohol test.

I understand that I may refuse to take the drug and alcohol test and that such refusal may result in termination.

_____
Employee


_____
Social Security Number            _____
                                  Date


_____
Witness

*Execution Copy*

APPENDIX "K"

**Mutual Agreements**
**(Custom, Past Practice, Letters of Understanding)**

As part of the 2001 contract negotiations and settlement, the parties added a new Article 25 entitled, "Entire Agreement" to the Agreement. In connection with adding Article 25 to the Collective Bargaining Agreement, both parties made a reasonable and good faith effort to locate, identify and discuss all separate mutually agreed upon custom, past practices, or letters of agreement understanding which they believe were part of the collective bargaining agreement. As a result, the parties agree that the following items are part of the Collective Bargaining Agreement:

1.    From letter of August 19, 1988 to Dan Skinner, HR Manager, Kahler Hotel, from Terry Weivoda, Local 21 any employee with prior service and seniority in a room (restaurant) is permitted to use that seniority to bid on any posted jobs in that room (restaurant).

2.    From letter of September 24, 1991 to Terry Weivoda, Local 21, from Kevin Molloy, Senior VP Operations,

a.    It is agreed that no absolute room quota exists for room housekeepers, but the employer has the right to set reasonable performance standards.

b.    Consistent with past practice, it is agreed that full time housekeepers shall be able to use their seniority to select work areas, part time housekeepers shall be assigned as needed.

c.    It is agreed that when employees have been requested to work on their day off, such designation shall be made on the employee's work schedule noting any sixth or seventh day worked.

d.    It is agreed that tipped employees shall not be required to share gratuities with other Hotel employees.

e.    It is agreed that the Employer will continue for the life of their 2011 – 2014 Collective Bargaining Agreement the current employee discount for meals purchased in restaurants in accordance with the established policy, i.e. employee cafeteria, or if not available, from employee menu.

3.    From letter of October 23, 1997 to Dave Blanchard, Local 21, from Kevin Molloy, Regional VP Sunstone.

a.    It is agreed that a shift chef will not be used to fill a regular shift while a cook is on lay off. It is understood, however, that under such circumstances a laid off cook will not be recalled to cover short periods of cooking that could occur during the heavy volume periods of the day.

b.    It is agreed that when an employee is required to work through the lunch, the supervisor will be advised, and will attempt to reschedule the lunch periods. Employees will not, however, have lunch periods scheduled during the last one half hour of the shift.

c.    With respect to Article 9, Section 1, it is agreed that the language will be interpreted to require that employees who work on a holiday will be paid double time for all hours worked on that

13826232v.2

K-1

day.

4.  From letter of October 5, 1998 to Kevin Molloy, Senior VP Operations, from Brian Brandt, Local 21. Concerning the issue of the employer using workers obtained through temporary employment agencies, it is understood that the Union would not consider it to be a violation of the Collective Bargaining Agreement should the Employer choose to utilize such workers provided that the Employer has made every reasonable effort to fill all positions with regular employees and, where practicable, to offer the work to all bargaining unit employees in the job classification first. The temporary workers will have no seniority rights and will not be used to prevent overtime or additional hours for Union members. Any temporary worker utilized by the Employer for more than thirty (30) calendar days will immediately become a Sunstone employee subject to the Collective Bargaining Agreement and the thirty days as a temporary worker will be considered the probationary period. The Employer will provide the Union with a record of all temporary workers' names and hours worked upon request.

5.  From letter of June 22, 1994 to Jim Porrett, VP (Textile Care Services), from Terry Weivoda, Local 21 - it is agreed that maintenance employees with boiler operator responsibilities will be paid $1.00 per hour for those hours during which they perform boiler operator job duties.

6.  From letter of January 4, 1993 to Randy Lacey, Plant Manager (TCS), from Terry Weivoda, Local 21 - the union has accepted the employer's proposal to adopt an absence control policy.

7.  From letter of August 1, 2001, to Frank Heavlin, from David Blanchard, Local 21, regarding treatment of biohazard bags at Textile Care Services in Rochester, Minnesota. It is agreed that employees at TCS will no longer be required to handle any bio-hazard bags when they come to the plant. Any such bags will be placed, unopened, into a special bin that will be picked up by Mayo to be handled by them. This policy will not change during the life of the 2001-2005 Agreement unless required by law.

8.  As a result of discussions between the parties during the 2001 contract negotiations, the Employer agrees that bargaining unit employees will no longer be required to push wheelchairs occupied by non-hotel guests, or wheelchairs occupied by guests off company premises.

In addition, the parties recognize and agree that despite their efforts, there may be other separate documented mutual agreements which the Union or the Employer did not locate, identify or discuss, but which one party may believe is a part of the Collective Bargaining Agreement. If, after the 2001 Agreement is settled, either party discovers a previously undiscovered, documented mutual agreement, which they believe is part of the Collective Bargaining Agreement, Article 26 will not operate as a waiver of their right to assert their rights under the newly discovered and documented mutual agreement.

K-2

EXHIBIT NO. **GC 3** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **3** DATE **12/15/15** REPORTER **SMW**

| S.No. | Article | Subject | Current Language | Proposed Language |
|---|---|---|---|---|
| 1 | 8 | Work week | Double time will be paid after 48 hours worked or paid as an approved holiday or vacation day in a work week. | Pay calculation shall be the same as is applicable to our other employees and in accordance with applicable MN/Federal Law. Eliminate double time completely. Time and one half paid for any hours worked over 40 hours in a work week. |
| 2 | Appendix A | Payroll Rates | Currently, in addition to the annual increases, the rate increases are set at 4 additional service points – 12 months, 24 months, 42 months and 60 months. | Retain the annual increases, however eliminate rate increases at various service points. This would be consistent with standard practice across various organizations and with other employees. |
| 3 | 8 | Work week | Time and one-half to be paid for any hours worked in excess of eight (8) hours worked in a work day. | Pay calculation shall be the same as is applicable to our other employees and in accordance with applicable MN/Federal Law. Time and one-half to be paid only for hours worked over 40 hours in a work week. Eliminate daily OT. |
| 4 | 15 | Health, Sick and Safety benefits | The maximum benefit that can be accumulated by an employee will be three hundred (300) hours. Upon an employee reaching the maximum balance, the employee may sell upto sixty (60) hours of sick pay at fifty percent (50%) of value on the employee's anniversary date. | The maximum benefit that can be accumulated by an employee will be one hundred twenty (120) hours. Upon an employee reaching the maximum balance, the employee may sell up to 30 (30) hours of sick pay at 50% of value on the employee's anniversary date. Associates who currently have 300 hours will get a one-time sell option of 60 hours at 50% of value on the anniversary date during this transition period following which the 30 hours sick pay sell off (as outlined above) will be in effect. |

**GC Exhibit 3**

| | | | | |
|---|---|---|---|---|
| 5 | 8 | Work week | The senior employees in a classification who are on duty shall be given the first preference to work OT. | Prior to giving OT to associates, if there are associates in the same classification in a different property who are not receiving 40 hours due to lack of business at that property, management should be able to schedule them prior to giving OT hours. |
| 6 | 10 | Vacations | A maximum of two(2) years vacation *(benefit)* may be accummulated. Once the employee has accumulated the maximum of two (2) years' vacation entitlement he/she shall stop accumulating additional vacation but shall not lose any vacation accumulated. | *Vacation benefit will be granted on associate's anniversary date and upto a maximum of 40 hours carry over is permitted.* |
| 7 | Appendix E | Banquet Service Addendum | Banquet servers shall receive 15% of the banquet service charge on all functions. Should the service charge be increased, the hotel will retain the full increase upto 18%. Any service charge over 18% percent will be divided equally between the employees and the hotel. | Service charge to be capped at 15% regardless of other increases. <br><br> Banquet servers and cooks should not work for non-union shops or direct competitors OR the service charge will be eliminated and will be paid at a straight hourly rate. |
| 8 | Appendix E | Banquet Service Addendum | One-half of the cake plating charge shall be included in the tip pool. | Eliminate cake cutting 50/50 split. This should be part of any wedding service or meal service not any different than a dessert course. This makes us non-competitive both in terms of pricing and service standards. |
| 9 | Appendix E | Banquet Service Addendum | When the Employer collects a corkage fee for guest supplied alcohol, 50% of that fee shall be added to the service charge pool. For events where no corkage fee is collected, 50% of the customary fee will be added to the service charge pool*(Clarification for Jovon: this amount is going out of the hotel account).* | Corkage will be paid at 15% of the total negotiated corkage fee paid by the client. If no corkage fee is collected from the client, there will be no payment to the staff. If the hotel does not receive any amount, the hotel does not have to pay this out from its own pocket. |

| 10 | 2 | Union Security | The employer will send copies of bargaining unit job postings to the union which may refer candidates for employment. The employer shall have no obligation to hire any person so referred. | The union shall be aware of all hotels open position list at all times and proactively assist the hotel in filling positions through networking and marketing. The hotel reserves the right to select referred candidates. |
|----|---|----|----|----|
| 11 | 7 | Leaves of Absence | Leaves of absence for illness or injury will be granted upon request for absences not to exceed one (1) year, unless a longer period is required by the ADA. | Leaves of absence for illness or injury will be granted upon request for absences not to exceed 12 weeks, unless a longer period is required by the ADA. Not reasonable to hold a position for one year. |
| 12 | 3 | Seniority | Employees who bid and accept a new position have a thirty (30) day trial period. At the end of the trial period if the employee is unable to meet the job requirements or is unhappy in the position, he/she will be returned to the previous position. | Employees who bid and accept a new position are subject to a 30-day trial period. If after 30-days the employee cannot perform the task then the employee can look at other positions but cannot go back to where they were unless the position is still vacant. |

EXHIBIT NO. __**GC 5**__ RECEIVED ___✔___ REJECTED _____

CASE NO. __**18-CA-151245**__ CASE NAME ____**Richfield**____

NO. OF PAGES ___**2**___ DATE __**12/15/15**__ REPORTER ___**SMW**___

P 01003

**Wichmann, Andrea G.**

| | |
|---|---|
| **From:** | Martin Goff <mgoff@here17.org> |
| **Sent:** | Wednesday, June 17, 2015 12:45 PM |
| **To:** | Wiese, Tyler |
| **Subject:** | FW: Ashley Rudloff |
| **Sensitivity:** | Personal |
| **Flag Status:** | Completed |

I just saw this from Rochester regarding wage increases for people still in the negotiated step wage increases.
Martin Goff

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Wednesday, June 17, 2015 12:01 PM
**To:** brian@local21.com
**Cc:** Mary Costello; Chad Decker; Martin Goff; Nancy Goldman
**Subject:** RE: Ashley Rudloff

Hello Brian,
In reference to your grievance on Ashley Rudloff for her 12 month pay increase.

As of 2.28.15 the mutually extended collective bargaining agreement, has expired. Currently the properties are without a contract. The employer has shared with the union that we will not be extending the previous contract.

The employer has provided a comprehensive and ready to execute last best and final offer on the table since 3.24.15 which the union has not signed.

The employers position is that we are awaiting the signed and to be executed proposal that is on the table to provide all affected associates with the appropriate negotiated increase.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

---

**From:** brian@local21.com [mailto:brian@local21.com]
**Sent:** Thursday, June 11, 2015 4:28 PM
**To:** Michael Henry
**Cc:** Mary Costello; Chad Decker; mgoff@here17.org; Nancy Goldman
**Subject:** Ashley Rudloff

Michael,                                      **GC Exhibit 5**

1

Ashley Rudloff, a housekeeper at the Marriott has informed me that she should have received her 12 month pay increase as of 5-12-15 but when she spoke to you she was told she would not get it until the contract is settled. The Union is filing a grievance concerning this matter. The employer is in violation of, including but not limited to, Appendix "A" of the CBA. The union requests as resolution to this grievance that Ms Rudloff's pay be increased immediately to the correct rate and that she be made whole. Please let me know when she can expect to see the pay increase and back pay.

Brian Brandt
President UNITE HERE Local 21
Phone: 507-288-2021
Cell: 507-254-5735
Fax: 507-281-3491

P 01005

EXHIBIT NO. **GC 6(a)** RECEIVED _____✔_____ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME _____**Richfield**_____

NO. OF PAGES ___**160**___ DATE **12/15/15** REPORTER ___**SMW**___

#1

1-20-15

| CURRENT CONTRACT | PROPOSED CONTRACT |
|---|---|
| AGREEMENT<br>Between<br>Sunstone Hotel Properties, Inc.<br>And<br>UNITE HERE Local 21 AFL-CIO<br>Rochester, Minnesota<br>October 1, 2011<br>to<br>August 31, 2014 | AGREEMENT<br>between<br>Textile Care Services<br>and<br>UNITE HERE Local 21 AFL-CIO<br>Rochester, Minnesota<br>[date]<br>to<br>[date] |

Union TA:_____

Employer TA:_____

GC Exhibit 6 (a)

2

P 01007

| TABLE OF CONTENTS | PAGE |
|---|---|

ARTICLE 1 RECOGNITION. .1
ARTICLE 2 UNION SECURITY .1
ARTICLE 3 SENIORITY .3
ARTICLE 4 PROBATIONARY PERIOD. .6
ARTICLE 5 DISCHARGE OR DISCIPLINE .6
ARTICLE 6 GRIEVANCE AND ARBITRATION PROCEDURE. .7
ARTICLE 7 LEAVES OF ABSENCE. .9
ARTICLE 8 WORKWEEK. .10
ARTICLE 9 HOLIDAYS .13
ARTICLE 10 VACATIONS. .14
ARTICLE 11 INSURANCE BENEFITS .16
ARTICLE 12 UNIFORMS AND LAUNDRY .16
ARTICLE 13 BULLETIN BOARDS. .16

| TABLE OF CONTENTS | PAGE |
|---|---|

3

P 01008

ARTICLE 14 WAGES

.17

ARTICLE 15 HEALTH, SAFETY AND SICK BENEFITS

.18

ARTICLE 16
PENSION.                                                      .19
ARTICLE 17 UNITE HERE
401(K).                                                       .19
ARTICLE 18 NO STRIKE OR LOCKOUT

.19

ARTICLE 19 MAINTENANCE TOOL ALLOWANCE

.20

ARTICLE 20 DISCRIMINATION

.20

ARTICLE 21 RESPECT &
DIGNITY                                                       .20
ARTICLE 22 MANAGEMENT RIGHTS

.21

ARTICLE 23 LAUNDRY AND DRY CLEANING WORK
STABILIZATION.                                                .21
ARTICLE 24 SUCCESSORSHIP

.22

ARTICLE 25 LATERAL
SERVICE.                                                      .22
ARTICLE 26 ENTIRE
AGREEMENT.                                                    .22
ARTICLE 27
DURATION.                                                     .23

4

| | |
|---|---|
| SIDE LETTER. | .24 |
| APPENDIX "A" PAYROLL RATES | .A-1 |
| APPENDIX "B" DEPARTMENTS AND SENIORITY SECTIONS. | .B-1 |
| APPENDIX "C" MAINTENANCE ADDENDUM. | .C-1 |
| APPENDIX "D" HOUSEKEEPING ADDENDUM. | .D-1 |
| APPENDIX "E" BANQUET DEPARTMENT ADDENDUM | .E-1 |
| APPENDIX "F" FOOD AND BEVERAGE ADDENDUM. | .F-1 |
| APPENDIX "G" TEXTILE CARE SERVICES ADDENDUM. | .G-1 |
| APPENDIX "H" BELL POSITION ADDENDUM. | .H-1 |
| APPENDIX "I" GUEST SERVICE | .I-1 |
| APPENDIX "J" DRUG AND ALCOHOL TESTING. | .J-1 |
| APPENDIX "K" MUTUAL AGREEMENTS (CUSTOM, PAST PRACTICE, LETTERS OF UNDERSTANDING). | .K-1 |

Union TA:_____

5

P 01010

Employer TA:_____

| | |
|---|---|
| This Agreement made this 1st day of October, 2011 by and between Sunstone Hotel Properties, Inc., as agent for d/b/a The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites; and Textile Care Services located in Rochester, Minnesota, hereinafter referred to as "Employer," and UNITE HERE Local 21 AFL-CIO, hereinafter referred to as "Union." | This Agreement made this ___ day of _____, ____ by and between Textile Care Services located in Rochester, Minnesota, hereinafter referred to as "Employer," and UNITE HERE Local 21 AFL-CIO, hereinafter referred to as "Union." |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| WHEREAS, it is the desire of the respective parties hereto to avoid disruption in the service and operation of the units covered by this Agreement and to secure the benefits intended to be derived by the Employer, its employees and the Union under these articles of Agreement, it is agreed by and between the Employer and the Union as follows: | No change (except to singularize the term "unit") |

Union TA:_____

Employer TA:_____

6

| ARTICLE 1 RECOGNITION | |
|---|---|
| The Employer above named, for and on behalf of the properties above named, recognizes the Union as the exclusive bargaining representative of all employees of the Employer employed at the above properties in Rochester, Minnesota listed in the classifications set forth in Appendix A, with respect to wages, hours, and all other working conditions. All other employees, including supervisors, managers, administrative employees and confidential employees are excluded from the bargaining unit. | The Employer above named, for and on behalf of Textile Care Services, recognizes the Union as the exclusive bargaining representative of all employees of the Employer employed at this location in Rochester, Minnesota listed in the classifications set forth in Appendix A, with respect to wages, hours, and all other working conditions. All other employees, including supervisors, managers, administrative employees and confidential employees are excluded from the bargaining unit. |

Union TA: _____

Employer TA: _____

7

P 01012

| ARTICLE 2 UNION SECURITY | |
|---|---|
| 1. The Employer agrees not to enter into any contract or agreement with the employees herein, individually or collectively, which conflicts with the terms and provisions hereof. | No change |

Union TA: _____

Employer TA: _____

| 2. All employees covered by this Agreement who are now or who may hereafter become members of the Union shall, during the life of this agreement, remain members of the Union in good standing or pay fees in lieu thereof as a condition of continued employment. "In good standing" for the purposes of this agreement is defined to mean the payment as required by the Union of a standard initiation fee and standard regular monthly dues relating to the Union's collective bargaining function, applied uniformly to all members of the bargaining unit covered by this Agreement. | No change |
|---|---|

Union TA: _____

Employer TA: _____

8

P 01013

| | |
|---|---|
| Provided, however, temporary summer employees hired between May 1 and September 30 will be exempt for four (4) months from initiation fees normally charged other employees. It is agreed that these temporary positions shall be posted and that any employees who take a temporary position shall not be restricted from bidding on a regular position should one become available. If such employees are retained past September 30, they will be obligated to pay the initiation fee. Such employees will be entitled to all fringe benefits for which they qualify except seniority and insurance. | Provided, however, temporary employees hired between two (2) and twenty four (24) weeks will be exempt from initiation fees and dues normally charged other employees. It is agreed that these temporary positions shall be posted and that any employees who take a temporary position shall not be restricted from bidding on a regular position should one become available. If such employees are retained past Twenty-four (24) weeks, they will be obligated to pay the initiation fee. Such employees will be entitled to all fringe benefits for which they qualify except seniority and insurance. |

Union TA: _____

Employer TA: _____

P 01014

| | |
|---|---|
| 3. Employees hired who average ten (10) hours or more per week in a four (4) week period or who have been working under a work permit shall, as a condition of employment, become and remain members in good standing of the Union or pay fees in lieu thereof after thirty (30) calendar days employment. All such employees averaging over said ten (10) hours shall have all of the benefits under this Agreement except as to insurance benefits, ~~and such employees shall average twenty-five (25) hours or more per week. Provided, however, that employees in "B" classifications who average twenty (20) hours or more per week will be covered by the insurance benefits.~~ In determining the average, the weekly average shall be determined the last pay period of each month based upon the previous twenty-six (26) week period. The twenty-six (26) week period shall be a floating period. | Employees hired who average ten (10) hours or more per week in a four (4) week period or who have been working under a work permit shall, as a condition of employment, become and remain members in good standing of the Union or pay fees in lieu thereof after thirty (30) calendar days of employment. All such employees averaging over said ten (10) hours shall have all of the benefits under this Agreement except as to insurance benefits. ~~Such employees who average thirty (30) hours or more per week shall have insurance benefits.~~ In determining the average, the weekly average shall be determined the last pay period of each month based upon the previous twenty-six (26) week period. The twenty-six (26) week period shall be a floating period. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 4. The Employer shall update the dues checkoff list provided by the Union on a monthly basis to reflect new hires and terminations. | No change |

Union TA:_____

Employer TA:_____

10

P 01015

| | |
|---|---|
| 5̶ The Employer and the Union agree not to adopt rules or regulations or to engage in practices that conflict with the express terms of this Agreement. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 6̶ The Employer shall check off monthly Union dues and initiation fees and/or other required fees in a manner according to procedures agreed upon between the representatives of both parties, upon receipt of written authorization form to deduct Union dues or fees signed by the employee. By the twelfth (12th) of each month the Union must submit to the Employer in duplicate a current list of deductions to be made. The Employer agrees to remit such deductions to the Union by the last Friday of the current month after receipt of deduction list. The date of dues deductions may be changed by agreement between the Employer and the Union. | No change |

Union TA:_____

Employer TA:_____

11

P 01016

| 7. The Employer will send copies of bargaining unit job postings to the Union which may refer candidates for employment. The Employer shall have no obligation to hire any person so referred. | The Employer will post all bargaining unit job openings on its property to which the Union has access. The Union may refer candidates for employment. The Employer shall have no obligation to hire any person so referred. |
|---|---|

Union TA:_____

Employer TA:_____

| 8. The designated union representative will be allowed to visit the premises of the Employer for the purpose of administering this Agreement. The Union representative will provide the Human Resources Director or General Manager with as much advance notice as is possible prior to visiting the facility. Upon arriving at the facility, the Union representative will check in at the office. It is agreed that the work of the employees will not be interrupted by such visits. Union representatives will not meet with employees during working time without the knowledge and permission of the Employer. | No change |
|---|---|

Union TA:_____

Employer TA:_____

12

P 01017

| 9. New Member Orientation. The Union or a designated representative will be provided access to newly hired employees on the Employer's premises, after thirty (30) days of employment, to provide information about this Agreement and the employees' rights thereunder. Such access shall be for up to thirty (30) minutes, once per month, at a mutually agreed upon time and location. | No change |
|---|---|

Union TA:_____

Employer TA:_____

| 10. Tip Check-Off – the Employer agrees to honor political contribution deduction authorizations from employees in the following form: | No change |
|---|---|

Union TA:_____

Employer TA:_____

13

P 01018

| | |
|---|---|
| I hereby authorize my Employer to deduct from my pay the sum of $\$\_\_\_$ per pay period and to forward that amount as my voluntary contribution to the UNITE HERE International Political Committee, 275 Seventh Avenue, New York, N.Y 10001 ("PAC"). My decision to participate in the UNITE HERE PAC is a voluntary one and I understand that I am under no compulsion to contribute to it, since such contributions are neither a condition of my continued employment or of membership in the Union. I also understand that this authorization may be revoked by me at any time and that it is automatically revoked upon termination of my employment. | No change |

Union TA:_____

Employer TA:_____

14

P 01019

| | |
|---|---|
| The political contribution deduction shall be made once each month during which an employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within thirty (30) days after the last day of the preceding month to the UNITE HERE International Political Committee, 275 Seventh Avenue, New York, N.Y. 10001, accompanied by a form stating the name of each employee for whom a deduction has been made, and the amount deducted. The parties have taken into account the cost of administration of this deduction in negotiating the wage increases and benefits specified in this Agreement. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits, or other terms of liability that may arise out of or by reason of action taken by the Employer to comply with this Article. | No change |

Union TA:_____

Employer TA:_____

15

P 01020

| ARTICLE 3 SENIORITY | |
|---|---|
| 1. Seniority shall be by section (see Appendix B) and by work location (e.g. The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites, or Textile Care Services), except the banquet department as set forth in the Banquet Department addendum. Employees shall not acquire seniority until they have completed their probationary period; then seniority shall revert to the date of employment. | Seniority shall be by department. Employees shall not acquire seniority until they have completed their probationary period; then seniority shall revert to the date of employment. |

Union TA:_____

Employer TA:_____

| 2. Where qualifications to perform the available work are equal, layoff and recall will be by seniority as defined in paragraph 3. | No change |
|---|---|

Union TA:_____

Employer TA:_____

16

| | |
|---|---|
| When recalling employees who have been laid off because of reduction of work force, the Union shall be notified by the Employer of such employees who are to be rehired. If an employee so notified does not report for work within seven (7) days from the date his notice was mailed by certified mail, he shall forfeit seniority unless he has reasonable excuse for his failure. In the event an employee is employed elsewhere when he/she receives a notice to report for work, the employee shall not forfeit his/her seniority by not reporting unless the Employer gives the employee reasonable assurance of at least three (3) months steady employment. However, the employee must immediately notify the Employer and waive his right to the particular job that is open. | §17. When recalling employees who have been laid off because of reduction of work force, the Union shall be notified by the Employer of such employees who are to be rehired. If an employee so notified does not report for work within seven (7) days from the date his notice was mailed by certified mail, he shall forfeit seniority unless he has reasonable excuse for his failure. In the event an employee is employed elsewhere when he/she receives a notice to report for work, the employee shall not forfeit his/her seniority by not reporting unless the Employer gives the employee reasonable assurance of at least three (3) months steady employment. However, the employee must immediately notify the Employer no later than the seventh (7th) day after the recall notice is mailed, identify his/her current employment and waive his right to the particular job that is open. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 3. Seniority shall mean continuous length of employment with the Employer in the sections listed in Appendix "B". Any employee transferred or re-employed in another section retains but does not accumulate his seniority in his original section and, in addition, commences seniority in his new section. | 3. Seniority shall mean continuous length of employment with the Employer within any department. Any employee transferred or re-employed in another department retains but does not accumulate his seniority in his original section and, in addition, commences seniority in his new section. |

17

P 01022

Union TA:_____

Employer TA:_____

| 4. Where qualifications are equal, employees shall be promoted within their departments on the basis of seniority. Only when a vacancy occurs or a new position is created for purposes of shift preference, days off, and server sections. | No change |
|---|---|

Union TA:_____

Employer TA:_____

| 5. Except where rotation is practiced, servers shall be given preferential stations on the basis of seniority, provided that they are sufficiently qualified. | Omit |
|---|---|

Union TA:_____

Employeyr TA:_____

| 6. As with permanent job openings under section 7, an employee laid off from his/her section shall have preference based on seniority in hiring over any other applicant for other sections of the Employer, even though it may be in another operation, provided qualifications are equal. Seniority shall be forfeited on the following grounds: | As with permanent job openings under section 7, an employee laid off from his/her department shall have preference based on seniority in hiring over any other applicant for other sections of the Employer, provided qualifications are equal. Seniority shall be forfeited on the following grounds: |
|---|---|

18

P 01023

| | |
|---|---|
| | Union TA:_____ |
| | Employer TA:_____ |
| (a) Voluntarily leaving the employ of the Employer; | No change |
| | Union TA:_____ |
| | Employer TA:_____ |
| (b) Discharge for proper cause; | No change |
| | Union TA:_____ |
| | Employer TA:_____ |
| (c) Layoffs in excess of six (6) months; or | No change |
| | Union TA:_____ |
| | Employer TA:_____ |
| (d) Failure to report for work after a layoff within a reasonable time, not to exceed seven (7) days, after the Employer has notified employee to report for work, as previously provided. | No change |
| | Union TA:_____ |

19

Employer TA:_____

| | |
|---|---|
| (e) Absences for any reason longer than one (1) year, unless a longer period is required by the Americans with Disabilities Act. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 7. Permanent job openings in the classifications covered in this Agreement will be posted for a minimum of five (5) days on the Human Resources bulletin board ~~at the Kahler Grand Hotel and in the break rooms at all other facilities covered by this Agreement~~ to advise employees of the opening. Employees interested in the position must advise the Human Resources office in writing of their desire to be transferred or promoted to the open position. Where qualifications are equal, the opening will be filled by seniority, adhering to the following preferences: | Permanent job openings in the classifications covered in this Agreement will be posted for a minimum of five (5) days on the Human Resources bulletin board. Employees interested in the position must advise the Human Resources office in writing of their desire to be transferred or promoted to the open position. Where qualifications are equal, the opening will be filled by seniority, adhering to the following preferences: |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 1st Employees working in the classification ~~at the property where the opening is available~~ | 1st Employees currently working in the classification. |

Union TA:_____

20

P 01025

Employer TA:_____

| 2nd Employees working in the classification at other properties; | Omit |
|---|---|

Union TA:_____

Employer TA:_____

| 3rd Employees working outside of the classification who have demonstrated the skill or potential ability to successfully perform in the position, and who have notified the Employer of their desire to change classifications; | No change |
|---|---|

Union TA:_____

Employer TA:_____

| 4th Employees working outside of the classification | 3rd Employees not currently in the bargaining unit |
|---|---|

P 01026

Union TA:_____

Employer TA:_____

| For purposes of scheduling, employees moving to a new location in the same classification shall move to the bottom of the seniority list. However, prior classification seniority shall be maintained. If an employee bids for and receives a permanent job vacancy, he/she cannot bid again for a posted job opening for a period of six (6) months. The six (6) month limitation will not apply to requests for shift preferences or work schedules within a classification and section. "Qualifications," as used herein, shall be based on the Employer's reasonable judgment of the applicant's skills, abilities, aptitude, and overall work record. Notwithstanding the foregoing, the Employer may postpone a transfer or promotion where it would leave another department with an insufficient number of skilled employees or an excessive number of vacancies. Until a permanent job opening is filled, the Employer may use its discretion to select an employee to temporarily fill the opening. | For purposes of scheduling, employees moving to a new location in the same classification shall move to the bottom of the seniority list. However, prior classification seniority shall be maintained. If an employee bids for and receives a permanent job vacancy, he/she cannot bid again for a posted job opening for a period of six (6) months. The Employer need not permit an employee more than one transfer to a different job classification in a twelve (12) month period. The six (6) month limitation will not apply to requests for shift preferences or work schedules within a classification and section. "Qualifications," as used herein, shall be based on the Employer's reasonable judgment of the applicant's skills, abilities, aptitude, and overall work record. Notwithstanding the foregoing, the Employer may postpone a transfer or promotion where it would leave another department with an insufficient number of skilled employees or an excessive number of vacancies. Until a permanent job opening is filled, the Employer may use its discretion to select an employee to temporarily fill the opening. |

22

P 01027

|  |  |
|---|---|

Union TA:_____

Employer TA:_____

| A permanent job opening is a vacancy in a position which is scheduled for fifteen (15) or more hours per week on a regular basis. ~~A permanent job opening will not exist when any person who has a seniority claim on that position is on vacation, sick leave, or other leave of absence.~~ | A permanent job opening is a vacancy in a position which is scheduled for fifteen (15) or more hours per week on a regular basis. |

Union TA._____

Employer TA:_____

| Employees who bid and accept a new position have a thirty (30) day trial period. At the end of the trial period if the employee is unable to meet job requirements or is unhappy in the position, he/she ~~will be returned to the previous position. Either the employee or management may initiate the return.~~ In the event management | Employees who bid and accept a new position have a thirty (30) day trial period. At the end of the trial period if the employee is unable to meet job requirements or is unhappy in the position, he/she ~~may consider bidding for another position for which he or she is qualified, but may not return to the former position if that position has~~ |

23

P 01028

initiates the return, the employee shall have the right to grieve the decision under the Grievance and Arbitration Procedure contained herein, provided however, the Employer has acted in an arbitrary or capricious manner.

been filled. In the event management, at the end of this thirty (30) day period, initiates the process of the employee either bidding or returning (because management has decided the employee is unable to meet job requirements), the employee shall have the right to grieve the decision under the Grievance and Arbitration Procedure contained herein; however, the sole permitted basis for asserting a grievance in this instance is that the Employer has acted in an arbitrary or capricious manner.

Union TA:_____

Employer TA:_____

Any regular employee within a classification and section may exercise their seniority as it applies to shift preference schedules and/or days off up to forty (40) hours in a work week. In the Maintenance Departments, new hires may be trained on the day shift for up to thirty (30) days before shift preference can be exercised to displace that employee; provided, however, that there will be an automatic extension of an additional thirty (30) days in the event the Employer believes that additional time is required to determine the employee's ability to work off-shifts. Employees shall not be placed on the third shift until supervisor is satisfied the

Any regular employee within a classification and section may exercise their seniority as it applies to shift preference schedules and/or days off up to forty (40) hours in a work week. In the Maintenance and Checking Departments, new hires may be trained on the day shift for up to ninety (90) days before shift preference can be exercised to displace that employee; provided, however, that there will be an automatic extension of an additional thirty (30) days in the event the Employer believes that additional time is required to determine the employee's ability to work off-shifts. Employees shall not be placed on the third shift until supervisor is satisfied the

24

P 01029

| | |
|---|---|
| employee is capable of working alone. | employee is capable of working alone. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 8. The Employer shall furnish a complete up to date seniority list to the Union of all employees covered by this Agreement within thirty (30) days following a request from the Union representative. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 9. Re-employment of members of the Armed Forces shall be governed by applicable law. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 10. The Employer and the Union shall make every effort to provide work for incapacitated employees returning | No change |

25

P 01030

| from the Armed Forces. | |
|---|---|
| | Union TA:_____ |
| | Employer TA:_____ |

| 11. When an employee is transferred to a position outside the coverage of this Agreement, he/she shall retain seniority for thirty (30) days. At the end of such time, seniority shall be forfeited if the employee retains a position outside the unit. | No change - §30 |
|---|---|

Union TA:_____

Employer TA:_____

| 12. In the event the Employer rehires an employee who has been discharged, such employee shall not be reinstated in accordance with his accumulated seniority unless such action is approved by both the Union and the Employer. | No change - §31 |
|---|---|

Union TA:_____

Employer TA:_____

26

P 01031

| | |
|---|---|
| 13. Retirees working on an on-call or part-time basis shall receive the benefits of this Agreement except those provided under Article 3 and Article 11. | No change - §32 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 14. If there is a reposting of a section, the Union will be notified and upon request the Employer will explain the reason for the reposting. | Omit |

Union TA:_____

Employer TA:_____

| ARTICLE 4 PROBATIONARY PERIOD | |
|---|---|
| The first sixty (60) days of employment shall be probationary, during which time an employee may be discharged with or without cause and without recourse to the grievance procedure. An automatic extension of the probationary period of an additional thirty (30) days will apply at the written request of the Employer, in the event the Employer believes that additional time is required to determine the employee's qualifications. | The first ninety (90) days of employment shall be probationary, during which time an employee may be discharged with or without cause and without recourse to the grievance procedure. An automatic extension of the probationary period of an additional thirty (30) days will apply at the written direction of the Employer, in the event the Employer believes, in its sole discretion, that additional time is required to determine the employee's qualifications. |

27

P 01032

| | |
|---|---|
| | Union TA:_____ |
| | Employer TA:_____ |

| ARTICLE 5 DISCHARGE OR DISCIPLINE | |
|---|---|
| 1. No employee will be disciplined or (except for a probationary employee) discharged without just cause. In the event a meeting is held for disciplinary purposes, the affected employee shall have the right to have a Union steward and/or Union Business Agent present if the employee so requests. | No employee who has completed his/her probationary period will be disciplined or discharged without just cause. In the event a meeting is held for disciplinary purposes, the affected employee shall have the right to have a Union steward and/or Union Business Agent present if the employee so requests. |

|  | Union TA:_____ |
|---|---|
| | Employer TA:_____ |

| 2. Warning notices and other disciplinary action which are to become part of an employee's file shall be read and signed by the employee. Such signature shall not be an admission of wrongdoing by the employee. | No change - §36 |
|---|---|

| | Union TA:_____ |
|---|---|
| | Employer TA:_____ |

28

P 01033

| | |
|---|---|
| Copies of all warning notices and all other disciplinary action given to employees will be mailed to the Union without delay. In addition, it is agreed that if a verbal warning results in a written report by a supervisor for the employee's personnel file, a copy of such notice will be given to the employee. | For less serious work rule and policy violations, the Employer will follow a progressive disciplinary procedure in an effort to correct the Employee's performance. Copies of all warning notices and all other disciplinary action given to employees will be provided to the Union without delay. In addition, it is agreed that if a verbal warning results in a written report by a supervisor for the employee's personnel file, a copy of such notice will be given to the employee. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| | The Employer will follow the steps of progressive discipline, except in more serious violations where immediate termination is appropriate, including but not limited to the following: <br> 1. Violation of the drug and alcohol policy; <br> 2. Repeated refusal to follow directives; <br> 3. An act of physical or threatened physical violence or harassment on the Employer's property; <br> 4. Intentional damage or destruction of the Employer's |

29

P 01034

|  | or customer's property.<br>5. Possession of firearms, with or without a permit on the Employer's property.<br>6. Intentionally providing false information to the Employer resulting in a financial loss to the Employer. |

Union TA:_____

Employer TA:_____

|  | The Employer shall have the right to establish reasonable rules applied evenly among the employees with consideration for the operation of the business and for the conduct of the employees. The rules will be communicated to the employees and a copy of any amendments shall be sent to the Union. The Union's prior approval of the rules shall not be required. |

Union TA:_____

Employer TA:_____

30

P 01035

| If an employee avoids disciplinary offenses for a period of eighteen (18) consecutive months, offenses in his/her personal record which preceded that time will not be used as a basis for disciplinary action; such discipline may, however, be introduced in any arbitration proceeding involving the employee. | If an employee avoids disciplinary offenses for a period of twenty-four (24) consecutive months, offenses in his/her personal record which preceded that time will not be used as a basis for disciplinary action, except as necessary pursuant to the Attendance Policy; such discipline may, however, be introduced in any arbitration proceeding involving the employee. |

Union TA:_____

Employer TA:_____

| 3. The Employer may decline to give the employee the name of the complaining party, but must, upon request, divulge such information to the Union after the Union has received a copy of the discipline, which information the Union will keep confidential. The Employer will provide this information to the employee at an arbitration hearing if so directed by the arbitrator. | No change - §39 |

Union TA:_____

Employer TA:_____

P 01036

| | |
|---|---|
| 4. The Employer shall at reasonable times and at reasonable intervals, upon the request of an employee, permit the employee to inspect such employee's personnel file on the employee's own time. | No change - §40 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| ARTICLE 6 GRIEVANCE AND ARBITRATION PROCEDURE | |
| 1. The grievance procedure set forth in this Article is established for the specific purpose of providing prompt and amicable means of settlement of all questions arising under the terms of this Agreement or the application of them. Both the Employer and the Union intend to make every effort to settle grievances quickly and amicably and with a minimum of friction. | No change - §41 |

Union TA:_____

Employer TA:_____

P 01037

| 2. An employee may, with or without the assistance of a shop steward, first attempt to resolve workplace disputes with the employee's manager. If not resolved informally, the following shall be the grievance procedure: | No change - §42 |
| --- | --- |

Union TA:_____

Employer TA:_____

| Step 1. The grievance shall be reduced to writing by the Union Business Agent within twenty-one (21) calendar days from the date of the incident giving rise to the grievance, or within twenty-one (21) calendar days of when the employee reasonably should have had knowledge, and shall be furnished to the Human Resources Director. The written grievance shall set forth the facts giving rise to the grievance, including the dates and persons involved, identify the Agreement provisions violated, and state the relief requested. | No change |
| --- | --- |

Union TA:_____

Employer TA:_____

P 01038

| | |
|---|---|
| Step 2. The Union Business Agent and the Human Resources Director shall meet within fourteen (14) calendar days of receipt of the written grievance and attempt to settle the grievance. If the grievance is not settled, the Employer shall issue a written response to the grievance within seven (7) calendar days of the meeting. The Employer's failure to issue a written response within this time period shall be considered a denial of the grievance; provided, however, it is the Employer's intent and it will use its best efforts to provide a substantive written response to the grievance within seven (7) calendar days of the grievance meeting. | No change |

Union TA:_____

Employer TA:_____

34

P 01039

| | |
|---|---|
| **Step 3 (Optional):** If the grievance is not settled at Step 2, the Union Business Agent may appeal the grievance to mediation within seven (7) calendar days from the date of the decision rendered in Step 2 by giving written notice of a request for mediation to the Employer and the Federal Mediation and Conciliation Service (FMCS), Minnesota Bureau of Mediation, or other neutral mediation agency. Mediation shall consist of up to two (2) Employer representatives and up to two (2) Union representatives, and a neutral mediator acceptable to both parties, who shall mediate the dispute in an attempt to have the parties reach a settlement. No attorneys or other consultants may participate in the mediation. The proceedings shall be informal and no formal record of the proceedings shall be made. If no settlement is reached, the mediator shall provide the parties with an immediate written advisory decision of the grievance, including the grounds for such decision. All offers to compromise presented during the mediation, as well as any decision of the mediator, shall be confidential and non-admissible in any subsequent proceedings. | No change |

Union TA:_____

Employer TA:_____

P 01040

**Step 4.** If the grievance is not settled at Step 3, or if the Union Business Agent chooses to skip Step 3, the Union may submit the matter to arbitration within fourteen (14) calendar days of the date of the mediation or the Employer's written response (or failure to respond) to the grievance by furnishing the Employer with a written request for arbitration and proposing therein the names of three (3) arbitrator(s) acceptable to the requesting party. The Union shall also state in writing the matter to be arbitrated and the relief that is sought. If the parties are unable to agree upon an arbitrator within fourteen (14) days, the Union shall request the FMCS to submit a panel of seven (7) names. The Employer and the Union shall alternate striking one name from the list submitted until only one name remains. The Union shall take the first strike. The cost of securing the list of arbitrators shall be shared equally between the Employer and the Union.

**Step 4.** If the grievance is not settled at Step 3, or if the Union Business Agent chooses to skip Step 3, the Union may submit the matter to arbitration within fourteen (14) calendar days of the date of the mediation or the Employer's written response (or failure to respond) to the grievance by furnishing the Employer with a written request for arbitration and proposing therein the names of three (3) arbitrator(s) acceptable to the requesting party. The Union shall also state in writing the matter and issue to be arbitrated and the relief that is sought; provided, however, that if the Employer is dissatisfied with the Union's statement of the issue to be decided and the dissatisfaction is timely communicated to the Union's stated, then the Employer shall have the option to propose a joint statement of the issue. If the parties are unable to agree on a joint statement of the issue, the Employer shall have the option of presenting an alternative statement of the issue. In that event, the arbitrator shall be empowered to determine, after hearing evidence, the appropriate statement of the issue to be decided. If the parties are unable to agree upon an arbitrator within fourteen (14) days, the Union shall request the FMCS to submit a panel of seven (7) names. The Employer and the Union shall alternately strike one name from the list submitted until only one name remains. The Union shall take the first strike. The cost of securing the list of arbitrators shall be shared equally

P 01041

| | between the Employer and the Union. |
|---|---|

Union TA:_____

Employer TA:_____

| Arbitration shall be handled in the following manner: | |
|---|---|

Union TA:_____

Employer TA:_____

| The authority of the arbitrator shall be limited solely to the determination of the matter submitted in writing at the time of request for arbitration. The arbitrator shall not have power to add to, subtract from, or modify in any way the terms of this Agreement. If, during the course of the arbitration hearing, either party introduces any facts which were not introduced during any of the steps of the grievance procedure, the other party shall be granted an extension of hearing upon request. | §43. The authority of the arbitrator shall be limited solely to the determination of the issue submitted in writing at the time of request for arbitration as provided in Step 4. The arbitrator shall not have power to add to, subtract from, or modify in any way the terms of this Agreement. If, during the course of the arbitration hearing, either party introduces any facts deemed by the arbitrator as material and significant which were not introduced during any of the steps of the grievance procedure, the other party shall be granted an extension of hearing upon request. |
|---|---|

Union TA:_____

Employer TA:_____

37

P 01042

| | |
|---|---|
| The decision of the arbitrator shall be made not later than thirty (30) days after the submission of post-hearing briefs, and his/her decision shall be final and binding upon both parties and the employee(s) involved. | No change - §44 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Expenses of the arbitrator shall be paid equally by the Employer and the Union. If a court reporter is used, the ordering party shall pay the cost thereof, unless the other party requests a copy of the transcript, in which case the cost of the court reporter and transcript shall be paid equally. | No change - §45 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The time limitations set forth herein relating to the time for filing a grievance and the demand for arbitration shall be mandatory. Failure to follow said time limitations shall result in the grievance being permanently barred and waived. The time limitations | No change - §46 |

P 01043

| and/or grievance steps provided for herein may be extended or waived by mutual written agreement between the parties. | |

Union TA:_____

Employer TA:_____

| 3. Mathematical or mechanical mistakes on a paycheck resulting in an under or overpayment of the employee may be corrected within sixty (60) calendar days of the pay day involved. If an error is discovered, it must be corrected by payment within five (5) business days (Monday - Friday); provided, however, that the Employer will make a concerted effort to make the corrected payment sooner than five (5) business days if possible. | 3. Mathematical or mechanical mistakes on a paycheck resulting in an under or overpayment of the employee may be corrected within sixty (60) calendar days of the pay day involved. If an error ~~which results in greater than $50.00 financial impact to the Employee is discovered~~, it must be corrected by payment within five (5) business days (Monday - Friday); provided, however, that the Employer will make a concerted effort to make the corrected payment sooner than five (5) business days if possible. |

Union TA:_____

Employer TA:_____

39

P 01044

| | |
|---|---|
| 4. The Union shall advise the Employer of the names of the Union Stewards who shall participate in the grievance procedure and who shall be recognized by the Employer as representatives of the employees for purposes of enforcing this Agreement, and who will generally act as representatives on the job of the Union. | 4. The Employer shall not recognize the Union Stewards until the Union has advised the Employer in writing the names of the Union Stewards who shall participate in the grievance procedure and who shall be recognized by the Employer as representatives of the employees for purposes of enforcing this Agreement, and who will generally act as representatives on the job of the Union |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The words "Union Steward" shall mean and refer only to employees who are designated by the Union in writing to the Employer as authorized representatives of the employees of a specific department for grievance procedure purposes. Whenever such authorization is withdrawn as to an individual Union steward or a new Union steward is added to the number of those authorized, the Union shall promptly notify the Employer in writing of such action. The Employer and its representatives shall be fully protected with a Union steward so authorized with respect to any grievance as to which he has at any time purported to represent the | §49. The words "Union Steward" shall mean and refer only to employees who are designated by the Union in writing to the Employer as authorized representatives of the employees of a specific department for grievance procedure purposes. Whenever such authorization is withdrawn as to an individual Union steward or a new Union steward is added to the number of those authorized, the Union shall promptly notify the Employer in writing of such action. In the absence of notice of such authorization, the Employer shall have the right to refuse recognition of an employee asserting shop-steward authority, until such time as the Union |

P 01045

| | |
|---|---|
| aggrieved employee and they need not deal with any Union steward not so authorized. | confirms authority. The Employer and its representatives shall be entitled to rely upon the representations and authority of a Union steward so authorized with respect to any grievance as to which he or she has at any time purported to represent the aggrieved employee(s), and the Union and aggrieved employee(s) shall be bound by the representations and authority exercised by the Union Steward. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 5. When a grievance requires the attention of a shop steward during working hours, he/she shall first secure the permission of his/her supervisor. The handling of all grievances shall be done during working hours, without any deduction from wages of employees who necessarily attend. The Union agrees to attempt to minimize any disruption to the Employer's operation. | No change |
| New section to be added | §5.13. In the event an employee alleges a breach of the Employer's obligation not to discriminate, as provided in Article 20 of the Agreement (hereinafter a Discrimination Claim), the above-stated Grievance-Arbitration procedure shall provide the sole dispute resolution procedure to address the Discrimination Claim as a condition of their employment and by virtue of this provision entered into with the Union that their right of access to a court of law or equity, including the right to a trial by jury, is |

41

P 01046

waived in favor of the above-stated Grievance & Arbitration Procedure. Provided, however, the procedures stated above in this Article shall be modified, with respect to Discrimination Claims only, as follows:

a.  The arbitration of the Discrimination Claim will be conducted in accordance with the Employment Arbitration Rules of the American Arbitration Association.

b.  Employees will not be bound to the grievance deadlines above, and will be entitled, instead, to the full benefit of the applicable statutes of limitations.

c.  The Employer will pay all fees and costs charged by the American Arbitration Association and by the arbitrator, with the following single exception: the employee or the Union (as determined between them) will be responsible for any initial filing fee imposed by the American Arbitration Association.

d.  The employee will otherwise be responsible for all costs and expenses incurred in litigating the Discrimination Claim, including the fees and expenses charged by any attorneys retained to represent him or her. However, as stated immediately below, the arbitrator shall be

42

P 01047

empowered (subject to applicable law) to require the Employer to pay such costs and expenses.

e.   The arbitrator shall be fully empowered to award any and all remedies under the applicable laws referenced in Article 20. An award of any such remedy may be enforced by a federal or state court under the provisions of the Federal Arbitration Act or under the Minnesota equivalent.

f.   Nothing in this section, however, shall be construed to prevent an employee from filing a pre-lawsuit administrative charge of discrimination with any federal, state or local administrative agency, such as the Equal Employment Opportunities Commission, and the Employer will not seek to prevent the agency from processing the administrative charges. However, after the issuance of a Notice of Right to Sue or its equivalent under a state or local agency, and in the event the employee files suit, the Employer may file a motion to dismiss for purposes of enforcing this section.

g.   Nothing in this section shall be construed to prevent an employee from filing an unfair labor practice charge with the National Labor Relations Board.

43

P 01048

|  |  |
|---|---|
|  |  |

Union TA:_____

Employer TA:_____

P 01049

## CHRONOLOGY & CHART OF GRIEVANCE
## & ARBITRATION PROCEDURE

| Event | Total Business Days (M-F) Elapsed | Business Days (M-F) Elapsed Between Events |
|---|---|---|
| Incident giving rise to grievance | --- | --- |
| **Step 1.** Informal discussion between employee and immediate manager (with shop steward, if elected) | 5 | 5 |
| Response by immediate manager | 10 | 5 |
| **Step 2:** Written Grievance provided to General Manager ("GM") | 15 | 5 |
| Meeting with GM, **Local 100** representative, shop steward and employee | 20 | 5 |
| Written response by GM | 25 | 5 |
| **Step 3:** Request for panel of *seven (7)* arbitrators from the American Arbitration Association (AAA) | 55 *calendar* days | 30 *calendar* days |
| Strike and select *one (1)* arbitrator | --- | --- |
| Hearing | --- | --- |
| Arbitrator's Decision | 30 *calendar* days after hearing | _____ |

P 01050

## ILLUSTRATIVE CALENDAR
## FOR GRIEVANCE & ARBITRATION SCHEDULE

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|--------|---------|-----------|----------|--------|----------|--------|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |

46

P 01051

| ARTICLE 7 LEAVES OF ABSENCE | |
|---|---|
| Employees may be granted unpaid leaves of absence by the Employer for a period of not more than thirty (30) days. Leaves of absence in excess of thirty (30) days, and any extensions of leaves beyond the thirty (30) days, shall be put into writing by the Employer and a copy kept by the employee, the Employer and the Union. Requests for such leaves and extensions shall be made to the employee's immediate supervisor. However, leaves of absence for illness or injury will be granted upon request for absences not to exceed one (1) year unless a longer period is required by the Americans with Disabilities Act. | Employees may be granted unpaid leaves of absence by the Employer for a period of not more than thirty (30) days. Leaves of absence in excess of thirty (30) days, and any extensions of leaves beyond the thirty (30) days, shall be put into writing by the Employee and a copy kept by the employee, the Employer and the Union. Requests for such leaves and extensions shall be made to the employee's immediate supervisor. A specific leave and return date must be coordinated with the employee's supervisor. However, leaves of absence for illness or injury will be granted upon request for absences not to exceed six (6) months, unless a longer period is required by the Americans with Disabilities Act. Work related injury/illness and preapproved medical LOA's must be substantiated by a physician's or hospital's document. |

Union TA:_____

Employer TA:_____

| Illness or injury which qualifies for leave under the Federal and Family Medical Leave Act will run concurrently with Family and Medical Leave Act leaves. | **Family and Medical Leave Act (FMLA)** Unpaid leave shall be granted according to FMLA and based on a calendar year method. Employees are eligible if they have worked for the Employer for at least twelve (12) months and for at |

47

P 01052

least one thousand two hundred fifty (1,250) hours in the previous twelve (12) months of employment.

1. **Notice and Procedures for Requesting Leave:** Employees must notify their Supervisor a minimum of fifteen (15) days in advance of beginning leave if he/she knows in advance. If circumstances require that FMLA begin in less than fifteen (15) days, the employee must notify the Supervisor as soon as practical.

2. **Certification:** In the case of Medical Leave, the Employer requires medical certification to be provided in a timely manner. The Certification will include the date of onset, probable duration, and appropriate medical facts concerning the condition. If an employee is seeking Medical Leave for his/her own health condition, the certification must also state that he/she is unable to perform the functions of his/her position. If the employee is seeking a Medical Leave to care for a family member, the certification must also state that he/she is needed to care for the family member and an estimate of the amount of time needed.

3. **Additional Requirements:** If medically necessary for an employee's serious health condition or that of his/her spouse, child, or parent, leave may be taken on an intermittent or reduced leave schedule. If leave is requested on this basis, the employee may be required to temporarily transfer to an alternative position with equivalent pay and benefits which better accommodates recurring periods of absence or a part-time schedule.

48

| | |
|---|---|
| | **Health Care Coverage:** While an employee is on Family and Medical Leave, the Employer will pay its share of the premiums for health care coverage it provides, provided the employee has elected coverage. It is the employee's responsibility to pay his/her share of the premium. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Employees who have been employed for at least one (1) year may be granted a leave of absence for educational purposes up to twelve (12) months, provided the leave is used for future employment with the Employer, and is approved by management. | No change - §54 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 2. The Employer agrees to grant necessary time off without pay or loss of seniority rights to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business. The Union agrees to give in writing two (2) weeks | The Employer agrees to grant necessary time off, without pay or loss of seniority rights to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business. The Union agrees to give in writing a minimum of two |

P 01054

| notice to the Employer. It is agreed that there shall be no disruption of the Employer's operation. | (2) weeks notice to the Employer. It is agreed that there shall be no disruption of the Employer's operation. |
|---|---|

Union TA:_____

Employer TA:_____

| 3. Any employee who is appointed as a full time Business Representative or is elected to a full time office of the Union, or the International Union, shall be given a leave of absence not to exceed a total of six years. | No change- §56. |
|---|---|

Union TA:_____

Employer TA:_____

| 4. Disability leaves of absence for employees will be granted in accordance with the recommendation of the attending physician, not to exceed one (1) year unless a longer period is required by the American with Disabilities Act. Maternity/paternity leaves will not be | No Change |
|---|---|

P 01055

| | |
|---|---|
| granted beyond three (3) months unless supported by the attending physician. | |
| | Union TA:_____ |
| | Employer TA:_____ |

| | |
|---|---|
| 5. Failure to report for work at the end of the period of a leave of absence is equivalent to resignation. | No change - §58 |
| | Union TA:_____ |
| | Employer TA:_____ |

| | |
|---|---|
| 6. Seniority shall accumulate during the period of leave of absence. | Seniority shall accumulate during the period of ~~approved~~ leave of absence. |
| | Union TA:_____ |
| | Employer TA:_____ |

| | |
|---|---|
| 7. In the event of the death of a member of an employee's immediate family, he/she will be granted time off from work with pay for up to three (3) consecutive days, one of which must be the day of the funeral. The employee will be paid for that portion of his/her regular week's work which falls within the | 7. In the event of the death of a member of an employee's immediate family, he/she will be granted time off from work with pay for up to three (3) consecutive days, one of which must be the day of the funeral. The employee will be paid for that portion of his/her regular week's work which falls within the |

51

| | |
|---|---|
| above three (3) day period if he/she was, under the terms of this Agreement, scheduled to work. If bereavement leave occurs during an employee's scheduled vacation, the employee will be permitted to substitute bereavement leave in lieu of vacation time. The Employer may require an employee to provide proof of death. | above three (3) day period if he/she was, under the terms of this Agreement, scheduled to work. Time paid as funeral leave will not be considered compensable in determining overtime. If bereavement leave occurs during an employee's scheduled vacation, the employee will be permitted to substitute bereavement leave in lieu of vacation time. The Employer may require an employee to provide proof of death. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Immediate family shall mean the employee's father, mother, father-in-law, mother-in-law, spouse, previously declared (on Employer form) same gender domestic partner, children, stepchildren, stepparents, guardian, brother or sister, grandchild, son-in-law, daughter-in-law, grandparents, half-brother, stepbrother, half-sister, stepsister, current grandparent-in-law, current brother-in-law and current sister-in-law. | Immediate family shall mean the employee's father, mother, father-in-law, mother-in-law, spouse, children, stepchildren, stepparents, guardian, brother or sister, grandchild, son-in-law, daughter-in-law, grandparents, half-brother, stepbrother, half-sister, stepsister, current grandparent-in-law, current brother-in-law and current sister-in-law. |

Union TA:_____

Employer TA:_____

52

P 01057

| | |
|---|---|
| In addition to the foregoing paid leave, an employee will be permitted to take one (1) day of unpaid leave in order to serve as a pallbearer. An employee also may take off up to three (3) days without pay to attend the funeral of an aunt or uncle. | No change - §62 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 8 Jury Duty: If a regular employee with seniority is summoned for petit or grand jury service, such employee shall be paid the difference between jury pay and the pay the employee would have earned from the Employer for each day of jury duty which falls on a day on which the employee would otherwise be scheduled to work. If on a day the employee would otherwise be working for the Employer, he or she is released from jury duty prior to the end of his or her scheduled shift, the employee will be expected to return to work as soon as possible. No employee shall be required to perform work for the employer during any twenty-four (24) hour period (11:00 p.m. - 11:00 p.m.) during which the employee is required to be present for a petit jury or grand jury service. | No change |

Union TA:_____

53

P 01058

Employer TA:_____

| | |
|---|---|
| To be eligible for benefits under this section, the employee must endorse and turn over to the Employer the check received for jury duty. All hours spent on jury duty will be credited for purposes of calculating vacation and holiday benefits. The Employer will in turn pay the employee the pay the employee would otherwise have earned on that day. Payment for jury duty service will be limited to a maximum of six (6) calendar weeks for each Agreement year. | No change - §64 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 9. The Employer is obligated to continue to provide health insurance benefits during an employee's leave of absence under this Article only to the extent required by law (e.g., FMLA or Minnesota Parental Leave Law). | Omit, covered above |

Union TA:_____

Employer TA:_____

54

P 01059

| ARTICLE 8 WORKWEEK | |
|---|---|
| 1. The basic work week shall consist of five (5) days, forty (40) hours, and two (2) consecutive days of rest within a seven (7)-day period, starting the first shift on Friday of each week; provided, however, this shall not serve as a guarantee of a minimum number of hours or a minimum number or length of shifts. Time and one-half shall be paid after forty (40) hours worked or paid as an approved holiday or vacation day in any one work week. Time and one-half shall be paid for all hours worked on the sixth (6th) and seventh (7) day in a work week to all employees except banquet servers. However, banquet servers will not normally be required to work a sixth (6th) day until all regular full-time servers have been rescheduled for five (5) days. Double time will be paid after forty-eight (48) hours worked or paid as an approved holiday or vacation day in a work week. Employees recalled from layoff to work on the employee's scheduled days of work will be paid straight time. | 1. The basic work week shall consist of five (5) days, forty (40) hours, and two (2) consecutive days of rest within a seven (7)-day period, starting the first shift on Monday of each week; provided, however, this shall not serve as a guarantee of a minimum number of hours or a minimum number or length of shifts. Time and one-half shall be paid after forty (40) hours worked. Employees recalled from layoff to work on the employee's scheduled days of work will be paid straight time. |

Union TA:_____

Employer TA:_____

55

P 01060

| | |
|---|---|
| Time and one-half is to be paid for any hours worked in excess of eight (8) hours worked in a work day. Provided, however, that daily overtime will not apply to function and on-call employees who work less than four (4) days per week. There shall be no pyramiding of overtime. | Omit |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Sick leave, paid or unpaid, will not count for purposes of computing overtime. | Time not worked, including vacation, holiday or sick leave, will not count for purposes of computing overtime. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| By mutual agreement between employees and the Employer, nonconsecutive days off may be scheduled. The nonconsecutive days off schedule will not be binding on any other employee. Irrespective of the foregoing, non-consecutive days off may be scheduled for function and on-call personnel. | No change - §68 |

Union TA:_____

Employer TA:_____

56

P 01061

| 2. Any employee in the maintenance departments who is called from home for an emergency condition shall be given two (2) hours minimum pay at time and one-half for such call-in work. Emergency callbacks will be handled on a seniority basis among employees qualified to correct the emergency. Employees shall be paid for all overtime work and shall not be required to take time off for extra time worked. | No change - §69 |
|---|---|

Union TA:_____

Employer TA._____

| 3. Employees in the maintenance departments, housekeepers and Kahler PBX operators shall be paid a premium of fifty cents (50¢) for all hours worked between 10:00 p.m. and 6:00 a.m., except for call-in work. | 3. Employees in the maintenance department, shall be paid a premium of fifty cents (50¢) for all hours worked between 10:00 p.m. and 6:00 a.m., except for call-in work. |
|---|---|

Union TA:_____

Employer TA._____

P 01062

| 4. Employees who work beyond their regular daily schedule in any day shall not be required to take time off later in the work week because of such extra hours. The Employer agrees not to schedule employees for work with less than eight (8) hours between shifts, unless mutually agreed upon by the employee and the Employer; provided, however, that this provision shall not apply to employees working split-shifts pursuant to Article 8, Section 11. | §71. Employees who work beyond their regular daily schedule in any day shall not be required to take time off later in the work week because of such extra hours. The Employer agrees not to schedule employees for work with less than eight (8) hours between shifts, unless mutually agreed upon by the employee and the Employer; provided, however, that this provision shall not apply to employees working split-shifts. |
|---|---|

Union TA:_____

Employer TA:_____

P 01063

| | |
|---|---|
| 5. The Employer reserves the right to prepare work schedules and to schedule days off. Work schedules and scheduled days off shall be posted in each department as far in advance as possible, but not later than Monday at 5:00 p.m, prior to the beginning of the work week involved. Employees will have until 5:00 p.m. on Tuesday to contest any discrepancies in the schedule. After 5:00 p.m. on Tuesday, the schedule will not be changed except in emergencies and/or for business needs. When cancelling a scheduled shift, the Employer will attempt, at least two (2) hours before the start of the employee's scheduled shift, to speak with the employee directly by calling the phone number in the employee's personnel file; if the Employer gets the employee's voicemail/answering machine or another person answers, the Employer will leave a message. Work schedules and scheduled days off may be changed without notice in case of emergency and/or for business needs. Any employee who reports to work on his scheduled day off at the request of the Employer will be paid time and one-half for all hours worked on that date. Employees who are scheduled in advance to work one or both of their days off, and calls in sick earlier in the week, shall not be eligible for time and one-half on the scheduled day off. In order to secure time off for a doctor's appointment, employees must provide notice of the appointment at least a week prior to the start of the new schedule, except in cases of emergency. | 5. The Employer reserves the right to prepare work schedules and to schedule days off. Work schedules and scheduled days off shall be posted in each department as far in advance as possible, but not later than Monday at 5:00 p.m, prior to the beginning of the work week involved. Employees will have until 5:00 p.m. on Tuesday to contest any discrepancies in the schedule. After 5:00 p.m. on Tuesday, the schedule will not be changed except in emergencies and/or for business needs. When cancelling a scheduled shift, the Employer will attempt, at least two (2) hours before the start of the employee's scheduled shift, to speak with the employee directly by calling the phone number in the employee's personnel file; if the Employer gets the employee's voicemail/answering machine or another person answers, the Employer will leave a message. Work schedules and scheduled days off may be changed without notice in case of emergency and/or for business needs. Any employee who reports to work on his scheduled day off at the request of the Employer will be paid time and one-half for all hours worked on that date. Employees who are scheduled in advance to work one or both of their days off, and calls in sick earlier in the week, shall not be eligible for time and one-half on the scheduled day off. In order to secure time off for a doctor's appointment, employees must provide notice of the appointment at least a week prior to the appointment, except in cases of emergency. |

P 01064

Union TA:_____

Employer TA._____

| | |
|---|---|
| 6. Temporary Hours Reductions. In the event it is necessary to reduce staffing on a short term basis because of low occupancy, the Employer will grant employees, at their request, absent days on a voluntary basis. | 6. Temporary Hours Reductions. In the event it is necessary to reduce staffing on a short term basis due to business levels, the Employer will grant employees, at their request, absent days on a voluntary basis. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 7. New extra or additional employees will not be utilized to prevent regular full-time employees from working forty (40) hours during a work week; provided, however, this does not constitute a guarantee of hours. | No change - §74 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 8. Employees shall be granted preferential work schedules and preferential days off in accordance with their seniority within the section and the respective units consistent with the efficient operation of the section. | No change - §75 |

Union TA:_____

60

P 01065

Employer TA:_____

| 9. The following reporting pay guarantees will apply: | No change - §76. |
|---|---|

Union TA:_____

Employer TA:_____

| (a) A four (4) hour call-in on an employee's day off and a minimum reporting pay on a regular work day of four (4) hours for all employees normally scheduled to work in excess of twenty (20) hours per week. | No Change |
|---|---|

Union TA:_____

Employer TA:_____

| (b) Employees who normally are scheduled for twenty (20) or less hours per week or on-call employees including function personnel will be guaranteed two (2) hours. | No change |
|---|---|

Union TA:_____

Employer TA:_____

| (c) A person called back after having completed his work shift will receive a minimum of two (2) hours call back pay. | No Change |
|---|---|

Union TA:_____

61

P 01066

Employer TA:_____

| | |
|---|---|
| (d) Split-shift employees will receive a three (3) hour guarantee per shift, however, this guarantee would not apply to those employees who choose to voluntarily leave early. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| (e) Employees scheduled or called in for a training session or mandatory meeting will be paid a minimum of ▓▓▓▓ hours at the appropriate rate of pay. | (e) Employees scheduled or called in for a training session or mandatory meeting will be paid a minimum of ▓▓▓▓ hour at the appropriate rate of pay. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 10. The senior employees in a classification who are on duty shall be given first preference to work overtime. If senior employees on duty in a particular job classification reject an offer of overtime, the junior employees on duty must perform the overtime work. Involuntary overtime will be assigned based on reverse seniority. | No Change |

Union TA:_____

Employer TA:_____

P 01067

| | |
|---|---|
| An employee working on his/her regular day shall be required to work overtime before an employee who is working on his/her day off. | No change - §78 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 11. Lunch periods will be scheduled for a maximum of thirty (30) minutes for all employees except for food and beverage employees who will be required to take lunch when and to the extent that operations permit. | Omit |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Meal periods shall be an uninterrupted one-half (1/2) hour for which the employee is not to be compensated. If employees are required to work any portion of the meal period, they shall be paid for the entire meal period. Employees are responsible for clocking in and out at the beginning and end of each thirty (30) minute meal period. | No change - §80 |

63

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The Employer shall provide meals which are palatable and wholesome at a cost to employees which it determines. Employee meals shall be served under clean and sanitary conditions. | No change - §81 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| ██ Employees shall be entitled to one (1) fifteen (15) minute break for each four (4) hours of work. It is understood, however, that the Employer reserves the right to schedule the breaks. Employees who work ████████ beyond the end of their shift will be entitled to an additional fifteen (15) minute break after each additional two (2) hours ██ ████████ worked. | 12. Employees shall be entitled to one (1) fifteen (15) minute break for each four (4) ████████ hours of work. It is understood, however, that the Employer reserves the right to schedule the breaks. Employees who work beyond the end of their shift will be entitled to an additional fifteen (15) minute break after each additional two (2) hours worked. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 13. ████████████████ shall have the option to | 13. ████████████ shall have the option to schedule a |

64

P 01069

| | |
|---|---|
| schedule a four (4) day work week using ten (10) hour days in accordance with the following: | four (4) day work week using ten (10) hour days in accordance with the following: |
| | Union TA:_____ |
| | Employer TA:_____ |
| The work weeks shall consist of four (4) work days and three (3) scheduled days off. | |
| | Union TA:_____ |
| | Employer TA:_____ |
| Two (2) days scheduled off to be consecutive. | |
| | Union TA:_____ |
| | Employer TA:_____ |
| Hours in excess of ten (10) in a work day or forty (40) in a work week to be paid at one and a half (1 1/2) times base rate. Hours worked on scheduled days off to be paid at one and a half (1 1/2) times base rate. | Omit |
| | Union TA:_____ |
| | Employer TA:_____ |

65

P 01070

| | |
|---|---|
| When computing holiday pay, participating employees will have average days computed using four (4) days per week to a maximum of ten (10) hours. | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| When computing vacation pay, participating employees will have average days computed using four (4) days per week. Vacation taken in less than full week increments will be computed based on this average day to a maximum of ten (10) hours. | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| ~~14. At Textile Care Services~~ the Employer agrees to give preference to senior employees in selecting shifts. Where operations permit, the Employer will provide a ~~Textile Care Services driver~~ with fourteen (14) days' notice of any reassignment to a new route. | 14. ~~The Employer~~ agrees to give preference to senior employees in selecting shifts. Where operations permit, the Employer will ~~provide an employee in the transportation classifications~~ with fourteen (14) days' notice of any reassignment to a new route. |

Union TA:_____

Employer TA:_____

66

P 01071

| 15. The Employer shall not require an employee to work alone without a reasonable amount of training as provided and determined by the Employer. | No change - §83 |
| --- | --- |

Union TA:_____

Employer TA:_____

| ARTICLE 9 HOLIDAYS | |
| --- | --- |
| 1. The following shall be classified as holidays: Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's Day. Any time worked on those days shall be paid for at double time. Management shall have the exclusive right to determine which holidays are to be worked. | No change - §84 |

Union TA:_____

Employer TA:_____

| Should one of the foregoing holidays fall on Sunday, it will be celebrated on Monday in Texas Care Services. In all other facilities covered by this agreement, Sunday holidays will be celebrated on that day and paid for accordingly. | Should one of the foregoing holidays fall on Sunday, it will be celebrated on Monday. | |
| --- | --- | --- |

Union TA:_____

Employer TA:_____

| Should one of the following holidays fall on Saturday, it | Should one of the following holidays fall on Saturday, it | |
| --- | --- | --- |

P 01072

| | | |
|---|---|---|
| will be celebrated on Friday in Textile Care Services. In all other facilities covered by this Agreement, Saturday holidays will be celebrated on that day and paid for accordingly. | will be celebrated on Friday. | |

Union TA:_____

Employer TA._____

| | |
|---|---|
| 2. Holiday pay will be granted to all employees with established seniority irrespective of the day of the week on which it falls. To qualify for pay, an employee must work his regular scheduled work day before and after the holiday. Pay for holidays for employees not scheduled to work will be based on the average daily hours worked by each eligible employee in the twelve (12) week period preceding the holiday up to a maximum of eight (8) hours. An employee who is scheduled to work on a holiday and then fails to report for work will not receive holiday pay unless the absence is an excused absence. | No change - §87 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| An employee who is absent on the day before or after the holiday on compensable time (vacation, paid sick- | No change - §88 |

P 01073

| | |
|---|---|
| leave, etc.) will not be disqualified if otherwise eligible for holiday pay. In addition, an excused absence on the day before or day after a holiday will not disqualify an employee from receiving holiday pay. | |

Union TA:_____

Employer TA._____

| | |
|---|---|
| Such hours paid for will be counted as hours worked for overtime purposes if the holiday falls on an employee's regularly scheduled work day. | Omit |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Employees with seniority who are normally scheduled to work five (5) days will have designated sixth (6th) and seventh (7th) days and such days will not be changed in holiday weeks to avoid payment of overtime for work on the sixth (6th) and seventh (7th) day of a work week. This does not apply to function employees who work on an on call basis. | Employees with seniority who are normally scheduled to work five (5) days will have designated sixth (6th) and seventh (7th) days and such days will not be changed in holiday weeks to avoid payment of overtime for work on the sixth (6th) and seventh (7th) day of a work week |

Union TA:_____

69

P 01074

Employer TA:_____

| | |
|---|---|
| 3. If the holiday comes during the employee's regularly scheduled vacation the employee shall have the option to convert vacation pay to holiday pay or to receive an extra day's pay. | 3. If the holiday falls during the employee's regularly scheduled vacation the employee shall have the option to convert vacation pay to holiday pay. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 4. An employee receiving sick leave pay on leave of absence shall not receive holiday pay. | No change - §92 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 5. Regular full time bartenders shall not suffer a loss of pay due to their inability to work at their usual assignment or a related assignment during scheduled hours on an election day. | Omit |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 6. Employees with eight (8) or more years of service shall be entitled to one (1) paid personal day. Employees with sixteen (16) or more years of service shall be entitled to two (2) paid personal days. Employees with | No change - §94 |

70

P 01075

| | |
|---|---|
| twenty (20) or more years of service shall be entitled to three (3) paid personal days. The paid personal days are to be scheduled by mutual agreement in advance or to cover uncompensated days of sick leave. The paid personal days must be used within the employee's anniversary year. Eligibility is based upon the employee's anniversary date of employment. | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Personal days may be scheduled and taken in advance of the employee's anniversary date, subject to repayment by the employee if the employee does not remain an employee until his/her next anniversary date. Each employee's check stub will reflect the employee's personal day balance. | No change - §95 |

Union TA:_____

Employer TA:_____

| ARTICLE 10 VACATIONS | ARTICLE 10 PAID TIME OFF BENEFITS |
|---|---|
| 1. Employees shall receive vacations at the following rates: | 1. Employees shall receive vacation benefits at the following rates: |

Union TA:_____

71

P 01076

Employer TA:_____

| | |
|---|---|
| After one (1) year of continuous service - one (1) work week vacation; After three (3) years continuous service - two (2) work weeks vacation; After nine (9) years continuous service - three (3) work weeks vacation; After fifteen (15) years continuous service - four (4) work weeks vacation. | After one (1) year of continuous service – Up to forty (40) hours; After two (2) years continuous service – Up to eighty (80) hours each qualifying year; After five (5) years continuous service – Up to one hundred twenty (120) hours each qualifying year; After fifteen (15) years continuous service – Up to one hundred sixty (160) hours each qualifying year |

Union TA:_____

Employer TA:_____

| | | |
|---|---|---|
| 2) An employee whose average work week during the vacation year is between thirty-eight (38) and forty (40) hours will be paid vacation pay for forty (40) hours. Any employee whose average work week during the vacation year is less than thirty-eight (38) hours or more than forty (40) hours will be paid vacation pay equal to his average work week.  Time spent by members of the Union Negotiating Committee in negotiations for renewal of this Agreement at the time of its expiration shall be included in computing an employee's average work week. | §97. After one (1) year of continuous service, employees will accrue vacation pay equal to their average work week over the preceding year. Thereafter vacation time will accrue per the average of the numbers of hours worked up to the maximum number of hours in the timeline above. Time spent by members of the Union Negotiating Committee in negotiations for renewal of this Agreement shall be included in computing an employee's average work week. | |

P 01077

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Employees in the server and bellperson sections shall be given the option to use two (2) hours of their accrued vacation pay for each hour on vacation. | Omit |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Tipped Employee Vacation Adjustment. In addition to their base hourly rates, tipped employees working in the classifications of doorperson, bellperson, bell captain, all servers in functions, room service and all restaurants and lounges, shall be compensated at the rate of three dollars ($3.00) per hour for all vacation hours taken effective September 1, 2012, this rate will be increased to three dollars and twenty five cents ($3.25); and | Omit |

73

P 01078

effective September 1, 2013 this rate will be increased to three dollars and fifty cents ($3.50). "Base rate" for purposes of this Agreement means the wage rate assigned to the position excluding any premiums or differentials.

Union TA:_____

Employer TA:_____

74

| | |
|---|---|
| Employees shall earn vacation on a biweekly basis prorated in accordance with compensable hours for the pay period. The biweekly pay stub shall show total vacation hours accumulated. Employees will be eligible to receive their vacation benefits as they accrue it each pay period, providing, however, it can be scheduled with the employee's supervisor. A maximum of two (2) years' vacation may be accumulated. Once the employee has accumulated the maximum of two (2) years' vacation entitlement he/she shall stop accumulating additional vacation but shall not lose any vacation accumulated. Accumulation shall resume as soon as the employee uses accumulated vacation. | Employees shall earn vacation on a biweekly basis prorated in accordance with compensable hours for the pay period. The biweekly pay stub shall show total vacation hours accumulated. Earned vacation benefit shall be granted on the anniversary date, and scheduled with the employee's supervisor. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| By mutual agreement, Employees may sell up to forty (40) hours of accrued vacation one time during a calendar year. | Omit |

Union TA:_____

Employer TA:_____

75

P 01080

| | |
|---|---|
| 3. Fully earned vacation pay shall be paid in advance of the scheduled vacation if requested by the employee at least two (2) weeks in advance. | No change - §102 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 4. A vacation sign-up list shall be posted in each work unit at which time employees will sign for vacation between February 1 and March 31 for the period April 1 of the same year to March 31 of the following year. Thereafter, vacations will be selected on a first come, first serve basis and will not be subject to being bumped. Scheduling of vacation shall be arranged so that the functioning of the department shall not be impaired and shall be subject to the Employer's approval. Vacations can be arranged in one (1)-day increments by mutual agreement between the supervisor and the employee involved. | Between January 15 and February 28, a vacation sign-up list shall be posted in each work unit, during which employees will sign for vacation for the period April 1 of the same year to March 31 of the following year. Thereafter, vacations will be selected on a first come, first serve basis and will not be subject to being bumped. Scheduling of vacation shall be arranged so that the functioning of the department shall not be impaired and shall be subject to the Employer's approval. Vacations can be arranged in one (1)-day increments by mutual agreement between the supervisor and the employee involved. |

Union TA:_____

Employer TA:_____

P 01081

| | |
|---|---|
| Vacation requests made over ~~forty-eight (48) hours~~ in advance will be honored whenever reasonably possible. The Employer agrees to affirm or deny in writing the employee's written request for vacation within seven (7) days of receiving such request. | Vacation requests made over ~~two (2)~~ weeks in advance will be honored whenever reasonably possible. The Employer agrees to affirm or deny in writing the employee's written request for vacation within seven (7) days of receiving such |

Union TA:_____

Employer TA._____

| | |
|---|---|
| Employees will be permitted to take vacation year round, provided, however, that the Employer may require adequate staffing levels to meet business needs. | No change - §105 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 5. Vacations shall be taken within the year following the date the employee becomes eligible. In case of emergency, by mutual agreement an employee may work his vacation and receive his vacation pay in addition to wages for the hours worked or arrange his vacation for some other time. | No change - §106 |

Union TA:_____

Employer TA:_____

77

P 01082

| Employees may take their vacations in one (1) hour increments if requested and approved in advance. | No change - §107 |
|---|---|

Union TA:_____

Employer TA:_____

| 6. If an employee's services are terminated prior to the time of the taking of his vacation, he shall be immediately paid the full amount of his accumulated vacation pay, provided such employee has completed one or more years of service. | 6. If an employee's services are voluntarily terminated prior to the time of the taking of his/her vacation, he/she shall be paid the full amount of his/her accumulated vacation pay, provided such employee has provided a minimum five (5) day notice and completed one or more years of service. |
|---|---|

Union TA:_____

Employer TA:_____

| 7. If an employee becomes ill during his regularly scheduled vacation and qualifies for sick benefits he may re-schedule his unused vacation. | 7. If an employee becomes ill during his regularly scheduled vacation and qualifies for sick benefits he may re-schedule his unused vacation, provided the employee has provided sufficient medical certification. |
|---|---|

Union TA:_____

78

P 01083

Employer TA._____

**\*\* PROPOSE TO MOVE SICK BENEFITS TO ARTICLE 10, PAID TIME OFF BENEFITS \*\***

| ARTICLE 11 INSURANCE BENEFITS | Health and Welfare Benefits |
|---|---|
| 1. Employees who satisfy the average hours worked requirements set forth in Article 2, Paragraph 3, will be eligible to participate in the Employer's health and life insurance plans on the same terms and conditions as all other employees of the Employer. The Employer has the right to modify or eliminate these benefits (including providers) and increase the employee contributions to same. Said changes or increases in contributions shall be the same as those applicable to all other employees of the Employer. It is also agreed that the plan year, including enrollment periods, shall be the same as is applicable to all other employees of the Employer. | No change |

Union TA._____

Employer TA._____

| 2. Except for a violation of the express terms of this | No change - §111 |
|---|---|

79

P 01084

| Article, any question or dispute in connection with the Employer's health insurance plans is specifically excluded from the grievance and arbitration procedures of this Agreement. | |
|---|---|

Union TA:_____

Employer TA:_____

| ARTICLE 12 UNIFORMS AND LAUNDRY | |
|---|---|
| The Employer agrees to furnish and launder uniforms for all employees who are required to wear them. These uniforms shall not be worn off the premises unless authorized. The employee is expected to treat the uniforms with care. The Employer also agrees to replace, at no cost to the employees, those uniforms which have become permanently stained or worn out. | No change - §112 |

Union TA:_____

Employer TA:_____

| ARTICLE 13 BULLETIN BOARDS | |
|---|---|
| The Union shall be entitled to reasonable use of the bulletin boards of the Employer for the purpose of posting notices of official business. Other matters of interest to employees may be posted if approved by the Employer. It is agreed that the bulletin boards may be locked and a key maintained by the Management. | No change - §113 |

P 01085

Union TA:_____

Employer TA:_____

| ARTICLE 14 WAGES | |
|---|---|
| ¶. A schedule of "Appendix A" covering job classifications and base wage rates is attached and made a part of this Agreement. Additionally, the parties agree as follows: | §114. A schedule of "Appendix A" covering job classifications and base wage rates is attached and made a part of this Agreement. Additionally, the parties agree as follows: |

Union TA:_____

Employer TA:_____

| (a) Maintenance Boiler Pay - $1.00 per hour paid for all hours worked to employees with a license, working full-time at a hotel where a license is required. (TCS will continue current practice) | (a) Maintenance Boiler Pay - $1.00 per hour paid for all hours worked to an employee with a license when such an employee is responsible for the operation of the boiler, working full-time where a license is required. Only one boiler operator will be required at any time during operations. |

Union TA:_____

P 01086

Employer TA:_____

| (b) If applicable state or federal minimum wage is increased, all bellpersons, doorpersons, and servers will receive the same cents per hour as the minimum wage increase cents per hour. | Omit |
|---|---|

Union TA:_____

Employer TA:_____

| 2. Except pursuant to the Lateral Service Article of this Agreement (Article 23), an employee required to fill a higher rated job temporarily shall receive the rate for that job while on that job and must be paid such higher rate for at least three-tenths (3/10ths) of an hour. An employee required to fill a lower job temporarily shall receive his regular rate while on that job. | An employee required to fill a higher rated job temporarily shall receive the rate for that job while on that job. An employee required to fill a lower job temporarily shall receive his regular rate while on that job. |
|---|---|

Union TA:_____

Employer TA:_____

| Employees who request hours in a lower paying job in order to more nearly reach fulltime employment will be paid at the rates of the job being performed. | No change - §116 |
|---|---|

82

P 01087

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Except pursuant to the Lateral Service Article of this Agreement (Article 25), bargaining unit employees will not be required to temporarily fill in for non-bargaining unit positions. | §117. Except in those instances of work performed for a limited periods of time pursuant to the Lateral Service Article of this Agreement (Article 25), bargaining unit employees will not be required to temporarily fill in for non-bargaining unit positions. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 3. Employees being paid over scale shall receive the same percentage increase as employees paid on the Agreement's scale. | No change - §118 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 4. If any new classifications are added during the life of this Agreement, wages for the same shall be negotiated by letter or addendum and made a part of this Agreement. | No change - §119 |

Union TA:_____

83

Employer TA:_____

| | |
|---|---|
| 5. All rate increases shall become effective in the first pay period after the employee becomes eligible for the rate increase, it being the intention of the parties that changes in rates of pay not be made during a work week. | No change - §120 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 6. Employees who are required to leave their jobs because of occupational injury will receive pay for all hours scheduled to work on the day of the injury or accident. | No change - §121 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 7. Banquet servers working cashier/vending functions shall receive the five (5) year snack bar attendant rate of pay. Senior employees shall have the right to defer such functions to the junior employee provided there are sufficient employees to staff the event. | Omit |

Union TA:_____

84

P 01089

Employer TA:_____

| 8. A split shift shall be defined as any break of more than one (1) hour during working hours. All split shifts will be completed within a twelve (12) hour period, with the exception of function employees and bellpersons. A premium of twenty cents (20¢) per hour will be paid for all hours worked on any split shift except tip classifications. | A split shift shall be defined as any break of more than one (1) hour during working hours. All split shifts will be completed within a twelve (12) hour period. |
|---|---|

Union TA:_____

Employer TA:_____

| | ARTICLE ___ HEALTH AND SAFETY 1. The Employer shall at all times use its best efforts to plan and maintain a safe and healthful work environment. The Union agrees that it will endeavor to have its members observe all safety rules. |
|---|---|

| | 2. The Employer agrees that it will adhere to all applicable Federal and State laws enacted for the purpose of protecting the employees with respect to safety and health. |
|---|---|

| | 3. Following an injury which is compensable under |
|---|---|

P 01090

| | worker's compensation, an employee who presents a statement from his/her medical practitioner recommending the need to amend work responsibilities may be temporarily reassigned, in order to provide a reasonable accommodation. Such temporary assignments shall not exceed twelve (12) weeks. The Union supports and encourages a return to work as soon as possible following an injury. |
|---|---|

| | 4. The Employer may make temporary work reassignments in order to reasonably accommodate the limitations or special work requirements of an employee returning to work from a work-related injury or illness. Such reassignments will be limited to sixty (60) days unless extended by mutual agreement. |
|---|---|

| | 5. It is agreed that employees will not be required to handle any bio-hazard bags when they come to the plant. Any such bags will be placed, unopened, into a special bin that will be picked up by Mayo to be handled by them. |
|---|---|

| | 6. The Employer shall provide employees working in the soil sort department with OSHA approved gowns and gloves. Employees shall not remove these items |
|---|---|

P 01091

| from the premises. |
| --- |

| ARTICLE 15 HEALTH, SAFETY AND SICK BENEFITS | CONSOLIDATE WITH PAID TIME OFF ARTICLE |
| --- | --- |
| 1. All regular employees who have completed their probationary period of employment and attained seniority status will be eligible for sick leave benefits beginning with the second day of absence for actual illness. However, sick leave will be paid to any employee on the first day of hospitalization and for the first workday of any three (3) or more consecutively scheduled workdays absences. | Omit |

Union TA:_____

Employer TA:_____



| For employees hired prior to September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of eighty (80) hours of sick leave for two thousand eighty (2,080) hours of work or pay during an employee's anniversary year. The maximum benefit that can be accumulated by such an employee will be three hundred (300) hours. Upon an employee reaching the maximum balance, the employee may sell up to sixty (60) hours of sick pay at fifty percent (50%) of value on the employee's anniversary date. | Omit |
| --- | --- |

87

Union TA:_____

Employer TA:_____

| | |
|---|---|
| For employees hired on or after September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of forty (40) hours of sick leave for two thousand eighty (2,080) hours of work or pay during an employee's anniversary year of employment. The maximum benefit that can be accumulated by such an employee will be three hundred (300) hours. Upon an employee reaching the maximum balance, the employee may sell up to sixty (60) hours of sick day at fifty percent (50%) of value on the employee's anniversary date. | Sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of forty eight (48) hours of sick leave for two thousand eighty (2,080) hours of work or pay during an employee's anniversary year of employment. The maximum benefit that can be accumulated or carried after the effective date of this Agreement by such an employee will be two hundred forty (240) hours. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 2. Sick leave may be converted to hours in the instance of an employee becoming ill after having reported for work. The hours lost by such an employee on that day by reasons of illness will be accumulated to establish eligibility for sick leave after the required waiting period. | No change - §127 |

Union TA:_____

Employer TA:_____

| Employees in the server and bellperson sections shall be given the option to use two (2) hours of their accrued sick leave for each hour of sick leave provided they meet the sick leave eligibility requirements. | Omit |
|---|---|

Union TA:_____

Employer TA:_____

| To receive sick pay after three (3) days of illness, an employee must present a doctor's certificate as proof of illness. Absences due to accidents covered by workers' compensation are not eligible for sick leave benefits; provided, however, that sick leave which has been accumulated can be utilized in connection with workers' compensation benefits in order to permit an employee to receive up to the employee's average income in a combination of workers' compensation and sick leave pay. | No change - §129 |
|---|---|

Union TA:_____

Employer TA:_____

89

P 01094

| | |
|---|---|
| 4. The Employer will do everything reasonably possible to create and maintain safe, healthful and sanitary working conditions. The Union agrees that it will endeavor to have its members observe all of the safety rules. | Omit (moved to Health and Safety Article) |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 5. The Employer may make temporary work reassignments in order to accommodate the light duty or special work requirements of an employee returning to work from a work-related injury or illness. Such reassignments will be limited to sixty (60) days unless extended by mutual agreement. | Omit (moved to Health and Safety Article) |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 6. The Employer agrees that employees shall be allowed to use any of their accrued sick time for those absences | No change - §132 |

90

P 01095

| which would be covered by the Family and Medical Leave Act. | |
|---|---|
| | Union TA:_____ |
| | Employer TA:_____ |

| ARTICLE 16 PENSION | |
|---|---|
| 1. The Employer will continue to maintain and administer a pension plan ("Plan"). The normal pension benefit will be fourteen dollars ($14.00) per month for each year of service. The pension program will be funded by the Employer as required by ERISA and the Internal Revenue Code. Employees who work beyond age sixty-five (65) will continue to accrue the full benefits subject to the maximum accumulation of forty-five (45) years. | No change - §133 |
| | Union TA:_____ |
| | Employer TA:_____ |

| 2. The following is a brief outline of pension eligibility and benefits. The Plan and Trust Document are the ruling documents in all respects: | No change §134 |
|---|---|
| | Union TA:_____ |
| | Employer TA:_____ |

| Eligibility - Age twenty-one (21), one (1) year of | No change -§134(a) |
|---|---|

P 01096

| | |
|---|---|
| service, and 1,000 hours worked within a twelve (12) month period. | Union TA:_____<br><br>Employer TA:_____ |
| Normal Retirement Age sixty-five (65) and five (5) years of participation. | No change - §134(b)<br><br>Union TA:_____<br><br>Employer TA:_____ |
| Early Retirement Age sixty-two (62) and five (5) years of participation. | No change - §134(c)<br><br>Union TA:_____<br><br>Employer TA:_____ |
| Disability retirements are available to qualified employees. | No change - §134(d)<br><br>Union TA:_____<br><br>Employer TA:_____ |
| The normal pension benefit will be fourteen dollars ($14.00) per month for each year of service up to forty-five (45) years. | No change - §134(e)<br><br>Union TA:_____<br><br>Employer TA:_____ |

92

P 01097

| There are a number of optional methods for payments of benefits | No change - §134(f) |
|---|---|
| | Union TA:_____ |
| | Employer TA:_____ |

| Vesting occurs after five (5) years of Vesting Service | No change - §134(g) |
|---|---|
| | Union TA._____ |
| | Employer TA:_____ |

| 3. The Employer shall have the right to amend the Plan from time to time, consistent with the foregoing terms. | No change -§135 |
|---|---|
| | Union TA:_____ |
| | Employer TA:_____ |

| ARTICLE 17 UNITE HERE 401(k) | |
|---|---|
| Employees will be eligible to participate in the 401(k) plan created and administered by the Union ("Union 401(k) Plan"). The Employer will not match employee contributions to and the Union will be responsible for all the costs of the Union 401(k) Plan, including all costs associated with the administration of the Union 401(k) Plan. | No change - §136 |
| | Union TA:_____ |

93

P 01098

Employer TA:_____

| ARTICLE 18 NO STRIKE OR LOCKOUT | |
|---|---|
| 1. There shall be no strike, picketing, work stoppage, slow down, sit downs, or cessation of work, including of a sympathy nature, boycotts, or any walk out of any kind or for any reason, including any dispute relating to alleged unfair labor practices, during the term of this Agreement. The provisions of this Article shall be absolute and shall apply regardless of whether the dispute is subject to arbitration under the provisions of Article 6 of this Agreement. | No change - §137 |

Union TA:_____

Employer TA:_____

| 2. It will not be a violation of this agreement for employees to refuse to go through a legally authorized picket line in any strike approved by a two-thirds (2/3) vote of the executive board of the Union. | No change - §138 |
|---|---|

Union TA:_____

P 01099

Employer TA:_____

P 01100

| ARTICLE 19 MAINTENANCE TOOL ALLOWANCE | |
|---|---|
| Maintenance employees will be entitled to a tool allowance of up to $325.00 per year to maintain and replace tools required by the Employer. Paid receipts must be presented to the Employer before payment is received by the employee. Employees will be reimbursed within fifteen (15) business days of presenting a receipt. | No change - §139 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The tool allowance will be paid to eligible employees who are actively employed on September 1. For those employed less than a full year at that time, the tool allowance will be prorated based on the number of full months worked in the preceding twelve (12) months resulting in one-twelfth (1/12th) of the allowance for each month. | No change - §140 |

Union TA:_____

Employer TA:_____

96

P 01101

| | |
|---|---|
| Specialized tools and test equipment required for maintaining equipment, but not listed on the employee tool list will be provided by the employer. These tools will not generally be issued to maintenance employees, but will be stocked in the maintenance shop to be issued on an as needed basis. | No change - §141 |

Union TA._____

Employer TA:_____

97

P 01102

| ARTICLE 20 DISCRIMINATION | |
|---|---|
| The Employer and the Union agree to abide by the federal law prohibiting discrimination in hiring practices because of sex, race, age, religion, color, national origin or union membership. The Employer further agrees that there shall be no discrimination in regard to tenure, upgrading or work assignments because of sex, race, age, religion, color, national origin or union membership. All employees shall be permitted to wear their official Union button and/or official steward button provided the button is no larger than one and one-quarter (1-1/4) inches in diameter. However, the foregoing limitation on the number and size of buttons worn shall not apply to employees in classifications that are not visible to the public. | §142.  The Employer and the Union agree to abide by all federal, state and local laws prohibiting discrimination in hiring practices because of sex, race, age, religion, color, disability, national origin, union membership and all other legally protectable categories. The Employer further agrees, subject to all federal, state and local laws, that there shall be no discrimination in regard to terms, conditions and privileges of employment because of sex, race, age, religion, color, disability, national origin, union membership and all other legally protectable categories. The Grievance and Arbitration Procedure, as set forth in Article 5, shall be the sole dispute resolution procedure an employee may utilize in the event he or she alleges the Employer has breached the preceding sentence by a violation of the laws referenced therein. |
| | All employees shall be permitted to wear their official Union button and/or official steward button provided the button is no larger than one and one-quarter (1-1/4) inches in diameter. However, the foregoing limitation on the number and size of buttons worn shall not apply to employees in classifications that are not visible to the public. |

Union TA:_____

Employer TA:_____

P 01103

| ARTICLE 21 RESPECT & DIGNITY | |
|---|---|
| The Union and the Employer recognize that workers in the hospitality industry are professional employees deserving of the highest regard. The Union, the Employer, the non-Union and Union employees will work together to honor the principles of respect, and dignity. The parties and non-Union and Union employees agree that the continued success and operation of this establishment is dependent upon their mutual respect for one another's work. | The Union and the Employer recognize that all employees are professional employees deserving of the highest regard. The Union, the Employer, the non-Union and Union employees will work together to honor the principles of respect, and dignity. The parties and non-Union and Union employees agree that the continued success and operation of this establishment is dependent upon their mutual respect for one another's work. |

Union TA: _____

Employer TA: _____

| ARTICLE 22 MANAGEMENT RIGHTS | |
|---|---|
| Except as limited by the express provisions of this Agreement, and longstanding mutually agreed written | No change - §144 |

99

P 01104

| | |
|---|---|
| custom and past practice, the management of the business and the direction of the working forces shall rest solely and exclusively with the Employer. This includes, but is not limited to, the right to hire; to determine the quality and quantity of work performed; to determine the number of employees to be employed; to determine the jobs and job classifications; to layoff employees; to assign and delegate work; to maintain and improve efficiency; to promulgate, rescind, revise and require observance of rules, regulations, and other policies; to direct the activities of all employees employed by the Employer; to schedule work and to determine the number of hours to be worked; to determine the methods and equipment to be utilized and the type of service to be provided; to create, combine and to eliminate job classifications; except as limited by Appendix F, to subcontract bargaining unit work including using temporary agency employees for same; and to change, modify or discontinue existing methods of service and equipment to be used or provided. | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| ARTICLE 23 LAUNDRY AND DRY CLEANING WORK STABILIZATION | |
| Notwithstanding any strike, work stoppage, interruption | No change |

P 01105

| of work or other economic sanction instigated or conducted by the Union or employees against the Employer for any good reason, specifically including the occasion of negotiating new or different terms of collective bargaining agreements, there shall be no work stoppage or interruption of work as relates to materials being processed in the laundry and dry cleaning departments for the use of any public and private hospitals, the Mayo buildings and nursing homes. | |

Union TA:_____

Employer TA:_____

| If such a strike or work stoppage occurs, the Employer and the Union will cooperate with the other to the end that regular employees of the Employer will be made available for the processing of such uninterrupted work and services of public and private hospitals, the Mayo buildings and nursing homes. | No change |

Union TA:_____

Employer TA:_____

101

P 01106

| | |
|---|---|
| In consideration of the foregoing no-strike agreement, the Employer agrees that it will not process any other work in its laundry and dry cleaning facilities during the term of a strike, so long as the Union and the employees do process, without interruption, all work required for the use of any public and private hospitals, the Mayo buildings and nursing homes. | No Change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| This Article shall remain in full force and effect for a period equal to the life of this Agreement and/or any renewal thereof plus six (6) months in addition thereto. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| Any breach or threatened breach of this Article or any of the terms thereof in addition to any remedies at law or this Agreement shall be subject to suit for specific performance by the Employer or the Union. | No change |

Union TA:_____

Employer TA:_____

102

P 01107

| ARTICLE 24 SUCCESSORSHIP | ARTICLE 23 |
|---|---|
| In the event the owner of a facility covered by this Agreement decides to sell, transfer or assign its interest in any of the three (3) hotels listed on page one (1) of this Agreement, or in Textile Care Services, it will, prior to closing, provide a copy of this Agreement to the purchaser, assignee or transferee. In addition, the Employer will notify the Union and bargain in good faith over the effects of the pending sale, transfer or assignment on bargaining unit employees, prior to closing. The Employer agrees to notify the Union of the owner's intent to sell, transfer or assign its interest at the earliest possible date but in any case, no later than the date, of the execution of the purchase agreement. | In the event the owner of the facility covered by this Agreement decides to sell, transfer or assign its interest, it will, prior to closing, provide a copy of this Agreement to the purchaser, assignee or transferee. In addition, the Employer will notify the Union and bargain in good faith over the effects of the pending sale, transfer or assignment on bargaining unit employees, prior to closing. The Employer agrees to notify the Union of the owner's intent to sell, transfer or assign its interest at the earliest possible date but in any case, no later than the date, of the execution of the purchase agreement. |

Union TA:_____

Employer TA:_____

103

P 01108

| ARTICLE 25 LATERAL SERVICE | ARTICLE 24 |
|---|---|
| To support the Employer's provision of a high level of service to guests of the hotels covered by this Agreement, a high degree of cooperation with managers and with workers is required. In order to promote cooperation in the workplace, managers and workers are encouraged to develop ongoing communication. Consistent with the needs of the workplace, the Union recognizes that cooperation can be beneficial to both the workers and a hotel. | To support the Employer's provision of a high level of performance, a high degree of cooperation with managers and with workers is required. In order to promote cooperation in the workplace, managers and workers are encouraged to develop ongoing communication. Consistent with the needs of the workplace, the Union recognizes that cooperation can be beneficial to both the workers and the Company. |

Union TA:_____

Employer TA:_____

| Management may, using reasonable discretion, utilize a policy of lateral service for limited periods of time to satisfy guests' and the hotel's needs. Lateral service consists of an employee performing work which ordinarily is performed by employees in a different job classification and is designed to allow employees to help where needed until guest or other hotel needs are satisfied. | Management may, using reasonable discretion, utilize a policy of lateral service for limited periods of time to satisfy business needs. Lateral service consists of an employee performing work which ordinarily is performed by employees in a different job classification and is designed to allow employees to help where needed until needs are satisfied. |

Union TA:_____

Employer TA:_____

104

P 01109

| ARTICLE 26 ENTIRE AGREEMENT | ARTICLE 25 |
|---|---|
| This Agreement incorporates the entire understanding between the parties and supersedes all prior agreements, letters of understanding, grievance settlements and past practices between the parties except for those practices identified by the parties in Appendix K that may continue to be relevant. This Agreement shall be modified or amended only by a writing referring to this Agreement executed by both parties setting forth the amendment or modification. | **No change - §148** |

Union TA:_____

Employer TA:_____

| ARTICLE 27 DURATION | ARTICLE 26 |
|---|---|
| This Agreement shall be effective as of October 1, 2011 and continue in full force and effect to and including the 31st day of August 2014 and continue thereafter from year to year unless either party hereto shall, at least sixty (60) days previous to the termination of any yearly period, notify the other party in writing of its intention to amend, modify or terminate this agreement. By yearly period the parties understand that the anniversary date of this Agreement will be August 31st of any succeeding year unless changed by mutual consent of the parties. | §149.  This Agreement shall be effective as of ░░░░░░░ and continue in full force and effect to and including the ░░░ day of ░░░░, 20░░ and continue thereafter from year to year unless either party hereto shall, at least sixty (60) days previous to the termination of any yearly period, notify the other party in writing of its intention to amend, modify or terminate this agreement. By yearly period the parties understand that the anniversary date of this Agreement will be ░░░░░░░░ of any succeeding year unless changed by mutual consent of the parties. |

Union TA:_____

Employer TA:_____

P 01110

| | |
|---|---|
| Wage increases set forth in Appendix A will be effective on the first full pay period after September 1, 2011, the first full pay period after September 1, 2012 and the first full pay period after September 1, 2013. | §150.  Wage increases set forth in Appendix A will be effective on the first full pay period after _____, the first full pay period after _____ and ____ |

Union TA:_____

Restaurants TA:_____

Union TA:_____

Restaurants TA._____

| | |
|---|---|
| In the event of actual declaration of war by the Congress of the United States, this Agreement may be reopened by either party on sixty (60) days written notice. | No change - §151 |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| IN WITNESS WHEREOF, The Employer and the Union have hereto set their hands this _____ day of October 2011. | IN WITNESS WHEREOF, The Employer and the Union have hereto set their hands this _____ day of _____ |

Union TA:_____

Employer TA:_____

106

P 01111

SUNSTONE HOTEL PROPERTIES, INC.
AS AGENT FOR DBA THE KAHLER
GRAND HOTEL, ROCHESTER
MARRIOTT MAYO CLINIC AREA,
KAHLER INN & SUITES AND
TEXTILE CARE SERVICES

_____

Robert LaCasse
Regional Director of Operations

SUNSTONE HOTEL PROPERTIES, INC.
AS AGENT FOR DBA TEXTILE CARE SERVICES

_____

Robert LaCasse
Regional Director of Operations

Union TA:_____

Employer TA:_____

UNITE HERE LOCAL 21 AFL-CIO

_____

Brian Brandt
President / Business Representative

_____

Nancy Goldman
International VP, UNITE HERE

Union TA:_____

Employer TA:_____

107

| | |
|---|---|
| **SIDE LETTER**<br><br>Sunstone Hotel Properties, Inc., as agent for d/b/a The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites and Textile Care Services located in Rochester, Minnesota, ("Employer") and UNITE HERE Local 21 AFL-CIO, enter into this Side Letter to their October 1, 2011 - August 31, 2014 collective bargaining agreement: | [delete] |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| As a result of the elimination of the retiree life insurance benefit set forth in the parties' September 1, 2005 to August 31, 2010 collective bargaining agreement, the Employer has agreed that employees who were eligible as of September 1, 2011 or would become eligible by August 31, 2014 for this benefit will receive no later than December 15, 2011, a payment of two hundred and fifty dollars ($250.00) minus applicable legal deductions. | [delete] |

Union TA:_____

Employer TA:_____

108

P 01113

GRAND HOTEL, ROCHESTER
MARRIOTT MAYO CLINIC AREA,
KAHLER INN & SUITES AND
TEXTILE CARE SERVICES

_____  _____

Robert LaCasse
Regional Director of Operations

Union TA:_____

Employer TA:_____

UNITE HERE LOCAL 21 AFL-CIO

_____

Brian Brandt
President / Business Representative

_____

Nancy Goldman
International VP, UNITE HERE

Union TA:_____

Employer TA:_____

109

P 01114

| APPENDIX "A" | |
|---|---|
| **Payroll Rates**<br><br>The rates of pay for classifications are set forth below. The hiring rate shall apply to employees transferring to another classification, providing there is no decrease in hourly rate. After an employee who has transferred to another classification completes three (3) months of continuous employment in the new classification, he/she will be granted the appropriate service rate based upon his/her continuous employment with the Employer. Employees will, however, be given credit for actual experience in filling in on the new position towards the three (3) months of continuous employment. | No change |

Union TA:_____

Employer TA:_____

110

P 01115

| | |
|---|---|
| The Employer will have the right to select the individuals who will be classified lead and to determine the number of lead positions and the shifts where they will be utilized. The Employer will also have the right to increase or decrease the number of lead positions in the future. The minimum wage differential for lead positions will be fifty cents (50¢) per hour. Leads shall be responsible for the general direction of employees in the department and ensuring that all tasks are completed. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| [ADD] new wage table, with annual increases – NO rate increases at 12-month, 24-month, 42-month and 60-month service points] | |

111

P 01116

APPENDIX "B"
Departments And Seniority Sections

THE KAHLER GRAND HOTEL

Food & Beverage Department
- Cooking Section
- Preparation Section
- Room Service Serving Section
- Grand Grill Serving Section
- Function Serving Section
- Function Set-Up
- Sanitation Section
- Bartenders Section
- Stores Section
- Room Service Telephone Section
- Starbucks Section
- J-Club Section
- Martini's

Rooms Department
- PBX Section
- Bellperson/Lobby Porter Section
- Housekeeping Section

Production Department
☐ Receiving Section
☐ Wash Section
☐ Flat/Tumble Finishing Section
☐ Wearing Apparel Finishing Section
☐ Packaging/Shipping Section
☐ Dry Cleaning Section

Distribution Department
☐ Service Representative Section
☐ Utility Section

Maintenance Department
☐ Maintenance Section

112

Maintenance Department

- Maintenance Section

KAHLER INN & SUITES

Food and Beverage Department
- Cooking Section
- Serving Section
- Sanitation Section

Rooms Department
- Housekeeping Section
- Bellperson Section

Maintenance Department
- Maintenance Section

B-1

Union TA: _____    Union TA: _____

Restaurants TA: _____    Restaurants TA: _____

ROCHESTER MARRIOTT
Food and Beverage Department
- Cooking Section
- Preparation Section
- Serving Section

113

P 01118

- Room Service Serving Section
- Function Serving Section
- Function Set-Up
- Sanitation Section
- Bartenders Section
- Stores Section

Rooms Department
- Bellperson, Doorperson Section
- Housekeeping Section

Maintenance Department
- Maintenance Section
- Housekeeping Section

TEXTILE CARE SERVICES

Production Department
- Receiving Section
- Wash Section
- Flat/Tumble Finishing Section
- Wearing Apparel Finishing Section
- Packaging/Shipping Section
- Dry Cleaning Section
- Utility Section

114

P 01119

| | |
|---|---|
| Distribution Department<br>    • Service Representative Section<br><br>Maintenance Department<br>    • Maintenance Section<br><br>      B-2 | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| APPENDIX "C"<br>MAINTENANCE ADDENDUM<br><br>Apprentices in the Maintenance Department will be permitted to take a test to move to the "mechanic" classification after completing two years of service as an apprentice. The apprentice wishing to take the test will furnish the employer with a written request and will be permitted to take the test within thirty (30) calendar days following the written request. The employer will inform the apprentice of the test results within thirty (30) calendar days of taking the test. If the apprentice passes the test he/she will be promoted to the "mechanic" classification. | Omit addendum and create maintenance article |

Union TA:_____

Employer TA:_____

P 01120

| | |
|---|---|
| At Textile Care Services, the laundry specialist classification will require the employee to have a class 1-B boiler license and maintenance electrician's license. The employee will be required to demonstrate skills in electronics to troubleshoot PLC and computer control systems, make programming changes as directed by the equipment manufacturer and repair circuit boards | The laundry specialist classification will require the employee to have a class 1-B boiler license and maintenance electrician's license. The employee will be required to demonstrate skills in electronics to troubleshoot PLC and computer control systems, make programming changes as directed by the equipment manufacturer and repair circuit boards. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The employee will be required to demonstrate proficiency in welding and plumbing. The Employer agrees to provide, at no cost to the employee, for all training and education that is required for maintenance employees to obtain and maintain licensure provided the training is approved by the Employer and the course is successfully completed. | No change |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The Employer agrees to employ no more than the following number of employees in the classifications of light/yard maintenance and preventative maintenance: | Omit, these numbers will be determined by management/business needs |

Union TA:_____

Employer TA:_____

116

| Facility | Light/Yard | Preventative |
|---|---|---|
| The Kahler Grand Hotel | 2 | 2 |
| Kahler Inn and Suites | | 1 |
| Rochester Marriott | 1 | 1 |
| TCS | | 3 |

Omit

Union TA:_____

Employer TA:_____

---

Seniority Rights. The Employer will maintain separate seniority lists at each hotel by classification. A separate seniority list for maintenance employees working at Textile Care Services will be maintained for purposes of all seniority rights.

Seniority Rights. The Employer will maintain separate seniority lists by classification.

Union TA:_____

Employer TA:_____

---

Staffing and appropriate coverage at all locations will be determined by management.

Staffing and appropriate coverage will be determined by management.

Union TA:_____

Employer TA:_____

117

P 01122

| With the exception of apprentices, advancement to a higher paid classification will only be permitted when a new position opens in a specific classification. | No change |
|---|---|

Union TA:_____

Employer TA:_____

| Any and all license requirements will be determined by management and/or applicable law.<br><br>C-1 | No change |
|---|---|

Union TA:_____

Employer TA:_____

118

P 01123

| APPENDIX "D"<br>Housekeeping Addendum | Omit |
|---|---|
| A housekeeping employee shall not be required to clean more than sixteen (16) rooms within eight (8) hours. When a housekeeping employee cleans eleven (11) or more check outs in a day, the maximum number of assigned rooms shall be reduced by one (1), and when a housekeeping employee cleans fourteen (14) or more check outs in a day, the maximum number of assigned rooms shall be reduced by two (2). Each bedroom or separate sitting room of a suite shall count as one (1) room. Management in its sole discretion may reduce the number of rooms to be cleaned during a shift or assign a houseperson to assist a housekeeping employee with rooms where, for example, rooms are exceptionally dirty or extraordinary cleaning is required. | |

Union TA:_____

Employer TA:_____

| Except pursuant to the provisions of Article 25, Lateral Service, Room Attendants will not normally be required to perform houseperson work in addition to their normal duties. | |
|---|---|

Union TA:_____

Employer TA:_____

P 01124

| Housekeepers assigned to clean rooms on three (3) or more floors during a shift shall have their room quota reduced by one (1) room. | |
|---|---|
| | Union TA: |
| | Employer TA: |

| A housekeeping employee who volunteers to clean more than the foregoing amount of rooms within eight (8) hours shall be paid a bought room bonus of seven dollars ($7.00) for each additional room. However, the bought room bonus shall not apply to rooms cleaned during overtime. | |
|---|---|
| | Union TA: |
| | Employer TA: |

| Housekeeping supervisors will make reasonable efforts to have housekeepers assigned to the room accompanying them when entering s a checkout room before it is cleaned. | |
|---|---|
| | Union TA: |
| | Employer TA: |

| The Employer shall not arbitrarily reassign housekeeping sections. | |
|---|---|
| | Union TA: _____ |
| | Employer TA: _____ |

120

| The Employer will install sharps containers in all Hotel public restrooms. | |
|---|---|

Union TA: _____

Employer TA: _____

| Bargaining unit employees shall not normally be required to clean up and/or dispose of human or animal waste, vomit or significant blood spill. Employees shall comply with the Employer's procedures whenever they encounter human or animal feces, vomit, or significant blood spill in the workplace, and shall immediately contact a qualified responder who will handle disposal. Where a bargaining unit employee is required to clean human or animal waste, vomit or a significant blood spill, they will receive a six dollar ($6.00) payment. | |
|---|---|

Union TA: _____

Employer TA: _____

| Hotel employees shall not be required to handle any items that have been placed in a biohazard bag. Employees shall contact their supervisor for handling of those items. | |
|---|---|

Union TA: _____

Employer TA: _____

121

In the event Hotel employees encounter improperly discarded syringes or other sharp objects while working, they shall be disposed of in accordance with established policy. The policy will include adequate available "sharps" containers for collection.

D-1

Union TA

Employer TA

The Employer will provide linen, equipment and cleaning materials which is sufficient for Housekeeping employees to perform their jobs. Room Attendants will not be disciplined where they could not perform a task because they did not have the necessary equipment or supplies.

Union TA

Employer TA

The Employer will provide assistance to a housekeeper in connection with moving or lifting any furniture weighing more than twenty-five (25) pounds. No Room Attendant will be required to stand on a ladder, bath tub or vanity.

Union TA

Employer TA

The Employer will provide at least thirty (30) day's notice to the Union and, upon the Union's request, meet and discuss any renovation or new

122

P 01127

amenities or service standards which will significantly affect the housekeeper's work loads.

D-2

Union TA: _____

Employer TA: _____

APPENDIX "E"
Banquet Department Addendum

Banquet Definition: A banquet shall be deemed to be any reserved function with a pre-set menu and a fixed cost, including receptions, supervised by the banquet department.

Union TA: _____

Employer TA: _____

System-Wide Seniority: For purposes of lay-off, recall and filling available positions, the Employer shall maintain a master seniority list which shall contain the names of all regular fulltime and regular part-time banquet servers who work in each of the Employer's hotels. Seniority shall be based on first function worked as a regular server following completion of probation.

Union TA: _____

Employer TA: _____

P 01128

Seniority by Location: The Employer will maintain at each location three (3) banquet employee seniority lists for purposes of scheduling at each of the Hotels.

Union TA

Employer TA

A. First List

The First List will contain the names of all regular full-time banquet employees. These employees must be available to work any shift at the Hotel(s), seven days per week. The seniority list for regular full-time banquet employees shall be posted every month.

Union TA

Employer TA

Although fluctuations in business will have an impact on the Employer's ability to consistently schedule these employees on a full-time basis, it is the intention of the parties to provide First List employees with a reasonable opportunity to work a full time schedule. Accordingly, the number of employees on the First List will be established and maintained so as to reflect this intention.

Union TA

Employer TA

124

P 01129

**B. Second List.**

The Second List will contain the names of banquet employees who are available to work a minimum of three (3) shifts, per week, at the Hotel(s). The days and shifts on which such employees are available will be submitted to management in writing. Second List employees will be on a separate seniority list, which will be posted. Second List employees will be scheduled only after the First List has been exhausted, when necessary to meet staffing needs, or where use of the First List employees would result in the payment of overtime.

Union TA:

Employer TA:

**C. On-Call List.**

The On-Call List will contain the names of banquet employees who are called and work on an "as needed" basis at the Hotel(s). On-Call employees may be scheduled when the First and Second Lists have been exhausted, where necessary to meet staffing needs, or where use of First or Second List employees would result in the payment of overtime. Local 21 will check hours worked on a monthly basis to see if hours worked fall under guidelines (average 10 hours/week are subject to dues).

D.

Union TA:

Employer TA:

125

P 01130

**D. Seniority Standing.**
1. First List employees moving to the Second List will be "dove-tailed" based on seniority date. The Second List employees moving to the First List will go to the bottom of the list with seniority based on date of transfer.

Union TA

Employer TA

2. First List servers will have preference for scheduling purposes at their own Hotel and preference over Second List and On-Call servers at the other Hotels.

Union TA

Employer TA

3. Maximum hours available will be offered to senior First List employees; up to forty (40) hours per week, but no employee will work a triple shift until all First List employees have been offered a double shift.

Union TA

Employer TA

4. Any regular server involuntarily cut from a function shall be entitled to bump the least senior server scheduled to work at their home Hotel, in that work week.

Union TA

Employer TA

126

5. Employee requests for days off must be received in writing by noon, forty-eight (48) hours prior to posting of the weekly schedule, and will be duly considered. A regular server will not be disciplined for his/her inability to work a shift if the server is notified less than twenty-four (24) hours before the scheduled shift.

Union TA:

Employer TA:

6. All weekly banquet schedules shall be posted at each of the Hotels. It is understood that employees may be required to work at all locations.

Union TA:

Employer TA:

F. Special Conditions/Scheduling

Employees will be scheduled by shifts. A shift is defined as a work period of no less than three (3) hours and no more than eight (8) hours. A shift may include working one, or any combination of, the following events:

Union TA:

Employer TA:

127

- Breakfasts
- Coffee Breaks
- Lunches
- Dinners
- Receptions
- Special Events

Union TA: _____

Employer TA: _____

**Banquet Employee Compensation:**

A. Banquet Service Charge. Banquet servers shall receive fifteen (15%) of the banquet service charge on all functions, including those contracted for at the Civic Center. This service charge applies to food and beverages served to guests who have functions at a hotel covered by this Agreement and does not apply to any other fees and/or charges to guests who have functions at a hotel covered by this Agreement, including but not limited to room fees, audio-visual equipment charges, etc.

E-2

Union TA: _____

Employer TA: _____

128

P 01133

| B. Service Charges on Guaranteed Meals: Service charges shall be paid on the guaranteed number of meals paid for by the customer. | |
|---|---|

Union TA: _____

Employer TA: _____

| C. Service Charge on Complimentary Functioning: Servers who work a promotional function for which the Hotel does not charge the guest will be paid a service charge percentage consistent with the above schedule. The service charge will be calculated on the retail value of the function. | |
|---|---|

Union TA: _____

Employer TA: _____

| D. Corkage Fees. When the Employer collects a corkage fee for guest supplied alcohol, fifty percent (50%) of that fee shall be added to the service charge pool. For events where no corkage fee is collected, fifty percent (50%) of the customary fee will be added to the service charge pool. However, the foregoing shall not apply to off-site events where the customer will not pay the corkage fee. | |
|---|---|

Union TA: _____

Employer TA: _____

129

P 01134

E. Cake Cutting. One-half of the cake plating charge shall be included in the tip pool.

Union TA: _____

Employer TA: _____

F. Service Charge Increase. Should the service charge be increased, the hotel will retain the full increase up to eighteen percent (18%) percent. Any service charge over eighteen percent (18%) percent will be divided equally between the employees and the hotel.

Union TA: _____

Employer TA: _____

Tip Pooling System
A. The service charge will be pooled and divided on a daily basis based on hours worked at each hotel.

Union TA: _____

Employer TA: _____

Temporary employees shall not be included in the tip pool.

Union TA: _____

Employer TA: _____

130

P 01135

B. **Employer Records**: The employer records on the amount of service charge and method of distribution shall be made available to the Union Representative or designee for purposes of monitoring the tip pooling system. The Union may request a meeting on a quarterly basis to review the system.

E-3

Union TA _____

Employer TA _____

APPENDIX "F"
Food and Beverage Addendum

All Employees working in the cook classification will receive a meal during their shift at no cost to the employee.

Union TA _____

Employer TA _____

The lead cook rate of pay will be applied to at least one (1) cook in the Grand Grill, Center Street, Country Cafe, and Vino for all hours of operation.

Union TA _____

Employer TA _____

131

P 01136

| It is agreed there will be no more than one (1) sous chef and one (1) executive chef assigned per shift at each hotel. | |
|---|---|
| | Union TA: _____ |
| | Employer TA: _____ |

| Starbucks employees will be paid at the snack bar rate. | |
|---|---|
| | Union TA: _____ |
| | Employer TA: _____ |

| The Employer will not subcontract or lease out to another food and beverage operator any kitchen, bar, or restaurant in either the Marriott or Kahler Grand that is subject to this Agreement. | |
|---|---|
| F-1 | |

Union TA:_____

Employer TA:_____

132

P 01137

| | |
|---|---|
| APPENDIX "G"<br>Textile Care Services Addendum<br><br>Employees in the janitor classification shall receive the same night shift differential as the maintenance classification. | Omit. Move to Maintenance article |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| The Employer shall provide employees working in the soil sort department with OSHA approved gowns and gloves. Employees shall not remove these items from the premises. | Move to Health and Safety Article |

Union TA:_____

Employer TA:_____

P 01138

| APPENDIX "H" | |
|---|---|
| **Bell Position Addendum** | |
| For groups of more than ten (10) people, bellpersons shall receive a portage rate of two dollars ($2.00) per person each coming in and two dollars ($2.00) each for going out if negotiated and collected. It is agreed that these amounts are only minimums. | Omit |
| H-1 | |

Union TA: _____

Employer TA: _____

| APPENDIX "I" | |
|---|---|
| **GUEST SERVICE** | |
| The parties agree to supplement the Agreement for the following purposes) | Omit |

Union TA: _____

Employer TA: _____

| WHEREAS, the parties recognize that premier guest service is essential to the success of the Hotel and its ability to employ persons who are paid competitive wages; | |
|---|---|

Union TA: _____

Employer TA: _____

P 01139

WHEREAS, the parties recognize that because most guest dissatisfaction is not reported, and most dissatisfied guests simply take their business elsewhere, the guest complaints received by the Hotel are a reflection of dissatisfaction by some who have not complained but who will not return to the Hotel;

Union TA:

Employer TA:

WHEREAS, the parties agree that the Hotel shall train employees on how to provide premier guest service and that each employee may be expected to successfully complete such training;

Union TA:

Employer TA:

NOW, THEREFORE, the parties agree as follows:
(1) The Hotel has the right to establish service standards and appearance, grooming, and dress standards that must be adhered to by all employees and managers;

Union TA:

Employer TA:

135

P 01140

(2) The parties agree that the Hotel may apply progressive discipline, up to and including discharge, against employees who are the subject of guest complaints other than those set forth in the following paragraph 3. (examples of complaints include, but are not limited to, misplaced luggage, guest room not completely cleaned, mishandled food or beverage order, incorrect credit card charge).

Union TA _____

Employer TA _____

(3) The parties agree that the Hotel shall have just cause for discharge of any employee who, among other reasons:

Union TA _____

Employer TA _____

a) is the subject of two or more legitimate complaints from guests within one year of poor, rude, or discourteous service (examples include, but are not limited to, use of foul language in the presence of a guest, arguing with a guest, indifference to a guest concern, carrying on personal business while a guest is waiting);

Union TA _____

Employer TA _____

136

P 01141

| b) Is the subject of one legitimate complaint from a guest of extraordinarily poor, rude, or discourteous guest service (examples include, but are not limited to, directing foul language toward a guest, sexual or other harassment of a guest, refusal to assist a guest, requesting or adding a gratuity); | |
|---|---|
| | Union TA |
| | Employer TA |

| c) Fails to pass a course pertaining to the Hotel's service standards; | |
|---|---|
| I-1 | |
| | Union TA |
| | Employer TA |

| d) Acts in gross neglect of the Hotel's service standards on one occasion or more, unless the Hotel deems it appropriate to excuse such neglect on a non-precedent setting basis: | |
|---|---|
| | Union TA |
| | Employer TA |

| The parties further agree that the foregoing are examples and that employees may terminated in other circumstances, subject to the requirement that the termination be for just cause; | |
|---|---|
| | Union TA |

137

P 01142

Employer TA:_____

(4) In the event the Hotel chooses to conduct written or oral testing of employees in connection with guest service training, such tests must be reasonable, job related, and nondiscriminatory. Such tests shall be limited to guest service and communication skills and abilities, as well as employee knowledge of the services and products offered by the Hotel. The Union shall be permitted to a copy of any tests used in advance of utilization by the Hotel. The Union shall be permitted to grieve such tests if it believes they are unreasonable, not job related, and/or discriminate on an unlawful basis.

Union TA _____

Employer TA _____

138

| | |
|---|---|
| (5) Where a guest complaint is reduced to writing, the Hotel shall not be required to compel the guest to testify during the grievance and arbitration procedure or reveal the guest's address or telephone number to the Union or to the employee. The Hotel may introduce into evidence at arbitration written guest complaints. Upon request of the Union, the Hotel shall provide the Union with a copy of any written guest complaint that resulted in disciplinary action being taken against an employee, with the guest's identity redacted from such copy. Where the Union wishes to investigate a complaint, the Hotel shall arrange for a conference call between the guest, a representative of the Union, and a representative of Hotel management. Where, however, an employee has been discharged based on one or more guest complaints the Union shall be permitted to investigate the complaint to the extent permitted by the National Labor Relations Act, as interpreted by the National Labor Relations Board and the courts. | |

Union TA: _____

Employer TA: _____

| | |
|---|---|
| APPENDIX I<br>DRUG AND ALCOHOL TESTING<br>This Drug and Alcohol Testing Policy is intended to be in accordance with Minnesota law and with the terms of the Agreement. | No change |

Union TA:_____

Employer TA:_____

139

P 01144

**OBJECTIVE:**
The Company strives to maintain a work environment free from the effects of drug and alcohol abuse for the protection of our customers, employees, and the community.

Union TA:_____

Employer TA:_____

The Company recognizes that alcoholism and other drug dependencies are behavioral/medical problems which can be treated.

Union TA:_____

Employer TA:_____

**POLICY STATEMENTS:**
1. The possession, use, manufacture, transfer, or sale of illegal drugs during work hours, while operating a Company vehicle or on Company premises is prohibited. The Company premises include all SUNSTONE HOTEL PROPERTIES, INC. worksites, including parking facilities. Employees violating this provision may be terminated.

Union TA:_____

Employer TA:_____

140

| | |
|---|---|
| 2.      Employees are not permitted to work under the influence of alcohol or any illegal drug. Employees violating this provision are subject to disciplinary action up to and including termination. | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 3.      Abuse of legally prescribed drugs or controlled substances, or over-the-counter drugs, is prohibited because it may impair an employee's ability to perform his or her job responsibilities. Depending on individual circumstances, this abuse could result in termination. | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 4.      Employees suffering from drug dependency are encouraged to seek medical treatment. The Human Resources representative may be contacted for referrals for evaluation and/or treatment facilities and the application of Company medical benefits for evaluation and treatment. No employee may suffer reprisals as a result of seeking help. If an employee feels he/she has suffered reprisals, he/she should report it to the Human Resources representative immediately and an appropriate investigation and action will take place. | |

Union TA:_____

Employer TA:_____

P 01146

5.    Every employee will receive a copy of the Drug and Alcohol Testing Policy and will be required to sign an Acknowledgment Form, Attachment A, which will be kept in the employee's personnel file. In addition, the Company shall post notices in appropriate and conspicuous locations at each of its worksites that the Company has adopted a Drug and Alcohol Testing Policy and that copies of the Policy are available for inspection during regular business hours by its employees and job applicants in the Company's Human Resources office.

Union TA:_____

Employer TA:_____

6.    An employee may be required to undergo drug and alcohol testing when at least two (2) supervisors (if feasible) have reasonable suspicion that the employee:

Union TA:_____

Employer TA:_____

142

P 01147

| | |
|---|---|
| a.)    is under the influence of drugs or alcohol. Factors that may be considered in determining whether an employee is under the influence of drugs and alcohol include but are not limited to: evidence of repeated errors on the job, Company rule violation, and unsatisfactory time and attendance patterns, if coupled with specific facts and rational inferences drawn from those facts that indicate possible drug use; or<br><br>    J-1 | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| b.)    has violated the Company's written Policy Statements (numbers 1, 2, or 3 above); or | |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| c.)    has had a personal injury while working or has caused a personal injury to another person; or | |

Union TA:_____

Employer TA:_____

143

P 01148

| d.)    has caused a work-related accident or was operating or helping to operate machinery, equipment or vehicles in a work-related accident. | |
|---|---|
| | Union TA._____<br><br>Employer TA:_____ |

| Post-accident or injury testing will be conducted as soon as practical following the accident, but not later than thirty-two (32) hours following the accident. | |
|---|---|
| | Union TA._____<br><br>Employer TA:_____ |

| 7    Drug and alcohol testing will be accomplished by the collection of hair, urine, and/or blood. The screening of hair, urine, and/or blood samples will be performed by qualified and certified testing laboratories. Testing is done for alcohol and the following drugs and drug classes: | |
|---|---|
| | Union TA:_____<br><br>Employer TA:_____ |

144

P 01149

| Marijuana metabolites, cocaine metabolites, the opiates morphine and codeine, phencyclidine (PCP, angel dust), and amphetamines (amphetamine and methamphetamine), and/or all other drug classes as described in Schedules I through V of Minn. Stat. Section 152.02. | |

Union TA:_____

Employer TA:_____

| The detection levels of confirmatory tests shall be those established under Minnesota Rules. | |

Union TA:_____

Employer TA:_____

| 8.     Every employee has the right to refuse to undergo drug and alcohol testing.  Employees who refuse to undergo testing are subject to disciplinary action up to and including termination. | |

Union TA:_____

Employer TA:_____

| 9.     Any employee who tests positive shall have the right to explain the positive test result of a confirmatory test or request and pay for a confirmatory retest of the original specimen sample. | |

Union TA:_____

Employer TA:_____

145

10.    If a positive test result on a confirmatory test was the first such result for the employee on a drug or alcohol test by the Company, the employee will be immediately suspended without pay. The employee can be reinstated upon participation in either a drug or alcohol counseling or rehabilitation program, whichever is more appropriate as determined by the Company after consultation with a certified chemical use counselor or a physician trained in the diagnosis and treatment of chemical dependency. The cost for the evaluation will be paid by the Company. Costs for the recommended treatment will be the employee's responsibility. Employees who refuse to participate in the counseling or rehabilitation program or fail to successfully complete the program, as evidenced by withdrawal from the program before its completion or by a positive test result on a confirmatory test after the completion of the program, may be subject to termination.

J-2

Union TA:_____

Employer TA:_____

11.    An employee who is referred by the Company for chemical dependency treatment or evaluation or is participating in a chemical dependency treatment program may be requested or required to undergo drug or alcohol testing without prior notice during the evaluation or treatment period and for up to one (1) year following completion of any prescribed chemical dependency treatment program. An employee testing positive during this period may be subject to termination.

Union TA:_____

Employer TA:_____

146

P 01151

| 12.    A Medical Review Officer (M.R.O.) will review all test results. All positive test results shall be confirmed by a Gas Chromatography Mass Spectrometry analysis of the original specimen sample. The M.R.O. will review and interpret analytical (laboratory) results, validate the results scientifically, and determine if there is a legitimate medical explanation for a positive test result, and notify the Company of the results. The M.R.O. is a third party licensed physician with specialized knowledge of substance abuse. | |

Union TA:_____

Employer TA:_____

| 13.    The Company reserves the right to change or terminate this Policy and Procedures at any time, after prior notice and negotiation with the Union. Every employee will be given a copy of the amended policy if a change is made. | |

Union TA:_____

Employer TA:_____

147

P 01152

14.    Test result reports and other information acquired in the drug and alcohol testing process are confidential information. Disclosure of the results to third parties may be done with the employee's prior written consent. Notwithstanding the above, test results may be disclosed to any federal agency or other unit of the United States government as required under federal law, regulation or order, or in accordance with compliance requirements of a federal government contract. The test results may also be disclosed to a substance abuse treatment facility for the purpose of evaluation or treatment of the employee, or may be disclosed to the Union or other necessary persons in connection with a potential or actual grievance or threatened or actual litigation. An employee has the right to request and receive from the Company, a copy of the test result report on any drug or alcohol test.

Union TA:_____

Employer TA:_____

No employee may be required to undergo drug or alcohol testing without the prior approval of the Director of Human Resources or the General Manager or his/her designee.

Union TA:_____

Employer TA:_____

148

P 01153

PROCEDURES:
1. When at least two (2) supervisors (if feasible) have reasonable suspicion to test an employee as stated in Policy Statement #6, the request must go to the applicable Human Resources representative or his/her designee to arrange for the collection and begin the required paperwork designating the need for hair, urine, and/or blood specimen.

Union TA:_____

Employer TA:_____

2. Before a test is administered, the Company will ensure that the employee has completed a Drug and Alcohol Acknowledgment Form.

Union TA:_____

Employer TA:_____

149

P 01154

3. The employee will go to the collection site and provide a hair, urine, and/or blood specimen and appropriate identification. The collection site staff will begin the chain of custody paperwork and forward the specimen to the certified laboratory for testing. If an employee appears impaired and unable to safely go to the collection site on his/her own, the Company will arrange for transportation to the collection site and home following the collection procedure. Under no circumstances should an employee suspected of being impaired be allowed to drive. The employee will be reimbursed for any out-of-pocket expense incurred in taking the test, with proper documentation.

J-3

Union TA:_____

Employer TA:_____

4. Test results will be reviewed to determine if there is evidence of the use of alcohol, drugs or controlled substances and forwarded to the M.R.O. If the specimen sample shows a positive result, the original sample will be kept for additional confirming tests.

Union TA:_____

Employer TA:_____

150

P 01155

| 5. The M.R.O. will communicate the results to the Company Human Resources representative. | |
|---|---|

Union TA:_____

Employer TA:_____

| 6. The Human Resources representative and/or the employee's supervisor will communicate the results of the test to the employee or job applicant, as the case may be, within three working days upon receipt of the results. | |
|---|---|

Union TA:_____

Employer TA:_____

P 01156

7. If an employee tests positive for drug use, the employee will be notified in writing of his/her right to explain the positive test and the Company may request that the employee indicate any over-the-counter or prescription medication that the individual is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test result.

Union TA:_____

Employer TA:_____

8. Within three (3) working days after notice of a positive test result on a confirmatory test, the employee may submit information to the Company, in addition to any information already submitted under paragraph 7, to explain that result, or may request a confirmatory re-test of the original sample at the employee's own expense.

Union TA:_____

Employer TA:_____

9. The Human Resources representative will follow up on any recommended treatment and determine whether the employee has successfully completed the treatment.

J-4

Union TA:_____

Employer TA:_____

P 01157

Attachment A
DRUG AND ALCOHOL POLICY ACKNOWLEDGMENT FORM

I, the undersigned, certify that I have received and read a copy of the
Company's Policy regarding drug and alcohol abuse.

Union TA:_____

Employer TA:_____

As part of my employment with the Company, I understand that my
position is
subject to drug and alcohol testing and that I may be requested to provide a
hair, urine, and/or blood specimen for a drug or alcohol test.

Union TA:_____

Employer TA:_____

153

P 01158

I understand that I may refuse to take the drug and alcohol test and that such refusal
may result in termination.

_____
Employee

_____          _____
Social Security Number          Date

_____
Witness

J-5

Union TA:_____

Employer TA:_____

154

| APPENDIX "K"<br><br>**Mutual Agreements**<br>**(Custom, Past Practice, Letters of Understanding)**<br><br>As part of the 2001 contract negotiations and settlement, the parties added a new Article 25 entitled, "Entire Agreement" to the Agreement. In connection with adding Article 25 to the Collective Bargaining Agreement, both parties made a reasonable and good faith effort to locate, identify and discuss all separate mutually agreed upon custom, past practices or letters of agreement understanding which they believe were part of the collective bargaining agreement. As a result, the parties agree that the following items are part of the Collective Bargaining Agreement. | Omit Appendix, items can be included in body of bargaining agreement, if deemed necessary |
|---|---|
| | Union TA:_____<br><br>Employer TA._____ |

| A. from letter of August 19, 1988 to Dan Skinner, HR Manager Kahler Hotel from Terry Weivoda, Local 21 any employee with prior service and seniority in a room (restaurant) is permitted to use that seniority to bid on any posted jobs in that room (restaurant). | Omit |
|---|---|
| | Union TA:_____<br><br>Employer TA._____ |

155

P 01160

| | |
|---|---|
| 2. From letter of September 24, 1991 to Terry Weivoda, Local 21, from Kevin Molloy, Senior VP Operations; | Omit |
| | Union TA:_____ |
| | Employer TA:_____ |

| | |
|---|---|
| a. It is agreed that no absolute room quota exists for room housekeepers, but the employer has the right to set reasonable performance standards. | Omit |
| | Union TA:_____ |
| | Employer TA:_____ |

| | |
|---|---|
| b. Consistent with past practice, it is agreed that full time housekeepers shall be able to use their seniority to select work areas, part time housekeepers shall be assigned as needed. | Omit |
| | Union TA:_____ |
| | Employer TA:_____ |

156

P 01161

| | |
|---|---|
| c. It is agreed that when employees have been requested to work on their day off, such designation shall be made on the employee's work schedule noting any sixth or seventh day worked. | Omit (no posted work schedules)<br><br>Union TA:_____<br><br>Employer TA:_____ |
| d. It is agreed that tipped employees shall not be required to share gratuities with other Hotel employees. | Omit<br><br>Union TA:_____<br><br>Employer TA:_____ |
| e. It is agreed that the Employer will continue for the life of their 2011-2014 Collective Bargaining Agreement the current employee discount for meals purchased in restaurants in accordance with the established policy, i.e. employee cafeteria, or if not available, from employee menu. | Omit<br><br>Union TA:_____<br><br>Employer TA:_____ |
| f. From letter of October 23, 1997 to Dave Blanchard, Local 21 from Kevin Molloy, Regional VP, Sunstone. | Omit<br><br>Union TA:_____<br><br>Employer TA:_____ |

157

a. It is agreed that a shift chef will not be used to fill a regular shift while a cook is on lay off. It is understood, however, that under such circumstances a laid off cook will not be recalled to cover short periods of cooking that could occur during the heavy volume periods of the day.

Union TA:_____

Employer TA:_____

b. It is agreed that when an employee is required to work through the lunch, the supervisor will be advised and will attempt to reschedule the lunch periods. Employees will not, however, have lunch periods scheduled during the last one half hour of the shift.

Move to Article 8, Work Week

Union TA:_____

Employer TA:_____

c. With respect to Article 9, Section 1, it is agreed that the language will be interpreted to require that employees who work on a holiday will be paid double time for all hours worked on that day.

Omit, if language is unclear in Article 9, revise

K-1

Union TA:_____

Employer TA:_____

P 01163

| | |
|---|---|
| 4. From letter of October 5, 1998 to Kevin Molloy, Senior VP Operations, from Brian Brandt, Local 21. Concerning the issue of the employer using workers obtained through temporary employment agencies, it is understood that the Union would not consider it to be a violation of the Collective Bargaining Agreement should the Employer choose to utilize such workers provided that the Employer has made every reasonable effort to fill all positions with regular employees and, where practicable, to offer the work to all bargaining unit employees in the job classification first. The temporary workers will have no seniority rights and will not be used to prevent overtime or additional hours for Union members. Any temporary worker utilized by the Employer for more than thirty (30) calendar days will immediately become a Sunstone employee subject to the Collective Bargaining Agreement and the thirty days as a temporary worker will be considered the probationary period. The Employer will provide the Union with a record of all temporary workers' names and hours worked upon request. | Move to Union Security Article, no changes other than removing highlighted text. |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 5. From letter of June 22, 1994 to Jim Forrett, VP (Textile Care Services) from Jerry Weivoda, Local 21. It is agreed that maintenance employees with boiler operator responsibilities will be paid $1.00 per hour for those hours during which they perform boiler operator job duties. | Omit |

Union TA:_____

Employer TA:_____

159

P 01164

| | |
|---|---|
| 6. From letter of January 4, 1993 to Randy Lacey, Plant Manager (TCS); from Terry Weivoda, Local 21 - the union has accepted the employer's proposal to adopt an absence control policy. | Omit |

Union TA:_____

Employer TA:_____

| | |
|---|---|
| 7. From letter of August 4, 2001 to Frank Heavlin, from David Blanchard, Local 21, regarding treatment of biohazard bags at Textile Care Services in Rochester, Minnesota. It is agreed that employees at TCS will no longer be required to handle any bio-hazard bags when they come to the plant. Any such bags will be placed, unopened, into a special bin that will be picked up by Mayo to be handled by them. This policy will not change during the life of the 2001-200X Agreement unless required by law. | Move to Health and Safety Article. It is agreed that employees will not be required to handle any bio-hazard bags when they come to the plant. Any such bags will be placed, unopened, into a special bin that will be picked up by Mayo to be handled by them. |

Union TA:_____

Employer TA:_____

160

P 01165

| | |
|---|---|
| 8. As a result of discussions between the parties during the 2001 contract negotiations, the Employer agrees that bargaining unit employees will no longer be required to push wheelchairs occupied by non-hotel guests, or wheelchairs occupied by guests off company premises. | Omit |

Union TA._____

Employer TA._____

| | |
|---|---|
| In addition, the parties recognize and agree that despite their efforts, there may be other separate documented mutual agreements which the Union or the Employer did not locate, identify or discuss, but which one party may believe is a part of the Collective Bargaining Agreement. If, after the 2001 Agreement is settled, either party discovers a previously undiscovered, documented mutual agreement, which they believe is part of the Collective Bargaining Agreement, Article 26 will not operate as a waiver of their right to assert their rights under the newly discovered and documented mutual agreement.<br><br>K-2 | |

Union TA._____

Employer TA._____

161

P 01166

# OFFICIAL REPORT OF PROCEEDINGS
## before the
# NATIONAL LABOR RELATIONS BOARD

Volume 2 of

## GENERAL COUNSEL EXHIBITS

In the Matter of:

RICHFIELD HOSPITALITY, INC. AS
MANAGING AGENT FOR KAHLER HOTELS, LLC,

              Respondent,

and                                  Case No. 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21,

              Charging Party.

| Party: | GENERAL COUNSEL 6(g) and 9 |
|---|---|

Date:      December 15-17, 2015

Place:     Rochester, Minnesota

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

EXHIBIT NO. **GC 6(g)** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **150** DATE **12/15/15** REPORTER **SMW**

*Cf. March 24th?*
*?*

AGREEMENT

between

Richfield Hospitality, Inc.

as managing agent for

Kahler Hotels, LLC

jointly with

- KAH 20 2nd Avenue LLC d/b/a The Kahler Grand Hotel
- MAR 1st Avenue SW LLC d/b/a Marriott Rochester Mayo Clinic Area
- KINN 9 3rd Avenue LLC d/b/a Kahler Inn & Suites
- RES 441 Center Street LLC d/b/a Residence Inn Rochester Mayo Clinic Area

(TC Services, LLC d/b/a Textile Care Services)

and

UNITE HERE Local 21 AFL-CIO

**UNITE** **!**
**LOCAL 21**

Rochester, Minnesota

April 24th, 2015

to

April 23rd, 2020 (*five (5) years*)

1

**GC Exhibit 6(g)**







**Marriott**
ROCHESTER
IAYO CLINIC AREA

2

## TABLE OF CONTENTS

§1. Recognition.                               1

§2. Union Security.                            1

§3. Union Membership.                          1

§4. Temporary Employees.                       . 2

§5. Union Insurance Benefits.                  . 2

§6. Dues Checkoff List.                        . 2

§7. Rules or Regulations.                      . 2

§8.  Monthly Dues and Initiation Fees.         . 2

§9. Job Openings .                             . 3

§10. Union Representative.                      . 3

§11. New Member Orientation .                   . 3

§12. Tip Check-Off.                             . 3

§13. Political Contribution .                   . 4

§14. Political Contribution Liability.          . 4

§15. Seniority .                                . 4

§16. Recall .                                   . 4

§17. Notification of Recall..                   . 4

§18. Seniority Definition.                      . 5

§19. Equal Qualifications.                      . 5

i

§20. Seniority Preference.                              . 5

§21. Permanent Job Openings .                           . 6

§22. New Location Seniority.                            . 6

§23. Trial Period.                                      7

§24. Shift Preference.                                  7

§25. Up to Date Seniority List .                        7

§26. Re-employment of Armed Forces.                     7

§27. Incapacitated Employees.                           7

§28. Seniority Outside Coverage..                       7

§29. Discharged Employee Seniority.                     . 8

§30. Retirees Working .                                 . 8

§31. Probationary Period.                               . 8

§32. No Discharge Without Just Cause.                   . 8

§33. Discipline and Discharge .                         . 8

§34. Written Notices.                                   . 8

§35. Suspension and Discharges                          . 9

§36. Mail Warning Notices.                              . 9

§37. *Eighteen (18) Months* No Discipline.              . 9

§38. Confidentiality .                                  . 9

§39. Right of Review.                                   . 9

II

§40. Posting of Rules.                                            10

§41. Employee's Human Resources File.                            10

§42. Grievance and Arbitration Procedure.                        10

First Attempt.                                                    10

Step *One (1)*.                                                   10

Step *Two (2)*.                                                   10

Step *Three (3)* (Optional).                                      11

Step *Four (4)* Arbitration.                                      11

CHRONOLOGY & CHART OF GRIEVANCE.                                  13

CHRONOLOGY & CHART OF GRIEVANCE & ARBITRATION

PROCEDURE..                                                       13

ILLUSTATIVE CALENDAR..                                            15

ILLUSTATIVE CALENDAR OR ARBITRATION & GRIEVANCE

SCHEDULE.                                                         15

§43. Authority of Arbitrator.                                    17

§44. Arbitrator Decision.                                        17

§45. Arbitrator Expense.                                         17

§46. Grievance Time Limitations.                                 17

§47. Election of Remedies.                                       17

§48. Mistakes on Paycheck.                    ....               17

iii

§49. Names of Union Stewards.                          18

§50. Grievance During Work Hours.                      18

§51. Leave of Absence.                                 18

§52. FMLA.                                             18

§53. Leave for Education.                              18

§54. Time off for Union Activity.                      18

§55. Business Representative.                           19

§56. Medical Leave of Absence.                         19

§57. Failure to Report.                                19

§58. Seniority During Leave of Absence.                19

§59. Bereavement.                                      19

§60. Immediate Family Definition.                      19

§61. Leave for Non-Immediate Family.                  .20

§62. Jury Duty.                                       .20

§63. Check Received for Jury Duty.                    .20

§64. Leave of Absence Benefits.                       .20

§65. Workweek.                                        .20

§66. Overtime.                                        .21

§67. Nonconsecutive Days Off.                         .21

§68. Emergency Callbacks.                             .21

lv

§69. Housekeeper Premium Pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

§70. No Make-up Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

§71. Work Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§72. Temporary Hours Reductions . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§73. No Guarantee of Hours. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§74. Preferential Work Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§75. Reporting Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§76. Offer of Overtime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§77. Overtime While Present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§78. Meal Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

§79. Provide Meals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§80. *Fifteen (15) Minute* Break. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§81. No Work Alone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§82. Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

§83. Holiday Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§84. Seniority and Holiday . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§85. Holiday Comes During Vacation. . . . . . . . . . . . . . . . . . . . . . . . . 25

§86. Holiday While Sick.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§87. No Loss of Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

§88. Paid Personal Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

v

§89. Paid Personal Day in Advance of Anniversary Date.          . 26

§90. Vacations.          . 26

§91. *Forty (40) Hours* Vacation Pay.          . 26

§92. Server and Bellperson Vacation Pay.          . 27

§93. Tipped Employee Vacation Adjustment.          . 27

§94. Bi-Weekly Vacation Accrual.          . 27

§95. Pay in Advance of Vacation.          . 27

§96. Vacation Sign-Up List.          . 27

§97. Vacation Requests.          . 28

§98. Year Round Vacation.          . 28

§99. Vacations Within the Year.          . 28

§100. Vacations in *One (1) Hour* Increments.          . 28

§101. Paid Accumulated Vacation Pay.          . 28

§102. Becomes Ill During Vacation.          . 28

§103. Insurance Benefits.          . 28

§104. Uniforms and Laundry.          . 29

§105. Bulletin Boards.          . 29

§106. Maintenance Boiler Pay.          . 29

§107. Minimum Wage.          . 29

§108. Higher Rated Job Pay.          . 29

vi

§109. Lower Paying Job. .30

§110. Limited Period of Alternative Work. .30

§111. Paid Over Scale. .30

§112. Banquet Employee Compensation. .30

§113. New Classifications. .30

§114. Rate Increases. .30

§115. Leave Because of Occupational Injury. .30

§116. Banquet Server Working Cashier Pay. .30

§117. Split Shift. .30

§118. Health, Safety and Sick Benefits. .31

§119. Sick Leave for Employees Hired Prior to September 1, 2005. .32

§120. Sick Leave for Employees Hired On or After September 1, 2005. .32

§121. Sick Leave Conversion. .32

§122. Accrued Sick Leave for Server/Bellperson. .33

§123. Doctor's Certificate. .33

§124. Safe Work Environment. .33

§125. Temporary Work Reassignments. .33

§126. Pension Plan. .33

§127. Pension Plan Eligibility. .34

§128. Employer's Right to Amend Pension Plan. .34

vii

§129. UNITE HERE 401K Plan. . 34

§130. No Strike or Lockout . . 34

§131. Refuse to go Through Legal Picket Line. . 35

§132. Maintenance Tool Allowance. . 35

§133. Tool Allowance Prorated. . 35

§134. Specialized Tools and Test Equipment . . 35

§135. Discrimination . . 35

§136. Union Buttons. . 35

§137. Respect & Dignity . . 35

§138. Management Rights . . 36

§139. Successorship . . 37

§140. Communication . . 37

§141. Lateral Service. . 37

§142. Agreement Supersedes Prior Agreements. . 38

§143. Duration . . 38

§144. Wage Increases . . 38

§145. Declaration of War. . 38

§146. Agreement. . 38

APPENDIX "A". . 40

APPENDIX "B". . 45

viii

P 01178

APPENDIX "C".                                    .48

APPENDIX "D".                                    .50

APPENDIX "E".                                    .52

APPENDIX "F".                                    .55

APPENDIX "G".                                    .56

APPENDIX "G".                                    .56

APPENDIX "H".                                    .57

APPENDIX "I".                                    .60

APPENDIX "J".                                    .67

**TOTAL REAL WAGE PIE CHARTS**.                  .69

INDEX.                                           124

ix

This Agreement made this 24ᵗʰ day of March, 2015 by and between Richfield Hospitality, Inc. as managing agent for Kahler Hotels, LLC, jointly with KAH 20 2ⁿᵈ Avenue LLC d/b/a The Kahler Grand Hotel, and jointly with MAR 1ˢᵗ Avenue SW LLC d/b/a Marriott Rochester Mayo Clinic Area, and jointly with KINN 9 3ʳᵈ Avenue LLC d/b/a Kahler Inn & Suites and jointly with RES 441 Center Street LLC d/b/a Residence Inn Rochester Mayo Clinic Area (TC Services, LLC d/b/a Textile Care Services) located in Rochester, Minnesota, hereinafter referred to as [**Employer**] and UNITE HERE Local 21 AFL-CIO, hereinafter referred to as [**Union**].

It is the desire of the respective parties to avoid disruption in the service and operation of the units covered by this Agreement and to secure the benefits intended to be derived by the **Employer**, its Employees and the **Union** under these Sections of Agreement, it is agreed by and between the **Employer** and the **Union** as follows:

**§1. Recognition.** The **Employer** above named, for and on behalf of Richfield Hospitality, Inc. as managing agent for Kahler Hotels, LLC, jointly with KAH 20 2ⁿᵈ Avenue LLC d/b/a The Kahler Grand Hotel, and jointly with MAR 1ˢᵗ Avenue SW LLC d/b/a Marriott Rochester Mayo Clinic Area, and jointly with KINN 9 3ʳᵈ Avenue LLC d/b/a Kahler Inn & Suites and jointly with RES 441 Center Street LLC d/b/a Residence Inn Rochester Mayo Clinic Area (TC Services, LLC d/b/a Textile Care Services) recognizes the **Union** as the exclusive bargaining representative of all employees of the **Employer** employed at these properties in Rochester, Minnesota listed in the classifications set forth in Appendix A, with respect to wages, hours, and all other working conditions. All other employees, including supervisors, managers, administrative employees and confidential employees are excluded from the bargaining unit.

**§2. Union Security.** The **Employer** agrees not to enter into any contract or agreement with the Employees, individually or collectively, which conflicts with the terms and provisions.

**§3. Union Membership.** All Employees covered by this Agreement who are now or who may become members of the **Union** shall, during the life of this Agreement, remain members of the **Union** in good standing or pay fees in lieu of as a condition of continued employment. "In good standing" for the purposes of this agreement is

defined to mean the payment as required by the **Union** of a standard initiation fee and standard regular monthly dues relating to the **Union's** collective bargaining function, applied uniformly to all members of the bargaining unit covered by this Agreement.

**§4. Temporary Employees.**    Provided, however, temporary Employees hired between *two (2)* and *twenty four (24) weeks* will be exempt from initiation fees and dues normally charged other Employees. It is agreed that these temporary positions shall be posted and that any Employees who take a temporary position shall not be restricted from bidding on a regular position should one become available. If such Employees are retained past *Twenty-four (24) weeks*, they will be obligated to pay the initiation fee. Such Employees will be entitled to all fringe benefits for which they qualify except seniority and insurance.

**§5. Union Insurance Benefits.**    Employees hired who average *ten (10) hours* or more per week in a *four (4) week* period or who have been working under a work permit shall, as a condition of employment, become and remain members in good standing of the **Union** or pay fees in lieu after *thirty (30) calendar days* employment. All such Employees averaging over said *ten (10) hours* shall have all of the benefits under this Agreement except as to insurance benefits. Such Employees who average *thirty (30) hours* or more per week shall have insurance benefits. (Provided, however, that Employees in tip classifications who average *twenty-five (25) hours* or more per week will be covered by the insurance benefits.) OMIT TC In determining the average, the weekly average shall be determined the last pay period of each month based upon the previous *twenty-six (26) week* period. The *twenty-six (26) week* period shall be a floating period.

**§6. Dues Checkoff List.** The **Employer** shall update the dues checkoff list provided by the **Union** on a monthly basis to reflect new hires and terminations.

**§7. Rules or Regulations.** The **Employer** and the **Union** agree not to adopt rules or regulations or to engage in practices that conflict with the express terms of this Agreement.

**§8. Monthly Dues and Initiation Fees.** The **Employer** shall check off monthly **Union** dues and initiation fees and/or other required fees in a manner according to procedures agreed upon between the representatives of both parties, upon receipt

2

of written authorization form to deduct **Union** dues or fees signed by the
**Employee.** By the *twelfth (12th)* of each month the **Union** must submit to the
**Employer** in duplicate a current list of deductions to be made. The **Employer**
agrees to remit such deductions to the **Union** by the last Friday of the current
month after receipt of deduction list. The date of dues deductions may be changed
by agreement between the **Employer** and the **Union**.

**§9. Job Openings.** The **Employer** posts all job openings electronically and on post
boards, to which the **Union** has access. The **Union** shall proactively assist the
**Employer** in filling positions. The **Employer** shall have no obligation to hire any
person referred by the **Union**, and shall retain the right to select the best qualified
candidates.

**§10. Union Representative.** The designated **Union** representative will be allowed
to visit the premises of the **Employer** for the purpose of administering this
Agreement. The **Union** representative will provide the Human Resources Director
or General Manager with as much advance notice as is possible prior to visiting the
facility. Upon arriving at the facility, the **Union** representative will check in at the
office. It is agreed that the work of the Employees will not be interrupted by such
visits. **Union** representatives will not meet with Employees during working time
without the knowledge and permission of the **Employer**.

**§11. New Member Orientation.** The **Union** or a designated representative will be
provided access to newly hired employees on the **Employer's** premises, after *thirty
(30) days* of employment, to provide information about this Agreement and the
employees' rights thereunder. Such access shall be for up to *thirty (30) minutes*,
once per month, at a mutually agreed upon time and location.

**§12. Tip Check-Off.** The **Employer** agrees to honor political contribution
deduction authorizations from Employees in the following form:

> I hereby authorize my **Employer** to deduct from my pay the sum of
> $\_\_\_ per pay period and to forward that amount as my voluntary
> contribution to the UNITE HERE International Political Committee,
> 275 Seventh Avenue, New York, N.Y. 10001 ("PAC"). My decision to
> participate in the UNITE HERE PAC is a voluntary one and I
> understand that I am under no compulsion to contribute to it, since such

3

contributions are neither a condition of my continued employment or of membership in the Union. I also understand that this authorization may be revoked by me at any time and that it is automatically revoked upon termination of my employment.

**§13. Political Contribution.** The political contribution deduction shall be made once each month during which an Employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within *thirty (30) days* after the last day of the preceding month to the UNITE HERE International Political Committee, 275 Seventh Avenue, New York, N.Y. 10001, accompanied by a form stating the name of each Employee for whom a deduction has been made, and the amount deducted. The parties have taken into account the cost of administration of this deduction in negotiating the wage increases and benefits specified in this Agreement.

**§14. Political Contribution Liability.** The **Union** shall indemnify, defend and save the **Employer** harmless against any and all claims, demands, suits, or other terms of liability that may arise out of or by reason of action taken by the **Employer** to comply with this Article.

**§15. Seniority.** Seniority shall be by job classification (see Appendix B) and by work location (*e.g.*, The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, The Kahler Inn and Suites and Residence Inn by Marriott Mayo Clinic Area) (Textile Care Services) except the banquet department as set forth in the Banquet Department addendum. Employees shall not acquire seniority until they have completed their probationary period. Then seniority shall revert to the date of employment.

**§16. Recall.** Where qualifications to perform the available work are equal, layoff and recall will be by seniority as defined in §15.

**§17. Notification of Recall.** When recalling Employees who have been laid off because of reduction of work force, the **Union** shall be notified by the **Employer** of such Employees who are to be rehired. If an Employee so notified does not report for work within *seven (7) days* from the date his notice was mailed by certified mail, he shall forfeit seniority unless he has reasonable excuse for his failure. If an Employee is employed elsewhere when she/he receives a notice to report for work, the Employee shall not forfeit her/his seniority by not reporting unless the **Employer**

4

gives the Employee reasonable assurance of at least *three (3) months* steady employment. However, the employee must immediately notify the **Employer** no later than the *seventh (7th) day* after the recall notice is mailed, identify her/his current employment, and waive her/his right to the particular job that is open.

**§18. Seniority Definition.** Seniority shall mean continuous length of employment with the Employer in the job classification and work location. Any employee transferred or re-employed in another job classification and work location retains but does not accumulate her/his seniority in her/his original job classification and work location and, in addition, commences seniority in her/his new job classification and work location.

**§19. Equal Qualifications.** Where qualifications are equal, Employees shall be promoted within their job classification and work location on the basis of seniority. Only when a vacancy occurs or a new position is created can seniority be exercised for purposes of shift preference, days off, and server sections. An Employee who bids on and is awarded a posted position in another classification or property shall be transferred to the new position no later than *ninety (90) calendar days* after they are awarded the position.

Except where rotation is practiced, servers shall be given preferential stations on the basis of seniority, provided they are sufficiently qualified. Note TC: OMIT

**§20. Seniority Preference.**    As with permanent job openings under §21, an Employee laid off from her/his job classification and work station shall have preference based on seniority in hiring over any other applicant for other job classification and work station of the **Employer**, even though it may be in another operation, provided qualifications are equal. Seniority shall be forfeited on the following grounds:

(a) Voluntarily leaving the employ of the **Employer**;
(b) Discharge for proper cause;
(c) Layoffs in excess of *six (6) months*; or
(d) Failure to report for work after a layoff within a reasonable time, not to exceed *seven (7) days*, after the **Employer** has notified employee to report for work, as previously provided.

5

**§21. Permanent Job Openings.**    Permanent job openings in the classifications covered in this Agreement will be posted for a minimum of *five (5) days* on the Human Resources bulletin board and online at the **Employer's** Outlets to advise Employees of the opening. Employees interested in the position must advise the Human Resources office in writing of their desire to be transferred or promoted to the open position. Where qualifications are equal, the opening will be filled by seniority, adhering to the following preferences:

> **First** - Employees working in the classification at the property where the opening is available;

> **Second** - Employees working in the classification at the other properties; NOTE TC: Omit

> **Third(Second)** - Employees working outside of the classification who have demonstrated the skill or potential ability to successfully perform in the position, and who have notified the Employer of their desire to change classifications;

> **Fourth** - Employees working outside of the classification. **Third-** Employees not currently within the bargaining agreement.

**§22. New Location Seniority.** For purposes of scheduling, Employees moving to a new location in the same classification shall move to the bottom of the seniority list. However, prior classification seniority shall be maintained. If an employee bids for and receives a permanent job vacancy, she/he cannot bid again for a posted job opening for a period of *six (6) months.* (The Employer need not permit an employee more than one transfer to a different job classification in a twelve (12) month period. TCS ONLY). The *six (6) month* limitation will not apply to requests for shift preferences or work schedules within a job classification. "Qualifications," as used herein, shall be based on the Employer's reasonable judgment of the applicant's skills, abilities, aptitude, and overall work record. Notwithstanding the foregoing, the Employer may postpone a transfer or promotion where it would leave another department with an insufficient number of skilled Employees or an excessive number of vacancies. Until a permanent job opening is filled, the Employer may use its discretion to select an employee to temporarily fill the opening.

6

**§23. Trial Period.** Employees who bid and accept a new position have a *thirty (30) day* trial period. At the end of the trial period if the Employee is unable to meet job requirements or is unhappy in the position, she/he may consider bidding for another position for which she or he is qualified, but may not return to the former position if that position has been filled. In the event management initiates the process of the employee either bidding or returning, by virtue of advising that the Employee is unable to meet job requirements, the Employee shall have the right to grieve the decision under the Grievance and Arbitration Procedure contained herein; however, the sole permitted basis for asserting a grievance in this instance is that the Employer has acted in an arbitrary or capricious manner.

**§24. Shift Preference.** Any regular Employee within a job classification and work location may exercise their seniority as it applies to shift preference schedules and/or days off up to *forty (40) hours* in a workweek. In the Maintenance Departments (Maintenance and Checking Department), new hires may be trained on the day shift for up to *thirty (30) days (ninety (90) days)* before shift preference can be exercised to displace that Employee. There will be an automatic extension of an additional *thirty (30) days* if the **Employer** believes that additional time is required to determine the Employee's ability to work off-shifts. Employees shall not be placed on the third shift until supervisor is satisfied the Employee is capable of working alone.

**§25. Up to Date Seniority List.** The **Employer** shall furnish a complete up to date seniority list to the **Union** of all Employees covered by this Agreement within *thirty (30) days* following a request from the **Union** representative.

**§26. Re-employment of Armed Forces.** Re-employment of members of the Armed Forces shall be governed by applicable law.

**§27. Incapacitated Employees.** The **Employer** and the **Union** shall make every effort to provide work for incapacitated Employees returning from the Armed Forces.

**§28. Seniority Outside Coverage.** When an Employee is transferred to a position outside the coverage of this Agreement, she/he shall retain seniority for *thirty (30) days*. At the end of such time, seniority shall be forfeited if the employee retains a position outside the unit.

7

**§29. Discharged Employee Seniority.** If the **Employer** rehires an Employee who has been discharged, such Employee shall not be reinstated in accordance with his accumulated seniority unless such action is approved by both the **Union** and the **Employer.**

**§30. Retirees Working.** Retirees working on an on-call or part-time basis shall receive the benefits of this Agreement except those provided under §15 and §103.

**§31. Probationary Period.** The first *ninety (90) days* of employment shall be probationary, during which time an Employee may be discharged with or without cause and without recourse to the grievance procedure.

**§32. No Discharge Without Just Cause.** No Employee (except for a probationary Employee) will be disciplined or discharged without just cause. If a meeting is held for disciplinary purposes, the affected Employee (including probationary Employees) shall have the right to have a **Union** steward and/or **Union** Business Agent present if the employee so requests. Prior to any such meeting or investigatory interview of an employee, the **Employer** shall present a copy of The Right To Union Representation Form.

**§33. Discipline and Discharge.** The **Employer** will discipline employees for just cause only. Discipline will normally be in the following form:

    a) Verbal warning

    b) Written warning

    c) Suspension/ Final warning

    d) Discharge

Progressive discipline need not be followed in incidents of violations of a serious nature as provided in the Employer Handbook, or Standards of Conduct, a copy of which shall be provided to each employee.

**§34. Written Notices.** Written reprimands, notices of suspension and notices of discharge, which are to become part of the Employee's file, shall be read and signed by the Employee. Such signature shall in no way be an admittance of wrongdoing

8

on the part of the Employee. A copy of such reprimands and/or notices shall be given to the Employee and the **Union**.

**§35. Suspension and Discharges.** All suspensions and discharges will be in written form and copies will be mailed to the Union upon issuance of such notices. Discharges will be preceded by a suspension during which an investigation of the incident leading to the discharge will be conducted. No Employee shall be placed on suspension pending investigation status for an unreasonable period of time. An issue specifically brought by the employee to a Human Resources representative shall be responded to within *seven (7) calendar days* excluding weekends. Such time line may be extended by mutual agreement.

**§36. Mail Warning Notices.** Copies of all warning notices and all other disciplinary action given to employees will be provided to the **Union** without delay. In addition, it is agreed that if a verbal warning results in a written report by a supervisor for the employee's personnel file, a copy of such notice will be given to the employee.

**§37. *Eighteen (18) Months* No Discipline.** If an employee avoids disciplinary offenses for a period of *eighteen (18) consecutive months*, offenses in her/his personal record which preceded that time will not be used as a basis for disciplinary action (except as necessary pursuant to the Attendance Policy NOTE: TCS ONLY); such discipline may, however, be introduced in any arbitration proceeding involving the employee.

**§38. Confidentiality.** The **Employer** may decline to give the Employee the name of the complaining party, but must, upon request, divulge such information to the **Union** after the **Union** has received a copy of the discipline, which information the **Union** will keep confidential. The **Employer** will provide this information to the Employee at an arbitration hearing if so directed by the Arbitrator.

**§39. Right of Review.** The **Union** shall have the right of review of any discharge of an Employee who has completed the probationary period by following the grievance procedure of this Agreement.

9

**§40. Posting of Rules.** All rules shall be conspicuously posted by time clocks or on Employee bulletin boards. The **Employer's** rules shall not conflict with this Agreement.

**§41. Employee's Human Resources File.** The **Employer** shall at reasonable times and at reasonable intervals, upon the request of an Employee, permit the Employee to inspect such Employee's personnel file on the Employee's own time.

**§42. Grievance and Arbitration Procedure.** The grievance procedure set forth in this section is established for the specific purpose of providing prompt and amicable means of settlement of all questions arising under the terms of this Agreement or the application of them. Both the **Employer** and the **Union** intend to make every effort to settle grievances quickly and amicably and with a minimum of friction.

> **First Attempt.** An Employee may, with or without the assistance of a shop steward, first attempt to resolve workplace disputes with the Employee's manager. If not resolved informally, the following shall be the grievance procedure:

>> (a) **Step *One (1)*.** The grievance shall be reduced to writing by the **Union** Business Agent within *twenty-one (21) calendar days* from the date of the incident giving rise to the grievance, or within *twenty-one (21) calendar days* of when the Employee reasonably should have had knowledge, and shall be furnished to the Human Resources Director. The written grievance shall set forth the facts giving rise to the grievance, including the dates and persons involved, identify the Agreement provisions violated, and state the relief requested.

>> (b) **Step *Two (2)*.** The **Union** Business Agent and the Human Resources Director shall meet within *fourteen (14) calendar days* of receipt of the written grievance and attempt to settle the grievance. If the grievance is not settled, the **Employer** shall issue a written response to the grievance within *seven*

10

*(7) calendar days* of the meeting.   Any grievance not appealed to a succeeding step within the time limits specified shall be deemed abandoned and not entitled to further consideration.

(c) **Step** *Three (3)* **(Optional).** If the grievance is not settled at Step 2, the **Union Business Agent** may appeal the grievance to mediation within *seven (7) calendar days* from the date of the decision rendered in Step 2 by giving written notice of a request for mediation to the **Employer** and the **Federal Mediation and Conciliation Service (FMCS)**, Minnesota Bureau of Mediation, or other neutral mediation agency. Mediation shall consist of up to *two (2)* **Employer** representatives and up to *two (2)* **Union** representatives, and a neutral mediator acceptable to both parties, who shall mediate the dispute in an attempt to have the parties reach a settlement. No attorneys or other consultants may participate in the mediation. The proceedings shall be informal and no formal record of the proceedings shall be made. If no settlement is reached, the mediator shall provide the parties with an immediate written advisory decision of the grievance, including the grounds for such decision. All offers to compromise presented during the mediation, as well as any decision of the mediator, shall be confidential and non-admissible in any subsequent proceedings.

(d) **Step** *Four (4)* **Arbitration.** If the grievance is not settled at Step 3, or if the **Union Business Agent** chooses to skip Step 3, the **Union** may submit the matter to arbitration within *fourteen (14) calendar days* of the date of the mediation or the **Employer's** written response (or failure to respond) to the grievance by furnishing the **Employer** with a written request for arbitration and proposing therein the names of *three (3) arbitrator(s)* acceptable to the requesting party. The **Union** shall also state in writing the matter and issue to be

11

arbitrated and the relief that is sought. If the Employer is dissatisfied with the Union's statement of the issue to be decided (*e.g.*, that it is unfairly, inaccurately or incompletely stated); then the Employer shall have the option to propose a joint statement of the issue. If the parties are unable to agree on a joint statement of the issue, the Employer shall have the option of presenting an alternative statement of the issue. In the latter event, the arbitrator shall be empowered to determine, after hearing evidence, the appropriate statement of the issue to be decided. If the parties are unable to agree upon an arbitrator within *fourteen (14) days*, the Union shall request the FMCS to submit a panel of *seven (7) names*. The Employer and the Union shall alternately strike one name from the list submitted until only one name remains. The Union shall take the first strike. The cost of securing the list of arbitrators shall be shared equally between the Employer and the Union.

12

## CHRONOLOGY & CHART OF GRIEVANCE
## & ARBITRATION PROCEDURE

| Event | Total Business Days (M-F) Elapsed | Business Days (M-F) Elapsed Between Events |
|---|---|---|
| Incident giving rise to grievance | --- | --- |
| First Attempt | --- | --- |
| **Step 1:** Written Grievance provided to Director of Human Resources (DHR) | 21 | 21 |
| **Step 2:** Meeting with DHR, GM, **Local 21** representative, shop steward and employee | 35 | 14 |
| Written response by DHR/GM | 42 | 7 |
| **Step 3:** Appeal to Mediation | 49 | *7 calendar days* |
| **Step 4: Union** submit to Arbitration | 63 | 14 |
| Must agree on Arbitrator or begin to strike names | 77 | 14 |

13

| | | |
|---|---|---|
| Arbitrator's Decision | 30 *calendar* days after hearing | _____ |

14

## ILLUSTATIVE CALENDAR FOR GRIEVANCE & ARBITRATION SCHEDULE

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| 1<br><br>Incident giving rise to grievance | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22<br><br>Written Grievance provided to Director of Human Resources (DHR) | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | 1 | 2 | 3 | 4 |
| 5<br><br>Meeting with DHR, GM, Local | 6 | 7 | 8 | 9 | 10 | 11 |

15

| | | | | | | |
|---|---|---|---|---|---|---|
| **21** representative, shop steward and employee | | | | | | |
| **12** <br><br>Written response by DHR/GM | 13 | 14 | 15 | 16 | 17 | 18 |
| **19** <br><br>Appeal to Mediation | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 |
| **2** **Union** submit to Arbitration | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| **16** Must Agree on Arbitrator or begin to strike names | 17 | 18 | 19 | 20 | 21 | 22 |

16

**§43. Authority of Arbitrator.** The authority of the arbitrator shall be limited solely to the determination of the issue submitted in writing at the time of request for arbitration, as provided in Step 4. The arbitrator shall not have power to add to, subtract from, or modify in any way the terms of this Agreement. If, during the course of the arbitration hearing, either party introduces any facts, deemed by the arbitrator as material and significant, which were not introduced during any of the steps of the grievance procedure, the other party shall be granted an extension of hearing upon request.

**§44. Arbitrator Decision.** The decision of the Arbitrator shall be made not later than *thirty (30) days* after the submission of post-hearing briefs, and her/his decision shall be final and binding upon both parties and the Employee(s) involved.

**§45. Arbitrator Expense.** Expenses of the Arbitrator shall be paid equally by the **Employer** and the **Union**. If a court reporter is used, the ordering party shall pay the cost of, unless the other party requests a copy of the transcript, in which case the cost of the court reporter and transcript shall be paid equally.

**§46. Grievance Time Limitations.** The time limitations set forth relating to the time for filing a grievance and the demand for arbitration shall be mandatory. Failure to follow said time limitations shall result in the grievance being permanently barred and waived. The time limitations and/or grievance steps provided may be extended or waived by mutual written agreement between the parties.

**§47. Election of Remedies.** The sole remedy available to any employee for any alleged breach of this Agreement shall be pursuant to the grievance procedure; provided, however, that nothing shall prevent an employee from electing to pursue a legal or statutory remedy providing such election will bar any further or subsequent proceeding for relief under the grievance/arbitration procedure.

**§48. Mistakes on Paycheck.** Mathematical or mechanical mistakes on a paycheck resulting in an under or overpayment of the Employee may be corrected within *thirty (30) calendar days* of the pay day involved. If an error (which results in greater than *fifty ($50.00) dollar* financial impact to the Employee is discovered) is discovered, it must be corrected by payment within *five (5) business days* (Monday - Friday). The **Employer** will make a concerted effort to make the corrected payment sooner than *five (5) business days* if possible.

17

**§49. Names of Union Stewards.** The Union shall advise the **Employer** of the names of the **Union** Stewards who shall participate in the grievance procedure and who shall be recognized by the **Employer** as representatives of the Employees for purposes of enforcing this Agreement, and who will generally act as representatives on the job of the Union.

**§50. Grievance During Work Hours.** When a grievance requires the attention of a shop steward during working hours, she/he shall first secure the permission of her/his supervisor, which shall not be unreasonably withheld, bearing in mind that the immediate needs of guest service shall take priority. The handling of all grievances shall be done during working hours, without any deduction from wages of employees who necessarily attend. The **Union** agrees to attempt to minimize any disruption to the **Employer's** operation.

**§51. Leave of Absence.** Employees may be granted unpaid leaves of absence by the **Employer** for a period of not more than *thirty (30) days*. Leaves of absence in excess of *thirty (30) days*, and any extensions of leaves beyond the *thirty (30) days*, shall be put into writing by the **Employer** and a copy kept by the employee, the **Employer** and the **Union**. Requests for such leaves and extensions shall be made to the Employee's immediate supervisor. However, leaves of absence for illness or injury will be granted upon request consistent with the law.

**§52. FMLA.** Illness or injury which qualifies for leave under the Federal and Family Medical Leave Act will run concurrently with and shall be governed by the federal and Minnesota Family and Medical Leave Acts.

The Employer agrees that employees shall be allowed to use any of their accrued sick time for those absences which would be covered by the Family and Medical Leave Act.

**§53. Leave for Education.** Employees who have been employed for at least *one (1) year* may be granted a leave of absence for educational purposes up to *twelve (12) months*, provided the leave is used for future employment with the **Employer**, and is approved by management.

**§54. Time off for Union Activity.** The **Employer** agrees to grant necessary time off, limited to *three (3) working days*, without pay or loss of seniority rights to any

18

Employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business. The Union agrees to give in writing a minimum of *two (2) weeks* notice to the Employer. It is agreed that there shall be no disruption of the Employer's operation.

**§55. Business Representative.** Any employee who is appointed as a full time Business Representative or is elected to a full time office of the Union, or the International Union, shall be given a leave of absence not to exceed a total of six years.

**§56. Medical Leave of Absence.** Disability leaves of absence for employees will be granted in accordance with the recommendation of the attending physician, not to exceed *twelve (12) weeks*. Maternity/paternity leaves will not be granted beyond *three (3) months* unless supported by the attending physician.

**§57. Failure to Report.** Failure to report for work at the end of the period of a leave of absence is equivalent to resignation.

**§58. Seniority During Leave of Absence.** Seniority shall accumulate during the period of leave of absence.

**§59. Bereavement.** In the event of the death of a member of an Employee's immediate family, she/he will be granted time off from work with pay for up to *three (3) consecutive days*, one of which must be the day of the funeral. The Employee will be paid for that portion of her/his regular week's work which falls within the above *three (3) day period* if she/he was, under the terms of this Agreement, scheduled to work. If bereavement leave occurs during an Employee's scheduled vacation, the Employee will be permitted to substitute bereavement leave in lieu of vacation time. The Employer may require an employee to provide proof of death.

**§60. Immediate Family Definition.** Immediate family shall mean the employee's father, mother, father-in-law, mother-in-law, spouse, previously declared (on Employer form) same-gender domestic partner, children, stepchildren, stepparents, guardian, brother or sister, grandchild, son-in-law, daughter-in-law, grandparents, half-brother, stepbrother, half-sister, stepsister, current grandparent-in-law, current brother-in-law and current sister-in-law.

19

**§61. Leave for Non-Immediate Family.** In addition to the foregoing paid leave, an employee will be permitted to take *one (1) day* of unpaid leave in order to serve as a pallbearer. An employee also may take off up to *three (3) days* without pay to attend the funeral of an aunt or uncle.

**§62. Jury Duty.** If a regular Employee with seniority is summoned for petit or grand jury service, such Employee shall be paid the difference between jury pay and the pay the Employee would have earned from the **Employer** for each day of jury duty which falls on a day on which the Employee would otherwise be scheduled to work. Employees are required to give prompt advance notice after receipt of the summons to jury duty, and failure to do so with at least *seventy-two (72) hours'* notice prior to a scheduled shift shall result in forfeiture of jury pay. If on a day the Employee would otherwise be working for the **Employer**, and he or she is released from jury duty at least *six (6) hours* prior to the end of his or her scheduled shift, the Employee will be expected to return to work as soon as possible, unless the **Employer** has scheduled another employee in his or her place. Otherwise, where less than *six (6) hours* remain on the scheduled shift, the Employee shall return to work on the next scheduled shift after being released.

**§63. Check Received for Jury Duty.** To be eligible for benefits under this section, the employee must endorse and turn over to the **Employer** the check received for jury duty. All hours spent on jury duty will be credited for purposes of calculating vacation and holiday benefits. The **Employer** will in turn pay the Employee the pay the Employee would otherwise have earned on that day. Payment for jury duty service will be limited to a maximum of *six (6) calend*ar weeks for each Agreement year.

**§64. Leave of Absence Benefits.** The **Employer** is obligated to continue to provide health insurance benefits during an Employee's leave of absence under this Article only to the extent required by law (e.g., FMLA or Minnesota Parental Leave Law).

**§65. Workweek.** The basic work week shall consist of *five (5) days, forty (40) hours,* and *two (2) consecutive days* of rest within a *seven (7) day* period, starting the first shift on Monday of each week; provided, however, this shall not serve as a guarantee of a minimum number of hours or a minimum number or length of shifts. Time and one-half shall be paid after *forty (40) hours* worked or paid as an approved

20

holiday or vacation day in any one work week. Banquet servers will not normally be required to work a *sixth (6th) day* until all regular full-time servers have been rescheduled for *five (5) days*. Employees recalled from layoff to work on the Employee's scheduled days of work will be paid straight time.

**§66. Overtime.** Time and one-half is to be paid for any hours worked in excess of *forty (40) hours (eight (8) hours - TCS ONLY)* worked in a work day. Provided, however, that daily overtime will not apply to function and on-call employees who work less than *four (4) days* per week. There shall be no pyramiding of overtime.

Time not worked, including vacation, holiday or sick leave, will not count for purposes of computing overtime.

**§67. Nonconsecutive Days Off.** By mutual agreement between Employees and the **Employer**, nonconsecutive days off may be scheduled. The nonconsecutive days off schedule will not be binding on any other employee. Irrespective of the foregoing, non-consecutive days off may be scheduled for function and on-call personnel.

**§68. Emergency Callbacks.** Any Employee in the maintenance departments who is called from home for an emergency condition shall be given *two (2) hours (four(4)hours)* minimum pay at time and one-half for such call-in work. Emergency callbacks will be handled on a seniority basis among Employees qualified to correct the emergency. Employees shall be paid for all overtime work and shall not be required to take time off for extra time worked.

**§69 Housekeeper Premium Pay.** Employees in the maintenance departments, housekeepers and **Employer's** PBX operators shall be paid a premium of *fifty cents (50¢)* for all hours worked between 10:00 p.m. and 6:00 a.m., except for call-in work. NOTE: OMIT TC

**§70. No Make-up Time.** Employees who work beyond their regular daily schedule in any day shall not be required to take time off later in the work week because of such extra hours. The **Employer** agrees not to schedule employees for work with less than *eight (8) hours* between shifts, unless mutually agreed upon by the employee and the **Employer**. This provision shall not apply to employees working split-shifts.

21

**§71. Work Schedules.** The **Employer** reserves the right to prepare work schedules and to schedule days off. Work schedules and scheduled days off shall be posted in each department as far in advance as possible, but not later than *four (4) days*, prior to the beginning of the work week involved. Employees will have until 5:00 p.m. on the day after the schedule is posted to contest any discrepancies in the schedule. After 5:00 p.m. that day, the schedule will not be changed except in emergencies and/or for business needs. When cancelling a scheduled shift, the **Employer** will attempt, at least *two (2) hours* before the start of the employee's scheduled shift, to speak with the Employee directly by calling the phone number in the Employee's personnel file; if the **Employer** gets the Employee's voicemail/answering machine or another person answers, the **Employer** will leave a message. Work schedules and scheduled days off may be changed without notice in case of emergency and/or for business needs. Any Employee who reports to work on his scheduled day off at the request of the **Employer** will be paid time and one-half for all hours worked on that date. Employees who are scheduled in advance to work one or both of their days off, and calls in sick earlier in the week, shall not be eligible for time and one-half on the scheduled day off. In order to secure time off for a doctor's appointment, employees must provide notice of the appointment at least a week prior to the start of the new schedule, except in cases of emergency.

**§72. Temporary Hours Reductions.** In the event it is necessary to reduce staffing on a short term basis because of low occupancy, the **Employer** will grant Employees, at their request, absent days on a voluntary basis.

**§73. No Guarantee of Hours.** New extra or additional employees will not be utilized to prevent regular full-time employees from working *forty (40) hours* during a work week, provided, however, this does not constitute a guarantee of hours.

**§74. Preferential Work Schedules.** Employees shall be granted preferential work schedules and preferential days off in accordance with their seniority within the section and the respective units consistent with the efficient operation of the section.

**§75. Reporting Pay.** The following reporting pay guarantees will apply:

(a) A *four (4) hour* call-in on an Employee's day off (and a minimum reporting pay on a regular work day of *four (4) hours*) OMIT TC for all Employees normally scheduled to work in excess of *twenty (20) hours* per week

22

(b) Employees who normally are scheduled for *twenty (20) or less hours* per week or on-call Employees including function personnel will be guaranteed *two (2) hours*.

(c) A person called back after having completed his work shift will receive a minimum of *two (2) hours* call back pay.

(d) Split-shift Employees will receive a *three (3) hour* guarantee per shift, however, this guarantee would not apply to those Employees who choose to voluntarily leave early.

(e) Employees scheduled or called in for a training session or mandatory meeting will be paid a minimum of *two (2) hours (one (1) hour)* at the appropriate rate of pay.

**§76. Offer of Overtime.** When overtime is necessary, the Employer reserves the right to offer that work to another Employee in the same classification at the other hotel, provided that employee is scheduled for less than *forty (40) hours* for that work week. Absent this ability, the senior Employees in a classification who are on duty shall be given first preference to work overtime. If senior Employees on duty in a particular job classification reject an offer of overtime, the junior employees on duty must perform the overtime work. Involuntary overtime will be assigned based on reverse seniority.

*****Note TC: Omit addition (yellow) for TC******

**§77. Overtime While Present.** An Employee working on her/his regular day shall be required to work overtime before an Employee who is working on her/his day off.

**§78. Meal Periods.** (Meal periods will be scheduled for a maximum of *thirty (30) minutes* for all Employees, except for food and beverage Employees, who will be expected to take lunch when and to the extent that operations permit.) OMIT TC

Meal periods shall be an uninterrupted *one-half (1/2) hour* for which the employee is not to be compensated. If Employees are required to work any portion of the meal period, they shall be paid for the entire meal period. Employees are responsible for clocking in and out at the beginning and end of each *thirty (30) minute* meal period.

23

**§79. Provide Meals.** The **Employer** shall provide meals which are palatable and wholesome at a cost to employees which it determines. Employee meals shall be served under clean and sanitary conditions.

**§80.** *Fifteen (15) Minute* **Break.** Employees shall be entitled to *one (1) fifteen (15) minute* break for each *four (4) hours* of work. It is understood, however, that the **Employer** reserves the right to schedule the breaks. Employees who work overtime beyond the end of their shift will be entitled to an additional *fifteen (15) minute* break after each additional *two (2) hours* of overtime worked.

TC Services, LLC shall have the option to schedule a *four (4) day* work week using *ten (10) hour* days in accordance with the following:

(a) The work weeks shall consist of *four (4) work days* and *three (3) scheduled days* off.

(b) *Two (2) days* scheduled off to be consecutive.

(c) When computing holiday pay, participating employees will have average days computed using *four (4) days* per week to a maximum of *ten (10) hours*.

(d) When computing vacation pay, participating employees will have average days computed using *four (4) days* per week. Vacation taken in less than full week increments will be computed based on this average day to a maximum of *ten (10) hours*.

(e) At TC Services, LLC, the Employer agrees to give preference to senior employees in selecting shifts. Where operations permit, the Employer will provide a TC Services, LLC driver with *fourteen (14) days'* notice of any reassignment to a new route.

**§81. No Work Alone.** The **Employer** shall not require an Employee to work alone without a reasonable amount of training as provided and determined by the **Employer**.

**§82. Holidays.** The following shall be classified as holidays: Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's

24

Day. Any time worked on those days shall be paid for at double time. Management shall have the exclusive right to determine which holidays are to be worked.

**Sunday Holidays.** Sunday holidays will be celebrated on that day and paid for accordingly.

**Saturday Holidays.** Saturday holidays will be celebrated on that day and paid for accordingly.

**§83. Holiday Pay.** Holiday pay will be granted to all Employees with established seniority irrespective of the day of the week on which it falls. To qualify for pay, an employee must work his regular scheduled work day before and after the holiday. Pay for holidays for Employees not scheduled to work will be based on the average daily hours worked by each eligible employee in the *twelve (12) week* period preceding the holiday up to a maximum of *eight (8) hours.* An employee who is scheduled to work on a holiday and then fails to report for work will not receive holiday pay.

An employee who is absent on the day before or after the holiday on compensable time (vacation, paid sick-leave, etc.) will not be disqualified if otherwise eligible for holiday pay.

**§84. Seniority and Holiday.** Employees with seniority who are normally scheduled to work *five (5) days* will have designated *sixth (6th)* and *seventh (7th)* days and such days will not be changed in holiday weeks to avoid payment of overtime for work on the *sixth (6th)* and *seventh (7th) day* of a work week. This does not apply to function employees who work on an on call basis.

**§85. Holiday Comes During Vacation.** If the holiday comes during the employee's regularly scheduled vacation the employee shall have the option to convert vacation pay to holiday pay.

**§86. Holiday While Sick.** An employee receiving sick leave pay on leave of absence shall not receive holiday pay.

**§87. No Loss of Pay.** Regular full time bartenders shall not suffer a loss of pay due to their inability to work at their usual assignment or a related assignment during scheduled hours on an election day.

25

NOTE TC: OMIT

**§88. Paid Personal Days.** Employees with *eight (8)* or more years of service shall be entitled to *one (1) paid personal day*. Employees with *sixteen (16)* or more years of service shall be entitled to *two (2)* paid personal days. Employees with *twenty (20)* or more years of service shall be entitled to *three (3) paid personal days*. The paid personal days are to be scheduled by mutual agreement in advance or to cover uncompensated days of sick leave. The paid personal days must be used within the employee's anniversary year. Eligibility is based upon the employee's anniversary date of employment.

**§891. Paid Personal Day in Advance of Anniversary Date.** Personal days may be scheduled and taken in advance of the employee's anniversary date, subject to repayment by the employee if the employee does not remain an employee until her/his next anniversary date. Each Employee's check stub will reflect the Employee's personal day balance.

**§90. Vacations.** Employees shall receive vacations at the following rates:

After *one (1) year* of continuous service - *one (1) work week* vacation;

After *three (3) years* continuous service - *two (2) work weeks* vacation;

After *five (5) years* continuous service - *three (3) work weeks* vacation; and

After ten *(10) years* continuous service - *four (4) work weeks* vacation.

**§91. Forty (40) Hours Vacation Pay.** Any employee whose average work week during the vacation year is between *thirty-eight (38)* and *forty (40) hours* will be paid vacation pay for *forty (40) hours*. Any employee whose average work week during the vacation year is less than *thirty-eight (38) hours* or more than *forty (40) hours* will be paid vacation pay equal to his average work week over the preceding one-year. Time spent by members of the **Union** Negotiating Committee in negotiations for renewal of this Agreement shall be included in computing an employee's average work week. OMIT TC

After *one (1) year* of continuous service, any employee will accrue vacation pay equal to his average work week over the preceding one-year, then vacation time will accrue per hour worked according to the timeline above. Time spent by members of

26

the Union Negotiating Committee in negotiations for renewal of this Agreement shall be included in computing an employee's average work week.

**§92. Server and Bellperson Vacation Pay.** Employees in the server and bellperson sections shall be given the option to use *two (2) hours* of their accrued vacation pay for each hour on vacation.

*******NOTE TC: OMIT*****

**§93. Tipped Employee Vacation Adjustment.** In addition to their base hourly rates, tipped employees working in the classifications of doorperson, bellperson, bell captain, all servers in functions, room service and all restaurants and lounges, shall be compensated at the rate of *three dollars and fifty cents ($3.50) per hour* for all vacation hours taken. "Base rate" for purposes of this Agreement means the wage rate assigned to the position excluding any premiums or differentials.

****NOTE TC: OMIT******

**§94. Bi-Weekly Vacation Accrual.** Employees shall earn vacation on a biweekly basis prorated in accordance with compensable hours for the pay period. The biweekly pay stub shall show total vacation hours accumulated. Earned vacation benefit shall be granted on the anniversary date, and scheduled with the employee's supervisor. A maximum of *one (1) week's* vacation benefit may be carried over into the year following the year it is earned and can be used. Once the employee has accumulated the maximum of *one (1) week* of carried-over vacation benefit, she/he shall stop accumulating additional vacation but shall not lose any vacation accumulated. Accumulation shall resume as soon as the employee uses accumulated vacation.

**§95. Pay in Advance of Vacation.** Fully earned vacation pay shall be paid in advance of the scheduled vacation if requested by the employee at least *two (2) weeks* in advance.

**§96. Vacation Sign-Up List.** Between February 15 and March 31, (Between January 15 and February 28) a vacation sign-up list shall be posted in each work unit, during which employees will sign for vacation for the period April 1 of the same year to March 31 of the following year. Thereafter, vacations will be selected on a first come, first serve basis and will not be subject to being bumped. Scheduling

27

of vacation shall be arranged so that the functioning of the department shall not be impaired, and shall be subject to the **Employer's** approval. Vacations can be arranged in *one (1)-day* increments by mutual agreement between the supervisor and the employee involved.

**§97. Vacation Requests.** Vacation requests made over *forty-eight (48) hours (two (2) weeks)* in advance will be honored whenever reasonably possible. The **Employer** agrees to affirm or deny in writing the employee's written request for vacation within *seven (7) days* of receiving such request.

**§98. Year Round Vacation.** Employees will be permitted to take vacation year round, provided, however, that the **Employer** may require adequate staffing levels to meet business needs.

**§99. Vacations Within the Year.** Vacations shall be taken within the year following the date the Employee becomes eligible. In case of emergency, by mutual agreement an Employee may work his vacation and receive his vacation pay in addition to wages for the hours worked or arrange his vacation for some other time.

**§100. Vacations in *One (1) Hour* Increments.** Employees may take their vacations in *one (1) hour* increments if requested and approved in advance.

**§101. Paid Accumulated Vacation Pay.** If an Employee's services are (voluntarily) terminated prior to the time of the taking of her/his vacation, she/he shall be immediately paid the full amount of her/his accumulated vacation pay, provided such Employee has (provided a minimum *five (5) day notice and)* completed one or more years of service.

**§102. Becomes Ill During Vacation.** If an employee becomes ill during his regularly scheduled vacation and qualifies for sick benefits he may re-schedule his unused vacation. (provided the employee has provided sufficient medical certification.)

**§103. Insurance Benefits.** Employees who satisfy the average hours worked requirements set forth in§5, will be eligible to participate in the **Employer's** health and life insurance plans on the same terms and conditions as all other employees of the **Employer**. The **Employer** has the right to modify or eliminate these benefits (including providers) and increase the employee contributions to same. Said changes

28

or increases in contributions shall be the same as those applicable to all other employees of the **Employer**. It is also agreed that the plan year, including enrollment periods, shall be the same as is applicable to all other employees of the **Employer**.

Except for a violation of the express terms of this Section, any question or dispute in connection with the **Employer's** health insurance plans is specifically excluded from the grievance and arbitration procedures of this Agreement.

**§104. Uniforms and Laundry.** The **Employer** agrees to furnish and launder uniforms for all Employees who are required to wear them. These uniforms shall not be worn off the premises unless authorized. The Employee is expected to treat the uniforms with care. The **Employer** also agrees to replace, at no cost to the Employees, those uniforms which have become permanently stained or worn out.

**§105. Bulletin Boards.** The **Union** shall be entitled to reasonable use of the bulletin boards of the **Employer** for the purpose of posting notices of official business. Other matters of interest to employees may be posted if approved by the **Employer**. It is agreed that the bulletin boards may be locked and a key maintained by the Management.

**§106. Maintenance Boiler Pay.** *One ($1.00) dollar per hour* paid for all hours worked to an employee with a license when such an employee is responsible for the operation of the boiler, Employees with a license, working full-time at a hotel where a license is required. Only one boiler operator will be required at any time during operations.

**§107. Minimum Wage.** If applicable state or federal minimum wage is increased, all bellpersons, doorpersons, and servers will receive the same cents per hour as the minimum wage increase cents per hour.

NOTE TC: OMIT

**§108. Higher Rated Job Pay.** Except in those instances of work performed for a limited periods of time pursuant to the Lateral Service Article of this Agreement (§141), an Employee required to fill a higher rated job temporarily shall receive the rate for that job while on that job and must be paid such higher rate for at least *three-tenths (3/10ths)* of an hour. An Employee required to fill a lower job temporarily shall receive his regular rate while on that job.

29

**§109. Lower Paying Job.** Employees who request hours in a lower paying job in order to more nearly reach fulltime employment will be paid at the rates of the job being performed.

**§110. Limited Period of Alternative Work.** Except in those instances of work performed for a limited periods of time pursuant to the Lateral Service Article of this Agreement , bargaining unit employees will not be required to temporarily fill in for non-bargaining unit positions.

**§111. Paid Over Scale.** Employees being paid more than the maximum rate for their job classification shall be continued to be paid that red circled rate except for banquets Employees. Banquet Employees shall be paid the hourly rate set forth on the schedule of wages.

**§112. Banquet Employee Compensation.** Banquet servers shall receive a flat rate for all functions, including those contracted for at the Civic Center.

**§113. New Classifications.** If any new classifications are added during the life of this Agreement, wages for the same shall be negotiated by letter or addendum and made a part of this Agreement.

**§114. Rate Increases.** All rate increases shall become effective in the first pay period after the employee becomes eligible for the rate increase, it being the intention of the parties that changes in rates of pay not be made during a work week.

**§115. Leave Because of Occupational Injury.** Employees who are required to leave their jobs because of occupational injury will receive pay for all hours scheduled to work on the day of the injury or accident.

**§116. Banquet Server Working Cashier Pay.** Banquet servers working cashier/vending functions shall receive the *five (5) year* snack bar attendant rate of pay. Senior employees shall have the right to defer such functions to the junior employee provided there are sufficient employees to staff the event.

****NOTE TC: OMIT*****

**§117. Split Shift.** A split shift shall be defined as any break of more than *one (1) hour* during working hours. All split shifts will be completed within a *twelve (12) hour* period, (with the exception of function employees and bellpersons. A premium

30

of *twenty cents (20¢) per hour* will be paid for all hours worked on any split-shift except tip classifications. [Omit for TC])

**Safe and Healthful Work Environment.** The **Employer** will do everything possible to create and maintain a safe and healthful work environment. The **Union** agrees that it will endeavor to have its members observe all safety rules.

**Health and Safety Laws.** The **Employer** agrees that it will adhere to all applicable Federal and State laws enacted for the purpose of protecting the employees with respect to safety and health.

**Workers Compensation.** Following an injury which is compensable under worker's compensation, an Employee who presents a statement from his/her medical practitioner recommending the need amend work responsibilities may be temporarily reassigned. Such temporary assignments shall not exceed *twelve (12) weeks*. The **Union** supports and encourages a return to work as soon as possible following an injury.



**Temporary Work Reassignments.** The **Employer** may make temporary work reassignments in order to accommodate the light duty or special work requirements of an employee returning to work from a work-related injury or illness. Such reassignments will be limited to *sixty (60) days* unless extended by mutual agreement.

**No Bio – Hazard Bags.** It is agreed that employees will not be required to handle any bio-hazard bags when they come to the plant. Any such bags will be placed, unopened, into a special bin that will be picked up by Mayo to be handled by them.

**Soil Sort Department.** The **Employer** shall provide employees working in the soil sort department with OSHA approved gowns and gloves. Employees shall not remove these items from the premises.

**§118. Health, Safety and Sick Benefits.** All regular Employees who have completed their probationary period of employment and attained seniority status will be eligible for sick leave benefits beginning with the second day of absence for actual illness. However, sick leave will be paid to any employee on the first day of hospitalization and for the first work day of any *three (3)* or more consecutively scheduled work day absences.

31

**§119. Sick Leave for Employees Hired Prior to September 1, 2005.**  For employees hired prior to September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of *eighty (80) hours* of sick leave for *two thousand eighty (2,080) hours* of work or pay during an Employee's anniversary year. The maximum benefit that can be accumulated or carried after the effective date of this Agreement by such an employee will be one hundred and *twenty (120) hours*. Upon an employee reaching the maximum balance, the employee may sell up to *thirty (30) hours* of sick pay at *fifty percent (50%)* of value on the employee's anniversary date. Those employees who, as of the effective date of this Agreement have reached the previous maximum of *three hundred (300) hours*, shall have a one-time option at their next anniversary date to sell up to *sixty (60) hours* of those *three hundred (300) hours* of sick pay at *fifty percent (50%)* of value, after which the above-stated *thirty (30) hour* option will go into effect at subsequent anniversary dates.

**§120. Sick Leave for Employees Hired On or After September 1, 2005.**  For employees hired on or after September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of *forty (40) hours* (*forty eight (48) hours*) of sick leave for *two thousand eighty (2,080) hours* of work or pay during an employee's anniversary year of employment. The maximum benefit that can be accumulated or carried after the effective date of this Agreement by such an employee will be *two hundred and forty (240) hours* (*two hundred forty (240).*). Upon an employee reaching the maximum balance, the employee may sell up to *thirty (30) hours* of sick pay at *fifty percent (50%)* of value on the employee's anniversary date. (Those employees who, as of the effective date of this Agreement have reached the previous maximum of *three hundred (300) hours*, shall have a one-time option at their next anniversary date to sell up to *sixty (60) hours* of those *three hundred (300) hours* of sick pay at fifty percent (50%) of value, after which the above-stated *thirty (30) hour* option will go into effect at subsequent anniversary dates.)

NOTE: Omit portion in parentheses for TC

**§121. Sick Leave Conversion.**  Sick leave may be converted to hours in the instance of an Employee becoming ill after having reported for work. The hours lost by such

32

an Employee on that day by reasons of illness will be accumulated to establish eligibility for sick leave after the required waiting period.

**§122. Accrued Sick Leave for Server/Bellperson.** Employees in the server and bellperson sections shall be given the option to use *two (2) hours* of their accrued sick leave for each hour of sick leave provided they meet the sick leave eligibility requirements.

NOTE TC: OMIT

**§123. Doctor's Certificate.** To receive sick pay after *three (3) days* of illness, an Employee must present a doctor's certificate as proof of illness. Absences due to accidents covered by workers' compensation are not eligible for sick leave benefits; provided, however, that sick leave which has been accumulated can be utilized in connection with workers' compensation benefits in order to permit an Employee to receive up to the Employee's average income in a combination of workers' compensation and sick leave pay.

**§124. Safe Work Environment.** The **Employer** will do everything reasonably possible to create and maintain safe, healthful and sanitary working conditions. The **Union** agrees that it will endeavor to have its members observe all of the safety rules.

NOTE TC: OMIT

**§125. Temporary Work Reassignments.** The **Employer** may make temporary work reassignments in order to accommodate the light duty or special work requirements of an Employee returning to work from a work-related injury or illness. Such reassignments will be limited to *sixty (60) days* unless extended by mutual agreement.

NOTE TC: OMIT

**§126. Pension Plan.** The **Employer** will continue to maintain and administer a pension plan ("Plan"). The normal pension benefit will be *fourteen dollars ($14.00) per month* for each year of service. The pension program will be funded by the **Employer** as required by ERISA and the Internal Revenue Code. Employees who work beyond age *sixty-five (65)* will continue to accrue the full benefits subject to the maximum accumulation of *forty-five (45) years*.

33

**§127. Pension Plan Eligibility.** The following is a brief outline of pension eligibility and benefits. The Plan and Trust Document are the ruling documents in all respects:

(a) **Age and Hour Eligibility.** - Age *twenty-one (21), one (1) year* of service, and *one thousand (1,000) hours* worked within a *twelve (12) month* period.

(b) **Normal Retirement Age.** Normal Retirement Age *sixty-five (65)* and *five (5) years* of participation.

(c) **Early Retirement Age.** Early Retirement Age *sixty-two (62)* and *five (5) years* of participation.

(d) **Disability Retirements.** Disability retirements are available to qualified employees.

(e) **Normal Pension Benefit.** The normal pension benefit will be *fourteen dollars ($14.00) per month* for each year of service up to *forty-five (45) years.*

(f) **Optional Methods for Payment.** There are a number of optional methods for payments of benefits.

(g) **Vesting Service.** Vesting occurs after *five (5) years* of Vesting Service

**§128. Employer's Right to Amend Pension Plan.** The Employer shall have the right to amend the Plan from time to time, consistent with the foregoing terms.

**§129. UNITE HERE 401K Plan.** Employees will be eligible to participate in the 401(k) plan created and administered by the **Union** ("**Union 401(k) Plan**"). The **Employer** will not match employee contributions to and the **Union** will be responsible for all the costs of the **Union** 401(k) **Plan**, including all costs associated with the administration of the **Union** 401(k) **Plan**.

**§130. No Strike or Lockout.** There shall be no strike, picketing, work stoppage, slow down, sit downs, or cessation of work, including of a sympathy nature, boycotts, or any walk out of any kind or for any reason, including any dispute

34

relating to alleged unfair labor practices, during the term of this Agreement. The provisions of this Section shall be absolute and shall apply regardless of whether the dispute is subject to arbitration under the provisions of §41 of this Agreement.

**§131. Refuse to go Through Legal Picket Line.** It will not be a violation of this agreement for Employees to refuse to go through a legally authorized picket line in any strike approved by a *two-thirds (2/3) vote* of the executive board of the **Union**.

**§132. Maintenance Tool Allowance.** Maintenance employees will be entitled to a tool allowance of up to *three hundred and twenty-five dollars ($325.00) per year* to maintain and replace tools required by the **Employer**. Paid receipts must be presented to the **Employer** before payment is received by the Employee. Employees will be reimbursed within *fifteen (15) business days* of presenting a receipt.

**§133. Tool Allowance Prorated.** The tool allowance will be paid to eligible employees who are actively employed on September 1. For those employed less than a full year at that time, the tool allowance will be prorated based on the number of full months worked in the preceding *twelve (12) months* resulting in *one-twelfth (1/12th)* of the allowance for each month.

**§134. Specialized Tools and Test Equipment.** Specialized tools and test equipment required for maintaining equipment, but not listed on the Employee tool list will be provided by the **Employer**. These tools will not generally be issued to maintenance Employees, but will be stocked in the maintenance shop to be issued on an as needed basis.

**§135. Discrimination.** The **Employer** and the **Union** agree to abide by all federal, state and local laws prohibiting discrimination.

**§136. Union Buttons.** All Employees shall be permitted to wear their official **Union** button and/or official steward button provided the button is no larger than *one and one-quarter (1-1/4) inches* in diameter. However, the foregoing limitation on the number and size of buttons worn shall not apply to Employees in classifications that are not visible to the public.

**§137. Respect & Dignity.** The **Union** and the **Employer** recognize that (workers in the hospitality industry [OMIT]) (all employees) are professional employees deserving of the highest regard. The **Union**, the **Employer**, the non-**Union** and

35

**Union** Employees will work together to honor the principles of respect, and dignity. The parties and non-**Union** and **Union** Employees agree that the continued success and operation of this establishment is dependent upon their mutual respect for one another's work.

**§138. Management Rights.** Except as limited by the express provisions of this Agreement, and longstanding mutually agreed written custom and past practice, the management of the business and the direction of the working forces shall rest solely and exclusively with the **Employer**. This includes, but is not limited to, the right to hire; to determine the quality and quantity of work performed; to determine the number of employees to be employed; to determine the jobs and job classifications; to layoff Employees; to assign and delegate work; to maintain and improve efficiency; to promulgate, rescind, revise and require observance of rules, regulations, and other policies; to direct the activities of all Employees employed by the **Employer**; to schedule work and to determine the number of hours to be worked; to determine the methods and equipment to be utilized and the type of service to be provided; to create, combine and to eliminate job classifications; (except as limited by Appendix F,)(OMIT for TC) to subcontract bargaining unit work including using temporary agency Employees for same; and to change, modify or discontinue existing methods of service and equipment to be used or provided.

Notwithstanding any strike, work stoppage, interruption of work or other economic sanction instigated or conducted by the Union or employees against the Employer for any good reason, specifically including the occasion of negotiating new or different terms of collective bargaining agreements, there shall be no work stoppage or interruption of work as relates to materials being processed in the laundry and dry cleaning departments for the use of any public and private hospitals, the Mayo buildings and nursing homes.

If such a strike or work stoppage occurs, the Employer and the Union will cooperate with the other to the end that regular employees of the Employer will be made available for the processing of such uninterrupted work and services of public and private hospitals, the Mayo buildings and nursing homes.

In consideration of the foregoing no-strike agreement, the **Employer** agrees that it will not process any other work in its laundry and dry cleaning facilities during the

36

term of a strike, so long as the **Union** and the employees do process, without interruption, all work required for the use of any public and private hospitals, the Mayo buildings and nursing homes.

This Section shall remain in full force and effect for a period equal to the life of this Agreement and/or any renewal of plus *six (6) months* in addition.

Any breach or threatened breach of this Article or any of the terms in addition to any remedies at law or this Agreement shall be subject to suit for specific performance by the **Employer** or the **Union**.

New extra or additional employees will not be utilized to prevent regular full-time employees from working *forty (40) hours* during a work week, provided, however, this does not constitute a guarantee of hours.

**§139. Successorship.** In the event the owner of a facility covered by this Agreement decides to sell, transfer or assign its interest in any of the hotels (Textile Care Services) listed on page *one (1)* of this Agreement, it will, prior to closing, provide a copy of this Agreement to the purchaser, assignee or transferee. In addition, the **Employer** will notify the **Union** and bargain in good faith over the effects of the pending sale, transfer or assignment on bargaining unit employees, prior to closing. The **Employer** agrees to notify the **Union** of the owner's intent to sell, transfer or assign its interest at the earliest possible date but in any case, no later than the date, of the execution of the purchase agreement.

**§140. Communication.** To support the **Employer's** provision of a high level of service to guests of (the hotels[OMIT])(performance) covered by this Agreement, a high degree of cooperation with managers and with workers is required. In order to promote cooperation in the workplace, managers and workers are encouraged to develop ongoing communication. Consistent with the needs of the workplace, the **Union** recognizes that cooperation can be beneficial to both the workers and (a hotel. [OMIT]) (the Company.)

**§141. Lateral Service.** Management may, using reasonable discretion, utilize a policy of lateral service for limited periods of time to satisfy guests' and the hotel's needs. Lateral service consists of an employee performing work which ordinarily is

<center>37</center>

P 01216

performed by Employees in a different job classification and is designed to allow Employees to help where needed until guest or other hotel needs are satisfied.

§142. **Agreement Supersedes Prior Agreements.** This Agreement incorporates the entire understanding between the parties and supersedes all prior agreements, letters of understanding, grievance settlements and past practices between the parties except for those practices identified by the parties. This Agreement shall be modified or amended only by a writing referring to this Agreement executed by both parties setting forth the amendment or modification.

§143. **Duration.**    This Agreement shall be effective as of April 24th, 2015 and continue in full force and effect for *five (5) years* to and including the 23rd day of April, 2020 and continue thereafter from year to year unless either party shall, at least *sixty (60) days* previous to the termination of any yearly period, notify the other party in writing of its intention to amend, modify or terminate this agreement. By yearly period the parties understand that the anniversary date of this Agreement will be April 24th, 2015 of any succeeding year unless changed by mutual consent of the parties.

§144. **Wage Increases.**  Wage increases set forth in Appendix A will be effective on April 24th, 2015.

§145. **Declaration of War.** In the event of actual declaration of war by the Congress of the United States, this Agreement may be reopened by either party on at least *sixty (60) days* written notice.

§146. **Agreement.** The **Employer** and the **Union** have agreed to this Collective Bargaining Agreement this 24th day of March, 2015.

Richfield Hospitality, Inc. as managing agent for Kahler Hotels, LLC, jointly with KAH 20 2nd Avenue LLC d/b/a The Kahler Grand Hotel, and jointly with MAR 1st Avenue SW LLC d/b/a Marriott Rochester Mayo Clinic Area, and jointly with KINN 9 3rd Avenue LLC d/b/a Kahler Inn & Suites and jointly with RES 441 Center Street LLC d/b/a Residence Inn Rochester Mayo Clinic Area) (TC Services, LLC d/b/a Textile Care Services)

38

Brian Brandt
President, UNITE HERE
Local 21

Michael Henry,
Area Director of Human
Resources, Richfield
Hospitality, Inc. and Area
Director of Human
Resources, Kahler
Hospitality Group, Kahler
Hotels, LLC.

Nancy Goldman
President, UNITE HERE
Local 17

Patrick Short,
Area Managing Director
of Operations, Richfield
Hospitality, Inc. and Area
Managing Director of
Operations, Kahler
Hospitality Group, Kahler
Hotels, LLC.

Martin Goff
Representative, UNITE
HERE Local 21

Paul Jewison,
President and Chief
Executive Officer,
TC Services, LLC d/b/a
Textile Care Services

Formatted: Font color: Blue

Carissa Gisi
Human Resources
Manager
TC Services, LLC d/b/a
Textile Care Services

39

APPENDIX "A"

Payroll Rates

The rates of pay for classifications are set forth below. The hiring rate shall apply to Employees transferring to another classification, providing there is no decrease in hourly rate. After an Employee who has transferred to another classification completes *three (3) months* of continuous employment in the new classification, she/he will be granted the appropriate service rate based upon her/his continuous employment with the **Employer**. Employees will, however, be given credit for actual experience in filling in on the new position towards the *three (3) months* of continuous employment.

The **Employer** will have the right to select the individuals who will be classified lead and to determine the number of lead positions and the shifts where they will be utilized. The **Employer** will also have the right to increase or decrease the number of lead positions in the future. The minimum wage differential for lead positions will be *fifty cents (50¢) per hour*. Leads shall be responsible for the general direction of Employees in the department and ensuring that all tasks are completed.

40

| KAHLER GRAND HOTEL | New 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Cooks | | | | | | |
| 2nd Cook | $ 15.50 | $ 15.50 | $ 15.66 | $ 15.89 | $ 16.13 | $ 16.37 |
| Lead Cook | $ 14.25 | $ 14.25 | $ 14.39 | $ 14.61 | $ 14.83 | $ 15.05 |
| Cooks | $ 14.00 | $ 14.00 | $ 14.14 | $ 14.35 | $ 14.57 | $ 14.79 |
| Line Cook | $ 11.20 | $ 11.20 | $ 11.31 | $ 11.48 | $ 11.65 | $ 11.83 |
| Prep & Serving | | | | | | |
| Pantry & Veg - Lead | $ 10.51 | $ 10.51 | $ 10.62 | $ 10.77 | $ 10.94 | $ 11.10 |
| Pantry & Veg - Prep | $ 10.10 | $ 10.10 | $ 10.20 | $ 10.35 | $ 10.51 | $ 10.67 |
| - | - | - | - | - | - | - |
| Snack Bar - Attend | $ 11.00 | $ 11.00 | $ 11.11 | $ 11.28 | $ 11.45 | $ 11.62 |
| Storeroom Helper | $ 10.00 | $ 10.00 | $ 10.10 | $ 10.25 | $ 10.41 | $ 10.56 |
| Room SV Tele & Setup | $ 9.88 | $ 9.98 | $ 10.08 | $ 10.23 | $ 10.38 | $ 10.59 |
| - | - | - | - | - | - | - |
| Banquet Set Up | $ 10.50 | $ 10.50 | $ 10.61 | $ 10.76 | $ 10.93 | $ 11.09 |
| Sanitation | | | | | | |
| Bussperson | $ 9.30 | $ 9.65 | $ 9.75 | $ 9.89 | $ 10.04 | $ 10.19 |
| Dishmachine Oper & Porter | $ 10.03 | $ 10.49 | $ 10.59 | $ 10.75 | $ 10.92 | $ 11.08 |
| Potwasher | $ 10.03 | $ 10.49 | $ 10.59 | $ 10.75 | $ 10.92 | $ 11.08 |
| Bartenders | | | | | | |
| Bartenders | $ 9.75 | $ 10.02 | $ 10.02 | $ 10.02 | $ 10.02 | $ 10.02 |
| Bartenders Hired Prior 1991 | $ 16.02 | $ 16.02 | $ 16.02 | $ 16.02 | $ 16.02 | $ 16.02 |
| Rooms | | | | | | |
| Housekeeper | $ 11.10 | $ 11.21 | $ 11.32 | $ 11.49 | $ 11.67 | $ 11.84 |
| Lobby Porter | $ 10.09 | $ 10.19 | $ 10.29 | $ 10.45 | $ 10.60 | $ 10.76 |
| Door Person | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| PBX Operator | $ 11.50 | $ 11.50 | $ 11.62 | $ 11.79 | $ 11.97 | $ 12.15 |
| Tip Classifications | | | | | | |

41

P 01220

| Tip Classifications | | | | | | |
|---|---|---|---|---|---|---|
| Server | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Banquet Server | $ 13.00 | $ 13.13 | $ 13.26 | $ 13.46 | $ 13.66 | $ 13.87 |
| Bellperson | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Maintenance Department | | | | | | |
| Specialist/Lead/Req. License | $ 19.88 | $ 19.88 | $ 20.08 | $ 20.38 | $ 20.69 | $ 21.00 |
| Mechanic | $ 18.89 | $ 18.89 | $ 19.08 | $ 19.37 | $ 19.66 | $ 19.95 |
| Apprentice | $ 16.41 | $ 16.41 | $ 16.58 | $ 16.82 | $ 17.08 | $ 17.33 |
| Preventative Maintenance | $ 14.82 | $ 14.82 | $ 14.97 | $ 15.19 | $ 15.42 | $ 15.65 |
| Light/Yard Maintenance | $ 10.50 | $ 10.50 | $ 10.61 | $ 10.76 | $ 10.93 | $ 11.09 |
| | | | | | | |
| KAHLER INN & SUITES | New 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| | | | | | | |
| Cooks | | | | | | |
| Lead Cook | $ 14.25 | $ 14.25 | $ 14.39 | $ 14.61 | $ 14.83 | $ 15.05 |
| Cooks | $ 14.00 | $ 14.00 | $ 14.14 | $ 14.35 | $ 14.57 | $ 14.79 |
| Line Cook | $ 11.20 | $ 11.20 | $ 11.31 | $ 11.48 | $ 11.65 | $ 11.83 |
| Prep & Serving | | | | | | |
| Pantry & Veg - Prep | $ 10.10 | $ 10.10 | $ 10.20 | $ 10.35 | $ 10.51 | $ 10.67 |
| Service Bar - Attend | $ 10.50 | $ 10.50 | $ 10.61 | $ 10.76 | $ 10.93 | $ 11.09 |
| Sanitation | | | | | | |
| Busperson | $ 9.30 | $ 9.65 | $ 9.75 | $ 9.89 | $ 10.04 | $ 10.19 |
| Dishmachine Oper & Porter | $ 10.03 | $ 10.49 | $ 10.59 | $ 10.75 | $ 10.92 | $ 11.08 |
| Potwasher | $ 10.03 | $ 10.49 | $ 10.59 | $ 10.75 | $ 10.92 | $ 11.08 |
| Bartenders | | | | | | |
| Bartenders | $ 9.75 | $ 10.02 | $ 10.02 | $ 10.02 | $ 10.02 | $ 10.02 |
| Rooms | | | | | | |
| Housekeeper | $ 11.10 | $ 11.21 | $ 11.32 | $ 11.49 | $ 11.67 | $ 11.84 |
| Lobby Porter | $ 10.09 | $ 10.19 | $ 10.29 | $ 10.45 | $ 10.60 | $ 10.76 |
| Door Person | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Tip Classifications | | | | | | |

43

| | | | | | | |
|---|---|---|---|---|---|---|
| Server | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Banquet Server | $ 13.00 | $ 13.00 | $ 13.13 | $ 13.33 | $ 13.53 | $ 13.73 |
| Bellperson | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Bell Captain | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Maintenance Dept | | | | | | |
| Specialist/Lead/Required License | $ 19.88 | $ 19.88 | $ 20.08 | $ 20.38 | $ 20.69 | $ 21.00 |
| Mechanic | $ 18.89 | $ 18.89 | $ 19.08 | $ 19.37 | $ 19.66 | $ 19.95 |
| Apprentice | $ 16.41 | $ 16.41 | $ 16.58 | $ 16.82 | $ 17.08 | $ 17.33 |
| Preventative Maintenance | $ 14.82 | $ 14.82 | $ 14.97 | $ 15.19 | $ 15.42 | $ 15.65 |
| Light/Yard Maintenance | $ 10.50 | $ 10.50 | $ 10.61 | $ 10.76 | $ 10.93 | $ 11.09 |
| | | | | | | |
| MARRIOTT | New 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Cooks | | | | | | |
| Lead Cook | $ 14.25 | $ 14.25 | $ 14.39 | $ 14.61 | $ 14.83 | $ 15.05 |
| Cooks | $ 14.00 | $ 14.00 | $ 14.14 | $ 14.35 | $ 14.57 | $ 14.79 |
| Line Cook | $ 11.20 | $ 11.20 | $ 11.31 | $ 11.48 | $ 11.65 | $ 11.83 |
| Prep & Serving | | | | | | |
| Pantry & Veg - Prep | $ 10.10 | $ 10.10 | $ 10.20 | $ 10.35 | $ 10.51 | $ 10.67 |
| Banquet Set Up | $ 10.50 | $ 10.50 | $ 10.61 | $ 10.76 | $ 10.93 | $ 11.09 |
| Sanitation | | | | | | |
| Busperson | $ 9.30 | $ 9.65 | $ 9.75 | $ 9.89 | $ 10.04 | $ 10.19 |
| Dishmachine Oper & Porter | $ 10.03 | $ 10.49 | $ 10.59 | $ 10.75 | $ 10.92 | $ 11.08 |
| Potwasher | $ 10.03 | $ 10.49 | $ 10.59 | $ 10.75 | $ 10.92 | $ 11.08 |
| Bartenders | | | | | | |
| Bartenders | $ 9.75 | $ 10.02 | $ 10.02 | $ 10.02 | $ 10.02 | $ 10.02 |
| Bartenders hired prior 1991 | $ 16.02 | $ 16.02 | $ 16.02 | $ 16.02 | $ 16.02 | $ 16.02 |
| Rooms | | | | | | |
| Housekeeper | $ 11.10 | $ 11.21 | $ 11.32 | $ 11.49 | $ 11.67 | $ 11.84 |
| Lobby Porter | $ 10.09 | $ 10.19 | $ 10.29 | $ 10.45 | $ 10.60 | $ 10.76 |
| Door Person | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |

42

APPENDIX "B"

Departments And Seniority Sections


THE KAHLER GRAND HOTEL

    Food & Beverage Department

- Cooking/Preparation Classification
- Room Service Serving Classification
- Function Serving Classification
- Function Set-Up Classification
- Sanitation Classification
- Bartenders Classification
- Room Service Telephone Classification
- Starbucks Classification
- Restaurant Server Classification

Formatted: Font: (Default) Times New Roman, 14 pt

    Rooms Department
- PBX Classification
- Bellperson, Lobby Porter Classification
- Housekeeping Classification

Formatted: Space After: 0 pt

    Maintenance Department

- Maintenance Classification


KAHLER INN & SUITES

Food and Beverage Department

- Cooking Classification
- Serving Classification
- Sanitation Classification

45

| | New 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Server | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Bellperson | $ 9.00 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 | $ 9.50 |
| Maintenance Department | | | | | | |
| Specialist/Lead/Req. License | $ 19.88 | $ 19.88 | $ 20.08 | $ 20.38 | $ 20.69 | $ 21.00 |
| Mechanic | $ 18.89 | $ 18.89 | $ 19.08 | $ 19.37 | $ 19.66 | $ 19.95 |
| Apprentice | $ 16.41 | $ 16.41 | $ 16.58 | $ 16.82 | $ 17.08 | $ 17.33 |
| Preventative Maintenance | $ 14.82 | $ 14.82 | $ 14.97 | $ 15.19 | $ 15.42 | $ 15.65 |
| Light/Yard Maintenance | $ 10.50 | $ 10.50 | $ 10.61 | $ 10.76 | $ 10.93 | $ 11.09 |

| RESIDENCE INN | New 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Rooms | | | | | | |
| Housekeeper | $ 11.10 | $ 11.21 | $ 11.32 | $ 11.49 | $ 11.67 | $ 11.84 |
| Lobby Porter | $ 10.09 | $ 10.19 | $ 10.29 | $ 10.45 | $ 10.60 | $ 10.76 |
| Maintenance Department | | | | | | |
| Specialist/Lead/Req. License | $ 19.88 | $ 19.88 | $ 20.08 | $ 20.38 | $ 20.69 | $ 21.00 |
| Mechanic | $ 18.89 | $ 18.89 | $ 19.08 | $ 19.37 | $ 19.66 | $ 19.95 |
| Apprentice | $ 16.41 | $ 16.41 | $ 16.58 | $ 16.82 | $ 17.08 | $ 17.33 |
| Preventative Maintenance | $ 14.82 | $ 14.82 | $ 14.97 | $ 15.19 | $ 15.42 | $ 15.65 |
| Light/Yard Maintenance | $ 10.50 | $ 10.50 | $ 10.61 | $ 10.76 | $ 10.93 | $ 11.09 |

44

<u>TEXTILE CARE SERVICES</u>

Production Department

- Receiving Classification
- Wash Classification
- Flat/Tumble Finishing Classification
- Wearing Apparel Finishing Classification
- Packaging/Shipping Classification
- Dry Cleaning Classification
- Utility Classification

Distribution Department

- Service Representative Classification

Maintenance Department

- Maintenance Classification

47

- Restaurant Server Classification
- 

> Formatted: Font: (Default) Times New Roman, 14 pt

## Rooms Department

- Housekeeping Classification
- Bellperson Classification

## Maintenance Department

- Maintenance Classification

## ROCHESTER MARRIOTT

### Food and Beverage Department

- Cooking/Preparation Classification
- Serving Classification
- Room Service Serving Classification
- Function Serving Classification
- Function Set-Up
- Sanitation Classification
- Bartenders Classification
- Restaurant Server Classification

> Formatted: Font: (Default) Times New Roman, 14 pt

### Rooms Department

- Bellperson, Doorperson Classification
- Housekeeping Classification

### Maintenance Department

- Maintenance Classification
- Housekeeping Classification

46

**Seniority Rights.** The Employer will maintain separate seniority lists at each hotel, by classification.

| Formatted: Justified |

A separate seniority list for maintenance Employees working at Textile Care Services will be maintained for purposes of all seniority rights.

Staffing and appropriate coverage at all locations will be determined by management.

With the exception of apprentices, advancement to a higher paid classification will only be permitted when a new position opens in a specific classification.

Any and all license requirements will be determined by management and/or applicable law. Any maintenance employee called back to work after he or she has left the property will receive a minimum of *four (4) hours* call back pay.

| Formatted: Justified |

49

## APPENDIX "C"

### MAINTENANCE ADDENDUM

Apprentices in the Maintenance Department will be permitted to take a test to move to the "mechanic" classification after completing two years of service as an apprentice. The apprentice wishing to take the test will furnish the employer with a written request and will be permitted to take the test within *thirty (30) calendar days* following the written request. The **Employer** will inform the apprentice of the test results within *thirty (30) calendar days* of taking the test. If the apprentice passes the test she/he will be promoted to the "mechanic" classification.

At Textile Care Services, tThe laundry specialist classification will require the Employee to have a class 1-B boiler license and maintenance electrician's license. The employee will be required to demonstrate skills in electronics to troubleshoot PLC and computer control systems, make programming changes as directed by the equipment manufacturer and repair circuit boards

The Employee will be required to demonstrate proficiency in welding and plumbing. | Formatted: Font color: Blue
The **Employer** agrees to provide, at no cost to the Employee, for all training and education that is required for maintenance Employees to obtain and maintain licensure provided the training is approved by the **Employer** and the course is successfully completed. The **Employer** will reimburse Employees for the yearly cost to renew or maintain licensure if such license is required.

| Formatted: Font: Bold |
| Formatted: Font: 14 pt, Bold, Font color: Blue |
| Formatted: Font: 14 pt, Font color: Blue |
| Formatted: Font: 14 pt, Font color: Blue |
| Formatted: Font color: Blue |

The **Employer** agrees to employ no more than the, following number of Employees in the classifications of light/yard maintenance and preventative maintenance:

| Facility | Light/Yard | Preventative |
|----------|-----------|--------------|
| The Kahler Grand Hotel | 2 | 2 |
| Rochester Marriott | 1 | 1 |
| Kahler Inn and Suites | 1 | 1 |
| TCS | 1 | 3 |

| Formatted: Not Highlight |

48

APPENDIX "D"

Housekeeping Addendum

A housekeeping employee shall not be required to clean more than *sixteen (16) rooms* within *eight (8) hours*. When a housekeeping Employee cleans *eleven (11)* or more check outs in a day, the maximum number of assigned rooms shall be reduced by *one (1)*, and when a housekeeping Employee cleans *fourteen (14)* or more check outs in a day, the maximum number of assigned rooms shall be reduced by *two (2)*. Each bedroom or separate sitting room of a suite shall count as *one (1)* room. Management in its sole discretion may reduce the number of rooms to be cleaned during a shift or assign a houseperson to assist a housekeeping Employee with rooms where, for example, rooms are exceptionally dirty or extraordinary cleaning is required.

Except pursuant to the provisions of §141, Lateral Service, Room Attendants will not normally be required to perform houseperson work in addition to their normal duties.

Housekeepers assigned to clean rooms on *three (3)* or more floors during a shift shall have their room quota reduced by *one (1) room*.

A housekeeping Employee who volunteers to clean more than the foregoing amount of rooms within *eight (8) hours* shall be paid a bought room bonus of *seven dollars ($7.00)* for each additional room. However, the bought room bonus shall not apply to rooms cleaned during overtime.

Room Attendants shall sign for their area or floor (s) by seniority. The **Employer** shall not arbitrarily reassign housekeeping sections.

The **Employer** will install sharps containers in all Hotel public restrooms.

Bargaining unit Employees shall not normally be required to clean up and/or dispose of human or animal waste, vomit or significant blood spill. Employees shall comply with the **Employer's** procedures whenever they encounter human or animal feces, vomit, or significant blood spill in the workplace, and shall immediately contact a qualified responder who will handle disposal. Where a bargaining unit Employee is

50

required to clean human or animal waste, vomit or a significant blood spill, they will receive a *six dollar ($6.00)* payment upon verification by a qualified responder.

Hotel Employees shall not be required to handle any items that have been placed in a biohazard bag. Employees shall contact their supervisor for handling of those items.

If Hotel Employees encounter improperly discarded syringes or other sharp objects while working, they shall be disposed of in accordance with established policy. The policy will include adequate available "sharps" containers for collection.

The **Employer** will provide linen, equipment and cleaning materials which is sufficient for Housekeeping employees to perform their jobs. Room Attendants will not be disciplined where they could not perform a task because they did not have the necessary equipment or supplies.

The **Employer** will provide assistance to a housekeeper in connection with moving or lifting any furniture weighing more than *twenty-five (25) pounds*. No Room Attendant will be required to stand on a ladder, bath tub or vanity.

The **Employer** will provide at least *thirty (30) day's* notice to the **Union** and, upon the **Union's** request, meet and discuss any renovation or new amenities or service standards which will significantly affect the housekeeper's work loads.

51

APPENDIX "E"
**Banquet Department Addendum**

**NOTE: Appendix E – Banquet Department Addendum will be deleted in the
TC Contract**

Banquet Definition. A banquet shall be deemed to be any reserved function with a
pre-set menu and a fixed cost, including receptions, supervised by the banquet
department.

System-Wide Seniority. For purposes of lay-off, recall and filling available
positions, the **Employer** shall maintain a master seniority list which shall contain
the names of all regular fulltime and regular part-time banquet servers who work in
each of the **Employer's** hotels. Seniority shall be based on first function worked as
a regular server following completion of probation.

Seniority by Location. The Employer will maintain at each location *three (3)
banquet employee* seniority lists for purposes of scheduling at each of the Hotels.

A. First List.

The First List will contain the names of all regular full-time banquet
Employees. These Employees must be available to work any shift at the
Hotel(s), seven days per week. The seniority list for regular full-time banquet
Employees shall be posted every month.

Although fluctuations in business will have an impact on the **Employer's**
ability to consistently schedule these Employees on a full-time basis, it is the
intention of the parties to provide First List Employees with a reasonable
opportunity to work a full-time schedule. Accordingly, the number of
Employees on the First List will be established and maintained so as to reflect
this intention.

B. Second List.

The Second List will contain the names of banquet Employees who are
available to work a minimum of *three (3) shifts*, per week, at the Hotel(s).
The days and shifts on which such employees are available will be submitted

52

to management in writing. Second List Employees will be on a separate seniority list, which will be posted. Second List Employees will be scheduled only after the First List has been exhausted, when necessary, to meet staffing needs, or where use of the First List Employees would result in the payment of overtime.

C. On-Call List.

The On-Call List will contain the names of banquet Employees who are called and work on an "as needed" basis at the Hotel(s). On-Call Employees may be scheduled when the First and Second Lists have been exhausted, where necessary to meet staffing needs, or where use of First or Second List Employees would result in the payment of overtime. Local 21 will check hours worked on a monthly basis to see if hours worked fall under guidelines (average 10 hours/week are subject to dues).

D. Seniority Standing.

1. First List Employees moving to the Second List will be "dove-tailed" based on seniority date. The Second List employees moving to the First List will go to the bottom of the list with seniority based on date of transfer.

2. First List servers will have preference for scheduling purposes at their own Hotel and preference over Second List and On-Call servers at the other Hotels.

3. Maximum hours available will be offered to senior First List employees, up to *forty (40) hours* per week, but no Employee will work a triple shift until all First List Employees have been offered a double shift.

4. Any regular server involuntarily cut from a function shall be entitled to bump the least senior server scheduled to work at their home Hotel, in that work week.

5. Employee requests for days off must be received in writing by noon, *forty-eight (48) hours* prior to posting of the weekly schedule, and will

53.

## APPENDIX "F"

<u>Food and Beverage Addendum</u>

All Employees working in the cook classification will receive a meal during their shift at no cost to the Employee.

The lead cook rate of pay will be applied to at least *one (1) cook* in the Grand Grill, Crossing Bistro and Salute in the absence of a supervisor/manager for all hours of operation.

It is agreed there will be no more than *one (1) sous chef* and *one (1) executive chef* assigned per shift at each hotel.

Starbucks Employees will be paid at the snack bar rate.

The **Employer** will be allowed to subcontract or lease out to another food and beverage operator any kitchen, bar, or restaurant in either the Marriott or Kahler Grand where the **Employer** deems economically viable for the continued success of the hotel.

55

be duly considered. A regular server will not be disciplined for her/his inability to work a shift if the server is notified less than *twenty-four (24) hours* before the scheduled shift.

6. All weekly banquet schedules shall be posted at each of the Hotels. It is understood that Employees may be required to work at all locations.

E. Special Conditions/Scheduling.

Employees will be scheduled by shifts. A shift is defined as a work period of no less than *three (3) hours* and no more than *eight (8) hours*. A shift may include working one, or any combination of, the following events:

- Breakfasts
- Coffee Breaks
- Lunches
- Dinners
- Receptions
- Special Events

54

APPENDIX "H"

<u>GUEST SERVICE</u>

<u>NOTE: DELETE Appendix for TC Contract</u>

The parties agree to supplement the Agreement for the following purposes:

The parties recognize that premier guest service is essential to the success of the **Employer** and its ability to employ persons who are paid competitive wages;

The parties recognize that because most guest dissatisfaction is not reported, and most dissatisfied guests simply take their business elsewhere, the guest complaints received by the **Employer** are a reflection of dissatisfaction by some who have not complained but who will not return to the **Employer**;

The parties agree that the **Employer** shall train employees on how to provide premier guest service and that each employee may be expected to successfully complete such training;

The parties agree as follows:

(1) The **Employer** has the right to establish service standards and appearance, grooming, and dress standards that must be adhered to by all employees and managers.

(2) The parties agree that the **Employer** may apply progressive discipline, up to and including discharge, against employees who are the subject of guest complaints other than those set forth in the following paragraph 3 (examples of complaints include, but are not limited to, misplaced luggage, guest room not completely cleaned, mishandled food or beverage order, incorrect credit card charge)

(3) The parties agree that the **Employer** shall have just cause for discharge of any employee who, among other reasons:
   a) Is the subject of *two (2)* or more legitimate complaints from guests within *one (1) year* of poor, rude, or discourteous service (examples include, but are not limited to, use of foul language in the presence

57

## APPENDIX "G"

**Bell Position Addendum**

**NOTE: Bell Position Addendum will be deleted for TC Contract and replaced with the below TCS Addendum.**

For groups of more than *ten (10) people*, bellpersons shall receive a portage rate of *two dollars ($2.00) per person* each coming in and *two dollars ($2.00)* each for going out if negotiated and collected. It is agreed that these amounts are only minimums.

## APPENDIX "G"

**Textile Care Services Addendum**

Employees in the janitor classification shall receive the same night shift differential as the maintenance classification.

The Employer shall provide employees working in the soil sort department with OSHA approved gowns and gloves. Employees shall not remove these items from the premises.

56

arrange for a conference call between the guest, a representative of the **Union**, and a representative of Hotel management. Where, however, an employee has been discharged based on one or more guest complaints the **Union** shall be permitted to investigate the complaint to the extent permitted by the National Labor Relations Act, as interpreted by the National Labor Relations Board and the courts.

59

of a guest, arguing with a guest, indifference to a guest concern, carrying on personal business while a guest is waiting);

b) Is the subject of one legitimate complaint from a guest of extraordinarily poor, rude, or discourteous guest service (examples include, but are not limited to, directing foul language toward a guest, sexual or other harassment of a guest, refusal to assist a guest, requesting or adding a gratuity);

c) Fails to pass a course pertaining to the **Employer's** service standards;

d) Acts in gross neglect of the **Employer's** service standards on one occasion or more, unless the **Employer** deems it appropriate to excuse such neglect on a non-precedent setting basis.

The parties further agree that the foregoing are examples and that Employees may terminated in other circumstances, subject to the requirement that the termination be for just cause.

(4) If the **Employer** chooses to conduct written or oral testing of Employees in connection with guest service training, such tests must be reasonable, job related, and nondiscriminatory. Such tests shall be limited to guest service and communication skills and abilities, as well as employee knowledge of the services and products offered by the Hotel. The **Union** shall be permitted to a copy of any tests used in advance of utilization by the Hotel. The **Union** shall be permitted to grieve such tests if it believes they are unreasonable, not job related, and/or discriminate on an unlawful basis.

(5) Where a guest complaint is reduced to writing, the Hotel shall not be required to compel the guest to testify during the grievance and arbitration procedure or reveal the guest's address or telephone number to the **Union** or to the employee. The Hotel may introduce into evidence at arbitration written guest complaints. Upon request of the **Union**, the Hotel shall provide the **Union** with a copy of any written guest complaint that resulted in disciplinary action being taken against an employee, with the guest's identity redacted from such copy. Where the **Union** wishes to investigate a complaint, the Hotel shall

58

his or her job responsibilities. Depending on individual circumstances, this abuse could result in termination.

4.    Employees suffering from drug dependency are encouraged to seek medical treatment. The Human Resources representative may be contacted for referrals for evaluation and/or treatment facilities and the application of Company medical benefits for evaluation and treatment. No Employee may suffer reprisals as a result of seeking help. If an Employee feels she/he has suffered reprisals, she/he should report it to the Human Resources representative immediately and an appropriate investigation and action will take place.

5.    Every Employee will receive a copy of the Drug and Alcohol Testing Policy and will be required to sign an Acknowledgment Form, Attachment A, which will be kept in the employee's personnel file. In addition, the Company shall post notices in appropriate and conspicuous locations at each of its worksites that the Company has adopted a Drug and Alcohol Testing Policy and that copies of the Policy are available for inspection during regular business hours by its Employees and job applicants in the Company's Human Resources office.

6.    An Employee may be required to undergo drug and alcohol testing when at least *two (2) supervisors* (if feasible) have reasonable suspicion that the Employee:

    a) is under the influence of drugs or alcohol. Factors that may be considered in determining whether an Employee is under the influence of drugs and alcohol include but are not limited to: evidence of repeated errors on the job, Company rule violation, and unsatisfactory time and attendance patterns, if coupled with specific facts and rational inferences drawn from those facts that indicate possible drug use; or

    b) has violated the Company's written Policy Statements (numbers 1, 2, or 3 above); or

    c) has had a personal injury while working or has caused a personal injury to another person; or

61

APPENDIX "I"

DRUG AND ALCOHOL TESTING

This Drug and Alcohol Testing Policy is intended to be in accordance with Minnesota law and with the terms of the Agreement.

OBJECTIVE:

The Company strives to maintain a work environment free from the effects of drug and alcohol abuse for the protection of our customers, employees, and the community.

The Company recognizes that alcoholism and other drug dependencies are behavioral/medical problems which can be treated.

POLICY STATEMENTS:

1.      The possession, use, manufacture, transfer, or sale of illegal drugs during work hours, while operating a Company vehicle or on Company premises is prohibited.   The Company premises include all Richfield Hospitality, Inc. as managing agent for Kahler Hotels, LLC, jointly with KAH 20 2nd Avenue LLC d/b/a The Kahler Grand Hotel, and jointly with MAR 1st Avenue SW LLC d/b/a Marriott Rochester Mayo Clinic Area, and jointly with KINN 9 3rd Avenue LLC d/b/a Kahler Inn & Suites and jointly with RES 441 Center Street LLC d/b/a Residence Inn Rochester Mayo Clinic Area (TC Services, LLC d/b/a Textile Care Services) worksites, including parking facilities. Employees violating this provision may be terminated.

2.      Employees are not permitted to work under the influence of alcohol or any illegal drug. Employees violating this provision are subject to disciplinary action up to and including termination.

3.      Abuse of legally prescribed drugs or controlled substances, or over-the-counter drugs, is prohibited because it may impair an employee's ability to perform

60

responsibility. Employees who refuse to participate in the counseling or rehabilitation program or fail to successfully complete the program, as evidenced by withdrawal from the program before its completion or by a positive test result on a confirmatory test after the completion of the program, may be subject to termination.

10. An Employee who is referred by the Company for chemical dependency treatment or evaluation or is participating in a chemical dependency treatment program may be requested or required to undergo drug or alcohol testing without prior notice during the evaluation or treatment period and for up to *one (1) year* following completion of any prescribed chemical dependency treatment program. An Employee testing positive during this period may be subject to termination.

11. A Medical Review Officer (M.R.O.) will review all test results. All positive test results shall be confirmed by a Gas Chromatography Mass Spectrometry analysis of the original specimen sample. The M.R.O. will review and interpret analytical (laboratory) results, validate the results scientifically, and determine if there is a legitimate medical explanation for a positive test result, and notify the Company of the results. The M.R.O. is a third party licensed physician with specialized knowledge of substance abuse.

12. The Company reserves the right to change or terminate this Policy and Procedures at any time, after prior notice and negotiation with the Union. Every Employee will be given a copy of the amended policy if a change is made.

13. Test result reports and other information acquired in the drug and alcohol testing process are confidential information. Disclosure of the results to third parties may be done with the Employee's prior written consent. Notwithstanding the above, test results may be disclosed to any federal agency or other unit of the United States government as required under federal law, regulation or order, or in accordance with compliance requirements of a federal government contract. The test results may also be disclosed to a substance abuse treatment facility for the purpose of evaluation or treatment of the Employee, or may be disclosed to the Union or other necessary persons in connection with a potential or actual grievance or

63

d) has caused a work-related accident or was operating or helping to operate machinery, equipment or vehicles in a work-related accident.

Post-accident or injury testing will be conducted as soon as practical following the accident, but not later than *thirty-two (32) hours* following the accident

Drug and alcohol testing will be accomplished by the collection of hair, urine, and/or blood. The screening of hair, urine, and/or blood samples will be performed by qualified and certified testing laboratories. Testing is done for alcohol and the following drugs and drug classes:

Marijuana metabolites, cocaine metabolites, the opiates morphine and codeine, phencyclidine (PCP, angel dust), and amphetamines (amphetamine and methamphetamine), and/or all other drug classes as described in Schedules I through V of Minn. Stat. Section 152.02.

The detection levels of confirmatory tests shall be those established under Minnesota Rules.

7.     Every Employee has the right to refuse to undergo drug and alcohol testing. Employees who refuse to undergo testing are subject to disciplinary action up to and including termination.

8.     Any Employee who tests positive shall have the right to explain the positive test result of a confirmatory test or request and pay for a confirmatory retest of the original specimen sample.

9.     If a positive test result on a confirmatory test was the first such result for the Employee on a drug or alcohol test by the Company, the Employee will be immediately suspended without pay. The Employee can be reinstated upon participation in either a drug or alcohol counseling or rehabilitation program, whichever is more appropriate as determined by the Company after consultation with a certified chemical use counselor or a physician trained in the diagnosis and treatment of chemical dependency. The cost for the evaluation will be paid by the Company. Costs for the recommended treatment will be the Employee's

62

5. The M.R.O. will communicate the results to the Company Human Resources representative.

6. The Human Resources representative and/or the employee's supervisor will communicate the results of the test to the Employee or job applicant, as the case may be, within *three (3) working days* upon receipt of the results.

7. If an Employee tests positive for drug use, the employee will be notified in writing of her/his right to explain the positive test and the Company may request that the employee indicate any over-the-counter or prescription medication that the individual is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test result.

8. Within *three (3) working days* after notice of a positive test result on a confirmatory test, the employee may submit information to the Company, in addition to any information already submitted under paragraph 7, to explain that result, or may request a confirmatory re-test of the original sample at the Employee's own expense.

9. The Human Resources representative will follow up on any recommended treatment and determine whether the Employee has successfully completed the treatment.

65

threatened or actual litigation. An Employee has the right to request and receive from the Company, a copy of the test result report on any drug or alcohol test.

No Employee may be required to undergo drug or alcohol testing without the prior approval of the Director of Human Resources or the General Manager or her/his designee.

PROCEDURES:

1. When at least *two (2) supervisors* (if feasible) have reasonable suspicion to test an employee as stated in Policy Statement #6, the request must go to the applicable Human Resources representative or his/her designee to arrange for the collection and begin the required paperwork designating the need for hair, urine, and/or blood specimen.

2. Before a test is administered, the Company will ensure that the employee has completed a Drug and Alcohol Acknowledgment Form.

3. The Employee will go to the collection site and provide a hair, urine, and/or blood specimen and appropriate identification. The collection site staff will begin the chain of custody paperwork and forward the specimen to the certified laboratory for testing. If an employee appears impaired and unable to safely go to the collection site on her/his own, the Company will arrange for transportation to the collection site and home following the collection procedure. Under no circumstances should an employee suspected of being impaired be allowed to drive. The Employee will be reimbursed for any out-of-pocket expense incurred in taking the test, with proper documentation.

4. Test results will be reviewed to determine if there is evidence of the use of alcohol, drugs or controlled substances and forwarded to the M.R.O. If the specimen sample shows a positive result, the original sample will be kept for additional confirming tests.

64

APPENDIX "J"
**Mutual Agreements**

**(Custom, Past Practice, Letters of Understanding)**

1. From letter of September 24, 1991 to Terry Weivoda, Local 21, from Kevin Molloy, Senior VP Operations,

    a. It is agreed that no absolute room quota exists for room housekeepers, but the **Employer** has the right to set reasonable performance standards.

    b. Consistent with past practice, it is agreed that full time housekeepers shall be able to use their seniority to select work areas, part time housekeepers shall be assigned as needed.

    c. It is agreed that when Employees have been requested to work on their day off, such designation shall be made on the Employee's work schedule noting any *sixth (6th) or seventh (7th) day* worked.

    d. It is agreed that the **Employer** will continue for the life of their 2015 – 2020 Collective Bargaining Agreement the current Employee discount for meals purchased in restaurants in accordance with the established policy, i.e. Employee cafeteria, or if not available, from Employee menu.

NOTE: Side letter 1 will be deleted from the TC Contract

1. From letter of August 1, 2001, to Frank Heavlin, from David Blanchard, Local 21, regarding treatment of biohazard bags at Textile Care Services in Rochester, Minnesota. It is agreed that Employees at TCS will no longer be required to handle any bio-hazard bags when they come to the plant. Any such bags will be placed, unopened, into a special bin that will be picked up by Mayo

67

ATTACHMENT "A"

DRUG AND ALCOHOL POLICY ACKNOWLEDGMENT FORM

I, the undersigned, certify that I have received and read a copy of the Company's Policy regarding drug and alcohol abuse.

As part of my employment with the Company, I understand that my position is subject to drug and alcohol testing and that I may be requested to provide a hair, urine, and/or blood specimen for a drug or alcohol test.

I understand that I may refuse to take the drug and alcohol test and that such refusal may result in termination.

_____
Employee

_____
Date

_____
Witness

66

TOTAL REAL WAGE PIE CHARTS

to be handled by them. This policy will not change during the life of the 2015-2020 Agreement unless required by law

68

Textile Care Services
2015 - 2020 Wages - Union                     START WAGE
Increase on starting wage rates

| | current rate | | | | | 2015 | | | | 2016 | | | | 2017 | | | | 2018 | | | | 2019 | | | | 2020 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 12 Mo | 24 Mo | 42 Mo | 60 Mo | 12 Mo | 24 Mo | 42 Mo | 60 Mo | 12 Mo | 24 Mo | 42 Mo | 60 Mo | 12 Mo | 24 Mo | 42 Mo | 60 Mo | 12 Mo | 24 Mo | 42 Mo | 60 Mo | 12 Mo | 24 Mo | 42 Mo | 60 Mo |



| | April 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $14.97 | 2080 | $31,137.60 |
| Overtime 1.5x BR | | $0.60 | 50 | $1,122.75 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $17.25 | 1870 | $32,260.35 |
| Vacation (W) | 2 | $0.64 | 80 | $1,197.60 |
| Holiday (D) | 6 | $0.77 | 48 | $1,437.12 |
| Sick/Personal (D) | 5 | $0.32 | 40 | $598.80 |
| Jury Duty (D) | 6 | $0.38 | | $718.56 |
| Bereavement (D) | 3 | $0.19 | | $359.28 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $2.31 | 240 | $4,311.36 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.16 | | $4,032.54 |
| Workers Comp | 0.036 | $0.62 | | $1,162.66 |
| Total | | $2.78 | | $5,195.21 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $24.38 | 0 | $45,585.64 |



## TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services

## Preventative Maintenance- 1 yr Employee April 2015

$0.64   $0.77   $0.32   $0.38   $0.19   $0.08   $2.16   $0.62   $1.49   $0.47

$17.25

TRW=$24.38

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



| | April 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.42 | 2080 | $31,137.60 |
| Overtime 1.5x BR | | $0.62 | 50 | $1,122.75 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $17.77 | 1870 | $32,260.35 |
| Vacation (W) | 2 | $0.66 | 80 | $1,197.60 |
| Holiday (D) | 6 | $0.79 | 48 | $1,437.12 |
| Sick/Personal (D) | 5 | $0.33 | 40 | $598.80 |
| Jury Duty (D) | 6 | $0.40 | | $718.56 |
| Bereavement (D) | 3 | $0.20 | | $359.28 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $2.37 | 240 | $4,311.36 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.22 | | $4,032.54 |
| Workers Comp | 0.036 | $0.64 | | $1,162.66 |
| Total | | $2.86 | | $5,195.21 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $25.05 | 0 | $45,585.64 |



**TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services**

**Preventative Maintenance- 1 yr Employee April 2016**

$0.66  $0.79  $0.33  $0.40  $0.20  $0.08  $2.22  $0.64  $1.49  $0.47

$17.77

**TRW= $25.05 Increased from  April 2015 2.75%**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services
Preventative Maintenance- 1 yr Employee
Nov. 2017

TRW= $25.75
Increased from April 2016
2.80%

$0.68  $0.82  $0.34  $0.41  $0.20  $0.08  $2.29  $0.66  $1.49  $18.31  $0.47

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension



## TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Textile Care Services

### Preventative Maintenance- 1 yr Employee Nov. 2017

| | Nov. 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.89 | 2080 | $33,049.92 |
| Overtime 1.5x BR | | $0.64 | 50 | $1,191.70 |
| Lunch 30min/8hrs | | | 130.00 | |
| Rest 15min/4hrs | | | 130.00 | |
| Total Compensable Productive Work Time | | $18.31 | 1870 | $34,241.62 |
| Vacation (W) | 2 | $0.68 | 80 | $1,271.15 |
| Holiday (D) | 6 | $0.82 | 48 | $1,525.38 |
| Sick/Personal (D) | 5 | $0.34 | 40 | $635.58 |
| Jury Duty (D) | 6 | $0.41 | 48 | $762.69 |
| Bereavement (D) | 3 | $0.20 | 24 | $381.35 |
| Total Compensable Non-Productive Work Time | | $2.45 | 240 | $4,576.14 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $2.29 | | $4,280.20 |
| Workers Comp | 3.60% | $0.66 | | $1,234.07 |
| Total | | $2.95 | | $5,514.27 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $25.75 | 0 | $48,150.76 |

**TRW=$25.75 Increased from April 2016 2.80%**

Pie chart values: $18.31, $0.68, $0.82, $0.34, $0.41, $0.20, $0.08, $2.29, $0.66, $1.49, $0.47

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension



TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services
Preventative Maintenance- 1 yr Employee
2018

TRW= $25.75 Increased from Nov. 2017 0.00%

$0.68   $0.82   $0.34   $0.41   $0.20
$0.08
$2.29
$0.66
$18.31
$1.49
$0.47

⊠ Base Pay & OT   ▾ Vacation   ⊠ Holiday   ⊠ Personal/Sick   ⊠ Jury Duty   ⊠ Bereavement   ⊠ Uniforms   ⊠ Taxes   ⊠ Workers Comp   ⊠ Health & Welfare   ⊠ Pension



| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.89 | 2080 | $33,049.92 |
| Overtime 1.5x BR | | $0.64 | 50 | $1,191.70 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $18.31 | 1870 | $34,241.62 |
| Vacation (W) | 2 | $0.68 | 80 | $1,271.15 |
| Holiday (D) | 6 | $0.82 | 48 | $1,525.38 |
| Sick/Personal (D) | 5 | $0.34 | 40 | $635.58 |
| Jury Duty (D) | 6 | $0.41 | | $762.69 |
| Bereavement (D) | 3 | $0.20 | | $381.35 |
| Total Compensable Non-Productive Work Time | | $2.45 | 240 | $4,576.14 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $2.29 | | $4,280.20 |
| Workers Comp | 3.60% | $0.66 | | $1,234.07 |
| Total | | $2.95 | | $5,514.27 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $25.75 | 0 | $48,150.76 |

**TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services**

**Preventative Maintenance- 1 yr Employee 2018**

$0.68  $0.82  $0.34  $0.41  $0.20  $0.08  $2.29  $0.66  $1.49  $18.31  $0.47

**TRW=$25.75 Increased from Nov. 2017 0.00%**

Legend:
- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services
Preventative Maintenance- 1 yr Employee
April 2019

TRW= $27.31
Increased
from: 2018
6.08%

$0.72  $0.87  $0.36  $0.43  $0.22
$0.08
$2.44
$0.70
$1.49
$19.52
$0.47

≋ Base Pay & OT  ▾ Vacation  ≋ Holiday  ▸ Personal/Sick  ▸ Jury Duty  ▾ Bereavement  ≋ Uniforms  ≋ Taxes  ≋ Workers Comp  ≋ Health & Welfare  ≋ Pension

| | April 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $16.94 | 2080 | $31,137.60 |
| Overtime 1.5x BR | | $0.68 | 50 | $1,122.75 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $19.52 | 1870 | $32,260.35 |
| Vacation (W) | 2 | $0.72 | 80 | $1,197.60 |
| Holiday (D) | 6 | $0.87 | 48 | $1,437.12 |
| Sick/Personal (D) | 5 | $0.36 | 40 | $598.80 |
| Jury Duty (D) | 6 | $0.43 | | $718.56 |
| Bereavement (D) | 3 | $0.22 | | $359.28 |
| Total Compensable Non-Productive Work Time | | $2.61 | 240 | $4,311.36 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.44 | | $4,032.54 |
| Workers Comp | 0.036 | $0.70 | | $1,162.66 |
| Total | | $3.14 | | $5,195.21 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $27.31 | 0 | $45,585.64 |



TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services

Preventative Maintenance- 1 yr Employee April 2019

$0.72  $0.87  $0.36  $0.43  $0.22  $0.08  $2.44  $0.70  $1.49  $0.47

$19.52

TRW=$27.31 Increased from 2018 6.08%

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension



TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services
Preventative Maintenance- 1 yr Employee
Nov. 2020

TRW= $27.82 Increased from April 2019 1.85%

$0.74  $0.89  $0.37  $0.44  $0.22  $0.08  $2.49  $0.72  $1.49  $0.47  $19.91

≈ Base Pay & OT  ▾ Vacation  ▾ Holiday  ▾ Personal/Sick  ≋ Jury Duty  ≋ Bereavement  ≋ Uniforms  ≋ Taxes  ≋ Workers Comp  ≋ Health & Welfare  ≋ Pension

| | Nov. 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $17.28 | 2080 | $31,137.60 |
| Overtime 1.5x BR | | $0.69 | 50 | $1,122.75 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $19.91 | 1870 | $32,260.35 |
| Vacation (W) | 2 | $0.74 | 80 | $1,197.60 |
| Holiday (D) | 6 | $0.89 | 48 | $1,437.12 |
| Sick/Personal (D) | | $0.37 | 40 | $598.80 |
| Jury Duty (D) | | $0.44 | | $718.56 |
| Bereavement (D) | | $0.22 | | $359.28 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $2.66 | 240 | $4,311.36 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.49 | | $4,032.54 |
| Workers Comp | 0.036 | $0.72 | | $1,162.66 |
| Total | | $3.21 | | $5,195.21 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $27.82 | 0 | $45,585.64 |

## TC Services, LLC and UNITE HERE Local 21 AFL-CIO - Texitle Care Services

### Preventative Maintenance- 1 yr Employee Nov. 2020



TRW=$27.82
Increased
from   April 2019
1.85%

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension





Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn Housekeeper 2015

TRW = $18.60

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.10 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.45 | 50 | $832.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $12.79 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.47 | 80 | $888.00 |
| Holiday (D) | 6 | $0.57 | 48 | $1,065.60 |
| Sick/Personal (D) | 5 | $0.24 | 40 | $444.00 |
| Jury Duty (D) | 6 | $0.28 | | $532.80 |
| Bereavement (D) | 3 | $0.14 | | $266.40 |
| Total Compensable Non-Productive Work Time | | $1.71 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.60 | | $2,990.06 |
| Workers Comp | 0.036 | $0.46 | | $862.09 |
| Total | | $2.06 | | $3,852.16 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $18.60 | 0 | $34,788.18 |



**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn**

**Housekeeper 2015**

TRW=$18.60

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn
Housekeeper
2016

TRW= $18.77
Increased
from 2015
0.89%



| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.21 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.45 | 50 | $832.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $12.92 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.48 | 80 | $888.00 |
| Holiday (D) | 6 | $0.58 | 48 | $1,065.60 |
| Sick/Personal (D) | 5 | $0.24 | 40 | $444.00 |
| Jury Duty (D) | 6 | $0.29 | | $532.80 |
| Bereavement (D) | 3 | $0.14 | | $266.40 |
| Total Compensable Non-Productive Work Time | | $1.73 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.61 | | $2,990.06 |
| Workers Comp | 0.036 | $0.47 | | $862.09 |
| Total | | $2.08 | | $3,852.16 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $18.77 | 0 | $34,788.18 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn

Housekeeper

2016

TRW= $18.77 Increased from 2015 0.89%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn Housekeeper 2017

TRW = $18.94 Increased from 2016 0.89%

Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension

| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.32 | 2080 | $23,552.07 |
| Overtime 1.5x BR | | $0.45 | 50 | $849.23 |
| Lunch 30min/8hrs | | | 130.00 | |
| Rest 15min/4hrs | | | 130.00 | |
| Total Compensable Productive Work Time | | $13.05 | 1870 | $24,401.30 |
| Vacation (W) | 2 | $0.48 | 80 | $905.85 |
| Holiday (D) | 6 | $0.58 | 48 | $1,087.02 |
| Sick/Personal (D) | 5 | $0.24 | 40 | $452.92 |
| Jury Duty (D) | 6 | $0.29 | 48 | $543.51 |
| Bereavement (D) | 3 | $0.15 | 24 | $271.75 |
| Total Compensable Non-Productive Work Time | | $1.74 | 240 | $3,261.06 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $1.63 | | $3,050.16 |
| Workers Comp | 3.60% | $0.47 | | $879.42 |
| Total | | $2.10 | | $3,929.59 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $18.94 | 0 | $35,410.67 |



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn

**Housekeeper**
**2017**

$0.48  $0.58  $0.24  $0.29  $0.15  $0.08  $1.63  $0.47

$1.49

$13.05

$0.47

**TRW=$18.94 Increased from 2016 0.89%**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn Housekeeper 2018

TRW= $19.19 Increased from 2017 1.34%

$0.49  $0.59  $0.25  $0.30  $0.15  $0.08  $1.66  $0.48  $1.49  $13.24  $0.47

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension



| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.49 | 2080 | $23,905.35 |
| Overtime 1.5x BR | | $0.46 | 50 | $861.97 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $13.24 | 1870 | $24,767.32 |
| Vacation (W) | 2 | $0.49 | 80 | $919.44 |
| Holiday (D) | 6 | $0.59 | 48 | $1,103.32 |
| Sick/Personal (D) | 5 | $0.25 | 40 | $459.72 |
| Jury Duty (D) | 6 | $0.30 | | $551.66 |
| Bereavement (D) | 3 | $0.15 | | $275.83 |
| Total Compensable Non-Productive Work Time | | $1.77 | 240 | $3,309.97 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $1.66 | | $3,095.92 |
| Workers Comp | 3.60% | $0.48 | | $892.61 |
| Total | | $2.13 | | $3,988.53 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $19.19 | 0 | $35,884.55 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn

Housekeeper
2018

$0.49  $0.59  $0.25  $0.30  $0.15  $0.08  $1.66  $0.48  $1.49  $0.47

$13.24

TRW=$19.19
Increased
from   2017
1.34%

- Base Pay & OT     - Vacation     - Holiday     - Personal/Sick
- Jury Duty     - Bereavement     - Uniforms     - Taxes
- Workers Comp     - Health & Welfare     - Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn
Housekeeper
2019

TRW= $19.45
Increased
from: 2018
1.34%

$0.50
$0.60
$0.25
$0.15
$0.08
$1.68
$0.48
$1.39
$0.47
$13.44

■ Base Pay & OT  ■ Vacation  ■ Holiday  ■ Personal/Sick  ■ Jury Duty  ■ Bereavement  ■ Uniforms  ■ Taxes  ■ Workers Comp  ■ Health & Welfare  ■ Pension

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.67 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.47 | 50 | $832.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $13.44 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.50 | 80 | $888.00 |
| Holiday (D) | 6 | $0.60 | 48 | $1,065.60 |
| Sick/Personal (D) | 5 | $0.25 | 40 | $444.00 |
| Jury Duty (D) | 6 | $0.30 | | $532.80 |
| Bereavement (D) | 3 | $0.15 | | $266.40 |
| Total Compensable Non-Productive Work Time | | $1.80 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.68 | | $2,990.06 |
| Workers Comp | 0.036 | $0.48 | | $862.09 |
| Total | | $2.16 | | $3,852.16 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $19.45 | 0 | $34,788.18 |



**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn**

**Housekeeper**
**2019**

$0.60
$0.25
$0.30
$0.50
$0.15
$0.08
$1.68
$0.48
$13.44
$1.49
$0.47

TRW=$19.45
Increased
from   2018
1.34%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn Housekeeper 2020

TRW= $19.71
Increased from 2019
1.34%

$0.51  $0.61  $0.30 $0.15  $0.08  $1.71  $0.49  $1.49  $0.47  $13.64

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension

| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.84 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.47 | 50 | $832.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensated Productive Work Time | | $13.64 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.51 | 80 | $888.00 |
| Holiday (D) | 6 | $0.61 | 48 | $1,065.60 |
| Sick/Personal (D) | | $0.25 | 40 | $444.00 |
| Jury Duty (D) | | $0.30 | | $532.80 |
| Bereavement (D) | | $0.15 | | $266.40 |
| Total Compensated Non-Productive Work Time | | $1.82 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.71 | | $2,990.06 |
| Workers Comp | 0.036 | $0.49 | | $862.09 |
| Total | | $2.20 | | $3,852.16 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $19.71 | 0 | $34,788.18 |



## Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Residence Inn

### Housekeeper
### 2020

$0.61
$0.51
$0.25
$0.30
$0.15
$0.08
$1.71
$0.49
$1.49
$13.64
$0.47

### TRW=$19.71
### Increased from 2019
### 1.34%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension





Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites
Apprentice
2015

TRW = $26.53

$18.91

$0.70

$0.83

$0.35

$0.43

$0.21

$0.08

$2.36

$0.68

$1.49

$0.47

▪ Base Pay & OT   ▪ Vacation   ▪ Holiday   ▪ Personal/Sick   ▪ Jury Duty   ▪ Bereavement   ▪ Uniforms   ▪ Taxes   ▪ Workers Comp   ▪ Health & Welfare   ▪ Pension



| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $16.41 | 2080 | $34,132.80 |
| Overtime 1.5x BR | | $0.66 | 50 | $1,230.75 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $18.91 | 1870 | $35,363.55 |
| Vacation (W) | 2 | $0.70 | 80 | $1,312.80 |
| Holiday (D) | 6 | $0.84 | 48 | $1,575.36 |
| Sick/Personal (D) | 5 | $0.35 | 40 | $656.40 |
| Jury Duty (D) | 6 | $0.42 | | $787.68 |
| Bereavement (D) | 3 | $0.21 | | $393.84 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $2.53 | 240 | $4,726.08 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.36 | | $4,420.44 |
| Workers Comp | 0.036 | $0.68 | | $1,274.50 |
| Total | | $3.05 | | $5,694.95 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $26.53 | 0 | $49,603.30 |

**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites**

**Apprentice 2015**

$0.70  $0.84  $0.35  $0.42  $0.08  $2.36  $0.68

$1.49

$18.91

$0.47

**TRW=$26.53**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension





| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $16.41 | 2080 | $34,132.80 |
| Overtime 1.5x BR | | $0.66 | 50 | $1,230.75 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $18.91 | 1870 | $35,363.55 |
| Vacation (W) | 2 | $0.70 | 80 | $1,312.80 |
| Holiday (D) | 6 | $0.84 | 48 | $1,575.36 |
| Sick/Personal (D) | 5 | $0.35 | 40 | $656.40 |
| Jury Duty (D) | 6 | $0.42 | | $787.68 |
| Bereavement (D) | 3 | $0.21 | | $393.84 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $2.53 | 240 | $4,726.08 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.36 | | $4,420.44 |
| Workers Comp | 0.036 | $0.68 | | $1,274.50 |
| Total | | $3.05 | | $5,694.95 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $26.53 | 0 | $49,603.30 |

**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites**

**Apprentice**
**2016**

TRW= $26.53
Increased
from 2015
0.00%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites
Apprentice
2017

TRW= $26.78
Increased
from 2016
0.96%

$0.71   $0.85   $0.35   $0.43   $0.21
$0.08
$2.39
$0.6
$19.11
$1.49
$0.47

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $16.58 | 2080 | $34,486.40 |
| Overtime 1.5x BR | | $0.66 | 50 | $1,243.50 |
| Lunch 30min/8hrs | | | 130.00 | |
| Rest 15min/4hrs | | | 130.00 | |
| Total Compensable Productive Work Time | | $19.11 | 1870 | $35,729.90 |
| Vacation (W) | 2 | $0.71 | 80 | $1,326.40 |
| Holiday (D) | 6 | $0.85 | 48 | $1,591.68 |
| Sick/Personal (D) | 5 | $0.35 | 40 | $663.20 |
| Jury Duty (D) | 6 | $0.43 | 48 | $795.84 |
| Bereavement (D) | 3 | $0.21 | 24 | $397.92 |
| Total Compensable Non-Productive Work Time | | $2.55 | 240 | $4,775.04 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $2.39 | | $4,466.24 |
| Workers Comp | 3.60% | $0.69 | | $1,287.71 |
| Total | | $3.08 | | $5,753.94 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $26.78 | 0 | $50,077.61 |



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites

Apprentice
2017

TRW=$26.78
Increased
from  2016
0.96%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites
Apprentice
2018

$0.72  $0.86  $0.36  $0.43  $0.22  $0.08  $2.42  $0.79  $1.49  $0.47  $19.38

TRW= $27.14
Increased
from 2017
1.34%

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $16.82 | 2080 | $34,985.60 |
| Overtime 1.5x BR | | $0.67 | 50 | $1,261.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $19.38 | 1870 | $36,247.10 |
| Vacation (W) | 2 | $0.72 | 80 | $1,345.60 |
| Holiday (D) | 6 | $0.86 | 48 | $1,614.72 |
| Sick/Personal (D) | 5 | $0.36 | 40 | $672.80 |
| Jury Duty (D) | 6 | $0.43 | | $807.36 |
| Bereavement (D) | 3 | $0.22 | | $403.68 |
| Total Compensable Non-Productive Work Time | | $2.59 | 240 | $4,844.16 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $2.42 | | $4,530.89 |
| Workers Comp | 3.60% | $0.70 | | $1,306.35 |
| Total | | $3.12 | | $5,837.23 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $27.14 | 0 | $50,747.22 |



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites

Apprentice
2018

$0.72  $0.86  $0.36  $0.43  $0.22  $0.08  $2.42  $0.70  $1.49  $19.38  $0.47

TRW=$27.14
Increased
from   2017
1.34%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites
Apprentice
2019

TRW= $27.53
Increased
from: 2018
1.43%

$0.73  $0.88  $0.37  $0.44  $0.22
$0.08
$2.46
$0.7
$1.49
$19.68
$0.47

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $17.08 | 2080 | $34,132.80 |
| Overtime 1.5x BR | | $0.69 | 50 | $1,230.75 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $19.68 | 1870 | $35,363.55 |
| Vacation (W) | 2 | $0.73 | 80 | $1,312.80 |
| Holiday (D) | 6 | $0.88 | 48 | $1,575.36 |
| Sick/Personal (D) | 5 | $0.37 | 40 | $656.40 |
| Jury Duty (D) | 6 | $0.44 | | $787.68 |
| Bereavement (D) | 3 | $0.22 | | $393.84 |
| Total Compensable Non-Productive Work Time | | $2.63 | 240 | $4,726.08 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.46 | | $4,420.44 |
| Workers Comp | 0.036 | $0.71 | | $1,274.50 |
| Total | | $3.17 | | $5,694.95 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $27.53 | 0 | $49,603.30 |

**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites**

**Apprentice 2019**



$0.73  $0.88  $0.37  $0.44  $0.22  $0.08  $2.46  $0.71  $1.49  $0.47

$19.68

TRW=$27.53
Increased
from   2018
1.43%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension

P 01285



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites
Apprentice
2020

TRW= $27.90
Increased
from 2019
1.36%

$0.74  $0.89  $0.37  $0.44  $0.22  $0.08  $2.50  $0.72  $1.49  $0.47

$19.97

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension

| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $17.33 | 2080 | $34,132.80 |
| Overtime 1.5x BR | | $0.70 | 50 | $1,230.75 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $19.97 | 1870 | $35,363.55 |
| Vacation (W) | 2 | $0.74 | 80 | $1,312.80 |
| Holiday (D) | 6 | $0.89 | 48 | $1,575.36 |
| Sick/Personal (D) | | $0.37 | 40 | $656.40 |
| Jury Duty (D) | | $0.44 | | $787.68 |
| Bereavement (D) | | $0.22 | | $393.84 |
| Total Compensable Non-Productive Work Time | | $2.67 | 240 | $4,726.08 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.50 | | $4,420.44 |
| Workers Comp | 0.036 | $0.72 | | $1,274.50 |
| Total | | $3.22 | | $5,694.95 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $27.90 | 0 | $49,603.30 |



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Inn & Suites

Apprentice
2020

TRW=$27.90
Increased
from  2019
1.36%

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension





Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott
Housekeeper
2015

TRW=$18.60

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.10 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.45 | 50 | $832.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $12.79 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.47 | 80 | $888.00 |
| Holiday (D) | 6 | $0.57 | 48 | $1,065.60 |
| Sick/Personal (D) | 5 | $0.24 | 40 | $444.00 |
| Jury Duty (D) | 6 | $0.28 | | $532.80 |
| Bereavement (D) | 3 | $0.14 | | $266.40 |
| Total Compensable Non-Productive Work Time | | $1.71 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.60 | | $2,990.06 |
| Workers Comp | 0.036 | $0.46 | | $862.09 |
| Total | | $2.06 | | $3,852.16 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $18.60 | 0 | $34,788.18 |



**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott**
**Housekeeper**
**2015**

$0.47  $0.57  $0.24  $0.28  $0.14  $0.08  $1.60  $0.46
$12.79
$1.49
$0.47

**TRW=$18.60**

Base Pay & OT ⬩ Vacation ⬩ Holiday ⬩ Personal/Sick
Jury Duty ⬩ Bereavement ⬩ Uniforms ⬩ Taxes
Workers Comp ⬩ Health & Welfare ⬩ Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott
Housekeeper
2016

TRW= $18.77
Increased
from 2015
0.88%

$0.48  $0.58  $0.24  $0.29  $0.14
$0.08
$1.61  $0.47
$1.49
$12.92
$0.47

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.21 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.45 | 50 | $832.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $12.92 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.48 | 80 | $888.00 |
| Holiday (D) | 6 | $0.58 | 48 | $1,065.60 |
| Sick/Personal (D) | 5 | $0.24 | 40 | $444.00 |
| Jury Duty (D) | 6 | $0.29 | | $532.80 |
| Bereavement (D) | 3 | $0.14 | | $266.40 |
| Total Compensable Non-Productive Work Time | | $1.73 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.61 | | $2,990.06 |
| Workers Comp | 0.036 | $0.47 | | $862.09 |
| Total | | $2.08 | | $3,852.16 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $18.77 | 0 | $34,788.18 |



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott

Housekeeper

2016

$0.48  $0.58  $0.24  $0.29  $0.14  $0.08  $1.61  $0.47  $1.49  $0.47

$12.92

TRW= $18.77
Increased
from  2015
0.88%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott Housekeeper 2017

TRW= $18.93 Increased from 2016 0.89%



| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.32 | 2080 | $23,549.97 |
| Overtime 1.5x BR | | $0.45 | 50 | $849.16 |
| Lunch 30min/8hrs | | | 130.00 | |
| Rest 15min/4hrs | | | 130.00 | |
| Total Compensable Productive Work Time | | $13.05 | 1870 | $24,399.13 |
| Vacation (W) | 2 | $0.48 | 80 | $905.77 |
| Holiday (D) | 6 | $0.58 | 48 | $1,086.92 |
| Sick/Personal (D) | 5 | $0.24 | 40 | $452.88 |
| Jury Duty (D) | 6 | $0.29 | 48 | $543.46 |
| Bereavement (D) | 3 | $0.15 | 24 | $271.73 |
| Total Compensable Non-Productive Work Time | | $1.74 | 240 | $3,260.76 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $1.63 | | $3,049.89 |
| Workers Comp | 3.60% | $0.47 | | $879.34 |
| Total | | $2.10 | | $3,929.24 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $18.93 | 0 | $35,407.85 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott

**Housekeeper**

**2017**

$0.48  $0.58  $0.24  $0.29  $0.15  $0.08  $1.63  $0.47  $1.49  $0.47  $13.05

**TRW=$18.93 Increased from 2016 0.89%**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott Housekeeper 2018

TRW= $19.19 Increased from 2017 1.34%

$0.49  $0.59  $0.25  $0.29  $0.15  $0.08  $1.66  $0.48  $1.49  $0.47  $13.24

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension



| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.49 | 2080 | $23,903.22 |
| Overtime 1.5x BR | | $0.46 | 50 | $861.89 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $13.24 | 1870 | $24,765.11 |
| Vacation (W) | 2 | $0.49 | 80 | $919.35 |
| Holiday (D) | 6 | $0.59 | 48 | $1,103.23 |
| Sick/Personal (D) | 5 | $0.25 | 40 | $459.68 |
| Jury Duty (D) | 6 | $0.29 | | $551.61 |
| Bereavement (D) | 3 | $0.15 | | $275.81 |
| Total Compensable Non-Productive Work Time | | $1.77 | 240 | $3,309.68 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $1.66 | | $3,095.64 |
| Workers Comp | 3.60% | $0.48 | | $892.53 |
| Total | | $2.13 | | $3,988.17 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $19.19 | 0 | $35,881.69 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott

**Housekeeper**

**2018**

$0.49  $0.59  $0.25  $0.29  $0.15  $0.08  $1.66  $0.48  $1.49  $0.47

$13.24

TRW=$19.19
Increased
from  2017
1.34%

Base Pay & OT   Vacation   Holiday   Personal/Sick
Jury Duty   Bereavement   Uniforms   Taxes
Workers Comp   Health & Welfare   Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott
Housekeeper
2019

TRW= $19.45
Increased
from: 2018
1.34%

$0.50  $0.60  $0.25  $0.30  $0.15  $0.08  $1.68  $0.48  $1.49  $0.47

$13.44

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.66 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.47 | 50 | $832.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $13.44 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.50 | 80 | $888.00 |
| Holiday (D) | 6 | $0.60 | 48 | $1,065.60 |
| Sick/Personal (D) | 5 | $0.25 | 40 | $444.00 |
| Jury Duty (D) | 6 | $0.30 | | $532.80 |
| Bereavement (D) | 3 | $0.15 | | $266.40 |
| Total Compensable Non-Productive Work Time | | $1.80 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.68 | | $2,990.06 |
| Workers Comp | 0.036 | $0.48 | | $862.09 |
| Total | | $2.16 | | $3,852.16 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $19.45 | 0 | $34,788.18 |

**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott**

**Housekeeper**
**2019**



$13.44 $0.50 $0.60 $0.25 $0.30 $0.15 $0.08 $1.68 $0.48 $1.49 $0.47

**TRW=$19.45**
**Increased**
**from   2018**
**1.34%**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott
Housekeeper
2020

TRW= $19.71
Increased
from 2019
1.34%

$0.51    $0.61    $0.25    $0.30    $0.15    $0.08    $1.71    $0.49    $1.49    $0.47

$13.64

⚊ Base Pay & OT    ⚊ Vacation    ⚊ Holiday    ⚊ Personal/Sick    ⚊ Jury Duty    ⚊ Bereavement    ⚊ Uniforms    ⚊ Taxes    ⚊ Workers Comp    ⚊ Health & Welfare    ■ Pension

| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.84 | 2080 | $23,088.00 |
| Overtime 1.5x BR | | $0.47 | 50 | $832.50 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $13.64 | 1870 | $23,920.50 |
| Vacation (W) | 2 | $0.51 | 80 | $888.00 |
| Holiday (D) | 6 | $0.61 | 48 | $1,065.60 |
| Sick/Personal (D) | | $0.25 | 40 | $444.00 |
| Jury Duty (D) | | $0.30 | | $532.80 |
| Bereavement (D) | | $0.15 | | $266.40 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $1.82 | 240 | $3,196.80 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.71 | | $2,990.06 |
| Workers Comp | 0.036 | $0.49 | | $862.09 |
| Total | | $2.20 | | $3,852.16 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $19.71 | 0 | $34,788.18 |



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Marriott

Housekeeper

2020

$0.51  $0.61  $0.25  $0.30  $0.15  $0.08  $1.71  $0.49  $1.49  $0.47  $13.64

TRW=$19.71 Increased from 2019 1.34%

Base Pay & OT   Vacation   Holiday   Personal/Sick
Jury Duty   Bereavement   Uniforms   Taxes
Workers Comp   Health & Welfare   Pension



| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $9.30 | 2080 | $19,344.00 |
| Overtime 1.5x BR | | $0.37 | 50 | $697.50 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $10.72 | 1870 | $20,041.50 |
| Vacation (W) | 2 | $0.40 | 80 | $744.00 |
| Holiday (D) | 6 | $0.48 | 48 | $892.80 |
| Sick/Personal (D) | 5 | $0.20 | 40 | $372.00 |
| Jury Duty (D) | 6 | $0.24 | | $446.40 |
| Bereavement (D) | 3 | $0.12 | | $223.20 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $1.43 | 240 | $2,678.40 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.34 | | $2,505.19 |
| Workers Comp | 0.036 | $0.39 | | $722.30 |
| Total | | $1.73 | | $3,227.48 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $15.92 | 0 | $29,766.11 |



**Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand**
**Busperson**
**2015**

$0.40  $0.48  $0.20  $0.24  $0.12  $0.08  $1.34  $0.39  $1.49  $0.47  $10.72

**TRW=$15.92**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Busperson
2015

TRW= $15.92

$0.40
$0.48
$0.20
$0.24
$0.12
$0.08
$1.34
$0.39
$1.49
$0.47
$10.72

⋈ Base Pay & OT  ⋄ Vacation  ⋈ Holiday  ⋄ Personal/Sick  ⋈ Jury Duty  ⋈ Bereavement  ⋈ Uniforms  ⋈ Taxes  ⋈ Workers Comp  ⋈ Health & Welfare  ⋈ Pension

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand

Busperson
2016

TRW=$16.44
Increased
from 2015
3.28%

$0.40
$0.21 $0.25 $0.12
$0.50 $0.08 $1.39
$0.41 $1.49

$0.47

$11.12

▪ Base Pay & OT  ▪ Vacation  ▪ Holiday  ▪ Personal/Sick  ▪ Jury Duty  ▪ Bereavement  ▪ Uniforms  ▪ Taxes  ▪ Workers Comp  ▪ Health & Welfare  ▪ Pension



| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $9.65 | 2080 | $19,344.00 |
| Overtime 1.5x BR | | $0.39 | 50 | $697.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $11.12 | 1870 | $20,041.50 |
| Vacation (W) | 2 | $0.41 | 80 | $744.00 |
| Holiday (D) | 6 | $0.50 | 48 | $892.80 |
| Sick/Personal (D) | 5 | $0.21 | 40 | $372.00 |
| Jury Duty (D) | 6 | $0.25 | | $446.40 |
| Bereavement (D) | 3 | $0.12 | | $223.20 |
| Total Compensable Non-Productive Work Time | | $1.49 | 240 | $2,678.40 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.39 | | $2,505.19 |
| Workers Comp | 0.036 | $0.40 | | $722.30 |
| Total | | $1.79 | | $3,227.48 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $16.44 | 0 | $29,766.11 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand

Busperson
2016

$0.50    $0.2  $0.25    $0.12
$0.41                    $0.08  $1.39    $0.40
                                        $1.49
$11.12
                                        $0.47

TRW= $16.44
Increased
from  2015
3.28%

⊤ Base Pay & OT    ⊤ Vacation    ⊥ Holiday    ⊤ Personal/Sick
⊥ Jury Duty    ⊥ Bereavement    ■ Uniforms    ⊥ Taxes
■ Workers Comp    ≡ Health & Welfare    ■ Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Busperson
2017

TRW= $16.58
Increased
from 2016
0.88%

Base Pay & OT ☐ Vacation ☐ Holiday ☐ Personal/Sick ☐ Jury Duty ☐ Bereavement ☐ Uniforms ☐ Taxes ☐ Workers Comp ☐ Health & Welfare ☐ Pension



| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $9.75 | 2080 | $20,272.72 |
| Overtime 1.5x BR | | $0.39 | 50 | $730.99 |
| Lunch 30min/8hrs | | | 130.00 | |
| Rest 15min/4hrs | | | 130.00 | |
| Total Compensable Productive Work Time | | $11.23 | 1870 | $21,003.71 |
| Vacation (W) | 2 | $0.42 | 80 | $779.72 |
| Holiday (D) | 6 | $0.50 | 48 | $935.66 |
| Sick/Personal (D) | 5 | $0.21 | 40 | $389.86 |
| Jury Duty (D) | 6 | $0.25 | 48 | $467.83 |
| Bereavement (D) | 3 | $0.13 | 24 | $233.92 |
| Total Compensable Non-Productive Work Time | | $1.50 | 240 | $2,806.99 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $1.40 | | $2,625.46 |
| Workers Comp | 3.60% | $0.40 | | $756.97 |
| Total | | $1.81 | | $3,382.44 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $16.58 | 0 | $31,011.86 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand

**Busperson**
**2017**

$0.42  $0.50  $0.21  $0.25  $0.13  $0.08  $1.40  $0.40

$1.49

$11.23

$0.47

TRW=$16.58
Increased
from  2016
0.88%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension





| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $9.89 | 2080 | $20,576.81 |
| Overtime 1.5x BR | | $0.40 | 50 | $741.95 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $11.40 | 1870 | $21,318.76 |
| Vacation (W) | 2 | $0.42 | 80 | $791.42 |
| Holiday (D) | 6 | $0.51 | 48 | $949.70 |
| Sick/Personal (D) | 5 | $0.21 | 40 | $395.71 |
| Jury Duty (D) | 6 | $0.25 | | $474.85 |
| Bereavement (D) | 3 | $0.13 | | $237.42 |
| Total Compensable Non-Productive Work Time | | $1.52 | 240 | $2,849.10 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $1.43 | | $2,664.85 |
| Workers Comp | 3.60% | $0.41 | | $768.33 |
| Total | | $1.84 | | $3,433.17 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $16.80 | 0 | $31,419.76 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand

Busperson
2018

$0.42  $0.51  $0.21  $0.25  $0.13  $0.08  $1.43  $0.41  $1.49  $0.47  $11.40

TRW=$16.80
Increased
from   2017
1.32%

- Base Pay & OT    - Vacation    - Holiday    - Personal/Sick
- Jury Duty    - Bereavement    - Uniforms    - Taxes
- Workers Comp    - Health & Welfare    - Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Busperson
2019

TRW= $17.02
Increased
from: 2018
1.32%





| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.19 | 2080 | $19,344.00 |
| Overtime 1.5x BR | | $0.41 | 50 | $697.50 |
| | | | | |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| | | | | |
| Total Compensable Productive Work Time | | $11.74 | 1870 | $20,041.50 |
| Vacation (W) | 2 | $0.44 | 80 | $744.00 |
| Holiday (D) | 6 | $0.52 | 48 | $892.80 |
| Sick/Personal (D) | | $0.22 | 40 | $372.00 |
| Jury Duty (D) | | $0.26 | | $446.40 |
| Bereavement (D) | | $0.13 | | $223.20 |
| | | | | |
| Total Compensable Non-Productive Work Time | | $1.57 | 240 | $2,678.40 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.47 | | $2,505.19 |
| Workers Comp | 0.036 | $0.42 | | $722.30 |
| Total | | $1.89 | | $3,227.48 |
| | | | | |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| | | | | |
| Total Real Wage Per Productive Hour | | $17.25 | 0 | $29,766.11 |

Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand

**Busperson**

**2020**

$0.52   $0.22   $0.26   $0.13   $0.08   $1.47   $0.42   $0.44   $11.74   $1.49   $0.47

TRW=$17.25
Increased from 2019
1.32%

Base Pay & OT   Vacation   Holiday   Personal/Sick
Jury Duty   Bereavement   Uniforms   Taxes
Workers Comp   Health & Welfare   Pension

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.04 | 2080 | $19,344.00 |
| Overtime 1.5x BR | | $0.40 | 50 | $697.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $11.57 | 1870 | $20,041.50 |
| Vacation (W) | 2 | $0.43 | 80 | $744.00 |
| Holiday (D) | 6 | $0.52 | 48 | $892.80 |
| Sick/Personal (D) | 5 | $0.21 | 40 | $372.00 |
| Jury Duty (D) | 6 | $0.26 | | $446.40 |
| Bereavement (D) | 3 | $0.13 | | $223.20 |
| Total Compensable Non-Productive Work Time | | $1.55 | 240 | $2,678.40 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.45 | | $2,505.19 |
| Workers Comp | 0.036 | $0.42 | | $722.30 |
| Total | | $1.86 | | $3,227.48 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $17.02 | 0 | $29,766.11 |



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand

Busperson
2019

$0.52  $0.21  $0.26  $0.13
$0.43  $0.08  $1.45  $0.42
$1.49
$11.57
$0.47

TRW=$17.02
Increased
from  2018
1.32%

⊤ Base Pay & OT    ˙ Vacation    ≅ Holiday    ⁻ Personal/Sick
≅ Jury Duty    ˙ Bereavement    ▦ Uniforms    ≅ Taxes
▪ Workers Comp    ≅ Health & Welfare    ▪ Pension



# INDEX

Accrued Sick Leave for Server/Bellperson . . 36
Age and Hour Eligibility . . 37
Agreement . . 43
Agreement Supersedes Prior Agreements . . 42
APPENDIX "A" . . 45
APPENDIX "B" . . 50
APPENDIX "C" . . 53
APPENDIX "D" . . 55
APPENDIX "E" . . 57
APPENDIX "F" . . 60
APPENDIX "G" . . 61
APPENDIX "H" . . 62
APPENDIX "I" . . 65
APPENDIX "J" . . 72
Arbitrator Decision . . 18
Arbitrator Expense . . 18
ATTACHMENT "A" . . 71
Authority of Arbitrator . . 18
Banquet Employee Compensation . . 33
Banquet Server Working Cashier Pay . . 34
Becomes Ill During Vacation . . 31
Bereavement . . 21
Bi-Weekly Vacation Accrual . . 30
Bulletin Boards . . 32
Business Representative . . 20
Check Received for Jury Duty . . 22
Communication . . 41
Confidentiality . . 10
Declaration of War . . 42
Disability Retirements . . 38
Discharged Employee Seniority . . 8
Discipline and Discharge . . 9
Discrimination . . 39
Doctor's Certificate . . 36
Dues Checkoff List . . 2
Duration . . 42
Early Retirement Age . . 38
Eighteen (18) Months No Discipline . . 10
Election of Remedies . . 18
Emergency Callbacks . . 23
Employee's Human Resources File . . 11
Employer's Right to Amend Pension Plan . . 38

124

| | |
|---|---|
| Equal Qualifications.. | .5 |
| Failure to Report. | .20 |
| *Fifteen (15) Minute* Break.. | .26 |
| First.. | .6 |
| FMLA. | .19 |
| *Forty (40) Hours* Vacation Pay . | .29 |
| Fourth.. | .7 |
| Grievance and Arbitration Procedure.. | .11 |
| Grievance During Work Hours.. | .19 |
| Grievance Time Limitations. | .18 |
| Health, Safety and Sick Benefits . | .35 |
| Higher Rated Job Pay . | .32 |
| Holiday Comes During Vacation . | .28 |
| Holiday Pay.. | .27 |
| Holiday While Sick.. | .28 |
| Holidays. | .27 |
| Housekeeper Premium Pay . | .23 |
| Immediate Family Definition.. | .21 |
| Incapacitated Employees . | .8 |
| Insurance Benefits . | .31 |
| Job Openings.. | .3 |
| Jury Duty.. | .21 |
| Lateral Service.. | .42 |
| Leave Because of Occupational Injury.. | .33 |
| Leave for Education . | .20 |
| Leave for Non-Immediate Family.. | .21 |
| Leave of Absence . | .19 |
| Leave of Absence Benefits.. | .22 |
| Limited Period of Alternative Work.. | .33 |
| Lower Paying Job. | .33 |
| Mail Warning Notices . | .10 |
| Maintenance Boiler Pay.. | .32 |
| Maintenance Tool Allowance . | .39 |
| Management Rights.. | .40 |
| Meal Periods . | .25 |
| Medical Leave of Absence.. | .20 |
| Minimum Wage.. | .32 |
| Mistakes on Paycheck . | .19 |
| Monthly Dues and Initiation Fees. | .3 |
| Names of Union Stewards . | .19 |
| New Classifications.. | .33 |
| New Location Seniority.. | .7 |
| New Member Orientation.. | .3 |
| No Discharge Without Just Cause . | .9 |
| No Guarantee of Hours. | .24 |
| No Loss of Pay.. | .28 |
| No Make-up Time.. | .23 |
| No Strike or Lockout.. | .38 |

No Work Alone. .27
Nonconsecutive Days Off. .23
Normal Pension Benefit. .38
Normal Retirement Age.. .37
Notification of Recall.. .5
Offer of Overtime. .25
Optional Methods for Payment.. .38
Overtime.. .22
Overtime While Present.. .25
Paid Accumulated Vacation Pay.. .31
Paid Over Scale.. .33
Paid Personal Day in Advance of Anniversary Date.. .28
Paid Personal Days.. .28
Pay in Advance of Vacation.. .30
Pension Plan.. .37
Pension Plan Eligibility. .37
Permanent Job Openings.. .6
Political Contribution.. .4
Political Contribution Liability. .4
Posting of Rules. .11
Preferential Work Schedules.. .24
Probationary Period.. .8
Provide Meals. .26
Rate Increases. .33
Recall. .5
Recognition.. .1
Re-employment of Armed Forces. .8
Refuse to go Through Legal Picket Line. .39
Reporting Pay. .24
Respect & Dignity.. .40
Retirees Working.. .8
Right of Review.. .10
Rules or Regulations.. .2
Safe Work Environment. .37
Second.. .6
Seniority. .4
Seniority and Holiday.. .27
Seniority Definition. .5
Seniority During Leave of Absence.. .21
Seniority Outside Coverage. .8
Seniority Preference. .6
Seniority Rights. .54
Server and Bellperson Vacation Pay. .29
Shift Preference. .7
Sick Leave Conversion.. .36
Sick Leave for Employees Hired On or After September 1, 2005.. .35
Sick Leave for Employees Hired Prior to September 1, 2005. .35
Specialized Tools and Test Equipment.. .39

126

| | |
|---|---|
| Split Shift.. | .34 |
| Successorship . | .41 |
| Suspension and Discharges.. | .9 |
| Temporary Employees. | .2 |
| Temporary Hours Reductions.. | .24 |
| Temporary Work Reassignments . | .37 |
| Third.. | .6 |
| Time off for Union Activity . | .20 |
| Tip Check-Off.. | .4 |
| Tipped Employee Vacation Adjustment.. | .29 |
| Tool Allowance Prorated . | .39 |
| TOTAL REAL WAGE PIE CHARTS. | .73 |
| Trial Period.. | .7 |
| Uniforms and Laundry . | .32 |
| Union Buttons. | .39 |
| Union Insurance Benefits.. | .2 |
| Union Membership. | .1 |
| Union Representative. | .3 |
| Union Security . | .1 |
| UNITE HERE 401K Plan . | .38 |
| Up to Date Seniority List . | .8 |
| Vacation Requests . | .30 |
| Vacation Sign-Up List.. | .30 |
| Vacations . | .28 |
| Vacations in *One (1) Hour* Increments . | .31 |
| Vacations Within the Year . | .31 |
| Vesting Service.. | .38 |
| Wage Increases. | .42 |
| Work Schedules. | .23 |
| Workweek . | .22 |
| Written Notices. | .9 |
| Year Round Vacation.. | .31 |

Page 150 of 150
P 01318

EXHIBIT NO. __**GC 9**__ RECEIVED __✔__ REJECTED _____

CASE NO. __**18-CA-151245**__ CASE NAME __**Richfield**__

NO. OF PAGES __**1**__ DATE __**12/15/15**__ REPORTER __**SMW**__

Dear Rattler Employees,

Some of you have asked questions concerning management's Last, Best and Final offer and how it impacts you individually. We urge you to deal directly with the union on this issue as the union has been given individualized pie charts reflecting exactly what management's Last, Best and Final proposal is for each member of the bargaining unit.

Sincerely,

Michael Henry

GCX 9

Page 2 of 2

# OFFICIAL REPORT OF PROCEEDINGS
## before the
# NATIONAL LABOR RELATIONS BOARD

Volume 3 of

## GENERAL COUNSEL EXHIBITS

In the Matter of:

RICHFIELD HOSPITALITY, INC. AS
MANAGING AGENT FOR KAHLER HOTELS, LLC,

       Respondent,

and                                          Case No. 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21,

       Charging Party.

| Party: | GENERAL COUNSEL 10-14, 18, 19 |
|---|---|

Date:      December 15-17, 2015

Place:     Rochester, Minnesota

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

**GC 10(a) - 10(l)**

EXHIBIT NO._____ RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **114** DATE **12/15/15** REPORTER **SMW**



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Andrew Vacura Lead Cook DOH 2/27/2005
2015

TRW= $30.10

$1.24  $0.99  $0.91  $0.00  $0.00
                    $0.19
                           $2.97
                                  $0.83
                                  $1.70
$20.58
                                  $0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

GC Exhibit 10(a)

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $18.82 | 1,824 | 34,328 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 114 | |
| Rest 15min/4hrs | | | 114 | |
| Total Compensable Productive Work Time | | $20.58 | 1,824 | 37,546 |
| Vacation (W) | 3 | $1.24 | 120 | 2,258 |
| Holiday (D) | 6 | $0.99 | 48 | 1,807 |
| Sick/Personal (D) | 11 | $0.91 | 88 | 1,656 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $3.14 | 256 | 5,721 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $2.97 | | 5,408 |
| Workers Comp | 0.0349 | $0.83 | | 1,510 |
| Total | | $3.79 | | 6,918 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.70 | | - |
| Pension | | $0.69 | | 1,261 |
| Total | | $2.39 | | 4,363 |
| Total Real Wage Per Productive Hour | | $30.10 | - | 54,898 |



**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Andrew Vacura Lead Cook DOH 2/27/2005

2015

$1.24  $0.99  $0.91  $0.00  $0.00  $0.19  $2.97  $0.83  $1.70  $0.69

$20.53

TRW=$30.10

☒ Base Pay & OT    ☒ Vacation    ☒ Holiday    ☒ Personal/Sick
☒ Jury Duty    ☒ Bereavement    ☒ Uniforms    ☒ Taxes
☒ Workers Comp    ☒ Health & Welfare    ☒ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Andrew Vacura Lead Cook DOH 2/27/2005
2016

TRW= $30.56
Increased
from 2015
1.54%

$1.26  $1.01  $0.92  $0.00  $0.00
                        $0.19
                               $3.01
                                      $0.84
$20.89                                       $1.75

                                             $0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $19.10 | 1,824 | 34,328 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 114 | |
| Rest 15min/4hrs | | | 114 | |
| Total Compensable Productive Work Time | | $20.89 | 1,824 | 37,546 |
| Vacation (W) | 3 | $1.26 | 120 | 2,258 |
| Holiday (D) | 6 | $1.01 | 48 | 1,807 |
| Sick/Personal (D) | 11 | $0.92 | 88 | 1,656 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $3.18 | 256 | 5,721 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $3.01 | | 5,408 |
| Workers Comp | 0.0349 | $0.84 | | 1,510 |
| Total | | $3.85 | | 6,918 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.75 | | - |
| Pension | | $0.69 | | 1,261 |
| Total | | $2.44 | | 4,363 |
| Total Real Wage Per Productive Hour | | $30.56 | - | 54,898 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Andrew Vacura Lead Cook DOH 2/27/2005

2016

$1.26  $0.92  $0.00  $0.00  $0.19  $3.01  $0.84  $1.75  $0.69

$20.89

TRW= $30.56 Increased from 2015 1.54%

⊠ Base Pay & OT    ⊠ Vacation    ⊠ Holiday    ⊠ Personal/Sick
⊠ Jury Duty    ⊠ Bereavement    ⊠ Uniforms    ⊠ Taxes
■ Workers Comp    ⊠ Health & Welfare    ■ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Andrew Vacura Lead Cook DOH 2/27/2005
2017

TRW= $30.61 Increased from 2016 0.17%



| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $19.10 | 1,824 | 34,843 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 114 | |
| Rest 15min/4hrs | | | 114 | |
| Total Compensable Productive Work Time | | $20.89 | 1,824 | 38,109 |
| Vacation (W) | 3 | $1.26 | 120 | 2,292 |
| Holiday (D) | 6 | $1.01 | 48 | 1,834 |
| Sick/Personal (D) | 11 | $0.92 | 88 | 1,681 |
| Jury Duty (D) | 0 | $0.00 | - | - |
| Bereavement (D) | 0 | $0.00 | - | - |
| Total Compensable Non-Productive Work Time | | $3.18 | 256 | 5,807 |
| Uniforms | 3 | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 12.50% | $3.01 | | 5,490 |
| Workers Comp | 3.49% | $0.84 | | 1,533 |
| Total | | $3.85 | | 7,022 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.80 | | - |
| Pension | | $0.69 | | 1,261 |
| Total | | $2.50 | | 4,551 |
| Total Real Wage Per Productive Hour | | $30.61 | - | 55,840 |

Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Andrew Vacura Lead Cook DOH 2/27/2005

2017

$20.89

$1.26  $1.01  $0.92  $0.00  $0.00  $0.19  $3.01  $0.84  $1.80  $0.69

TRW=$30.61
Increased
from  2016
0.17%

⊠ Base Pay & OT    ⊠ Vacation    ⊠ Holiday    ⊠ Personal/Sick
⊠ Jury Duty    ⊠ Bereavement    ⊠ Uniforms    ⊠ Taxes
■ Workers Comp    ⊠ Health & Welfare    ■ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Andrew Vacura Lead Cook DOH 2/27/2005
2018

TRW= $31.09
Increased
from 2017
1.55%

| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $19.39 | 1,824 | 35,365 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 114 | |
| Rest 15min/4hrs | | | 114 | |
| Total Compensable Productive Work Time | | $21.21 | 1,824 | 38,681 |
| Vacation (W) | 3 | $1.28 | 120 | 2,327 |
| Holiday (D) | 6 | $1.02 | 48 | 1,861 |
| Sick/Personal (D) | 11 | $0.94 | 88 | 1,706 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | |
| Total Compensable Non-Productive Work Time | | $3.23 | 256 | 5,894 |
| Uniforms | 3 | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 12.50% | $3.05 | | 5,572 |
| Workers Comp | 3.49% | $0.85 | | 1,556 |
| Total | | $3.91 | | 7,128 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.86 | | - |
| Pension | | $0.69 | | 1,261 |
| Total | | $2.55 | | 4,650 |
| Total Real Wage Per Productive Hour | | $31.09 | - | 56,703 |

## Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Andrew Vacura Lead Cook DOH 2/27/2005



2018

TRW=$31.09
Increased
from  2017
1.55%

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Andrew Vacura Lead Cook DOH 2/27/2005
2019

TRW= $31.57
Increased
from: 2018
1.55%

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $19.68 | 1,824 | 34,328 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 114 | |
| Rest 15min/4hrs | | | 114 | |
| Total Compensable Productive Work Time | | $21.52 | 1,824 | 37,546 |
| Vacation (W) | 3 | $1.29 | 120 | 2,258 |
| Holiday (D) | 6 | $1.04 | 48 | 1,807 |
| Sick/Personal (D) | 11 | $0.95 | 88 | 1,656 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $3.28 | 256 | 5,721 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $3.10 | | 5,408 |
| Workers Comp | 0.0349 | $0.87 | | 1,510 |
| Total | | $3.97 | | 6,918 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.91 | | - |
| Pension | | $0.69 | | 1,261 |
| Total | | $2.61 | | 4,363 |
| Total Real Wage Per Productive Hour | | $31.57 | - | 54,898 |



## Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Andrew Vacura Lead Cook DOH 2/27/2005

**2019**

TRW=$31.57
Increased
from   2018
1.55%

⌘ Base Pay & OT    ⌘ Vacation    ⌘ Holiday    ⌘ Personal/Sick
⌘ Jury Duty    ⌘ Bereavement    ⌘ Uniforms    ⌘ Taxes
⌘ Workers Comp    ⌘ Health & Welfare    ⌘ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Andrew Vacura Lead Cook DOH 2/27/2005
2020

TRW= $32.72
Increased
from 2019
3.63%



| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $19.97 | 1,824 | 34,328 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 114 | |
| Rest 15min/4hrs | | | 114 | |
| Total Compensable Productive Work Time | | $21.86 | 1,824 | 37,546 |
| Vacation (W) | 3 | $1.79 | 120 | 2,258 |
| Holiday (D) | 6 | $1.07 | 48 | 1,807 |
| Sick/Personal (D) | | $0.98 | 88 | 1,656 |
| Jury Duty (D) | | $0.00 | | - |
| Bereavement (D) | | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $3.85 | 256 | 5,721 |
| Uniforms | | $0.20 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.20 | | 350 |
| Taxes | 0.125 | $3.21 | | 5,408 |
| Workers Comp | 0.0349 | $0.90 | | 1,510 |
| Total | | $4.11 | | 6,918 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $2.01 | | - |
| Pension | | $0.69 | | 1,261 |
| Total | | $2.70 | | 4,363 |
| Total Real Wage Per Productive Hour | | $32.72 | - | 54,898 |

**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Andrew Vacura Lead Cook DOH 2/27/2005

2020

$1.79   $0.98   $0.00   $0.00   $0.20   $3.21   $0.90   $2.01   $0.69   $21.86

TRW= $32.72
Increased
from 2019
3.63%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Andrew Vacura Lead Cook DOH 2/27/2005
2015- 2020



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Felipe Cruz Garcia Lead Cook DOH 5/13/13
2015

TRW= $21.95

GC Exhibit 10(b)

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.21 | 1,952 | 29,690 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| **Total Compensable Productive Work Time** | | **$16.69** | **1,970** | **32,884** |
| Vacation (W) | 1 | $0.31 | 40 | 608 |
| Holiday (D) | 6 | $0.74 | 48 | 1,460 |
| Sick/Personal (D) | 5 | $0.31 | 40 | 608 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| **Total Compensable Non-Productive Work Time** | | **$1.36** | **128** | **2,677** |
| Uniforms | | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| **Total** | | **$0.18** | | **350** |
| Taxes | 0.125 | $2.26 | | 4,445 |
| Workers Comp | 0.0349 | $0.63 | | 1,241 |
| **Total** | | **$2.89** | | **5,686** |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.15 | | - |
| Pension | | $0.69 | | 1,362 |
| **Total** | | **$0.84** | | **1,648** |
| **Total Real Wage Per Productive Hour** | | **$21.95** | **-** | **43,246** |

## Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

### Felipe Cruz Garcia Lead Cook DOH 5/13/13

## 2015



$0.31  $0.74  $0.31  $0.00
$0.00
$0.18
$2.26
$0.63
$0.15
$16.69
$0.69

## TRW=$21.95

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Felipe Cruz Garcia Lead Cook DOH 5/13/13
2016

TRW= $22.69 Increased from 2015 3.36%

| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.44 | 1,952 | 29,690 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $16.95 | 1,970 | 32,884 |
| Vacation (W) | 1 | $0.64 | 40 | 608 |
| Holiday (D) | 6 | $0.77 | 48 | 1,460 |
| Sick/Personal (D) | 5 | $0.32 | 40 | 608 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.73 | 128 | 2,677 |
| Uniforms | | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.18 | | 350 |
| Taxes | 0.125 | $2.33 | | 4,445 |
| Workers Comp | 0.0349 | $0.65 | | 1,241 |
| Total | | $2.99 | | 5,686 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.15 | | - |
| Pension | | $0.69 | | 1,362 |
| Total | | $0.84 | | 1,648 |
| Total Real Wage Per Productive Hour | | $22.69 | - | 43,246 |

## Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Felipe Cruz Garcia Lead Cook DOH 5/13/13

### 2016

$0.64   $0.77   $0.32   $0.00   $0.00   $0.18   $2.33   $0.65   $0.15   $0.69

$16.95

**TRW= $22.69 Increased from 2015 3.36%**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.44 | 1,912 | 29,518 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 120 | |
| Rest 15min/4hrs | | | 120 | |
| Total Compensable Productive Work Time | | $16.95 | 1,933 | 32,760 |
| Vacation (W) | 2 | $0.64 | 80 | 1,235 |
| Holiday (D) | 6 | $0.77 | 48 | 1,482 |
| Sick/Personal (D) | 5 | $0.32 | 40 | 618 |
| Jury Duty (D) | 0 | $0.00 | - | - |
| Bereavement (D) | 0 | $0.00 | - | - |
| Total Compensable Non-Productive Work Time | | $1.73 | 168 | 3,335 |
| Uniforms | 3 | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.18 | | 350 |
| Taxes | 12.50% | $2.33 | | 4,512 |
| Workers Comp | 3.49% | $0.65 | | 1,260 |
| Total | | $2.99 | | 5,771 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.16 | | - |
| Pension | | $0.69 | | 1,336 |
| Total | | $0.85 | | 1,640 |
| Total Real Wage Per Productive Hour | | $22.69 | - | 43,856 |

### Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Felipe Cruz Garcia Lead Cook DOH 5/13/13

**2017**



TRW=$22.69
Increased
from 2016
0.02%

- ⌧ Base Pay & OT
- ⌧ Vacation
- ⌧ Holiday
- ⌧ Personal/Sick
- ⌧ Jury Duty
- ⌧ Bereavement
- ⌧ Uniforms
- ⌧ Taxes
- ⌧ Workers Comp
- ⌧ Health & Welfare
- ⌧ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Felipe Cruz Garcia Lead Cook DOH 5/13/13
2018

TRW= $23.02 Increased from 2017 1.45%

| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.67 | 1,952 | 29,961 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $17.21 | 1,970 | 33,251 |
| Vacation (W) | 2 | $0.65 | 40 | 1,254 |
| Holiday (D) | 6 | $0.78 | 48 | 1,504 |
| Sick/Personal (D) | 5 | $0.32 | 40 | 627 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.75 | 128 | 3,385 |
| Uniforms | 3 | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.18 | | 350 |
| Taxes | 12.50% | $2.37 | | 4,579 |
| Workers Comp | 3.49% | $0.66 | | 1,279 |
| Total | | $3.03 | | 5,858 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.16 | | - |
| Pension | | $0.69 | | 1,336 |
| Total | | $0.85 | | 1,649 |
| Total Real Wage Per Productive Hour | | $23.02 | - | 44,493 |

## Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

*Felipe Cruz Garcia Lead Cook DOH 5/13/13*

### 2018



TRW=$23.02
Increased
from 2017
1.45%

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Felipe Cruz Garcia Lead Cook DOH 5/13/13
2019

TRW= $23.36
Increased
from: 2018
1.45%

$0.66  $0.79  $0.33 $0.00
$0.00
$0.18
$2.41
$0.67
$0.17
$0.69
$17.46

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $15.90 | 1,952 | 29,690 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $17.46 | 1,970 | 32,884 |
| Vacation (W) | 1 | $0.66 | 40 | 608 |
| Holiday (D) | 6 | $0.79 | 48 | 1,460 |
| Sick/Personal (D) | 5 | $0.33 | 40 | 608 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.78 | 128 | 2,677 |
| Uniforms | | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.18 | | 350 |
| Taxes | 0.125 | $2.41 | | 4,445 |
| Workers Comp | 0.0349 | $0.67 | | 1,241 |
| Total | | $3.08 | | 5,686 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.17 | | - |
| Pension | | $0.69 | | 1,362 |
| Total | | $0.86 | | 1,648 |
| Total Real Wage Per Productive Hour | | $23.36 | - | 43,246 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Felipe Cruz Garcia Lead Cook DOH 5/13/13

2019

$0.66  $0.79  $0.33  $0.00  $0.00  $0.18  $2.41  $0.67  $0.17  $0.69  $17.46

TRW=$23.36 Increased from 2018 1.45%

Base Pay & OT    Vacation    Holiday    Personal/Sick
Jury Duty    Bereavement    Uniforms    Taxes
Workers Comp    Health & Welfare    Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Felipe Cruz Garcia Lead Cook DOH 5/13/13
2020

TRW= $23.70 Increased from 2019 1.45%

| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $16.14 | 1,952 | 29,690 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $17.73 | 1,970 | 32,884 |
| Vacation (W) | 1 | $0.67 | 40 | 608 |
| Holiday (D) | 6 | $0.80 | 48 | 1,460 |
| Sick/Personal (D) | | $0.33 | 40 | 608 |
| Jury Duty (D) | | $0.00 | | - |
| Bereavement (D) | | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.80 | 128 | 2,677 |
| Uniforms | | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.18 | | 350 |
| Taxes | 0.125 | $2.44 | | 4,445 |
| Workers Comp | 0.0349 | $0.68 | | 1,241 |
| Total | | $3.12 | | 5,686 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.17 | | - |
| Pension | | $0.69 | | 1,362 |
| Total | | $0.86 | | 1,648 |
| Total Real Wage Per Productive Hour | | $23.70 | - | 43,246 |

**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Felipe Cruz Garcia Lead Cook DOH 5/13/13

**2020**

$0.67  $0.80  $0.33  $0.00  $0.00  $0.18  $2.44  $0.68  $0.17  $0.69

$17.73

**TRW=$23.70 Increased from 2019 1.45%**

☒ Base Pay & OT    ☒ Vacation    ☒ Holiday    ☒ Personal/Sick
☒ Jury Duty    ☒ Bereavement    ☒ Uniforms    ☒ Taxes
☒ Workers Comp    ☒ Health & Welfare    ☒ Pension





Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Tum Chan Lead Cook DOH 9/14/2007
2015

TRW= $28.39

$0.71  $0.85  $0.43  $0.00  $0.17  $2.80  $0.78  $1.51  $0.69  $20.44

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension



### Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
### Tum Chan Lead Cook DOH 9/14/2007
### 2016

TRW= $29.35 Increased from 2015 3.38%

$1.10  $0.88  $0.4 $0.0 $0.00  $0.17  $2.90  $0.81  $1.59  $0.69  $20.77

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $18.48 | 1,904 | 34,672 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 119 | |
| Rest 15min/4hrs | | | 119 | |
| Total Compensable Productive Work Time | | $20.77 | 2,050 | 41,910 |
| Vacation (W) | 2 | $1.10 | 80 | 1,457 |
| Holiday (D) | 6 | $0.88 | 48 | 1,748 |
| Sick/Personal (D) | 6 | $0.44 | 48 | 874 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $2.42 | 176 | 4,079 |
| Uniforms | | $0.17 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.17 | | 350 |
| Taxes | 0.125 | $2.90 | | 5,749 |
| Workers Comp | 0.0349 | $0.81 | | 1,605 |
| Total | | $3.71 | | 7,354 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.59 | | - |
| Pension | | $0.69 | | 1,418 |
| Total | | $2.28 | | 4,515 |
| Total Real Wage Per Productive Hour | | $29.35 | - | 58,208 |

**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Tum Chan Lead Cook DOH 9/14/2007

2016

$1.10  $0.88  $0.44  $0.00  $0.00  $0.17  $2.90  $0.81  $1.59  $20.77  $1.59  $0.69

TRW= $29.35 Increased from 2015 3.38%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $18.21 | 1,904 | 34,672 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 119 | |
| Rest 15min/4hrs | | | 119 | |
| Total Compensable Productive Work Time | | $20.44 | 2,050 | 41,910 |
| Vacation (W) | 2 | $0.71 | 80 | 1,457 |
| Holiday (D) | 6 | $0.85 | 48 | 1,748 |
| Sick/Personal (D) | 6 | $0.43 | 48 | 874 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.99 | 176 | 4,079 |
| Uniforms | | $0.17 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.17 | | 350 |
| Taxes | 0.125 | $2.80 | | 5,749 |
| Workers Comp | 0.0349 | $0.78 | | 1,605 |
| Total | | $3.59 | | 7,354 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.51 | | - |
| Pension | | $0.69 | | 1,418 |
| Total | | $2.20 | | 4,515 |
| Total Real Wage Per Productive Hour | | $28.39 | - | 58,208 |

# Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Tum Chan Lead Cook DOH 9/14/2007

## 2015

$0.71  $0.85  $0.43  $0.00
$0.00
$0.17
$2.80
$0.78
$1.51
$20.44
$0.69

**TRW=$28.39**

- ⊠ Base Pay & OT
- ⊠ Vacation
- ⊠ Holiday
- ⊿ Personal/Sick
- ⊟ Jury Duty
- ⊠ Bereavement
- ⊠ Uniforms
- ⊠ Taxes
- ▪ Workers Comp
- ▪ Health & Welfare
- ▪ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Tum Chan Lead Cook DOH 9/14/2007
2017

TRW= $29.40
Increased
from 2016
0.16%

| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $18.48 | 1,864 | 34,453 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 117 | |
| Rest 15min/4hrs | | | 117 | |
| Total Compensable Productive Work Time | | $20.77 | 2,013 | 41,800 |
| Vacation (W) | 3 | $1.10 | 120 | 2,218 |
| Holiday (D) | 6 | $0.88 | 48 | 1,774 |
| Sick/Personal (D) | 6 | $0.44 | 48 | 887 |
| Jury Duty (D) | 0 | $0.00 | - | - |
| Bereavement (D) | 0 | $0.00 | - | - |
| Total Compensable Non-Productive Work Time | | $2.42 | 216 | 4,880 |
| Uniforms | 3 | $0.17 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.17 | | 350 |
| Taxes | 12.50% | $2.90 | | 5,835 |
| Workers Comp | 3.49% | $0.81 | | 1,629 |
| Total | | $3.71 | | 7,464 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.63 | | - |
| Pension | | $0.69 | | 1,392 |
| Total | | $2.32 | | 4,678 |
| Total Real Wage Per Productive Hour | | $29.40 | - | 59,171 |

**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Tum Chan Lead Cook DOH 9/14/2007

2017

$1.10  $0.88  $0.44  $0.00  $0.00  $0.17  $2.90  $0.81  $1.63  $0.69  $20.77

TRW=$29.40
Increased
from   2016
0.16%

- Base Pay & OT    ▨ Vacation    ▨ Holiday    ▨ Personal/Sick
- Jury Duty    ▨ Bereavement    ▨ Uniforms    ▨ Taxes
- Workers Comp    ▨ Health & Welfare    ▨ Pension



### Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
### Tum Chan Lead Cook DOH 9/14/2007
### 2018

TRW= $29.85
Increased
from 2017
1.54%

$1.12  $0.89  $0.00 $0.00 $0.14 $0.00 $0.17  $2.94  $0.82  $1.68  $24.08  $0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $18.76 | 1,904 | 34,969 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 119 | |
| Rest 15min/4hrs | | | 119 | |
| Total Compensable Productive Work Time | | $21.08 | 2,050 | 42,427 |
| Vacation (W) | 3 | $1.12 | 80 | 2,251 |
| Holiday (D) | 6 | $0.89 | 48 | 1,801 |
| Sick/Personal (D) | 6 | $0.45 | 48 | 900 |
| Jury Duty (D) | 0 | $0.00 | | . |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $2.46 | 176 | 4,953 |
| Uniforms | 3 | $0.17 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.17 | | 350 |
| Taxes | 12.50% | $2.94 | | 5,922 |
| Workers Comp | 3.49% | $0.82 | | 1,654 |
| Total | | $3.76 | | 7,576 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.68 | | - |
| Pension | | $0.69 | | 1,392 |
| Total | | $2.37 | | 4,777 |
| Total Real Wage Per Productive Hour | | $29.85 | - | 60,082 |

**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Tum Chan Lead Cook DOH 9/14/2007

2018

$1.12  $0.89  $0.45  $0.00  $0.00  $0.17  $2.94  $0.82  $1.68  $0.69

$21.08

**TRW=$29.85 Increased from 2017 1.54%**

⊠ Base Pay & OT    ⊠ Vacation    ⊠ Holiday    ⸱ Personal/Sick
⊠ Jury Duty    ⊠ Bereavement    ⊠ Uniforms    ⊠ Taxes
⊠ Workers Comp    ⊠ Health & Welfare    ⊠ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Tum Chan Lead Cook DOH 9/14/2007
2019

TRW= $30.31
Increased
from: 2018
1.54%

$1.14  $0.91  $0.45  $0.00  $0.00  $0.17  $2.99  $0.83  $1.73  $0.69  $21.40

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $19.04 | 1,904 | 34,672 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 119 | |
| Rest 15min/4hrs | | | 119 | |
| Total Compensable Productive Work Time | | $21.40 | 2,050 | 41,910 |
| Vacation (W) | 2 | $1.14 | 80 | 1,457 |
| Holiday (D) | 6 | $0.91 | 48 | 1,748 |
| Sick/Personal (D) | 6 | $0.45 | 48 | 874 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $2.50 | 176 | 4,079 |
| Uniforms | | $0.17 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.17 | | 350 |
| Taxes | 0.125 | $2.99 | | 5,749 |
| Workers Comp | 0.0349 | $0.83 | | 1,605 |
| Total | | $3.82 | | 7,354 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.73 | | - |
| Pension | | $0.69 | | 1,418 |
| Total | | $2.42 | | 4,515 |
| Total Real Wage Per Productive Hour | | $30.31 | - | 58,208 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Tum Chan Lead Cook DOH 9/14/2007

2019

$1.14  $0.91  $0.45  $0.00  $0.17  $2.99  $0.83  $1.73  $0.69  $21.40

TRW=$30.31
Increased
from   2018
1.54%

◼ Base Pay & OT    ◪ Vacation    ◼ Holiday    ◱ Personal/Sick
◪ Jury Duty    ◼ Bereavement    ◼ Uniforms    ◼ Taxes
◼ Workers Comp    ◼ Health & Welfare    ◼ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Tum Chan Lead Cook DOH 9/14/2007
2020

TRW= $30.78
Increased
from 2020
1.54%

| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $19.33 | 1,904 | 34,672 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 119 | |
| Rest 15min/4hrs | | | 119 | |
| Total Compensable Productive Work Time | | $21.72 | 2,050 | 41,910 |
| Vacation (W) | 2 | $1.15 | 80 | 1,457 |
| Holiday (D) | 6 | $0.92 | 48 | 1,748 |
| Sick/Personal (D) | | $0.46 | 48 | 874 |
| Jury Duty (D) | | $0.00 | | - |
| Bereavement (D) | | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $2.54 | 176 | 4,079 |
| Uniforms | | $0.17 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.17 | | 350 |
| Taxes | 0.125 | $3.03 | | 5,749 |
| Workers Comp | 0.0349 | $0.85 | | 1,605 |
| Total | | $3.88 | | 7,354 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.78 | | - |
| Pension | | $0.69 | | 1,418 |
| Total | | $2.48 | | 4,515 |
| Total Real Wage Per Productive Hour | | $30.78 | - | 58,208 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Tum Chan Lead Cook DOH 9/14/2007

2020

TRW=$30.78 Increased from 2019 1.54%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension





Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15
2015

TRW= $14.55

$10.83

$0.21  $0.51  $0.7  $0.00  $0.00
$0.19
$1.47
$0.41
$0.03
$0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

**GC Exhibit 10(d)**

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.03 | 1,952 | 19,579 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $10.83 | 1,885 | 20,406 |
| Vacation (W) | 1 | $0.21 | 40 | 401 |
| Holiday (D) | 6 | $0.51 | 48 | 963 |
| Sick/Personal (D) | 5 | $0.21 | 40 | 401 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $0.94 | 128 | 1,765 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $1.47 | | 2,771 |
| Workers Comp | 0.0349 | $0.41 | | 774 |
| Total | | $1.88 | | 3,545 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.03 | | - |
| Pension | | $0.69 | | 1,303 |
| Total | | $0.72 | | 1,354 |
| Total Real Wage Per Productive Hour | | $14.55 | - | 27,420 |

# Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

### Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15

## 2015

$0.21  $0.51  $0.21  $0.00
$0.00
$0.19
$1.47
$0.41
$0.03
$10.83
$0.69

# TRW=$14.55

- ⚹ Base Pay & OT
- ⚹ Vacation
- ⚹ Holiday
- ⚹ Personal/Sick
- ⚹ Jury Duty
- ⚹ Bereavement
- ⚹ Uniforms
- ⚹ Taxes
- ⚹ Workers Comp
- ⚹ Health & Welfare
- ⚹ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15
2016

TRW= $14.75 Increased from 2015 1.41%

$0.22    $0.52    $0.25 $0.00 $0.00
$0.19
$1.49
$0.42
$0.03
$10.99
$0.69

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension

| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.18 | 1,952 | 19,579 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $10.99 | 1,885 | 20,406 |
| Vacation (W) | 1 | $0.22 | 40 | 401 |
| Holiday (D) | 6 | $0.52 | 48 | 963 |
| Sick/Personal (D) | 5 | $0.22 | 40 | 401 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $0.95 | 128 | 1,765 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $1.49 | | 2,771 |
| Workers Comp | 0.0349 | $0.42 | | 774 |
| Total | | $1.91 | | 3,545 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.03 | | - |
| Pension | | $0.69 | | 1,303 |
| Total | | $0.72 | | 1,354 |
| Total Real Wage Per Productive Hour | | $14.75 | - | 27,420 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15

2016

$0.22  $0.52  $0.22  $0.00  $0.00  $0.19  $1.49  $0.42  $0.03  $0.69

$10.99

TRW= $14.75 Increased from 2015 1.41%

Legend:
- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15
2017

TRW= $15.04 Increased from 2016 1.94%

| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.18 | 1,912 | 19,465 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 120 | |
| Rest 15min/4hrs | | | 120 | |
| Total Compensable Productive Work Time | | $10.99 | 1,848 | 20,305 |
| Vacation (W) | 2 | $0.44 | 80 | 814 |
| Holiday (D) | 6 | $0.53 | 48 | 977 |
| Sick/Personal (D) | 5 | $0.22 | 40 | 407 |
| Jury Duty (D) | 0 | $0.00 | - | - |
| Bereavement (D) | 0 | $0.00 | - | - |
| Total Compensable Non-Productive Work Time | | $1.19 | 168 | 2,199 |
| Uniforms | 3 | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 12.50% | $1.52 | | 2,813 |
| Workers Comp | 3.49% | $0.43 | | 785 |
| Total | | $1.95 | | 3,598 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.03 | | - |
| Pension | | $0.69 | | 1,278 |
| Total | | $0.72 | | 1,331 |
| Total Real Wage Per Productive Hour | | $15.04 | - | 27,783 |



**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15

2017

$0.44  $0.53  $0.22  $0.00  $0.00  $0.19  $1.52  $0.43  $0.03  $10.99  $0.69

TRW=$15.04 Increased from 2016 1.94%

- ☒ Base Pay & OT
- ☑ Vacation
- ▨ Holiday
- ☒ Personal/Sick
- ☒ Jury Duty
- ▨ Bereavement
- ▨ Uniforms
- ☒ Taxes
- ■ Workers Comp
- ▨ Health & Welfare
- ■ Pension



# Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
## Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15
## 2018

TRW= $15.25
Increased
from  2017
1.42%

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension

| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.33 | 1,952 | 19,757 |
| Vacation (W) | | $3.50 | - | |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $11.16 | 1,885 | 20,609 |
| Vacation (W) | 2 | $0.45 | 40 | 827 |
| Holiday (D) | 6 | $0.54 | 48 | 992 |
| Sick/Personal (D) | 5 | $0.22 | 40 | 413 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.21 | 128 | 2,232 |
| Uniforms | 3 | $0.19 | | 350 |
| Transportation | | $0.00 | | |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 12.50% | $1.55 | | 2,855 |
| Workers Comp | 3.49% | $0.43 | | 797 |
| Total | | $1.98 | | 3,652 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.03 | | - |
| Pension | | $0.69 | | 1,278 |
| Total | | $0.72 | | 1,332 |
| Total Real Wage Per Productive Hour | | $15.25 | - | 28,176 |

**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15

**2018**



$0.45  $0.54  $0.22  $0.00  $0.00  $0.19  $1.55  $0.43  $0.03  $0.69  $11.16

**TRW=$15.25 Increased from 2017 1.42%**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15
2019

TRW= $15.47
Increased
from: 2018
1.42%

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.49 | 1,952 | 19,579 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $11.32 | 1,885 | 20,406 |
| Vacation (W) | 1 | $0.45 | 40 | 401 |
| Holiday (D) | 6 | $0.54 | 48 | 963 |
| Sick/Personal (D) | 5 | $0.23 | 40 | 401 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.23 | 128 | 1,765 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $1.57 | | 2,771 |
| Workers Comp | 0.0349 | $0.44 | | 774 |
| Total | | $2.01 | | 3,545 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.03 | | - |
| Pension | | $0.69 | | 1,303 |
| Total | | $0.72 | | 1,354 |
| Total Real Wage Per Productive Hour | | $15.47 | - | 27,420 |



### Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15

**2019**

$0.45   $0.54   $0.23   $0.00   $0.00   $0.19   $1.57   $0.44   $0.03   $0.69

$11.32

**TRW=$15.47 Increased from 2018 1.42%**

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15
2020

TRW= $15.69
Increased
from 2019
1.42%

$0.46  $0.55  $0.23  $0.00 $0.00  $0.19  $1.59  $0.44  $0.03  $0.69  $11.49

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension

| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $10.65 | 1,952 | 19,579 |
| Vacation (W) | | $3.50 | - | - |
| Lunch 30min/8hrs | | | 122 | |
| Rest 15min/4hrs | | | 122 | |
| Total Compensable Productive Work Time | | $11.49 | 1,885 | 20,406 |
| Vacation (W) | 1 | $0.46 | 40 | 401 |
| Holiday (D) | 6 | $0.55 | 48 | 963 |
| Sick/Personal (D) | | $0.23 | 40 | 401 |
| Jury Duty (D) | | $0.00 | | - |
| Bereavement (D) | | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.24 | 128 | 1,765 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $1.59 | | 2,771 |
| Workers Comp | 0.0349 | $0.44 | | 774 |
| Total | | $2.04 | | 3,545 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.03 | | - |
| Pension | | $0.69 | | 1,303 |
| Total | | $0.72 | | 1,354 |
| Total Real Wage Per Productive Hour | | $15.69 | - | 27,420 |

## Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Bonifica Schnell Dishmachine Operations DOH 7/21/14 Assumes FT in F15

**2020**



$0.46  $0.55  $0.23  $0.00  $0.00  $0.19  $1.59  $0.44  $0.03  $11.49  $0.69

TRW=$15.69 Increased from 2019 1.42%

Base Pay & OT    Vacation    Holiday    Personal/Sick
Jury Duty    Bereavement    Uniforms    Taxes
Workers Comp    Health & Welfare    Pension



*Inn & Suites*



Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites
Michael Lindell - Houseman
2015

TRW= $22.66

$0.59  $0.71  $0.30  $0.35  $0.18  $0.08  $1.99  $0.57  $0.00  $0.47

$15.93

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

**GC Exhibit 10(e)**

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.82 | 2080 | $28,745.60 |
| Overtime 1.5x BR | | $0.55 | 50 | $1,036.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $15.93 | 1870 | $29,782.10 |
| Vacation (W) | 2 | $0.59 | 80 | $1,105.60 |
| Holiday (D) | 6 | $0.71 | 48 | $1,326.72 |
| Sick/Personal (D) | 5 | $0.30 | 40 | $552.80 |
| Jury Duty (D) | 6 | $0.35 | | $663.36 |
| Bereavement (D) | 3 | $0.18 | | $331.68 |
| Total Compensable Non-Productive Work Time | | $2.13 | 240 | $3,980.16 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.99 | | $3,722.76 |
| Workers Comp | 0.036 | $0.57 | | $1,073.35 |
| Total | | $2.56 | | $4,796.11 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $22.66 | 0 | $42,377.10 |



Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites

Michael Lindell - Houseman
2015

$0.59  $0.71  $0.30  $0.35  $0.18  $0.08  $1.99  $0.57  $0.00  $0.47

$15.93

TRW=$22.66

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension



| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.82 | 2080 | $28,745.60 |
| Overtime 1.5x BR | | $0.55 | 50 | $1,036.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $15.93 | 1870 | $29,782.10 |
| Vacation (W) | 2 | $0.59 | 80 | $1,105.60 |
| Holiday (D) | 6 | $0.71 | 48 | $1,326.72 |
| Sick/Personal (D) | 5 | $0.30 | 40 | $552.80 |
| Jury Duty (D) | 6 | $0.35 | | $663.36 |
| Bereavement (D) | 3 | $0.18 | | $331.68 |
| Total Compensable Non-Productive Work Time | | $2.13 | 240 | $3,980.16 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $1.99 | | $3,722.76 |
| Workers Comp | 0.036 | $0.57 | | $1,073.35 |
| Total | | $2.56 | | $4,796.11 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $22.66 | 0 | $42,377.10 |



Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites

Michael Lindell - Houseman

2016

$0.59   $0.71   $0.30
$0.35
$0.18
$0.08
$1.99
$0.57
$0.00
$0.47
$3.393

TRW= $22.66
Increased
from 2015
0.00%

Legend:
- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension





| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.96 | 2080 | $29,033.06 |
| Overtime 1.5x BR | | $0.56 | 50 | $1,046.87 |
| Lunch 30min/8hrs | | | 130.00 | |
| Rest 15min/4hrs | | | 130.00 | |
| Total Compensable Productive Work Time | | $16.09 | 1870 | $30,079.92 |
| Vacation (W) | 2 | $0.60 | 80 | $1,116.66 |
| Holiday (D) | 6 | $0.72 | 48 | $1,339.99 |
| Sick/Personal (D) | 5 | $0.30 | 40 | $558.33 |
| Jury Duty (D) | 6 | $0.36 | 48 | $669.99 |
| Bereavement (D) | 3 | $0.18 | 24 | $335.00 |
| Total Compensable Non-Productive Work Time | | $2.15 | 240 | $4,019.96 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $2.01 | | $3,759.99 |
| Workers Comp | 3.60% | $0.58 | | $1,084.08 |
| Total | | $2.59 | | $4,844.07 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $22.87 | 0 | $42,762.68 |

**Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites**

**Michael Lindell - Houseman**

**2017**

$0.60   $0.72   $0.30   $0.36   $0.18   $0.08   $2.01   $0.58   $0.00   $0.47

$16.09

TRW=$22.87
Increased
from   2016
0.91%

☒ Base Pay & OT     ☒ Vacation     ☒ Holiday     ☒ Personal/Sick

☒ Jury Duty     ☒ Bereavement     ☒ Uniforms     ☒ Taxes

☒ Workers Comp     ☒ Health & Welfare     ☒ Pension



Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites
Michael Lindell - Houseman
2018

TRW= $23.18
Increased
from  2017
1.37%

$0.61  $0.73  $0.30  $0.36  $0.18  $0.08  $2.04  $0.59  $0.00  $0.47  $16.33

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension



| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $14.17 | 2080 | $29,468.55 |
| Overtime 1.5x BR | | $0.57 | 50 | $1,062.57 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $16.33 | 1870 | $30,531.12 |
| Vacation (W) | 2 | $0.61 | 80 | $1,133.41 |
| Holiday (D) | 6 | $0.73 | 48 | $1,360.09 |
| Sick/Personal (D) | 5 | $0.30 | 40 | $566.70 |
| Jury Duty (D) | 6 | $0.36 | | $680.04 |
| Bereavement (D) | 3 | $0.18 | | $340.02 |
| Total Compensable Non-Productive Work Time | | $2.18 | 240 | $4,080.26 |
| Uniforms | 3 | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 12.50% | $2.04 | | $3,816.39 |
| Workers Comp | 3.60% | $0.59 | | $1,100.34 |
| Total | | $2.63 | | $4,916.73 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $23.18 | 0 | $43,346.84 |

Sunstone Hotel Properties, Inc and UNITE HERE
Local 21 AFL-CIO - Kahler Inn & Suites

Michael Lindell - Houseman
2018

$0.61  $0.73  $0.30
$0.36
$0.18
$0.08
$2.04
$0.59
$16.33
$0.00
$0.47

TRW=$23.18
Increased
from 2017
1.37%

≡ Base Pay & OT    ≡ Vacation    ✗ Holiday    ≡ Personal/Sick

≡ Jury Duty    ≡ Bereavement    ≡ Uniforms    ≡ Taxes

≡ Workers Comp    ≡ Health & Welfare    ≡ Pension



Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites
Michael Lindell - Houseman
2019

TRW= $23.50
Increased
from: 2018
1.37%

$0.62  $0.74  $0.31  $0.37  $0.18  $0.08  $2.07  $0.60  $0.00  $0.47  $16.57

≡ Base Pay & OT  ≡ Vacation  ≡ Holiday  ≡ Personal/Sick  ≡ Jury Duty  ≡ Bereavement  ≡ Uniforms  ≡ Taxes  ≡ Workers Comp  ≡ Health & Welfare  ≡ Pension

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay | | $14.38 | 2080 | $28,745.60 |
| Overtime 1.5x BR | | $0.58 | 50 | $1,036.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $16.57 | 1870 | $29,782.10 |
| Vacation (W) | 2 | $0.62 | 80 | $1,105.60 |
| Holiday (D) | 6 | $0.74 | 48 | $1,326.72 |
| Sick/Personal (D) | 5 | $0.31 | 40 | $552.80 |
| Jury Duty (D) | 6 | $0.37 | | $663.36 |
| Bereavement (D) | 3 | $0.18 | | $331.68 |
| Total Compensable Non-Productive Work Time | | $2.21 | 240 | $3,980.16 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.07 | | $3,722.76 |
| Workers Comp | 0.036 | $0.60 | | $1,073.35 |
| Total | | $2.67 | | $4,796.11 |
| Trust Fund Report | | | | |
| Health & Welfare | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $23.50 | 0 | $42,377.10 |



Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites

Michael Lindell - Houseman

2019

TRW=$23.50 Increased from 2018 1.37%

■ Base Pay & OT  ■ Vacation  ■ Holiday  ■ Personal/Sick
■ Jury Duty  ■ Bereavement  ■ Uniforms  ■ Taxes
■ Workers Comp  ■ Health & Welfare  ■ Pension



Sunstone Hotel Properties, Inc and UNITE HERE Local 21 AFL-CIO - Kahler Inn & Suites
Michael Lindell - Houseman
2020

TRW= $23.82
Increased
from 2019
1.37%

$16.82

$0.62  $0.75  $0.31  $0.37  $0.19  $0.08  $2.10  $0.61  $0.00  $0.47

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension



| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $14.60 | 2080 | $28,745.60 |
| Overtime 1.5x BR | | $0.59 | 50 | $1,036.50 |
| Lunch 30min/8hrs | | | 130 | |
| Rest 15min/4hrs | | | 130 | |
| Total Compensable Productive Work Time | | $16.82 | 1870 | $29,782.10 |
| Vacation (W) | 2 | $0.62 | 80 | $1,105.60 |
| Holiday (D) | 6 | $0.75 | 48 | $1,326.72 |
| Sick/Personal (D) | | $0.31 | 40 | $552.80 |
| Jury Duty (D) | | $0.37 | | $663.36 |
| Bereavement (D) | | $0.19 | | $331.68 |
| Total Compensable Non-Productive Work Time | | $2.25 | 240 | $3,980.16 |
| Uniforms | | $0.08 | | $156.00 |
| Transportation | | $0.00 | | $0.00 |
| Meals | 0 | $0.00 | | $0.00 |
| Total | | $0.08 | | $156.00 |
| Taxes | 0.125 | $2.10 | | $3,722.76 |
| Workers Comp | 0.036 | $0.61 | | $1,073.35 |
| Total | | $2.71 | | $4,796.11 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $1.49 | | $0.00 |
| Pension | | $0.47 | | $872.67 |
| Total | | $1.96 | | $3,662.73 |
| Total Real Wage Per Productive Hour | | $23.82 | 0 | $42,377.10 |

Sunstone Hotel Properties, Inc and UNITE HERE
Local 21 AFL-CIO - Kahler Inn & Suites

Michael Lindell - Houseman

2020

$0.62  $0.75  $0.31
$0.37
$0.19
$0.08
$2.10
$0.61
$16.82
$0.00
$0.47

TRW=$23.82
Increased
from 2019
1.37%

- Base Pay & OT
- Vacation
- Holiday
- Personal/Sick
- Jury Duty
- Bereavement
- Uniforms
- Taxes
- Workers Comp
- Health & Welfare
- Pension





Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Paul Fuller Dishroom DOH   10/29/2012
2015

TRW= $17.06

$0.40  $0.52  $0.22 $0.26 $0.13
$0.17
$1.55
$0.43
$0.27
$0.69
$12.40

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Paul Fuller Dishroom DOH  10/29/2012
2016

TRW= $17.30
Increased
from  2015
1.40%

$0.41  $0.53  $0.22  $0.27  $0.13
$0.17
$1.57
$0.44
$0.27
$12.59
$0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Paul Fuller Dishroom DOH  10/29/2012
2017

TRW= $17.30 Increased from  2016 0.00%

$0.41  $0.53  $0.22  $0.27  $0.13

$0.17

$1.57

$0.44

$0.27

$12.59

$0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

000003
P 01390



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Paul Fuller Dishroom DOH  10/29/2012
2018

TRW= $17.45 Increased from 2017 0.86%



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Paul Fuller Dishroom DOH  10/29/2012
2019

TRW= $17.69
Increased
from: 2019
1.40%

$0.62  $0.54  $0.22  $0.27  $0.13  $0.17  $1.59  $0.44  $0.27  $0.69  $12.74

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

GC Exhibit 10(f)



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Paul Fuller Dishroom DOH  10/29/2012
2020

TRW= $18.08 Increased from 2019 2.21%

Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Wellare · Pension

GC Exhibit 10(f)

000006
P 01393



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Fahrudin Suljevic  Dishroom DOH  10/7/2002
2015

TRW= $23.28

$0.80
$0.85
$0.85
$0.42
$0.21
$0.23
$1.76
$0.49
$2.91
$14.07
$0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

GC Exhibit 10(g)



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Fahrudin Suljevic  Dishroom DOH  10/7/2002
2016

TRW= $23.57
Increased
from  2015
1.25%

$0.81  $0.86  $0.86  $0.43  $0.21  $0.23  $1.78  $0.50  $2.91  $0.69  $14.23

Base Pay & OT | Vacation | Holiday | Personal/Sick | Jury Duty | Bereavement | Uniforms | Taxes | Workers Comp | Health & Welfare | Pension

GC Exhibit 10(g)

000002
P 01395



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Fahrudin Suljevic  Dishroom DOH  10/7/2002
2017

TRW= $23.38
Increased
from  2016
-0.79%

$0.84  $0.42  $0.21
$0.84  $0.23
$1.06  $1.75  $0.49
$2.86
$14.00
$0.69

⌇Base Pay & OT  ⌇Vacation  ⌇Holiday  ⌇Personal/Sick  ⌇Jury Duty  ⌇Bereavement  ⌇Uniforms  ⌇Taxes  ⌇Workers Comp  ⌇Health & Welfare  ⌇Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Fahrudin Suljevic  Dishroom DOH  10/7/2002
2018

TRW= $23.68
Increased
from  2017
1.26%



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Fahrudin Suljevic  Dishroom DOH  10/7/2002
2019

TRW= $23.98
Increased
from: 2018
1.26%

$0.87  $0.43  $0.22
$0.87  $0.23  $1.80  $0.50
$1.09  $2.86
$14.42  $0.69

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension

GC Exhibit 10(g)

000005
P 01398



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Fahrudin Suljevic  Dishroom DOH  10/7/2002
2020

TRW= $24.28
Increased
from 2019
1.26%

$0.88
$0.44
$0.22
$0.23
$0.88
$1.11
$1.83
$0.51
$2.86
$14.64
$0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Gary Rowe Dishroom DOH 5/15/1995
2015

TRW= $22.16

$0.90  $0.60  $0.65  $0.30 $0.15  $0.17  $1.78  $0.50  $2.14  $14.28  $0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

GC Exhibit 10(h)



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Gary Rowe  Dishroom DOH  5/15/1995
2016

TRW= $22.45
Increased
from  2015
1.30%

$0.92   $0.61   $0.66   $0.30  $0.15   $0.17   $1.81   $0.51   $2.14

$14.49

$0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

000002
P 01401



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Gary Rowe  Dishroom DOH  5/15/1995
2017

TRW= $22.45
Increased
from  2016
0.00%

$0.92  $0.61  $0.66  $0.30  $0.15  $0.17  $1.81  $0.51  $2.14  $0.69

$14.49

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

000003
P 01402



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Gary Rowe  Dishroom DOH  5/15/1995
2018

TRW= $22.74 Increased from  2017 1.30%

$0.93  $0.62  $0.67  $0.31  $0.15  $0.17  $1.84  $0.51  $2.14  $0.69  $14.71

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

GC Exhibit 10(h)

000004
P 01403



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Gary Rowe  Dishroom DOH  5/15/1995
2019

TRW= $23.03
Increased
from: 2018
1.30%

$0.94  $0.63  $0.68  $0.31  $0.16  $0.17  $1.87  $0.52  $2.14

$14.93

$0.69

⊠ Base Pay & OT  ⊠ Vacation  ⊠ Holiday  ⊠ Personal/Sick  ⊠ Jury Duty  ⊠ Bereavement  ⊠ Uniforms  ⊠ Taxes  ⊠ Workers Comp  ⊠ Health & Welfare  ⊠ Pension

000005
P 01404



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Gary Rowe  Dishroom DOH  5/15/1995
2020

TRW= $23.33 Increased from 2019 1.30%

$0.96  $0.64  $0.69  $0.32  $0.16  $0.17  $1.89  $0.53  $2.14  $0.69  $15.15

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

GC Exhibit 10(h)

000006
P 01405



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Richard Lammers Bell DOH 10/3/2011
2015

TRW= $16.28

Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Richard Lammers Bell DOH 10/3/2011
2016

TRW= $16.99
Increased
from 2015
4.37%



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Richard Lammers Bell DOH  10/3/2011
2017

TRW= $16.99
Increased
from  2016
0.00%

$0.38  $0.56  $0.28  $0.28  $0.14  $0.21  $1.30  $0.36  $2.09  $0.69  $10.39

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

GC Exhibit 10(i)

000003
P 01408



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Richard Lammers Bell DOH  10/3/2011
2018

TRW= $16.99
Increased
from  2017
0.00%

$0.38  $0.56  $0.28  $0.28  $0.14  $0.21  $1.30  $0.36  $0.39  $0.69

$10.39

⛭ Base Pay & OT  ⛭ Vacation  ⛭ Holiday  ⛭ Personal/Sick  ⛭ Jury Duty  ⛭ Bereavement  ⛭ Uniforms  ⛭ Taxes  ⛭ Workers Comp  ⛭ Health & Welfare  ⛭ Pension

GC Exhibit 10(i)

000004
P 01409



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Richard Lammers Bell DOH  10/3/2011
2019

TRW= $16.99
Increased
from: 2018
0.00%



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Richard Lammers Bell DOH  10/3/2011
2020

TRW = $16.98
Increased
from 2019
-0.05%

$0.56  $0.55  $0.32  $0.27  $0.14  $0.21  $1.28  $0.36

$2.34

$10.26

$0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

000006
P 01411



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Shane Halverson Bell DOH 10/18/2010
2015

TRW= $16.21

$0.37 $0.60 $0.30 $0.30 $0.15 $0.24 $1.24 $0.35 $2.05 $0.69 $9.92

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

GC Exhibit 10(j)

000001
P 01412



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Shane Halverson Bell DOH 10/18/2010
2016

TRW= $16.93
Increased
from 2015
4.48%

$0.39 — $0.63 — $0.32 — $0.32 — $0.16 — $0.24 — $1.31 — $0.37 — $2.05

$10.46

$0.69

☑ Base Pay & OT  ☑ Vacation  ☑ Holiday  ☑ Personal/Sick  ☑ Jury Duty  ☑ Bereavement  ☑ Uniforms  ☑ Taxes  ☑ Workers Comp  ☑ Health & Welfare  ☑ Pension

GC Exhibit 10(j)

000002
P 01413



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Shane Halverson Bell DOH 10/18/2010
2017

TRW= $16.93 Increased from 2016 0.00%

$0.39, $0.63, $0.32, $0.32, $0.16, $0.24, $1.31, $0.37, $2.05, $0.69

$10.46

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Shane Halverson Bell DOH 10/18/2010
2018

TRW= $16.98
Increased
from 2017
0.31%



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Shane Halverson Bell DOH 10/18/2010
2019

TRW= $16.93
Increased
from: 2018
-0.33%

$0.36 $0.31 $0.16
$0.62 $0.24 $1.29 $0.36
$0.58 $2.01
$10.32 $0.69

☑ Base Pay & OT  ☑ Vacation  ☑ Holiday  ☑ Personal/Sick  ☑ Jury Duty  ☑ Bereavement  ☑ Uniforms  ☑ Taxes  ☑ Workers Comp  ☑ Health & Welfare  ☑ Pension

000005
P 01416



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO - Kahler Grand
Shane Halverson Bell DOH 10/18/2010
2020

TRW= $16.93 Increased from 2019 0.00%

$0.58  $0.62  $0.36  $0.31  $0.16  $0.24  $1.29  $0.36  $2.01  $0.69  $10.32

Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension

GC Exhibit 10(j)

000006
P 01417



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Timothy Hall Dish Machine Operator DOH 8/3/2009
2015

TRW= $18.52

$0.55    $0.66    $0.28 $0.00
$0.18
$1.89
$0.53
$0.08
$13.65
$0.69

Base Pay & OT | Vacation | Holiday | Personal/Sick | Jury Duty | Bereavement | Uniforms | Taxes | Workers Comp | Health & Welfare | Pension

| | 2015 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.23 | 1,912 | 25,296 |
| Vacation (W) | | $0.00 | 80 | - |
| Lunch 30min/8hrs | | | 120 | |
| Rest 15min/4hrs | | | 120 | |
| Total Compensable Productive Work Time | | $13.65 | 1,915 | 26,129 |
| Vacation (W) | 2 | $0.55 | 80 | 1,058 |
| Holiday (D) | 6 | $0.66 | 48 | 1,270 |
| Sick/Personal (D) | 5 | $0.28 | 40 | 529 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.49 | 168 | 2,858 |
| Uniforms | | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | |
| Total | | $0.18 | | 350 |
| Taxes | 0.125 | $1.89 | | 3,623 |
| Workers Comp | 0.0349 | $0.53 | | 1,012 |
| Total | | $2.42 | | 4,635 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.08 | | - |
| Pension | | $0.69 | | 1,324 |
| Total | | $0.77 | | 1,480 |
| Total Real Wage Per Productive Hour | | $18.52 | - | 35,452 |

# Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Timothy Hall Dish Machine Operator DOH 8/3/2009

## 2015

$0.55  $0.66  $0.28  $0.00  $0.00  $0.18  $1.89  $0.53  $0.08  $0.69

$13.65

TRW=$18.52

☑ Base Pay & OT    ☑ Vacation    ☑ Holiday    ☑ Personal/Sick

☑ Jury Duty    ☑ Bereavement    ☑ Uniforms    ☑ Taxes

☑ Workers Comp    ☑ Health & Welfare    ☑ Pension

GC Exhibit 10(k)

000002
P 01419



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Timothy Hall Dish Machine Operator DOH 8/3/2009
2016

TRW= $18.95 Increased from 2015 2.35%

$0.56  $0.67  $0.28 $0.00 $0.00
$0.18
$1.94
$0.54
$0.08
$14.00
$0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

| | 2016 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.43 | 1,912 | 25,296 |
| Vacation (W) | | $3.50 | 80 | - |
| Lunch 30min/8hrs | | | 120 | |
| Rest 15min/4hrs | | | 120 | |
| Total Compensable Productive Work Time | | $14.00 | 1,915 | 26,129 |
| Vacation (W) | 2 | $0.56 | 80 | 1,058 |
| Holiday (D) | 6 | $0.67 | 48 | 1,270 |
| Sick/Personal (D) | 5 | $0.28 | 40 | 529 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.52 | 168 | 2,858 |
| Uniforms | | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.18 | | 350 |
| Taxes | 0.125 | $1.94 | | 3,623 |
| Workers Comp | 0.0349 | $0.54 | | 1,012 |
| Total | | $2.48 | | 4,635 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.08 | | - |
| Pension | | $0.69 | | 1,324 |
| Total | | $0.78 | | 1,480 |
| Total Real Wage Per Productive Hour | | $18.95 | - | 35,452 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Timothy Hall Dish Machine Operator DOH 8/3/2009

2016

TRW= $18.95 Increased from 2015 2.35%

Legend: Base Pay & OT · Vacation · Holiday · Personal/Sick · Jury Duty · Bereavement · Uniforms · Taxes · Workers Comp · Health & Welfare · Pension

GC Exhibit 10(k)

000004
P 01421



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Timothy Hall Dish Machine Operator DOH 8/3/2009
2017

TRW= $19.03 Increased from 2016 0.39%

$0.56   $0.68   $0.39 $0.00   $0.00
$0.18
$1.95
$0.54
$0.09
$14.00
$0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

GC Exhibit 10(k)

| | 2017 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.43 | 1,904 | 25,568 |
| Vacation (W) | | $3.50 | 80 | 280 |
| Lunch 30min/8hrs | | | 119 | |
| Rest 15min/4hrs | | | 119 | |
| Total Compensable Productive Work Time | | $14.00 | 1,907 | 26,694 |
| Vacation (W) | 2 | $0.56 | 80 | 1,074 |
| Holiday (D) | 6 | $0.68 | 48 | 1,289 |
| Sick/Personal (D) | 6 | $0.34 | 48 | 645 |
| Jury Duty (D) | 0 | $0.00 | - | |
| Bereavement (D) | 0 | $0.00 | - | |
| Total Compensable Non-Productive Work Time | | $1.58 | 176 | 3,008 |
| Uniforms | 3 | $0.18 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.18 | | 350 |
| Taxes | 12.50% | $1.95 | | 3,713 |
| Workers Comp | 3.49% | $0.54 | | 1,037 |
| Total | | $2.49 | | 4,749 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.09 | | - |
| Pension | | $0.69 | | 1,319 |
| Total | | $0.78 | | 1,485 |
| Total Real Wage Per Productive Hour | | $19.03 | - | 36,286 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Timothy Hall Dish Machine Operator DOH 8/3/2009

2017

$0.56  $0.68  $0.34  $0.00  $0.00  $0.18  $1.95  $0.54  $0.09  $14.00  $0.69

TRW=$19.03 Increased from 2016 0.39%

⊠ Base Pay & OT    ⊠ Vacation    ⊠ Holiday    ⊠ Personal/Sick
⊠ Jury Duty    ⊠ Bereavement    ⊠ Uniforms    ⊠ Taxes
⊠ Workers Comp    ⊠ Health & Welfare    ⊠ Pension



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Timothy Hall Dish Machine Operator DOH 8/3/2009
2018

TRW= $19.67 Increased from 2017 3.39%

$0.87    $0.70    $0.35    $0.00    $0.00    $0.19    $2.02    $0.56    $0.09    $0.69    $14.20

Base Pay & OT    Vacation    Holiday    Personal/Sick    Jury Duty    Bereavement    Uniforms    Taxes    Workers Comp    Health & Welfare    Pension

| | 2018 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.63 | 1,912 | 25,406 |
| Vacation (W) | | $3.50 | 80 | 280 |
| Lunch 30min/8hrs | | | 120 | |
| Rest 15min/4hrs | | | 120 | |
| Total Compensable Productive Work Time | | $14.20 | 1,915 | 26,545 |
| Vacation (W) | 3 | $0.87 | 80 | 1,636 |
| Holiday (D) | 6 | $0.70 | 48 | 1,308 |
| Sick/Personal (D) | 6 | $0.35 | 40 | 654 |
| Jury Duty (D) | 0 | $0.00 | | - |
| Bereavement (D) | 0 | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.92 | 168 | 3,598 |
| Uniforms | 3 | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 12.50% | $2.02 | | 3,768 |
| Workers Comp | 3.49% | $0.56 | | 1,052 |
| Total | | $2.58 | | 4,820 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.09 | | - |
| Pension | | $0.69 | | 1,293 |
| Total | | $0.78 | | 1,464 |
| Total Real Wage Per Productive Hour | | $19.67 | | 36,777 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Timothy Hall Dish Machine Operator DOH 8/3/2009

2018

$0.87   $0.70   $0.35   $0.00   $0.19   $2.02   $0.56   $0.09   $0.69   $14.20

TRW=$19.67
Increased
from   2017
3.39%

◪ Base Pay & OT   ◪ Vacation   ◪ Holiday   ◪ Personal/Sick
◪ Jury Duty   ◪ Bereavement   ◪ Uniforms   ◪ Taxes
◪ Workers Comp   ◪ Health & Welfare   ◪ Pension

GC Exhibit 10(k)

000008
P 01425



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Timothy Hall Dish Machine Operator DOH 8/3/2009
2019

TRW= $19.95
Increased
from: 2018
1.43%

$0.89  $0.71  $0.36 $0.00 $0.00  $0.19  $2.05  $0.57  $0.09

$14.41

$0.69

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

000009
P 01426

| | 2019 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $13.83 | 1,912 | 25,296 |
| Vacation (W) | | $3.50 | 80 | |
| Lunch 30min/8hrs | | | 120 | |
| Rest 15min/4hrs | | | 120 | |
| Total Compensable Productive Work Time | | $14.41 | 1,915 | 26,129 |
| Vacation (W) | 2 | $0.89 | 80 | 1,058 |
| Holiday (D) | 6 | $0.71 | 48 | 1,270 |
| Sick/Personal (D) | 6 | $0.36 | 40 | 529 |
| Jury Duty (D) | 0 | $0.00 | | |
| Bereavement (D) | 0 | $0.00 | | |
| Total Compensable Non-Productive Work Time | | $1.95 | 168 | 2,858 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | |
| Meals | 0 | $0.00 | | |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $2.05 | | 3,623 |
| Workers Comp | 0.0349 | $0.57 | | 1,012 |
| Total | | $2.62 | | 4,635 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.09 | | |
| Pension | | $0.69 | | 1,324 |
| Total | | $0.79 | | 1,480 |
| Total Real Wage Per Productive Hour | | $19.95 | | 35,452 |



**Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO**

Timothy Hall Dish Machine Operator DOH 8/3/2009

**2019**

$0.89   $0.71   $0.36   $0.00   $0.00   $0.19   $2.05   $0.57   $0.09   $14.41   $0.69

**TRW= $19.95 Increased from 2018 1.43%**

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

000010
P 01427



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Timothy Hall Dish Machine Operator DOH 8/3/2009
2020

TRW= $16.37
Increased
from 2019
-17.95%

$0.72    $0.57    $0.29  $0.60 $0.00
$0.19
$1.66
$0.46
$11.69    $0.10
$0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

000011
P 01428

| | 2020 | Hourly Rate | Total Annual Hours | Total Annual Cost |
|---|---|---|---|---|
| Base Pay- | | $11.20 | 1,912 | 25,296 |
| Vacation (W) | | $3.50 | 80 | - |
| Lunch 30min/8hrs | | | 120 | |
| Rest 15min/4hrs | | | 120 | |
| Total Compensable Productive Work Time | | $11.69 | 1,915 | 26,129 |
| Vacation (W) | 2 | $0.72 | 80 | 1,058 |
| Holiday (D) | 6 | $0.57 | 48 | 1,270 |
| Sick/Personal (D) | | $0.29 | 40 | 529 |
| Jury Duty (D) | | $0.00 | | - |
| Bereavement (D) | | $0.00 | | - |
| Total Compensable Non-Productive Work Time | | $1.58 | 168 | 2,858 |
| Uniforms | | $0.19 | | 350 |
| Transportation | | $0.00 | | - |
| Meals | 0 | $0.00 | | - |
| Total | | $0.19 | | 350 |
| Taxes | 0.125 | $1.66 | | 3,623 |
| Workers Comp | 0.0349 | $0.46 | | 1,012 |
| Total | | $2.12 | | 4,635 |
| Trust Fund Report | | | | |
| Health & Welfare- | | $0.10 | | - |
| Pension | | $0.69 | | 1,324 |
| Total | | $0.79 | | 1,480 |
| Total Real Wage Per Productive Hour | | $16.37 | - | 35,452 |



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO

Timothy Hall Dish Machine Operator DOH 8/3/2009

2020

$0.72  $0.57  $0.29  $0.00  $0.00  $0.19  $1.66  $0.46  $0.10  $11.69  $0.69

TRW=$16.37 Increased from 2019 -17.95%

Base Pay & OT    Vacation    Holiday    Personal/Sick
Jury Duty    Bereavement    Uniforms    Taxes
Workers Comp    Health & Welfare    Pension

GC Exhibit 10(k)

000012
P 01429



Kahler Hotels LLC and UNITE HERE Local 21 AFL-CIO
Timothy Hall Dish Machine Operator DOH 8/3/2009
2015- 2020

000013
P 01430

Marriott



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Ryan Dubois 2nd Cook DOH  2/4/2008
2015

TRW= $30.83

$0.74   $0.97   $0.40 $0.48 $0.24
$0.18
$2.76   $0.77
$1.56
$22.05
$0.69

☒ Base Pay & OT   ☒ Vacation   ☒ Holiday   ☒ Personal/Sick   ☒ Jury Duty   ☒ Bereavement   ☒ Uniforms   ☒ Taxes   ☒ Workers Comp   ☒ Health & Welfare   ☒ Pension



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Ryan Dubois 2nd Cook DOH  2/4/2008
2016

TRW= $31.34 Increased from 2015 1.64%



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Ryan Dubois 2nd Cook DOH  2/4/2008
2017

TRW= $31.15 Increased from 2016 -0.59%

$1.11  $0.96  $0.48  $0.48  $0.24  $0.17  $2.75  $0.77  $1.53  $0.69  $21.97

Base Pay & OT  Vacation  Holiday  Personal/Sick  Jury Duty  Bereavement  Uniforms  Taxes  Workers Comp  Health & Welfare  Pension

GC Exhibit 10(l)

000003
P 01433



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Ryan Dubois 2nd Cook DOH  2/4/2008
2018

TRW= $31.59
Increased
from  2017
1.40%

$1.13   $0.98   $0.49  $0.49   $0.24   $0.17   $2.79   $0.78   $1.53   $0.69

$22.31

⊠Base Pay & OT  ⊠Vacation  ⊠Holiday  ⊠Personal/Sick  ⊠Jury Duty  ⊠Bereavement  ⊠Uniforms  ⊠Taxes  ⊠Workers Comp  ⊠Health & Welfare  ⊠Pension

GC Exhibit 10(l)

000004
P 01434



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Ryan Dubois 2nd Cook DOH  2/4/2008
2019

TRW= $32.03
Increased
from: 2018
1.38%

$1.14  $0.99  $0.50  $0.50  $0.25  $0.17  $2.83  $0.79  $1.53  $0.69

$22.64

☑ Base Pay & OT  ☑ Vacation  ☑ Holiday  ☑ Personal/Sick  ☑ Jury Duty  ☑ Bereavement  ☑ Uniforms  ☑ Taxes  ☑ Workers Comp  ☑ Health & Welfare  ☑ Pension

GC Exhibit 10(l)



Kahler Hotels, LLC and UNITE HERE Local 21 AFL-CIO
Ryan Dubois 2nd Cook DOH  2/4/2008
2020

TRW= $32.46
Increased
from 2019
1.36%

$1.16  $1.01  $0.50  $0.50  $0.25  $0.17  $2.87  $0.80

$22.97

$1.33

$0.69

Base Pay & OT   Vacation   Holiday   Personal/Sick   Jury Duty   Bereavement   Uniforms   Taxes   Workers Comp   Health & Welfare   Pension

GC Exhibit 10(l)

000006
P 01436

EXHIBIT NO. **GC 11** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME _____ **Richfield**

NO. OF PAGES **2** DATE **12/15/15** REPORTER **SMW**

| From: | Martin Goff |
|---|---|
| To: | Wiese, Tyler |
| Subject: | FW: Negotiations for tomorrow. |
| Date: | Monday, October 19, 2015 4:07:06 PM |
| Attachments: | image001.gif |

Below, fine Nancy Goldman's request for clarification and Michael Henry's response.

Martin Goff


**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Monday, October 19, 2015 4:03 PM
**To:** Nancy Goldman <ngoldman@here17.org>; brian@local21.com; Martin Goff <mgoff@here17.org>
**Cc:** Patrick Short <pshort@kahlerhospitalitygroup.com>; Mary Costello <MCostello@kahlerhospitalitygroup.com>; Chad Decker <cdecker@kahlerhospitalitygroup.com>
**Subject:** RE: Negotiations for tomorrow.

Yes. That is correct.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o:  507.285.2708
f:  507.285.2793
e:  mhenry@kahlerhospitalitygroup.com


**From:** Nancy Goldman [mailto:ngoldman@here17.org]
**Sent:** Monday, October 19, 2015 3:00 PM
**To:** Michael Henry; brian@local21.com; Martin Goff
**Cc:** Patrick Short; Mary Costello; Chad Decker
**Subject:** RE: Negotiations for tomorrow.

Based on your email, am I to assume that you are cancelling the negotiations for tomorrow,

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**


**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]

**GC Exhibit 11**

**Sent:** Monday, October 19, 2015 1:47 PM
**To:** Nancy Goldman; brian@local21.com; Martin Goff
**Cc:** Patrick Short; Mary Costello; Chad Decker
**Subject:** Negotiations for tomorrow.

Dear Nancy,

After very careful review of the union's counter proposal presented at our September 24th, 2015 meeting. There is nothing we have seen and that you have said over the past few months of negotiations that dictates quid-quo-quo. We have seen your opposition to the proposed changes to tighten up the effective operation of the hotels and to make us more competitive in the Rochester market and with the Rochester competition. As we continue to manage in the competitive Rochester market we must make changes to impact the fact that we are the only union hotels.

We went through each of the line items and our responses are attached. Based on the status of the negotiations and the fact that you have not given us any significant reason to change our proposal we do not feel the need for an additional meeting to discuss the same things we have already discussed several times over the last several months. If you bring us something that is significant enough for us to move off of our last best and final offer then let us know.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

EXHIBIT NO. **GC 12** RECEIVED ✔ REJECTED

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **2** DATE **12/15/15** REPORTER **SMW**

| From: | Martin Goff |
|---|---|
| To: | Wiese, Tyler |
| Subject: | FW: Negotiations for tomorrow. |
| Date: | Wednesday, November 04, 2015 5:24:45 PM |
| Attachments: | image002.gif |

This was an email to Michael Henry this afternoon. Thank you, Martin

**From:** brian@local21.com [mailto:brian@local21.com]
**Sent:** Wednesday, November 04, 2015 3:43 PM
**To:** 'Michael Henry' <mhenry@kahlerhospitalitygroup.com>; Nancy Goldman
<ngoldman@here17.org>; Martin Goff <mgoff@here17.org>
**Cc:** 'Patrick Short' <pshort@kahlerhospitalitygroup.com>; 'Mary Costello'
<MCostello@kahlerhospitalitygroup.com>; 'Chad Decker' <cdecker@kahlerhospitalitygroup.com>
**Subject:** RE: Negotiations for tomorrow.

Michael,
Please provide the Union with several dates over the next few weeks that the employer would be
available to meet to continue the negotiations for a new CBA. We believe the Union made several
proposals which warrant discussion. As soon as we have your list of available dates we can
coordinate our next meetings.

Thanks


Brian Brandt
President UNITE HERE Local 21
Phone: 507-288-2021
Cell: 507-254-5735
Fax: 507-281-3491


**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Monday, October 19, 2015 1:47 PM
**To:** Nancy Goldman <ngoldman@here17.org>; brian@local21.com; mgoff@here17.org
**Cc:** Patrick Short <pshort@kahlerhospitalitygroup.com>; Mary Costello
<MCostello@kahlerhospitalitygroup.com>; Chad Decker <cdecker@kahlerhospitalitygroup.com>
**Subject:** Negotiations for tomorrow.

Dear Nancy,
After very careful review of the union's counter proposal presented at our September 24th,
2015 meeting. There is nothing we have seen and that you have said over the past few months
of negotiations that dictates quid-quo-quo. We have seen your opposition to the proposed
changes to tighten up the effective operation of the hotels and to make us more competitive in
the Rochester market and with the Rochester competition. As we continue to manage in the

**GC Exhibit 12**

competitive Rochester market we must make changes to impact the fact that we are the only union hotels.

We went through each of the line items and our responses are attached. Based on the status of the negotiations and the fact that you have not given us any significant reason to change our proposal we do not feel the need for an additional meeting to discuss the same things we have already discussed several times over the last several months. If you bring us something that is significant enough for us to move off of our last best and final offer then let us know.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

EXHIBIT NO. **GC 13** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **3** DATE **12/15/15** REPORTER **SMW**

| From: | Martin Goff |
|---|---|
| To: | Wiese, Tyler |
| Subject: | FW: Negotiations |
| Date: | Monday, November 09, 2015 9:26:48 AM |
| Attachments: | image002.gif |

This is Brian's second request for dates. Martin

**From:** brian@local21.com [mailto:brian@local21.com]
**Sent:** Monday, November 09, 2015 12:38 AM
**To:** 'Michael Henry' <mhenry@kahlerhospitalitygroup.com>
**Cc:** 'Mary Costello' <MCostello@kahlerhospitalitygroup.com>; 'Chad Decker'
<cdecker@kahlerhospitalitygroup.com>; Martin Goff <mgoff@here17.org>; Nancy Goldman
<ngoldman@here17.org>
**Subject:** Negotiations

Michael,
Please provide the Union with several dates over the next few weeks that the employer would be
available to meet to continue the negotiations for a new CBA. We believe the Union made several
proposals which warrant discussion. As soon as we have your list of available dates we can
coordinate our next meetings. Please respond by November 12th.

Thanks


Brian Brandt
President UNITE HERE Local 21
Phone: 507-288-2021
Cell: 507-254-5735
Fax: 507-281-3491


**From:** brian@local21.com [mailto:brian@local21.com]
**Sent:** Wednesday, November 4, 2015 3:43 PM
**To:** 'Michael Henry' <mhenry@kahlerhospitalitygroup.com>; 'Nancy Goldman'
<ngoldman@here17.org>; 'mgoff@here17.org' <mgoff@here17.org>
**Cc:** 'Patrick Short' <pshort@kahlerhospitalitygroup.com>; 'Mary Costello'
<MCostello@kahlerhospitalitygroup.com>; 'Chad Decker' <cdecker@kahlerhospitalitygroup.com>
**Subject:** RE: Negotiations for tomorrow.

Michael,
Please provide the Union with several dates over the next few weeks that the employer would be
available to meet to continue the negotiations for a new CBA. We believe the Union made several
proposals which warrant discussion. As soon as we have your list of available dates we can
coordinate our next meetings.

**GC Exhibit 13**

Thanks

Brian Brandt
President UNITE HERE Local 21
Phone: 507-288-2021
Cell: 507-254-5735
Fax: 507-281-3491

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Monday, October 19, 2015 1:47 PM
**To:** Nancy Goldman <ngoldman@here17.org>; brian@local21.com; mgoff@here17.org
**Cc:** Patrick Short <pshort@kahlerhospitalitygroup.com>; Mary Costello <MCostello@kahlerhospitalitygroup.com>; Chad Decker <cdecker@kahlerhospitalitygroup.com>
**Subject:** Negotiations for tomorrow.

Dear Nancy,

After very careful review of the union's counter proposal presented at our September 24th, 2015 meeting. There is nothing we have seen and that you have said over the past few months of negotiations that dictates quid-quo-quo. We have seen your opposition to the proposed changes to tighten up the effective operation of the hotels and to make us more competitive in the Rochester market and with the Rochester competition. As we continue to manage in the competitive Rochester market we must make changes to impact the fact that we are the only union hotels.

We went through each of the line items and our responses are attached. Based on the status of the negotiations and the fact that you have not given us any significant reason to change our proposal we do not feel the need for an additional meeting to discuss the same things we have already discussed several times over the last several months. If you bring us something that is significant enough for us to move off of our last best and final offer then let us know.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

EXHIBIT NO. **GC 14** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME ____ **Richfield** ____

NO. OF PAGES ___ **11** ___ DATE **12/15/15** REPORTER ___ **SMW** ___

| From: | Martin Goff |
|---|---|
| To: | Wiese, Tyler |
| Subject: | FW: Negotiations for tomorrow. |
| Date: | Wednesday, November 11, 2015 1:19:06 PM |
| Attachments: | image001.gif |
| | Unite Here Proposal Response 9 24 15 (3).docx |

Here is Kahler's most recent answer below. Martin Goff

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Wednesday, November 11, 2015 12:57 PM
**To:** brian@local21.com; Nancy Goldman <ngoldman@here17.org>; Martin Goff <mgoff@here17.org>
**Cc:** Chad Decker <cdecker@kahlerhospitalitygroup.com>; Mary Costello <MCostello@kahlerhospitalitygroup.com>
**Subject:** FW: Negotiations for tomorrow.

Hello Brian,
I have attached a copy of the Hotel's response to the Union proposal forwarded below a copy of the email that was sent to you, Nancy, and Martin responding to all the proposed items presented to us at our previous bargaining session.
As indicated in the final paragraph of that email. We are willing to meet with you and the rest of the team when you have given us a significant reason to do so. That is, presenting something different from what you have, and we have discussed at length over the past several months with you and your team.
As per your email you are not presenting anything further or different that would encourage or force us to change our position. Furthermore, we have responded to all your proposals in our meetings and also in writing, with clarification on items you or the team had.
If there are changes you would like to present that will assist us in tightening up the effective operation of the hotels and will contribute to the hotels being more competitive in the Rochester market. We look forward to discussing them.
PLEASE SEE BELOW EMAIL and the attachment on the responses of the Union's Proposal from 9/28/15


Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

---

**From:** Michael Henry
**Sent:** Monday, October 19, 2015 1:47 PM
**To:** Nancy Goldman; 'brian@local21.com'; mgoff@here17.org
**Cc:** Patrick Short; Mary Costello; Chad Decker

**Subject:** Negotiations for tomorrow.

Dear Nancy,

After very careful review of the union's counter proposal presented at our September 24th, 2015 meeting. There is nothing we have seen and that you have said over the past few months of negotiations that dictates quid-quo-quo. We have seen your opposition to the proposed changes to tighten up the effective operation of the hotels and to make us more competitive in the Rochester market and with the Rochester competition. As we continue to manage in the competitive Rochester market we must make changes to impact the fact that we are the only union hotels.

We went through each of the line items and our responses are attached. Based on the status of the negotiations and the fact that you have not given us any significant reason to change our proposal we do not feel the need for an additional meeting to discuss the same things we have already discussed several times over the last several months. If you bring us something that is significant enough for us to move off of our last best and final offer then let us know.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

**Unite Here Local 21 Counter Proposal 9/24/2015**

**#4**. Temporary Employees:  Current language amended to include: The Employer shall be allowed to employ Interns to work in classifications covered by the CBA for a period of no longer than 30 days.  Interns shall be paid no less than the start rate of the classification which they are assigned to and shall not be scheduled to work before regular fulltime and part time employees.  Interns shall not be scheduled to avoid paying overtime to regular full and part time employees.

*Response: We have heard your proposal and understand it. The current climate in our market, Rochester, makes it rather difficult to recruit and maintain employees. As a reminder, based on the reports the unemployment rate in Rochester is currently 1.6% with 1400 more new rooms scheduled in Rochester. Which has resulted in the need to explore alternative; in this case temp labor. As a result this is an area that we need to execute the only avenue we have as a management in the CBA, "Management Right" to be oscillate with the change in our market place. We will adhere to our current proposal.*

**#5.** Reject Union counter: average of 20 hours per week for insurance

*Response: We understand and we have heard your rejection to the change proposed. As discussed at the length during our negotiations, the employer is proposing to make the eligibility hours for insurance benefits match what the federal government has proposed and what all other organization in the country does, especially those that are our competitors in Rochester. We will adhere to our current proposal.*

#31. Reject 90 day probationary

*Response: This was TA'd 4/26/15. As per our discussion on 9/24/15 the ability to have the 90 days already existed; which has not impacted the onboarding or*

*evaluation process for each new employee. We understand and hear your rejection. We adhere to the TA'd section in our current proposal.*

#37 Reduce 18 months to 12 months

*Response: We heard and understand your proposal to reduce disciplinary action in files from 18 – 12 months. Due to the litigious nature of our society, where law suits are filed at the drop of a bucket, this is important to manage the hotels effectively. We adhere to our proposal.*

#42 Add to b: <u>Effect of failure to Appeal</u>.  Any grievance not appealed to a succeeding step within the time limits specified shall be deemed abandoned and not entitled to further consideration.  Such abandonment by the Employer shall be deemed an acceptance of the grievance as started and the remedy requested shall be accepted and enforced.

*Response: We understand your request for the addition to the current language. That would constitute a change contrary to the existing proposed language in that section. Also if the parties want to resolve the matter they can do so. We adhere to our proposed language.*

#51Reject any change to current leave language

*Response: We heard and understand your rejection of the proposed leave language. The proposed language as discussed during our negotiations is in conjunction with Federal and Minnesota guideline. We adhere to our current proposal.*

#54 Reject limit of 3 working days proposed up to 6 months

*Response: We have heard your concerns and understand the proposal. We will adhere to our current proposal.*

#66 Reject deletion of daily overtime

*Response: We understand your rejection to the proposed change. While we understand the need at times for an employee to, at times for business needs, to work more than 8 hour shifts it does not preclude the employee from being paid overtime after 40 hours for the work week. We also want to be more consistent with our competitors in Rochester, which is essential to our business. Although we also discussed the possibility of $ by 10 hour shifts. We will still adhere to our current proposal.*

#76 Reject any change to current language

*Response: We understand and hear your rejection to the change. The proposed and the expired contract covers all the hotels and while there is seniority, this proposal allows the associates in the other hotels that experience downturn at different times to be able to get additional hours. As indicated during our discussions in bargaining sessions, on the occasions when the hotels current staff is already at their forty (40) hours would be the time this language would be in effect. This allows the employee to be kept whole and assist with retention especially with the tight employment market in Rochester. We feel strongly that this proposed change will assist with the more effective management of the business.*

#79 Change cost to NO COST

*Response: We understand the union's proposal for the employee to not have a cost for employee meal. The competitors and non-competitors in the Rochester market does not give or offer employee meals for free. This is a cost that typically increases annually. Remember also that the cost of labor, food, room, and other incidental charges are not included. What we intended to do or have the ability to do is to be able to manage this process at a reasonable cost as noted also in the expired contract. We adhere to our current proposal.*

#90 DISCUSS (union requested the quantifications of this proposal)

*Response: We understand and hear your request for quantification of the proposal. As per our discussion at the negotiation table the change does benefit our associates. Your response on just having a ball park figure on what the cost is or will be to the employer. From what we have surmised this could be a cost of about $84k (we have the scenario of approximately a minimum of 65 associate will be impacted. At an average cost of $1200 for the early additional week resulting in $84k).*

#93 Add:  Tipped adjustment rate shall be paid for all Holiday, Report in Pay, Sick time, and Personal days.  <u>REJECT deletion of selling up to 40 annually and add may rollover up to 80 hours annually to be used in the following year.</u>

*Response: We heard and understand your rejection of the employers' proposal. We adhere to the current proposal.*

#100 Add: There shall be no cap on the number of vacation days that may be taken at one time provided business levels allow.

*Response: As we clarified in negotiations there is not a cap on the number of days that may be taken at one time. We adhere to the language I the proposal.*

#103 Reject reference to employer's #5. ADD: the cost of the monthly premiums and any increases to the premiums, shall be split 80/20 with the Employer paying 80%.  Effective upon ratification of the Employer shall reimburse 80% of the Employees cost toward the deductible annually.  Employees shall provide proof of payments and reimbursement shall be paid within 14 days of receipt of such proof.

*Response: We hear and understand your proposal. The employer will maintain the ability to move, negotiate, and manage with the changing climate in the market place. It would be irresponsible to be locked in to the proposed language especially with the constant change with insurance providers and what is directed with*

*Obama Care. In negotiations we were able to eloquently and elaborately explained the process that the insurance companies take to make their decision to provide coverage and at what cost. Those cost change annually, and the employer maintains the ability to discuss and negotiate any proposed change.  As a result we adhere to our current proposal.*

ADD: During the life of the agreement either party with 30 days written notice to the other, shall be allowed to open this section of the Contract for the purpose of bargaining a change in insurance policy or provided. ***Note that the Union has proposed 2 alternative Plans which are available.

*Response: We understand the union's proposal. The employer was able to review the 2 proposed medical plan presented. As we reported in a few of our negotiations that the cost of the unions proposed alternative to our medical plan that the cost is significantly hirer. We will adhere to the current proposal.*

| Comment [MC1]: Typo |
| --- |

#111 Reject Banquet hourly rate

Over scale employees to be paid the same percent or cents per hour as others in their classification.

*Response: We understand your rejection of the proposed banquet hourly rate. We were able to share with the negotiating committee the changes that have taken place year over year in Rochester with the increasing competition from the Canadian Honkers and the other caterers in the market. Our competition in Rochester hirers our people at a different rate to work for them. Which has contributed to our competitors being able to bid lower for business in Rochester. The proposed change allows the employer the opportunity to improve its competitive edge to capture business. The employer adheres to the current proposal.*

#112 REJECT

*Response: We recognize your rejection. We adhere to our proposal.*

#118 Change 2nd day to 1st day

*Response: We acknowledge your request for change. We adhere to our proposal.*


#119 Change maximum accumulation/carry over to 240 hours. Clarify employers

*Response: We hear and appreciate the feedback on this type "o". We will address and make the changes on this page available reflecting 240 hours for those employees hired prior to September 1st, 2005.*


#132 Increase to $350.00 in year 2 and $375.00 in year 3

*Response: We understand your proposal. We will adhere to the current proposal.*


#143 Effective date

*Response: We understand the proposal. We adhere to our proposal.*


#144 Reject.  Add:  wage increases shall be effective March 1, 2015

*Response: We understand the proposal. We adhere to our proposal.*


#146 Reject date

*Response: We understand the proposal. We adhere to our proposal.*

**APPENDIX "A"** Reject proposed increase for 2016-2020

Accept Employers proposed 2015 rates as new start rate.

*Response: We understand the union's rejection of the proposed wage increase 2016-2020 proposal. We adhere to our proposal.*


New Employees Increases-New employees who do not receive any disciplinary action during first ninety (90) days of employment will receive twenty-five cent (.25) pay increase above the new start rate.

*Response: We understand the proposal. We adhere to our proposal.*


**Wages Effective March 1, 2015**

***2013-12 Month rate, 2013-24 month rate,

The 42 month rate becomes a 36 month rate.  The 60 month rate becomes a 48 month rate.  The new 60 month rate is increased by 3% for 2015.

March 1st of each year: add 2 ½ % on each step in all classifications.

*Response: We understand the proposal. We adhere to our proposal.*


***__Perfect Attendance Bonus-__employee's shall receive a quarterly bonus of $25.00

*Response: We understand the proposal. We adhere to our proposal.*

***__New Employee Finder's Fee-__**If a worker refers another person to be employed at any of the Hotels that worker will receive $100.00 upon the new person passing probation and another $100.00 if that person makes it 6 months with no disciplinary write ups placed in their file.

*Response: We understand the proposal. The employer already have this program in-place.*

__APPENDIX "D"__ Effective March 1, 2017 the total number of rooms assigned daily shall be fifteen (15).

**Effective on ratification the "Waste Cleanup fee" shall be $10.00. Effective March 1, 2017 this amount shall be increased to $15.00

**Effective March 1, 2016 housekeeping employees shall be paid $2.00 for each extra bed, cot, rollaway or air mattress made up.

**__Efficient Room Cleaning Incentive Pay-__** Room cleaners who complete their normal complement of rooms on time and in an efficient manner during each scheduled shift shall receive $10.00 per week.

** __Housekeeping Service Charge-__**$5.00 per day shall be added to each guest room bill; $2.00 per room cleaner, $1.00 to the lobby Porter/Houseman and $2.00 to the house. (The $2.00 to the house can be used to defray other contractual costs to the employer such as Healthcare costs)

| Comment [MC2]: Typo? |
| --- |

*Response: We understand the proposal. This is not a common charge in the market and would put us at a disadvantage versus the competition. In addition we believe this would not be well received from our guests and impact our service scores greatly. Therefore, we reject the proposed addition and aaaadhere to our proposal.*

**APPENDIX "E"** REJECT employers proposal of $12-15 flat fee.  Leave current language and system as is.

*Response: We understand the proposal. We adhere to our proposal.*

**APPENDIX "F"** Reject subcontracting/leasing out language.

*Response: We understand the proposal. We adhere to our proposal.*

The Union reserves the right to add to, modify, or amend these proposals.

EXHIBIT NO. __**GC 18**__ RECEIVED ___✔___ REJECTED _____

CASE NO. __**18-CA-151245**__ CASE NAME ___**Richfield**___

NO. OF PAGES __**14**__ DATE __**12/15/15**__ REPORTER __**SMW**__



**STOKES WAGNER**
STOKES WAGNER HUNT MARETZ & TERRELL

One Atlantic Center
1201 W. Peachtree Street, Suite 2400
Atlanta, Georgia 30309
(404) 766-0076 Phone
(404) 766-8823 Fax
www.stokeswagner.com

Karl M. Terrell
kterrell@stokeswagner.com

August 3, 2015

Tyler Weiss
NLRB Region 18
Via email

Re: <u>Kahler Hospitality Group</u>, case 18-CA-151245

Dear Tyler:

The Employer declines to produce any further evidence at this time, except as stated and shown below.   We provide here a further statement of Respondent's position.

<u>Request to quantify Employer's vacation proposal</u>:

Several discussions concerning this proposal and its cost were held at the bargaining table.  The Employer explained it would be impossible to provide a precise quantification, and exceptionally difficult to provide a materially meaningful quantification.

The reasons for this are self-evident.  It is impossible to predict over the course of a future multi-year CBA how many employees, for example, will hit the five-year mark, and when, and how many will hit the ten-year mark, and when.  In addition, you have the variable of wage rates: How many, for example, will be at a $10 wage rate when they hit the five-year mark, and how many at a $12 wage rate.

<u>Request for Employer to explain whether its wage proposal constitutes a 'floor' with merit increases or whether the proposal constitutes set wage rates only</u>:

The Employer doesn't see the issue here, or understand why the question has been posed.  It is abundantly clear that the Employer has made a set-wage proposal only.

**GC Exhibit 18**

Tyler Weiss
August 3, 2015
Page 2

*See*, sample page from the proposal attached here as **Exhibit 1**. The Employer has not made any proposals for merit increases, nor has this Employer made any merit – pay increases since assuming the CBA.

<u>Request for quantification regarding health care cost:</u>

The Employer has provided quantification, and has discussed the costs at the table. *See,* attached **Exhibit 2**.

<u>Request for quantification of the cost of removing 6th & 7th day premium pay:</u>

Several discussions concerning this proposal and its cost were held at the bargaining table. The Employer explained it would be impossible to provide a precise quantification, and exceptionally difficult to provide a materially meaningful quantification. Specifically, in this regard, the time-keeping/payroll system the Employer has in place doesn't quantify or segregate this cost. Further, it would be impossible to predict over the future course of a multi-year CBA how many employees, at varying wage rates, will be called upon to work 6th & 7th days.

<u>Verbal request for information concerning employees who have not received anniversary-date increases since contract expiration:</u>

The Union has had all the information it needs in this regard. Specifically, the Union has been provided during the course of negotiations several updated iterations of the employee census, which contains all the anniversary dates for all employees. Using this data, the Union can make an easy determination as to who, they contend, are entitled to post-expiration anniversary-date increases.

Tyler Weiss
August 3, 2015
Page 3


Allegation: passing over committee members for job advancement – the "banquet captain" issue:

The initial charge left us with no clue as to the allegation being made here. Your July 26 letter clarifies that the issue relates to the supposed creation of a banquet captain position.

First, no such position has been created. Second, if such a position had been created, the Employer would have been well within its management rights to do so. *See,* Article 22 of the expired CBA; *and see,* Article 14.4 (making clear that if management does create a new job classification, it is obligated only to negotiate the wage rate).

As to the first point: There have been internal discussions only concerning the possible creation of a banquet captain position. This position, however, has not been created, requisitioned, posted or advertised. The possibility of having a banquet captain position was, however, mentioned at the bargaining table.

If any discussions concerning this were held with current banquet servers, the discussions were highly informal and conducted only in the context of an exploration of the possible creation of such a position. No one was offered the job, because no such job exists.


Removal of Union posters from non-union bulletin boards:

We have already responded to this allegation. You have noted in your June 26 letter, however, that the Union is apparently claiming a past practice that has allowed postings in locations other than designated union boards.

This Employer has no awareness of any such past practice. This Employer, prior to this winter, made no observations of any posting of union materials in places other than on the designated union boards. After negotiations did heat up, there were observations of some union postings in non-approved locations – including, for example, on the public bulletin board at the Starbucks café. These were removed, as explained before, consistent with the terms of the CBA.

In response to your question as to the Employer's process and policies related to approving and removing postings by the union – there is no policy or process. The Employer has not sought to require approval, and has not removed any postings

Tyler Weiss
August 3, 2015
Page 4

based on content. As has been explained, it has only removed postings mounted in inappropriate locations.

Alleged skipping of disciplinary steps – Graham Brandon:

Attached, as **Exhibit 3**, is the discipline at issue. The discipline was originally issued on February 25, 2015, as a second written warning (*i.e.,* a 'third' level warning, following a verbal and a first written warning). Following a complaint that the discipline had been issued at an incorrect level, the adjustment was made that you will see in the attached Exhibit: It was reduced on April 29 to a first written warning. We don't understand, therefore, the nature of the ULP charge allegation. This is a matter that was resolved on April 29.

Union buttons:

We have already responded to this issue, involving a culinary intern working in the hotel for a 12-week period. The question came up as to whether he was "a member" of the Union (the answer was 'no,' given his temporary status). He was not told to remove the button.

This Employer does not have a policy against wearing a union button. The Union will be unable to present evidence to the contrary.

Allegation related to "steps in pay schedule":

Unlike the facts in some Board cases you may have reviewed, the wage schedule in the expired CBA does not provide for step increases or percentage increases. *See,* Schedule A to the expired CBA. Although reaching an anniversary date triggered the increase at issue, the increase was not percentage-based, but was for a specific amount stated in dollars and cents. The current Employer did not negotiate these 'Schedule A' rates, and can only be guided by the wage schedule it followed when assuming this contract.

These specific dollar amounts are pegged and presented, in Schedule A, to occur on the identified anniversary points occurring within the term of the contract. It is clear from the schedule and from the context that these specific dollar-amount increases were agreed to only for the term of the Agreement. Neither Schedule A

Tyler Weiss
August 3, 2015
Page 5

nor any other language in this Agreement provides for any dollar-amount increases beyond the term of the Agreement.

In your June 26 letter, you asked for evidence of discussion on this issue, and you referred to the contract expiration as "alleged." There is in fact no dispute as to the expiration of the CBA, as reflected in the email exchange between representatives of the Union and Employer, attached here as **Exhibit 4**.

Alleged discrimination by not offering work to Committee member Kelli Johnson:

The Employer denies this allegation of discrimination. Johnson was given an opportunity to work in a different classification and provided the training to do so. The shifts needed at the time, however, did not fit her needs and schedule. Further, Johnson did not follow through and submit appropriate transfer-request paperwork. The department needed someone to cover the shifts, and a less-senior person who was available, and who did complete the transfer-request, was transferred into the role.

Respectfully submitted,

STOKES WAGNER HUNT MARETZ & TERRELL

KARL M. TERRELL

| | Current | $ 2015 | $ 2016 | $ 2017 | $ 2018 | $ 2019 | $ 2020 |
|---|---|---|---|---|---|---|---|
| Mechanic | $ 18.53 | 18.65 | 18.65 | 18.74 | 18.93 | 19.21 | 19.50 |
| Apprentice | $ 16.09 | 16.25 | 16.25 | 16.33 | 16.49 | 16.74 | 16.99 |
| Preventive Maintenance | $ 14.53 | 14.63 | 14.63 | 14.70 | 14.85 | 15.07 | 15.30 |
| Light/Yard Maintenance | $ 9.82 | 10.00 | 10.00 | 10.05 | 10.15 | 10.30 | 10.46 |

**KAHLER GRAND HOTEL** *PROPOSED RATES*

| Cooks | *CURRENT* | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| 2nd Cook | $ 15.03 | $ 15.20 | $ 15.20 | $ 15.28 | $ 15.43 | $ 15.66 | $ 15.90 |
| Lead Cook | $ 13.97 | $ 14.10 | $ 14.10 | $ 14.17 | $ 14.31 | $ 14.53 | $ 14.74 |
| Cooks | $ 13.49 | $ 14.00 | $ 14.00 | $ 14.07 | $ 14.21 | $ 14.42 | $ 14.64 |
| Line Cook | $ 10.41 | $ 10.75 | $ 10.75 | $ 10.80 | $ 10.91 | $ 11.08 | $ 11.24 |
| **Prep & Serving** | | | | | | | |
| Pantry & Veg - Lead | $ 8.88 | $ 9.20 | $ 9.20 | $ 9.25 | $ 9.34 | $ 9.48 | $ 9.62 |
| Pantry & Veg - Prep | $ 8.41 | $ 9.10 | $ 9.10 | $ 9.15 | $ 9.24 | $ 9.38 | $ 9.52 |
| Snack Bar - Attend | $ 10.07 | $ 10.50 | $ 10.50 | $ 10.55 | $ 10.66 | $ 10.82 | $ 10.98 |
| Storeroom Helper | $ 8.73 | $ 9.00 | $ 9.00 | $ 9.05 | $ 9.14 | $ 9.27 | $ 9.41 |
| Room SV Tele & Setup | $ 8.78 | $ 9.35 | $ 9.35 | $ 9.40 | $ 9.49 | $ 9.63 | $ 9.78 |
| Banquet Set Up | $ 8.59 | $ 9.30 | $ 9.30 | $ 9.35 | $ 9.44 | $ 9.58 | $ 9.73 |
| **Sanitation** | | | | | | | |
| Bussperson | $ 8.52 | $ 9.00 | $ 9.00 | $ 9.05 | $ 9.14 | $ 9.27 | $ 9.41 |
| Dishmachine Oper & Porter | $ 8.59 | $ 9.15 | $ 9.15 | $ 9.20 | $ 9.29 | $ 9.43 | $ 9.57 |
| Potwasher | $ 8.59 | $ 9.15 | $ 9.15 | $ 9.20 | $ 9.29 | $ 9.43 | $ 9.57 |
| **Bartenders** | | | | | | | |
| Bartenders | $ 8.85 | $ 9.00 | $ 9.00 | $ 9.05 | $ 9.14 | $ 9.27 | $ 9.41 |
| Bartenders Hired Prior 1991 | $ 15.40 | $ 9.00 | $ 9.00 | $ 9.05 | $ 9.14 | $ 9.27 | $ 9.41 |
| **Rooms** | | | | | | | |
| Housekeeper | $ 9.91 | $ 10.50 | $ 10.50 | $ 10.55 | $ 10.66 | $ 10.82 | $ 10.98 |
| Lobby Porter | $ 8.23 | $ 9.30 | $ 9.30 | $ 9.35 | $ 9.44 | $ 9.58 | $ 9.73 |
| Door Person | $ 7.91 | $ 9.00 | $ 9.00 | $ 9.05 | $ 9.14 | $ 9.27 | $ 9.41 |
| PBX Operator | $ 10.42 | $ 11.00 | $ 11.00 | $ 11.06 | $ 11.17 | $ 11.33 | $ 11.50 |

41



Exhibit 1

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Saturday, April 04, 2015 11:08 AM
**To:** Nancy Goldman; Arch Stokes (astokes@stokeswagner.com); Bill Bunce; Javon Bea
**Cc:** Martin Goff; Brian B (brian@local21.com); Chad Decker; Mary Costello; Leslie Hohmann
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Hello Nancy, please see the below information with the benefits calculation. If you have any questions don't hesitate to let us know.

The information for the employers 2015 cost includes non-union members as well.

### *Local 17  Proposed plan Total hours worked for 2014*

| Rgl HRS Wkd "14" | O.T. Hrs Wkd '14' | Other Hrs '14' | Total *2.75 (15) | Total *2.85 (16) |
|---|---|---|---|---|
| 729786.22 | 29827.55 | 79244.68 | $ 2,306,860.74 | $ 2,390,746.58 |

| | | |
|---|---|---|
| Proposed Local 17 cost (15) | $ 2,306,860.74 | |
| Actual Total cost (15) for medical | $    939,058.80 | |
| Difference | $ 1,325,859.02 | |

### *Plan "B"  Proposal for 2015 Cost*



1

| | "15" Plan B Proposal with # of current enrolled associates. | Proposed Plan B rate for (15) to the employer | Proposed Plan B Employer Monthly cost (15) | Proposed Plan B Employer yearly cost (15) |
|---|---|---|---|---|
| # Emp only | 228 | $ 538.35 | $ 122,745.51 | $ 1,472,946.12 |
| # Emp + one | 21 | $ 1,047.31 | $ 21,993.61 | $ 263,923.32 |
| # Emp. Family | 38 | $ 1,511.48 | $ 57,436.33 | $ 689,235.96 |

| | | |
|---|---|---|
| Total Proposed yrly (15) | | $ 2,426,105.40 |
| Total cost (15) difference | | $939058.80 $1487046.60 |

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o:  507.285.2708
f:  507.285.2793
e:  mhenry@kahlerhospitalitygroup.com

**From:** Nancy Goldman [mailto:ngoldman@here17.org]
**Sent:** Saturday, April 04, 2015 10:00 AM
**To:** Michael Henry; Arch Stokes (astokes@stokeswagner.com); Bill Bunce; Javon Bea
**Cc:** Martin Goff; Brian B (brian@local21.com)
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal

Michael, The Union proposed 2 alternative health insurance plans at the bargaining table on March 16, 2015. You chose to reject those by email on March 20, 2015 stating only that your cost would be greater than one million dollars. I sent you an email on March 25th, and again on March 27th and a third time on March 30th asking for clarification as to which of the 2 Plans you are referring to and if you were saying that was the cost for 1 year or 5 years. I finally received a response on March 31st. I then sent the request below which you have failed to respond to. I am once again requesting information regarding your March 20th response:
The Union is requesting the quantification and calculations for the cost of each of the Plans that the Union proposed on March 16, 2015. Please supply this information by the close of business on Monday, April 6, 2015. If we do not receive the information requested we will assume that you did not do any actual quantifying and are simply rejecting the Union's proposal while refusing to provide information.

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

2

**From:** Nancy Goldman
**Sent:** Tuesday, March 31, 2015 1:22 PM
**To:** 'Michael Henry'
**Cc:** Arch Stokes (astokes@stokeswagner.com); Brian B (brian@local21.com); Martin Goff
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Please send me your calculation for each year for each of the Plans that the Union proposed. Please provide this information by Friday, April 3, 2015.

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Tuesday, March 31, 2015 12:39 PM
**To:** Nancy Goldman
**Cc:** Arch Stokes (astokes@stokeswagner.com)
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Hello Nancy,
Sorry for the delay in responding.

Yes, the Plan B and Local 17 plan is greater than a million dollar for over the life of the proposed contract

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

**From:** Nancy Goldman [mailto:ngoldman@here17.org]
**Sent:** Monday, March 30, 2015 11:03 AM
**To:** Michael Henry
**Cc:** Arch Stokes (astokes@stokeswagner.com)
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal

3

Hi, I am still waiting for clarification of your email which I received on March 20th. Again, which proposal are you referring to the UNITE HERE Plan B or the Local 17 Plan? And is the cost of "greater than a million dollars" for 1 year or for the proposed 5 years?

---

**From:** Nancy Goldman
**Sent:** Friday, March 27, 2015 8:51 AM
**To:** mhenry@kahlerhospitalitygroup.com; Arch Stokes (astokes@stokeswagner.com)
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal

Hello, please respond to my question below as we are working on our proposal. Nancy

---

**From:** Nancy Goldman
**Sent:** Wednesday, March 25, 2015 10:20 AM
**To:** 'Michael Henry'; Martin Goff; brian@local21.com
**Cc:** Arch Y. Stokes; Mary Costello; Chad Decker; Leslie Hohmann
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Hello, which proposal are you referring to the UNITE HERE Plan B or the Local 17 Plan? And is the cost of "greater than a million dollars" for 1 year or for the proposed 5 years?

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

---

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Friday, March 20, 2015 4:01 PM
**To:** Nancy Goldman; Martin Goff; brian@local21.com
**Cc:** Arch Y. Stokes; Mary Costello; Chad Decker; Leslie Hohmann; Erin R. Whitlock
**Subject:** Local 17 and Union National Plan B Health Insurance Proposal

Dear Nancy,
We have researched your alternate proposal for healthcare presented at the negotiations 3/16/15.

Your proposal has been reviewed and subsequently rejected. The proposed plan would increase our cost greater than a million dollars.

We will stick to our proposal which is consistent with the previous collective bargaining agreement.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708

**RICHFIELD HOSPITALITY**

*Documentation status*
*changed to & 1st written*
*warning MC 4/29/15*

## EMPLOYEE PERFORMANCE DISCUSSION

DATE: _____ 7-25-15 MC

NAME OF EMPLOYEE: _____ Graham Brandon _____

EMPLOYEE'S POSITION & DEPARTMENT: _____ Salute Kitchen lead cook _____

TYPE OF ACTION FOR THIS DISCUSSION:

☐ Verbal Warning   ☒ 1st Written Warning   ☒ 2nd Written Warning   ☐ Final Warning
   MC 4/29/15

☐ Suspension   ☐ Termination

On Monday Feb. 16th I woke upon my day off at 8:30 am. I had a missed text message from 6:27am Quote "I feel like I'm dying, Are there any Kahler cooks ... maria?" I also had a missed text message from Sophia Stating Graham was not here & was a no Call, no show. Without getting into the debate of the accuracy of that statement I want to clairify the proper procedure moving forward.

We need Graham to connect with a cook or Supervisor within the proper amount of time being ____? hrs before the shift begins & try to find a replacement.

I am concerned about the impact this has on the team & want to foster communication & partnership throughout the team

EMPLOYEE HAS BEEN WARNED PREVIOUSLY:   ☐ Verbal   ☐ Written

Date(s):_____ROC

Is the employee being placed on probation?  ☒ NO  ☐ YES  *Until what date:* _____

Is the employee being suspended?  ☒ NO  ☐ YES  *Until what date:* _____

WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION? *(Action steps & dates)*

_____

_____

_____

_____

*Exhibit 3*

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

*Refused to signed.*

_____          2-25-15
Employee's Signature                                        Date

_____          2-25-15
Signature of Supervisor Conducting Discussion        Date

_____          2-25-15
Signature of Human Resources Representative or Witness   Date

**Michael Henry**

| | |
|---|---|
| **From:** | Nancy Goldman <ngoldman@here17.org> |
| **Sent:** | Monday, June 22, 2015 5:34 PM |
| **To:** | Michael Henry; brian@local21.com |
| **Cc:** | Mary Costello; Chad Decker |
| **Subject:** | RE: Ashley Rudloff |

Michael, regardless of the fact that the Collective Bargaining Agreement has expired, under the law the Employer is obligated to continue the terms and conditions of the prior contact including the specified wage increases.

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Wednesday, June 17, 2015 12:01 PM
**To:** brian@local21.com
**Cc:** Mary Costello; Chad Decker; Martin Goff; Nancy Goldman
**Subject:** RE: Ashley Rudloff

Hello Brian,
In reference to your grievance on Ashley Rudloff for her 12 month pay increase.

As of 2.28.15 the mutually extended collective bargaining agreement, has expired. Currently the properties are without a contract. The employer has shared with the union that we will not be extending the previous contract.

The employer has provided a comprehensive and ready to execute last best and final offer on the table since 3.24.15 which the union has not signed.

The employers position is that we are awaiting the signed and to be executed proposal that is on the table to provide all affected associates with the appropriate negotiated increase.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com



Exhibit 4

1

**From:** brian@local21.com [mailto:brian@local21.com]
**Sent:** Thursday, June 11, 2015 4:28 PM
**To:** Michael Henry
**Cc:** Mary Costello; Chad Decker; mgoff@here17.org; Nancy Goldman
**Subject:** Ashley Rudloff

Michael,

Ashley Rudloff, a housekeeper at the Marriott has informed me that she should have received her 12 month pay increase as of 5-12-15 but when she spoke to you she was told she would not get it until the contract is settled. The Union is filing a grievance concerning this matter. The employer is in violation of, including but not limited to, Appendix "A" of the CBA. The union requests as resolution to this grievance that Ms Rudloff's pay be increased immediately to the correct rate and that she be made whole. Please let me know when she can expect to see the pay increase and back pay.

Brian Brandt
President UNITE HERE Local 21
Phone: 507-288-2021
Cell: 507-254-5735
Fax: 507-281-3491

EXHIBIT NO. **GC 19** RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **5** DATE **12/16/15** REPORTER **SMW**

**From:** Mary Costello [mailto:MCostello@kahlerhospitalitygroup.com]
**Sent:** Monday, March 02, 2015 5:36 PM
**To:** Nancy Goldman; brian@local21.com; astokes@stokeswagner.com; Erin R. Whitlock
**Cc:** Michael Henry; Chad Decker
**Subject:** Copy of Performance Evaluation Form, non-exempt associates (evaluating 2014 performance).xlsm

Good Afternoon,

Per your request Nancy I have attached an annual review for our non-exempt associates.

Mary Kay


Mary Kay Costello
Organizational Development/Human Resources Manager
Kahler Hotels
20 2nd Ave SW
Rochester, MN 55902                    **GC Exhibit 19**

1

O: 507-285-2796
F: 507-285-2793
C: 507-254-3297
mcostello@kahlerhospitalitygroup.com









The contents of this e-mail message and any attachments are confidential and are intended solely for address
This transmission is sent in trust, for the sole purpose of delivery, to the intended recipient. If you have receive
or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immed
and delete this message and its attachments, if any.

# RICHFIELD HOSPITALITY

## Performance Management Process, non-exempt associates

Richfield Hospitality

Review period: [ ] to [ ]

### Information on the ASSOCIATE being reviewed:

Name: [ ]
Title: [ ]
Function/Department: [ ]

### Information on the MANAGER completing this form:

Name: [ ]
Title: [ ]
Function/Department: [ ]

## Rating Scale:

| | |
|---|---|
| Outstanding | Consistently and significantly exceeded goals, expectations or standards; Contributions were extraordinary; Served as a role model to others. (Calculated Rating only) |
| Above Expectations | Exceeded goals , expectations & standards.  Contributions were above what was expected for the role; An above average performer. |
| Meets Expectations | Met and occasionally exceeded all goals, expectations, or standards; Contributions were in line with what was expected for the role; A successful, fully competent performer. |
| Below Expectations | Did not consistently meet goals, expectations, or standards; Contributions were below minimum job expectations; Development was needed in one or more critical areas. |

## Required Signatures

**Year-End Review**

*These signatures indicate that the Associate has met with the Manager to discuss the year-end review in detail.*

_____     _____
Associate Signature                          Date

_____     _____
Manager Signature                            Date

_____     _____
Human Resources Signature                Date

_____     _____
Second Level Manager Signature          Date



RICHFIELD
HOSPITALITY

**Performance Management Process, non-exempt associates**

Richfield Hospitality

## Hallmarks

The Richfield Hospitality Hallmarks represent the behaviors that are most critical for success. Provide written comments and ratings for the Year-End Review. Written comments are always recommended but MUST be provided for any ratings of "above" or "below".

| Competency | Performance Standards | Manager Year-End Comments | Year-End Rating: |
|---|---|---|---|
| Accountable | • Reports to work on time and as scheduled<br>• Follows company policies and procedures<br>• Clean, well-groomed appearance and in proper uniform | | ○ Above<br>◉ Meets<br>○ Below |
| Authentic | • Communicates effectively with supervisors, associates and guests<br>• Meets productivity standards<br>• Meets quality standards | | ○ Above<br>◉ Meets<br>○ Below |
| Compassionate | • Demonstrates brand/hotel standards of hospitality when interacting with guests and co-workers<br>• Open to different points of view<br>• Treats others with courtesy and respect | | ○ Above<br>◉ Meets<br>○ Below |
| Driven | • Willingness to make decisions and solve problems<br>• commits to assigned duties and tasks through to completion<br>• Open to learn and apply new skills | | ○ Above<br>◉ Meets<br>○ Below |
| Original | • Seeks new ways to improve operation (Service/quality/efficiencies)<br>• Can work independently without continuous supervision<br>• Seeks guidance/assistance from others when necessary | | ○ Above<br>◉ Meets<br>○ Below |
| Talentcentric | • Accepts and supports organizational change<br>• Participates cooperatively to resolve conflicts as a member of the team<br>• Encourages and maintains effective cross-department | | ○ Above<br>◉ Meets<br>○ Below |
| Fun | • Positive attitude<br>• Engaged and represents the Brand/Hotel's service culture<br>• Creates a positive and energizing environment for guests and co-workers | | ○ Above<br>◉ Meets<br>○ Below |
| **Hallmarks Year End Rating:** | | | |


RICHFIELD
HOSPITALITY

**Performance Management Process, non-exempt associates**

Richfield Hospitality

## Overall Performance Rating

At the end of each review period, a Calculated Rating will appear based on the ratings provided for the Hallmarks. Under special circumstances, the manager may override the Calculated rating with a Recommended rating. Overall comments should be included in the space provided. When a rating override occurs, explanatory text must be included in the manager comments.

### Year-End Review

**Hallmarks Year End Rating:**

**Recommended\* Rating:**

**Overall Manager Year-End Comments:**

**Overall Associate Year-End Comments**

\* If the recommended rating differs from the calculated rating, explanatory comments must be provided above, and a second-level signature is required on the front page.

## Associate Career Pathing

**Manager/Supervisor:** Complete this section for associates who desire development for future positions within the hotel/company. Then complete the career planning section.

**Associate's next desired career step:**

**Timeframe**

### Career Planning

Use this space to outline additional steps/objectives for skill and career development

**Required Action/Training**

**Timeframe**

# OFFICIAL REPORT OF PROCEEDINGS
## before the
# NATIONAL LABOR RELATIONS BOARD

Volume 4 of

## GENERAL COUNSEL EXHIBITS

In the Matter of:

RICHFIELD HOSPITALITY, INC. AS
MANAGING AGENT FOR KAHLER HOTELS, LLC,

        Respondent,

and                                 Case No. 18-CA-151245

UNITE HERE INTERNATIONAL UNION
LOCAL 21,

        Charging Party.

| Party: | GENERAL COUNSEL 20-23, 25-31, 33, 34, 37, 39-41, 43-45 |
|---|---|

Date:       December 15-17, 2015

Place:      Rochester, Minnesota

Veritext National Court Reporting Company
1250 Eye Street NW - Suite 1201
Washington, DC  20005
(888)777-6690

EXHIBIT NO. **GC 20** RECEIVED ✔ REJECTED

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **5** DATE **12/16/15** REPORTER **SMW**

**From:** Martin Goff
**To:** Wiese, Tyler
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal
**Date:** Monday, June 08, 2015 2:28:16 PM
**Attachments:** image002.gif

**From:** Nancy Goldman
**Sent:** Monday, June 08, 2015 2:09 PM
**To:** Martin Goff
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal

**From:** Nancy Goldman
**Sent:** Monday, April 06, 2015 10:31 AM
**To:** 'Michael Henry'; Arch Stokes (astokes@stokeswagner.com); Bill Bunce; Javon Bea
**Cc:** Martin Goff; Brian B (brian@local21.com); Chad Decker; Mary Costello; Leslie Hohmann
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Thank you. However neither of our proposed Plans allow for non-union participation so your figures are somewhat skewed. Perhaps a more accurate quantification would have been a more realistic response to such an important and costly, to the employees, issue. We will look for the rest of the information requested tomorrow.

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Saturday, April 04, 2015 11:08 AM
**To:** Nancy Goldman; Arch Stokes (astokes@stokeswagner.com); Bill Bunce; Javon Bea
**Cc:** Martin Goff; Brian B (brian@local21.com); Chad Decker; Mary Costello; Leslie Hohmann
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Hello Nancy, please see the below information with the benefits calculation. If you have any questions don't hesitate to let us know.

The information for the employers 2015 cost includes non-union members as well.

| Local 17  Proposed plan Total hours worked for 2014 | | | | |
|---|---|---|---|---|
| Rgl HRS Wkd "14" | O.T. Hrs Wkd '14' | Other Hrs '14' | Total *2.75 (15) | Total *2.85 (16) |

| 729786.22 | 29827.55 | 79244.68 | $ 2,306,860.74 | $ 2,390,746.58 |

| | Proposed Local 17 cost (15) | $ 2,306,860.74 |
|---|---|---|
| | Actual Total cost (15) for medical | $   939,058.80 |
| | Difference | $ 1,325,859.02 |

## Plan "B"  Proposal for 2015 Cost

| | "15" Plan B Proposal with # of current enrolled associates. | Proposed Plan B rate for (15) to the employer | Proposed Plan B Employer Monthly cost (15) | Proposed Plan B  Employer yearly cost (15) |
|---|---|---|---|---|
| # Emp only | 228 | $    538.35 | $    122,745.51 | $ 1,472,946.12 |
| # Emp + one | 21 | $ 1,047.31 | $      21,993.61 | $    263,923.32 |
| # Emp. Family | 38 | $ 1,511.48 | $      57,436.33 | $    689,235.96 |

| | Total Proposed yrly (15) | $ 2,426,105.40 |
|---|---|---|
| | Total cost (15) difference | $939058.80 $1487046.60 |

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

**From:** Nancy Goldman [mailto:ngoldman@here17.org]
**Sent:** Saturday, April 04, 2015 10:00 AM
**To:** Michael Henry; Arch Stokes (astokes@stokeswagner.com); Bill Bunce; Javon Bea
**Cc:** Martin Goff; Brian B (brian@local21.com)
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal

Michael, The Union proposed 2 alternative health insurance plans at the bargaining table on March 16, 2015. You chose to reject those  by email on March 20, 2015 stating only that your cost would be greater than one million dollars. I sent you an email on March 25th, and again on March 27th and

a third time on March 30th asking for clarification as to which of the 2 Plans you are referring to and if you were saying that was the cost for 1 year or 5 years. I finally received a response on March 31st. I then sent the request below which you have failed to respond to. I am once again requesting information regarding your March 20th response:

The Union is requesting the quantification and calculations for the cost of each of the Plans that the Union proposed on March 16, 2015. Please supply this information by the close of business on Monday, April 6, 2015. If we do not receive the information requested we will assume that you did not do any actual quantifying and are simply rejecting the Union's proposal while refusing to provide information.


**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

,

,

---

**From:** Nancy Goldman
**Sent:** Tuesday, March 31, 2015 1:22 PM
**To:** 'Michael Henry'
**Cc:** Arch Stokes (astokes@stokeswagner.com); Brian B (brian@local21.com); Martin Goff
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Please send me your calculation for each year for each of the Plans that the Union proposed.
 Please provide this information by Friday, April 3, 2015.

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

---

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Tuesday, March 31, 2015 12:39 PM
**To:** Nancy Goldman
**Cc:** Arch Stokes (astokes@stokeswagner.com)
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Hello Nancy,
Sorry for the delay in responding.

Yes, the Plan B and Local 17 plan is greater than a million dollar for over

**GC Exhibit 20**

the life of the proposed contract

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

---

**From:** Nancy Goldman [mailto:ngoldman@here17.org]
**Sent:** Monday, March 30, 2015 11:03 AM
**To:** Michael Henry
**Cc:** Arch Stokes (astokes@stokeswagner.com)
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal

Hi, I am still waiting for clarification of your email which I received on March 20th.  Again, which proposal are you referring to the UNITE HERE Plan B or the Local 17 Plan? And is the cost of "greater than a million dollars" for 1 year or for the proposed 5 years?

---

**From:** Nancy Goldman
**Sent:** Friday, March 27, 2015 8:51 AM
**To:** mhenry@kahlerhospitalitygroup.com; Arch Stokes (astokes@stokeswagner.com)
**Subject:** FW: Local 17 and Union National Plan B Health Insurance Proposal

Hello, please respond to my question below as we are working on our proposal. Nancy

---

**From:** Nancy Goldman
**Sent:** Wednesday, March 25, 2015 10:20 AM
**To:** 'Michael Henry'; Martin Goff; brian@local21.com
**Cc:** Arch Y. Stokes; Mary Costello; Chad Decker; Leslie Hohmann
**Subject:** RE: Local 17 and Union National Plan B Health Insurance Proposal

Hello, which proposal are you referring to the UNITE HERE Plan B or the Local 17 Plan? And is the cost of "greater than a million dollars" for 1 year or for the proposed 5 years?

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

---

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Friday, March 20, 2015 4:01 PM
**To:** Nancy Goldman; Martin Goff; brian@local21.com
**Cc:** Arch Y. Stokes; Mary Costello; Chad Decker; Leslie Hohmann; Erin R. Whitlock
**Subject:** Local 17 and Union National Plan B Health Insurance Proposal

Dear Nancy,
We have researched your alternate proposal for healthcare presented at
the negotiations 3/16/15.

Your proposal has been reviewed and subsequently rejected. The proposed
plan would increase our cost greater than a million dollars.

We will stick to our proposal which is consistent with the previous
collective bargaining agreement.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

EXHIBIT NO. **GC 21** RECEIVED ✔ REJECTED

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/16/15** REPORTER **SMW**

**From:** Martin Goff
**To:** Wiese, Tyler
**Subject:** FW: question from you
**Date:** Monday, June 08, 2015 2:24:34 PM

**From:** Nancy Goldman
**Sent:** Monday, June 08, 2015 2:19 PM
**To:** Martin Goff
**Subject:** FW: question from you

**From:** Nancy Goldman
**Sent:** Wednesday, May 06, 2015 11:48 AM
**To:** mhenry@kahlerhospitalitygroup.com; Arch Stokes (astokes@stokeswagner.com)
**Cc:** Brian B (brian@local21.com); Martin Goff
**Subject:** question from you

In addition, the Union requested the following information verbally on 4/16/15 and did not receive it.

1. The quantification of the estimated value of the Employers vacation proposal of 1-20-15 which the Union accepted.

In order to respond factually to your request, could you please further explain specifically what you are requesting. The proposed change will see an added cost in budgeting for vacation accruals. As the employer propose to shorten the length of service accrual for vacation time.

The Employer made that proposal on the first day of negotiations and as you say, it will be an added cost, we want to know what that added cost is for each year of the Employers proposal. We assume that you quantified this before proposing it to the Union.

Please respond to the email below sent to you on Monday, thanks

**Nancy Goldman**
**President**
**UNITE HERE Local 17**
**612-379-4730 ext 18**

**From:** Nancy Goldman
**Sent:** Monday, May 04, 2015 5:27 PM

GC Exhibit 21

EXHIBIT NO. **GC 22** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME _____ **Richfield** _____

NO. OF PAGES ____ **2** ____ DATE **12/16/15** REPORTER ____ **SMW** ____

P 01489

| | |
|---|---|
| **From:** | Wiese, Tyler |
| **To:** | Wiese, Tyler |
| **Subject:** | FW: Negotiations for tomorrow. |
| **Date:** | Saturday, November 21, 2015 5:31:08 PM |
| **Attachments:** | image001.gif |

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Wednesday, October 21, 2015 7:17 PM
**To:** Nancy Goldman; brian@local21.com; Martin Goff
**Cc:** Patrick Short; Mary Costello; Chad Decker
**Subject:** RE: Negotiations for tomorrow.

The information provided is the ball park estimate of the potential yearly cost once the threshold are realized.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

**From:** Nancy Goldman [mailto:ngoldman@here17.org]
**Sent:** Tuesday, October 20, 2015 3:40 PM
**To:** Michael Henry; brian@local21.com; Martin Goff
**Cc:** Patrick Short; Mary Costello; Chad Decker
**Subject:** RE: Negotiations for tomorrow.

Michael, is this for each year or 5 years?

#90 DISCUSS (union requested the quantifications of this proposal)
*Response: We understand and hear your request for quantification of the proposal. As per our discussion at the negotiation table the change does benefit our associates. Your response on just having a ball park figure on what the cost is or will be to the employer. From what we have surmised this could be a cost of about $84k (we have the scenario of approximately a minimum of 65 associate will be impacted. At an average cost of $1200 for the early additional week*

**GC Exhibit 22**

*resulting in $84k).*

---

**From:** Michael Henry [mailto:mhenry@kahlerhospitalitygroup.com]
**Sent:** Monday, October 19, 2015 1:47 PM
**To:** Nancy Goldman; brian@local21.com; Martin Goff
**Cc:** Patrick Short; Mary Costello; Chad Decker
**Subject:** Negotiations for tomorrow.

Dear Nancy,

After very careful review of the union's counter proposal presented at our September 24th, 2015 meeting. There is nothing we have seen and that you have said over the past few months of negotiations that dictates quid-quo-quo. We have seen your opposition to the proposed changes to tighten up the effective operation of the hotels and to make us more competitive in the Rochester market and with the Rochester competition. As we continue to manage in the competitive Rochester market we must make changes to impact the fact that we are the only union hotels.

We went through each of the line items and our responses are attached. Based on the status of the negotiations and the fact that you have not given us any significant reason to change our proposal we do not feel the need for an additional meeting to discuss the same things we have already discussed several times over the last several months. If you bring us something that is significant enough for us to move off of our last best and final offer then let us know.

Michael Henry
Area Managing Director of Human Resources
**Kahler Hospitality Group**
20 SW Second Avenue
Rochester, MN  55902

o: 507.285.2708
f:  507.285.2793
e: mhenry@kahlerhospitalitygroup.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com

---

GC 23(a)

EXHIBIT NO._____ RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **7** DATE **12/15/15** REPORTER **SMW**

Initial
proposal

GC Exhibit 23(a)



**Non-Economic**

# Unite Here Local 21 – Kahler Hospitality Group / Richfield

## PROPOSAL

These proposed changes to the collective bargaining agreement are presented with the understanding that any deletions and/or amendments are made in an attempt to reach settlement on all issues. Any proposal withdrawn, deleted or revised is done so without prejudice and a withdrawal, deletion or revision of any proposal shall not be a basis for argument against the Union in any future dispute between the parties. Furthermore, it is agreed between the parties that neither the fact of a withdrawal, deletion or revision of any proposal by the Union, nor its terms, nor any reference thereto, may be used as precedent, evidence, or argument, nor shall they be referred to in any manner by the Employer, or any of its representatives, with regard to the meaning or application of the terms of any collective bargaining agreements between the Employer and the Union, nor for any other purpose in the event of any grievance, arbitration, claim, dispute, or proceeding of any kind between the parties. The Employer acknowledges that the Union has relied upon these representations in agreeing to withdraw, delete or revise any proposal.

The Union further reserves the right to add proposals as the negotiations proceed.

Date: 1/20/15

2

**UNION NO. 1**

### Article 3
### SENIORITY

1. **Section 7, Add a sentence after first sentence of the first paragraph to read: Section**
   The job posting will include the schedule for the position including start and stop times and days off.

2. **Add a section:** Any employee who bids on and is awarded a posted position in another classification or other property shall be transferred to the new position no later than 30 calendar days after they are awarded the position.

### Article 5
### DISCHARGE OR DISCIPLINE

3. **Add a new sentence in second paragraph after the word "employee."** "Prior to any meeting which could lead to disciplinary action or any investigatory interview of an employee, the employer will present a copy of the THE RIGHT TO UNION REPRESENTATION FORM as outlined in Appendix L.

4. **Add a section:** Disciplinary actions must be given to employees no later than 3 calendar days from when the employer should reasonably have known of the incident giving rise to the discipline.

2. PERIOD OF DISIPLINE WARNING NOTICES BE REDUCED TO 1-YEAR.

3

## Article 6
## GRIEVANCE AND ARBITRATION PROCEDURE

5.      **Section 2, step 2, delete last sentence.**

6.      **Section 2, step 4, delete (or failure to respond)**

7.      **Section 2, step 4, delete last paragraph and change to read:** "Any grievance not appealed to a succeeding step within the time limits specified shall be deemed abandoned and not entitled to further consideration. Such abandonment by the Employer shall be deemed an acceptance of the grievance as stated and the remedy requested shall be accepted and enforced.

8.      **Section 3, second paragraph Add a new sentence,** "Failure to comply with the agreed upon time limits in correcting payroll shortages will result in a penalty of $20.00 dollars per day for each day that the employee has not been compensated correctly which will be added to the amount owed the employee."

4

## Article 8
## WORK WEEK

9.    **Section 3, change** "fifty cents" (.50) **to read** "one dollar ($1.00)" — OOER NIGHTS

10.    **Section 3, add** "TCS Drivers"

11.    **Section 5, Add to the second to last sentence after the word "off" at end of sentence,** "except those with doctor excuse."

12.    **Add a new section,** "The employer agrees that drivers at TCS will be guaranteed eight hours pay when a utility driver rides along to train"

## Article 12
## UNIFORMS AND LAUNDRY

13.    **Delete and replace with following:** "The employer will provide an adequate number of uniforms for all employees required to wear a uniform at work. Uniforms will be of correct size. Full time employees scheduled to work five days shall receive 11 sets of uniforms, employees working less than five days a week will be prorated on the amount of uniforms provided to them. The employer also agrees to replace at no cost to employees, those uniforms which have become permanently stained or worn out."

## ARTICLE 15
## HEALTH, SAFTEY AND SICK BENEFITS

14.    All regular employees who have completed their probationary period of employment and attained seniority status will be eligible for sick leave benefits beginning with the first day of absence. ~~However, sick leave will be paid to any employee on the first day of hospitalization and for the first work day of any three (3) or more consecutively scheduled work day absences.~~

15.    **Section 2, add a sentence to end of 1st paragraph to read:** Employees may use accrued sick time to cover time lost for doctors and dentist appointments.

5

16.    **Section 2, add a sentence to end of 2ⁿᵈ paragraph to read:** In addition to their regular hourly rates, tipped employees working in the classifications of door person, bell person, bell captain, lobby porter and all servers in functions, room service and all restaurants and lounges, shall be compensated at $5.00 per hour for all hours of sick pay.

**Article 26**
**Entire Agreement**

**Delete entire article**

**Article 27**
**Duration**

**Open for discussion**

**APPENDIX F**
**FOOD AND BEVERAGE ADDENDUM**

17.    **Delete last paragraph and replace with the following:** "The employer agrees that it will not subcontract or lease any existing food and beverage operation including banquets at any of the hotels"

18.    **Add:** When utilizing restaurant sections, including outdoor sections for banquet functions the servers and bartenders normally working in those sections will be offered the opportunity to work the function before on-call banquet employees.

**APPENDIX L**
**RIGHT TO UNION REPRESENTATION ADDENDUM**

This meeting or discussion may result in you receiving a disciplinary warning.

6

You have the right to Union representation, and this meeting will be postponed if you wish to have your Union Representative or Union Steward present. Without representation, you may refuse to answer any questions. This is your legal right.

Do you want your Union Representative to be present for this meeting?

**(Circle one)  Yes  /  No**

_____          _____
Signature                                                    Date

**GC 23(b)**

EXHIBIT NO._____ RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **48** DATE **12/15/15** REPORTER **SMW**

P 01500

2/13/15
OURS
#2

# COLLECTIVE BARGAINING AGREEMENT

## Between

~~Sunstone Hotel Properties, Inc.~~
d/b/a/

## And

## UNITE HERE Local 21 AFL-CIO

## Rochester, Minnesota

~~October 1, 2011~~

## to

~~August 31, 2014~~

*Legal Entities Where Appropriate*

This Agreement made this 1st day of ~~October, 2011~~ by and between ~~Sunstone Hotel Properties, Inc.,~~ as agent for d/b/a The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites, Residence Inn Rochester Mayo Clinic, and Textile Care Services located in Rochester, Minnesota, hereinafter referred to as "Employer," and UNITE HERE Local 21 AFL-CIO, hereinafter referred to as "Union."

WHEREAS, it is the desire of the respective parties hereto to avoid disruption in the service and operation of the units covered by this Agreement and to secure the benefits intended to be derived by the Employer, its employees and the Union under these articles of Agreement, it is agreed by and between the Employer and the Union as follows: TA

ARTICLE 1
RECOGNITION

The Employer above named, for and on behalf of the properties above named, recognizes the Union as the exclusive bargaining representative of all employees of the Employer employed at the above-properties in Rochester, Minnesota listed in the classifications set forth in Appendix A, with respect to wages, hours, and all other working conditions. All other employees, including supervisors, managers, administrative employees and confidential employees are excluded from the bargaining unit. TA

ARTICLE 2
UNION SECURITY

1.    The Employer agrees not to enter into any contract or agreement with the employees herein, individually or collectively, which conflicts with the terms and provisions hereof. TA

2.    All employees covered by this Agreement who are now or who may hereafter become members of the Union shall, during the life of this agreement, remain members of the Union in good standing or pay fees in lieu thereof as a condition of continued employment. "In good standing" for the purposes of this agreement is defined to mean the payment as required by the Union of a standard initiation fee and standard regular monthly dues relating to the Union's collective bargaining function, applied uniformly to all members of the bargaining unit covered by this Agreement. TA

Provided, however, temporary summer employees hired between May 1 and September 30 will be exempt for four (4) months from initiation fees normally charged other employees. It is agreed that these temporary positions shall be posted and that any employees who take a temporary position shall not be restricted from bidding on a regular position should one become available. If such employees are retained past September 30, they will be obligated to pay the initiation fee. Such employees will be entitled to all fringe benefits for which they qualify except seniority and insurance.

3.    Employees hired who average ten (10) hours or more per week in a four (4) week

1

1 3826232v.2

period or who have been working under a work permit shall, as a condition of employment, become and remain members in good standing of the Union or pay fees in lieu thereof after thirty (30) calendar days employment. All such employees averaging over said ten (10) hours shall have all of the benefits under this Agreement except as to insurance benefits, and such employees shall average twenty-five (25) hours or more per week. Provided, however, that employees in tip classifications who average twenty (20) hours or more per week will be covered by the insurance benefits. In determining the average, the weekly average shall be determined the last pay period of each month based upon the previous twenty-six (26) week period. The twenty-six (26) week period shall be a floating period.

4.      The Employer shall update the dues checkoff list provided by the Union on a monthly basis to reflect new hires and terminations. TA

5.      The Employer and the Union agree not to adopt rules or regulations or to engage in practices that conflict with the express terms of this Agreement. TA

6.      The Employer shall check off monthly Union dues and initiation fees and/or other required fees in a manner according to procedures agreed upon between the representatives of both parties, upon receipt of written authorization form to deduct Union dues or fees signed by the employee. By the twelfth (12th) of each month the Union must submit to the Employer in duplicate a current list of deductions to be made. The Employer agrees to remit such deductions to the Union by the last Friday of the current month after receipt of deduction list. The date of dues deductions may be changed by agreement between the Employer and the Union. TA

7.      The Employer will send copies of bargaining unit job postings which shall include the schedule, shift, and days off of the position to the Union which may refer candidates for employment. The Employer shall have no obligation to hire any person so referred.

8.      The designated Union representative will be allowed to visit the premises of the Employer for the purpose of administering this Agreement. The Union representative will provide the Human Resources Director or General Manager with as much advance notice as is possible prior to visiting the facility. Upon arriving at the facility, the Union representative will check in at the office. It is agreed that the work of the employees will not be interrupted by such visits. Union representatives will not meet with employees during working time without the knowledge and permission of the Employer. TA

9.      New Member Orientation. The Union or a designated representative will be provided access to newly hired employees on the Employer's premises, after thirty (30) days of employment, to provide information about this Agreement and the employees' rights thereunder. Such access shall be for up to thirty (30) minutes, once per month, at a mutually agreed upon time and location. TA

10.     Tip Check-Off – the Employer agrees to honor political contribution deduction authorizations from employees in the following form: TA

I hereby authorize my Employer to deduct from my pay the sum of $__ per pay period and to forward that amount as my voluntary contribution to the UNITE HERE International Political Committee, 275 Seventh Avenue, New York, N.Y. 10001 ("PAC"). My decision to participate in the UNITE HERE PAC is a

2

voluntary one and I understand that I am under no compulsion to contribute to it, since such contributions are neither a condition of my continued employment or of membership in the Union. I also understand that this authorization may be revoked by me at any time and that it is automatically revoked upon termination of my employment.

The political contribution deduction shall be made once each month during which an employee who has performed compensated service has i n effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within thirty (30) days after the last day of the preceding month to the UNITE HERE International Political Committee, 275 Seventh Avenue, New York, N.Y. 10001, accompanied by a form stating the name of each em ployee for whom a deduction has been made, and the amount deducted. The parties have taken into account the cost of administration of this deduction in negotiating the wage increases and benefits specified in this Agreement. TA

The Union shall indemnify, defend and save the Employer harmless against any and all claims, demands, suits, or other terms of liability that may arise out of or by reason of action taken by the Employer to comply with this Article. TA

ARTICLE 3
SENIORITY

1.     Seniority shall be by d e p a r t m e n t–section–(see Appendix B) and by work location (e.g., The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites, or Textile Care Services), except the banquet department as set forth in the Banquet Department addendum. Employees shall not acquire seniority until they have completed their probationary period; then seniority shall revert to the date of employment.

2.     Where qualifications to perform the available work are equal, layoff and recall will be by seniority as defined in paragraph 3. TA

When recalling employees who have been laid off because of reduction of work force, the Union shall be notified by the Employer of such employees who are to be rehired. If an employee so notified does not report for work within seven (7) days from the date his notice was mailed by certified mail, he shall forfeit seniority unless he has reasonable excuse for his failure. In the event an employee is employed elsewhere when he/she receives a notice to report for work, the employee shall not forfeit his/her seniority by not reporting unless the Employer gives the employee reasonable assurance of at least three (3) months steady employment. However, the employee must immediately notify the Employer and waive his right to the particular job that is open.

3.     Seniority shall mean continuous length of employment with the Employer in the sections–departments listed in Appendix "B." Any employee transferred or re-employed in another section retains but does not accumulate his seniority i n his original section and, in addition, commences seniority in his new section.

4.     Where qualifications are equal, employees shall be promoted within their departments on the basis of seniority. Only when a vacancy occurs or a new position is created can seniority be exercised for purposes of shift preference, days off, and server sections. An Employee who bids on and is awarded a posted position in another classification or property shall be transferred to the new position no later than 30 calendar days after they are awarded the position.

3

5.    Except where rotation is practiced, servers shall be given preferential stations on the basis of seniority, provided that they are sufficiently qualified. TA

6.    As with permanent job openings under section 7, an employee laid off from his/her ~~section~~ department shall have preference based on seniority in hiring over any other applicant for other ~~sections~~ departments of the Employer, even though it may be in another operation, provided qualifications are equal. Seniority shall be forfeited on the following grounds: TA

(a)    Voluntarily leaving the employ of the Employer; TA

(b)    Discharge for proper cause; TA

(c)    Layoffs in excess of six (6) months; or TA

(d)    Failure to report for work after a layoff within a reasonable time, not to exceed seven (7) days, after the Employer has notified employee to' report for work, as previously provided. TA

(e)    ~~Absences for any reason longer than one (1) year, unless a longer period is required by the Americans with Disabilities Act.~~

7.    Permanent job openings in the classifications covered in this Agreement will be posted for a minimum of five (5) days on the Human Resources bulletin board at the Kahler Grand Hotel and in the break rooms at all other facilities covered by this Agreement to advise employees of the opening. Employees interested in the position must advise the Human Resources office in writing of their desire to be transferred or promoted to the open position. Where qualifications are equal, the opening will be filled by seniority, adhering to the following preferences:

1st    Employees working in the classification at the property where the opening is available; TA

2nd    Employees working in the classification at other properties;

3rd    Employees working outside of the classification who have demonstrated the skill or potential ability to successfully perform in the position, and who have notified the Employer of their desire to change classifications; TA

4th    Employees working outside of the classification. TA

For purposes of scheduling, employees moving to a new location in the same classification shall move to the bottom of the seniority list. However, prior classification seniority shall be maintained. If an employee bids for and receives a permanent job vacancy, he/she cannot bid again for a posted job opening for a period of six (6) months. The six (6) month limitation will not apply to requests for shift preferences or work schedules within a classification and section. "Qualifications," as used herein, shall be based on the Employer's reasonable judgment of the applicant's skills, abilities, aptitude, and overall work record. Notwithstanding the foregoing, the Employer may postpone a transfer or promotion where it would leave another department with an insufficient number of skilled employees or an

13826232v-2

4

excessive number of vacancies. Until a permanent job opening is filled, the Employer may use its discretion to select an employee to temporarily fill the opening.

A permanent job opening is a vacancy in a position which is scheduled for fifteen (15) or more hours per week on a regular basis. A permanent job opening will not exist when any person who has a seniority claim on that position is on vacation, sick leave or other leave of absence. TA

Employees who bid and accept a new position have a thirty (30) day trial period. At the end of the trial period if the employee is unable to meet job requirements or is unhappy in the position, he/she will be returned to the previous position. Either the employee or management may initiate the return. In the event management initiates the return, the employee shall have the right to grieve the decision under the Grievance and Arbitration Procedure contained herein, provided however, the Employer has acted in an arbitrary or capricious manner.

Any regular employee within a classification and section may exercise their seniority as it applies to shift preference schedules and/or days off up to forty (40) hours in a work week. In the Maintenance Departments, new hires may be trained on the day shift for up to thirty (30) days before shift preference can be exercised to displace that employee; provided, however, that there will be an automatic extension of an additional thirty (30) days in the event the Employer believes that additional time is required to determine the employee's ability to work off-shifts. Employees shall not be placed on the third shift until supervisor is satisfied the employee is capable of working alone. TA

8.    The Employer shall furnish a complete up to date seniority list to the Union of all employees covered by this Agreement within thirty (30) days following a request from the Union representative. TA

9.    Re-employment of members of the Armed Forces shall be governed by applicable law.
TA

10.    The Employer and the Union shall make every effort to provide work for incapacitated employees returning from the Armed Forces. TA

11. When an employee is transferred to a position outside the coverage of this Agreement, he/she shall retain seniority for thirty (30) days. At the end of such time, seniority shall be forfeited if the employee retains a position outside the unit. TA

12.    In the event the Employer rehires an employee who has been discharged, such employee shall not be reinstated in accordance with his accumulated seniority unless such action is approved by both the Union and the Employer. TA

13.    Retirees working on an on-call or part-time basis shall receive the benefits of this Agreement except those provided under Article 3 and Article 11. TA

14. If there is a reposting of a section, the Union will be notified and upon request the Employer will explain the reason for the reposting. TA

L 3826733v.2

5

*Execution Copy*

## ARTICLE 4
## PROBATIONARY PERIOD

The first sixty (60) days of employment shall be probationary, during which time an employee may be discharged with or without cause and without recourse to the grievance procedure. An automatic extension of the probationary period of an additional thirty (30) days will apply ~~at the~~ after written notification to the Union and the employee~~request of the Employer,~~ in the event the Employer believes that additional time is required to determine the employee's qualifications.

## 5 ARTICLE
## DISCHARGE OR DISCIPLINE

***Union would agree to charts/calendars with time lines

1.—No employee will be disciplined or (except for a probationary employee) discharged without just cause. In the event a meeting is held for disciplinary purposes, the affected employee shall have the right to have a Union steward and/or Union Business Agent present if the employee so requests. Prior to any such meeting or investigatory interview of an employee, the Employer shall present a copy of The Right To Union Representation Form in Appendix "L"

~~2.    Warning notices and other disciplinary action which are to become part of an employee's file shall be read and signed by the employee. Such signature shall not be an admission of wrongdoing by the employee.~~

~~Copies of all warning notices and all other disciplinary action given to employees will be mailed to the Union without delay. In addition, it is agreed that if a verbal warning results in a written report by a supervisor for the employee's personnel file, a copy of such notice will be given to the employee.~~

~~If an employee avoids disciplinary offenses for a period of eighteen (18) consecutive months, offenses in his/her personal record which preceded that time will not be used as a basis for disciplinary action; such discipline may, however, be introduced in any arbitration proceeding involving the employee.~~

~~3.    The Employer may decline to give the employee the name of the complaining party, but must, upon request, divulge such information to the Union after the Union has received a copy of the discipline, which information the Union will keep confidential. The Employer will provide this information to the employee at an arbitration hearing if so directed by the arbitrator.~~

~~4.    The Employer shall at reasonable times and at reasonable intervals, upon the request of an employee, permit the employee to inspect such employee's personnel file on the employee's own time.~~

Discipline and Discharge. The Employer will discipline employees for just cause only. Discipline will normally be in the following form:

    a) Verbal warning

    b) Written warning

    c) Suspension/ Final warning

    d) Discharge

- Progressive discipline need not be followed in incidents of violations of a serious nature as provided in the Employer Handbook, or Standards of Conduct, a copy of which shall be provided to each employee.

<u>Written Notices</u>. Written reprimands, notices of suspension and notices of discharge, which are to become part of the employee's file, shall be read and signed by the employee. Such signature shall in no way be an admittance of wrongdoing on the part of the employee. A copy of such reprimands and/or notices shall be given to the employee and the Union.

<u>Warning Notices - Cancellation</u>. Warning notices shall not be used as a basis for discipline after a period of twelve (12) months. All Discipline will follow two (2) tracks, time and attendance and policy and procedure.

<u>Suspension and Discharges</u>. All suspensions and discharges will be in written form and copies will be mailed to the Union upon issuance of such notices. Discharges will be preceded by a suspension during which an investigation of the incident leading to the discharge will be conducted. No employee shall be placed on suspension pending investigation status for an unreasonable period of time. An issue specifically brought by the employee to a Human Resources representative shall be responded to within seven (7) calendar days excluding weekends. Such time line may be extended by mutual agreement.

<u>Confidentiality</u>. The Employer may decline to give the employee the name of the complaining party, but must divulge such information to the Union at the time of discipline, which information the Union shall keep confidential, and to the employee at an arbitration hearing if so directed by the Arbitrator. TA

<u>Right of Review</u>. The Union shall have the right of review of any discharge of an employee who has completed the probationary period by following the grievance procedure of this Agreement.

<u>Posting of Rules</u>. All rules shall be conspicuously posted by time clocks or on employee bulletin boards. The Employer's rules shall not conflict with this Agreement.

<u>Personnel Files</u>. The Employer shall at reasonable times and at reasonable intervals, upon the request of an employee, permit that employee to inspect such employee's personnel files on his/her own time. TA

<p style="text-align:center">6</p>

## ARTICLE 6
## GRIEVANCE AND ARBITRATION PROCEDURE

1.    The grievance procedure set forth in this Article is established for the specific purpose of providing prompt and amicable means of settlement of all questions arising under the terms of this Agreement or the application of them. Both the Employer and the Union intend to make every effort to settle grievances quickly and amicably and with a minimum of friction. TA

2.    An employee may, with or without the assistance of a shop steward, first attempt to resolve workplace disputes with the employee's manager. If not resolved informally, the following shall be the grievance procedure: TA.

Step 1. The grievance shall be reduced to writing by the Union Business Agent within twenty-one (21) calendar days from the date of the incident giving rise to the grievance, or within twenty-one (21) calendar days of when the employee reasonably should have had knowledge, and shall be furnished to the Human Resources Director. The written grievance shall set forth the facts giving rise to the grievance, including the dates and persons involved, identify the Agreement provisions violated, and state the relief requested. TA

Step 2. The Union Business Agent and the Human Resources Director shall meet within fourteen (14) calendar days of receipt of the written grievance and attempt to settle the grievance. If the grievance is not settled, the Employer shall issue a written response to the grievance with in seven (7) calendar days of the meeting. ~~The Employer's failure to issue a written response within this time period shall be considered a denial of the grievance; provided, however, it is the Employer's intent and it will use its best efforts to provide a substantive written response to the grievance within seven (7) calendar days of the grievance meeting.~~

Effect of Failure to Appeal. Any grievance not appealed to a succeeding step within the time limits specified shall be deemed abandoned and not entitled to further consideration. Such abandonment by the Employer shall be deemed an acceptance of the grievance as stated and the remedy requested shall be accepted and enforced.

Failure to comply with the agreed upon time limits in correcting payroll shortages shall result in an additional penalty to the Employer of $20.00 per day for each day that the employee has not been compensated correctly.

Step 3 (Optional). If the grievance is not settled at Step 2, the Union Business Agent may appeal the grievance to mediation within seven (7) calendar days from the date of the decision rendered in Step 2 by giving written notice of a request for mediation to the Employer and the Federal Mediation and Conciliation Service (FMCS), Minnesota Bureau of Mediation, or other neutral mediation agency. Mediation shall consist of up to two (2) Employer representatives and up to two (2) Union representatives, and a neutral mediator acceptable to both parties, who shall mediate the dispute in an attempt to have the parties reach a settlement. No attorneys or other consultants may participate in the mediation. The proceedings shall be informal and no formal record of the proceedings shall be made. If no settlement is reached, the mediator shall provide the parties with an immediate written advisory decision of the grievance, including the grounds for such decision. All offers to compromise presented during the mediation, as well as any decision of the mediator, shall be confidential and non-admissible in any subsequent proceedings. TA .

Step 4. If the grievance is not settled at Step 3, or if the Union Business Agent chooses to skip Step 3, the Union may submit the matter to arbitration within fourteen (14) calendar days of the date of the mediation or the Employer's written response ~~(or failure to respond)~~ to the grievance by furnishing the Employer with a written request for arbitration and proposing therein the names of three (3) arbitrator(s) acceptable to the requesting party. The Union shall also state in writing the matter to be arbitrated and the relief that is sought. If the parties are unable to

1 3826232v-2

7

agree upon an arbitrator within fourteen (14) days, the Union shall request the FMCS to submit a panel of seven (7) names. The Employer and the Union shall alternate striking one name from the list submitted until only one name remains. The Union shall take the first strike. The cost of securing the list of arbitrators shall be shared equally between the Employer and the Union.

Arbitration shall be handled in the following manner:

The authority of the arbitrator shall be limited solely to the determination of the matter submitted in writing at the time of request for arbitration. The arbitrator shall not have power to add to, subtract from, or modify in any way the terms of this Agreement. If, during the course of the arbitration hearing, either party introduces any facts which were not introduced during any of the steps of the grievance procedure, the other party shall be granted an extension of hearing upon request.

The decision of the arbitrator shall be made not later than thirty (30) days after the submission of post-hearing briefs, and his/her decision shall be final and binding upon both parties and the employee(s) involved. TA

Expenses of the arbitrator shall be paid equally by the Employer and the Union. If a court reporter is used, the ordering party shall pay the cost thereof, unless the other party requests a copy of the transcript, in which case the cost of the court reporter and transcript shall be paid equally. TA

The time limitations set forth herein relating to the time for filing a grievance and the demand for arbitration shall be mandatory. Failure to follow said time limitations shall result in the grievance being permanently barred and waived. The time limitations and/or grievance steps provided for herein may be extended or waived by mutual written agreement between the parties. TA

3.      Mathematical or mechanical mistakes on a paycheck resulting in an under or overpayment of the employee may be corrected within sixty (60) calendar days of the pay day involved. If an error is discovered, it must be corrected by payment within five (5) business days (Monday - Friday); provided, however, that the Employer will make a concerted effort to make the corrected payment sooner than five (5) business days if possible. TA

4.      The Union shall advise the Employer of the names of the Union Stewards who shall participate in the grievance procedure and who shall be recognized by the Employer as representatives of the employees for purposes of enforcing this Agreement, and who will generally act as representatives on the job of the Union. TA

The words "Union Steward" shall mean and refer only to employees who are designated by the Union in writing to the Employer as authorized representatives of the employees of a specific department for grievance procedure purposes. Whenever such authorization is withdrawn as to an individual Union steward or a new Union steward is added to the number of those authorized, the Union shall promptly notify the Employer in writing of such action. The Employer and its representatives shall be fully protected with a Union steward so authorized with respect to any grievance as to which he has at any time purported to represent the aggrieved employee and they need not deal with any Union steward not so authorized.

5.      When a grievance requires the attention of a shop steward during working hours,

8

he/she shall first secure the permission of his/her supervisor. The handling of all grievances shall be done during working hours, without any deduction from wages of employees who necessarily attend. The Union agrees to attempt to minimize any disruption to the Employer's operation.

## ARTICLE 7
## LEAVES OF ABSENCE

1.    Employees may be granted unpaid leaves of absence by the Employer for a period of not more than thirty (30) days. Leaves of absence in excess of thirty (30) days, and any extensions of leaves beyond the thirty (30) days, shall be put into writing by the Employer and a copy kept by the employee, the Employer and the Union. Requests for such leaves and extensions shall be made to the employee's immediate supervisor. However, leaves of absence for illness or injury will be granted upon request for absences not to exceed one (1) year, *unless a longer period is required by the Americans with Disabilities Act.*

Illness or injury which qualifies for leave under the Federal and Family Medical Leave Act will run concurrently with and shall be governed by the Minnesota Family and Medical Leave Act ~~leaves~~. TA

Employees who have been employed for at least one (1) year may be granted a leave of absence for educational purposes up to twelve (12) months, provided the leave is used for future employment with the Employer, and is approved by management. TA

2.    The Employer agrees to grant necessary time off without pay or loss of seniority rights to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business. The Union agrees to give in writing a minimum two (2) weeks' notice to the Employer.  It is agreed that there shall be no disruption of the Employer's operation. TA

3.    Any employee who is appointed as a full time Business Representative or is elected to a full time office of the Union, or the International Union, shall be given a leave of absence not to exceed a total of six (6) years. TA

4.    Disability leaves of absence for employees will be granted in accordance with the recommendation of the attending physician, not to exceed one (1) year. *unless a longer period is required by the American with Disabilities Act.* Maternity /paternity leaves will not be granted beyond three (3) months unless supported by the attending physician. TA

5.    Failure to report for work at the end of the period of a leave of absence 1s equivalent to resignation. TA

6.    Seniority shall accumulate during the period of leave of absence. TA

7.    In the event of the death of a member of an employee's immediate family, he/she will be granted time off from work with pay for up to three (3) consecutive days, one of which must be the day of the funeral. The employee will be paid for that portion of his/her regular week's work which falls within the above three (3) day period if he/she was, under the terms of this Agreement, scheduled to work. If bereavement leave occurs during an employee's scheduled vacation, the employee will be permitted to substitute bereavement leave in lieu of vacation time. The Tipped Adjustment Rate as defined in Article 10 will be applied. The Employer may require an employee to provide proof of death.

13826232v.2                                             9

Immediate family shall mean the employee's father, mother, father-in-law, mother-in-law, spouse, *previously declared (on Employer form)* same-gender domestic partner, children, stepchildren, stepparents, guardian, brother or sister, grandchild, son-in-law, daughter-in-law, grandparents, half-brother, stepbrother, half-sister, stepsister, current grandparent-in-law, current brother-in-law and current sister-in-law.

In addition to the foregoing paid leave, an employee will be permitted to take one (1) day of unpaid leave in order to serve as a pallbearer. An employee also may take off up to three (3) days without pay to attend the funeral of an aunt or uncle. TA

8.    Jury Duty: If a regular employee with seniority is summoned for petit or grand jury service, such employee shall be paid the difference between jury pay and the pay the employee would have earned from the Employer for each day of jury duty which falls on a day on which the employee would otherwise be scheduled to work. If on a day the employee would otherwise be working for the Employer, he or she is released from jury duty prior to the end of his or her scheduled shift, the employee will be expected to return to work as soon as possible. No employee shall be required to perform work for the employer during any twenty-four (24) hour period (11:00 p.m. - 11:00 p.m.) during which the employee is required to be present for a petit jury or grand jury service.

To be eligible for benefits under this section, the employee must endorse and turn over to the Employer the check received for jury duty. All hours spent on jury duty will be credited for purposes of calculating vacation and holiday benefits. The Employer will in turn pay the employee the pay the employee would otherwise have earned on that day. Payment for jury duty service will be limited to a maximum of six (6) calendar weeks for each Agreement year. TA

9.    The Employer is obligated to continue to provide health insurance benefits during an employee's leave of absence under this Article only to the extent required by law (e.g., FMLA or Minnesota Parental Leave Law).TA

### ARTICLE 8
### WORKWEEK

1.    The basic work week shall consist of five (5) days, forty (40) hours, and two (2) consecutive days of rest within a seven (7)-day period, starting the first shift on ~~Friday~~ Monday TA of each week; provided, however, this shall not serve as a guarantee of a minimum number of hours or a minimum number or length of shifts. Time and one-half shall be paid after forty (40) hours worked or paid as an approved holiday or vacation day in any one work week. Time and one-half shall be paid for all hours worked on the sixth (6th) and seventh (7th) day in a work week to all employees except Banquet Servers. However, Banquet Servers will not normally be required to work a sixth (6th) day until all regular full-time servers have been rescheduled for five (5) days. Double time will be paid after forty-eight (48) hours worked or paid as an approved holiday or vacation day in a work week. Employees recalled from layoff to work on the employee's scheduled days of work will be paid straight time.

Time and one-half is to be paid for any hours worked in excess of eight (8) hours worked in a work day. Provided, however, that daily overtime will not apply to function and on-call employees who work less than four (4) days per week. There shall be no pyramiding of

10

overtime.

Sick leave, paid or unpaid, will not count for purposes of computing overtime. TA

By mutual agreement between employees and the Employer, nonconsecutive days off may be scheduled. The nonconsecutive days off schedule will not be binding on any other employee. Irrespective of the foregoing, non-consecutive days off may be scheduled for function and on-call personnel. TA

2.    Any employee in the maintenance departments who is called from home for an emergency condition shall be given two (2) hours minimum pay at time and one-half for such call-in work. Emergency callbacks will be handled on a seniority basis among employees qualified to correct the emergency. Employees shall be paid for all overtime work and shall not be required to take time off for extra time worked. TA

3.    Employees in the maintenance departments, housekeepers and Kahler PBX operators and TCS Drivers shall be paid a premium of ~~fifty cents (50¢)~~one dollar ($1.00) for all hours worked between 10:00 p.m. and 6:00 a.m., except for call-in work.

4.    Employees who work beyond their regular daily schedule in any day shall not be required to take time off later in the work week because of such extra hours. The Employer agrees not to schedule employees for work with less than eight (8) hours between shifts, unless mutually agreed upon by the employee and the Employer; provided, however, that this provision shall not apply to employees working split-shifts pursuant to **Article 8, Section 11?.**

5.    The Employer reserves the right to prepare work schedules and to schedule days off. Work schedules and scheduled days off shall be posted in each department as far in advance as possible, but not later than Monday at 5:00 p.m., prior to the beginning of the work week involved. Employees will have until 5:00 p.m. on Tuesday to contest any discrepancies in the schedule. After 5:00 p.m. on Tuesday, the schedule will not be changed except in emergencies and/or for business needs. When cancelling a scheduled shift, the Employer will attempt, at least two (2) hours before the start of the employee's scheduled shift, to speak with the employee directly by calling the phone number in the employee's personnel file; if the Employer gets the employee's voicemail/answering machine or another person answers, the Employer will leave a message. Work schedules and scheduled days off may be changed without notice in case of emergency and/or for business needs. Any employee who reports to work on his scheduled day off at the request of the Employer will be paid time and one-half for all hours worked on that date. Employees who are scheduled in advance to work one or both of their days off, and calls in sick earlier in the week, shall not be eligible for time and one-half on the scheduled day off. In order to secure time off for a doctor's appointment, employees must provide notice of the appointment at least a week prior to the start of the new schedule, except in cases of emergency.

6.    Temporary Hours Reductions. In the event it is necessary to reduce staffing on a short term basis because of low occupancy, the Employer will grant employees, at their request, absent days on a voluntary basis.TA

7.    New extra or additional employees will not be utilized to prevent regular full-time employees from working forty (40) hours during a work week; provided, however, this does not constitute a guarantee of hours. TA

*Execution Copy*

8. Employees shall be granted preferential work schedules and preferential days off in accordance with their seniority within the section and the respective units consistent with the efficient operation of the section. TA

9. The following reporting pay guarantees will apply: TA

(a) A four (4) hour call-in on an employee's day off and a minimum reporting pay on a regular work day of four (4) hours for all employees normally scheduled to work in excess of twenty (20) hours per week. TA

(b) Employees who normally are scheduled for twenty (20) or less hours per week or on-call employees including function personnel will be guaranteed two (2) hours. TA

(c) A person-called back after having completed his work shift will receive a minimum of two (2) hours call back pay. TA

(d) Split-shift employees will receive a three (3) hour guarantee per shift, however, this guarantee would not apply to those employees who choose to voluntarily leave early. TA

(e) Employees scheduled or called in for a training session or mandatory meeting will be paid a minimum of two (2) hours at the appropriate rate of pay. TA

10. The senior employees in a classification who are on duty shall be given first preference to work overtime. If senior employees on duty in a particular job classification reject an offer of overtime, the junior employees on duty must perform the overtime work. Involuntary overtime will be assigned based on reverse seniority.

An employee working on his/her regular day shall be required to work overtime before an employee who is working on his/her day off. TA

11. ~~Lunch~~ Meal periods will be scheduled for a ~~maximum of~~ thirty (30) minutes for all employees, except for food and beverage employees, who will be expected to take lunch when and to the extent that operations permit.

Meal periods shall be an uninterrupted one-half (1/2) hour for which the employee is not to be compensated. If employees are required to work any portion of the meal period, they shall be paid for the entire meal period. Employees are responsible for clocking in and out at the beginning and end of each thirty (30) minute meal period. TA

The Employer shall provide meals which are palatable and wholesome at ~~a~~ no cost to employees ~~which it determines~~. Employee meals shall be served under clean and sanitary conditions. Employees at TCS shall be paid a meal allowance of $3.00 per day.

12. Employees shall be entitled to one (1) fifteen (15) minute break for each four (4) hours of work. It is understood, however, that the Employer reserves the right to schedule the breaks. Employees who work overtime beyond the end of their shift will be entitled to an additional fifteen (15) minute break after each additional two (2) hours of overtime worked. TA

13. Textile Care Services shall have the option to schedule a four (4) day work week

using ten (10) hour days in accordance with the following:

The work weeks shall consist of four (4) work days and three (3) scheduled days off.

Two (2) days scheduled off to be consecutive.

Hours in excess of ten (10) in a work day or forty (40) in a work week to be paid at one and a half (1-1/2) times base rate. Hours worked on scheduled days off to be paid at one and a half (1-1 l2) times base rate.

When computing holiday pay, participating employees will have average days computed using four (4) days per week to a maximum of ten (10) hours.

When computing vacation pay, participating employees will have average days computed using four (4) days per week. Vacation taken in less than full week increments will be computed based on this average day to a maximum of ten (10) hours.

14.    At Textile Care Services, the Employer agrees to give preference to senior employees in selecting shifts. Where operations permit, the Employer will provide a Textile Care Services driver with fourteen (14) days' notice of any reassignment to a new route.

15.    The Employer shall not require an employee to work alone without a reasonable amount of training as provided and determined by the Employer. TA

## ARTICLE 9
## HOLIDAYS

1.    The following shall be classified as holidays: Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's Day. Any time worked on those days shall be paid for at double time. Management shall have the exclusive right to determine which holidays are to be worked.

Should one of the foregoing holidays fall on Sunday, it will be celebrated on Monday in Textile Care Services. In all other facilities covered by this agreement, Sunday holidays will be celebrated on that day and paid for accordingly.

Should one of the following holidays fall on Saturday, it will be celebrated on Friday in Textile Care Services. In all other facilities covered by this Agreement, Saturday holidays will be celebrated on that day and paid for accordingly.

2.    Holiday pay will be granted to all employees with established seniority irrespective of the day of the week on which it falls. To qualify for pay, an employee must work his regular scheduled work day before and after the holiday. Pay for holidays for employees not scheduled to work will be based on the average daily hours worked by each eligible employee in the twelve (12) week period preceding the holiday up to a maximum of eight (8) hours. An employee who is scheduled to work on a holiday and then fails to report for work will not receive holiday pay unless the absence is an excused absence. All named Holidays shall be paid at the Tipped Adjustment Rate as defined in Article13.2.

An employee who is absent on the day before or after the holiday on compensable time

13836333v 3

13

(vacation, paid sick-leave, etc.) will not be disqualified if otherwise eligible for holiday pay. In addition, an excused absence on the day before or day after a holiday will not disqualify an employee from receiving holiday pay.

Such hours paid for will be counted as hours worked for overtime purposes if the holiday falls on an employee's regularly scheduled work day.

Employees with seniority who are normally scheduled to work five (5) days will have designated sixth (6th) and seventh (7th) days and such days will not be changed in holiday weeks to avoid payment of overtime for work on the sixth (6th) and seventh (7th) day of a work week. This does not apply to function employees who work on an on call basis.

3.      If the holiday comes during the employee's regularly scheduled vacation the employee shall have the option to convert vacation pay to holiday pay or to receive an extra day's pay.

TA    4.      An employee receiving sick leave pay on leave of absence shall not receive holiday pay.

5.      Regular full time bartenders shall not suffer a loss of pay due to their inability to work at their usual assignment or a related assignment during scheduled hours on an election day.

6.      Employees with eight (8) five (5) or more years of service shall be entitled to one (1) paid personal day. Employees with sixteen (16) Ten (10) or more years of service shall be entitled to two (2) paid personal days. Employees with twenty (20) fifteen (15) or more years of service shall be entitled to three (3) paid personal days and Employees with twenty (20) years of service shall have four (4) paid personal days. The paid personal days are to be scheduled by mutual agreement in advance or to cover uncompensated days of sick leave. The paid personal days must be used within the employee's anniversary year. Eligibility is based upon the employee's anniversary date of employment. Personal Days shall be paid at the Tipped Adjustment Rate as defined in Article 13.2.

Personal days may be scheduled and taken in advance of the employee's anniversary date, subject to repayment by the employee if the employee does not remain an employee until his/her next anniversary date. Each employee's check stub will reflect the employee's personal day balance. TA

ARTICLE 10
VACATIONS

1.      Employees shall receive vacations at the following rates:
After one (1) year of continuous service -    one (1) work week vacation;
After three (3) years continuous service -    two (2) work weeks vacation;
After nine five(95) years continuous service - three (3) work weeks vacation;
After fifteen ten (150) years continuous service - four (4) work weeks vacation. TA

2.      Any employee whose average work week during the vacation year is between thirty-eight (38) and forty (40) hours will be paid vacation pay for forty (40) hours. Any employee whose average work week during the vacation year is less than thirty-eight (38) hours

14

or more than forty (40) hours will be paid vacation pay equal to his average work week. Time spent by members of the Union Negotiating Committee in negotiations for renewal of this Agreement at the time of its expiration shall be included in computing an employee's average work week.

Employees in the server and bellperson sections shall be given the option to use two (2) hours of their accrued vacation pay for each hour on vacation.

Tipped Employee Vacation Adjustment. In addition to their base hourly rates, tipped employees working in the classifications of doorperson, bellperson, bell captain, all servers in functions, room service and all restaurants and lounges, shall be compensated at the rate of three dollars ($3.00) per hour for all vacation hours taken; effective September 1, 2012, this rate will be increased to three dollars and twenty-five cents ($3.25); and effective September 1, 2013 this rate will be increased to three dollars and fifty cents ($3.50). This rate shall increase to $4.00 effective March 1, 2016 and effective March 1, 2017 the rate shall increase to $5.00. "Base rate" for purposes of this Agreement means the wage rate assigned to the position excluding any premiums or differentials.

Employees shall earn vacation on a biweekly basis prorated in accordance with compensable hours for the pay period. The biweekly pay stub shall show total vacation hours accumulated. Employees will be eligible to receive their vacation benefits as they accrue it each pay period, providing, however, it can be scheduled with the employee's supervisor. A maximum of two (2) years' vacation may be accumulated. Once the employee has accumulated the maximum of two (2) years' vacation entitlement he/she shall stop accumulating additional vacation but shall not lose any vacation accumulated. Accumulation shall resume as soon as the employee uses accumulated vacation.

By mutual agreement, Employees may sell or roll over up to forty (40) eighty (80) hours of accrued vacation one time during a calendar year.

3.    Fully earned vacation pay shall be paid in advance of the scheduled vacation if requested by the employee at least two (2) weeks in advance. TA

4.    A vacation sign-up list shall be posted in each work unit at which time employees will sign for vacation between February 15 and March 31 for the period April 1 of the same year to March 31 of the following year. Thereafter, vacations will be selected on a first come, first serve basis and will not be subject to being bumped. Scheduling of vacation shall be arranged so that the functioning of the department shall not be impaired and shall be subject to the Employer's approval. Vacations can be arranged in one (1)-day increments by mutual agreement between the supervisor and the employee involved.

Vacation requests made over forty-eight (48) hours in advance will be honored whenever reasonably possible. The Employer agrees to affirm or deny in writing the employee's written request for vacation within seven (7) days of receiving such request. TA

Employees will be permitted to take vacation year round, provided, however, that the Employer may require adequate staffing levels to meet business needs. TA

5.    Vacations shall be taken within the year following the date the employee becomes eligible. In case of emergency, by mutual agreement an employee may work his vacation and

15

13826212v.2

receive his vacation pay in addition to wages for the hours worked or arrange his vacation for some other time. TA

Employees may take their vacations in one (1) hour increments if requested and approved in advance. There shall be no cap on the number of vacation days that an employee may take at one time provided that business levels allow.

6.   If an employee's services are terminated prior to the time of the taking of his vacation, he shall be immediately paid the full amount of his accumulated vacation pay, provided such employee has completed one or more years of service. TA

7.   If an employee becomes ill during his regularly scheduled vacation and qualifies for sick benefits he may re-schedule his unused vacation. TA

ARTICLE 11 INSURANCE
BENEFITS

1.   Employees who satisfy the average hours worked requirements set forth in Article 2, Paragraph 3, will be eligible to participate in the Employer's health and life insurance plans on the same terms and conditions as all other employees of the Employer. The Employer has the right to modify or eliminate these benefits (including providers) and increase the employee contributions to same. Said changes or increases in contributions shall be the same as those applicable to all other employees of the Employer. It is also agreed that the plan year, including enrollment periods, shall be the same as is applicable to all other employees of the Employer.

2.   Except for a violation of the express terms of this Article, any question or dispute in connection with the Employer's health insurance plans is specifically excluded from the grievance and arbitration procedures of this Agreement.

ARTICLE 12
UNIFORMS AND
LAUNDRY

~~The Employer agrees to furnish and launder uniforms for all employees who are required to wear them. These uniforms shall not be worn off the premises unless authorized. The employee is expected to treat the uniforms with care. The Employer also agrees to replace, at no cost to the employees, those uniforms which have become permanently stained or worn out.~~

"The employer will provide and launder an adequate number of uniforms for all employees required to wear a uniform at work. Uniforms will be of correct size. Full time employees scheduled to work five (5) days shall receive 11 sets of uniforms, employees working less than five (5) days a week will be prorated on the amount of uniforms provided to them. The Employer   replace at no cost to employees, those uniforms which have become permanently stained or worn out."

ARTICLE 13
BULLETIN BOARDS

The Union shall be entitled to reasonable use of the bulletin boards of the Employer for the purpose of posting notices of official business.  Other matters of interest to employees may be posted if approved by the Employer. It is agreed that the bulletin boards may be locked and a key maintained by the Management. TA

13826232v 2

16

## ARTICLE 14
### WAGES

1    A schedule of "Appendix A" covering job classifications and base wage rates is attached and made a part of this Agreement. Additionally, the parties agree as follows:

(a)    <u>Maintenance Boiler Pay</u> - $1.00 per hour paid for all hours worked to employees with a license, working full-time at a hotel where a license is required. (TCS will continue current practice.)

(b)    If applicable state or federal minimum wage is increased, all bell persons, doorpersons, and servers will receive the same cents per hour as the minimum wage increase cents per hour. TA

2.    Except pursuant to the Lateral Service Article of this Agreement (Article 25), an employee required to fill a higher rated job temporarily shall receive the rate for that job while on that job and must be paid such higher rate for at least three-tenths (3/10ths) of an hour. An employee required to fill a lower job temporarily shall receive his regular rate while on that job.

Employees who request hours in a lower paying job in order to more nearly reach full-time employment will be paid at the rates of the job being performed. TA

Except pursuant to the Lateral Service Article of this Agreement (Article 25), bargaining unit employees will not be required to temporarily fill in for non-bargaining unit positions.

3.    Employees being paid over scale shall receive the same percentage increase as employees paid on the Agreement's scale. TA

4.    If any new classifications are added during the life of this Agreement, wages for the same shall be negotiated by letter or addendum and made a part of this Agreement. TA

5.    All rate increases shall become effective in the first pay period after the employee becomes eligible for the rate increase, it being the intention of the parties that changes in rates of pay not be made during a work week.TA

6.    Employees who are required to leave their jobs because of occupational injury will receive pay for all hours scheduled to work on the day of the injury or accident.TA

7.    Banquet servers working cashier/vending functions shall receive the five (5) year snack bar attendant rate of pay. Senior employees shall have the right to defer such functions to the junior employee provided there are sufficient employees to staff the event.

8.    A split shift shall be defined as any break of more than one (1) hour during working hours. All split shifts will be completed within a twelve (12) hour period, with the exception of function employees and bell persons. A premium of ~~twenty cents (20¢)~~One dollar ($1.00) per hour will be paid for all hours worked on any split-shift except tip classifications.

9.    Employees who assist with training and orientation of new hires shall be paid an additional $1.50 per hour for all hours spent training with a 4 hour minimum.

## ARTICLE 15
### HEALTH, SAFETY AND SICK BENEFITS

1. All regular employees who have completed their probationary period of employment and attained seniority status will be eligible for sick leave benefits beginning with the ~~second~~ first day of absence for actual illness. ~~However, sick leave will be paid to any employee on the first day of hospitalization and for the first work day of any three (3) or more consecutively scheduled work day absences.~~

For employees hired prior to September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of eighty (80) hours of sick leave for two thousand eighty (2,080) hours of work or pay during an employee's anniversary year. The maximum benefit that can be accumulated by such an employee will be three hundred (300) hours. Upon an employee reaching the maximum balance, the employee may sell up to sixty (60) hours of sick pay at fifty percent (50%) of value on the employee's anniversary date.

For employees hired on or after September 1, 2005, sick leave benefits will be earned and accumulated bi-weekly on a pro-rata basis of forty (40) hours of sick leave for two thousand eighty (2,080) hours of work or pay during an employee's anniversary year of employment. The maximum benefit that can be accumulated by such an employee will be three hundred (300) hours. Upon an employee reaching the maximum balance, the employee may sell up to sixty (60) hours of sick pay at fifty percent (50%) of value on the employee's anniversary date.

Sick leave shall be paid at the Tipped Adjustment Rate as defined in Article 13.2

2. Sick leave may be converted to hours in the instance of an employee becoming ill after having reported for work or to cover lost time for doctor/dentist appointments. The hours lost by such an employee on that day by reasons of illness will be accumulated to establish eligibility for sick leave after the required waiting period.

Employees in the server and bellperson sections shall be given the option to use two (2) hours of their accrued sick leave for each hour of sick leave provided they meet the sick leave eligibility requirements. TA

3. To receive sick pay after three (3) days of illness, an employee must present a doctor's certificate as proof of illness. Absences due to accidents c o v e r e d by w o r k e r s ' compensation are not eligible for sick leave benefits; provided, however, that sick leave which has been accumulated can be utilized in connection with workers' compensation benefits in order to permit an employee to receive up to the employee's average income in a combination of workers' compensation and sick leave pay.TA

4. The Employer will do everything reasonably possible to create and maintain safe, healthful and sanitary working conditions. The Union agrees that it will endeavor to have its members observe all of the safety rules. TA

5. The Employer may make temporary work reassignments in order to accommodate the light duty or special work requirements of an employee returning to work from a work-related injury or illness. Such reassignments will be limited to sixty (60) days unless extended by mutual agreement. TA

6. The Employer agrees that employees shall be allowed to use any of their accrued sick time for those absences which would be covered by the Family and Medical Leave Act.TA

18

13826232v 2

## ARTICLE 16
## PENSION

1.  The Employer will continue to maintain and administer a pension plan ("Plan"). The normal pension benefit will be fourteen dollars ($14.00) per month for each year of service. The pension program will be funded by the Employer as required by ERISA and the Internal Revenue Code. Employees who work beyond age sixty-five (65) will continue to accrue the full benefits subject to the maximum accumulation of forty-five (45) years.

2.  The following is a brief outline of pension eligibility and benefits. The Plan and Trust Document are the ruling documents in all respects:

Eligibility - Age twenty-one (21), one (1) year of service, and 1,000 hours worked within a twelve (12) month period.

Normal Retirement Age sixty-five (65) and five (5) years of participation.

Early Retirement Age sixty-two (62) and five (5) years of participation.

Disability retirements are available to qualified employees.

The normal pension benefit will be fourteen dollars ($14.00) per month for each year of service up to forty-five (45) years.

There are a number of optional methods for payments of benefits

Vesting occurs after five (5) years of Vesting Service

3.  The Employer shall have the right to amend the Plan from time to time, consistent with the foregoing terms.

## ARTICLE 17
## UNITE HERE 401(k)

Employees will be eligible to participate in the 401(k) plan created and administered by the Union ("Union 401(k) Plan"). The Employer will not match employee contributions to and the Union will be responsible for all the costs of the Union 401(k) Plan, including all costs associated with the administration of the Union 401(k) Plan. TA

## ARTICLE 18
## NO STRIKE OR LOCKOUT

1.  There shall be no strike, picketing, work stoppage, slow down, sit downs, or cessation of work, including of a sympathy nature, boycotts, or any walk out of any kind or for any reason, including any dispute relating to alleged unfair labor practices, during the term of this Agreement. The provisions of this Article shall be absolute and shall apply regard less of whether the dispute is subject to arbitration under the provisions of Article 6 of this Agreement. TA

2.    It will not be a violation of this agreement for employees to refuse to go through a legally authorized picket line in any strike approved by a two-thirds (2/3) vote of the executive board of the Union. TA

## ARTICLE 19
## MAINTENANCE TOOL ALLOWANCE

Maintenance employees will be entitled to a tool allowance of up to ~~$325.00~~ $375.00 per year to maintain and replace tools required by the Employer and light maintenance employees shall be eligible for a $50.00 annual tool allowance. Paid receipts must be presented to the Employer before payment is received by the employee. Employees will be reimbursed within fifteen (15) business days of presenting a receipt.

The tool allowance will be paid to eligible employees who are actively employed on September 1 of each year of the Agreement. For those employed less than a full year at that time, the tool allowance will be prorated based on the number of full months worked in the preceding twelve (12) months resulting in one-twelfth (I/12th) of the allowance for each month. TA

Specialized tools and test equipment required for maintaining equipment, but not listed on the employee tool list will be provided by the Employer. These tools will not generally be issued to maintenance employees, but will be stocked in the maintenance shop to be issued on an as needed basis. TA

## ARTICLE 20
## DISCRIMINATION

The Employer and the Union agree that there shall be no discrimination by either Party which violates any of the City, State or Federal laws, ordinances or regulations on Equal Opportunity Law. ~~to abide by the federal law prohibiting discrimination in hiring practices because of sex, race, age, religion, color, national origin or union membership. The Employer further agrees that there shall be no discrimination in regard to tenure, upgrading or work assignments because of sex, race, age, religion, color, national origin or union membership.~~ All employees shall be permitted to wear their official Union button and/or official steward button provided the button is no larger than one and one-quarter (1 -1/4) inches in diameter. However, the foregoing limitation on the number and size of buttons worn shall not apply to employees in classifications that are not visible to the public. (move to Article 2)

## ARTICLE 21
## RESPECT &DIGNITY

The Union and the Employer recognize that workers in the hospitality industry are professional employees deserving of the highest regard. The Union, the Employer, the non-Union and Union employees will work together to honor the principles of respect, and dignity. The parties and non-Union and Union employees agree that the continued success and operation of this establishment is dependent upon their mutual respect for one another's work. TA

20

13826232v2

## ARTICLE 22
## MANAGEMENT RIGHTS

Except as limited by the express provisions of this Agreement, and longstanding mutually agreed written custom and past practice, the management of the business and the direction of the working forces shall rest solely and exclusively with the Employer. This includes, but is not limited to, the right to hire; to determine the quality and quantity of work performed; to determine the number of employees to be employed; to determine the jobs and job classifications; to layoff employees; to assign and delegate work; to maintain and improve efficiency; to promulgate, rescind, revise and require observance of rules, regulations, and other policies; to direct the activities of all employees employed by the Employer; to schedule work and to determine the number of hours to be worked; to determine the methods and equipment to be utilized and the type of service to be provided; to create, combine and to eliminate job classifications; except as limited by Appendix F, to subcontract bargaining unit work including using temporary agency employees for same; and to change, modify or discontinue existing methods of service and equipment to be used or provided. TA

## ARTICLE 23
## LAUNDRY AND DRY CLEANING WORK STABILIZATION

Notwithstanding any strike, work stoppage, interruption of work or other economic sanction instigated or conducted by the Union or employees against the Employer for any good reason, specifically including the occasion of negotiating new or different terms of collective bargaining agreements, there shall be no work stoppage or interruption of work as relates to materials being processed in the laundry and dry cleaning departments for the use of any public and private hospitals, the Mayo buildings and nursing homes.

If such a strike or work stoppage occurs, the Employer and the Union will cooperate with the other to the end that regular employees of the Employer will be made available for the processing of such uninterrupted work and services of public and private hospitals, the Mayo buildings and nursing homes.

In consideration of the foregoing no-strike agreement, the Employer agrees that it will not process any other work in its laundry and dry cleaning facilities during the term of a strike, so long as the Union and the employees do process, without interruption, all work required for the use of any public and private hospitals, the Mayo buildings and nursing homes.

This Article shall remain in full force and effect for a period equal to the life of this Agreement and/or any renewal thereof plus six (6) months in addition thereto.

Any breach or threatened breach of this Article or any of the terms thereof in addition to any remedies at law or this Agreement shall be subject to suit for specific performance by the Employer or the Union.

## ARTICLE 24
## SUCCESSORSHIP

In the event the owner of a facility covered by this Agreement decides to sell, transfer or assign its interest in any of the three (3) hotels listed on page one (1) of this Agreement, or in Textile Care Services, it will, prior to closing, provide a copy of this Agreement to the purchaser, assignee or transferee. In addition, the Employer will notify the Union and bargain in good faith over the effects of the pending sale, transfer or assignment on bargaining unit employees, prior to closing. The Employer agrees to notify the Union of the owner's intent to sell, transfer or assign its interest at the earliest possible date but in any case, no later than the date, of the execution of the purchase agreement.

## ARTICLE 25
## LATERAL SERVICE

To support the Employer's provision of a high level of service to guests of the hotels covered by this Agreement, a high degree of cooperation with managers and with workers is required. In order to promote cooperation in the workplace, managers and workers are encouraged to develop ongoing communication. Consistent with the needs of the workplace, the Union recognizes that cooperation can be beneficial to both the workers and a hotel. TA

Management may, using reasonable discretion, utilize a policy of lateral service for limited periods of time to satisfy guests' and the hotel's needs. Lateral service consists of an employee performing work which ordinarily is performed by employees in a different job classification and is designed to allow employees to help where needed until guest or other hotel needs are satisfied. TA

## ARTICLE 26
## ~~ENTIRE AGREEMENT~~

~~This Agreement incorporates the entire understanding between the parties and supersedes all prior agreements, letters of understanding, grievance settlements and past practices between the parties except for those practices identified by the parties in Appendix K that may continue to be relevant. This Agreement shall be modified or amended only by a writing referring to this Agreement executed by both parties setting forth the amendment or modification.~~

## ARTICLE 27
### DURATION

This Agreement shall be effective as of ~~October 1, 2011~~ and continue in full force and effect to and including the ~~31st day of August, 2014~~ and continue thereafter from year to year unless either party hereto shall, at least sixty (60) days previous to the termination of any yearly period, notify the other party in writing of its intention to amend, modify or terminate this agreement. By yearly period the parties understand that the anniversary date of this Agreement will be ~~August 31st~~ of any succeeding year unless changed by mutual consent of the parties.

Wage increases set forth in Appendix A will be effective on the first full pay period after ~~September 1, 2011~~, the first full pay period after ~~September 1, 2012~~ and the first full pay period after ~~September 1, 2013~~.

In the event of actual declaration of war by the Congress of the United States, this Agreement may be reopened by either party on sixty (60) days written notice. TA

WITNESS WHEREOF, The Employer and the Union have hereto set their hands this ~~day~~ of ~~October 2011~~.

~~SUNSTONE HOTEL PROPERTIES, INC.~~
AS AGENT FOR DBA THE KAHLER
GRAND HOTEL, ROCHESTER
MARRIOTT MAYO CLINIC AREA,
KAHLER INN & SUITES AND

UNITE HERE LOCAL 21 AFL-CIO

Regional Director of Operations

Brian Brandt
President / Business Representative

Nancy Goldman
International VP, UNITE HERE

23

## SIDE LETTER

~~Sunstone Hotel Properties,~~ Inc., as agent for d/b/a The Kahler Grand Hotel, Rochester Marriott Mayo Clinic Area, Kahler Inn & Suites and Textile Care Services located in Rochester, Minnesota, ("Employer") and UNITE HERE Local 21 AFL-CIO, enter into this Side Letter to their October 1, 2011 – August 31, 2014 collective bargaining agreement.

As a result of the elimination of the retiree life insurance benefit set forth in the parties' September 1, 2005 to August 31, 2010 collective bargaining agreement, the Employer has agreed that employees who were eligible as of September 1, 2011 or would become eligible by August 31, 2014 for this benefit will receive no later than December 15, 2011, a payment of two hundred and fifty dollars ($250.00) minus applicable legal deductions.

~~SUNSTONE HOTEL PROPERTIES, INC.~~
AS AGENT FOR DBA THE KAHLER
GRAND HOTEL, ROCHESTER
MARRIOTT MAYO CLINIC AREA,
KAHLER INN & SUITES AND
TEXTILE CARE SERVICES

Robert LaCasse
Regional Director of Operations

UNITE HERE LOCAL 21 AFL-CIO

Brian Brandt
President / Business Representative

Nancy Goldman
International VP, UNITE HERE

1 3826232v.2

24

APPENDIX "A"

<u>Payroll Rates</u>

The rates of pay for classifications are set forth below. The hiring rate shall apply to employees transferring to another classification, providing there is no decrease in hourly rate. After an employee who has transferred to another classification completes three (3) months of continuous employment in the new classification, he/she will be granted the appropriate service rate based upon his/her continuous employment with the Employer. Employees will, however, be given credit for actual experience in filling in on the new position towards the three (3) months of continuous employment. TA

The Employer will have the right to select the individuals who will be classified lead and to determine the number of lead positions and the shifts where they will be utilized. The Employer will also have the right to increase or decrease the number of lead positions in the future. The minimum wage differential for lead positions will be fifty cents (50¢) per hour. Leads shall be responsible for the general direction of employees in the department and ensuring that all tasks are completed. TA

A-1

| | Sept. 1, 2011 | | | | | Sept. 1, 2012 | | | | | Sept. 1, 2013 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Textile Care Services | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo | Hire | 11 Mo | f1 Mo | Mo | ?L Mo | Hire | 12 Mo | 24 Mo | 42 Mo | 60 Mo |
| Production I | 8.76 | 9.80 | 10.66 | 11.51 | 12.25 | 8.76 | 10.10 | 10.87 | 11.74 | 12.50 | 8.76 | 10.30 | 11.09 | 11.97 | 12.75 |
| Feeder/Folder | | | | | | | | | | | | | | | |
| Inventory Preparation | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Production II | 9.10 | 10.30 | 11.09 | 11.87 | 12.68 | 9.10 | 10.51 | 11.31 | 12.11 | 12.93 | 9.10 | 10.72 | 11.54 | 12.35 | 13.19 |
| Cart Handler | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Production III | 9.54 | 10.74 | 11.56 | 12.34 | 13.17 | 9.54 | 10.96 | 11.79 | 12.59 | 13.43 | 9.54 | 11.17 | 12.02 | 12.84 | 13.70 |
| Janitor | | | | | | | | | | | | | | | |
| Dock Worker | | | | | | | | | | | | | | | |
| Soil Sorter | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Production IV | 9.90 | 11.12 | 11.96 | 12.77 | 13.62 | 9.90 | 11.34 | 12.20 | 13.03 | 13.89 | 9.90 | 11.57 | 12.45 | 13.29 | 14.17 |
| Dry Cleaner/Presser | | | | | | | | | | | | | | | |
| Mender | | | | | | | | | | | | | | | |
| Wearing Apparel Finisher | | | | | | | | | | | | | | | |
| Checker | | | | | | | | | | | | | | | |
| Washer Machine Op. | | | | | | | | | | | | | | | |
| Soil Sort Cart Dumper | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Production V | 10.98 | 11.99 | 12.89 | 13.69 | 14.58 | 10.98 | 12.22 | 13.15 | 13.96 | 14.87 | 10.98 | 12.47 | 13.41 | 14.24 | 15.16 |
| Dry Cleaner Machine Operator | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Production VI | 11.28 | 12.30 | 13.24 | 14.03 | 14.93 | 11.28 | 12.55 | 13.50 | 14.31 | 15.23 | 11.28 | 12.80 | 13.77 | 14.59 | 15.54 |
| Tunnel Machine Operator | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Distribution VII | 14.02 | 15.19 | 16.34 | 17.07 | 18.13 | 14.02 | 15.49 | 16.67 | 17.42 | 18.49 | 14.02 | 15.80 | 17.00 | 17.76 | 18.88 |
| Commercial Driver | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Distribution VIII | 14.99 | 16.22 | 17.45 | 18.18 | 19.29 | 14.99 | 16.54 | 17.80 | 18.54 | 19.67 | 14.99 | 16.87 | 18.16 | 18.91 | 20.07 |
| Service Rep / Utility | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Production IX | 15.80 | 17.16 | 18.46 | 19.10 | 20.26 | 15.80 | 17.50 | 18.83 | 19.49 | 20.66 | 15.80 | 17.85 | 19.21 | 19.88 | 21.08 |
| COL | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| TCS Maintenance | | | | | | | | | | | | | | | |
| Laundry Specialist | 21.34 | 22.88 | 24.62 | 25.31 | 26.78 | 21.34 | 23.34 | 25.12 | 25.81 | 27.31 | 21.34 | 23.80 | 25.62 | 26.33 | 27.86 |
| Mechanic | 18.53 | 19.93 | 21.45 | 22.18 | 23.47 | 18.53 | 20.33 | 21.88 | 22.61 | 23.94 | 18.53 | 20.74 | 22.32 | 23.06 | 24.42 |
| Apprentice | 16.09 | 17.35 | 18.67 | 19.40 | 20.57 | 16.09 | 17.70 | 19.04 | 19.79 | 20.88 | 16.09 | 18.05 | 19.42 | 20.18 | 21.40 |
| Preventive Maintenance | 14.53 | 15.73 | 16.93 | 17.68 | 18.75 | 14.53 | 16.04 | 17.27 | 18.01 | 19.12 | 14.53 | 16.38 | 17.62 | 18.37 | 19.51 |
| Light/Yard Maintenance | 9.82 | 10.76 | 11.58 | 12.38 | 13.21 | 9.82 | 10.98 | 11.81 | 12.63 | 13.47 | 9.82 | 11.20 | 12.04 | 12.88 | 13.74 |

A-2

APPENDIX "B"
Departments And Seniority

Sections THE KAHLER GRAND HOTEL

Food & Beverage Department

- Cooking Section
- Preparation Section
- Room Service Serving Section
- Grand Grill Serving Section
- Function Serving Section
- Function Set-Up
- Sanitation Section
- Bartenders Section
- Stores Section
- Room Service Telephone Section
- Starbucks Section
- U-Club Section
- Martini's

Rooms Department
- PBX Section
- Bellperson, Lobby Porter Section
- Housekeeping Section

Maintenance Department
- Maintenance Section

KAHLER INN & SUITES

Food and Beverage Department
- Cooking Section
- Serving Section
- Sanitation Section

Rooms Department
- Housekeeping Section
- Bellperson Section

Maintenance Department
- Maintenance Section

B-1

<u>ROCHESTER MARRIOTT</u>

Food and Beverage Department
- Cooking Section
- Preparation Section
- Serving Section
- Room Service Serving Section
- Function Serving Section
- Function Set-Up
- Sanitation Section
- Bartenders Section
- Stores Section

Rooms Department
- Bellperson, Doorperson Section
- Housekeeping Section

Maintenance Department
- Maintenance Section
- Housekeeping Section

<u>TEXTILE CARE SERVICES</u>

Production Department
- Receiving Section
- Wash Section
- Flat/Tumble Finishing Section
- Wearing Apparel Finishing Section
- Packaging/Shipping Section
- Dry Cleaning Section
- Utility Section

Distribution Department
- Service Representative Section

Maintenance Department
- Maintenance Section

B-2

APPENDIX "C"

MAINTENANCE

ADDENDUM

Apprentices in the Maintenance Department will be permitted to take a test to move to the "mechanic" classification after completing two years of service as an apprentice. The apprentice wishing to take the test will furnish the employer with a written request and will be permitted to take the test within thirty (30) calendar days following the written request. The employer will inform the apprentice of the test results within thirty (30) calendar days of taking the test. If the apprentice passes the test he/she will be promoted to the "mechanic" classification.

At Textile Care Services, the laundry specialist classification will require the employee to have a class 1-B boiler license and maintenance electrician's license. The employee will be required to demonstrate skills in electronics to troubleshoot PLC and computer control systems, make programming changes as directed by the equipment manufacturer and repair circuit boards. The employee will be required to demonstrate proficiency in welding and plumbing.

The Employer agrees to provide, at no cost to the employee, for all training and education that is required for maintenance employees to obtain and maintain licensure provided the training is approved by the Employer and the course is successfully completed. The employer will reimburse employees for the yearly cost to renew or maintain licensure if such license is required.

The Employer agrees to employ no more than the' following number of employees in the classifications of light/yard maintenance and preventative maintenance:

| Facility | Light/Yard | Preventative |
|---|---|---|
| The Kahler Grand Hotel | 2 | 2 |
| Kahler Inn and Suites | | 1 |
| Rochester Marriott | | 1 |
| TCS | | 3 |

Seniority Rights. The Employer will maintain separate seniority lists at each Hotel, by classification. A separate seniority list for maintenance employees working at Textile Care Services will be maintained for purposes of all seniority rights.

Staffing and appropriate coverage at all locations will be determined by management. With the exception of apprentices, advancement to a higher paid classification will only be permitted when a new position opens in a specific classification.

Any and all license requirements will be determined by management and/or applicable law.

Any maintenance employee called back to work after he or she has left the property will receive a minimum of 4 hours call back pay.

C-1

APPENDIX "D"

Housekeeping Addendum (all Hotels)

A housekeeping employee shall not be required to clean more than sixteen (16) rooms within eight (8) hours. When a housekeeping employee cleans eleven (11) or more check outs in a day, the maximum number of assigned rooms shall be reduced by one (1), and when a housekeeping employee cleans ~~fourteen~~ thirteen (13) or more check outs in a day, the maximum number of assigned rooms shall be reduced by two (2). Each bedroom or separate sitting room of a suite shall count as one (1) room. Management in its sole discretion may reduce the number of rooms to be cleaned during a shift or assign a houseperson to assist a housekeeping employee with rooms where, for example, rooms are exceptionally dirty or extraordinary cleaning is required.

Except pursuant to the provisions of Article 25, Lateral Service, Room Attendants will not normally be required to perform houseperson work in addition to their normal duties.

Housekeepers assigned to clean rooms on three (3) or more floors during a shift shall have their room quota reduced by one (1) room.

A housekeeping employee who volunteers to clean more than the foregoing amount of rooms within eight (8) hours shall be paid a bought room bonus of seven dollars ($7.00) for each additional room. However, the bought room bonus shall not apply to rooms cleaned during overtime.

~~Housekeeping supervisors will make reasonable efforts to have housekeepers assigned to the room accompanying them when entering a checkout room before it is cleaned.~~

Housekeeping managers, supervisors, and inspectors shall not enter a checkout room before it has been cleaned unless the Room Attendant assigned to the room is present. Any proven violation of this section shall result in a $20.00 fine which shall be paid to the Room Attendant assigned to the room.

Room Attendants shall sign for their area or floor (s) by seniority. The Employer shall not arbitrarily reassign housekeeping sections.

The Employer will install sharps containers in all Hotel public restrooms.

Bargaining unit employees shall not normally be required to clean up and/or dispose of human or animal waste, vomit or significant blood spill. Employees shall comply with the Employer's procedures whenever they encounter human or animal feces, vomit, or significant blood spill in the workplace, and shall immediately contact a qualified responder who will handle disposal. Where a bargaining unit employee is required to clean human or animal waste, vomit or a significant blood spill, they will receive a ~~six dollar ($6.00) a~~ ten dollar payment.

Room Attendants shall be paid $3.00 for each rollaway, cot, or extra bed made up

Hotel employees shall not be required to handle any items that have been placed in a bio-hazard bag. Employees shall contact their supervisor for handling of those items.

In the event Hotel employees encounter improperly discarded syringes or other sharp objects while working, they shall be disposed of in accordance with established policy. The policy will include adequate available "sharps" containers for collection.

D-1

The Employer will provide linen, equipment and cleaning materials which is sufficient for Housekeeping employees to perform their jobs. Room Attendants will not be disciplined where they could not perform a task because they did not have the necessary equipment or supplies.

The Employer will provide assistance to a housekeeper in connection with moving or lifting any furniture weighing more than twenty-five (25) pounds. No Room Attendant will be required to stand on a ladder, bath tub or vanity.

The Employer will provide at least thirty (30) days' notice to the Union and, upon the Union's request, meet and discuss any renovation or new amenities or service standards which will significantly affect the housekeeper's workloads.

D-2

APPENDIX "E"

## Banquet Department Addendum

Banquet Definition. A banquet shall be deemed to be any reserved function with a pre-set menu and a fixed cost, including receptions, supervised by the banquet department.

System-Wide Seniority.  For purposes of lay-off, recall and filling available positions, the Employer shall maintain a master seniority list which shall contain the names of all regular full-time and regular part-time banquet servers who work in each of the Employer's hotels. Seniority shall be based on first function worked as a regular server following completion of probation.

Seniority by Location. The Employer will maintain at each location three (3) banquet employee seniority lists for purposes of scheduling at each of the Hotels.

    A.    First List.

The First List will contain the names of all regular full-time banquet employees. These employees must be available to work any shift at the Hotel(s), seven days per week. The seniority list for regular full-time banquet employees shall be posted every month.

Although fluctuations in business will have an impact on the Employer's ability to consistently schedule these employees on a full-time basis, it is the intention of the parties to provide First List employees with a reasonable opportunity to work a full-time schedule. Accordingly, the number of employees on the First List will be established and maintained so as to reflect this intention.

    B.    Second List.

The Second List will contain the names of banquet employees who are available to work a minimum of three (3) shifts, per week, at the Hotel(s). The days and shifts on which such employees are available will be submitted to management in writing. Second List employees will be on a separate seniority list, which will be posted. Second List employees will be scheduled only after the First List has been exhausted, when necessary, to meet staffing needs, or where use of the First List employees would result in the payment of overtime.

    C.    On-Call List.

The On-Call List will contain the names of banquet employees who are called and work on an "as needed" basis at the Hotel(s). On-Call employees may be scheduled when the First and Second Lists have been exhausted, where necessary to meet staffing needs, or where use of First or Second List employees would result in the payment of overtime. Local 21 will check hours worked on a monthly basis to see if hours worked fall under guidelines (average 10 hours/week are subject to dues).

<div align="center">E-1</div>

D.    Seniority Standing.

1    First List employees moving to the Second List will be "dove-tailed" based on seniority date. The Second List employees moving to the First List will go to the bottom of the list with seniority based on date of transfer.

2.    First List servers will have preference for scheduling purposes at their own Hotel and preference over Second List and On-Call servers at the other Hotels.

3.    Maximum hours available will be offered to senior First List employees, up to forty (40) hours per week, but no employee will work a triple shift until all First List employees have been offered a double shift.

4.    Any regular server involuntarily cut from a function shall be entitled to bump the least senior server scheduled to work at their home Hotel, in that work week.

5.    Employee requests for days off must be received in writing by noon, forty-eight (48) hours prior to posting of the weekly schedule, and will be duly considered. A regular server will not be disciplined for his/her inability to work a shift if the server is notified less than twenty-four (24) hours before the scheduled shift.

6.    All weekly banquet schedules shall be posted at each of the Hotels. It is understood that employees may be required to work at all locations. Banquet Servers shall not be required to transport food or dish carts.

E.    Special Conditions/Scheduling.
Employees will be scheduled by shifts. A shift is defined as a work period of no less than three (3) hours and no more than eight (8) hours. A shift may include working one, or any combination of, the following events:

- Breakfasts

- Coffee Breaks

- Lunches

- Dinners

- Receptions

- Special Events

Banquet Employee Compensation.

A.    Banquet Service Charge. Banquet servers shall receive fifteen and one-half percent (15.5%) of the banquet service charge on all functions, including those contracted for at the Civic Center. This service charge applies to food and beverages served to guests who have functions at a hotel covered by this Agreement and does not apply to any other fees and/or charges to guests who have functions at a hotel covered by this Agreement, including but not limited to room fees,

E-2

audio-visual equipment charges, etc.

     B.     <u>Service Charges on Guaranteed Meals.</u> Service charges shall be paid on the guaranteed number of meals paid for by the customer.

     C.     <u>Service Charge on Complimentary Functioning.</u> Servers who work a promotional function for which the Hotel does not charge the guest will be paid a service charge percentage consistent with the above schedule. The service charge will be calculated on the retail value of the function.

     D.     <u>Corkage Fees.</u> When the Employer collects a corkage fee for guest-supplied alcohol, fifty percent (50%) of that fee shall be added to the service charge pool. For events where no corkage fee is collected, fifty percent (50%) of the customary fee will be added to the service charge pool. However, the foregoing shall not apply to off-site events where the customer will not pay the corkage fee.

     E.     <u>Cake Cutting.</u> One-half of the cake plating charge shall be included in the ~~tip pool.~~ Service charge pool.

     F.     <u>Service Charge Increase.</u> ~~Should the service charge be increased, the hotel will retain the full increase up to eighteen percent (18%) percent.~~ Any service charge over ~~eighteen~~nineteen percent (~~18~~-19%) percent will be divided equally between the employees and the hotel.

     G.     <u>Off-site events:</u> for banquet set-up, servers, bartenders, captains - $35.00 per hour flat rate for all hours worked at off-site events. This flat hourly rate shall be paid for all off-site banquet set-up, tear down, loading and travel time starting when employee punches in under a separate hourly pay code for off-site event until employee punches out after the conclusion of the event. Start time for off-site event will be indicated on work schedule

<u>Tip Pooling System</u>

     A.     The service charge will be pooled and divided on a daily basis based on hours worked at each hotel.

     Temporary employees shall not be included in the tip pool.

     B.     <u>Employer Records.</u> The employer records on the amount of service charge and method of distribution shall be made available to the Union Representative or designee for purposes of monitoring the tip pooling system. The Union may request a meeting on a quarterly basis to review the system.

APPENDIX "F"

Food and Beverage Addendum

All Employees working in the cook classification will receive a meal during their shift at no cost to the employee.

The lead cook rate of pay will be applied to at least one (1) cook in the Grand Grill, ~~Center Street Country Cafe~~, Crossings and Vino for all hours of operation.

It is agreed there will be no more than one (1) sous chef and one (1) Executive chef assigned per shift at each hotel.

Starbucks employees will be paid at the snack bar rate.

~~The Employer will not subcontract or lease out to another food and beverage operator any kitchen, bar, or restaurant in either the Marriott or Kahler Grand that is subject to this Agreement.~~ The employer agrees that it will not subcontract or lease any existing food and beverage operation including banquets at any of the hotels.

When utilizing restaurant sections, including outdoor sections for banquet functions the servers and Bartenders who normally work in those sections will be offered the opportunity to work the function before on-call banquet employees.

13826232v.2

F-1

APPENDIX "G"

Textile Care Services Addendum

Employees in the janitor classification shall receive the same night shift differential as the maintenance classification.

The Employer shall provide employees working in the soil sort department with OSHA-approved gowns and gloves. Employees shall not remove these items from the premises.

TCS Drivers shall be guaranteed eight (8) hours pay when a utility driver rides along to train.

TCS employees shall receive an additional $1.50 per hour when training other employees.

13826232v.2

G-1

## APPENDIX "H"

### Bell Position Addendum

For groups of more than ten (10) people, bell persons shall receive a portage rate of two dollars ($2.00) per person each coming in and two dollars ($2.00) each for going out if negotiated and collected. It is agreed that these amounts are only minimums.

H-1

APPENDIX "I"

GUEST SERVICE

The patties agree to supplement the Agreement for the following purposes:

WHEREAS, the parties recognize that premier guest service is essential to the success of the Hotel and its ability to employ persons who are paid competitive wages;

WHEREAS, the parties recognize that because most guest dissatisfaction is not reported, and most dissatisfied guests simply take their business elsewhere, the guest complaints received by the Hotel are a reflection of dissatisfaction by some who have not complained but who will not return to the Hotel;

WHEREAS, the parties agree that the Hotel shall train employees on how to provide premier guest service and that each employee may be expected to successfully complete such training;

WHEREAS, the parties agree that the Hotel should not employ or continue to employ employees who are either unable or unwilling to provide, or who do not provide, premier guest service;

NOW, THEREFORE, the parties agree as follows:

(1)    The Hotel has the right to establish service standards and appearance, grooming, and dress standards that must be adhered to by all employees and managers.

(2)    The parties agree that the Hotel may apply progressive discipline, up to and including discharge, against employees who are the subject of guest complaints other than those set forth in the following paragraph 3 (examples of complaints include, but are not limited to, misplaced luggage, guest room not completely cleaned, mishandled food or beverage order, incorrect credit card charge).

(3)    The parties agree that the Hotel shall have just cause for discharge of any employee who, among other reasons:

a)    Is the subject of two or more legitimate complaints from guests within one year of poor, rude, or discourteous service (examples include, but are not limited to, use of foul language in the presence of a guest, arguing with a guest, indifference to a guest concern, carrying on personal business while a guest is waiting);

b)    Is the subject of one legitimate complaint from a guest of extraordinarily poor, rude, or discourteous guest service (examples include, but are not limited to, directing foul language toward a guest, sexual or other harassment of a guest, refusal to assist a guest, requesting or adding a gratuity);

c)    Fails to pass a course pertaining to the Hotel's service standards;

I-1

d)    Acts in gross neglect of the Hotel's service standards on one occasion or more, unless the Hotel deems it appropriate to excuse such neglect on a non-precedent setting basis.

The parties further agree that the foregoing are examples and that employees may terminated in other circumstances, subject to the requirement that the termination be for just cause.

(4)    In the event the Hotel chooses to conduct written or oral testing of employees in connection with guest service training, such tests must be reasonable, job related, and non-discriminatory. Such tests shall be limited to guest service and communication skills and abilities, as well as employee knowledge of the services and products offered by the Hotel. The Union shall be permitted to a copy of any tests used in advance of utilization by the Hotel. The Union shall be permitted to grieve such tests if it believes they are unreasonable, not job related, and/or discriminate on an unlawful basis.

(5)    Where a guest complaint is reduced to writing, the Hotel shall not be required to compel the guest to testify during the grievance and arbitration procedure or reveal the guest's address or telephone number to the Union or to the employee. The Hotel may introduce into evidence at arbitration written guest complaints. Upon request of the Union, the Hotel shall provide the Union with a copy of any written guest complaint that resulted in disciplinary action being taken against an employee, with the guest's identity redacted from such copy. Where the Union wishes to investigate a complaint, the Hotel shall arrange for a conference call between the guest, a representative of the Union, and a representative of Hotel management. Where, however, an employee has been discharged based on one or more guest complaints the Union shall be permitted to investigate the complaint to the extent permitted by the National Labor Relations  Act, as interpreted by the National Labor Relations Board and the courts.

I    3826232v.2

I-2

APPENDIX "J"

DRUG AND ALCOHOL TESTING
TA

This Drug and Alcohol Testing Policy is intended to be in accordance with Minnesota law and with the terms of the Agreement.

OBJECTIVE:

The Company strives to maintain a work environment free from the effects of drug and alcohol abuse for the protection of our customers, employees, and the community.

The Company recognizes that alcoholism and other drug dependencies are behavioral/medical problems which can be treated.

POLICY STATEMENTS:

1.      The possession, use, manufacture, transfer, or sale of illegal drugs during work hours, while operating a Company vehicle or on Company premises is prohibited. The Company premises include all ~~SUNSTONE HOTEL PROPERTIES, INC.~~ worksites, including parking facilities. Employees violating this provision may be terminated.

2.      Employees are not permitted to work under the influence of alcohol or any illegal drug. Employees violating this provision are subject to disciplinary action up to and including termination.

3.      Abuse of legally prescribed drugs or controlled substances, or over-the-counter drugs, is prohibited because it may impair an employee's ability to perform his or her job responsibilities. Depending on individual circumstances, this abuse could result in termination.

4.      Employees suffering from drug dependency are encouraged to seek medical treatment. The Human Resources representative may be contacted for referrals for evaluation and/or treatment facilities and the application of Company medical benefits for evaluation and treatment. No employee may suffer reprisals as a result of seeking help. If an employee feels he/she has suffered reprisals, he/she should report it to the Human Resources representative immediately and an appropriate investigation and action will take place.

5.      Every employee will receive a copy of the Drug and Alcohol Testing Policy and will be required to sign an Acknowledgment Form, Attachment A, which will be kept in the employee's personnel file. In addition, the Company shall post notices in appropriate and conspicuous locations at each of its worksites that the Company has adopted a Drug and Alcohol Testing Policy and that copies of the Policy are available for inspection during regular business hours by its employees and job applicants in the Company's Human Resources office.

6.      An employee may be required to undergo drug and alcohol testing when at least two (2) supervisors (if feasible) have reasonable suspicion that the employee:

a)      is under the influence of drugs or alcohol. Factors that may be considered in determining whether an employee is under the influence of drugs and alcohol include but are not

13826232v.2                              J-1

limited to: evidence of repeated errors on the job, Company rule violation, and unsatisfactory time and attendance patterns, if coupled with specific facts and rational inferences drawn from those facts that indicate possible drug use; or

      b)     has violated the Company's written Policy Statements (numbers 1, 2, or 3 above); or

      c)     has had a personal injury while working or has caused a personal injury to another person; or

      d)     has caused a work-related accident or was operating or helping to operate machinery, equipment or vehicles in a work-related accident.

Post-accident or injury testing will be conducted as soon as practical following the accident, but not later than thirty-two (32) hours following the accident.

7.     Drug and alcohol testing will be accomplished by the collection of hair, urine, and/or blood. The screening of hair, urine, and/or blood samples will be performed by qualified and certified testing laboratories. Testing is done for alcohol and the following drugs and drug classes:

Marijuana metabolites, cocaine metabolites, the opiates morphine and codeine, phencyclidine (PCP, angel dust), and amphetamines (amphetamine and methamphetamine), and/or all other drug classes as described in Schedules I through V of Minn. Stat.Section 152.02.

The detection levels of confirmatory tests shall be those established under Minnesota Rules.

8.     Every employee has the right to refuse to undergo drug and alcohol testing. Employees who refuse to undergo testing are subject to disciplinary action up to and including termination.

9.     Any employee who tests positive shall have the right to explain the positive test result of a confirmatory test or request and pay for a confirmatory retest of the original specimen sample.

10.     If a positive test result on a confirmatory test was the first such result for the employee on a drug or alcohol test by the Company, the employee will be immediately suspended without pay. The employee can be reinstated upon participation in either a drug or alcohol counseling or rehabilitation program, whichever is more appropriate as determined by the Company after consultation with a certified chemical use counselor or a physician trained in the diagnosis and treatment of chemical dependency. The cost for the evaluation will be paid by the Company. Costs for the recommended treatment will be the employee's responsibility. Employees who refuse to participate in the counseling or rehabilitation program or fail to successfully complete the program, as evidenced by withdrawal from the program before its completion or by a positive test result on a confirmatory test after the completion of the program, may be subject to termination.

<div align="center">J-2</div>

11.    An employee who is referred by the Company for chemical dependency treatment or evaluation or is participating in a chemical dependency treatment program may be requested or required to undergo drug or alcohol testing without prior notice during the evaluation or treatment period and for up to one (1) year following completion of any prescribed chemical dependency treatment program. An employee testing positive during this period may be subject to termination.

12.    A Medical Review Officer (M.R.O.) will review all test results. All positive test results shall be confirmed by a Gas Chromatography Mass Spectrometry analysis of the original specimen sample. The M.R.O. will review and interpret analytical (laboratory) results, validate the results scientifically, and determine if there is a legitimate medical explanation for a positive test result, and notify the Company of the results. The M.R.O. is a third party licensed physician with specialized knowledge of substance abuse.

13.    The Company reserves the right to change or terminate this Policy and Procedures at any time, after prior notice and negotiation with the Union. Every employee will be given a copy of the amended policy if a change is made.

14.    Test result reports and other information acquired in the drug and alcohol testing process are confidential information. Disclosure of the results to third parties m ay be done with the employee's prior written consent. Notwithstanding the above, test results may be disclosed to any federal agency or other unit of the United States government as required under federal law, regulation or order, or in accordance with compliance requirements of a federal government contract. The test results may also be disclosed to a substance abuse treatment facility for the purpose of evaluation or treatment of the employee, or may be disclosed to the Union or other necessary persons in connection with a potential or actual grievance or threatened or actual litigation. An employee has the right to request and receive from the Company, a copy of the test result report on any drug or alcohol test.

No employee may be required to undergo drug or alcohol testing without the prior approval of the Director of Human Resources or the General Manager or his/her designee.

PROCEDURES:

1.    When at least two (2) supervisors (if feasible) have reasonable suspicion to test an employee as stated in Policy Statement #6, the request must go to the applicable Human Resources representative or his/her designee to arrange for the collection and begin the required paperwork designating the need for hair, urne, and/or blood specimen.

2.    Before a test is administered, the Company will ensure that the employee has completed a Drug and Alcohol Acknowledgment Form.

3.    The employee will go to the collection site and provide a hair, urine, and/or blood specimen and appropriate identification. The collection site staff will begin the chain of custody paperwork and forward the specimen to the certified laboratory for testing. If an employee appears impaired and unable to safely go to the collection site on his/her own, the Company will arrange for transportation to the collection site and home following the collection procedure. Under no circumstances should an employee suspected of being impaired be allowed

13826232v.2                                    J-3

to drive. The employee will be reimbursed for any out-of-pocket expense incurred in taking the test, with proper documentation.

4.    ′    Test results will be reviewed to determine if there is evidence of the use of alcohol, drugs or controlled substances and forwarded to the M.R.O.  If the specimen sample shows a positive result, the original sample will be kept for additional confirming tests.

5.    The M.R.O. will communicate the results to the Company Human Resources representative.

6.    The Human Resources representative and/or the employee's supervisor will communicate the results of the test to the employee or job applicant, as the case may be, within three working days upon receipt of the results.

7.    If an employee tests positive for drug use, the employee will be notified in writing of his/her right to explain the positive test and the Company may request that the employee indicate any over-the-counter or prescription medication that the individual is currently taking or has recently taken and any other information relevant to the reliability of, or explanation for, a positive test result.

8.    Within three (3) working days after notice of a positive test result on a confirmatory test, the employee may submit information to the Company, in addition to any information already submitted under paragraph 7, to explain that result, or may request a confirmatory re-test of the original sample at the employee's own expense.

9.    The Human Resources representative will follow up on any recommended treatment and determine whether the employee has successfully completed the treatment.

1                                            J-4

Attachment A

DRUG AND ALCOHOL POLICY ACKNOWLEDGMENT FORM

I, the undersigned, certify that I have received and read a copy of the Company's Policy regarding drug and alcohol abuse.

As part of my employment with the Company, I understand that my position is subject to drug and alcohol testing and that I may be requested to provide a hair, urine, and/or blood specimen for a drug or alcohol test.

I understand that I may refuse to take the drug and alcohol test and that such refusal may result in termination.

_____
Employee

_____        _____
~~Social Security Number~~        Date

_____
Witness

·J-5

APPENDIX "K"

Mutual Agreements
(Custom, Past Practice, Letters of Understanding)

As part of the 2001 contract negotiations and settlement, the parties added a new Article 25 entitled, "Entire Agreement" to the Agreement. In connection with adding Article 25 to the Collective Bargaining Agreement, both parties made a reasonable and good faith effort to locate, identify and discuss all separate mutually agreed upon custom, past practices, or letters of agreement understanding which they believe were part of the collective bargaining agreement. As a result, the parties agree that the following items are part of the Collective Bargaining Agreement:

1.     From letter of August 19, 1988 to Dan Skinner, HR Manager, Kahler Hotel, from Terry Weivoda, Local 21 any employee with prior service and seniority in a room (restaurant) is permitted to use that seniority to bid on any posted jobs in that room (restaurant).

2.     From letter of September 24, 1991 to Terry Weivoda, Local 21, from Kevin Molloy, Senior VP Operations,

a.     It is agreed that no absolute room quota exists for room housekeepers, but the employer has the right to set reasonable performance standards.

b.     Consistent with past practice, it is agreed that full time housekeepers shall be able to use their seniority to select work areas, part time housekeepers shall be assigned as needed.

c.     It is agreed that when employees have been requested to work on their day off, such designation shall be made on the employee's work schedule noting any sixth or seventh day worked.

d.     It is agreed that tipped employees shall not be required to share gratuities with other Hotel employees.

e.     It is agreed that the Employer will continue for the life of their 2011 – 2014 Collective Bargaining Agreement the current employee discount for meals purchased in restaurants in accordance with the established policy, i.e. employee cafeteria, or if not available, from employee menu.

3.     From letter of October 23, 1997 to Dave Blanchard, Local 21, from Kevin Molloy, Regional VP Sunstone.

a.     It is agreed that a shift chef will not be used to fill a regular shift while a cook is on lay off. It is understood, however, that under such circumstances a laid off cook will not be recalled to cover short periods of cooking that could occur during the heavy volume periods of the day.

b.     It is agreed that when an employee is required to work through the lunch, the supervisor will be advised, and will attempt to reschedule the lunch periods. Employees will not, however, have lunch periods scheduled during the last one half hour of the shift.

c.     With respect to Article 9, Section 1, it is agreed that the language will be interpreted to require that employees who work on a holiday will be paid double time for all hours worked on that

K-1

1

day.

4.    From letter of October 5, 1998 to Kevin Molloy, Senior VP Operations, from Brian Brandt, Local 21. Concerning the issue of the employer using workers obtained through temporary employment agencies, it is understood that the Union would not consider it to be a violation of the Collective Bargaining Agreement should the Employer choose to utilize such workers provided that the Employer has made every reasonable effort to fill all positions with regular employees and, where practicable, to offer the work to all bargaining unit employees in the job classification first. The temporary workers will have no seniority rights and will not be used to prevent overtime or additional hours for Union members. Any temporary worker utilized by the Employer for more than thirty (30) calendar days will immediately become a Sunstone employee subject to the Collective Bargaining Agreement and the thirty (30) days as a temporary worker will be considered the probationary period. The Employer will provide the Union with a record of all temporary workers' names and hours worked upon request.

5.    From letter of June 22, 1994 to Jim Porrett, VP (Textile Care Services); from Terry Weivoda, Local 21 - it is agreed that maintenance employees with boiler operator responsibilities will be paid $1.00 per hour for those hours during which they perform boiler operator job duties.

6.    From letter of January 4, 1993 to Randy Lacey, Plant Manager (TCS), from Terry Weivoda, Local 21 - the union has accepted the employer's proposal to adopt an absence control policy.

7.    From letter of August 1, 2001, to Frank Heavlin, from David Blanchard, Local 21, regarding treatment of biohazard bags at Textile Care Services in Rochester, Minnesota. It is agreed that employees at TCS will no longer be required to handle any bio-hazard bags when they come to the plant. Any such bags will be placed, unopened, into a special bin that will be picked up by Mayo to be handled by them. This policy will not change during the life of the 2001-2005 Agreement unless required by law.

8.    As a result of discussions between the parties during the 2001 contract negotiations, the Employer agrees that bargaining unit employees will no longer be required to push wheelchairs occupied by non-hotel guests, or wheelchairs occupied by guests off company premises.

In addition, the parties recognize and agree that despite their efforts, there may be other separate documented mutual agreements which the Union or the Employer did not locate, identify or discuss, but which one party may believe is a part of the Collective Bargaining Agreement. If, after the 2001 Agreement is settled, either party discovers a previously undiscovered, documented mutual agreement, which they believe is part of the Collective Bargaining Agreement, Article 26 will not operate as a waiver of their right to assert their rights under the newly discovered and documented mutual agreement.

**The Union reserves the right to add to, amend, or modify these proposals.**

Opelu#12/NG/mt

K-2

**GC 23(c)**

EXHIBIT NO. _____ RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/15/15** REPORTER **SMW**

# UNITE HERE Local 21 Wage/ benefit Proposal 2-19-15

Term of Agreement: 5 years

ARTICLE 11 Insurance Benefits: Under the current Plans offered by Richfield Hospitality, the Union proposes that the Employer pay $4,000 annually towards the deductible for single coverage and $8,000 annually towards the deductible for family coverage.

APPENDIX A Wages:  The Union proposes to delete ALL current start rates in all classifications and make the 12 month rate the new start rate, the 24 month rate to be the new 12 Month rate, the 42 month rate to be the new 36 month rate and the 60 month rate be at 48 month step and the increases below be added to create a new 60 month step:

| | |
|---|---|
| 3-1-15 | 5% |
| 3-1-16 | 4.25% |
| 3-1-17 | 4% |
| 3-1-18 | 4.5% |
| 3-1-19 | 5% |

**In addition the Union proposes that at TCS Wages for the Production 1-3 classifications be the same rates as the current Production 4.

**GC Exhibit 23(c)**

P 01550

**GC 23(d)**

EXHIBIT NO._____RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/15/15** REPORTER **SMW**

UNION  PROPOSAL 2-27-15

<u>Probation Period - New Classification</u>.  An employee promoted to another classification shall serve a thirty (30) working day probationary period. During the probationary period, the Employer may return the employee to their previously held classification, room and schedule, for inability to perform the duties of the new job, or the employee may elect to return to their previously held classification, room and schedule if the position is not permanently filled. Otherwise, the employee shall be given available work in that classification. Employees so returning to previous work shall suffer no loss of seniority.

**GC Exhibit 23(d)**

**GC 23(e)**

EXHIBIT NO._____RECEIVED___✔___REJECTED_____

CASE NO. __18-CA-151245__ CASE NAME ____Richfield____

NO. OF PAGES ___4___ DATE __12/15/15__ REPORTER ___SMW___

## **UNITE HERE Local 21 Counter Proposal 4/16/15**

**#4.** Temporary Employees: Current language amended to include: The Employer shall be allowed to employ Interns to work in classifications covered by the CBA for a period of no longer than 30 days. Interns shall be paid no less than the start rate of the classification which they are assigned to and shall not be scheduled to work before all regular fulltime and part time employees. Interns shall not be scheduled to avoid paying overtime to regular full and part time employees.

**#5.** Reject any change — *INSURANCE*

**#31.** Reject any change — *PROBATIONARY PERIOD*

**#37.** Reduce 18 months to 12 months — *WARNING NOTICES*

**#42.** Add to b: Effect of Failure to Appeal.  Any grievance not appealed to a succeeding step within the time limits specified shall be deemed abandoned and not entitled to further consideration. Such abandonment by the Employer shall be deemed an acceptance of the grievance as stated and the remedy requested shall be accepted and enforced.  *IF WE ARE HELD TO TIME LIMITS, SO SHOULD THEY*

**#51.** Reject any change to current language  *LEAVE OF ABSENCE/MEDICAL LEAVE*

**#54.** Reject limit of 3 working days — *CONVENTION/POLITICAL LEAVES*

**#66.** Reject deletion of daily overtime

**#76.** Reject any change to current language  *OFFERING ~~OT~~ TO EMPLOYEES FROM OTHER HOTEL TO NOT PAY OT.*

**#79.** Change cost to NO COST  *MEALS IN HOTELS.*

**#90** DISCUSS — *VACATION PAY UPGRADE*

**#91** DISCUSS — *MEMBERS IN NEGOTIATIONS — HOURS BACK IN*

**#93** Add: Tipped adjustment rate shall be paid for all Holidays, Report in Pay, Sick time, Personal Days. REJECT deletion of selling up to 40 hours annually and add: may rollover up to 80 hours annually to be used in the following year.

**#100.** Add: There shall be no cap on the number of vacation days that may be taken at one time provided business levels allow.

GC Exhibit 23(e)

#103 Reject reference to employer's #5. ADD: The cost of the monthly Premiums, and any increases to the premiums, shall be split 80/20 with the Employer paying 80%. Effective upon ratification the Employer shall reimburse 80% of the Employees cost toward the deductible annually. Employees shall provide proof of payments and reimbursement shall be paid within 14 days of receipt of such proof.

ADD: during the life of the Agreement either Party, with 30 days written notice to the other, shall be allowed to open this section of the Contract for the purpose of bargaining a change in Insurance policy or provider. ***Note that the Union has proposed 2 alternative Plans which are available.

#111. Reject Banquet hourly rate  *FLAT RATE - HOURLY/*

Overscale employees to be paid the same percent or cents per hour as others in their classification.

#112. REJECT  *, BANQUET SERVER PAY*

#118. Change 2nd day to 1st day.  *- SICK PAY*

#119.  Change maximum accumulation/carry over to 240 hours. Clarify employers NOTE: omit from TC *? THEM ON THIS*

#132. Increase to $350.00 in year 2 and $375.00 in year 3 *TOOL ALLOWANCE*

#143. Effective date  *CONTRACT BEGINS 3/1*

#144. Reject. Add: wage increases shall be effective March 1, 2015

#146. Reject date

**APPENDIX "A"**    Reject proposed increases for 2016-2020.

**accept** Employers proposed 2015 rates as new start rate.

Current 12 month rate, the current 24 month rate, the 42 month rate becomes a 36 month rate and the 60 month rate becomes the 48 month rate and the new 60 month rate is increased by 3% for 2015.

Years 2 -5  add 2½ % on each step in all classifications

***On Time Bonus**- any employee who has reported to work as scheduled with no tardies, shall receive $100.00 every 3 months
*** **New Employee FINDERS FEE**-If a worker suggests another person to be employed at any of the facilities that worker will receive $100.00 upon the new person passing probation and another $100.00 if that person makes it 6 months with no disciplinary write ups placed in their file.


**APPENDIX "D"**. Effective March 1, 2017 the total number of rooms assigned daily shall be fifteen (15)   *Housekeepers*

**Effective on ratification the "waste cleanup fee" shall be $10.00. Effective March 1, 2017 this amount shall increase to $15.00.

** Effective March 1, 2016 Housekeeping employees shall be paid $2.00 for each extra bed, cot, rollaway or air mattress made up.

**Efficient Room Cleaning Incentive Pay-**  Room Cleaners who complete their normal complement of rooms on time and in an efficient manner during each scheduled shift shall receive $10.00 per week.
** **Housekeeping Service Charge**- $5.00 per day shall be added to each guest room bill; $2.00 per room to Room Cleaner, $1.00 to the Lobby Porter/Houseman and $2.00 to the house. (The $2.00 to the house can be used to defray other contractual costs to the employer such as Healthcare costs)

**APPENDIX"E"**    REJECT employers proposal of $12-$15 flat fee. Leave current language and system as is   *Banquet Servers*

**APPENDIX "F"**     Reject subcontracting/leasing out language.
*****Kitchen Incentive Pay**—Each cook will receive a monthly bonus of $50.00 and each dishwasher $20.00 for every month that the monthly food cost is within 2%  of the set food cost budget. The monthly food cost budget shall be communicated to the Union each month. Incentive Pay to be paid on the first paycheck of the following month.

## TCS:

Sheet Quota Bonus: 3¢ per sheet over daily quota

<u>Safe Driver Bonus:</u> All drivers who have no accidents or tickets shall receive a $50.00 per month bonus to be paid on the first paycheck of the following month.

<u>Clean Truck Bonus:</u>   Drivers who maintain a clean vehicle, inside and out, shall earn a $25.00 per month bonus.

<u>Full day Pay:</u> any employee who completes the production limit before the end of the shift shall be paid for the full 8 or 10 hour shift. *TCS*

<u>Deliveries over 100 miles:</u> Drivers assigned a route that is over 100 miles away shall receive an additional 2 hours pay. *TCS.*   *$100 PER DROP OVER 6 DROPS*

***<u>**On Time Bonus**</u>- any employee who has reported to work as scheduled with no tardies, shall receive $100.00 every 3 months

*** <u>**New Hire FINDERS FEE**</u>-If a worker suggests another person to be employed at any of the facilities  that worker will receive $100 upon the new person passing probation and another $100 if that person makes it 6 months with no disciplinary write ups placed in their file.

The Union reserves the right to add to, modify, or amend these proposals

**GC 23(f)**

EXHIBIT NO._____RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **9** DATE **12/15/15** REPORTER **SMW**

**Unite Here Local 21 Counter Proposal 9/24/2015**

**#4.** Temporary Employees:  Current language amended to include: The Employer shall be allowed to employ Interns to work in classifications covered by the CBA for a period of no longer than 30 days.  Interns shall be paid no less than the start rate of the classification which they are assigned to and shall not be scheduled to work before regular fulltime and part time employees.  Interns shall not be scheduled to avoid paying overtime to regular full and part time employees.

*Response: We have heard your proposal and understand it. The current climate in our market, Rochester, makes it rather difficult to recruit and maintain employees. As a reminder, based on the reports the unemployment rate in Rochester is currently 1.6% with 1400 more new rooms scheduled in Rochester. Which has resulted in the need to explore alternative; in this case temp labor. As a result this is an area that we need to execute the only avenue we have as a management in the CBA, "Management Right" to be oscillate with the change in our market place. We will adhere to our current proposal.*

**#5.** Reject Union counter: average of 20 hours per week for insurance

*Response: We understand and we have heard your rejection to the change proposed. As discussed at the length during our negotiations, the employer is proposing to make the eligibility hours for insurance benefits match what the federal government has proposed and what all other organization in the country does, especially those that are our competitors in Rochester. We will adhere to our current proposal.*

**#31.** Reject 90 day probationary

*Response: This was TA'd 4/26/15. As per our discussion on 9/24/15 the ability to have the 90 days already existed; which has not impacted the onboarding or*

*evaluation process for each new employee. We understand and hear your rejection. We adhere to the TA'd section in our current proposal.*

#37 Reduce 18 months to 12 months

*Response: We heard and understand your proposal to reduce disciplinary action in files from 18 – 12 months. Due to the litigious nature of our society, where law suits are filed at the drop of a bucket, this is important to manage the hotels effectively. We adhere to our proposal.*

#42 Add to b: <u>Effect of failure to Appeal</u>.  Any grievance not appealed to a succeeding step within the time limits specified shall be deemed abandoned and not entitled to further consideration.  Such abandonment by the Employer shall be deemed an acceptance of the grievance as started and the remedy requested shall be accepted and enforced.

*Response: We understand your request for the addition to the current language. That would constitute a change contrary to the existing proposed language in that section. Also if the parties want to resolve the matter they can do so. We adhere to our proposed language.*

#51 Reject any change to current leave language

*Response: We heard and understand your rejection of the proposed leave language. The proposed language as discussed during our negotiations is in conjunction with Federal and Minnesota guideline. We adhere to our current proposal.*

#54 Reject limit of 3 working days proposed up to 6 months

*Response: We have heard your concerns and understand the proposal. We will adhere to our current proposal.*

#66 Reject deletion of daily overtime

*Response: We understand your rejection to the proposed change. While we understand the need at times for an employee to, at times for business needs, to work more than 8 hour shifts it does not preclude the employee from being paid overtime after 40 hours for the work week. We also want to be more consistent with our competitors in Rochester, which is essential to our business. Although we also discussed the possibility of $ by 10 hour shifts. We will still adhere to our current proposal.*

#76 Reject any change to current language

*Response: We understand and hear your rejection to the change. The proposed and the expired contract covers all the hotels and while there is seniority, this proposal allows the associates in the other hotels that experience downturn at different times to be able to get additional hours. As indicated during our discussions in bargaining sessions, on the occasions when the hotels current staff is already at their forty (40) hours would be the time this language would be in effect. This allows the employee to be kept whole and assist with retention especially with the tight employment market in Rochester. We feel strongly that this proposed change will assist with the more effective management of the business.*

#79 Change cost to NO COST

*Response: We understand the union's proposal for the employee to not have a cost for employee meal. The competitors and non-competitors in the Rochester market does not give or offer employee meals for free. This is a cost that typically increases annually. Remember also that the cost of labor, food, room, and other incidental charges are not included. What we intended to do or have the ability to do is to be able to manage this process at a reasonable cost as noted also in the expired contract. We adhere to our current proposal.*

#90 DISCUSS (union requested the quantifications of this proposal)

*Response: We understand and hear your request for quantification of the proposal. As per our discussion at the negotiation table the change does benefit our associates. Your response on just having a ball park figure on what the cost is or will be to the employer. From what we have surmised this could be a cost of about $84k (we have the scenario of approximately a minimum of 65 associate will be impacted. At an average cost of $1200 for the early additional week resulting in $84k).*

#93 Add:  Tipped adjustment rate shall be paid for all Holiday, Report in Pay, Sick time, and Personal days.  <u>REJECT deletion of selling up to 40 annually and add may rollover up to 80 hours annually to be used in the following year.</u>

*Response: We heard and understand your rejection of the employers' proposal. We adhere to the current proposal.*

#100 Add: There shall be no cap on the number of vacation days that may be taken at one time provided business levels allow.

*Response: As we clarified in negotiations there is not a cap on the number of days that may be taken at one time. We adhere to the language I the proposal.*

#103 Reject reference to employer's #5. ADD: the cost of the monthly premiums and any increases to the premiums, shall be split 80/20 with the Employer paying 80%.  Effective upon ratification of the Employer shall reimburse 80% of the Employees cost toward the deductible annually.  Employees shall provide proof of payments and reimbursement shall be paid within 14 days of receipt of such proof.

*Response: We hear and understand your proposal. The employer will maintain the ability to move, negotiate, and manage with the changing climate in the market place. It would be irresponsible to be locked in to the proposed language especially with the constant change with insurance providers and what is directed with*

*Obama Care. In negotiations we were able to eloquently and elaborately explained the process that the insurance companies take to make their decision to provide coverage and at what cost. Those cost change annually, and the employer maintains the ability to discuss and negotiate any proposed change. As a result we adhere to our current proposal.*

ADD: During the life of the agreement either party with 30 days written notice to the other, shall be allowed to open this section of the Contract for the purpose of bargaining a change in insurance policy or provided. ***Note that the Union has proposed 2 alternative Plans which are available.

*Response: We understand the union's proposal. The employer was able to review the 2 proposed medical plan presented. As we reported in a few of our negotiations that the cost of the unions proposed alternative to our medical plan that the cost is significantly hirer. We will adhere to the current proposal.*

| Comment [MC1]: Typo |
| --- |

#### #111 Reject Banquet hourly rate

Over scale employees to be paid the same percent or cents per hour as others in their classification.

*Response: We understand your rejection of the proposed banquet hourly rate. We were able to share with the negotiating committee the changes that have taken place year over year in Rochester with the increasing competition from the Canadian Honkers and the other caterers in the market. Our competition in Rochester hirers our people at a different rate to work for them. Which has contributed to our competitors being able to bid lower for business in Rochester. The proposed change allows the employer the opportunity to improve its competitive edge to capture business. The employer adheres to the current proposal.*

#### #112 REJECT

*Response: We recognize your rejection. We adhere to our proposal.*

#118 Change 2nd day to 1st day

*Response: We acknowledge your request for change. We adhere to our proposal.*


#119 Change maximum accumulation/carry over to 240 hours. Clarify employers

*Response: We hear and appreciate the feedback on this type "o". We will address and make the changes on this page available reflecting 240 hours for those employees hired prior to September 1st, 2005.*


#132 Increase to $350.00 in year 2 and $375.00 in year 3

*Response: We understand your proposal. We will adhere to the current proposal.*


#143 Effective date

*Response: We understand the proposal. We adhere to our proposal.*


#144 Reject.  Add:  wage increases shall be effective March 1, 2015

*Response: We understand the proposal. We adhere to our proposal.*


#146 Reject date

*Response: We understand the proposal. We adhere to our proposal.*

**APPENDIX "A"** Reject proposed increase for 2016-2020

Accept Employers proposed 2015 rates as new start rate.

*Response: We understand the union's rejection of the proposed wage increase 2016-2020 proposal. We adhere to our proposal.*


New Employees Increases-New employees who do not receive any disciplinary action during first ninety (90) days of employment will receive twenty-five cent (.25) pay increase above the new start rate.

*Response: We understand the proposal. We adhere to our proposal.*


**Wages Effective March 1, 2015**

***2013-12 Month rate, 2013-24 month rate,

The 42 month rate becomes a 36 month rate.  The 60 month rate becomes a 48 month rate.  The new 60 month rate is increased by 3% for 2015.

March 1st of each year: add 2 ½ % on each step in all classifications.

*Response: We understand the proposal. We adhere to our proposal.*


***__Perfect Attendance Bonus-__employee's shall receive a quarterly bonus of $25.00

*Response: We understand the proposal. We adhere to our proposal.*

**\*\*\*New Employee Finder's Fee-**If a worker refers another person to be employed at any of the Hotels that worker will receive $100.00 upon the new person passing probation and another $100.00 if that person makes it 6 months with no disciplinary write ups placed in their file.

*Response: We understand the proposal. The employer already have this program in-place.*

**APPENDIX "D"** Effective March 1, 2017 the total number of rooms assigned daily shall be fifteen (15).

**\*\*Effective on ratification the "Waste Cleanup fee" shall be $10.00. Effective March 1, 2017 this amount shall be increased to $15.00

**\*\*Effective March 1, 2016 housekeeping employees shall be paid $2.00 for each extra bed, cot, rollaway or air mattress made up.

**\*\*Efficient Room Cleaning Incentive Pay-** Room cleaners who complete their normal complement of rooms on time and in an efficient manner during each scheduled shift shall receive $10.00 per week.

**\*\* Housekeeping Service Charge-**$5.00 per day shall be added to each guest room bill; $2.00 per room cleaner, $1.00 to the lobby Porter/Houseman and $2.00 to the house.  (The $2.00 to the house can be used to defray other contractual costs to the employer such as Healthcare costs)

| Comment [MC2]: Typo? |
| --- |

*Response: We understand the proposal. This is not a common charge in the market and would put us at a disadvantage versus the competition. In addition we believe this would not be well received from our guests and impact our service scores greatly. Therefore, we reject the proposed addition and aaaadhere to our proposal.*

**APPENDIX "E"** REJECT employers proposal of $12-15 flat fee.  Leave current language and system as is.

*Response: We understand the proposal. We adhere to our proposal.*

**APPENDIX "F"** Reject subcontracting/leasing out language.

*Response: We understand the proposal. We adhere to our proposal.*

The Union reserves the right to add to, modify, or amend these proposals.

**GC 25(a)**

EXHIBIT NO._____ RECEIVED __✔___ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME _____ **Richfield** _____

NO. OF PAGES ___**1**___ DATE **12/16/15** REPORTER ___**SMW**___

P 01568

| | |
|---|---|
| **From:** | Linda Henry |
| **To:** | Wiese, Tyler |
| **Subject:** | Fwd: site visits |
| **Date:** | Thursday, November 12, 2015 2:31:28 PM |

---------- Forwarded message ----------
From: **Linda Henry** <matre24@gmail.com>
Date: Wed, Mar 25, 2015 at 9:00 PM
Subject: site visits
To: mhenry@kahlerhospitalitygroup.com, Mary Costello
<mcostello@kahlerhospitalitygroup.com>

I will be at the Kahler, KIS and the Marriott tomorrow.
Thanks, Linda

**GC Exhibit 25(a)**

**GC 25(b)**

EXHIBIT NO._____ RECEIVED ___✔___ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME _____**Richfield**_____

NO. OF PAGES ___**1**___ DATE **12/16/15** REPORTER ___**SMW**___

**From:** Linda Henry
**To:** Wiese, Tyler
**Subject:** Fwd: site visits
**Date:** Thursday, November 12, 2015 2:33:54 PM

---------- Forwarded message ----------
From: **Linda Henry** <matre24@gmail.com>
Date: Thu, Apr 2, 2015 at 10:43 AM
Subject: Fwd: site visits
To: Brian Brandt <brian@local21.com>


---------- Forwarded message ----------
From: **Carissa Gisi** <CarissaG@textilecs.com>
Date: Thu, Apr 2, 2015 at 8:16 AM
Subject: RE: site visits
To: Linda Henry <matre24@gmail.com>
Cc: "brian@local21.com" <brian@local21.com>, Mandy Jacobson <MandyJ@textilecs.com>


Linda, could you start emailing mandyj@textilecs.com with this information? My last day at TCS will be April 9th.


Thank you,

Carissa

**From:** Linda Henry [mailto:matre24@gmail.com]
**Sent:** Wednesday, April 01, 2015 9:42 PM
**To:** mhenry@kahlerhospitalitygroup.com; Mary Costello; Carissa Gisi
**Subject:** site visits


I will be at TCS the Kahler and KIS Thursday.

Thanks, Linda


**GC Exhibit 25(b)**

**GC 25(c)**

EXHIBIT NO._____RECEIVED\_\_\_✔\_\_\_REJECTED_____

CASE NO. **18-CA-151245**  CASE NAME\_\_\_\_\_**Richfield**\_\_\_\_\_

NO. OF PAGES\_\_\_**1**\_\_\_ DATE **12/16/15** REPORTER\_\_**SMW**\_\_

| | |
|---|---|
| **From:** | Linda Henry |
| **To:** | Wiese, Tyler |
| **Subject:** | Fwd: site visits |
| **Date:** | Thursday, November 12, 2015 2:35:11 PM |

---------- Forwarded message ----------
From: **Linda Henry** <matre24@gmail.com>
Date: Mon, Apr 6, 2015 at 9:19 PM
Subject: site visits
To: mhenry@kahlerhospitalitygroup.com, Mary Costello
 <mcostello@kahlerhospitalitygroup.com>, Mandy Jacobson <MandyJ@textilecs.com>

I will be at TCS, the Kahler, Residence Inn and KIS Tuesday.
Thanks, Linda

**GC Exhibit 25(c)**

**GC 25(d)**

EXHIBIT NO._____RECEIVED___✔___REJECTED_____

CASE NO. **18-CA-151245** CASE NAME _____**Richfield**_____

NO. OF PAGES ____**1**____ DATE **12/16/15** REPORTER ___**SMW**___

**From:** Linda Henry
**To:** Wiese, Tyler
**Subject:** Fwd: site visits
**Date:** Thursday, November 12, 2015 2:36:21 PM

---------- Forwarded message ----------
From: **Linda Henry** <matre24@gmail.com>
Date: Wed, Jun 3, 2015 at 6:39 PM
Subject: site visits
To: mhenry@kahlerhospitalitygroup.com, Mary Costello
<mcostello@kahlerhospitalitygroup.com>, Mandy Jacobson <MandyJ@textilecs.com>

I will be at the Kahler, TCS, KIS and Residence Inn on Thursday.
 Thanks, Linda

**GC Exhibit 25(d)**

**GC 25(e)**

EXHIBIT NO._____RECEIVED___✔___REJECTED_____

CASE NO.__**18-CA-151245**__CASE NAME_____**Richfield**_____

NO. OF PAGES_____**1**_____DATE__**12/16/15**__REPORTER___**SMW**___

P 01576

| | |
|---|---|
| **From:** | Linda Henry |
| **To:** | Wiese, Tyler |
| **Subject:** | Fwd: site visits |
| **Date:** | Thursday, November 12, 2015 2:41:50 PM |

---------- Forwarded message ----------
From: **Linda Henry** <matre24@gmail.com>
Date: Wed, Jun 24, 2015 at 10:14 AM
Subject: site visits
To: mhenry@kahlerhospitalitygroup.com, Mary Costello
<mcostello@kahlerhospitalitygroup.com>

I will be at KIS 11:00 to 12:15 and at Marriott until 1:00.
Thanks, Linda

**GC Exhibit 25(e)**

**GC 25(f)**

EXHIBIT NO._____RECEIVED___✔___REJECTED_____

CASE NO. __**18-CA-151245**__ CASE NAME ____**Richfield**____

NO. OF PAGES ___**1**___ DATE __**12/16/15**__ REPORTER ___**SMW**___

| | |
|---|---|
| **From:** | Linda Henry |
| **To:** | Wiese, Tyler |
| **Subject:** | Fwd: site visits |
| **Date:** | Thursday, December 03, 2015 3:37:44 PM |

---------- Forwarded message ----------
From: **Linda Henry** <matre24@gmail.com>
Date: Wed, Sep 2, 2015 at 10:33 AM
Subject: site visits
To: mhenry@kahlerhospitalitygroup.com, Mary Costello
<mcostello@kahlerhospitalitygroup.com>


I will be at the Kahler and Marriott today between 11:00 and 1:30.
Thanks, Linda

**GC Exhibit 25(f)**

EXHIBIT NO. **GC 26** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/16/15** REPORTER **SMW**

Ericka
(507) 202-2156

11:49 AM

Hello Ericka. Kelli Johnston here.
Tyler said a bartender is going
to be gone in March. Would like
to pick up hours if I can. I was
going to stop yesterday but our
mtgs are lengthy. I can stop in if
you like or let me know where I
can fill in.

Feb 27

Hello Ericka. Kelli Johnston here.
Tyler said a bartender is out and
I would like to fill in please. I txt
you before and Havent heard
anything.

Mar 9

**GC Exhibit 26**

Type message          Page 1 of 1

P 01581



EXHIBIT NO. **GC 27** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **2** DATE **12/16/15** REPORTER **SMW**

*Documentation Notes, changed to & 1st written warning JM 4/29/15*

# RICHFIELD HOSPITALITY

## EMPLOYEE PERFORMANCE DISCUSSION

2-25-15 MLC

DATE: _____

NAME OF EMPLOYEE: _____ Graham Brandon _____

EMPLOYEE'S POSITION & DEPARTMENT: ___ Salute Kitchen lead cook /cl ork ___

TYPE OF ACTION FOR THIS DISCUSSION:

☐ Verbal Warning ☒ 1st Written Warning  JM 4/29/15   ☒ 2nd Written Warning   ☐ Final Warning

☐ Suspension ☐ Termination

On Monday Feb. 16th I woke up on my day off at 8:30 am. I had a missed text message from 6:27am Quote "I feel like I'm dying. Are there any Kahler cooks ... maria?" I also had a missed text message from Sophia stating Graham was not here & was a no call, no show. Without getting into the debate of the accuracy of that statement I want to clairity the proper procedure moving forward.

We need Graham to connect with a cook or Supervisor within the proper amount of time being ___ ? hrs before the shift begins & try to find a replacement.

I am concerned about the impact this has on the team & want to foster communication & partnership throughout the team.

EMPLOYEE HAS BEEN WARNED PREVIOUSLY:  ☐ Verbal  ☐ Written

Date(s): _____ROC_____

Is the employee being placed on probation? ☒ NO ☐ YES  *Until what date:* _____

Is the employee being suspended? ☒ NO ☐ YES  *Until what date:* _____

WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION? *(Action steps & dates)*

_____

_____

_____

# Exhibit 3

*Emp_perf.doc – 11/12*

**GC Exhibit 27**

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

_Refused to signed._
_____          2-25-15
Employee's Signature                               Date

_____          2-25-15
Signature of Supervisor Conducting Discussion     Date

_____          2-25-15
Signature of Human Resources Representative or Witness     Date

EXHIBIT NO. __**GC 28**__ RECEIVED ___✔___ REJECTED _____

CASE NO. __**18-CA-151245**__ CASE NAME ____**Richfield**____

NO. OF PAGES ___**1**___ DATE __**12/15/15**__ REPORTER ___**SMW**___



GC Exhibit 28

EXHIBIT NO. **GC 29** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **flash drive** DATE **12/16/15** REPORTER **SMW**



EXHIBIT NO. **GC 30** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/15/15** REPORTER **SMW**



Richfield Hospitality

Open
ADO

Leslie Holman
CFO

Michael Henry
ADHR

Maria Cjertovic
Area Director of
Revenue

Scott Mauer
Kahler Gm

Chase Albrechtt
KIS GM

Brett Wood
GM RI

Miki Radovic
GM Marriott

Nicole Miller
Director of
Sales/Marketing

Chris Ness
Director of Facilities

Art W.
Controller

Chad Decker
Safety/Benefits
Manager
Retail HR Manager

Mary Kay Costello
Hr Manager
Organizational
Development

Ebony Booker
Assistant Rev
Manager

Tyler Kase
Director of F&B

Becky Donaldson
Housekeeping
Manager

Emily Osweiler
Asst Housekeeping
Manager

Crystal Adcox
Housekeeping
Manager

Kelly Retterath
AD of Sales

Rick Culver
DOE

Jim Ross
Controller Marriott

Open
Reservation
Manager

Chef Woodman
Executive Chef

Open
AD of Catering

Jeff Burns
AD of Engineering

Melanie Parry
Asst. Controller

Alex Armour
Ex Sous Chef

Joel Johnston
IT Director

Marija Maria
Sous Chef

Greg Cook
Sous Chef

Hanna Michael
Manger GG

Ericka Scrabeck
Manager Crossings

Mati Englissman
Manager Salute

Gilbert Negron
Banquet Manager

Mary Hill
Front Office
Manager

Josipa Jerkovic
Housekeeping
Manager

EXHIBIT NO. **GC 31** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **2** DATE **12/17/15** REPORTER **SMW**

## C8B - Marriott Rochester Mayo Clinic
### 101 First Avenue
### Rochester, Minnesota 55902
**Hours Worked Summary With Shifts - Worked Hours**
**By Property, Department, Position, Employee for 01/01/2015 To 12/13/2015**
**105 - Kahler Marriott C8B / Department Worked**

| | HOURS | | | | PAY | | | |
|---|---|---|---|---|---|---|---|---|
| | Regular | OT | DT | Total | Regular | OT | DT | Total |

**Department Worked: 200 - Rooms**

Position Worked: 2006055003 - Houskeeper

| | Regular | OT | DT | Total | Regular | OT | DT | Total |
|---|---|---|---|---|---|---|---|---|
| 105169 - Rudloff, Ashley | 1,677.93 | 209.17 | 0.00 | 1,887.10 | 16,628.29 | 3,129.58 | 0.00 | 19,757.86 |
| 105500043 - Messner, Susan | 1,596.42 | 162.80 | 0.00 | 1,759.22 | 22,082.52 | 3,392.25 | 0.00 | 25,454.78 |
| 105500072 - Abdulamin, Basma | 1,925.11 | 416.46 | 0.00 | 2,341.57 | 26,605.02 | 8,768.94 | 0.00 | 35,373.96 |
| 105500073 - Allen, Rayshalonda | 70.39 | 0.65 | 0.00 | 71.04 | 794.00 | 11.00 | 0.00 | 805.00 |
| 105500075 - Danielson, Janice | 1,423.70 | 71.35 | 0.00 | 1,495.05 | 19,675.53 | 1,481.44 | 0.00 | 21,156.98 |
| 105500076 - Givens, Jamila | 1,706.49 | 115.51 | 0.00 | 1,822.00 | 22,133.18 | 2,264.08 | 0.00 | 24,397.25 |
| 105500077 - Karic, Advija | 1,734.43 | 212.39 | 0.00 | 1,946.82 | 23,969.82 | 4,418.64 | 0.00 | 28,388.46 |
| 105500078 - Kevljanin, Enisa | 1,691.11 | 34.56 | 0.00 | 1,725.67 | 23,371.14 | 716.92 | 0.00 | 24,088.06 |
| 105500079 - Mohamed, Iman | 1,906.90 | 143.33 | 0.00 | 2,050.23 | 26,353.36 | 2,978.71 | 0.00 | 29,332.07 |
| 105500080 - Nguyen, Phuc | 1,762.60 | 141.96 | 0.00 | 1,904.56 | 24,359.13 | 2,957.20 | 0.00 | 27,316.33 |
| 105500081 - Patel, Bhavna | 1,835.04 | 197.46 | 0.00 | 2,032.50 | 23,565.63 | 3,854.03 | 0.00 | 27,419.66 |
| 105500082 - Smailovic, Mejra | 60.46 | 0.00 | 0.00 | 60.46 | 835.56 | 0.00 | 0.00 | 835.56 |
| 105500132 - Soto Abreu, Issamar | 110.40 | 27.46 | 0.00 | 137.86 | 1,094.06 | 408.19 | 0.00 | 1,502.26 |
| 105500136 - LaFromboise, Shelby | 70.89 | 3.54 | 0.00 | 74.43 | 702.52 | 52.62 | 0.00 | 755.14 |
| 105500141 - Moore, Alyse | 1,492.45 | 190.39 | 0.00 | 1,682.84 | 14,790.18 | 2,851.01 | 0.00 | 17,641.19 |
| 105500147 - Townsend, Robyn | 13.25 | 0.00 | 0.00 | 13.25 | 131.31 | 0.00 | 0.00 | 131.31 |
| 105500148 - Henry, Anita | 428.68 | 69.67 | 0.00 | 498.35 | 4,248.22 | 1,057.27 | 0.00 | 5,305.49 |
| 105500170 - Britt, Ronald | 421.07 | 23.95 | 0.00 | 445.02 | 4,172.80 | 356.75 | 0.00 | 4,529.56 |
| 105500173 - Sartori, Kayla | 742.71 | 95.69 | 0.00 | 838.40 | 7,360.26 | 1,430.17 | 0.00 | 8,790.42 |
| 105500175 - Sanchez, Maria | 46.68 | 2.13 | 0.00 | 48.81 | 462.60 | 31.66 | 0.00 | 494.26 |
| 105500193 - Connatser, Jennifer | 515.25 | 58.24 | 0.00 | 573.49 | 5,106.13 | 866.06 | 0.00 | 5,972.19 |
| 105500196 - Luevano, Rebecca | 227.24 | 11.50 | 0.00 | 238.74 | 2,251.95 | 170.95 | 0.00 | 2,422.90 |
| 105500205 - Gomez Campos, Amy | 40.00 | 5.66 | 0.00 | 45.66 | 396.40 | 84.14 | 0.00 | 480.54 |
| 105500211 - Brown, Lavonta | 15.87 | 0.00 | 0.00 | 15.87 | 157.27 | 0.00 | 0.00 | 157.27 |
| 2006055003 - Position Totals: | 21,515.07 | 2,193.87 | 0.00 | 23,708.94 | 271,226.88 | 41,281.62 | 0.00 | 312,508.49 |

Position Worked: 2006055004 - Houseperson

| | Regular | OT | DT | Total | Regular | OT | DT | Total |
|---|---|---|---|---|---|---|---|---|
| 105500042 - Abdi, Safiya | 279.42 | 1.98 | 0.00 | 281.40 | 3,861.58 | 41.05 | 0.00 | 3,902.63 |
| 105500043 - Messner, Susan | 82.40 | 0.44 | 0.00 | 82.84 | 1,138.77 | 9.12 | 0.00 | 1,147.89 |
| 105500055 - Tadic, Zoran | 79.97 | 0.19 | 0.00 | 80.16 | 1,105.19 | 3.94 | 0.00 | 1,109.12 |
| 105500076 - Givens, Jamila | 8.00 | 0.20 | 0.00 | 8.20 | 103.76 | 3.89 | 0.00 | 107.65 |
| 105500081 - Patel, Bhavna | 43.62 | 0.28 | 0.00 | 43.90 | 542.55 | 5.32 | 0.00 | 547.88 |
| 105500132 - Soto Abreu, Issamar | 16.00 | 0.06 | 0.00 | 16.06 | 158.56 | 0.89 | 0.00 | 159.45 |
| 105500136 - LaFromboise, Shelby | 375.17 | 29.08 | 0.00 | 404.25 | 3,717.93 | 434.79 | 0.00 | 4,152.72 |
| 105500141 - Moore, Alyse | 108.77 | 11.39 | 0.00 | 120.16 | 1,077.91 | 170.06 | 0.00 | 1,247.97 |
| 105500148 - Henry, Anita | 913.57 | 31.34 | 0.00 | 944.91 | 9,053.48 | 466.77 | 0.00 | 9,520.25 |
| 105500150 - Darrell, Anthony | 16.00 | 0.82 | 0.00 | 16.82 | 158.56 | 12.19 | 0.00 | 170.75 |
| 105500173 - Sartori, Kayla | 125.31 | 1.55 | 0.00 | 126.86 | 1,241.82 | 23.08 | 0.00 | 1,264.91 |
| 2006055004 - Position Totals: | 2,048.23 | 77.33 | 0.00 | 2,125.56 | 22,160.11 | 1,171.11 | 0.00 | 23,331.23 |

Position Worked: 2006055005 - Public Areas Housekeeper

| | Regular | OT | DT | Total | Regular | OT | DT | Total |
|---|---|---|---|---|---|---|---|---|
| 105500024 - Heckman, Zach | 1,870.18 | 86.97 | 0.00 | 1,957.15 | 21,095.63 | 1,474.10 | 0.00 | 22,569.73 |
| 105500053 - Colakhodzic, Aziz | 1,615.07 | 74.96 | 0.00 | 1,690.03 | 22,320.27 | 1,555.46 | 0.00 | 23,875.73 |
| 105500072 - Abdulamin, Basma | 40.00 | 12.29 | 0.00 | 52.29 | 552.80 | 272.53 | 0.00 | 825.33 |
| 105500136 - LaFromboise, Shelby | 1,314.75 | 63.58 | 0.00 | 1,378.33 | 13,029.17 | 946.81 | 0.00 | 13,975.98 |
| 105500150 - Darrell, Anthony | 277.25 | 13.17 | 0.00 | 290.42 | 2,747.55 | 195.77 | 0.00 | 2,943.32 |
| 105500193 - Connatser, Jennifer | 263.02 | 16.47 | 0.00 | 279.49 | 2,606.53 | 244.95 | 0.00 | 2,851.48 |
| 2006055005 - Position Totals: | 5,380.27 | 267.44 | 0.00 | 5,647.71 | 62,351.95 | 4,689.63 | 0.00 | 67,041.57 |
| 200 - Department Totals: | 28,943.57 | 2,538.64 | 0.00 | 31,482.21 | 355,738.94 | 47,142.36 | 0.00 | 402,881.29 |

| C8B - Marriott Rochester Mayo Clinic - Property Totals: | 28,943.57 | 2,538.64 | 0.00 | 31,482.21 | 355,738.94 | 47,142.36 | 0.00 | 402,881.29 |

GCX 31

P 01592

**C8B - Marriott Rochester Mayo Clinic**
**101 First Avenue**
**Rochester, Minnesota 55902**
Hours Worked Summary With Shifts - Worked Hours
By Property, Department, Position, Employee for 01/01/2015 To 12/13/2015
105 - Kahler Marriott C8B / Department Worked

| | HOURS | | | | PAY | | | |
|---|---|---|---|---|---|---|---|---|
| | Regular | OT | DT | Total | Regular | OT | DT | Total |

**Hours Worked Summary With Shifts Report - Totals**

| | | | | |
|---|---|---|---|---|
| Regular Hours: | 28,943.57 | Regular Pay: | $355,738.94 |
| OT Hours: | 2,538.64 | OT Pay: | $47,142.36 |
| DT Hours: | 0.00 | DT Pay: | $0.00 |
| Total Hours: | 31,482.21 | Total Pay: | $402,881.29 |

P 01593

EXHIBIT NO. **GC 33** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/17/15** REPORTER **SMW**

# PERSONNEL ACTION FORM (PAF)

**R RICHFIELD HOSPITALITY**

DATE: 1-28-15

| Name Kelli Johnston | SSN | Birth Date |
|---|---|---|

**Street Address**

| City, State, Zip | Home Telephone ( ) |
|---|---|

| **STATUS:** | ☐ Exempt  ☐ Non-Exempt | ☐ Full Time  ☐ On-Call | ☐ Part Time  ☐ Temporary | EOC Member: ☐ Yes  ☐ No | Union: ☐ Yes  ☐ No |
|---|---|---|---|---|---|

| ☐ NEW HIRE | ☐ RE-HIRE | Effective Date: _____ |
|---|---|---|

| Position Title: | Location: | |
|---|---|---|
| Department: | Dept./Job Number: | Salary Grade: |

| Pay Rate: $ | ☐ hourly  ☐ weekly  ☐ bi-weekly  ☐ semi-monthly  ☐ annual | Tipped: ☐ Yes ☐ No |
|---|---|---|

| Badge #: (if applicable) | EEO Race Code: | EEO Occupation Code: |
|---|---|---|

| ☐ PROMOTION ☐ TITLE CHANGE ☐ STATUS CHANGE ☐ TRANSFER | Effective Date: _____ |
|---|---|

| Prior Location: | New Location: |
|---|---|
| Prior Position/Title: | New Position/Title: |
| Prior Department: | New Department: |
| Salary Grade: | Status: ☐ Full Time ☐ Part Time ☐ On-Call ☐ Temp |

| **PAY CHANGE:** ☐ Merit ☐ Equity ☐ Transfer ☐ Promo ☐ Other | Effective Date: _____ |
|---|---|

| Prior Pay Rate: $ | ☐ hourly ☐ weekly ☐ bi-weekly ☐ semi-monthly ☐ annual |
|---|---|
| New Pay Rate: $ | ☐ hourly ☐ weekly ☐ bi-weekly ☐ semi-monthly ☐ annual |
| Percentage Increase: | Salary Grade: | Performance Rating: |

| Exception to Policy? ☐ No | ☐ Yes, Please Explain _____ |
|---|---|

## TERMINATION OF EMPLOYMENT

| Termination Date: | Termination Code: | (see back of form) |
|---|---|---|
| Type of Separation: ☐ Voluntary ☐ Involuntary | Eligible for Rehire: ☐ Yes ☐ No | |

| | | | | |
|---|---|---|---|---|
| Regular Pay - Hours: | _____ | x Hourly Rate: $ _____ | = | $ _____ |
| Vacation Pay - Hours: | _____ | x Hourly Rate: $ _____ | = | $ _____ |
| Overtime Pay - Hours: | _____ | x Hourly Rate: $ _____ | = | $ _____ |
| Other Pay - Hours: | _____ | x Hourly Rate: $ _____ | = | $ _____ |

**COMMENTS:** _added bartender code for crossing_

## APPROVALS

| **CORPORATE:** | | | Department Head | Director of HR | President/CEO |
|---|---|---|---|---|---|
| **PROPERTY:** | Department Head | Director of HR | General Manager | Corp. Functional Spvr (EOC positions) | Operations Spvr (EOC positions) |

GCX 33

1/29/17

EXHIBIT NO. **GC 34** RECEIVED ✔ REJECTED

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **2** DATE **12/17/15** REPORTER **SMW**

P 01596

**Mary Costello**

| | |
|---|---|
| **From:** | Mary Costello |
| **Sent:** | Tuesday, May 05, 2015 3:39 PM |
| **To:** | Michael Henry |
| **Subject:** | FW: Kelli Johnston - banquet server |

Dialogue between Crystal and I.

I never did anything do to the lack of clarity.

mk

**From:** Crystal Adcox
**Sent:** Monday, April 06, 2015 1:38 PM
**To:** Mary Costello
**Subject:** RE: Kelli Johnston - banquet server

If you feel like she would be a good candidate. I had some attitude issues with her in banquets....

Crystal Adcox
Housekeeping Manager
**Rochester Marriott**
101 1st Ave SW
Rochester, MN  55902

o: 507.280.6000
f:  507.280.8531
e: cadcox@kahlerhospitalitygroup.com

*[handwritten note:]* • Kelli came into my office and stated that she interviewed with Crystal & starts her training as housemen this week — That prompted the email to Crystal —



khg
KAHLER HOSPITALITY GROUP
Serving you with all our heart.

The Kahler GRAND HOTEL    Towers    Kahler INN & SUITES    MARRIOTT ROCHESTER MAYO CLINIC AREA    Kahler APACHE    Residence Inn Marriott    Kahler EVENTS

The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or phone and delete this message and its attachments, if any.

**From:** Mary Costello
**Sent:** Monday, April 06, 2015 1:29 PM
**To:** Crystal Adcox
**Cc:** Tamala Miller; Chad Decker
**Subject:** Kelli Johnston - banquet server

Hi Crystal,

GCX   1   34

Kelli came over here saying that she is going to start training for a housemen positon.  Is that correct?

I have filled out a PAF for a secondary job code.  Is that what you need me to do?

Please advise....

mk


Mary Kay Costello
Organizational Development/Human Resources Manager
Kahler Hotels
20 2nd Ave SW
Rochester, MN 55902
O: 507-285-2796
F: 507-285-2793
C: 507-254-3297
mcostello@kahlerhospitalitygroup.com



     

The contents of this e-mail message and any attachments are confidential and are intended solely for addressee. The information may als
This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error,
or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by n
and delete this message and its attachments, if any.

P 01598

EXHIBIT NO. **GC 37** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **5** DATE **12/15/15** REPORTER **SMW**

FORM NLRB-31

## SUBPOENA DUCES TECUM

### UNITED STATES OF AMERICA
### NATIONAL LABOR RELATIONS BOARD

To    Richfield Hospitality, Inc. As Managing Agent for Kahler Hotels, LLC

Michael Henry, HR Manager and/or Custodian of Records, 20 SW Second Ave., Rochester, MN 55902

As requested by    Tyler J. Wiese, Counsel for the General Counsel, NLRB Region 18,

whose address is    Federal Office Building, 212 3rd Avenue South, Suite 200 Minneapolis, MN 55401
| (Street) | (City) | (State) | (ZIP) |

YOU ARE HEREBY REQUIRED AND DIRECTED TO APPEAR BEFORE  an Administrative Law Judge

of the National Labor Relations Board

at    Olmsted County, Government Center - Conference Room 3103A, 151 4th St SE

in the City of    Rochester, MN

on Tuesday, December 15, 2015    at  9:00 AM    or any adjourned

or rescheduled date to testify in    RICHFIELD HOSPITALITY, INC. AS MANAGING AGENT FOR KAHLER HOTELS, LLC
Case 18-CA-151245

(Case Name and Number)

And you are hereby required to bring with you and produce at said time and place the following books, records, correspondence, and documents:

### SEE ATTACHMENT

If you do not intend to comply with the subpoena, within 5 days (excluding intermediate Saturdays, Sundays, and holidays) after the date the subpoena is received, you must petition in writing to revoke the subpoena. Unless filed through the Board's E-Filing system, the petition to revoke must be received on or before the official closing time of the receiving office on the last day for filing. If filed through the Board's E-Filing system, it may be filed up to 11:59 pm in the local time zone of the receiving office on the last day for filing. Prior to a hearing, the petition to revoke should be filed with the Regional Director; during a hearing, it should be filed with the Hearing Officer or Administrative Law Judge conducting the hearing. See Board's Rules and Regulations, 29 C.F.R Section 102.31(b) (unfair labor practice proceedings) and/or 29 C.F.R. Section 102.66(c) (representation proceedings) and 29 C.F.R Section 102.111(a)(1) and 102.111(b)(3) (time computation). Failure to follow these rules may result in the loss of any ability to raise objections to the subpoena in court.

**B-1-PA60RN**

Under the seal of the National Labor Relations Board, and by direction of the Board, this Subpoena is

Issued at    Minneapolis, Minnesota

this 23rd day of November 2015

Chairman, National Labor Relations Board

**NOTICE TO WITNESS.** Witness fees for attendance, subsistence, and mileage under this subpoena are payable by the party at whose request the witness is subpoenaed. A witness appearing at the request of the General Counsel of the National Labor Relations Board shall submit this subpoena with the voucher when claiming reimbursement.

### PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing representation and/or unfair labor practice proceedings and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is mandatory in that failure to supply the information may cause the NLRB to seek enforcement of the subpoena in federal court.

GCX 37

Case 18-CA-151245

B-1-PA60RN

## RETURN OF SERVICE

I certify that, being a person over 18 years of age, I duly served a copy of this subpoena

|                     |                                                  |
|---------------------|--------------------------------------------------|
| ☐                   | by person                                        |
| ✓                   | by certified mail                                |
| ☐                   | by registered mail                               |
| ☐                   | by telegraph                                     |
| ☐                   | by leaving copy at principal office or place of business |
|                     | at _____                               |

(Check method used.)

on the named person on

_____

November 23, 2015

_____

(Month, day, and year)

/s/Deann Helget

_____

(Name of person making service)

Compliance Assistant

_____

(Official title, if any)

## CERTIFICATION OF SERVICE

I certify that named person was in attendance as a witness at

on _____

_____

(Month, day or days, and year)

_____

(Name of person certifying)

_____

(Official title)

P 01601

SUBPOENA DUCES TECUM B-1-PA60RN
Case 18-CA-151245
Page 2

1. A copy of Respondent's current employee handbook, and all versions of that handbook that have been in existence since September 1, 2014.

2. All documents in Respondent's possession which refer in any way to the posting of union fliers on bulletin boards in any of the hotel properties in existence since September 1, 2014.

3. All documents in Respondent's possession which refer in any way to union representative access of any of the hotel properties in existence since September 1, 2014.

4. All documents in Respondent's possession which refer in any way to Respondent's decision to cease granting wage increases after the expiration of the parties' previous collective-bargaining agreement in existence since September 1, 2014.

5. Documents reflecting all overtime worked by employees in the Mariott Housekeeping department since January 1, 2015.

6. Documents reflecting hours worked, including the names of employees, at the bar in the Kahler Inn and Suites since January 1, 2015.

7. A current copy of Kelli Johnston's personnel file.

8. A current copy of Graham Brandon's personnel file.

9. Copies of all discipline issued to Graham Brandon by Respondent.

10. Copies of all discipline and terminations issued to employees due to attendance issues since September 1, 2013.

11. All documents in Respondent's possession which refer in any way to Respondent's decision(s) to discipline Graham Brandon at any time since January 1, 2015.

12. Copies of all transfer request paperwork filed at the hotel properties since January 1, 2015.

13. All bargaining notes in possession of Respondent, including original copies of such documents.

14. All proposals made by Respondent to the Union regarding employee leave for union conventions and events since January 1, 2015.

SUBPOENA DUCES TECUM B-1-PA60RN
Case 18-CA-151245
Page 3

15. All documents in possession of Respondent which refer in any way to proposals made by Respondent regarding employee leave for union conventions and events since January 1, 2015.

16. All proposals made by Respondent to the Union regarding wages since January 1, 2015.

17. All documents in the possession of Respondent which refer in any way to proposals made by Respondent regarding wages since January 1, 2015.

18. All communications to employees by Respondent regarding all wage proposals made by Respondent since January 1, 2015.

19. All communications to employees by Respondent regarding all leave proposals made by Respondent since January 1, 2015.

20. All wage and/or employee compensation pie charts provided to the Union since January 1, 2015.

21. A copy of the current organizational chart for Respondent and all hotel properties.

22. A copy of the current seniority list for all employees in the hotel properties.

## DEFINITIONS AND INSTRUCTIONS

1. When used in this subpoena, the word "document" or "documents" means any existing printed, typewritten, handwritten or otherwise record material of whatever character, including, but not limited to, letters, correspondence, electronic correspondence (emails) memoranda, telegrams, mailgrams, minutes, notes, statements, affidavits, agreements, summaries, recordation of personal conversations, interviews or meetings, transcripts, diaries, reports, charts, contracts, calendars, interoffice communications, books, records, journals, photographs, microfilm, audio or video tapes, voice mail messages, material existing on computer software or hardware, computer tapes or disks, electronic mail and all data contained thereon that may be retrieved including material stored on hard disks, and any carbon photographic or other duplicate copy of such material in the possession of, control of, or available to the subpoenaed party or any attorney, agent, representative or other person acting in cooperation with, in concert with, or on behalf of the subpoenaed party.

2. When used in this subpoena, the term "hotel properties" shall refer to the Kahler Grand Hotel; Rochester Mariott Mayo Clinic Area; Residence Inn Rochester Mayo Clinic Area; and the Kahler Inn and Suites.

SUBPOENA DUCES TECUM B-1-PA60RN
Case 18-CA-151245
Page 4

3. Richfield Hospitality, Inc. as Managing Agent for Kahler Hotels, LLC shall be referred to as "Respondent."

4. UNITE HERE Local 17 shall be referred to as "the Union."

5. Any copies of original documents which are different in any way from the original, whether by interlineations, receipt, stamp, notations, indication or copies sent or received, or otherwise, shall themselves be considered original documents and must be produced separately from the originals or copies of originals.

6. All documents provided pursuant to this subpoena shall be organized by the subpoena paragraph to which each document or set of document is responsive.

7. Electronically stored information shall be produced in hard copy or in other reasonably usable form or forms.

8. This subpoena is not intended to request privileged documents and therefore should be read to exclude documents authorized by counsel for Respondent where the privilege has not been waived. It is also not intended to request documents that are otherwise protected by law from disclosure.

9. For any documents over which a privilege or other legal protection is asserted, identify the document, the person who created it, the date it was created and the nature of the privilege or other legal protection being asserted.

10. In the event that any document requested has been destroyed or discarded or otherwise disposed of, please identify the document as completely as possible, including without limitation the date, author(s), addressee(s), recipient(s), title, subject matter, and the reason for disposal of the document and the identity of all persons who authorized disposal of the document.

11. This subpoena is intended to cover all documents that are available to Respondent, and its officers and agents, including but not limited to documents in the possession of its attorneys, accountants, advisors, investigators, and other persons and entities directly or indirectly employed by or connected with Respondent, or its parents corporations or entities, subsidiaries or other subordinate entities, or other related companies or entities, and anyone otherwise subject to its control.

12. This request is continuing in character and if additional responsive documents come to your attention following the date of production, such documents must be promptly produced.

**GC 39(d)-39(f),39(h)-39(m)**

EXHIBIT NO._____ RECEIVED ✔ REJECTED_____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **23** DATE **12/17/15** REPORTER **SMW**



# RICHFIELD HOSPITALITY

## EMPLOYEE PERFORMANCE DISCUSSION

DATE: 16-Oct-2015

NAME OF EMPLOYEE: Walter Hardy

EMPLOYEE'S POSITION & DEPARTMENT: Dishwasher / Stewarding

TYPE OF ACTION FOR THIS DISCUSSION:

☑ Verbal Warning ☐ 1st Written Warning ☐ 2nd Written Warning ☐ Final Warning

☐ Suspension ☐ Termination

FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time): _____

Walter was one hour late for work.

_____

_____

_____

EMPLOYEE'S EXPLANATION: Over slept

_____

_____

_____

EMPLOYEE HAS BEEN WARNED PREVIOUSLY: ☐ Verbal ☐ Written

Date(s):_____

Is the employee being placed on probation? ☐ NO ☐ YES Until what date: _____

Is the employee being suspended? ☐ NO ☐ YES Until what date: _____

WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION? (Action steps & dates)

Walter will set an alarm, and Not be late again.

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

W. Hardy Jr.
_____     10-16-2015
Employee's Signature                        Date

_____     10/16/2015
Signature of Supervisor Conducting Discussion    Date
                                                GCR 39

_____     10/16/15
Signature of Human Resources Representative or Witness    Date

P 01606

Emp_perf.doc – 11/12

  

## Disciplinary Action (Union Associates)

Associate's Name:  Kent Hagan

Job Classification: Grand Grill

Supervisor:  Hanna Michael

Location:  KGH

***Action being taken:***

| | |
|---|---|
| Documented Verbal Warning | ☒ |
| First Written Warning | ☐ |
| Second Written Warning | ☐ |
| Final Warning | ☐ |
| Optional -Probation / Suspension | ☐ |
| Discharge | ☐ |

**Note: The disciplinary action to be taken in each case shall be determined by human resources.**

Nature of the violation – In of house rule #17 Violation of the Attendance and Punctuality Policy, in Paragraph #1 states: *The associate is responsible for reporting all absences from work to his/her supervisor or supervisor's designee, in accordance with department standards but not less than 3 hours prior to the start of a scheduled shift.*

Kent is a very valuable member of the team and he is a critical part of the success of the food and beverage operation. As a result Kent's attendance plays a vital role in establishing that success. Kent is expected to be at work at his scheduled time and if he cannot make it at that time Kent is required to communicate effectively with his direct supervisor so the appropriate arrangements can be made.

Recently Kent has had numerous days that he has been tardy to work. Kent needs to show up on time and be ready to perform his duties.

Kent is expected to review the attendance policy once more and clarify any questions that he might have as Kent will be expected to be at work when scheduled. Failure to do so will and can result in disciplinary action up to and including termination.

Date of Violation:                        Witness to the violation: Hanna Michael

| | | | |
|---|---|---|---|
| Has the violation occurred before? | Yes ☒ | No ☐ | When: 03/28/15, 3/29/15 |
| Has the associate been warned about it before? | Yes ☒ | No ☐ | When: Associate handbook, |

New Hire orientation

What is the next disciplinary action if this violation occurs again?   First Warning

What is the next disciplinary measure should any other violation occur?    Depends on the nature of violation

Associate's comments: _____

Date: _____

Date:  4/8/15

Date: _____

Human Resources Approval:

*Signature of Associate

Signature of Supervisor

Signature of Witness (if associate refuses to sign)
Date: 4-8-15

P 01607



**R**ICHFIELD
**H**OSPITALITY

## EMPLOYEE PERFORMANCE DISCUSSION

DATE: 11/11/15

NAME OF EMPLOYEE: James, Rhonda

EMPLOYEE'S POSITION & DEPARTMENT: Group Coordinator

TYPE OF ACTION FOR THIS DISCUSSION:

☑ Verbal Warning  ☐ 1st Written Warning  ☐ 2nd Written Warning  ☐ Final Warning

☐ Suspension  ☐ Termination

FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time): Excessive Tardiness
& Absenteeism. Several Dates in the month
of October you were late 10/6, 10/7, 10/8, 10/9,
10/12, etc... See Highlighted dates on Time Card.
Also Absent from work the most recent date 11/10/15.

EMPLOYEE'S EXPLANATION: _____

_____

_____

_____

EMPLOYEE HAS BEEN WARNED PREVIOUSLY:  ☐ Verbal  ☐ Written

Date(s): _____

Is the employee being placed on probation? ☑ NO  ☐ YES  *Until what date:* _____

Is the employee being suspended?  ☑ NO  ☐ YES  *Until what date:* _____

WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND
SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION? *(Action steps & dates)*

_____

_____

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above
to correct my performance. I also understand that if my performance does not improve by the designated date listed
above, I may be subject to further discipline.

Rhonda James                                      11/11/15
*Employee's Signature*                            *Date*

_____          _____
*Signature of Supervisor Conducting Discussion*           *Date*

_____          _____
*Signature of Human Resources Representative or Witness*           *Date*

Time Card

Employee: 103600143 - James, Rhonda
Pay Group:103 - Kahler Grand Hotel C8D
Start Date: 10/05/2015        End Date:10/18/2015

**Hours Paid**

| Day | In Date | PROP | DEPT - POSN | In | Out | Pay Code | Reg | OT | DT | Unit | Total | Rate | Amount | Forced | Work Day |
|-----|---------|------|-------------|-----|-----|----------|-----|-----|-----|------|-------|------|--------|--------|----------|
| Mon | 10/05/2015 | C8D | 200-2006065004 | 09:29 AM | 05:27 PM | | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Tue | 10/06/2015 | C8D | 200-2006065004 | 09:36 AM | 05:31 PM | | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Wed | 10/07/2015 | C8D | 200-2006065004 | 09:38 AM | 05:37 PM | | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Thu | 10/08/2015 | C8D | 200-2006065004 | 09:36 AM | 05:31 PM | | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Fri | 10/09/2015 | C8D | 200-2006065004 | 09:32 AM | 05:31 PM | | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Mon | 10/12/2015 | C8D | 200-2006065004 | 09:35 AM | 05:54 PM | | 8.25 | 0.00 | 0.00 | | 8.25 | | | | |
| Tue | 10/13/2015 | C8D | 200-2006065004 | 11:42 AM | 07:31 PM | | 7.75 | 0.00 | 0.00 | | 7.75 | | | | |
| Wed | 10/14/2015 | C8D | 200-2006065004 | 09:21 AM | 06:03 PM | | 8.75 | 0.00 | 0.00 | | 8.75 | | | | |
| Thu | 10/15/2015 | C8D | 200-2006065004 | 09:30 AM | 06:00 PM | | 8.50 | 0.00 | 0.00 | | 8.50 | | | | |
| Fri | 10/16/2015 | C8D | 200-2006065004 | 09:30 AM | 06:04 PM | | 6.75 | 1.75 | 0.00 | | 8.50 | | | | |
| | | | | | | Totals: | 80.00 | 1.75 | 0.00 | | 81.75 | | $0.00 | | |

P 01609

Time Card

Employee: 103600143 - James, Rhonda
Pay Group:103 - Kahler Grand Hotel C8D
Start Date: 10/19/2015      End Date:11/01/2015

**Hours Paid**

| Day | In Date | PROP | DEPT - POSN | In | Out | Pay Code | Reg | OT | DT | Unit | Total | Rate | Amount | Forced | Work Day |
|-----|---------|------|-------------|-----|-----|----------|-----|-----|-----|------|-------|------|--------|--------|----------|
| Mon | 10/19/2015 | C8D | 200-2006065004 | | | 7I - Incentive | | | | | | | 65.00 | | |
| | 10/19/2015 | C8D | 200-2006065004 | 11:29 AM | 07:30 PM | | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Tue | 10/20/2015 | C8D | 200-2006065004 | | | 7I - Incentive | | | | | | | 70.00 | | |
| | 10/20/2015 | C8D | 200-2006065004 | 10:03 AM | 05:58 PM | | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Wed | 10/21/2015 | C8D | 200-2006065004 | | | 7I - Incentive | | | | | | | 35.00 | | |
| | 10/21/2015 | C8D | 200-2006065004 | 09:33 AM | 06:02 PM | | 8.50 | 0.00 | 0.00 | | 8.50 | | | | |
| Thu | 10/22/2015 | C8D | 200-2006065004 | 09:43 AM | 05:54 PM | | 8.25 | 0.00 | 0.00 | | 8.25 | | | | |
| Fri | 10/23/2015 | C8D | 200-2006065004 | 09:32 AM | 05:59 PM | | 7.25 | 1.25 | 0.00 | | 8.50 | | | | |
| Mon | 10/26/2015 | C8D | 200-2006065004 | | | 4S - Sick | 4.00 | | | | 4.00 | | | | |
| | 10/26/2015 | C8D | 200-2006065004 | 09:33 AM | 01:45 PM | | 4.25 | 0.00 | 0.00 | | 4.25 | | | | |
| Tue | 10/27/2015 | C8D | 200-2006065004 | 09:27 AM | 05:59 PM | | 8.50 | 0.00 | 0.00 | | 8.50 | | | | |
| Wed | 10/28/2015 | C8D | 200-2006065004 | 11:21 AM | 07:29 PM | | 8.25 | 0.00 | 0.00 | | 8.25 | | | | |
| Thu | 10/29/2015 | C8D | 200-2006065004 | 11:24 AM | 06:36 PM | | 7.25 | 0.00 | 0.00 | | 7.25 | | | | |
| Fri | 10/30/2015 | C8D | 200-2006065004 | 09:06 AM | 06:03 PM | | 9.00 | 0.00 | 0.00 | | 9.00 | | | | |
| | | | | | | Totals: | 81.25 | 1.25 | 0.00 | | 82.50 | | $170.00 | | |

P 01610

Time Card

Employee: 103600143 - James, Rhonda
Pay Group:103 - Kahler Grand Hotel C8D
Start Date: 11/02/2015        End Date:11/15/2015

**Hours Paid**

| Day | In Date | PROP | DEPT - POSN | In | Out | Pay Code | Reg | OT | DT | Unit | Total | Rate | Amount | Forced | Work Day |
|-----|---------|------|-------------|-----|-----|----------|-----|-----|-----|------|-------|------|--------|--------|----------|
| Mon | 11/02/2015 | C8D | 200-2006065004 | 11:13 AM | 07:30 PM | | 8.25 | 0.00 | 0.00 | | 8.25 | | | | |
| Tue | 11/03/2015 | C8D | 200-2006065004 | 11:46 AM | 07:33 PM | | 7.75 | 0.00 | 0.00 | | 7.75 | | | | |
| Wed | 11/04/2015 | C8D | 200-2006065004 | | | TI - Incentive | | | | | | | 105.00 | | |
| | 11/04/2015 | C8D | 200-2006065004 | 11:33 AM | 07:32 PM | F | 8.00 | 0.00 | 0.00 | | 8.00 | | | | |
| Thu | 11/05/2015 | C8D | 200-2006065004 | 08:52 AM | 07:35 PM | | 10.75 | 0.00 | 0.00 | | 10.75 | | | | |
| Fri | 11/06/2015 | C8D | 200-2006065004 | 10:21 AM | 06:04 PM | F | 5.25 | 2.50 | 0.00 | | 7.75 | | | | |
| Mon | 11/09/2015 | C8D | 200-2006065004 | | | TI - Incentive | | | | | | | 110.00 | | |
| | 11/09/2015 | C8D | 200-2006065004 | 09:09 AM | 05:30 PM | | 8.25 | 0.00 | 0.00 | | 8.25 | | | | |
| | | | | | | Totals: | 48.25 | 2.50 | 0.00 | | 50.75 | | $215.00 | | |

P 01611

**Reservations Office Schedule**
**For the Week of**
**09-Nov-15**

| | Monday 09-Nov | Tuesday 10-Nov | Wednesday 11-Nov | Thursday 12-Nov | Friday 13-Nov | Saturday-Closed 14-Nov | Sunday 15-Nov |
|---|---|---|---|---|---|---|---|
| Venessa Hampshire Reservations Manager | 08:30 AM | 08:30 AM | 08:30 AM | 08:30 AM | 08:30 AM | CLOSED | CLOSED |
| Amanda Bradley Reservations Agent Training | 11:30 AM    07:30 PM | 09:00 AM    05:00 PM | 09:30 AM    05:00 PM | 09:00 AM    05:00 PM | 09:00 AM    05:00 PM | CLOSED | CLOSED |
| Mary Smith Reservations Agent | 07:30 AM  -  04:15 PM | 07:30 AM  -  04:15 PM | 07:30 AM  -  04:15 PM | 07:30 AM  -  04:15 PM | 07:30 AM  -  04:15 PM | CLOSED | CLOSED |
| Lenny Ecbert Reservations Agent | 08:30 AM  -  05:00 PM | OFF  -  OFF | 08:30 AM  -  05:00 PM | 08:30 AM  -  05:00 PM | 08:30 AM  -  05:00 PM | CLOSED | CLOSED |
| BJ Miller Reservations Agent | 05:00 PM  -  07:30 PM | 05:00 PM  - 07:30 PM | 05:00 PM  - 07:30 PM | 05:00 PM  - 07:30 PM | OFF | CLOSED | CLOSED |
| Rhonda James Group Coordinator | 09:30 AM    05:30 PM | 09:30 AM  - 05:30 PM | 09:30 AM  - 05:30 PM | 09:30 AM  - 05:30 PM | 10:00 AM  - 06:00 PM | CLOSED | CLOSED |
| | | | | | | | |
| Office Hours: | 07:30 AM    07:30 PM | 07:30 AM    07:30 PM | 07:30 AM    07:30 PM | 07:30 AM    07:30 PM | 07:30 AM    06:00 PM | | |
| | | | | | | | |

Reservations Office Schedule
For the Week of
05-Oct-15

| | Monday 05-Oct | Tuesday 06-Oct | Wednesday 07-Oct | Thursday 08-Oct | Friday 09-Oct | Saturday-Closed 10-Oct | Sunday 11-Oct |
|---|---|---|---|---|---|---|---|
| Venessa Hampshire Reservations Manager | OFF | OFF | 08:30 AM | 08:30 AM | 08:30 AM | CLOSED | CLOSED |
| | | | | | | CLOSED | CLOSED |
| Mary Smith Reservations Agent | 07:30 AM - 04:15 PM | 07:30 AM - 04:15 PM | 07:30 AM - 04:15 PM | 07:30 AM - 04:15 PM | 07:30 AM - 04:15 PM | CLOSED | CLOSED |
| Lenny Fobert Reservations Agent | 09:30 AM - 06:00 PM | 09:30 AM - 06:00 PM | 09:30 AM - 06:00 PM | 09:30 AM - 06:00 PM | 09:30 AM - 06:00 PM | CLOSED | CLOSED |
| B.J. Miller Reservations Agent | 04:45 PM - 07:30 PM | 04:45 PM - 07:30 PM | 04:45 PM - 07:30 PM | 04:45 PM - 07:30 PM | OFF | CLOSED | CLOSED |
| Rhonda James Group Coordinator | 09:30 AM 05:30 PM | 09:30 AM - 05:30 PM | 09:30 AM - 05:30 PM | 09:30 AM - 05:30 PM | 09:30 AM - 05:30 PM | CLOSED | CLOSED |
| | | | | | | | |
| Office Hours: | 07:30 AM 07:30 PM | 07:30 AM 07:30 PM | 07:30 AM 07:30 PM | 07:30 AM 07:30 PM | 07:30 AM 06:00 PM | | |
| | | | | | | | |
| | | | | | | | |

**Reservations Office Schedule**
**For the Week of**

| 12-Oct-15 | Monday 12-Oct | Tuesday 13-Oct | Wednesday 14-Oct | Thursday 15-Oct | Friday 16-Oct | Saturday-Closed 17-Oct | Sunday 18-Oct |
|---|---|---|---|---|---|---|---|
| Veneasa Hampshire Reservations Manager | 09:00 AM | 09:00 AM | 09:00 AM | 09:00 AM | 09:00 AM | CLOSED | CLOSED |
| Amanda Bradley Reservations Agent Training | 09:30 AM   05:30 PM Training | 09:30 AM   05:30 PM Training | 09:30 AM   05:30 PM Training | 09:30 AM   05:30 PM Training | 09:30 AM   05:30 PM Training | CLOSED - | CLOSED - |
| Mary Smith Reservations Agent | 07:30 AM   -   04:15 PM | 07:30 AM   -   04:15 PM | 07:30 AM   04:15 PM | 07:30 AM   04:15 PM | OFF   OFF | CLOSED | CLOSED |
| Lenny Fobert Reservations Agent | 08:30 AM   -   05:00 PM | 08:30 AM   -   05:00 PM | 08:30 AM   -   05:00 PM | 11:00 AM   -   07:30 PM | 07:30 AM   -   04:00 PM | CLOSED | CLOSED |
| BJ Miller Reservations Agent | 05:00 PM  - 07:30 PM | OFF - | 05:00 PM  - 07:30 PM | OFF - | OFF | CLOSED | CLOSED |
| Rhonda James Group Coordinator | 09:30 AM   06:00 PM | 11:00 AM   -  07:30 PM | 09:30 AM   -  06:00 PM | 09:30 AM   -  06:00 PM | 09:30 AM   -  06:00 PM | CLOSED | CLOSED |
| | | | | | | | |
| Office Hours: | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   06:00 PM | | |
| | | | | | | | |
| | | | | | | | |

**Reservations Office Schedule**
For the Week of
19-Oct-15

| | Monday 19-Oct | Tuesday 20-Oct | Wednesday 21-Oct | Thursday 22-Oct | Friday 23-Oct | Saturday-Closed 24-Oct | Sunday 25-Oct |
|---|---|---|---|---|---|---|---|
| Venessa Hampshire Reservations Manager | 09:00 AM | 09:00 AM | 09:00 AM | 09:00 AM | 09:00 AM | CLOSED | CLOSED |
| Amanda Bradley Reservations Agent Training | 09:30 AM    05:30 PM Training | 09:30 AM    05:30 PM Training | 09:30 AM    05:30 PM Training | 09:30 AM    05:30 PM Training | 09:30 AM    05:30 PM Training | CLOSED | CLOSED |
| Mary Smith Reservations Agent | 07:30 AM  -  04:15 PM | 07:30 AM  -  04:15 PM | 07:30 AM    04:15 PM | 07:30 AM    04:15 PM | 07:30 AM  -  04:15 PM | CLOSED | CLOSED |
| Lenny Fobert Reservations Agent | 08:30 AM  -  05:00 PM | 08:30 AM  -  05:00 PM | 08:30 AM  -  05:00 PM | 08:30 AM  -  05:00 PM | 08:30 AM  -  05:00 PM | CLOSED | CLOSED |
| BJ Miller Reservations Agent | OFF  - | 05:00 PM  - 07:30 PM | 05:00 PM  - 07:30 PM | 05:00 PM  - 07:30 PM | OFF | CLOSED | CLOSED |
| Rhonda James Group Coordinator | 11:00 AM    07:30 PM | 09:30 AM  - 06:00 PM | 09:30 AM  - 06:00 PM | 09:30 AM  - 06:00 PM | 09:30 AM  - 06:00 PM | CLOSED | CLOSED |
| | | | | | | | |
| Office Hours: | 07:30 AM    07:30 PM | 07:30 AM    07:30 PM | 07:30 AM    07:30 PM | 07:30 AM    07:30 PM | 07:30 AM    06:00 PM | | |
| | | | | | | | |
| | | | | | | | |

**Reservations Office Schedule**
**For the Week of**

| 26-Oct-15 | Monday 26-Oct | Tuesday 27-Oct | Wednesday 28-Oct | Thursday 29-Oct | Friday 30-Oct | Saturday-Closed 31-Oct | Sunday 01-Nov |
|---|---|---|---|---|---|---|---|
| Venessa Hampshire Reservations Manager | 08:30 AM | 08:30 AM | 08:30 AM | 08:30 AM | 08:30 AM | CLOSED | CLOSED |
| Amanda Bradley Reservations Agent Training | 08:30 AM   05:00 PM Training | 08:30 AM   05:00 PM Training | 08:30 AM   05:00 PM Training | 08:30 AM   05:00 PM Training | 08:30 AM   05:00 PM Training | CLOSED | CLOSED |
| Mary Smith Reservations Agent | 07:30 AM  -  04:15 PM | 07:30 AM  -  04:15 PM | 07:30 AM   04:15 PM | 07:30 AM   04:15 PM | 07:30 AM   04:15 PM | CLOSED | CLOSED |
| Lenny Fobert Reservations Agent | 08:30 AM  -  05:00 PM | 08:30 AM  -  06:00 PM | 08:30 AM  -  05:00 PM | 11:00 AM  -  07:30 PM | 08:30 AM  -  05:00 PM | CLOSED | CLOSED |
| BJ Miller Reservations Agent | 05:00 PM  -  07:00 PM | 05:00 PM  -  07:30 PM | OFF - | OFF - | OFF | CLOSED | CLOSED |
| Rhonda James Group Coordinator | 09:30 AM   06:00 PM | 09:30 AM  -  06:00 PM | 11:30 AM  -  07:30 PM | 09:30 AM  -  06:00 PM | 09:30 AM  -  06:00 PM | CLOSED | CLOSED |
|  |  |  |  |  |  |  |  |
| Office Hours: | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   06:00 PM |  |  |
|  |  |  |  |  |  | . | . |

**Reservations Office Schedule**
**For the Week of**
02-Nov-15

| | Monday 02-Nov | Tuesday 03-Nov | Wednesday 04-Nov | Thursday 05-Nov | Friday 06-Nov | Saturday-Closed 07-Nov | Sunday 08-Nov |
|---|---|---|---|---|---|---|---|
| Venessa Hampshire Reservations Manager | 08:30 AM | 08:30 AM | 08:30 AM | 08:30 AM | 08:30 AM | CLOSED | CLOSED |
| Amanda Bradley Reservations Agent Training | 09:00 AM   05:00 PM Training | 09:00 AM   05:00 PM Training | 09:00 AM   05:00 PM Training | 09:00 AM   05:00 PM Training | 09:00 AM   05:00 PM Training | CLOSED | CLOSED |
| Mary Smith Reservations Agent | OUT   - | OUT   - | OUT | OUT | OUT   OUT | CLOSED | CLOSED |
| Lenny Foberty Reservations Agent | 07:30 AM   -   04:00 PM | 07:30 AM   -   04:00 PM | 07:30 PM   -   04:00 PM | 07:30 PM   -   04:00 PM | 07:30 AM   -   04:00 PM | CLOSED | CLOSED |
| BJ Miller Reservations Agent | OFF  - | OFF  - | OFF  - | OFF  - | OFF | CLOSED | CLOSED |
| Rhonda James Group Coordinator | 11:30 AM   07:30 PM | 11:30 AM   - 07:30 PM | 11:30 AM   - 07:30 PM | 11:30 AM   - 07:30 PM | 10:00 AM   - 06:00 PM | CLOSED | CLOSED |
| | | | | | | | |
| Office Hours: | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   07:30 PM | 07:30 AM   06:00 PM | | |
| | | | | | | | |
| | | | | | | | |

  

## Disciplinary Action (Union Associates)

Associate's Name: Derrick Kotvazs

Job Classification: Server

Supervisor: Mary Althoff

Location: Crossings Bistro

**Action being taken:**

| | |
|---|---|
| Documented Verbal Warning | ☐ |
| First Written Warning | ☐ |
| Second Written Warning | ☐ |
| Final Warning | ☐ |
| Optional -Probation / Suspension | ☐ |
| Discharge | ☒ |

Note: The disciplinary action to be taken in each case shall be determined by human resources.

On 11/22/15 Derrick called me few minutes before his 9am shift. I missed the call because I was on the floor helping the other server. He then sent me a text asking if I found anyone to cover his shift for that morning, and I told him no (refer to attached text conversation). I told him I would see him at 11, since that is when he told me he could be here. He told me he was not going to "rush his ex-girlfriend" and he would be in for his second shift of the day. He did not come to his first shift at all.

*Any further violation of a similar nature may lead to further disciplinary action up to and including termination.*

Date of Violation 11/22/15      Witness to the violation: Mary Althoff

| | | | |
|---|---|---|---|
| Has the violation occurred before? | Yes ☒ | No ☐ | When: 11/19/15 and many times before |
| Has the associate been warned about it before? | Yes ☒ | No ☐ | When: multiple times |

What is the next disciplinary action if this violation occurs again?      Final Written Warning

What is the next disciplinary measure should any other violation occur?      Depends on the nature of violation

Associate's comments: _____

_____

_____

_____

Date: _____

Date: 11/24/15

Date: 11/24/15

**Human Resources Approval:** _____

*Signature of Associate_____

Signature of Supervisor_____

Signature of Witness (if associate refuses to sign)

Date: _____

P 0168

  

*A signature by the associate does not mean that the associate agrees or disagrees with the disciplinary action; the signature indicates that the associate understands and is aware that the disciplinary action was given and filed into their personnel file.

P 01619

  

# Disciplinary Action (Union Associates)

Associate's Name: Derrick Kotvazs

Job Classification: Server

Supervisor: Mary Althoff

Location: Crossings Bistro

**Action being taken:**

| | |
|---|---|
| Documented Verbal Warning | ☐ |
| First Written Warning | ☐ |
| Second Written Warning | ☐ |
| Final Warning | ☒ |
| Optional -Probation / Suspension | ☐ |
| Discharge | ☐ |

`Note: The disciplinary action to be taken in each case shall be determined by human resources.`

On 11/19/2015 Derrick called me at 8:47am to tell me he would be late for his 9am shift. He explained to me that he had his daughter, and his ex-girlfriend's mother was supposed to be there to pick her up so he could be on time for his 9am shift. However, she was not able to leave work to pick her up until after 10am and he would keep me posted on when he would be coming in. I texted him a little after 10am saying I still need him for the lunch hour and to keep me posted. He called again a few minutes before 11 to ask if I still wanted him to come in, and I said yes.

*Any further violation of a similar nature may lead to further disciplinary action up to and including termination.*

Date of Violation 11/19/15          Witness to the violation: Mary Althoff

Has the violation occurred before?   Yes ☒  No ☐   When: 11/15/15 and many times before

Has the associate been warned about it before?   Yes ☒  No ☐   When: multiple times

What is the next disciplinary action if this violation occurs again?   Discharge

What is the next disciplinary measure should any other violation occur?   <u>Depends on the nature of violation</u>

Associate's comments: _____

_____

_____

_____

Date: _____

Date: 11/24/15          *Signature of Associate _____

Date: 11/24/15          Signature of Supervisor _____

**Human Resources Approval:** _____   Signature of Witness (if associate refuses to sign)   Date: _____

P 01620

  

## Disciplinary Action (Union Associates)

Associate's Name: Derrick Kotvazs

**Action being taken:**

Job Classification: Server

| | |
|---|---|
| Documented Verbal Warning | ☐ |
| First Written Warning | ☒ |
| Second Written Warning | ☐ |
| Final Warning | ☐ |
| Optional -Probation / Suspension | ☐ |
| Discharge | ☐ |

Supervisor: Mary Althoff

Location: <u>Crossings Bistro</u>

`Note: The disciplinary action to be taken in each case shall be determined by human resources.`

On 11/19/15 I went into the Kitchen around 11:45am and saw Derrick standing at a prep table eating. I asked what he was doing, and he told me he had not yet clocked in and was not going to take tables in case he decided to leave. I told him that's not how it works and to go clock in immediately. About 1pm I was in the office again helping Maria with her schedule. When I came back to the server station about 1:45pm I asked Deb where Derrick was. Deb told me he cut himself and left, without telling me.

*Any further violation of a similar nature may lead to further disciplinary action up to and including termination.*

Date of Violation 11/19/15        Witness to the violation: Mary Althoff

| | | |
|---|---|---|
| Has the violation occurred before? | Yes ☐ No ☒ | When: |
| Has the associate been warned about it before? | Yes ☒ No ☐ | When: multiple times |

What is the next disciplinary action if this violation occurs again?    Second Written Warning

What is the next disciplinary measure should any other violation occur?    <u>Depends on the nature of violation</u>

Associate's comments: _____

_____

_____

_____

_____

Date: _____

Date: 11/24/15

Date: _____

**Human Resources Approval:** ⊗

*Signature of Associate _____

*Mary M~~~* 
Signature of Supervisor

Signature of Witness (if associate refuses to sign)
Date: 11/24/1

*A signature by the associate does not mean that the associate agrees or disagrees with the disciplinary action; the signature indicates that the associate understands and is aware that the disciplinary action was given and filed into their personnel file.*

  

*A signature by the associate does not mean that the associate agrees or disagrees with the disciplinary action; the signature indicates that the associate understands and is aware that the disciplinary action was given and filed into their personnel file.*

   

# RECORD OF CONVERSATION

Coaching is an on-going process designed to deliver feedback, motivate associates, and help them become successful.  This optional form can be used to record conversations related to coaching.  It should not be used to document disciplinary action.

*For all disciplinary action, please use the Corrective Disciplinary Record (CDR)form.*

**Associate Name: Derrick Kotvasz**

**Position: Server**

**On 11/17/15, I discussed the following with the associate:**

On Tuesday 11/17 Derrick told me that he would be late for his 9am – 1pm shift on 11/22. I then informed him that he was responsible for finding someone to work for him. He then said I am the "manager" and I need to find someone because it was a union rule. We didn't discuss it any further that night. On Thursday 11/19 I reminded Derrick that he needed to find someone to cover his shift, and he said okay. Sunday morning 11/22 he called a few minutes before his shift at 8:54am to "make sure" we found someone to cover his shift. I told him no, that it was his responsibility. I texted him saying I would see him around 11am after his daughter was picked up. He told me he was not going to rush his ex-girlfriend so he could get here for his first shift. He then told me he would be in for his second shift.

**Name of Coach (Manager):**

Cc: Personnel file

P 01623

Hey I'm just making sure you guys found somebody for my shift today, if not I my daughter is getting picked up at 1030

Yesterday 8:59 AM

We didn't have to find anyone that's your job and no we didn't. See you at 11 guess

Sent

Derrick                                        Yesterday 9:00 AM

OK good managing for 6 days notice

Derrick                                        Yesterday 9:05 AM

can no call no show three days in a row and be alright.

Derrick                                        Yesterday 9:05 AM

And actually I'm not going to rush my ex I gave you guys fair notice I couldn't work this morning

And actually I'm not going to rush my ex I gave you guys fair notice I couldn't work this morning so I'll be in for my shift tonight. Especially if Nick

Yesterday 9:16 AM

It's not by union our job to find someone to work for you. I am asking you to be here for your first shift and Nicks situation has nothing to do with anything

Sent

Derrick

Yesterday 9:17 AM

I'm not signing a write up this time, I gave y'all plenty of notice.

Yesterday 9:18 AM

I didn't say I was gonna write you up. But you also didn't make an effort to find someone to cover for you today.



RICHFIELD
HOSPITALITY

## RECORD OF CONVERSATION

Coaching is an on-going process designed to deliver feedback, motivate associates, and help them become successful. This optional form can be used to record conversation related to coaching. It should not be used to document disciplinary action.

*For all disciplinary action, please use the Corrective Disciplinary Record (CDR) form.*

Associate Name: ____Ray Allen _____     Position: ___Room Attendant_____

On _____12/15/15_____, I discussed the following with the associate:

Ray was a rehire on November 23rd under the condition that she has improved her attendance and punctuality record since her last separation from the company. I chose to rehire Ray based on her ability to contribute to the success of our operation. She is pleasant to work with and has great cleaning skills. It's unfortunate that since the 23rd Ray has had excessive attendance issues. She has called off 3 days 11/25, 12/11, 12/14. She was 30 minutes tardy her second day of work, and has called off her third day. She has left early on 12/6 and 12/7 due to personal issues.
It appears Ray's attendance has not improved, and is continuing to develop a pattern similar to her last employment with the company.

Ray was hired under the condition that no attendance issues will occur during her first 90 days.
It is expected for Ray to be at work as scheduled on time.
If Ray is unable to report to work she will need to find a replacement prior to the start of her shift in order to cover her work responsibilities. Moving forth any further absences or tardiness will result in separation from the company.

Manager/Supervisor: _Crystal Adcox_____     Date: __12/15/15_____

P 01626

  

# Disciplinary Action (Union Associates)

Associate's Name: Alyse Moore

Job Classification: Housekeeper

Supervisor: Crystal Adcox

Location: Rochester Marriott

*Action being taken:*

| | |
|---|---|
| Documented Verbal Warning | ☐ |
| First Written Warning | x |
| Second Written Warning | ☐ |
| Final Warning | ☐ |
| Optional -Probation / Suspension | ☐ |
| Discharge | ☐ |

**Note: The disciplinary action to be taken in each case shall be determined by human resources.**

---

Nature of the violation – state specifically what occurred:

Alyse has been working as a room attendant for us since October 2014. On June 6th 2015 Alyse was scheduled to work her scheduled shift from 8:30 – 5pm and did not show nor call to notify her absence. Alyse failed to notify her manager prior to her scheduled shift so possible arrangements could be made. As per our attendance policy Alyse has 2 unexcused absences. Her last call off was on May 3rd 2015 and two unexcused tardiness on May 2nd and June 5th this puts her into a first written warning. Your team members depend on you and this puts hardship onto the department. Moving forth Alyse needs to adhere to our attendance policy. She will need to be free of any attendance issues excluding emergencies and deaths for the next three months or further violation can occur. If Alyse incurs another no call or no show for work it could lead to termination.

Date of Violation: June 6th 2015                Witness to the violation:  Crystal Adcox, Brenda Vasquez

---

| | | | |
|---|---|---|---|
| Has the violation occurred before? | Yes ☐ | No x | When:_____ |
| Has the associate been warned about it before? | Yes ☐ | No x | When:_____ |

| | |
|---|---|
| What is the next disciplinary action if this violation occurs again? | DISCHARGE |
| What is the next disciplinary measure should any other violation occur? | Depends on the nature of violation |

Associate's comments: _____

Date: 6/9-15

Date: 6|19|15.

Date: _____

*Signature of Associate

Signature of Supervisor

Signature of Witness (if associate refuses to sign)

Human Resources Approval: _____  Date: _____

*A signature by the associate does not mean that the associate agrees or disagrees with the disciplinary action; the signature indicates that the associate understands and is aware that the disciplinary action was given and filed into their personnel file.





12.12

## RECORD OF CONVERSATION

Coaching is an on-going process designed to deliver feedback, motivate associates, and help them become successful. This optional form can be used to record conversation related to coaching. It should not be used to document disciplinary action.

*For all disciplinary action, please use the Corrective Disciplinary Record (CDR) form.*

Associate Name: __Alyse Moore_____       Position: _ Housekeeper_____

On ___Dec 9th 2014___, I discussed the following with the associate:

Alyse Moore has been working here almost 60 days. Management wanted to come together and reiterate rules and policies as well as give some feedback so far on her progress.

Alyse completes her work in a timely manner and is always willing to help out her fellow room attendants complete their rooms. She is friendly and hard working.

As a reminder, I would like Alyse to focus on her attendance issues, grooming standards, and cell phone usage.

In the past month, Alyse has had two unexcused call offs. Alyse know she must call at least two hours prior to the start of her shift.

All visible tattoos must be covered. This is a grooming standard for all Marriott hotels.

On Saturday, November 22, 2014, it was witnessed by management as the second time Alyse improperly used her cellphone. Cellphones are not allowed on the floors. It must remain in the associates' locker until they have lunch or a break. They cannot be used as a radio or clock.

Alyse is a hard worker and we value her as a team member. Without strong team members we would not be as successful as we are.

Manager/Supervisor: _Crystal Adcox_____    Date: _12/9/14_____

12-9-14          P 01628

EXHIBIT NO. **GC 40** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/16/15** REPORTER **SMW**



# RICHFIELD HOSPITALITY

# EMPLOYEE PERFORMANCE DISCUSSION

DATE: _06-26-14_____

NAME OF EMPLOYEE: __Graham Brandon_____

EMPLOYEE'S POSITION & DEPARTMENT: ___Cook /Culinary_____

TYPE OF ACTION FOR THIS DISCUSSION:

☐ Verbal Warning    ☐ Written Warning    ☒ Final Warning    ☐ Suspension    ☐ Termination

FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time): _____
Excessive Absentees : Calling out on to many shifts in a month

Over the past month, Graham has called out an excessive amount of times, please see below on call out dates.  The excessive call out has caused unnecessary over time, and hardship for his other coworkers due to being shorthanded with Graham calling out.  As well as him being late for shifts and having to leave in the middle of his shifts.  It has made it tough to fully staff and fulfil the needs of the Restaurant to run successfully and provide the guest with exceptional hospitality.   It is understandable that associates get sick and will have matters arise, but the excessive call outs have enabled the operation from running successfully and has hindered us from maximizing the full potential of our kitchen staff.


Today as well on 6/26/14, Graham Being the shop steward, did not follow proper protocol in the Union Handbook, upon his return from being sick for the last 3 days, did not bring a doctor's note excusing him from work. Graham came to work and punched in, we had to send Graham home to get the doctors note for him to return.  This cause the kitchen more turbulence from him having to leave his shift, which was during the lunch rush, and get his note.

5/2 graham was late
5/3 graham called off sick
5/4 graham called off sick
6/12 graham left a few hours into shift because his son hurt his ankle
6/19 graham was late because his son had a doctors apt
6/23 graham called off sick
6/24 graham called off sick
6/25 graham called off sick
(23-25 with tendinitis)

6/26- had to leave work to get doctors note to return

*Pencils in file as indication of patterns of behavior.*

EMPLOYEE'S EXPLANATION: _____

_____

_____

_____

EMPLOYEE HAS BEEN WARNED PREVIOUSLY:    ☐ Verbal    ☐ Written

Date(s):_____

Is the employee being placed on probation? ☐ NO    ☐ YES  *Until what date:* _____

Is the employee being suspended?    ☐ NO    ☐ YES  *Until what date:* _____

WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND

*Emp_perf.doc – 11/12*

EXHIBIT NO. **GC 41** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **2** DATE **12/16/15** REPORTER **SMW**

**HOSPITALITY**

# EMPLOYEE PERFORMANCE DISCUSSION

**DATE:** _06-26-14_____

NAME OF EMPLOYEE: __Graham Brandon_____

EMPLOYEE'S POSITION & DEPARTMENT: ___Cook /Culinary_____

TYPE OF ACTION FOR THIS DISCUSSION:

☐ Verbal Warning    ☒ Written Warning    ☐ Final Warning    ☐ Suspension    ☐ Termination

FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time): _____
Excessive Absentees: Calling out on to many shifts in a month

Over the past month, Graham has called out an excessive amount of times, please see below the call out dates. The excessive call out has caused unnecessary over time, and hardship for his other coworkers due to being shorthanded with Graham calling out. Graham has called off incorrectly by not calling outside the 2hour minimum and not calling his supervisor, as well as being late for shifts and having to leave in the middle of his shifts. It has made it tough to fully staff and fulfil the needs of the Restaurant to run successfully and provide the guest with exceptional hospitality. It is understandable that associates get sick and will have matters arise, but the excessive call outs have enabled the operation from running successfully and has hindered us from maximizing the full potential of our kitchen staff.

On 6/26/14, Graham, did not follow proper protocol as established by hotel policy and supported by the union handbook, upon his return from being sick for the last 3 days, did not bring a doctor's note excusing him from work. Associates including Graham is required to bring documentation prove of his clearance to return to work, this is for his own safety and the safety of other.
Graham is expected in the future to make sure he has the correct documentation available for his return to work. Furthermore Graham is expected to call and speak to his supervisor at least 2hours prior to his scheduled shift if he is calling off. We understand that life happens however, we have the responsibility of making sure that the operation functions effectively so it does not adversely affect the guest and other associates.

5/2 Graham was late
5/3 Graham called off sick
5/4 Graham called off sick
6/12 Graham left a few hours into shift because his son hurt his ankle
6/19 Graham was late because his son had a doctors apt
6/23 Graham called off sick
6/24 Graham called off sick
6/25 Graham called off sick
(23-25 with tendinitis)

6/26- had to leave work to get doctors note to return

EMPLOYEE'S EXPLANATION: this is grossly inaccurate & I have excused doctors notes... etc...

*Emp_perf.doc – 11/12*

Date(s):_____

Is the employee being placed on probation?   ☐ NO   ☐ YES   *Until what date:* _____

Is the employee being suspended?   ☐ NO   ☐ YES   *Until what date:* _____

**WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION?** *(Action steps & dates)*

_____

_____

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

_____          8-26-14
*Employee's Signature*                              *Date*

_____          6-26-14
*Signature of Supervisor Conducting Discussion*          *Date*

_____          6/26/14.
*Signature of Human Resources Representative or Witness*    *Date*

EXHIBIT NO. **GC 43** RECEIVED ✔ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME **Richfield**

NO. OF PAGES **1** DATE **12/17/15** REPORTER **SMW**

P 01634



**RICHFIELD HOSPITALITY**

# EMPLOYEE PERFORMANCE DISCUSSION

DATE: 6/25/15

NAME OF EMPLOYEE: Travis Allen

EMPLOYEE'S POSITION & DEPARTMENT: Barista    Starbucks

TYPE OF ACTION FOR THIS DISCUSSION:

☒ Verbal Warning  ☐ 1st Written Warning    ☐ 2nd Written Warning    ☒ Final Warning

☐ Suspension  ☐ Termination

FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time): NC/NS on 6/24/15
text at 4pm stating he just woke up.
scheduled shift was 6-2pm.

EMPLOYEE'S EXPLANATION: _____

EMPLOYEE HAS BEEN WARNED PREVIOUSLY:  ☐ Verbal  ☐ Written

Date(s): _____

Is the employee being placed on probation? ☐ NO  ☒ YES  Until what date: Sept 25th 2015

Is the employee being suspended?  ☒ NO  ☐ YES  Until what date: _____

WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND
SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION? *(Action steps & dates)*

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

_____      6/26/15
*Employee's Signature*                    *Date*

_____      6/26/15
*Signature of Supervisor Conducting Discussion*      *Date*

_____      _____
*Signature of Human Resources Representative or Witness*      *Date*

Emp_perf.doc P-01635    GCX#13

**GC 44(a) - 44(f)**

EXHIBIT NO. _____ RECEIVED __✔__ REJECTED _____

CASE NO. **18-CA-151245** CASE NAME _____ **Richfield** _____

NO. OF PAGES __**9**__ DATE __**12/17/15**__ REPORTER __**SMW**__

   

# RECORD OF CONVERSATION

Coaching is an on-going process designed to deliver feedback, motivate associates, and help them become successful.  This optional form can be used to record conversations related to coaching.  It should not be used to document disciplinary action.

*For all disciplinary action, please use the Corrective Disciplinary Record (CDR)form.*

**Associate Name: Daniel McIntrye   Position: Steward**

**On January 6th, 2015, I discussed the following with the associate:**

> On July 9th, 2015, I Chef Seth Essar & Mattie Eggiman, Coached Daniel McIntyre, on the following, When Daniel needs to leave the kitchen for anything, he needs to inform the Chef, if the Chef is not around, he needs to inform a member of the management team that he is leaving the kitchen.  It is important that Daniel communicates to the team when he leaves for anything.

**Name of Coach (Manager): Chef Seth Essar & Mattie Eggiman**

**Associates Signature:**_____

Cc: Personnel file

P 01687



RICHFIELD
HOSPITALITY

# EMPLOYEE PERFORMANCE DISCUSSION

1-21-15

**DATE:** _____

Daniel McIntyre

**NAME OF EMPLOYEE:** _____

Salute Kitchen

**EMPLOYEE'S POSITION & DEPARTMENT:** _____

**TYPE OF ACTION FOR THIS DISCUSSION:**

☑ Verbal Warning  ☐ 1st Written Warning  ☐ 2nd Written Warning  ☐ Final Warning

☐ Suspension  ☐ Termination

**Daniel did not show up for work on 2-14-15 until 11:53 am. He was scheduled at 8:00 am. We asked him to stay until 8:00 pm, which he agreed to and he left at 5:23 Pm without permission or approval. This is nothing short of abandoning a shift. Daniel knows the importance of being on time to work and working ones shift. Daniel needs to show commitment to the job, others including our guests rely on him being here to do the job.**

**EMPLOYEE'S EXPLANATION:** _____

_____

_____

_____

**EMPLOYEE HAS BEEN WARNED PREVIOUSLY:**  ☐ Verbal  ☐ Written

**Date(s):** _____ROC

Is the employee being placed on probation? ☒ NO  ☐ YES  *Until what date:* _____

Is the employee being suspended?  ☒ NO  ☐ YES  *Until what date:* _____

**WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION?** *(Action steps & dates)*

_____

_____

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

X *Daniel McIntyre*                              2-26-15
*Employee's Signature*                           *Date*

*Robert Merritt*                                 2-26-15
*Signature of Supervisor Conducting Discussion*  *Date*

_____          _____
*Signature of Human Resources Representative or Witness*      *Date*

   

# RECORD OF CONVERSATION

Coaching is an on-going process designed to deliver feedback, motivate associates, and help them become successful. This optional form can be used to record conversations related to coaching. It should not be used to document disciplinary action.

*For all disciplinary action, please use the Corrective Disciplinary Record (CDR)form.*

**Associate Name: Daniel McIntrye    Position: Steward**

**On July 27th, 2015, I discussed the following with the associate:**

On July 27th, 2015, I Chef Seth Essar & Tyler Kase, Coached Daniel McIntyre, on the following, When Daniel needs to leave the kitchen for anything, he needs to inform the Chef, if the Chef is not around, he needs to inform a member of the management team that he is leaving the kitchen. It is important that Daniel communicates to the team when he leaves for anything. This is the 4th conversation in the last week, that we have spoken with Daniel on properly communicating when he leaves the kitchen, a member of the management team is aware that he is leaving.

**Name of Coach (Manager): Chef Seth Essar & Tyler Kase**

**Associates Signature:**_____



**RICHFIELD HOSPITALITY**

## EMPLOYEE PERFORMANCE DISCUSSION

**DATE:** _8/4/15_

**NAME OF EMPLOYEE:** _____Daniel McIntyre_____

**EMPLOYEE'S POSITION & DEPARTMENT:** _____Steward, Marriott, Salute_____

**TYPE OF ACTION FOR THIS DISCUSSION:**

☐ Verbal Warning  ☐ 1ˢᵗ Written Warning   ☐ 2ⁿᵈ Written Warning   ☒ Final Warning

☐ Suspension   ☐ Termination

**FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time):**
On Friday, July 31ˢᵗ, at 10:15 am, Mattie asked Graham and Michelle if they knew where either of the dishwashers were. Michelle informed her that she hadn't seen Daniel since he arrived to work at 10am and clocked in. Daniel was found him sitting in the break room watching tv. When asked him what he was doing, as he had only been at work for 15 minutes, Daniel did not answer but got up and walked out of the breakroom. While walking back to the kitchen, Dan was again asked what he was doing sitting in the break room after only being at work for 15 minutes. He responded that he was really tired and that he had been up all night. Mattie reminded him that he is at work now, and he is getting paid to work, so he needs to keep busy or he needs to go home. At that time, Daniel decided that he was going to go home. There have been several instances over the past few weeks that Daniel is not in his work area and cannot be located by the chef or a supervisor. He has been warned about this behavior several times.

**EMPLOYEE'S EXPLANATION:** _____

_____

_____

**EMPLOYEE HAS BEEN WARNED PREVIOUSLY:**  ☐ Verbal  ☒ Written

**Date(s):**_____

Is the employee being placed on probation? ☐ NO  ☐ YES  *Until what date:* _____

Is the employee being suspended?  ☐ NO  ☐ YES  *Until what date:* _____

**WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION?** *(Action steps & dates)*

_____

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

_Daniel M&Intyre_____          _8-4-15_____
*Employee's Signature*                              *Date*

_Tyler_____          _8-4-15_____
*Signature of Supervisor Conducting Discussion*          *Date*

_____          _8-4-15_____
*Signature of Human Resources Representative or Witness*          *Date*

P 01640
*Emp_perf.doc – 11/12*

  

# Disciplinary Action (Union Associates)

Associate's Name: Daniel McIntyre

**Action being taken:**

Job Classification: Dishwasher

Supervisor: Greg Cook

Location: Marriott

| | |
|---|---|
| Documented Verbal Warning | ☐ |
| First Written Warning | ☐ |
| Second Written Warning | ☐ |
| Final Warning | XX |
| Optional -Probation / Suspension | ☐ |
| Discharge | ☐ |

Note: The disciplinary action to be taken in each case shall be determined by human resources.

Nature of the violation –

Daniel has been a valued member of the F&B team. However, Daniel's action on Saturday 09/26/2015 is a cause for great concern.

On Saturday 09/26/2015 Daniel was scheduled to arrive to work at 11am. He did not show up and at approximately 11:40am Maria called him. He answered his phone and stated that he overslept and was on his way. Daniel never showed up to work and missed his entire shift. This is considered a "no-call, no-show."

As a result of Daniel's action on Saturday 09/26/2015 we are issuing a final warning. The next occurrence of the same nature will result in progressive discipline, up to and including termination.

Date of Violation: 09/26/2015        Witness to the violation: Maria Mejia

| | | |
|---|---|---|
| Has the violation occurred before? | Yes ☐  No ☒ | When: |
| Has the associate been warned about it before? | Yes ☒  No ☐ | When upon date of hire |

when given associate handbook

What is the next disciplinary action if this violation occurs again?        Discharge

What is the next disciplinary measure should any other violation occur?        Discharge

Associate's comments: _____

_____

_____

_____

_____

Date: 9-28-15

Date: 9-28-15

*Signature of Associate

Signature of Supervisor

P 01644



The Kahler · GRAND HOTEL ·    Kahler INN & SUITES    Marriott HOTELS & RESORTS    Residence Inn Marriott

Date: _9-28-15_

Signature of Witness (if associate refuses to sign)

**Human Resources Approval:** _____    Date: _9.28.15_

*A signature by the associate does not mean that the associate agrees or disagrees with the disciplinary action; the signature indicates that the associate understands and is aware that the disciplinary action was given and filed into their personnel file.*

Daniel McIntyre    09|28|2015

  

## Disciplinary Action (Union Associates)

Associate's Name: _Daniel McIntyre_

Job Classification: _Dishwasher_

Supervisor: _Greg Cook_

Location: _Marriott_

**Action being taken:**

| | |
|---|---|
| Documented Verbal Warning | ☐ |
| First Written Warning | ☐ |
| Second Written Warning | ☐ |
| Final Warning | ☐ |
| Optional -Probation / Suspension | ☐ |
| Discharge | XXX |

Note: The disciplinary action to be taken in each case shall be determined by human resources.

Nature of the violation –

On the morning of 10/23/15 Daniel was scheduled to work at 8am. He showed up at approximately 10:15am stating he had just been released from jail. I told him to get his uniform on and go to work. Daniel told me he had to go pay some fines and it would only take "30 minutes max." I told him to go take care of that and come back. He did not return to work until over 4 hours later. Multiple people tried calling him and he did not answer his phone. Daniel worked 2:13pm-4pm of his scheduled 8a-4p shift.

On the morning of 10/25/15 Daniel was scheduled to work at 4:30pm. He did not report to work until 5:53pm.

On the night of 11/01/15 Daniel was witnessed by Mattie Eggimann in the break room for over 30 minutes watching TV. This was only an hour into his shift, and he did not clock out for any breaks.

Last night, 11/02/15, Daniel went to Norma, over at the Kahler, and told her he had a rash and needed to go home. Maria Mejia is Daniels immediate supervisor, and she was here but instead went to Norma. Norma and Daniel came to speak with Mattie, telling her that he had a rash and it was possibly from chemicals in the dish pit. Mattie told him if it did not get any better he could go home. At this point Maria heard what was being discussed and told Daniel that he was not telling the truth. He had previously shown that same rash to her, stating it was from bed bugs at his new residence. Maria told Daniel that he could not leave because the information being given to Mattie was not truthful. Daniel told Maria that Mattie already told him that he could leave. He then clocked out and left work at 6:40pm, leaving the hotel with no dishwasher for the rest of the night (he was scheduled until 12:30am).

Daniel has been counseled, warned and documented on multiple occasions for this same type of activity. At this point, we have decided to terminate employment of Daniel.

Date of Violation: _11/02/2015_        Witness to the violation: _Maria Mejia/ Mattie Eggimann_

| | | |
|---|---|---|
| Has the violation occurred before? | Yes ☒ No ☐ | When: |
| Has the associate been warned about it before? | Yes ☒ No ☐ | When _01/16/15, 02/26/15,_ |

_07/27/15, 08/04/15_

What is the next disciplinary action if this violation occurs again?        _Discharge_

P 01648

  

**What is the next disciplinary measure should any other violation occur?**    <u>Discharge</u>

Associate's comments: _____

_____

_____

_____

_____

Date: _____     *Signature of Associate

Date: ___11/5/15___            Signature of Supervisor

Date: ___11/5/15___            Signature of Witness (if associate refuses to sign)

**Human Resources Approval:** _____     Date: ___11/5/15___

*A signature by the associate does not mean that the associate agrees or disagrees with the disciplinary action; the signature indicates that the associate understands and is aware that the disciplinary action was given and filed into their personnel file.

11/2/15

Around 6:30pm, Daniel McIntryre came to my office with Norma. He told me that he had developed a rash on his arm. His right arm had large red bumps on it, he also pulled up his pant leg and had similar but smaller red bumps on his right leg. He told me that he had been doing dishes and filled the sanitizer, and then he started to get red spots on his arm and his leg and it was itching and burning. I asked him if he spilled anything on himself, trying to figure out if it could be some type of chemical burn. He told me that, no, he had no spilled anything on himself that he could remember. I asked him if it was too painful for him to work or if it was just itching. He said it mostly itched. I asked him to look in the first aid kit for itch cream, and that if that didn't work to come tell me if he needed to go home. He said ok and walked away. Norma went back to the Kahler.

A few minutes later, Maria came to me and told me that Daniel was lying. She said that the rash on his arm is from bug bites he got at the new place he moved into, and that he has had it for several days. She said that she told him he could not leave because she knew he was lying about the spots on his arm. She said that he told her "Mattie already told me I could leave" and she told him that no, he could not leave. I went to look for Daniel and could not find him anywhere. I went to the Kahler to see if he was talking to Norma and did not find him. I informed Norma of what was going on so she knew the story. When I returned to the Marriott a few minutes later, I looked at the time clock and saw that Daniel had clocked out at 6:40pm. He did not speak with me before leaving and did not have permission to leave early.

Mattie Eggimann

Food and Beverage Manager

**GC 45(a) - 45(c)**

EXHIBIT NO._____RECEIVED___✔___REJECTED_____

CASE NO. **18-CA-151245** CASE NAME _____**Richfield**_____

NO. OF PAGES ___**4**___ DATE __**12/17/15**__REPORTER ___**SMW**___



RICHFIELD
HOSPITALITY

# EMPLOYEE PERFORMANCE DISCUSSION

DATE: ___9/1/2015_____

**NAME OF EMPLOYEE:** _____Direen Hodges _____

**EMPLOYEE'S POSITION & DEPARTMENT:** _____Housekeeper/ Housekeeping_____

**TYPE OF ACTION FOR THIS DISCUSSION:**

☐ Verbal Warning X☐ 1st Written Warning    ☐ 2nd Written Warning    ☐ Final Warning

☐ Suspension    ☐ Termination

**FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time):** ____In order to be a successful business we need all of our associates working their scheduled shifts.  Direen is an integral part of our team and has a part in our success.  Direen have 5 unexcused absence and 7 tardy in the last 6 months. Please see attached attendance sheet.
Unexcased absence; 3/28,4/8,4/19,5/3,5/17,7/18 2015
Tardy; 3/3, 4/10,4/18,4/27,6/26,7/20,8/28 2015
These absences are detrimental to the entire department.
Direen needs to know her schedule, work her scheduled shifts, and if she is going to be absent, she needs follow the proper call off procedures.

Any further attendance violation will result in disciplinary action, up to and including termination.

**EMPLOYEE'S EXPLANATION:** _____

_____

**EMPLOYEE HAS BEEN WARNED PREVIOUSLY:** ☐ Verbal    ☐ Written

**Date(s):**___ _____Final Warning

_____

Is the employee being placed on probation? ☐ NO  ☐ YES  *Until what date:* _____

Is the employee being suspended?    ☐ NO  ☐ YES  *Until what date:* _____

**WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION?** *(Action steps & dates)*

_____

_____

_____

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance.  I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

_____
*Employee's Signature*

_____
*Date*

_____
*Signature of Supervisor Conducting Discussion*

_____
*Date*

_____
*Signature of Human Resources Representative or Witness*

_____
*Date*

45(a)

P 01647

*Emp_perf.doc – 11/12*


RICHFIELD HOSPITALITY

# EMPLOYEE PERFORMANCE DISCUSSION

**DATE:** __9/8/2015_____

**NAME OF EMPLOYEE:** _____Direen Hodges_____

**EMPLOYEE'S POSITION & DEPARTMENT:** _____Housekeeper/ Housekeeping_____

**TYPE OF ACTION FOR THIS DISCUSSION:**

☐ Verbal Warning  ☐ 1st Written Warning      ☐ 2nd Written Warning    X☐ Final Warning

☐ Suspension    ☐ Termination

**FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time):** Just for clarification---- Direen was scheduled to receive documentation and conversation regarding her attendance on September 1th 2015. Since that time Direen has had a no-call not show for work (on Monday 8/31/15) and after being called by the supervisor/manager called off in an untimely manner for two of her future scheduled shift (9/5/15 and 9/8/15). This is excessive and causes serious hardship on the department, her co-workers, and the guest.

Direen has been spoken to on several occasions about her attendance and we have not seen any improvement.

Any further attendance violation will result in disciplinary action, up to and including termination.

**EMPLOYEE'S EXPLANATION:** _____

_____

_____

_____

**EMPLOYEE HAS BEEN WARNED PREVIOUSLY:**    ☐ Verbal   x☐ Written

Date(s):9/1/15  1st Written W.___  _____Final Warning

_____

Is the employee being placed on probation? ☐ NO  ☐ YES  *Until what date:* _____

Is the employee being suspended?      ☐ NO  ☐ YES  *Until what date:* _____

**WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION?** *(Action steps & dates)*

_____

_____

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

_____          _____
*Employee's Signature*                              *Date*

_____          _____
*Signature of Supervisor Conducting Discussion*          *Date*

_____          _____
*Signature of Human Resources Representative or Witness*      *Date*      P 01648

45(b)

*Emp_perf.doc – 11/12*


**RICHFIELD HOSPITALITY**

# EMPLOYEE PERFORMANCE DISCUSSION

DATE: _9/23/2015_____

NAME OF EMPLOYEE: _____Direen Hodges _____

EMPLOYEE'S POSITION & DEPARTMENT: _____Housekeeper/ Housekeeping_____

TYPE OF ACTION FOR THIS DISCUSSION:

☐ Verbal Warning  ☐ 1st Written Warning    ☐ 2nd Written Warning    ☐ Final Warning

☐ Suspension    X☐ Termination

FULLY EXPLAIN THE VIOLATION (Include specific behavior, date & time): ____In order to be a successful business we need all of our associates working their scheduled shifts. Direen is an integral part of our team and has a part in our success. On September 21 and 22 , 2015, Direen you did not call or show and your scheduled shifts was 9am. Also Direen have unexcused absence on.
 Unexcused absence;3/28,4/8,4/19,5/3,5/17,7/18 2015 September 5,8, 2015 No call no show 8/31/2015
 Tardy; 3/3,4/10,4/18,4/27,6/26,7/20,8/28 2015
 These absences are detrimental to the entire department.

Direen needs to know her schedule, work her scheduled shifts, and if she is going to be absent, she needs follow the proper call off procedures.

Any further attendance violation will result in disciplinary action, up to and including termination.

_____

_____

_____

_____

_____

EMPLOYEE'S EXPLANATION: _____

_____

_____

_____

EMPLOYEE HAS BEEN WARNED PREVIOUSLY:    ☐ Verbal   x☐ Written

Date(s):9/1/15  1st Written W.___  _____9/1/15_Final Warning
_____

Is the employee being placed on probation? ☐ NO   ☐ YES  _Until what date:_ _____

Is the employee being suspended?    ☐ NO   ☐ YES  _Until what date:_ _____

WHAT ACTION STEPS HAVE BEEN AGREED UPON BETWEEN THE EMPLOYEE AND SUPERVISOR TO IMPROVE OR RESOLVE THE VIOLATION? *(Action steps & dates)*

_____

_____

_____

*Emp_perf.doc – 11/12*

I have reviewed and discussed this performance violation with my supervisor and understand the terms listed above to correct my performance. I also understand that if my performance does not improve by the designated date listed above, I may be subject to further discipline.

_Employee's Signature_

_Date_  9/23/15

_Signature of Supervisor Conducting Discussion_

_Date_  9/23/15

_Signature of Human Resources Representative or Witness_

_Date_

P 01650